# 19-706-cr(L), 19-3521-cr(CON)

## United States Court of Appeals

*for the*

## Second Circuit

———————————◆———————————

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

MEDIN KOSIC, AKA Dino, JASMIN CEJOVIC, AKA Min,
MIRSAD BOGDANOVIC, AKA Mike, SHAUN SULLIVAN, THEODORE
BANASKY, AKA Freddy, AKA Eduardo, ANTHONY FRANCESE,
ALEXANDER BUCCI, JOSEPH CUCCINIELLO, AKA Cuch, KENNETH
CHARLTON, JENNIFER BOGDANOVIC,

*Defendants,*

MICHAEL NUNEZ, AKA Gordo, PAUL VAN MANEN,

*Defendants-Appellants.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX FOR DEFENDANT-APPELLANT
## PAUL VAN MANEN
## Volume 2 of 3 (Pages A-281 to A-561)

DONALD J. YANNELLA III
DONALD YANNELLA PC
*Attorney for Defendant-Appellant*
*Paul Van Manen*
233 Broadway, Suite 2370
New York, New York 10279
(212) 226-2883

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Superseding Indictment, filed November 6, 2018 ..... A-24

Motion *in Limine*, by AUSA Geoffrey S. Berman,
    dated April 5, 2019 ................................................ A-28

    Exhibit A to AUSA Motion -
    Mark L. Taff Report, dated August 6, 2018 ........... A-73

Opinion and Order Denying Defendant Van
    Manen's Omnibus Motion, dated April 8, 2019 .... A-84

Motion by Letter, for Defendant Paul Van Manen,
    in Opposition to Motion *in Limine*, dated
    April 12, 2019 ....................................................... A-98

Reply Memorandum of Law, by AUSA, in Further
    Support of Motion *in Limine*, filed
    April 17, 2019 ....................................................... A-109

Supplemental Submission of Motion *in Limine*, by
    AUSA, filed April 21, 2019 ................................... A-123

Motion by Letter, for Defendant Paul Van Manen,
    for an Order to Preclude Trial Testimony, filed
    April 22, 2019 ....................................................... A-132

Motion by Letter, by AUSA, in Opposition to
    Preclude Trial Testimony, filed April 23, 2019 ...... A-137

Motion by Letter, by AUSA, in Opposition to *Voir
    Dire* Questions, filed April 26, 2019 ..................... A-141

Motion by Letter, by AUSA, for a Motion *in Limine*
    to Preclude Eliciting Hearsay through Witness
    Jessica Fyfe, filed May 2, 2019 ............................ A-144

**Page**

Motion by Letter, for Defendant Paul Van Manen,
   for Motion *in Limine* Regarding Admissibility of
   Background Evidence, filed May 2, 2019 ............. A- 150

Motion by Letter, for Defendant Paul Van Manen, in
   Opposition to Motion *in Limine* Regarding
   Hearsay, filed May 2, 2019 .................................... A-154

Opinion and Order Precluding Hearsay, filed
   May 3, 2019 ............................................................ A-156

Motion by Letter, by AUSA, in Opposition to
   Motion *in Limine* Related to Background
   Evidence, filed May 5, 2019 ................................. A-160

Motion by Letter, for Defendant Paul Van Manen, in
   in Opposition to Motion *in Limine* Regarding
   Proffer Statements, filed May 5, 2019 ................. A-168

Opinion and Order Regarding Admission of
   Background Evidence, filed May 6, 2019 ............. A-176

Transcript of Proceedings held before the
   Honorable Paul A. Crotty, filed May 7, 2019 ........ A-179

Transcript of Proceedings held before the
   Honorable Paul A. Crotty, dated May 7, 2019
   (Condensed Version)............................................... A-229

Transcript of Proceedings held before the
   Honorable Paul A. Crotty, dated May 8, 2019
   (Condensed Version)............................................... A-281

Transcript of Proceedings held before the
   Honorable Paul A. Crotty, dated May 9, 2019
   (Condensed Version)............................................... A-336

**Page**

Transcript of Proceedings held before the
Honorable Paul A. Crotty, dated May 10, 2019
(Condensed Version)...............................................  A-398

Motion by Letter, by AUSA, for a Supplemental
Request for Jury Charge Regarding Multiple
Conspiracies, the Buyer-Seller Rule, and Death
and Serious Bodily Injury, filed May 12, 2019......  A-438

Motion by Letter, by AUSA, for a Motion to Renew
Precluding Expert Testimony by Dr. Robert
Powers, filed May 12, 2019 ...................................  A-446

Transcript of Proceedings held before the
Honorable Paul A. Crotty, dated May 13, 2019
(Condensed Version)...............................................  A-449

Transcript of Proceedings held before the
Honorable Paul A. Crotty, dated May 14, 2019
(Condensed Version)...............................................  A-498

Transcript of Proceedings held before the
Honorable Paul A. Crotty, dated May 15, 2019
(Condensed Version)...............................................  A-562

Transcript of Proceedings held before the
Honorable Paul A. Crotty, dated May 16, 2019
(Condensed Version)...............................................  A-607

Jury Verdict Form and Notes, filed May 17, 2019.....  A-627

Letter from Quijano & Ennis to the Honorable Paul
A. Crotty, for Defendant Paul Van Manen, for an
Extension of Time to File a Motion Pursuant to
F.R.C.P. Rule 33, filed June 16, 2019 ...................  A-635

**Page**

Letter from Quijano & Ennis to the Honorable Paul
A. Crotty, for Defendant Paul Van Manen, for a
Notice that Post-Trial Motions Will not be Filed,
dated June 18, 2019 ................................................ A-637

*Pro Se* Letter, by Defendant Paul Van Manen,
Requesting Filing of Post-Trial Motions, filed
July 11, 2019.......................................................... A-639

Opinion and Order Denying Paul Van Manen 's
Rule 29 Motion and Extending Time for Rule 33
Motion by New Counsel, filed July 30, 2019 ........ A-640

*Pro Se* Letter, by Defendant Paul Van Manen,
Regarding Post-Trial Motions, filed
August 21, 2019...................................................... A-642

Transcript of Proceedings held before the
Honorable Paul A. Crotty, dated August 26, 2019. A-647

Notice of Motion, by Defendant Paul Van Manen,
for an Order Granting a New Trial, filed
September 18, 2019 ................................................ A-654

Declaration of Donald Yannella, for Defendant Paul
Van Manen, in Support of Motion for a New
Trial, filed September 18, 2019 ............................. A-655

Exhibit G to Yannella Declaration -
Photographs ........................................................... A-658

Letter from the Law Offices of Donald Yannella
P.C. to the Honorable Paul A. Crotty, for
Defendant Paul Van Manen, dated
September 19, 2019 ................................................ A-662

Memorandum of Law, by Defendant Paul Van
Manen, in Support of Motion for a New Trial,
dated September 19, 2019...................................... A-670

v

                                                                                             **Page**

Letter from the AUSA to the Honorable Paul A.
   Crotty, in Opposition to Motion for a New Trial,
    dated October 2, 2019 ............................................ A-676

Sentencing Memorandum, filed October 10, 2019 .... A-685

   Exhibit A to Sentencing Memorandum -
   Letter from Nancy Gomez Kemp to the
   Honorable Paul A. Crotty, dated August 28, 2019. A-697

   Exhibit B to Sentencing Memorandum -
   Letter from Alexandrea Van Manen to the
   Honorable Paul A. Crotty, undated ........................ A-701

   Exhibit C to Sentencing Memorandum -
   Letter from Teresa Garcia to the Honorable Paul
   A. Crotty, dated October 3, 2019 .......................... A-703

   Exhibit D to Sentencing Memorandum -
   Letter from Nicole Brennan to the Honorable
   Paul A. Crotty, undated ......................................... A-706

   Exhibit E to Sentencing Memorandum -
   Letter from Michael Ciro to the Honorable Paul
   A. Crotty, undated ................................................. A-708

   Exhibit F to Sentencing Memorandum -
   Letter from Kathleen Van Manen-Brush to the
   Honorable Paul A. Crotty, August 28, 2019 .......... A-711

   Exhibit G to Sentencing Memorandum -
   Online Obituary of Henry Van Manen ................... A-714

Opinion and Order, filed October 11, 2019 ............... A-717

Letter from the AUSA to the Honorable Paul A.
   Crotty, in Support of Sentencing Memorandum,
    filed October 11, 2019 ........................................... A-727

**Page**

Transcript of Sentencing Proceedings held before
   the Honorable Paul. A. Crotty, dated
     October 15, 2019 ................................................... A-739

Notice of Appeal, filed October 24, 2019 ................. A-772

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
    UNITED STATES OF AMERICA,          New York, N.Y.
 3
            v.                         18 Cr. 30(PAC)
 4
    PAUL VAN MANEN and KENNETH
 5  CHARLTON,
 6               Defendants.
    ------------------------------x    Trial
 7
                                       May 8, 2019
 8                                     9:30 a.m.
    Before:
 9
                    HON. PAUL A. CROTTY,
10
                                  District Judge
11                                - and a Jury-
12                   APPEARANCES
    GEOFFREY S. BERMAN
13       United States Attorney for the
         Southern District of New York
14  BY:  JESSICA K. FENDER
         RYAN B. FINKEL
15       CATHERINE E. GHOSH
         Assistant United States Attorneys
16
    QUIJANO & ENNIS, P.C.
17       Attorney for Defendant Van Manen
    BY:  PETER E. QUIJANO
18       ANNA N. SIDERIS
19  O'NEILL & HASSEN
         Attorney for Defendant Charlton
20  BY:  GRAINNE E. O'NEILL
21  THE LAW OFFICE OF CARLOS M. SANTIAGO
         Attorney for Defendant Charlton
22  BY:  CARLOS M. SANTIAGO, JR.
23
    ALSO PRESENT:
24
    MADISON DUNBAR, Paralegal, U.S. Attorney's Office
25  WILLIAM COLEMAN, Paralegal, U.S. Attorney's Office
```

1        (Trial resumed; jury not present)

2        THE COURT: Good morning. Please be seated.

3    Ms. O'Neill, do you know where Mr. Santiago is?

4        MS. O'NEILL: Mr. Santiago is stuck on the train I

5  believe there was an incident at Park Place. So he is on his

6  way.

7        THE COURT: On his way. Is he still on the train?

8        MS. O'NEILL: Last I heard from him he was, but it was

9  a while ago.

10        (Pause)

11        MS. O'NEILL: It was a half hour ago that he was in

12  the train, so he should be here momentarily, I would imagine.

13        MR. FINKEL: Your Honor, there are a few items the

14  government would like to put on the record for this morning?

15        THE COURT: Okay.

16        MR. FINKEL: And one to run by the court.

17        First is that with respect to the photographs of the

18  Ogno bedroom scene where the body was found, the parties have

19  discussed. The government has redacted certain of those

20  photographs. The government, in accordance with your Honor's

21  ruling, will only introduce one photograph of Mr. Ogno's body

22  to show the spacing of the room versus where the syringe and

23  the glassines were found. We propose, and with the defendant's

24  consent, Mr. Van Manen counsel's consent, showing some redacted

25  images which I can display for the court. This is 262. There

1  will be -- oh, there it is. It is already redacted. all

2  right. So this is a redaction of anything that might be

3  prejudicial.

4        THE COURT: All right.

5        MR. FINKEL: And this is 263, which is redacting a

6  blood spot that was found on the carpet, again, just to show

7  the syringe which was located on the dresser -- bedside table.

8        Second, your Honor, Detective Slevin, Daniel Slevin,

9  will be testifying this morning, likely. Detective Slevin

10  spoke with Witness 1. The government is not intending to

11  elicit Witness 1's excited utterance, justified excited

12  utterance, through Detective Slevin. We have instructed

13  Detective Slevin not to respond to any questions about what

14  people told him unless I specifically ask him "what did someone

15  say" to avoid this issue. I just want to put that on the

16  record.

17        Then, last, your Honor, is just with respect to the

18  government's application last night regarding possible cross

19  themes which we are concerned about with respect to

20  Mr. Cejovic, who is scheduled to testify likely this afternoon.

21        THE COURT: Mr. who?

22        MR. FINKEL: Cejovic.

23        MS. O'NEILL: In response to that, I spoke with the

24  government earlier. Rest assured, Mr. Charlton's dog was

25  terminally ill at the time of his arrest. He in no way blames

1  the government or this arrest for the death of his dog.

2        THE COURT: He won't take it up, then.

3        MS. O'NEILL: He won't take that up. We will not be

4  saying that or alluding to that or anything.

5        On direct examination with Shaun Sullivan, the

6  government elicited that dog food means heroin. We do not

7  intend to bring in anything about Mr. Charlton's dog unless the

8  government is going to argue that when Mr. Charlton is talking

9  about his dog or dog food he means heroin. So I think that we

10  reached an agreement on that earlier this morning.

11        MR. FINKEL: I think that's right, your Honor. Of

12  course, the government's application is a bit broader.

13  Although it certainly includes Mr. Charlton's dog, it also

14  includes cross themes, such as, questions that were posed to

15  Mr. Sullivan yesterday. "You understand that Mr. Charlton was

16  living in a shelter, right?" "You understand that Mr. Charlton

17  was displaced from Hurricane Sandy, right?" Those are sorts of

18  questions, the government believes, are designed simply to

19  elicit sympathy. We don't believe they have a place at this

20  trial. We don't believe they are relevant. We ask your Honor

21  to preclude questions about those topics, as well.

22        MS. O'NEILL: Okay. So just to back up a little bit,

23  that line of cross was designed to elicit that Shaun Sullivan

24  was selling heroin in a Hurricane Sandy evacuation shelter. It

25  was perhaps inartfully done, because it was totally irrelevant

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH  CHARLTON

CORRECTED
May 8, 2019

1 that Mr. Charlton was also there, and we apologize for that,
2 but that was the intention of that much.  It didn't come in,
3 and we are not trying to bring that out any more than necessary
4 to provide background information on Mr. Charlton.
5         Additionally, the government yesterday, on Detective
6 Truscelli's direct, brought out information about 9/11 and
7 terrorism, which is wholly unrelated to this case, and we would
8 just submit that if they are going to be bringing in irrelevant
9 prejudicial facts, that they should probably let us bring in
10 some information that is wholly relevant to this case.
11         THE COURT: Two wrongs make a right?
12         MS. O'NEILL: No, but we don't think that ours is
13 wrong because we are trying to say that Mr. Charlton did not
14 have the same intention to enter this conspiracy, and this goes
15 to his mind frame, his state of mind, which comes directly from
16 his circumstances.  We are not trying to argue that this was a
17 necessity.  We are trying to argue that when he was talking to
18 Mr. Cejovic, he was not telling the truth.  And the
19 circumstances of his life are relevant for the jury to make
20 that determination.  So it is wholly different than this 9/11
21 solicitation.
22         MR. FINKEL: Your Honor, a couple of points.
23         First, it sound like, I think, that there is some
24 agreement that defense counsel is not going to be crossing
25 Mr. Cejovic on those sympathetic issues -- I think that was

1 what I understood -- about whether he was homeless, this and
2 that, at least at the beginning of your presentation on that
3 issue.  But even if that is not the case, there was no
4 objection to the question about why Detective Truscelli joined
5 the NYPD.  That is very limited background information, which I
6 think is appropriate for a witness on direct, and your Honor
7 has ruled that limited background information is appropriate on
8 direct.  What we don't believe is appropriate is the
9 insinuation, which was done yesterday during Mr. Sullivan's
10 cross, about Mr. Kenny's personal and economic circumstances.
11         MS. O'NEILL: Thank you.
12         THE COURT: Are you going to do the cross on
13 Detective Truscelli?
14         MS. O'NEILL: Yes.
15         THE COURT: What would you say about proceeding -- we
16 will wait until quarter to ten for Mr. Santiago.
17         MS. O'NEILL: Mr. Santiago contacted me that he was in
18 security downstairs two minutes ago.
19         THE COURT: Okay, fine.
20         MS. O'NEILL: But, yes, that will be fine.  I will
21 proceed.
22         THE COURT: Could we call in the jury, then?
23         MR. FINKEL: Yes.
24         THE COURT: Bring in the detective.
25         Ms. O'Neill, could we call in the jury, then, and get

1 started?
2         MS. O'NEILL: Yes, your Honor.
3         THE COURT: Okay.
4         (Continued on next page)

1         (Jury present)
2         THE COURT: Good morning.  Please be seated.
3 ARTHUR TRUSCELLI, resumed.
4         THE COURT: Detective, you are still under oath.
5         THE WITNESS: Yes, sir.
6         THE COURT: Okay, Mr. Finkel.
7         MR. FINKEL: Thank you.
8 DIRECT EXAMINATION
9 BY MR. FINKEL:
10 Q.  Good morning.
11 A.  Good morning.
12         MR. FINKEL: Ms. Dunbar, if we can display for the
13 witness what is premarked as Government Exhibit 206H.
14 Q.  Detective Truscelli, is there an image on the screen before
15   you?
16 A.  Yes, there is.
17 Q.  What is that image?
18 A.  That is ten glassine envelopes containing heroin laid out
19   on top of a manila folder, which is marked "JD Paul," dated,
20   and there is also a rubber band which those envelopes were
21   secured with.
22 Q.  Did you take that photograph?
23 A.  I did, yes.
24 Q.  What were the circumstances under which you took that
25   photograph?

J582van1          Truscelli - Direct          Page 282

1 A.  The ten glassines were recovered from a controlled buy from
2    Paul Van Manen.
3          MR. FINKEL: Your Honor, the government offers 206H.
4          MR. QUIJANO: No objection.
5          MS. O'NEILL: No objection.
6          THE COURT: 206H is in evidence, then.
7          (Government's Exhibit 206H received in evidence)
8          MR. FINKEL: If we can publish that, Ms. Dunbar.
9 BY MR. FINKEL:
10 Q.  Detective Truscelli, you mentioned a moment ago that these
11    were glassines.  Can you just circle on your screen what you
12    mean by a glassine?
13 A.  This right here?
14 Q.  Yes.  It is a touch screen.
15 A.  Oh.
16          A glassine is a wax paper fold, which in this case was
17    used to secure the heroin which was sold.
18 Q.  And below the glassines appears to be a rubber band.  What
19    is your understanding of the purpose of that rubber band?
20 A.  Traditionally, when heroin is sold other than individually,
21    it is secured with a rubber band.
22          MR. FINKEL: Your Honor, if we can let the record
23    reflect that Detective Truscelli circled one of the
24    glassines --
25          THE COURT: Yes, the record will so reflect.

J582van1          Truscelli - Direct          Page 283

1          BY MR. FINKEL:
2 Q.  Detective Truscelli, what is the line that sort of appears
3    in the middle of all of the glassine bags?
4 A.  The -- well, the ten glassines which are pictured there
5    were folded in half, so that line indicates where the fold was.
6 Q.  Thank you.
7          MR. FINKEL: Ms. Dunbar, would you take that down.
8 Q.  Detective Truscelli, what have you done to prepare for your
9    testimony yesterday and today?
10 A.  I mean, I have reviewed my paperwork, my documents, I have
11    sat with the AUSAs' office on several occasions and we have,
12    again, gone over my paperwork and I discussed the facts and
13    circumstances of the case.
14 Q.  What kind of paperwork did you review?
15 A.  My DD-5s which I spoke of yesterday as the NYPD's recording
16    system from any documents that we produce, vouchers.
17 Q.  Detective Truscelli, based on your observations, in 2017,
18    what did Paul Van Manen do?
19 A.  He was operating a heroin delivery service.
20 Q.  Detective Truscelli, based on your observations, in 2017,
21    can you describe just generally how Paul Van Manen operated a
22    heroin delivery service?
23 A.  Sure.  I mean, basically what happened was, you placed a
24    phone call, one of his customers would place a phone call to
25    his cell phone, and from the cell phone really it was no

J582van1          Truscelli - Direct          Page 284

1    different than a cab service.  You put the call in and said I
2    needed something, and you get a time and a price and it would
3    be there whenever, you know, whenever they were in the area
4    basically.
5 Q.  Detective, based on your observations, in 2017 did Paul
6    Van Manen sell heroin alone?
7 A.  No, he did not.
8 Q.  Who are some of the people, if anyone, that Paul Van Manen
9    sold heroin with?
10 A.  Deceon Spinelli, Shaun Sullivan, Mirsad Bogdanovic, Medin
11    Kosic, Tommy Graziano was involved.
12 Q.  Detective have you personally spoken with Mr. Paul
13    Van Manen?
14 A.  Yes, I have.
15 Q.  Are you familiar with his voice?
16 A.  I am, yes.
17 Q.  Detective, I want to direct your attention to May 28, 2017.
18    What, if anything, were you doing as part of the Paul Van Manen
19    investigation on May 28, 2017?
20 A.  I believe we were conducting surveillance.
21 Q.  Do you recall where you were conducting surveillance?
22 A.  I would have to take a look, if I could refresh.
23 Q.  In front of you --
24          MR. FINKEL: If I may refresh the witness's
25    recollection, your Honor?

J582van1          Truscelli - Direct          Page 285

1          THE COURT: Yes.
2 Q.  To your side is a binder, Detective Truscelli.  If you can
3    turn to a tab that's marked 3507-14, at page 5.
4          Does that refresh your recollection?
5 A.  Yes, sir, it does.
6 Q.  What is the type of document you used to refresh your
7    recollection?
8 A.  This is the DD-5 I spoke of.
9 Q.  Where were you conducting your surveillance on May 28,
10    2017?
11 A.  We were in south Amboy, New Jersey.
12 Q.  Where specifically?
13 A.  The Circle Lodge Motel.
14          MR. FINKEL: Ms. Dunbar, if you can display for the
15    witness Government Exhibit 402.
16 Q.  Detective Truscelli, do you recognize this?
17 A.  Yes, I do.
18 Q.  What is it?
19 A.  That is a map of Staten Island as well as a portion of New
20    Jersey.
21 Q.  Is it a fair and accurate map?
22 A.  Yes, sir, it is.
23          MR. FINKEL: Your Honor, the government offers 402.
24          MR. QUIJANO: No objection.
25          MS. O'NEILL: No objection.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

**CORRECTED**
May 8, 2019

1  THE COURT: 402 is in evidence.
2  (Government's Exhibit 402 received in evidence)
3  MR. FINKEL: If we could publish it, please,
4  Ms. Dunbar.
5  BY MR. FINKEL:
6  Q. Detective Truscelli, if you could circle on your screen the
7  approximate location of that Circle Motor Lodge.
8  A. Sure.
9  MR. FINKEL: Your Honor, if the record could reflect
10  that Detective Truscelli circled, in the State of New Jersey, a
11  location.
12  THE COURT: What's the location.
13  MR. FINKEL: South Amboy.
14  THE COURT: South Amboy, okay.
15  BY MR. FINKEL:
16  Q. Detective Truscelli, to travel from Staten Island to the
17  Circle Motor Lodge, what bridges, if any, would one need to
18  cross?
19  A. To exit Staten Island, I mean the quickest route to that
20  location is taking the Outerbridge. Then when you get into
21  Jersey, you could see on the map there are two bridges next to
22  each other over that little body of water. That's the Raritan
23  bridge on the left and then the bridge to the right is the 35
24  bridge.
25  Q. Can you circle on your screen the bridge you would need to

1  cross between Staten Island and New Jersey?
2  A. (Witness complies).
3  Q. Which bridge is that, Detective?
4  A. That is the Outerbridge.
5  MR. FINKEL: Your Honor, if the record could reflect
6  that Detective Truscelli circled the Outerbridge between Staten
7  Island and New Jersey.
8  THE COURT: Yes.
9  BY MR. FINKEL:
10  Q. Detective Truscelli, why were you conducting surveillance
11  at the Circle Motor Lodge on May 28, 2017?
12  A. Because we had collected intelligence as well as cell phone
13  pings from the trap and trace that I spoke of yesterday that
14  indicated that Paul Van Manen was staying at that location.
15  MR. FINKEL: Ms. Dunbar, if we could display for the
16  witness what has been marked as Government Exhibit 223, and if
17  we can display 222.
18  BY MR. FINKEL:
19  Q. Detective Truscelli, do you recognize those images?
20  A. Yes, I do.
21  Q. What are they?
22  A. That is the Circle Motor Lodge.
23  Q. Are they fair and accurate pictures from the Circle Motor
24  Lodge?
25  A. Yes, they are.

1  MR. FINKEL: Government offers 222 and 223, your
2  Honor.
3  MR. QUIJANO: No objection.
4  MS. O'NEILL: No objection.
5  THE COURT: 222 and 223 are received in evidence.
6  (Government's Exhibits 222 and 223 received in
7  evidence)
8  MR. FINKEL: If we can publish 222, Ms. Dunbar,
9  please, and 223.
10  BY MR. FINKEL:
11  Q. Detective Truscelli, that day, May 28, 2017, at the Circle
12  Motor Lodge, what time were you there?
13  A. Approximately 1600 hours we arrived.
14  Q. That's 4:00?
15  A. 4:00, correct.
16  Q. What, if anything, did you see?
17  A. I positioned my car inside the location. At approximately
18  1630 hours, I observed a male exit room number 141, who I knew
19  to be Paul Van Manen. He exited that room, lit up a cigarette,
20  smoked a cigarette. As he was smoking the cigarette, he
21  approached a light-colored Nissan Murano, went to the driver's
22  side door, nothing more than that, walked back to the room,
23  finished his cigarette, and reentered room 141.
24  MR. FINKEL: Ms. Dunbar, if we can display for the
25  witness Government Exhibit 221.

1  Q. Detective Truscelli, what is this image?
2  A. That is the light-colored Nissan Murano that I just spoke
3  of.
4  Q. That you saw on that day?
5  A. Correct, yes.
6  MR. FINKEL: Your Honor, the government offers 221.
7  MS. O'NEILL: No objection.
8  MR. QUIJANO: No objection.
9  THE COURT: 221 is in evidence.
10  (Government's Exhibit 221 received in evidence)
11  MR. FINKEL: Ms. Dunbar, if we can publish that,
12  please.
13  BY MR. FINKEL:
14  Q. Detective Truscelli, what is the license plate of this
15  Nissan Murano?
16  A. If you are looking at the photograph, you can see there is
17  no hard plate on it. On the left side of the rear window, you
18  can see a temporary tag. We were not able to get the temporary
19  tag number at that time.
20  MR. FINKEL: You can take that down.
21  Q. Let me direct your attention to June 12, 2017. What, if
22  anything, were you doing as part of the Paul Van Manen
23  investigation on that occasion?
24  A. I believe that that day we were also conducting
25  surveillance.

A-285

1  Q. Do you know where you were conducting surveillance?
2  A. I believe on Staten Island, but I would like to take a look
3  to refresh.
4  Q. Sure. If you could just, with your Honor's permission,
5  turn to 3507-14, and it is page 15?
6        THE COURT: Yes.
7  A. Could you give me that again, please?
8  Q. Sure. Tab 3507-14 and it is page 15.
9  A. Okay.
10  Q. Does that refresh your recollection?
11  A. Yes, sir, it does.
12  Q. What, if anything, did you observe on June 12, 2017?
13  A. At approximately 415 hours, I started conducting
14  surveillance in regards to the same case. It came a time that
15  on Bay Street, on Staten Island, address 1169 is a location
16  that is two stores, the store on the left, being a check
17  cashing place and there is a laundromat on the right-hand side
18  of that store.
19        During the surveillance, I observed the Paul
20  Van Manen, as well as Doreen Spinelli, in the -- excuse me, the
21  Nissan Murano pulling into that location. Paul exited the car
22  from -- he was driving the vehicle, exited carrying two bags.
23  He entered the check cashing place carrying the bags. He was
24  in there for a short period of time, came back out again
25  carrying a black bag, and reentered his car.

1  Q. What, if anything, happened next?
2  A. After -- Doreen Spinelli had also exited the car. At this
3  time period she was kind of milling around the car. They both
4  reentered. Upon reentering, they proceeded to an area of
5  Staten Island, Steuben Street and Elbe Street, which is a short
6  distance from there. As they pulled on to Elbe Street, an
7  unidentified male black exited one of -- it's row houses, so I
8  couldn't say exactly which number it was, exited one of the
9  houses, approached the driver's side, where Paul was
10  operating the car, and there was an exchange of U.S. currency
11  for a black bag, and at that point I terminated the
12  surveillance.
13        MR. FINKEL: Ms. Dunbar, if you can display what is in
14  evidence as Government Exhibit 111.
15  BY MR. FINKEL:
16  Q. Detective Truscelli, do you recognize that individual?
17  A. Yes, I do.
18  Q. Who is that?
19  A. That is Doreen Spinelli.
20  Q. Is that the individual you saw with Paul Van Manen on June
21  12, 2017.
22  A. Yes, it is.
23  Q. Thank you.
24        MR. FINKEL: Ms. Dunbar, if you can display for the
25  witness Government Exhibit 229.

1        And then 230.
2        231.
3        232.
4        233.
5  BY MR. FINKEL:
6  Q. Detective Truscelli, what are those images of?
7  A. Those are all images that I took during the course of the
8  surveillance that day. The images show both Paul Van Manen and
9  Doreen Spinelli in the parking lot of the check
10  cashing/laundromat that I began the surveillance in. The last
11  photo that's on the screen is the vehicle on Elbe Street which
12  I mentioned is a block on Staten Island.
13        MR. FINKEL: Your Honor, the government offers 229
14  through 233?
15        MR. QUIJANO: No objection.
16        MS. O'NEILL: No objection.
17        THE COURT: They are received in evidence.
18        (Government's Exhibits 229 through 233 received in
19  evidence)
20        MR. FINKEL: Ms. Dunbar, if you can display 229,
21  please, and publish it, please.
22  BY MR. FINKEL:
23  Q. Detective Truscelli, what are we looking at here?
24  A. That is Paul Van Manen outside of the vehicle.
25  Q. And what was the license plate on that vehicle?

1  A. Again, there is no hard plate on it. There is still a
2  temporary tag in the back window of the car.
3        MR. FINKEL: If we can go to 230, please.
4  Q. What is that?
5  A. Again, that's Paul exiting the vehicle.
6        MR. FINKEL: And 231.
7  Q. What is that?
8  A. That is Doreen Spinelli exiting the vehicle.
9  Q. 232?
10  A. Again, that's Doreen Spinelli.
11  Q. 233.
12  A. And that is the vehicle that they both returned to with
13  Paul operating it and that picture is the vehicle on Elbe
14  Street on Staten Island.
15  Q. Can you circle the vehicle, Detective Truscelli?
16  A. (Witness complies).
17        MR. FINKEL: Your Honor, if we could let the record
18  reflect that Detective Truscelli circled at the top portion of
19  the screen, the Nissan Murano.
20        THE COURT: On what exhibit?
21        MR. FINKEL: 233.
22        THE COURT: Yes.
23  BY MR. FINKEL:
24  Q. Detective Truscelli, why was that photo taken from behind
25  the fence?

J582van1     Truscelli - Direct     Page 294

1  A. Because, as I spoke on yesterday, when conducting
2  surveillance, you want to stay as covert as possible, so I had
3  to position my car in a position where I wouldn't be seen by
4  Paul.
5        MR. FINKEL: We can take that down.
6  Q. Detective Truscelli, let me direct your attention to June
7  14, 2017, two days later. What, if anything, did you perform
8  as part of the Paul Van Manen -- what actions, if any, did you
9  perform as part of the Paul Van Manen investigation on that
10  occasion?
11  A. I believe that day we conducted a case buy.
12  Q. Do you recall what time?
13  A. No, sir, I don't.
14  Q. Is there anything that would refresh your recollection?
15  A. Yes, I have a DD-5 in regards to it.
16  Q. Okay.
17  A. If I may?
18  Q. If you can turn to 3507-14 at page 17.
19  A. 3507-14?
20  Q. Yes, sir.
21        Does that refresh your recollection?
22  A. It does.
23  Q. What, if any, action did you take in the Paul Van Manen
24  investigation on that occasion?
25  A. Actually on that day we conducted more surveillance.

J582van1     Truscelli - Direct     Page 295

1  Q. Where did you conduct surveillance?
2  A. Again in New Jersey, at the motel, Circle Motor Lodge.
3  Q. What time did you conduct surveillance?
4  A. Between 1100 hours and 1230 hours.
5  Q. And what, if anything, did you observe?
6  A. On that day, again, we observed Paul exit his room, room
7  number 141 again. During the surveillance, a gold four-door
8  sedan pulled into the parking lot. Unidentified person exited
9  the sedan, met up with Paul, they exchanged a few words. There
10  was a transaction of U.S. currency for a black bag. That
11  person then reentered the gold sedan and exited the location.
12  Q. Detective Truscelli, at that time were you able to identify
13  the person who met with Paul Van Manen?
14  A. Not at that time, no.
15  Q. Were you able to identify their gender?
16  A. I was not, no.
17  Q. What, if anything, happened next?
18  A. Okay, after they had their interaction, the transaction
19  occurred, the car exited, turned left out of the parking lot,
20  and then headed over the 35 bridge.
21        I proceeded to follow the vehicle. At that time there
22  was no other cars on the 35 bridge, just the vehicle, the gold
23  vehicle and myself. Gold vehicle was in the right-hand lane
24  traveling within the speed limit, not going exceptionally fast.
25  I was able to pull in to the left-hand lane -- it's a two-lane

J582van1     Truscelli - Direct     Page 296

1  bridge, so I got in to the left-hand lane, and I was able to
2  pull next to the vehicle and get a clear and unobstructed view
3  from my vehicle into that vehicle.
4  Q. And what, if anything, did you notice?
5  A. It is when I pulled next to the vehicle that I was able to
6  identify the person as a female, and really what jumped out at
7  me is that the female had large, I guess you call them spacers
8  in the ear, you know, like earrings, but they are big. And at
9  that point I had grabbed the license plate from it, got my
10  identification, the visual on the person, and I drove off.
11        MR. FINKEL: Ms. Dunbar if we can display for the
12  witness when has been marked for identification as Government
13  Exhibit 113.
14  Q. Detective Truscelli, do you recognize that individual?
15  A. I do, yes.
16  Q. Who is that?
17  A. That is Francesca Belfield. That was the person who was
18  operating the vehicle that day.
19        MR. FINKEL: Your Honor, the government offers 113.
20        MR. QUIJANO: No objection.
21        MS. O'NEILL: No objection.
22        THE COURT: 113 is in evidence.
23        (Government's Exhibit 113 received in evidence)
24        MR. FINKEL: If we could publish it, please.
25  BY MR. FINKEL:

J582van1     Truscelli - Direct     Page 297

1  Q. Detective Truscelli, you mentioned spacers in the ear?
2  A. Yes.
3  Q. Can you circle what you meant?
4  A. Sure.
5        MR. FINKEL: Your Honor, the government asks that the
6  record reflect that Detective Truscelli circled the earrings in
7  Ms. Belfield's --
8        THE COURT: Yes.
9        MR. FINKEL: -- ear.
10        Thank you.
11        THE COURT: The record will reflect.
12        MR. FINKEL: We can take that down.
13  BY MR. FINKEL:
14  Q. Let me direct your attention to July 24, 2017. What, if
15  anything, were you doing as part of the Paul Van Manen
16  investigation on that occasion?
17  A. What's the date again?
18  Q. July 24, 2017.
19  A. Could I refresh, please?
20  Q. If you could turn to 3507-16 at 77.
21  A. You said 77, correct?
22  Q. Yes, sir.
23        Does that refresh your recollection?
24  A. It does, yes.
25  Q. What, if anything, did you do as part of the Paul Van Manen

1    investigation on July 24, 2017?
2  A.  We conducted a case buy using a confidential informant.
3  Q.  What do you mean by "case buy"?
4  A.  Case buy, all the case references, the investigation that
5    has been ongoing and Paul in specific in this case, and a buy
6    is referencing utilizing a confidential informant to purchase
7    narcotics from our target.
8  Q.  And how did you effectuate this?
9  A.  What we did, we met up with the confidential informant.
10   The confidential informant places a phone call, puts it on
11   speakerphone so that myself and my partner could hear it, and
12   he placed the order for the heroin on speakerphone.  A meet
13   location was arranged between the confidential informant and
14   Paul, and a price is determined.
15 Q.  Did you recognize the voice on the other end of the phone?
16 A.  I did, yes.
17 Q.  And whose voice was that?
18 A.  That was Paul's voice.
19 Q.  Detective Truscelli, what number did the confidential
20   informant call in order to contact Mr. Van Manen?
21 A.  If I could just take a quick look at that.  It is
22   646-966-8865.
23 Q.  8865.  If I refer to that number as 8865, is that okay?
24 A.  Yes, that's fine.
25 Q.  How, if at all, did Mr. Van Manen and the CI arrange to

1    meet for the transaction?
2  A.  Well, once the confidential informant stated what they
3    wanted, basically this was arranged on just a convenient
4    vicinity for both the informant and I guess Paul at that point.
5  Q.  What did the CI state that they wanted?
6  A.  They said they needed a bundle.
7  Q.  Did there come a time when the CI purchased drugs?
8  A.  Yes.
9  Q.  Did you observe that?
10 A.  I did observe it, yes.
11 Q.  What did you observe?
12 A.  CI approached the vehicle.  Paul was operating the vehicle.
13   Sum of money was passed across to Paul.  Doreen Spinelli, also
14   in the car, passed the narcotics to Paul, which in turn was
15   passed to the confidential informant.  And once the buy was
16   finished, the confidential informant left the location as well
17   as Paul and Doreen.
18 Q.  The phone call between the CI and Mr. Van Manen, what, if
19   anything else did Mr. Van Manen say to the CI?
20 A.  If I could just take a quick look and refresh.
21       (Pause)
22 A.  In the -- during the course of the phone call, Paul stated
23   that he needed to see a few people before he could see the
24   confidential informant.
25 Q.  After the buy that you observed, what, if anything

1    happened next?
2  A.  The narcotics that were purchased, in this case heroin, was
3    taken into our custody and vouchered.
4  Q.  Detective Truscelli, how do you know if the CI did or did
5    not already have drugs on them before the buy from
6    Mr. Van Manen?
7  A.  Any time we work with a confidential informant, they are
8    searched, their person and their contents -- you know, if they
9    are carrying a bag or something like that, it is searched.
10       MR. FINKEL:  Your Honor, may I approach for a second?
11       THE COURT:  Yes, you may.
12 Q.  In case you need some water.
13 A.  Thank you.
14 Q.  Did you take possession of the heroin after the CI
15   purchased it?
16 A.  I did, yes.
17 Q.  And what did you do with it?
18 A.  I vouchered it.
19 Q.  What does that mean?
20 A.  In New York City, police department evidence that we take
21   into custody is vouchered, meaning that any item that we take
22   in is given a unique voucher number that's not duplicated.  In
23   the case of narcotics, they are first placed into a paper
24   envelope, manila envelope, and then they are placed into a
25   plastic envelope that is sealed up, and then the number is

1    generated.
2  Q.  Is the voucher number recorded on the DD-5?
3  A.  It could be, yes.
4  Q.  What was the voucher number for the drugs seized on that
5    occasion?  Do you remember?
6  A.  It's a long number.  I don't remember offhand.
7  Q.  Would anything refresh your recollection?
8  A.  Yes, the DD-5.
9        (Pause)
10 Q.  Does that refresh your recollection?
11 A.  Yes, it does.
12 Q.  What was the voucher number of the heroin?
13 A.  It's 5000122045.
14       MR. FINKEL:  Your Honor, at this time the government
15   would like to read a stipulation into the record?
16       THE COURT:  Yes.
17       MR. FINKEL:  This is from Government Exhibit 507,
18   paragraph 8.
19       "The contents of Government Exhibit 9 were purchased
20   from Paul Van Manen on July 24, 2017, and vouchered as
21   5000122045 by law enforcement officials.  The contents of
22   Government Exhibit 9 were tested by analysts employed by New
23   York City's Police Department laboratory.  The substance
24   contained within Government Exhibit 9 was in ten glassine
25   envelopes each containing a substance.  The substance tested

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1　positive for the presence of heroin and was determined to weigh
2　approximately .31 grams without packaging. This finding is
3　contained within a lab report that has been marked as
4　Government Exhibit 9A."
5　　　Your Honor, at this time the government offers 9 and
6　9A.
7　　　MR. QUIJANO: No objection.
8　　　MS. O'NEILL: No objection.
9　　　THE COURT: 9 and 9A are received in evidence.
10　(Government's Exhibits 9 and 9A received in evidence)
11　　　MR. FINKEL: May we publish?
12　　　THE COURT: Yes, you may.
13　　　MR. FINKEL: Ms. Dunbar, if you can put up Government
14　Exhibit 9A on the screen.
15　BY MR. FINKEL:
16　Q. Detective Truscelli, did there come a time when you
17　obtained a wiretap as part of this investigation?
18　A. Yes.
19　Q. And that was pursuant to a court order?
20　A. That is correct, yes.
21　Q. What was the phone number you wiretapped?
22　A. That you referred to as 8865.
23　Q. And whose phone is that?
24　A. That's Paul Van Manen's phone.
25　Q. At the time you obtained the court order for the wiretap,

1　why did you believe that the 8865 number was Mr. Van Manen's
2　phone number?
3　A. Well, first, we, again, referencing the CI buy we
4　conducted, I did hear him speak over that phone line.
5　Q. Detective Truscelli, how, if at all, was the wire used as
6　part of your investigation?
7　A. The wire case, which allows us to listen to the phone calls
8　on that cell phone number, what that does is allows us to focus
9　and streamline our investigation and surveillance to a much
10　greater degree than you would have using just the trap and
11　trace. Since we are getting his calls live time, we are able
12　to be directed to his predetermined meet locations for his
13　transactions that he was using -- that he was effecting.
14　Q. Detective Truscelli, we mentioned Doreen Spinelli before.
15　Do you recall that?
16　A. Yes.
17　Q. Have you spoken with her?
18　A. Yes, I have.
19　Q. Are you familiar with her voice?
20　A. I am, yes.
21　　　MR. FINKEL: Your Honor, at this time the government
22　will play GX301T which is in evidence. It is a call from
23　September 14, 2017, at 2:31 p.m., and it's an incoming call to
24　the 8865 phone number.
25　　　Oh, and, your Honor, we are going to pass out some

1　transcripts before we play that.
2　　　Okay, Ms. Dunbar. If the jury can turn to the first
3　transcript, this is 301T; and, Ms. Dunbar, if you can play
4　301T.
5　　　(Audio played)
6　　　MR. FINKEL: Stop right there.
7　BY MR. FINKEL:
8　Q. Detective Truscelli, do you recognize the voice who
9　answered hello?
10　A. Yes, I do.
11　Q. Whose voice is that?
12　A. That's Doreen Spinelli.
13　　　MR. FINKEL: Can you play it?
14　　　(Audio played)
15　　　MR. FINKEL: Stop right there.
16　BY MR. FINKEL:
17　Q. Detective Truscelli, in your experience as a detective on
18　Staten Island, do you have an understanding of what the terms
19　"Arthur Kill" and "Armstrong" are?
20　A. I do, yes.
21　Q. What are they?
22　A. They are both streets located in the Great Kills
23　neighborhood of Staten Island.
24　　　MR. FINKEL: And, Ms. Dunbar, if you can keep playing.
25　　　(Audio played)

1　BY MR. FINKEL:
2　Q. Detective Truscelli, approximately how many years have you
3　been a detective with respect to narcotics?
4　A. Seven.
5　Q. And during those seven years, have you spoken with CIs and
6　defendants about narcotics activity?
7　A. Yeah, many.
8　Q. And have you discussed with them various terms that are
9　used by them in the narcotics trade?
10　A. Yes, I have.
11　Q. Based on your involvement and your experience, do you have
12　an understanding of what "take one" meant?
13　A. Yes, I do.
14　Q. And what was that?
15　A. In this case it is -- "one" is referring to a bundle of
16　heroin, which is ten glassines of heroin.
17　Q. That call was from September 14, 2017.
18　Detective Truscelli, what, if anything, were you doing as part
19　of the Paul Van Manen investigation on September 14, 2017?
20　A. I was conducting surveillance.
21　Q. Do you recall where?
22　A. At that point I was also in the Great Kills area of Staten
23　Island.
24　Q. What time were you in the Great Kills area of Staten
25　Island?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  A. I would have to refresh on the time.
2  Q. Do you remember?
3  A. It was afternoon. It wasn't --
4  Q. Do you remember the precise time?
5  A. I do not, no.
6  Q. Is there anything that would refresh your recollection?
7  A. DD-5, yes.
8  Q. If you could turn to 3507-17, page 96.
9  A. 3507-17?
10  Q. Yes, sir.
11  A. 96?
12  Q. Yes.
13  A. It was approximately 1400 hours, which is 2:00.
14  Q. Detective Truscelli, that call we just played was from
15    1431. What, if anything, did you see at 1435?
16  A. 1435, one of the main streets on Staten Island is Hylan
17    Boulevard, which goes north/south. I was going northbound on
18    Hylan. The person on the other end of that phone call is
19    coming southbound on Hyland towards me. He proceeded to make a
20    right up Armstrong Avenue. I was able to make the left to get
21    behind the vehicle. The vehicle was a red pickup truck. I was
22    able to follow it up Armstrong until it hit Armstrong and
23    Wilson and pulled over.
24  Q. What happened then?
25  A. At that point, Paul and Doreen were coming down the

1  opposite direction on Armstrong, pulled over on the opposite
2  side of the road. Doreen exited the vehicle. She went to the
3  front passenger side of the red pickup truck and opened the
4  door. She leaned in. There was a transaction where she
5  received U.S. currency for a small object. And she closed the
6  door, she ran to her car. Pickup truck pulled off.
7  Q. Detective Truscelli what type of car was Ms. Spinelli and
8    Mr. Van Manen in?
9  A. They were in -- if I can take a quick look.
10  Q. Do you remember?
11  A. Small SUV.
12  Q. Do you remember the model?
13  A. I don't offhand, no.
14  Q. Is there anything that would refresh your recollection?
15  A. My DD-5 would, yes.
16    (Pause).
17  Q. What type of car were they in?
18  A. It was a gray Honda CRV.
19  Q. Is that the same kind of car that we saw before that didn't
20    have the license plate on it?
21  A. This was a different car.
22    MR. FINKEL: At this time, your Honor, the government
23    will play a recording which is in evidence. It is GX 301V
24    which is the second transcript in the packet, should be. This
25    is an incoming call to the 8865 number on September 21, 2017,

1  at approximately 1818, 6:18 in the afternoon.
2    Ms. Dunbar.
3    (Audio played)
4    MR. FINKEL: Pause right there.
5  Q. Detective Truscelli, do you recognize that voice?
6  A. I do.
7  Q. Whose voice is that?
8  A. That's Paul Van Manen's voice.
9    MR. FINKEL: Ms. Dunbar, if you could roll it back a
10    couple of seconds and then play it again.
11    (Audio played)
12  BY MR. FINKEL:
13  Q. Detective, that call was from September 21, 2017. What, if
14    anything, were you doing as part of the Paul Van Manen
15    investigation on September 21, 2017.
16  A. I was conducting surveillance.
17  Q. Where?
18  A. The area, vicinity of 737 Post Avenue which is on Staten
19    Island.
20    MR. FINKEL: I will try to do this again today. This
21    is Government Exhibit 401, which is in evidence.
22  Q. Detective Truscelli, can you just point out where 737 Post
23    Avenue is approximately.
24  A. It would be in the area, I guess, around, if you look at
25    this map, the West Brighton area. It would be to the left of

1  that.
2    MR. FINKEL: Your Honor, if the record could reflect
3    that Detective Truscelli pointed to the north central part of
4    Staten Island.
5    THE COURT: All right.
6  Q. Thank you, Detective. You can have a seat.
7    Detective, why did you conduct surveillance at 737
8    Post Avenue?
9  A. Because based on that phone call, we had -- and the
10    discussion we had with the other male on the phone call, we
11    knew that male resided at 737 Post Avenue, so we focused our
12    attention on that location.
13  Q. What time did you arrive in the vicinity of 737 Post
14    Avenue?
15  A. I don't recall the time offhand.
16  Q. Is there anything that would refresh your recollection?
17  A. Yes, if I may refer to the DD-5.
18  Q. If you can turn in your binder to 3507-17 at page 156.
19    (Pause)
20  Q. Does that refresh your recollection of what time you
21    arrived in the vicinity of 737 Post Avenue?
22  A. Yes, it does.
23  Q. And what time was that?
24  A. Approximately 1800 hours, which is 6:00.
25    MR. FINKEL: Ms. Dunbar, if we can display for the

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1 witness what has been marked for identification as Government
2 Exhibit 248.
3 Q. Do you recognize that?
4 A. I do, yes.
5 Q. What is that?
6 A. That is -- the car on the left is the Jersey plated Honda
7 CRV parked in the driveway of 737 Post Avenue.
8 Q. Is that a fair and accurate representation of 737 Post
9 Avenue?
10 A. It is, yes.
11          MR. FINKEL: Your Honor, the government offers 248.
12          MR. QUIJANO: No objection.
13          MS. O'NEILL: No objection.
14          THE COURT: 248 is in evidence.
15          (Government's Exhibit 248 received in evidence)
16          MR. FINKEL: Publish that, please, Ms. Dunbar.
17 BY MR. FINKEL:
18 Q. What, if anything, did you observe when you were in the
19 vicinity of 737 Post Avenue.
20 A. At approximately 1830 hours, Paul arrived at the location.
21 He was in a Hyundai Santa Fe with the out-of-state
22 Florida plate, I believe. He walked to the front door of the
23 location. He was met in the threshold of the front door by
24 Dino, who we knew to be Medin Kosic. There was a short
25 conversation back and forth. Paul took a -- he was passed a

1 small black bag, kind of like you would get in a bodega for a
2 soda, something like that. He exited the location, walked back
3 towards the his car. As he walked toward the car, he placed
4 that object down his pants.
5          MR. FINKEL: We could take that down. Thank you.
6 Q. Let me direct your attention to September 26, five days
7 later in 2017. What, if anything, were you doing with respect
8 to the Paul Van Manen investigation on that occasion?
9 A. What was the date?
10 Q. September 26, 2017.
11 A. If I could refresh?
12 Q. Do you remember?
13 A. I don't remember offhand.
14 Q. Is there anything that would refresh your recollection?
15 A. DD-5, please.
16 Q. If you could turn to 3507-17 at page 165.
17 A. Page 165, correct?
18 Q. That's correct.
19          (Pause)
20 Q. Does that refresh your recollection as to what you were
21 doing as part of the Paul Van Manen investigation on September
22 26, 2017?
23 A. Yes, it does.
24 Q. And what were you doing?
25 A. We were conducting surveillance on Paul.

1 Q. What time?
2 A. Approximately 1730 hours.
3 Q. What location approximately?
4 A. Huguenot off on Staten Island.
5          MR. FINKEL: If I could direct the jury to turn to
6 301CT, which I think is the third transcript in the packet, and
7 at this time I am going to ask Ms. Dunbar to play Government
8 Exhibit 301CT, which is in evidence, and this is an outgoing
9 call from the 8865 number to a number ending in 6957 on
10 September 26, 2017, at approximately 1731.
11          (Audio played)
12          MR. FINKEL: Let's pause right there.
13 Q. Based on your own personal observations, do you recognize
14 either of those individuals on the call?
15 A. The one female was Doreen Spinelli and at that point the
16 other one I did not recognize.
17          MR. FINKEL: Ms. Dunbar, if you could continue playing
18 the recording, please.
19          (Audio played)
20          MR. FINKEL: Pause right there.
21 Q. Detective Truscelli, based on your experience as a
22 narcotics detective and your involvement in this investigation,
23 what is your understanding of what was meant by "one"?
24 A. One would be one bundle or ten glassines of heroin.
25          MR. FINKEL: Ms. Dunbar, if we could finish the call,

1 please.
2          (Audio played)
3          MR. FINKEL: If I can direct the jury's attention to
4 the next transcript in the packet, which is marked as 301CU.
5          Now I'm going to play, with the court's permission,
6 what is in evidence as 301CU. This is an outgoing call from
7 that 8865 number to a 6957 number on September 26, 2017 a few
8 minutes later at 1743.
9          (Audio played)
10 BY MR. FINKEL:
11 Q. Detective Truscelli, what, if anything, did you observe on
12 September 26, 2017 at approximately 1745.
13 A. I had set up my vehicle across from the TD Bank. There is
14 actually another bank on the other side of the street, and
15 where I positioned was elevated in regards to the TD Bank
16 parking lot, so I had a good view inside of the parking lot
17 from where I was parked. A -- Paul and Doreen pulled into the
18 lot as well as another SUV which was driven by a female. After
19 both cars had parked -- they were parked several spaces away
20 from each other -- Paul exited his vehicle, he walked to the
21 waiting SUV that was in the lot, opened the front passenger
22 door, and went into the auto, conducted a narcotics
23 transaction, and walked back to his vehicle.
24          (Counsel confer)
25          MR. FINKEL: Your Honor, may I approach.

J582van1    Truscelli - Direct    Page 314

1    THE COURT: Yes, you may.
2    BY MR. FINKEL:
3    Q. Detective Truscelli, I have handed you what's been marked
4    for identification as Government Exhibits 251 to 259. Can you
5    flip through those real quick?
6        Do you recognize those?
7    A. I do, yes.
8    Q. What are they?
9    A. These are photographs that were taken during the
10    surveillance in regards to that phone call.
11    Q. Are they fair and accurate photographs of what you observed
12    that day?
13    A. Yes, sir, they are.
14        MR. FINKEL: Your Honor, the government offers 251
15    through 259.
16        MR. QUIJANO: No objection.
17        MS. O'NEILL: No objection.
18        THE COURT: 251 through 259 are received in evidence.
19        MR. FINKEL: Thank you.
20        (Government's Exhibits 251 through 259 received in
21    evidence)
22        MR. FINKEL: Ms. Dunbar, if we can publish for the
23    jury Exhibit 251.
24    BY MR. FINKEL:
25    Q. What are relooking at here, Detective Truscelli.

J582van1    Truscelli - Direct    Page 315

1    A. That is a picture of Paul sitting in the white Hyundai
2    Santa Fe.
3    Q. Can you circle him please?
4    A. (Witness complies).
5        MR. FINKEL: Your Honor, if the record could reflect
6    that Detective Truscelli circled the individual sitting in the
7    driver's seat?
8        THE COURT: He is smoking a cigarette?
9        THE WITNESS: Yes, your Honor.
10        THE COURT: Yes.
11    BY MR. FINKEL:
12    Q. Detective, I'm going to circle something, if I can, in red.
13    Detective Truscelli, what is that green box?
14    A. That is the TD Bank logo.
15    Q. Why is there a TD Bank logo there?
16    A. Because the transaction, based on that last phone call, you
17    could see they agreed to meet in the TD Bank.
18        MR. FINKEL: If we can go to 253, please.
19    Q. And what do we see here?
20    A. That is Paul in the auto with the door open; and, looking
21    at the picture on the left, that's Doreen Spinelli.
22    Q. And 252?
23    A. 252 that is Paul exiting the car.
24    Q. It should appear on your screen.
25        MR. FINKEL: And 257, please.

J582van1    Truscelli - Direct    Page 316

1    Q. What are we looking at here?
2    A. That's Paul opening the front passenger door of the Nissan
3    SUV that was waiting.
4        MR. FINKEL: And if we can go to 258, please,
5    Ms. Dunbar.
6    Q. What are we looking at here?
7    A. That's Paul after he had exited the Nissan.
8    Q. And 254, please.
9    A. That's a picture of Paul leaning in the Nissan. And if you
10    look at that picture, you can actually see what appears to be
11    both persons looking down towards the front passenger seat,
12    which in my experience has been that's --
13        MR. QUIJANO: Objection.
14        THE COURT: Sustained.
15    Q. Detective, were you able to identify the gender of the
16    person in the Nissan?
17    A. Yes.
18    Q. And what was that?
19    A. It was a female.
20        MR. FINKEL: And, Ms. Dunbar, if we can go to 255.
21    A. That is a picture of Paul and the female both leaned over
22    the passenger seat of the vehicle.
23    Q. And can you circle the individual you recognize to be
24    Mr. Van Manen?
25    A. (Witness complies).

J582van1    Truscelli - Direct    Page 317

1    Q. And can you circle the individual you recognize to be the
2    female you identified that afternoon.
3    A. (Witness complies).
4        MR. FINKEL: And, Ms. Dunbar, if we can go to 256 and
5    259, please.
6    Q. What are we looking at here?
7    A. 259 is Paul after he had exited the white Nissan walking
8    back to his vehicle.
9        MR. FINKEL: We can take that down. Thank you.
10    Q. Detective Truscelli I want to direct your attention to
11    September 28, 2017. Do you recall what, if anything, you were
12    doing as part of the Van Manen investigation on that date?
13    A. September 28?
14    Q. Yes, sir.
15    A. I have to refresh my memory, please.
16    Q. Do you remember?
17    A. I don't remember specifics offhand, no.
18    Q. What would refresh your recollection, if anything?
19    A. DD-5 for the day.
20    Q. Okay if you can turn to 3507-18 at page 3. Does that
21    refresh your recollection?
22    A. Yes, it does.
23    Q. What were you doing on that day as part of the Paul
24    Van Manen investigation?
25    A. We were conducting surveillance.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  Q. What time?
2  A. Approximately 2000 hours.
3  Q. What time is that?
4  A. 8:00 in the evening.
5  Q. What was the general vicinity in which you were conducting
6  surveillance?
7  A. 2800 Hylan Boulevard.
8  Q. Near what location, if any?
9  A. It's a Burger King at that location.
10      MR. FINKEL: Ms. Dunbar, if you can display for the
11  witness Government Exhibit 260.
12  Q. Detective, what are we looking at here?
13  A. That is the Burger King at 2800 Hylan.
14  Q. Is that a fair and accurate picture of the Burger King on
15  Hylan?
16  A. Yes, it is.
17      MR. FINKEL: Your Honor the government offers 260?
18      MS. O'NEILL: No objection.
19      THE COURT: 260 is in evidence.
20      (Government's Exhibit 260 received in evidence)
21      MR. FINKEL: If we could publish that, please.
22      Ms. Dunbar, if we can display for the witness what has
23  been marked for identification as Government Exhibit 301 C V.
24  The government will proffer that these are four text messages
25  from Government Exhibit 301.

1      BY MR. FINKEL:
2  Q. Detective Truscelli, are these text messages to and from
3  that 8865 number?
4  A. That's correct, yes.
5  Q. And what date?
6  A. The date on this is 9/28/17.
7      MR. FINKEL: Your Honor, the government offers 301CV?
8      MR. QUIJANO: No objection.
9      MS. O'NEILL: No objection.
10      THE COURT: It is received in evidence.
11      (Government's Exhibit 301CV received in evidence)
12      MR. FINKEL: If we could publish that, please.
13      BY MR. FINKEL:
14  Q. Detective Truscelli, if you can read the message incoming
15  to the 8865 number at 1645?
16  A. "Yo 630 chase."
17  Q. And can you read the text message outgoing from the 8865
18  number at 1841?
19  A. "8," "8:00."
20  Q. And can you read the text messages at 1841, incoming to the
21  8865 number?
22  A. "You suck."
23  Q. And if you can read the text message incoming to the 8865
24  number at 2012?
25  A. Sure. "My phone on five percent. Come in to BK in case my

1  phone dies."
2  Q. And 2012, what time is that?
3  A. 8:12.
4      MR. FINKEL: Ms. Dunbar, if we can put 260 back up,
5  please.
6  Q. Detective, can you tell the jury about the surveillance you
7  conducted on September 28, 2017.
8  A. Sure. Based upon the intercepted text messages, we knew
9  that the transaction was going to occur inside a Burger King,
10  so at approximately 2000 hours, I entered the Burger King,
11  grabbed a soda and a dollar cheeseburger and sat down. And
12  when I sat down, I was able to observe at the same point the
13  person who had contacted Paul on the phone sitting in there
14  also.
15      Approximately maybe ten, 12 minutes later, Paul and
16  his vehicle pulled into the parking lot. I was seated by the
17  window, so I was able to see this.
18      Paul and Doreen both entered the Burger King. Doreen
19  sat down with the male who I was observing who I knew to be
20  Derek Yung. Doreen sat down at the table. She conducted the
21  transaction with him.
22      While this was going on, Paul had gotten on line and
23  ordered some food. After he completed his order, got his food,
24  he came back, Doreen passed him some U.S. currency, she got up,
25  they exited, returned to their vehicle, and the person who had

1  received the small object from them exited on foot and left the
2  location.
3      When the purchaser had left the location, I followed
4  him out of the parking lot on foot as well. Came a point where
5  he took the small object -- he had, like, cargo shorts on that
6  have the extra pockets, so he took the small object, placed it
7  into the pocket of his cargo shorts, and at that point I broke
8  off the surveillance and went back to my car.
9  Q. Detective, why did you order food in the Burger King?
10  A. It would have looked strange for me sitting there with no
11  food, so I wanted to blend in.
12  Q. What do you mean, look strange?
13  A. You know, to be sitting there with no food staring at two
14  other people is a little weird.
15  Q. Let me direct your attention to October 22, 2017.
16      MR. FINKEL: And if I can ask the jury and the court
17  to turn to 301M in your packet.
18      This is a call between the 8865 number and a number
19  ending in 0111. It is October 22, 2017, at approximately 1423.
20      And Ms. Dunbar if you can play that, please.
21      (Audio played)
22      MR. FINKEL: Pause that, please.
23      BY MR. FINKEL:
24  Q. Do you recognize that voice?
25  A. Yes, I do.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  Q. Whose voice is it?
2  A. That's Paul Van Manen's voice.
3       MR. FINKEL: Ms. Dunbar, if you can start it from the
4  beginning and play it again.
5       (Audio played)
6  BY MR. FINKEL:
7  Q. What, if anything, did you do as part of the Paul Van Manen
8  investigation on October 22, 2017?
9  A. I was conducting surveillance.
10  Q. Do you recall where?
11  A. The vicinity of 225 Malone Avenue.
12  Q. Detective Truscelli, can you point out on the map in the
13  center of the courtroom Government Exhibit 401 where
14  approximately 225 Malone Avenue is?
15  A. Sure. This is Great Kills park here, to the right, right
16  around here.
17  Q. What neighborhood is that?
18  A. Kind of like the border of Great Kills and Oakwood.
19  Q. Okay. Thank you.
20       Detective, are you familiar with the name Michael
21  Ogno?
22  A. Yes, I am.
23  Q. Have you met Michael Ogno?
24  A. I have not, no.
25       THE COURT: You have or you have not?

1       THE WITNESS: I have not, sir.
2       THE COURT: Okay.
3  BY MR. FINKEL:
4  Q. What time did you conduct surveillance on October 22, 2017?
5  A. I don't specifically know offhand. If I could refresh from
6  a DD-5.
7  Q. Do you remember?
8  A. No, I do not.
9  Q. What, if anything, would refresh your recollection?
10  A. My DD-5 for the day.
11  Q. Okay. If you could turn to 3507-18 at 90.
12       What time did you conduct surveillance in the vicinity
13  of 225 Malone?
14  A. Approximately 1430, which is 2:30.
15  Q. Detective Truscelli have you conducted surveillance at 225
16  Malone more than this just one time?
17  A. Yes, I have.
18  Q. Why have you been there on more than one occasion?
19  A. Because he was what we would call one of his top callers or
20  multiple caller coming from that location ordering narcotics.
21  Q. What did you observe, if anything, at 1430?
22  A. At approximately 1430, Subaru pulled -- turned the corner
23  on to Malone, parked in front. The Subaru was operated by Nick
24  Genino, and in the front passenger seat was Paul Van Manen. At
25  the time that the car pulled up, Michael Ogno exited the

1  location, ran to the front passenger door. Transaction
2  occurred between Paul and Michael Ogno, U.S. currency for a
3  small object. Michael Ogno turned, ran back into the house, at
4  the same time placing the object into his shorts pocket.
5       MR. FINKEL: If the jury and the court can turn to in
6  their packet 301CW, which I believe is the next transcript, and
7  at this time the government will play what's in evidence and
8  marked as 301CW. And it is a call from that 8865 number to a
9  number ending in 0111, and it is October 22, at approximately
10  1559.
11       (Audio played)
12  BY MR. FINKEL:
13  Q. Detective Truscelli, that transaction you described
14  involving Mr. Van Manen on October 22, 2017, what time
15  approximately did you observe it?
16  A. 1430, a little after.
17       MR. FINKEL: If I can direct the jury's attention and
18  the court's attention to the next transcript in the packet,
19  which is marked as 301CY. The government is going to play this
20  call. This is a call from October 22, 2017, at approximately
21  1622 and it is between the 8865 number and the number ending in
22  0111.
23       Ms. Dunbar.
24       (Audio played)
25       MR. FINKEL: Let's pause right there.

1  BY MR. FINKEL:
2  Q. Detective Truscelli, whose voice, if you recognize it, said
3  "yeah, I gotta go to Brooklyn now. I'm empty, so I'm on the
4  rebound."
5  A. That's Paul Van Manen's voice.
6       MR. FINKEL: Ms. Dunbar, if you can roll it back a few
7  seconds.
8       (Continued on next page)

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1    (Audio played)
2    BY MR. FINKEL:
3    Q. Detective Truscelli, what, if anything, did you do as part
4    of the Paul Van Manen investigation that same day, October 22,
5    2017, but later in the day, around 1745?
6    A. We had conducted further surveillance at 225 Malone.
7         MR. FINKEL: Ms. Dunbar, if you can display for the
8    witness what has been marked for identification as Government
9    Exhibit 201.
10   Q. Detective Truscelli, do you recognize that?
11   A. I do, yes.
12   Q. What is that?
13   A. It's a picture of 225 Malone.
14        MR. FINKEL: The government offers 201.
15        MR. QUIJANO: No objection.
16        MS. O'NEILL: No objection.
17        THE COURT: 201 is received.
18   (Government's Exhibit 201 received in evidence)
19        MR. FINKEL: If we can publish that, please.
20        Ms. Dunbar, if we can display for the witness what has
21   been marked for identification as 301N.
22        The government will proffer this is a series of text
23   messages taken from Government Exhibit 301.
24   BY MR. FINKEL:
25   Q. Detective Truscelli, are these text messages between the

1    0111 number and the 8865 number?
2    A. Yes, they are.
3    Q. What date?
4    A. 10/22/2017.
5         MR. FINKEL: Your Honor, the government offers 301N.
6         MR. QUIJANO: No objection.
7         MS. O'NEILL: No objection.
8         THE COURT: 301 is in evidence.
9    (Government's Exhibit 301 received in evidence)
10        MR. FINKEL: If we can publish it, please.
11   Q. Detective Truscelli, if you can read the text at 1743 from
12   0111 to 8865?
13   A. It says, "Yo."
14   Q. And a moment later from 8865 to 0111.
15   A. "What's up?"
16   Q. And at 1758 from 8865 to 0111.
17   A. "2 min."
18   Q. And a moment later from 0111 to 8865.
19   A. "OK."
20   Q. At 1800, from 8865 to 0111.
21   A. "Here."
22   Q. Detective Truscelli, what, if anything, did you observe at
23   225 Malone on October 22, 2017 at 1800?
24   A. Again, Michael Ogno exited the location. Paul again was up
25   front with Nick Genino, and Michael Ogno went to the window.

1    There was another transaction at the front passenger window
2    where Paul was seated. Michael Ogno again passed currency,
3    took a small object, ran back into the house. And then Paul
4    and Nick Genino left the location.
5    Q. Is that at 1800?
6    A. Correct. Yes.
7    Q. What type of car was Mr. Van Manen in on that occasion?
8    A. It was a black Ford the second time.
9    Q. Is that different from the other cars you talked about
10   before?
11   A. Yes.
12   Q. Did there come a time when the wiretap on the 8865 number
13   came down?
14   A. Yes.
15   Q. Were you able to re-up it?
16   A. No, we were not.
17   Q. Why not?
18   A. Because we had, during the course of our investigation, I
19   guess, overlapping targets or subjects, who were also being
20   investigated by the strike force.
21   Q. We will talk about that in a moment.
22        Let me first direct your attention to October 29,
23   2017. Were you working on that date?
24   A. Yes, I was.
25   Q. What, if anything, were you doing as part of the Paul Van

1    Manen investigation on that date?
2    A. I don't remember offhand.
3    Q. Would anything refresh your recollection?
4    A. DD-5.
5    Q. If you would turn in your binder to 3507-08, at page 108.
6         Does that refresh your recollection?
7    A. Yes.
8    Q. What, if anything, did you do as part of the Paul Van Manen
9    investigation on October 29, 2017?
10   A. Again, we were conducting surveillance on 225 Malone
11   Avenue.
12   Q. At this time was the wire up?
13   A. It was down at this point.
14   Q. What time were you conducting surveillance at 225 Malone?
15   A. Approximately 1815 hours.
16   Q. What, if anything, did you see?
17   A. I have to check the times again.
18        Approximately 1840 hours, a black Ford, again driven
19   by Nick Genino and Paul as the front passenger, did arrive at
20   that location. Again, Mr. Ogno exited the location, walked up
21   to the front passenger window where Mr. Van Manen was seated, a
22   transaction was conducted, and Mr. Ogno returns inside of 225
23   Malone, and the vehicle departed that location.
24   Q. Detective Truscelli, which prosecutor's office were you
25   working with when the wire was up on the 8865 number.

UNITED STATES OF AMERICA, V                CORRECTED
PAUL VAN MANEN and KENNETH CHARLTON           May 8, 2019

1 A. Richmond County district attorney's office.
2 Q. Those are state prosecutors?
3 A. Yes.
4 Q. Richmond County, Staten Island?
5 A. Yes.
6 Q. Did there come a time when you learned there was another
7   agency working on this case?
8 A. Yes.
9 Q. What agency was that?
10 A. The strike force.
11 Q. What is your understanding of what strike force does?
12 A. Strike force is, I guess, a multi-agency task force
13   consisting of NYPD, DEA, state troopers, Homeland Security.
14 Q. What is DEA?
15 A. The Drug Enforcement Agency.
16 Q. What is HSI?
17 A. Homeland Security.
18 Q. Are those federal or state agencies?
19 A. Federal agencies.
20 Q. Do you have an understanding of what prosecutor's office
21   the strike force was working with?
22 A. Yes.
23 Q. What was that?
24 A. Southern District.
25 Q. Why would the strike force also be working on a case with

1   overlapping targets?
2 A. I believe at this point we had a few targets in common, but
3   they also had other targets which we had not identified.
4 Q. After learning of the strike force investigation, what
5   steps, if any, did you take to assist the strike force
6   investigation?
7 A. Once we sat down with the strike force, we had a meeting
8   and we did at this point turn over all of the information that
9   we had obtained through the course of our investigation.
10 Q. What was the approximate date of that, if you recall?
11 A. I'd say the end of September, mid to end of September.
12 Q. What is your understanding of the scope of the strike force
13   investigation compared to the Paul Van Manen investigation that
14   you were a part of?
15 A. From what we had, I guess the best way to explain it is
16   they had gone up the ladder, in terms of what kind of dealers
17   they were dealing with.
18 Q. For example, before the strike force
19   investigation -- withdrawn.
20      Before you became aware of the strike force
21   investigation, did you know who Kenneth Charlton was?
22 A. No.
23 Q. Was he part of your investigation?
24 A. No, he was not.
25 Q. Detective, how did you feel about the strike force

1   investigation and turning over your materials to strike force?
2      MR. QUIJANO: Objection.
3      THE COURT: Overruled.
4 A. I was not happy.
5 Q. Why?
6 A. Because myself and member of my team had put a lot of time
7   and effort into conducting this investigation.
8 Q. You talked about Michael Ogno before. Did there come a
9   time, if ever, that you learned that Michael Ogno died?
10 A. Yes.
11 Q. Was the Staten Island overdose task force investigation of
12   Paul Van Manen still running at that time or had it been turned
13   over to strike force?
14 A. It had been turned over at that point.
15 Q. Were you involved in the investigation of Michael Ogno's
16   death?
17 A. I did not have any direct -- no direct dealings with the
18   investigation.
19 Q. Did you participate in Paul Van Manen's arrest?
20 A. Yes, I did.
21 Q. Why were you part of the arrest if strike force had taken
22   over the investigation?
23 A. I guess it was a courtesy that strike force extended to
24   myself and members of my team to take him into custody.
25      MR. FINKEL: Ms. Dunbar, if we can display for the

1   witness what has been marked for identification as 203.
2 Q. What are we looking at here, Detective?
3 A. That is a ledger from the Circle Motor Lodge with names
4   attached to room numbers from the location.
5 Q. Who took that photograph?
6 A. I did.
7 Q. Why did you take that photograph?
8 A. Because there was -- we had planned on executing a search
9   warrant at the location, and we wanted to make sure that we had
10   all the right intelligence and what room Paul was staying in.
11      MR. FINKEL: The government offers 203.
12      MS. O'NEILL: No objection.
13      MR. QUIJANO: No objection.
14      THE COURT: 203 is in evidence.
15      (Government's Exhibit 203 received in evidence)
16      MR. FINKEL: Can we publish that, please.
17 Q. What is the date of this ledger?
18 A. 1/2/2018.
19 Q. What is this a ledger for?
20 A. Again, it's the Circle Motor Lodge.
21 Q. How do you know that?
22 A. If you look at the top of the piece of paper, I guess in
23   the bold letters.
24 Q. Does the ledger indicate where Paul Van Manen is residing
25   at the Circle Motor Lodge?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1   A. Yes, it does.
2   Q. Can you circle where you see that?
3       MR. FINKEL: If the record could reflect that
4   Detective Truscelli circled line 2.
5       THE COURT: Yes.
6   Q. Detective Truscelli, what is your understanding of what
7   room Mr. Van Manen was staying in on January 2, 2018?
8   A. Room number 119.
9       MR. FINKEL: Ms. Dunbar, if we can display for the
10   witness Government Exhibit 204.
11   Q. Detective Truscelli, what are we looking at here?
12   A. That is a photograph of, again, inside the parking lot of
13   the motel, and that is a Cadillac with a temporary tag on the
14   top right.
15   Q. Who took that photo?
16   A. I did.
17   Q. Approximately when did you take that photo?
18   A. I believe it was the same day, 1/2.
19       MR. FINKEL: The government offers 204.
20       MS. O'NEILL: No objection.
21       MR. QUIJANO: No objection.
22       THE COURT: 204 is in evidence.
23       (Government's Exhibit 204 received in evidence)
24       MR. FINKEL: Ms. Dunbar, if you can zoom in to the
25   room ID.

1   Q. Detective Truscelli, what room did you take a photograph
2   of?
3   A. That is room 119.
4       MR. FINKEL: If we can zoom out again.
5   Q. What is the license plate of that Cadillac?
6   A. It's a temporary tag.
7   Q. Did there come a time when Mr. Van Manen was arrested?
8   A. Yes.
9   Q. Where was he arrested?
10   A. He was arrested in New Jersey.
11   Q. Where in New Jersey?
12   A. Edison.
13   Q. Were you part of that arrest?
14   A. I was, yes.
15   Q. What, if anything, was seized from Mr. Van Manen on the day
16   of his arrest?
17   A. A quantity of heroin, approximately 130 bags, or 13
18   bundles, as well as the Cadillac that's pictured in this photo.
19       MR. FINKEL: Your Honor, at this time the government
20   is going to read a stipulation which is in evidence.
21       THE COURT: All right.
22       MR. FINKEL: The contents of Government Exhibit 19 was
23   seized from Paul Van Manen on January 16, 2018 and vouchered as
24   18003280 by law enforcement officials. The contents of
25   Government Exhibit 19 were tested by analysts employed by a New

1   Jersey state police office, a forensic science laboratory. The
2   substance contained within Government Exhibit 19 was in 190
3   glassine envelopes, each containing substance. The substance
4   tested positive for the presence of heroin, and the net weight
5   of a sample of one of the glassines was determined to weigh
6   approximately .02 grams without packaging. This finding is
7   contained within a lab report that has been marked as
8   Government Exhibit 19A.
9      Your Honor, at this time the government offers Exhibit
10   19 and Exhibit 19A.
11       MR. QUIJANO: No objection.
12       MS. O'NEILL: No objection.
13       THE COURT: They are received in evidence.
14       (Government's Exhibits 19 and 19A received in
15   evidence)
16       MR. FINKEL: May we publish?
17       THE COURT: Yes, you may.
18   BY MR. FINKEL:
19   Q. Detective Truscelli, on your screen should be Exhibit 19A.
20       MR. FINKEL: If we can zoom in again, Ms. Dunbar.
21   Q. You see there is an X and item number 1-1?
22   A. Yes.
23   Q. What is the X indicating?
24   A. That it tested positive for heroin.
25   Q. Detective Truscelli, have you told the jury about every

1   surveillance operation you conducted in the Paul Van Manen
2   case?
3   A. No, I have not.
4   Q. Have you told the jury about everything you know about the
5   Paul Van Manen case?
6   A. No.
7   Q. Thank you, Detective.
8       MR. FINKEL: Nothing further at this time.
9       THE COURT: We will take our morning recess now and we
10   will resume in 15 minutes.
11       (Jury exits courtroom)
12       THE COURT: Who is going to be conducting the cross?
13       MR. QUIJANO: I am, your Honor.
14       MS. O'NEILL: I am.
15       THE COURT: I will see you in 15 minutes.
16       (Recess)
17       (Jury present)
18   ARTHUR TRUSCELLI, resumed.
19       THE COURT: Mr. Quijano.
20   CROSS-EXAMINATION
21   BY MR. QUIJANO:
22   Q. Good morning, Detective Truscelli.
23   A. Good morning.
24   Q. Sir, I am going to ask you some questions. If you can
25   answer them with a yes or no, I will ask you to do so. If you

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  don't understand my question, simply tell me and I will try to
2  rephrase it. All right?
3  A. Very good.
4  Q. Now, there were two investigations. There was your
5  investigation out of Staten Island and the district attorney's
6  office there, and there was the strike force investigation
7  which was the federal investigation, correct?
8  A. That is correct, yes.
9  Q. When did your investigation that you have been talking
10  about, when did that start, approximately?
11  A. Approximately April of 2017.
12  Q. I believe you indicated some of the targets of that
13  investigation in your earlier testimony. They obviously
14  included Mr. Van Manen, Doreen Spinelli. I think you mentioned
15  Bogdanovic?
16  A. Yes.
17  Q. Sullivan?
18  A. Shaun Sullivan, correct.
19  Q. Graziano?
20  A. That is correct.
21  Q. Cejovic?
22  A. No.
23  Q. How about Kosic?
24  A. Yes.
25  Q. Now, based on your investigation, you certainly knew who

1  Mr. Cejovic was?
2  A. He was not one of our targets.
3  Q. But you knew who he was during the investigation?
4  A. I was familiar with him, yes.
5  Q. I am correct that through your investigation you learned
6  that Mr. Van Manen and all the other names I mentioned, besides
7  Cejovic and Kosic, were addicts, correct?
8  A. I was not aware of that, no.
9  Q. You did not know they were addicts?
10  A. No, sir.
11  Q. Were you aware that Kosic and Mr. Cejovic were not addicts?
12  A. Repeat that, please.
13  Q. Were you aware that Kosic and Cejovic were not addicts?
14  A. I was not aware of any of their drug use, in either
15  direction.
16  Q. OK. Now, the strike force, from what you understand,
17  actually dates back to about 2015. Does that sound right?
18  A. I was not privy to any information in regards to that
19  investigation.
20  Q. You had many conversations with the government prior to
21  your testimony, correct?
22  A. Did I have conversations?
23  Q. With these folks, yes.
24  A. Yes.
25  Q. Many, right?

1  A. I had several, yes.
2  Q. In late April, do you recall telling them how the strike
3  force was founded around 2015? Do you remember that?
4  A. The strike force was founded around 2015?
5  Q. Yes.
6  A. No, I don't recall that.
7      MR. QUIJANO: Ms. Dunbar, please put up for the
8  witness alone 3507-20, page 1.
9  Q. Look at that to yourself, the lower part of that document.
10  Does that refresh your recollection that in April,
11  late April of this year, you told the government about the
12  strike force being founded in 2015?
13  A. You're talking about the bottom of the page?
14  Q. Yes, sir.
15  A. It does not reference anything about the strike force being
16  founded in 2015.
17  Q. The question, actually, was if that refreshed your
18  recollection as to whether you told the government that the
19  strike force was founded in 2015?
20  A. No.
21  Q. OK. Certainly during the course of your investigation, you
22  ascertained that Paul Van Manen was an addict. Do you agree
23  with that?
24  A. I could not speak on, based on our investigation, if he was
25  an addict or not.

1  Q. You investigated him for four or five months, apparently
2  very closely, and you never ascertained whether he was an
3  addict; is that your testimony?
4  A. I had never --
5  Q. I think that's a yes or no, sir.
6      MR. FINKEL: Could the witness be allowed to finish
7  his answer?
8      THE COURT: The witness can answer the question.
9  A. The focus of our investigation was his narcotics sales. We
10  were not investigating whether or not he was a user.
11  Q. I didn't ask you that. Did you ascertain, based on your
12  entire involvement in this investigation against Paul Van
13  Manen, did you eventually determine or learn or conclude that
14  he was an addict?
15  A. No, sir.
16  Q. Now, you knew about Paul Van Manen from before the spring
17  of 2017, correct?
18  A. That is correct, yes.
19  Q. In fact, you first became aware of Paul Van Manen around
20  July of 2015. Does that sound familiar?
21  A. That is not the first time, sir, no.
22  Q. In July of 2015, weren't you called to a traffic stop that
23  involved someone that had a narcotics history, to investigate
24  that, and that person was Paul Van Manen? Do you remember
25  that?

1 A. I don't remember it offhand, sir, no.
2 Q. How about a year earlier in July of 2014, do you recall
3 being involved in a raid at 37 Victory Boulevard at 6 in the
4 morning?
5 A. Yes, sir.
6 Q. That was the home of Paul Van Manen, correct?
7 A. That is correct, yes.
8 Q. And to be clear, that particular involvement that you had,
9 that was not part of the investigation that you have been
10 talking about this morning, correct, it was something totally
11 separate and different?
12 A. That predates this investigation, yes.
13 Q. In that raid, Paul Van Manen's companion, Anthony Perez,
14 was there. Do you remember that?
15 A. I don't remember who else was in the apartment at that
16 time, sir, no.
17 Q. Do you remember the search, the raid and the search?
18 A. I recall it, yes.
19 Q. Do you remember Paul Van Manen was there during that raid
20 and search, correct?
21 A. That I recall, yes.
22 Q. Do you recall calling them junkies as well as faggots?
23 A. Excuse me?
24 Q. Did you call them junkies and faggots?
25 A. No, sir, I did not.

1 Q. In August 2015, you executed another search warrant at
2 Paul's home at Coddington Avenue, is that correct?
3 A. There was a warrant executed there, correct.
4 Q. You participated in that, correct?
5 A. No, sir. I was in Ocean City, Maryland.
6 Q. But the execution of that warrant was part of your case at
7 that point, right? You were involved in that case?
8 A. I did have some involvement, yes.
9 Q. You knew that raid was going to take place and it was going
10 to be at the home of Paul Van Manen, correct?
11 A. I was aware that we had an investigation there. I was not
12 aware of when the raid was going to be executed, no.
13 Q. You did become aware of when the raid actually took place,
14 you learned what took place, right?
15     MR. FINKEL: Objection. Foundation.
16     THE COURT: Overruled.
17 A. Can you repeat that?
18     MR. QUIJANO: Let me withdraw it and rephrase it.
19 Q. You subsequently learned the results of that raid at that
20 house, correct?
21 A. Yes, that's correct.
22 Q. And you learned that Paul wasn't there that night, is that
23 correct? Do you remember?
24     MR. FINKEL: Objection. Lacks personal knowledge.
25     THE COURT: Overruled. Let's find out.

1 A. I don't know whether he was there or not.
2 Q. Were there other individuals there, Anthony Perez again?
3 A. Again, sir, I was not there. So I can't answer that.
4 Q. Do you recall what contraband was seized during that raid?
5 A. I believe there was heroin recovered.
6 Q. About 119 glassines of heroin, or 12 bundles, does that
7 sound like about the quantity that was recovered?
8 A. If I took a look at a voucher, I would be able to tell you
9 exactly what was recovered.
10     THE COURT: But as you sit here now, you don't know?
11     THE WITNESS: I don't know, sir.
12 Q. Again, just to be clear, that raid had nothing to do with
13 the investigation you have been talking about today, correct?
14 A. It was not linked to this current investigation.
15 Q. Now, you talked earlier about some of the surveillance that
16 you conducted in the investigation when it started in the
17 spring of 2017.
18     Can you give us some estimate of approximately how
19 many surveillances you conducted?
20 A. Myself personally?
21 Q. Or your team.
22     MR. QUIJANO: Withdrawn.
23 Q. You were the leader of that investigation, lead
24 investigator, is that correct?
25 A. Yes, that's correct.

1 Q. So obviously you had to keep track of all the results of
2 the investigations that were happening, right?
3 A. I was made aware of the results, yes.
4 Q. Just give us an estimate, if you can, how much surveillance
5 was carried out that involved Paul, a ballpark figure, as best
6 as you can.
7     MR. FINKEL: Objection on the term of "how much."
8     THE COURT: It's a pretty clear question.
9     How many times did you surveil Mr. Van Manen?
10 A. I can speak personally on myself, probably close to 100
11 times. As far as the other team members, I couldn't even give
12 you a safe estimate on that.
13 Q. OK. As I followed your testimony this morning, you talked
14 about some of the surveillances. I think there was one on June
15 12th, a surveillance, where eventually you followed Mr. Van
16 Manen and he parks near a check cashing establishment and a
17 laundromat. Do you remember that testimony?
18 A. Yes.
19 Q. Then if I heard you correctly, you indicated that what you
20 were able to see was at one point Van Manen leave with a black
21 bag and enter a laundromat, correct?
22 A. That's correct.
23 Q. To be clear, you had no idea what was in that black bag,
24 correct?
25 A. No.

1 Q. Your surveillance did not allow you to see what took place
2 inside the laundromat, correct?
3 A. No, sir.
4 Q. That's not correct?
5     THE COURT: I think he is agreeing with you.
6 A. I'm agreeing with you.
7 Q. You then talked also about the June 14th surveillance,
8 which I think involved an actual transaction. You followed him
9 from the Circle Lodge where he was staying. Now there is an
10 exchange, I believe you were able to see money again for
11 another black bag, correct?
12     June 14th surveillance.
13 A. I don't remember just based off the date, sir.
14 Q. The various surveillances you described were either people
15 meeting with him or him going to particular locations, is that
16 fair?
17 A. That is fair, correct.
18 Q. Most of these surveillances, would you agree with me,
19 certainly you characterized it as what appeared to be narcotics
20 transactions, money for presumably narcotics, correct?
21 A. Based upon our investigation and just a wiretap, we were
22 able to safely determine, and it was a good determination, that
23 it was an actual narcotics transaction.
24 Q. My question is a little bit different.
25     I am simply asking, all of the surveillances you

1 talked about this morning, and indeed, all of the surveillances
2 that you conducted or are aware of of Paul Van Manen,
3 essentially came down to a transaction of money for heroin, is
4 that fair?
5 A. That is fair, yes.
6 Q. You didn't see Paul Van Manen packaging heroin?
7 A. No.
8 Q. Or any other aspect in terms of, like, a narcotics
9 enterprise, other than these exchanges, presumably, of money
10 for heroin?
11     MR. FINKEL: Objection to the term "enterprise."
12     THE COURT: Overruled.
13 A. No, sir, I did not.
14 Q. Based on your investigation, am I correct that one of the
15 things that you determined was that these transactions usually
16 involved under 30 bundles of heroin as opposed to kilos or
17 pounds or larger quantities? Would you agree with that?
18 A. There was no kilos and there was no pounds involved in the
19 transactions.
20 Q. My question though is, most of these, if not all of these
21 transactions involved a quantity of bundles that was usually 30
22 or less, 50 or less, do you agree with that?
23 A. Under 30 or 50 bundles, that's correct, yes.
24 Q. Do you recall in your testimony certain recordings were
25 played, transcripts were followed; there was one from a

1 September 21st encounter, it was Government Exhibit 301.
2     MR. QUIJANO: In fact, why don't we just play that
3 again, a portion of it. Can we do that? It's 301V.
4     Hold on.
5     THE COURT: I think you have to be more specific.
6     MR. QUIJANO: Let me withdraw that for a moment, your
7 Honor.
8 BY MR. QUIJANO:
9 Q. Actually, you still have the transcripts?
10 A. From the calls, yes, sir.
11 Q. Could I ask you to turn to 301V-T.
12     On page 1, starting at line 18, where the attribution
13 has Paul saying, "So I'll be there in ten minutes. Right, you
14 get a hundred today, then I owe you 270 at this point."
15     Dino replies: "Yeah, I know, dude."
16     You have no knowledge as to what that referred to,
17 what he owed 270 for, correct?
18 A. Line 18, sir?
19 Q. I started at line 18, yes, down to 20.
20     The question is, you have no knowledge of what he owed
21 Dino --
22     THE COURT: You're talking about 301?
23     MR. QUIJANO: 301V, as in Victor, transcript. Page 2,
24 starting at line 18.
25     THE COURT: Thank you.

1 A. Repeat the question, sir.
2 Q. You don't know what he owed Dino money for?
3     This was a call on September 21st, right?
4 A. Did I know what he owed him money for?
5 Q. Yes.
6 A. Yes, sir.
7 Q. What did he owe him money for?
8 A. Heroin that was purchased from Dino.
9 Q. How do you know that?
10 A. Based upon --
11 Q. Not based upon -- I'm sorry. How do you know that?
12 A. Based upon, again, the investigation, as we were
13 intercepting calls, there was a pattern between the two of
14 them, and based upon surveillance conducted, it was a safe
15 determination that it was a heroin transaction.
16 Q. Detective, I am not asking you whether he owed him money
17 for some heroin-related transaction or anything heroin related.
18 I am asking you whether you have any specific knowledge of what
19 he owed 270 for at this point.
20 A. Again, sir, based on what we had gone on through our
21 investigation, yes, we did know what he owed him money for.
22 Q. You're surmising. What did he owe the money for?
23 A. Sir, you're taking one call out of hundreds that were
24 intercepted.
25 Q. Detective, I am asking you about this call and what was

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

**CORRECTED**
May 8, 2019

1   said.
2            MR. FINKEL: If the witness can be allowed to finish
3   his answers, please.
4            THE COURT: Yes.
5            Do you have a pending question?
6            MR. QUIJANO: I will withdraw it.
7   Q.  My question to you is, this particular reference, this
8   statement that I owe you 270 for, you do not have any other
9   knowledge of what specifically he owed 270 for, other than your
10  surmise that it had something to do with heroin, correct?
11  A.  That is incorrect, sir.
12  Q.  What did he owe 270 for?
13  A.  He owed 270 for heroin.
14  Q.  For buying heroin, for packaging heroin, for heroin that he
15  bought before?  You do not know what specifically he owed 270
16  for, is that correct?
17  A.  The 270 that he is referencing in here?
18  Q.  Yes.
19  A.  It was -- the way that it worked between the two was that
20  the heroin was fronted, and after it was sold, Paul did pay off
21  his tab.
22  Q.  You have no independent knowledge to know that that's what
23  this particular "I owe you 270 for" is, do you?  You're
24  surmising based on your entire investigation, isn't that
25  correct?

1   A.  Sir, based upon prior phone calls, where he did order
2   heroin from Mr. Kosic, that is what he owed the money for.
3   Q.  Did any of those prior phone calls reference specifically
4   this particular conversation where he is saying I owe 270?
5   A.  Question again.
6   Q.  Again, I want to know if any of those prior phone calls
7   that you just referred to specifically referred to the debt he
8   is talking about on September 14 at 2:30 in the afternoon?
9   A.  I cannot speak on that, sir, because we don't have the
10  calls here.
11  Q.  And you don't have any independent knowledge of a call such
12  as that, correct?
13  A.  There was numerous calls.
14  Q.  Do you have any independent knowledge of a call, such as
15  the one you just described, such as one where he owed 270 for
16  specifically he owed 270 for on September 14 at 2:30?  You
17  don't have that, do you?
18  A.  I could not sit here and give you a time and date of a
19  call.
20  Q.  Based on your investigation, you came to determine that
21  Paul would purchase heroin from Kosic, correct?
22  A.  Yes, sir.
23  Q.  You also came to determine that Paul would purchase heroin
24  from several other sources, correct?
25  A.  That isn't correct, sir.

1   Q.  In the five months that you're investigating Paul Van
2   Manen, you never saw indications of him purchasing heroin from
3   another source other than Kosic?
4   A.  I believe there was one instance where he did purchase from
5   one other source, sir, not multiple.
6   Q.  Who and when was that?
7   A.  I'd -- I don't know offhand, but that is documented.
8   Q.  Does the name Drama mean anything to you?
9   A.  Yes, sir, I am aware of Drama.
10  Q.  He sells heroin, right?
11          He supplies heroin, correct?
12  A.  He was arrested for narcotics sales, that is correct.
13  Q.  For selling heroin, correct?
14  A.  I don't know what his specific charges were, sir.
15  Q.  You don't know Drama's involvement with either Paul Van
16  Manen or any of the other people that you have talked about in
17  terms of surveillance in your investigation?
18  A.  Sir, Drama was not a part of our case so I could not speak
19  of him.
20  Q.  Did you come across during your investigation that Drama
21  was a supplier to some of the other targets that you have
22  mentioned, including Paul Van Manen?
23          MR. FINKEL: Your Honor, I would just ask that Mr.
24  Quijano allow the witness to finish his answers.
25          MR. QUIJANO: I am allowing him.

1            MR. FINKEL: Thank you.
2            THE COURT: That's the format.  He asks a question and
3   then Mr. Truscelli has an opportunity to answer it.  That's the
4   format we will follow.
5   BY MR. QUIJANO:
6   Q.  Are you telling us that during the course of your
7   investigation, you never became aware that Drama would also
8   supply some of these other people that you have mentioned were
9   targets of your investigation?
10  A.  In reference to Paul, there was no link that I was aware of
11  between himself and Drama.  As far as the other individuals
12  that you referenced, there was no point in our investigation
13  where we had any direct link between Drama and any of the other
14  names.
15  Q.  OK.  What about CK, do you know someone named CK as part of
16  this investigation, or did you come across that individual?
17  A.  CK?
18  Q.  CK.
19  A.  No, sir.
20  Q.  I don't remember if you went into this.  A bundle has ten
21  glassines of heroin, is that correct?
22  A.  That is correct, yes.
23  Q.  There is about .4 grams of heroin in a glassine, does that
24  sound correct?
25  A.  I think that's giving it a little too much credit.  Usually

J588VAN2     Truscelli - Cross     Page 354

1 about .2.
2 Q. I'm sorry. I misspoke. .04 grams of heroin in a glassine?
3 A. Depending on who packaged it, but traditionally between .02
4 and .04 is fair.
5 Q. Certainly less than a half a gram in a bundle, would you
6 agree with that?
7 A. It's safe to say, yes.
8 Q. It became clear, I think from your testimony this morning,
9 that oftentimes Doreen Spinelli was with Paul Van Manen,
10 correct?
11 A. Yes, sir, that's correct.
12 Q. In fact, if I recall correctly, you started your testimony
13 by telling the jury that what you found was that Paul was
14 operating a heroin delivery service, I think is the term or
15 characterization you used, is that right?
16 A. Yes, sir.
17 Q. What you mean is you would see Paul drive to various
18 customers and appear to sell them heroin, right?
19 A. No, sir. He was operating a heroin delivery service where
20 he fielded calls in exchange for narcotics and U.S. currency.
21 Q. OK. He would get a call, presumably from a customer, and
22 then he would drive or go meet the customer and deliver the
23 heroin; that's what you're describing, right?
24 A. A delivery, yes, sir.
25 Q. Now, I believe you told us that in September your

J588VAN2     Truscelli - Cross     Page 355

1 investigation sort of got absorbed by the federal one, is that
2 when that happened?
3 A. Our investigation terminated and was taken over by the
4 strike force, correct.
5 Q. Did you continue to participate in the investigation but
6 now under the federal oversight?
7 A. I did not have any direct participation at that point, no.
8 Q. So your involvement stopped once the feds took over the
9 investigation in September, is that right?
10 A. We continued, based on whatever we had, we still conducted
11 a little bit of surveillance, but we were not directly tied to
12 the strike force investigation.
13 Q. You weren't happy about that, were you, losing the
14 investigation like that?
15 A. No, sir.
16 Q. You talked about Michael Ogno. I believe you described
17 what appeared to be two transactions with him, is that correct,
18 one on October 22 and one on October 29, correct?
19 A. I believe there were two, sir, on the 22nd, I believe, and
20 one on the 29th.
21 Q. Three transactions on those two dates, right?
22 A. Yeah. Correct.
23 Q. Now, you became aware, in fact, either on December 1st or
24 shortly thereafter, that Michael Ogno was found dead in his
25 home on December 1st from a drug overdose, correct?

J588VAN2     Truscelli - Cross     Page 356

1 A. I don't remember the specific date, but I was made aware of
2 it.
3 Q. In fact, you became aware of it from a communication from
4 one of your brother officers, Police Officer Dan Slevin. Does
5 that sound right?
6 A. Again, I believe that Officer Slevin did inform me. I
7 don't remember when and how.
8 Q. Didn't Slevin contact you when he was still at the house of
9 Michael Ogno's on the night of his passing to tell you that at
10 least he had a belief that Paul Van Manen was involved in this?
11      MR. FINKEL: Objection. Hearsay.
12      MR. QUIJANO: It's part of the investigation.
13      THE COURT: Overruled.
14      MR. QUIJANO: Not for the truth.
15 A. Say it again, sir.
16 Q. I am talking to the Court.
17      MR. QUIJANO: Not for the truth, your Honor.
18      THE COURT: You want the question read back?
19      THE WITNESS: Yes, please.
20      (Record read)
21 A. Again, I was informed by Officer Slevin. If he was in the
22 house, outside the house, in a car, I don't recall where he
23 called me from. I don't recall.
24      (Continued on next page)
25

J582van3     Truscelli - Cross     Page 357

1 Q. But he told you in that initial conversation that there
2 appeared to be a belief that Paul Van Manen was involved in
3 this.
4 A. I believe that's accurate, yes.
5 Q. At that point was Slevin working with you or under you?
6 A. Meaning?
7 Q. Was he part of -- well, was he working on investigations
8 with you at that point?
9 A. Do you mean do we have any investigations working together?
10 Q. Yes.
11 A. I don't believe so, no.
12 Q. As far as you know, Slevin just responded to a call of an
13 overdose and he went there. He didn't go there as part of an
14 investigation initially, is that correct?
15 A. I'm sorry. I believe that it was the initial response.
16 The way Staten Island narcotics works, the overdose task force,
17 if someone dies fatally or nonfatally overdose, someone is
18 dispatched out, yes, to conduct a preliminary investigation.
19 Q. And in that initial communication obviously you learned
20 that -- withdrawn.
21      Derek Yung, you are familiar with that name, right?
22 A. Yes, sir.
23 Q. He was part of your investigation when it existed, is that
24 right?
25 A. It was a purchaser, sir, yes.

UNITED STATES OF AMERICA, V                                                    **CORRECTED**
PAUL VAN MANEN and KENNETH CHARLTON                                            **May 8, 2019**

1 Q. And you determined as part of your investigation that he
2   purchased heroin from Paul Van Manen, correct?
3 A. He was a client of Paul's, yes.
4 Q. Okay. Did you also ascertain he had other sources?
5 A. I did not, sir, no.
6 Q. Now, did you ever interview Derek Yung either as part of
7   your original investigation or any time after December 1?
8 A. I do not believe so.
9 Q. Did you also ascertain that at times Paul was a customer of
10   Derek Yung and that Derek Yung would sell to him?
11 A. No, sir.
12 Q. After December 1, were you involved in any part of the
13   investigation of the Michael Ogno overdose, either formally or
14   informally?
15 A. I was not the case officer nor an assistant case officer on
16   it, so I didn't have any direct part of that investigation.
17 Q. What about indirect?
18 A. I don't know what indirectly means in your term.
19 Q. Did you have contact with Officer Slevin about the
20   investigation of the Ogno overdose after December 1?
21 A. You are referencing the fatal overdose portion of it?
22 Q. Yes.
23 A. Yes, obviously, I work in the same office. We would have
24   had conversations, sir.
25 Q. Did you ever participate in any interviews, either by

1   yourself or with Slevin or with any other officer, about the
2   investigation of the Michael Ogno overdose on December 1?
3 A. I believe that I went with Officer Slevin when he conducted
4   an interview.
5 Q. With a young lady, correct?
6 A. I don't remember her name. It was a woman, but --
7 Q. Okay. And that, to the best of your recollection, that
8   didn't happen at the precinct? It happened at another
9   location?
10 A. It was outside of the precinct, sir, yes.
11 Q. Did it happen at bakery by any chance?
12 A. In a bakery?
13 Q. Yes.
14 A. No, sir. I don't recall it being in a bakery.
15 Q. Did it happen at her location, her residence, if you
16   recall?
17 A. I believe it was -- I'm relatively sure it was in a home, I
18   believe. I don't know if it was hers specifically or her
19   parents' -- mom's, dad's -- but it was in a home.
20 Q. And that would have been within two weeks, say, of the
21   December 1 overdose?
22 A. I don't remember.
23 Q. Short time.
24 A. It was relatively -- you know, I guess in the same month.
25   Again, I don't remember specifically when it was, though.

1 Q. For now, don't tell me substance, but she provided certain
2   information at that interview, correct, about the Michael Ogno
3   overdose?
4 A. Officer Slevin conducted the interview, sir. I don't --
5 Q. You were there, right?
6 A. I was there, yes.
7 Q. Were you paying attention?
8 A. If he was conducting the interview and it was his case, I
9   mean, I could possibly have not been paying attention.
10 Q. Okay. So this was an interview of a witness of an overdose
11   death with Slevin.
12 A. Correct.
13 Q. And you are saying you are not paying close attention to
14   what the interview is about?
15 A. The last thing I would ever want to do, especially to a
16   young investigator, is step on their toes while they are
17   conducting the investigation. So I will sit back and let them
18   conduct. If there is anything that needs to be followed up at
19   a later date, I would be more than happy to provide them with
20   assistance, but it is not a good technique to do to
21   investigators to --
22 Q. Well, Detective, you weren't training him on that day,
23   right?
24 A. I was not a training -- I was not a training officer, no.
25 Q. You went with him as a colleague as part of this

1   investigation, correct? You were there -- withdrawn.
2       You were there in an official capacity to provide
3   assistance in the investigation that Slevin was conducting and
4   specifically this interview with this young lady, right?
5 A. Officer Slevin was the officer conducting the interview,
6   and I did go with him to the location. Yes, it was in an
7   official capacity but, again, like stated, he was the case
8   officer. It's his investigation. And I'm not going to speak
9   over him or step on his toes and I was allowing him to conduct
10   business as he saw fit.
11 Q. I'm certainly not asking you to speak over him or step on
12   his toes today. I'm merely asking if you heard the interview
13   and presumably participated in the interview.
14 A. Again, sir, I don't have any independent recollection of
15   what was discussed there. He was the case officer at that time
16   and like I said --
17 Q. This was an investigation of an overdose death, correct?
18 A. Yes, sir.
19 Q. Certainly one of the focuses of the Staten Island Police
20   Department's investigation is who gave him the heroin, right?
21 A. Yes, sir.
22 Q. That's a pretty important thing, right?
23 A. That is correct, yes.
24 Q. And you have no recollection if, during this interview that
25   you are present for with Officer Slevin, there is a discussion

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1   about who gave him the heroin?
2   A. Once again, sir, it was Officer Slevin's interview, it was
3   his case, and I don't have any independent recollection of the
4   discussion between him and the female that he spoke to.
5   Q. You would agree with me that identifying who sold someone
6   heroin that led to an overdose is a pretty big part of an
7   investigation?
8          MR. FINKEL: Objection.
9   Q. Yes? You can answer.
10         THE COURT: Overruled.
11  Q. Yes?
12         MR. QUIJANO: Overruled? Okay. Oh, overruled. Not
13  used to winning.
14  Q. Oh, you can answer that one.
15  A. Can you say it one more time, please? I apologize.
16  Q. Sure.
17         You would agree with me that in an investigation of a
18  heroin overdose that results in the death of -- how old was he
19  27? 26? He was a kid, right?
20  A. I don't have his date of birth in front of me.
21  Q. Pardon me?
22  A. I don't have --
23         THE COURT: He doesn't have his date of birth in front
24  of him.
25         MR. QUIJANO: Okay.

1          BY MR. QUIJANO:
2   Q. By the way, by the time you are at that interview, you
3   learned or you knew that also present in the house when Slevin
4   first responds to the scene was a cousin who was a detective in
5   the Brooklyn Police Department. Correct? Did you know that
6   when you went to the interview?
7   A. When -- could you -- one more time slower, please.
8   Q. Of course.
9          When you went to the interview, did you already know
10  that one of Michael Ogno's relatives, a cousin, was a detective
11  or is a detective in Brooklyn, a Staten Island resident, and he
12  was present at the scene when Slevin shows up on the night of
13  the overdose? Did you already know that when you went to talk
14  to this young lady?
15  A. Let me make sure I have this straight. You are referencing
16  Slevin's interview from the day that --
17  Q. Let me withdraw it and rephrase.
18  A. Okay.
19  Q. When you went to the interview, did you already know that
20  one of Michael Ogno's relatives was a Brooklyn detective?
21  A. No, sir, I was not aware of that.
22  Q. Did you ever become aware of that?
23  A. No, sir.
24  Q. So back to my original question. When you were at the
25  interview, we agree you are not there just to keep him company,

1   Slevin company. You are not there for fun. You are there in
2   an official capacity, right?
3   A. We were in an official capacity, sir, yes.
4   Q. And can you tell me -- again, not specifics, but generally
5   speaking -- what this young lady told you or what the topic of
6   the interview was?
7          MR. FINKEL: Objection. The court has ruled on this
8   issue.
9          MR. QUIJANO: I don't believe --
10         THE COURT: Sustained.
11         MR. QUIJANO: Again, your Honor, this is offered not
12  for the truth, purely for the --
13         MR. FINKEL: Objection.
14         THE COURT: The objection has been sustained.
15         MR. QUIJANO: Sustained.
16         THE COURT: The objection has been sustained.
17         MR. QUIJANO: Thank you.
18  BY MR. QUIJANO:
19  Q. After that interview, are you aware of -- well, did you or
20  are you aware if Slevin or anyone else involved in the
21  investigation followed up on whatever came out of that
22  interview with the young lady?
23  A. I'm really not -- you are talking about moving forward with
24  his investigation?
25  Q. I will withdraw it and rephrase it.

1          After the interview with the young lady, do you know
2   if there was any follow-up by the Staten Island police on what
3   the young lady had told you or told Slevin?
4   A. Again, sir, since I don't really remember the context of
5   that conversation, I couldn't tell you the results of it.
6   Q. All right.
7          Are you familiar with the name of Detective Andrew
8   Lassen?
9   A. No, sir.
10  Q. Now, are you aware that in the Ogno investigation two
11  phones were recovered that belonged to Michael Ogno? Were you
12  aware of that?
13  A. I was not aware of phones or how many were recovered.
14         MR. QUIJANO: One moment, your Honor.
15         (Counsel confer)
16         MR. QUIJANO: Thank you, Detective. I have no further
17  questions.
18         THE COURT: Ms. O'Neill.
19         MS. O'NEILL: We have no questions.
20         THE COURT: Redirect, Mr. Finkel?
21         MR. FINKEL: Thank you, your Honor.
22  REDIRECT EXAMINATION
23  BY MR. FINKEL:
24  Q. Detective, do you recall Mr. Quijano asking you some
25  questions about the strike force in 2015?

J582van3     Truscelli - Redirect     Page 366

1  A. Yes, sir, I do.
2  Q. When approximately was the Staten Island overdose task
3  force founded?
4  A. Approximately 2015.
5  Q. Based on your investigations of Mr. Van Manen, were you
6  able to ascertain whether Mr. Van Manen used heroin?
7  A. There were some indications that he was a user, yes.
8  Q. Based on your observations in your investigation, when did
9  you become aware that Mr. Van Manen was selling heroin? I'm
10  not just referring to the 2017 investigation.
11  A. The initial time when it came to light? Is that the
12  question?
13  Q. Yes, sir.
14  A. I was assigned to Staten Island in 2011 from Manhattan.
15  And, I mean, I would say, by the time I got to Staten Island,
16  late 2011, 2012, we were aware that he was selling heroin.
17  Q. Now, from approximately that time up until the April 2017
18  investigation that we talked about, did you have a Title III
19  wiretap?
20  A. No, we did not.
21  Q. Did you know the source from where Mr. Van Manen was
22  obtaining his heroin?
23  A. At that point we were not, you know, privy to that.
24  Q. When did you learn approximately when -- withdrawn.
25      When approximately did you learn how Mr. Van Manen was

J582van3     Truscelli - Redirect     Page 367

1  obtaining heroin?
2  A. I mean, we were able to determine that definitively once we
3  had gone up on a trap and trace which allowed us to, like I
4  mentioned yesterday, the 15-minute pings which would give US A
5  specific location as well as dump the call log. So with that
6  and then once we moved into the Title III wiretap, we were able
7  to determine that.
8  Q. What year was that?
9  A. 2017. Sorry.
10  Q. Detective, you were asked some questions about an
11  enterprise. Remember that?
12  A. Yes.
13  Q. Based on your experience as a narcotics detective, do
14  narcotics traffickers typically package heroin out in the open?
15  A. No, they do not.
16  Q. Do they typically make their activities known and
17  obvious?
18  A. No, sir, they do not.
19  Q. Do you have an understanding of why that is?
20  A. I would hazard a guess and say --
21      MR. QUIJANO: Objection.
22  A. -- they didn't want to get arrested.
23      THE COURT: You can't hazard a guess.
24      THE WITNESS: Okay.
25  A. They don't want to get arrested by doing it in public.

J582van3     Truscelli - Redirect     Page 368

1  Q. What does the use of many different cars of Mr. Van Manen
2  indicate to you as a detective?
3      MR. QUIJANO: Objection, your Honor. Beyond the scope
4  of cross.
5      THE COURT: Sustained.
6  BY MR. FINKEL:
7  Q. Do individuals who sell heroin typically do large-scale
8  purchases out in the open?
9      MR. QUIJANO: Objection. Beyond the scope of cross.
10      THE COURT: Overruled.
11  A. No, they do not.
12  Q. Talked a bit on direct about bundles of heroin and the
13  weight.
14  A. Yes.
15  Q. 300 bundles a week, approximately how much weight is
16  that?
17  A. I need a calculator.
18  Q. What did you say, sir?
19  A. I said I need a calculator.
20  Q. What would you calculate?
21  A. I mean, it is about .20 grams per bundle, if I'm not
22  mistaken, and then times that by three. That's a bad question
23  to ask me.
24  Q. It adds up, though, right?
25  A. It does. Yes. It is substantial.

J582van3     Truscelli - Redirect     Page 369

1  Q. Detective Truscelli, you used the term -- withdrawn.
2      You were asked some questions about Medin Kosic and
3  Paul Van Manen's relationship during cross. Do you remember
4  that?
5  A. Yes.
6  Q. And you used the term that, with respect to their
7  relationship, Medin Kosic would front heroin. Do you recall
8  using that term?
9  A. That's correct, yes.
10  Q. What did you mean by "front"?
11  A. Basically what would happen is that Paul would be given
12  certain amount of heroin, X amount of bundles, use 15, for
13  instance, and he would owe Medin a certain portion of the
14  profits from that to pay for it and he would keep the rest.
15  Q. Is there another word for "fronted" in sort of
16  nonnarcotics --
17  A. He was basically getting them on consignment.
18  Q. How long has Detective Slevin been a detective for?
19  A. I'm not sure.
20      MR. FINKEL: Your Honor, just one moment, please.
21      THE COURT: Yes.
22      (Counsel confer)
23      MR. FINKEL: Nothing further. Thank you, Detective.
24      MR. QUIJANO: May I ask one question?
25      THE COURT: One question.

J582van3     Truscelli - Recross     Page 370

1   RECROSS EXAMINATION
2   BY MR. QUIJANO:
3   Q. I may have misheard you. Did you just say that Kosic
4   fronted Paul Van Manen heroin? Did you say that?
5   A. That's what I said, yes.
6   Q. How do you know that?
7      THE COURT: That's the one question.
8      MR. QUIJANO: Your Honor. Two questions, please. How
9   he knows it.
10      THE COURT: One question. That's it. You are
11   excused, Detective.
12      THE WITNESS: Thank you, sir.
13      (Witness excused)
14      THE COURT: Call your next witness.
15      MS. GHOSH: Your Honor, the government --
16      MR. QUIJANO: Would the court take judicial notice
17   that there are 60 grams in 300 bundles?
18      MR. FINKEL: We object to that.
19      THE COURT: Well, I think I'm going to get a
20   calculator and do it myself. I think the parties ought to get
21   together and stipulate as to how much --
22      THE WITNESS: We will.
23      THE COURT: -- is in a bundle and how much is in 300
24   bundles.
25      MS. O'NEILL: Thank you, your Honor.

J582van3     Anderson - Direct     Page 371

1      MS. GHOSH: The government calls Paul Anderson.
2   PAUL MICHAEL ANDERSON,
3   called as a witness by the government,
4   having been duly sworn, testified as follows:
5      THE COURT: Please sit down, Mr. Anderson. Speak
6   right into the microphone.
7      All right, Ms. Ghosh.
8      MS. GHOSH: Thank you, your Honor.
9   DIRECT EXAMINATION
10   BY MS. GHOSH:
11   Q. Good afternoon, Mr. Anderson.
12   A. Good afternoon.
13   Q. Where do you work?
14   A. Moneygram Payment Systems, Incorporated.
15   Q. Generally speaking, what is Moneygram?
16   A. Moneygram is a service in which people can send money.
17   Q. What department of Moneygram do you work in?
18   A. Global investigations.
19   Q. What is your title?
20   A. Law enforcement liaison.
21   Q. How long have you worked at Moneygram?
22   A. 19 years.
23   Q. Can you explain briefly what services Moneygram offers?
24   A. Moneygram offers person-to-person sends, Moneygram express
25   payments, and money orders.

J582van3     Anderson - Direct     Page 372

1   Q. The first one you mentioned, person-to-person sends, what
2   are those?
3   A. A person wants to send money to another person. An express
4   payment is a person that would like to send money to pay a
5   bill.
6   Q. And then the third one you mentioned was money orders.
7   What is that?
8   A. A money order is when a person most likely does not have a
9   checking account, so they purchase a paper money order and most
10   likely they use them to pay their bills.
11      MS. GHOSH: Your Honor, at this time I would like to
12   read from a stipulation which has been marked for
13   identification as Government Exhibit 503, a stipulation
14   concerning financial transaction records.
15      THE COURT: All right.
16      MS. GHOSH: The stipulation states:
17      It is agreed between the parties that Government
18   Exhibit 601 consists of true and correct copies of financial
19   transaction records for Moneygram Payment Systems, Inc.
20      Moneygram is a provider of money transfer and payment
21   services in which, for a fee, a user can transmit funds to
22   another location domestically or abroad. The records were made
23   at or near the time of their creation by or from information
24   transmitted by a person with knowledge of the matters set forth
25   in the records and that were kept in the course of a regularly

J582van3     Anderson - Direct     Page 373

1   conducted activity of Moneygram as a regular practice of that
2   activity.
3      The stipulation further states that Government Exhibit
4   602 consists of true and correct copies of financial
5   transaction records for Western Union Financial Services, Inc.
6      Western Union is a provider of money transfer and
7   payment services in which, for a fee, a user can transmit funds
8   to another location domestically or abroad. The records were
9   made at or near the time of their creation by or from
10   information transmitted by a person with knowledge of the
11   matters set forth in the records and that were kept in the
12   course of a regularly conducted activity of Western Union as a
13   regular practice of that activity.
14      If called to testify at trial, a records custodian
15   from Western Union would testify to the following concerning
16   the information contained in Exhibit 602:
17      Column C, S Name indicates the sender's full name
18   provided by the sender.
19      Column E, S Phone indicates the phone number provided
20   by the sender.
21      Column G, Send Time is listed in U.S. Eastern standard
22   time.
23      Column V, P Name indicates the payee's full name
24   provided by the payee.
25      Column X, P Phone indicates the phone number provided

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  by the payee.
2       Column AB, PDOB indicates the payee's date of birth
3  provided by the payee.
4       Columns AE through AI, PID Location, P Address, P
5  City, P State, and P Zip indicate the location where the
6  payee's primary identification was issued and the address
7  provided by the payee.
8       In Columns AT through AW, Pay Agent Name, Pay Agent
9  Address, Pay Agent City, and Pay Agent State indicate the
10 business name and address of the pay agent.
11      It is further stipulated and agreed that Exhibits 601
12 and 602 are authentic business records of Moneygram and Western
13 Union respectively.
14      And it is stipulated that this stipulation, which is
15 Government Exhibit 503, may be received in evidence as a
16 Government Exhibit.
17      The government moves to admit Government Exhibit 503,
18 the stipulation.
19      MR. QUIJANO: No objection.
20      MR. SANTIAGO: No objection.
21      THE COURT: 503 is in evidence.
22      (Government's Exhibit 503 received in evidence)
23      MS. GHOSH: The government further moves to admit 602,
24 the Western Union Records.
25      MR. QUIJANO: No objection.

1       MR. SANTIAGO: No objection.
2       THE COURT: 602 is in evidence.
3       (Government's Exhibit 602 received in evidence)
4       MS. GHOSH: Ms. Dunbar, if you can pull up for the
5  witness what has been marked for identification as Government
6  Exhibit 601A.
7  BY MS. GHOSH:
8  Q. Mr. Anderson, do you recognize this?
9  A. Yes, I do.
10 Q. Have you reviewed this document before today?
11 A. Yes, I have.
12 Q. Is this a fair and accurate excerpt of data produced by
13    Moneygram pursuant to a subpoena?
14 A. Yes, it is.
15 Q. Generally speaking, what is Exhibit 601A?
16 A. A detailed account of a Moneygram transaction.
17      MS. GHOSH: The government moves to admit Government
18 Exhibit 601A.
19      MR. QUIJANO: No objection.
20      MR. SANTIAGO: No objection.
21      THE COURT: 601A is received in evidence.
22      (Government's Exhibit 601A received in evidence)
23      MS. GHOSH: Ms. Dunbar, if you can publish that to the
24 jury, please.
25 BY MS. GHOSH:

1  Q. Mr. Anderson, before we discuss 601A in more detail, you
2     mentioned three types of services that Moneygram offers. Which
3     of those types is the transaction here?
4  A. This is a person-to-person send.
5  Q. Can you please describe the process for conducting a
6     person-to-person send through Moneygram? What happens first?
7  A. A person wishes to send money to another individual. They
8     choose a location to send money, either a physical location, or
9     they can send it online through Moneygram.com.
10 Q. In the transaction listed in Government Exhibit 601A can
11    you determine whether this specific transaction was initiated
12    online or in a store?
13 A. In column O, it says "send agent name" and underneath that
14    it says "EMoneygram.com" which denotes that this transaction
15    was sent online.
16 Q. So in online transfers, what does the sender do to send
17    someone money?
18 A. They create a profile with their information and then they
19    choose the person they want to send to and the state and the
20    amount that they want to send.
21 Q. What type of confirmation does the sender receive after
22    completing the transaction?
23 A. An e-mail.
24 Q. What information is in that e-mail?
25 A. The transaction details, the reference number, and the

1     amount sent.
2  Q. What specific information about the recipient is the sender
3     required to include in the transaction?
4  A. The name and the state in which the receiver will receive
5     the money.
6  Q. After the money is sent, what steps does the receiver have
7     to take to get the money?
8  A. They need to locate a physical location, and they need to
9     take the reference number to that location. They will present
10    that, and then they will receive their payment.
11 Q. In what form is the payment given?
12 A. Cash.
13 Q. What information does the receiver have to provide before
14    being given the money?
15 A. Their name and their ID.
16 Q. What kinds of IDs are acceptable?
17 A. Government issued IDs -- passports, driver's licenses,
18    state IDs.
19 Q. Who inputs the information that the receiver provides?
20 A. The employee at the location they are receiving the money.
21 Q. Can someone other than the person whose name is listed on
22    the transaction pick up the money?
23 A. No.
24 Q. What would happen if someone tried to do that?
25 A. They would be refused, they would be referred back to the

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  sender, and the sender would then have to arrange with
2  Moneygram either to amend the transaction or get a refund.
3  Q.  Let's turn to the specific transaction in 601A now.
4  Directing your attention to row two, the blue row, what is the
5  date of this transaction?
6  A.  December 1, 2017.
7  Q.  And who is the sender?
8  A.  Michael Ogno.
9  Q.  What is the sender's address?
10  A.  225 Malone Avenue, Staten Island, New York 10306.
11  Q.  What time was this transaction sent?
12  A.  It was September at 9:24 central time in the morning, so
13  that would be 10:24 eastern time in the morning.
14  Q.  How much money was sent?
15  A.  $180.
16  Q.  Directing your attention to column A, what does "REF
17  number" refer to?
18  A.  This refers to the reference number.  It's an eight-digit
19  number that the sender would supply to the receiver and the
20  receiver would use that to pick up the money.
21  Q.  And in this case, what was the reference numbers for this
22  transaction?
23  A.  68943518.
24  Q.  What does column B, "SND status," refer to?
25  A.  This refers to the transaction status; and this is "REC,"

1  birth, provided by?
2  A.  It's provided by Paul Van Manen, the person receiving the
3  money.
4  Q.  Directing your attention to columns AB through AF,
5  generally speaking, what information is provided in these
6  columns?
7  A.  These columns are basically when the transaction was
8  received, AB is the receive agent name, La Iguana Azul Mexican
9  Market.  AC is the address of the location, 14 Giffords Lane,
10  Staten Island, New York.
11  Q.  So that's the location where the money was picked up?
12  A.  Correct.
13        MS. GHOSH: No further questions.
14        MR. QUIJANO: No questions.
15        MR. SANTIAGO: No questions, your Honor.
16        THE COURT: Mr. Anderson, you are excused.  Thank you
17  very much for coming.
18        (Witness excused)
19        MR. QUIJANO: Your Honor, we need to make an
20  application before the next witness.
21        THE COURT: Okay.  Sidebar.
22        (Continued on next page)
23
24
25

1  and this stands for received, meaning that this transaction was
2  successfully received.
3  Q.  If I could now direct your attention to column M, what
4  information is provided here?
5  A.  This is the phone number that the sender provided when
6  sending the money.
7  Q.  What is the number listed in this transaction?
8  A.  917-525-6725.
9  Q.  Mr. Anderson, you said that this transaction was sent on
10  December 1, 2017.  When was the money received?
11  A.  Column P shows a receive date of December 1, 2017.
12  Q.  What time was the transaction received?
13  A.  That was 10:22 a.m. central time so 11:22 a.m. eastern
14  time.
15  Q.  Who received the money in this transaction?
16  A.  Paul Van Manen.
17  Q.  What phone number is listed for Paul Van Manen?
18  A.  941-268-9918.
19  Q.  What other identifying information about Paul Van Manen was
20  provided as part of this transaction?
21  A.  Driver's license.
22  Q.  And directing your attention to column V, what information
23  is listed there?
24  A.  That is the receiver's date of birth, December 16, 1967.
25  Q.  Who is that information, the driver's license and date of

1        (At the sidebar)
2        MS. SIDERIS: Your Honor, the testimony, the
3  information that Detective Truscelli and Detective Slevin were
4  present and conducted an interview with Jessica Fyfe was a
5  surprise to us and new information and facts to us and, based
6  on that, we would like to renew our application to admit the
7  statement by Jessica Fyfe to Detective Slevin that she was
8  aware -- that it could have been someone else who sold drugs to
9  Michael Ogno, not for the truth, but it goes to the quality of
10  the investigation and the steps that were taken or not taken
11  based on learning that information from a witness.
12        MR. FINKEL: Your Honor, I'm not sure what defense
13  counsel means that this is new information.  Detective Slevin's
14  DD-5s from his investigation were provided.  Jessica Fyfe's
15  3500 was provided.  Detective Slevin's 3500 was provided.
16  Detective Truscelli's 3500 was provided.
17        In any event, at bottom, this is just an attempt to
18  reargue a motion this court has already decided.  This is
19  double-layered hearsay, and your Honor kept it out of this
20  trial for a good reason, because that's what the law requires.
21        And, furthermore, Jessica Fyfe will be called to
22  testify later on.
23        MS. SIDERIS: Jessica Fyfe will not be -- we don't
24  believe we could elicit this information from Jessica Fyfe, but
25  the information that these two witnesses, Truscelli and Slevin,

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1   were present for those interviews is new information.  We
2   didn't know that these detectives were there for that interview
3   and that it could be elicited through them, going not for the
4   truth, but to the investigation.
5        THE COURT: Yes.
6        MR. FINKEL: Even if that fact was new, that doesn't
7   change the problem with the evidence, which is it is
8   double-layered hearsay.  It is a statement by Jessica Fyfe to
9   someone else about what someone else told her that he later
10  recanted, and that's why it is not reliable.  Your Honor has
11  already ruled.
12       THE COURT: This was your excited utterance argument?
13       MS. SIDERIS: Yes, but now, your Honor, it is not
14  offered for the truth.  It is what is --
15       THE COURT: The application is denied.
16  Let's call Mr. Slevin.
17       (Continued on next page)
18
19
20
21
22
23
24
25

1   matter set forth in the records and that were kept in the
2   regular course -- in the course of regularly conducted activity
3   of OCME as a regular practice of that activity.
4        Government Exhibit 907 is a true and accurate copy of
5   the certificate of death of Michael Ogno stored by the New York
6   Department of Health and Mental Hygiene.  Exhibit 907 was made
7   at or near the time of their creation by or from information
8   transmitted by a person with knowledge of the matters set forth
9   in the records and that were kept in the course of a regularly
10  conducted activity of the New York City Department of Health
11  and Mental Hygiene.
12       The parties further stipulate and agree that this
13  stipulation, which is Government Exhibit 501, as well as
14  Government Exhibits 902 through 907, described in this
15  stipulation, may be received into evidence as government
16  exhibits at trial, subject to any objections by the defendants
17  on relevance grounds.
18       Signed by the parties.
19       If we can just go back a page, and at this time the
20  government offers 501 and 902 through 907.
21       MS. O'NEILL: No objection.
22       MR. QUIJANO: No objection.
23       THE COURT: They are received in evidence.
24       (Government's Exhibits 501 and 902 through
25  907 received in evidence)

1        (In open court)
2        MR. FINKEL: The government calls Detective Slevin.
3        While he is takes the stand, I'm going to read a
4   stipulation, with the court's permission, into evidence, 501:
5        It is hereby stipulated and agreed, by and between the
6   United States of America, by Geoffrey S. Berman, United States
7   Attorney, for the Southern District of New York, by Catherine
8   Ghosh, Ryan Finkel and Jessica Fender, Assistant United States
9   attorneys, and Paul Van Manen, the defendant, by his attorneys,
10  Grainne O'Neill and Carlos Santiago, Esq., that Government
11  Exhibits 902 through 905 are true and accurate excerpts from
12  the autopsy report of Michael Ogno prepared by the Office of
13  the Chief Medical Examiner of the City of New York (OCME) and
14  were made at or near the time of their creation by or from
15  information transmitted by a person with knowledge of the
16  matter set forth in the records and that were kept in the
17  course of a regularly conducted activity of OCME as a regular
18  practice of that activity.
19       Government Exhibit 906 is a true and accurate copy of
20  the forensic toxicology laboratory report dated December 21,
21  2017, prepared by Reinaldo Fonseca, Assistant Director Forensic
22  Toxicology Laboratory, regarding forensic testing of samples
23  collected from Michael Ogno on or about December 2, 2017.
24  Exhibit 906 was made at or near the time of its creation by or
25  from information transmitted by a person with knowledge of the

1        DANIEL SLEVIN,
2        called as a witness by the government,
3        having been duly sworn, testified as follows:
4        THE COURT: Please sit down, Detective.
5        Okay Mr. Finkel.
6        MR. FINKEL: Thank you, your Honor.
7   DIRECT EXAMINATION
8   BY MR. FINKEL:
9   Q.  Good morning, sir.
10  A.  Good morning.
11  Q.  Are you employed?
12  A.  Yes.
13  Q.  With whom are you employed?
14  A.  New York City Police Department.
15  Q.  Do you have a rank at the NYPD?
16  A.  Yes.
17  Q.  What is your rank?
18  A.  Detective.
19  Q.  How long have you been a detective for --
20  A.  Eight months.
21  Q.  Thanks.  Please let me finish the question.
22       What was your rank prior to being a detective?
23  A.  Police officer.
24  Q.  What's the difference between being a police officer and
25  being a detective?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1 A. Detective, you just investigate the -- like you investigate
2    all the crimes that happen.
3 Q. And what is just a non-detective police officer?
4 A. You are a beat officer, and you ride around in a patrol
5    car.
6 Q. Doing what?
7 A. Answering radio runs.
8 Q. What's a radio run?
9 A. It's a 9-1-1 call.
10 Q. For how long were you a beat officer?
11 A. Four years.
12 Q. Did there come a time, if ever, when you became involved in
13    an investigation concerning Paul Van Manen?
14 A. Yes.
15 Q. Do you see Mr. Van Manen in the courtroom here today?
16 A. Yes.
17 Q. Can you point him out, please.
18 A. (Indicating).
19 Q. Can you identify him by an article of clothing?
20 A. He is wearing a blue tie, white shirt.
21      MR. FINKEL: Your Honor, let the record reflect that
22 Detective Slevin has identified the defendant, Paul Van Manen.
23      THE COURT: Yes.
24      MR. FINKEL: Thank you.
25 BY MR. FINKEL:

1 Q. Detective Slevin, if you could slow down a little bit in
2    your responses, speak clearly into the mic, please.
3      Can you briefly describe for the jury the scope of
4    your involvement in the Paul Van Manen investigation?
5 A. I helped him in regards to the observations in regards to
6    the wire and I assisted Detective Truscelli in regards to the
7    wire.
8 Q. What was Detective Truscelli's role based on your
9    understanding with regard to the Paul Van Manen investigation?
10 A. He was the lead investigator.
11 Q. You mentioned you conducted surveillance, what do you mean
12    by surveillance?
13 A. We would follow the subject throughout Staten Island and
14    different parts of the borough to see -- try and gain
15    intelligence in regards . . .
16 Q. What do you mean by try to gain intelligence?
17 A. To see who he was meeting up with, see where he hangs out,
18    stuff like that.
19 Q. Why did you want to see who Mr. Van Manen was hanging out
20    with or where he was meeting up?
21 A. To see if there was any narcotics-related activity going
22    on.
23 Q. Why is it important, if at all, to know with whom
24    Mr. Van Manen was meeting up regarding narcotics activity?
25 A. To see who his associates are.

1 Q. Detective Slevin, when you conducted surveillance, did you
2    write down your observations and record them in any way?
3 A. Yes, I did.
4 Q. How would you do that?
5 A. Through a DD-5.
6 Q. And what's a DD-5?
7 A. It's a computerized memo book so that when we go back we
8    could recollect on the surveillances.
9 Q. How soon after you would -- withdrawn.
10      How soon after you conducted a surveillance would you
11    write down what you saw in your DD-5?
12 A. Right after.
13 Q. Why is that?
14 A. Just so everything is fresh to you, so you write down
15    exactly what happened.
16 Q. Now, was surveillance conducted in this investigation done
17    with the wiretap at times?
18 A. Yes.
19 Q. And how is surveillance different when it is done with a
20    wiretap as opposed to without a wiretap?
21 A. When someone's on wiretap you are intercepting calls from the
22    wires stating where the subject is going, who he is meeting up
23    with, and stuff like that.
24 Q. I am going to direct your attention to September 16, 2017.
25    Were you working that day?

1 A. Yes.
2 Q. Do you recall specifically what you were doing with respect
3    to the Paul Van Manen investigation on that occasion?
4 A. I don't remember.
5 Q. Is there anything that would refresh your recollection?
6 A. Yes.
7 Q. What is that?
8 A. My DD-5.
9 Q. There should be a binder of there. Do you see that?
10      If you could flip to the tab marked 3507-17. Do you
11    see that? And if you could flip to page 98. Take your time
12    and look at the document and let me know if that refreshes your
13    recollection.
14 A. Yes, it does.
15 Q. What were you doing, if anything, as part of the Paul
16    Van Manen investigation on September 16, 2017?
17 A. Conducting surveillance.
18 Q. What time were you conducting surveillance?
19 A. Approximately 1330 hours.
20 Q. That's 1:30?
21 A. Yes.
22 Q. And approximately where were you conducting surveillance?
23 A. We were in the confines of the 120 precinct.
24 Q. What's the 120 precinct?
25 A. It's St. George area in regards to Staten Island, the NYPD

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1   precinct.
2   Q. More specifically, where were you conducting surveillance?
3   What vicinity?
4   A. 737 Post Avenue.
5   Q. Did you take photographs when you were there that day?
6   A. No. My partner took the photographs.
7        MR. FINKEL: Your Honor, may I approach?
8        THE COURT: Yes, you may.
9   BY MR. FINKEL:
10  Q. Detective Slevin, I have handed you a stack of documents
11  that have been marked for identification as Government Exhibits
12  244 to 250. Do you recognize those documents?
13  A. Yes.
14  Q. What are they?
15  A. These are the photos that we took the day of the
16  surveillance we did at 737 Post Avenue.
17  Q. Are they a fair and accurate representation of what you
18  personally observed that day?
19  A. Yes.
20       MR. FINKEL: Your Honor, at this time the government
21  offers 247 and 248 and 250.
22       MS. O'NEILL: No objection.
23       MR. QUIJANO: No objection.
24       THE COURT: 247, 248, and 250 are received in
25  evidence.

1        MR. FINKEL: Just for the record, the other documents
2   have already been introduced into evidence.
3        (Government's Exhibits 247, 248, and 250 received in
4   evidence)
5   BY MR. FINKEL:
6   Q. Detective Slevin, can you describe briefly what you
7   observed at approximately 1330?
8   A. Approximately 1330 hours we arrived at 737 Post Avenue. We
9   observed a silver Honda CRV in the driveway of 737 Post Avenue.
10       MR. FINKEL: Your Honor, with your permission, we are
11  just going to pass out some transcripts to the jury and to the
12  court.
13       THE COURT: Yes.
14       MR. FINKEL: Thank you.
15       Ms. Dunbar, if you can publish what is in evidence as
16  Government Exhibit 250.
17  BY MR. FINKEL:
18  Q. Detective Slevin, what are we looking at?
19  A. A picture of Paul Van Manen on the phone.
20  Q. Near what location?
21  A. 737 Post Avenue.
22       MR. FINKEL: If I could direct the jury and the
23  court's attention to the transcript that they have in front of
24  them, which is 301CQ, and at this time, with the court's
25  permission, the government will play GX301CQ which is in

1   evidence, and this is a call from 2856 to 8865 at approximately
2   1407.
3        (Audio played)
4        MR. FINKEL: Ms. Dunbar, if we can put back up 250,
5   please.
6   BY MR. FINKEL:
7   Q. Detective Slevin, did you observe this Mr. Van Manen on the
8   phone at approximately 1407 that day?
9   A. Yes.
10       MR. FINKEL: If I could direct the jury's attention
11  and the court's attention to the next transcript in their
12  packet, which is marked as 301CR; and, with the court's
13  permission, the government will play GX 301CR, which is a call
14  between the 8865 number and a 2856 number, and this is a call
15  that same day, September 16, 2017, at 1417.
16       (Audio played)
17  BY MR. FINKEL:
18  Q. That call was 1417. Detective Slevin, do you recall what
19  you observed, if anything, at 1430?
20  A. Yeah, the Honda CRV leaves 737 Post Avenue.
21  Q. Were you able to observe who, if anyone, was in the Honda
22  CRV?
23  A. Yeah. It was Paul Van Manen and Doreen Spinelli.
24       MS. O'NEILL: Ms. Dunbar, if you can display GX111,
25  which is in evidence.

1   BY MR. FINKEL:
2   Q. Detective Slevin do you recognize individual?
3   A. Yes.
4   Q. Who is it?
5   A. Doreen Spinelli.
6   Q. That is the individual you observed in the car that day?
7   A. Yes.
8        MR. FINKEL: If I could direct the jury and the
9   court's attention to the next transcript in their packet, which
10  is 301CS, and with the court's permission, the government will
11  play 301CS, which is a call, September 16, 2017, 1454 p.m.
12       (Audio played)
13  BY MR. FINKEL:
14  Q. Detective Slevin, two minutes later, approximately 1456,
15  what, if anything, did you observe?
16  A. The Honda CRV comes back to 737 Post Avenue and pulls into
17  the driveway.
18  Q. What, if anything, did you observe next?
19  A. Paul Van Manen gets out of the driver's seat and enters 737
20  Post Avenue.
21  Q. And what, if anything, did you observe after that?
22  A. Two minutes later he comes out of 737 Post Avenue and goes
23  back into the Honda CRV in the driver's seat.
24  Q. And what, if anything, did you observe after that?
25  A. After that we saw -- two minutes later we see a male white

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

---

J582van3          Slevin - Direct          Page 394

1  leave 737 Post Avenue, light up a cigarette, walk down the
2  stairs, and enter the back seat of the Honda CRV.
3  Q.  And what did you see next?
4  A.  They backed out of 737 Post Avenue, they head towards Jude
5  Avenue.  That's where we terminated the surveillance.
6          MR. FINKEL: If we can display GX 248, which is in
7  evidence.
8  BY MR. FINKEL:
9  Q.  Detective Slevin, what are we looking at here?
10 A.  It's Paul Van Manen talking to an unknown male white in
11 front of 737 Post Avenue.
12 Q.  Is that the individual who got into the car with
13 Mr. Van Manen?
14 A.  No.
15         MR. FINKEL: If we can look at 244, please.
16 BY MR. FINKEL:
17 Q.  What are we looking at here?
18 A.  That's the Honda CRV leaving 737 Post Avenue.
19         MR. FINKEL: And 249, please.
20         245, please.
21 BY MR. FINKEL:
22 Q.  What are we look at here?
23 A.  That's Paul leaving 737 Post Avenue.
24         MR. FINKEL: 246, please.
25 BY MR. FINKEL:

---

J582van3          Slevin - Direct          Page 395

1  Q.  And what are we looking at here?
2  A.  That's the male white that came out after Paul.
3  Q.  Is that the individual who went in the car?
4  A.  Yes.
5          MR. FINKEL: 247, please.
6  Q.  And what are we looking at here?
7  A.  That's the male white entering the back passenger seat of
8  the vehicle.
9  Q.  And who else was in the vehicle at that time based on your
10 observations?
11 A.  Paul Van Manen was in the driver's seat and Doreen Spinelli
12 was in the passenger seat.
13 Q.  And you mentioned that then the car pulled out and drove
14 down the street.  Did you follow?
15 A.  We tried, but we lost sight of the vehicle.
16         MR. FINKEL: Your Honor, this would be a good time to
17 break, if you would like to, or I can keep going?
18         THE COURT: Okay.  We will break now.  We will resume
19 at 2:00.
20         (Continued on next page)
21
22
23
24
25

---

J582van3          Slevin - Direct          Page 396

1  (Jury not present)
2          THE COURT: See you at 2:00.
3          MS. O'NEILL: Thank you, your Honor.
4          (Luncheon recess)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

J588VAN4          Slevin - Direct          Page 397

1          AFTERNOON SESSION
2               2:00 p.m.
3  (Jury not present)
4          THE COURT: Are you ready for the jury?
5          MS. FENDER: I think we have one issue that we want to
6  address with you because it would take a little time to prepare
7  new exhibits, if we could.
8          THE COURT: Yes.
9          MS. FENDER: Your Honor, just to put on the record,
10 Ms. O'Neill raised with us the fact that during, I think it was
11 Detective Truscelli's examination, there was mention of another
12 drug dealer by the name of Drama.  Separately, Mr. Charlton had
13 a dog named Drama.  And so to avoid confusion, Ms. O'Neill
14 said, we think that any reference to Drama needs to be redacted
15 or clarified or something needs to be done so that the
16 references to Mr. Charlton's Drama is not confused with the
17 drug dealer Drama.  Of course we agree with that.  We
18 understand that is confusing and potentially prejudicial.
19         So the government's proposal, because the call in
20 question is already in evidence, the government's proposal is
21 to simply redact out where the word Drama would otherwise
22 appear, consistent with what we have done with many other
23 issues in this case, like racial epithets and other things of
24 that nature.  And then for the audio portion of that call, we
25 would offer a replacement exhibit in which -- can I have one

---

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

**CORRECTED**
**May 8, 2019**

1  moment, your Honor -- in which the portion where the word Drama
2  would be mentioned would just be blank, like it's a brief
3  moment of silence. And that's consistent with how we have
4  treated other redactions in this case.
5      I understand that Ms. O'Neill might object to that,
6  and we wanted to raise it because we need time to prepare the
7  new audio and the new transcript.
8      MS. O'NEILL: We do object to that. We don't
9  understand how it would possibly be prejudicial to the
10  government that Mr. Charlton has a dog. Second of all, the
11  redactions that they are proposing are two telephone calls, and
12  it looks like there is something being hidden from the jury and
13  makes Mr. Charlton look suspicious, and there is no reason for
14  this.
15      THE COURT: Is this going to come up between now and
16  4:30?
17      MS. FENDER: It may, your Honor, and because we need
18  time to prepare the new exhibits.
19      THE COURT: You're not going to prepare exhibits
20  between now and 4:30, are you?
21      MS. FENDER: Yes. That is what we are working on.
22      MR. QUIJANO: Can I have a moment to confer with Ms.
23  Fender?
24      THE COURT: Yes.
25      MR. QUIJANO: Thank you, your Honor.

1      MS. FENDER: So, your Honor, just to clarify, we have
2  not redacted out everything with reference to a dog even in
3  this call. It's already in evidence. What we are proposing to
4  redact is literally the word "Drama," which is a reference to
5  in this context, in the call, it's a reference to a dog's name,
6  whereas Mr. Quijano earlier elicited testimony about a drug
7  dealer named Drama. And we are trying not to prejudice the
8  defendant by introducing any confusion about the Drama that is
9  referenced to Mr. Charlton. They can introduce for all of the
10  reasons, we don't think the dog stuff should come in, but
11  certainly the name Drama adds nothing to whether or not there
12  is a dog and only invites confusion about whether he had a
13  relationship with some other drug dealer.
14      MS. O'NEILL: Our position is that these redactions
15  are inherently prejudicial to Mr. Charlton. They are black
16  redactions. I asked last night that the redactions be in white
17  about some other matters. And it's a bar over where it says
18  the word Drama, and there is simply no reason for this.
19      THE COURT: What do you propose?
20      MS. O'NEILL: I propose that we just leave the word
21  Drama in. Mr. Charlton is going to testify. He is going to
22  testify about who Drama is to him.
23      THE COURT: He is going to testify about his dog, is
24  that what you're saying?
25      MS. O'NEILL: If that's the issue, if the government

1  is going to claim that Drama is the drug dealer --
2      THE COURT: I don't think they are going to claim that
3  Drama is a drug dealer.
4      Are you going to claim the dog is a drug dealer?
5      MS. FENDER: We are not, your Honor. There apparently
6  is a Drama drug dealer; it is not Mr. Charlton's dog.
7      MS. O'NEILL: So we would just propose that the Drama
8  be left in.
9      MS. FENDER: Your Honor, frankly, I am surprised by
10  that suggestion given that I think it was Ms. O'Neill that
11  raised the potential confusion issue in the first place. But
12  for all of the reasons that we have already stated --
13      THE COURT: What is the harm in leaving it in?
14      MS. FENDER: The harm is exactly what I just
15  articulated, your Honor. First of all, for all of the reasons
16  we stated, we don't think the dog stuff should come in. But if
17  it's coming in, the name Drama is confusing to the jury because
18  there is a Drama drug dealer that Mr. Quijano elicited
19  testimony about earlier today.
20      THE COURT: And the government wants to do what?
21      MS. FENDER: We want to redact it, consistent with all
22  of the other redactions in this case, which is a black bar.
23      THE COURT: Go ahead and redact it.
24      MS. FENDER: Thank you, your Honor.
25      THE COURT: Get the jury in.

1      (Jury present)
2  DANIEL SLEVIN, resumed.
3      THE COURT: Please be seated.
4      All right, Mr. Finkel.
5  BY MR. FINKEL:
6  Q. Detective Slevin, just to remind you you are still under
7  oath.
8      Let me direct your attention to September 22, 2017.
9  Do you recall what, if anything, you were doing as part of the
10  Van Manen investigation on that date?
11  A. I don't remember.
12  Q. Is there anything that might refresh your recollection?
13  A. My DD-5s.
14  Q. If you can turn in the binder in front of you to 3507-17,
15  at page 158.
16      Please take the time to review it. My question is
17  simply whether or not that refreshes your recollection.
18  A. Yes.
19  Q. What were you doing?
20  A. Conducting surveillance.
21  Q. In what general geographic location?
22  A. Brooklyn.
23  Q. Why were you in Brooklyn conducting surveillance?
24  A. We obtained information from the wire room.
25      MR. FINKEL: At this time, if I could direct the jury

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  and the Court to a transcript in the packet from this morning.
2  It is the transcript marked 301W.  It's just one page.  It
3  should be the last one in your packet, if that's helpful.
4        Ms. Dunbar, if you can cue up -- and this is in
5  evidence, your Honor.  This is Government Exhibit 301W.  This
6  is a recording from September 22, 2017, at approximately 2210,
7  and it's a call between numbers ending in 2856 and 8865.
8        (Audio played)
9  BY MR. FINKEL:
10  Q.  Detective Slevin, the surveillance that we discussed that
11  you conducted on September 22, 2017, approximately what time
12  did you conduct surveillance?
13  A.  Approximately 2225.
14  Q.  What, if anything, did you see?
15  A.  We saw Paul Van Manen on Bay Parkway and 71st Street.
16  Q.  Was he walking?
17  A.  No, he was driving.
18  Q.  Were you in a vehicle at that time?
19  A.  Yes.
20  Q.  What, if anything, did you see next?
21  A.  We made a U-turn to follow him towards the Verrazzano
22  Bridge.
23  Q.  Did you follow him towards the Verrazzano Bridge?
24  A.  Yes.
25  Q.  What, if anything, did you observe as you approached the

1  Verrazzano Bridge?
2  A.  We saw Paul Van Manen driving the vehicle.  Then we
3  terminated the surveillance.
4  Q.  In which direction was Mr. Van Manen's vehicle heading?
5  A.  He was heading onto the Verrazzano Bridge exit.
6        MR. FINKEL: Ms. Dunbar, if you can put up for the
7  jury, I believe this is in evidence, 402.
8  Q.  Detective Slevin, on your screen, it's a touchscreen, if
9  you could circle for the jury the Verrazzano Bridge.
10        MR. FINKEL: If the record could reflect that
11  Detective Slevin circled the Verrazzano Bridge.
12        THE COURT: Yes.
13  Q.  Detective Slevin, what landmasses does the Verrazzano
14  Bridge connect?
15  A.  Staten Island and Brooklyn.
16  Q.  Have you driven over it before?
17  A.  Yes.
18        MR. FINKEL: You can take that down.  Thank you.
19  Q.  Detective Slevin, I want to direct your attention now to
20  October 21, 2017.
21        What, if anything, were you doing as part of the Van
22  Manen investigation on that date?
23  A.  I don't remember.
24  Q.  Would anything refresh your recollection?
25  A.  The DD-5.

1  Q.  If you can turn to 3507-18, and page 81.
2        Read that and let me know if it refreshes your
3  recollection.
4  A.  Yes, it does.
5  Q.  What, if anything, were you doing as part of the Van Manen
6  investigation on October 21, 2017?
7  A.  Conducting surveillance.
8  Q.  I'm sorry.  Let me back up.
9        Let me be more specific.  At approximately 1300 hours,
10  what, if anything, were you doing as part of the Paul Van Manen
11  investigation?
12  A.  Conducting surveillance.
13  Q.  Where?
14  A.  In the confines of the 123 precinct.
15  Q.  Can you be more specific?
16  A.  1380 Arthur Kill Road.
17  Q.  What, if anything, did you see?
18  A.  When we got to the scene, there was a deli.  We see Paul
19  Van Manen pull into the deli and park his vehicle.
20  Q.  By the way, to your knowledge, was the wire up at this
21  time?
22  A.  Yes.
23  Q.  What, if anything, did you see next?
24  A.  We saw a male white cross the street and enter the
25  passenger side vehicle of Paul Van Manen's vehicle.

1  Q.  What, if anything, did you observe next?
2  A.  We saw a hand-to-hand drug transaction.
3  Q.  What do you mean?
4  A.  We saw the male white hand Paul Van Manen money, Paul Van
5  Manen hand the male white a small white object.
6  Q.  After the male received the small white object, what, if
7  anything, did you observe next?
8  A.  We saw Paul Van Manen get out of the vehicle and enter the
9  deli.  We saw the male white exit the vehicle, still have the
10  small white object in his left hand and place it into his left
11  front pocket.
12  Q.  Did you continue to surveil Mr. Van Manen?
13  A.  No.
14  Q.  What did you continue to do, if anything?
15  A.  We surveilled the male white that exited the vehicle.
16  Q.  What, if anything, did you see him do?
17  A.  He crossed the street and started heading towards 643
18  Ilyssa Way.
19  Q.  If you could just slow down a little bit and make it easier
20  for the court reporter.
21        As the male headed to 643 Ilyssa Way, what, if
22  anything, did you observe?
23  A.  We stopped him.
24  Q.  What happened when you stopped him?
25  A.  We recovered 15 white glassines of heroin from his left

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  front pocket.
2  Q. Was he arrested?
3  A. Yes.
4  Q. Did you identify that individual that day?
5  A. Yes.
6  Q. Who was it?
7  A. Michael Marcus.
8  Q. What did you recover from him?
9  A. 15 glassines of heroin.
10  Q. What did you do with those glassines?
11  A. We vouchered it.
12  Q. What does that mean to voucher them?
13  A. A voucher is -- it's an item that gets a sequence of numbers
14  that just pertains to that item.
15  Q. What is the purpose of that?
16  A. So we could obtain it later on and send it to the lab for
17  testing.
18  Q. Do you recall the voucher number of those 15 glassines?
19  A. I don't remember.
20  Q. Is there anything that would refresh your recollection?
21  A. The DD-5.
22  Q. Take a look and let me know if that refreshes your
23  recollection.
24  A. Yes, it does.
25  Q. What was the voucher number?

1  A. 5000127515.
2      MR. FINKEL: At this time, the government would like
3  to read a stipulation about it.
4      THE COURT: Yes.
5      MR. FINKEL: This is from 509.
6      The contents of Government Exhibit 20 were seized from
7  Michael Marcus on October 21, 2017 and vouchered as 5000127515
8  by law enforcement officials. The contents of Government
9  Exhibit 20 were tested by analysts employed by a New York City
10  Police Department laboratory. The substance contained within
11  Government Exhibit 20 was in 15 glassine envelopes, each
12  containing a substance. The substance tested positive for the
13  presence of heroin and fentanyl, and was determined to weigh
14  approximately .615 grams without packaging. This finding is
15  contained within a lab report that has been marked as
16  Government Exhibit 20A.
17      Your Honor, at this time, the government offers 509,
18  20 and 20A.
19      MR. QUIJANO: No objection.
20      MS. O'NEILL: No objection.
21      THE COURT: 509, 20 and 20A are received in evidence.
22      (Government's Exhibits 509, 20 and 20A received in
23  evidence)
24      MR. FINKEL: May we publish?
25      THE COURT: Yes, you may.

1  BY MR. FINKEL:
2  Q. Detective Slevin, what were the substances identified,
3  based on what you are seeing on the screen?
4  A. Heroin and fentanyl.
5      MR. FINKEL: We can take that down.
6  Q. Are you familiar with the name of Michael Ogno?
7  A. Yes.
8  Q. On December 1, 2017, were you working that day?
9  A. Yes, I was.
10  Q. Did you respond to any scenes?
11  A. Yes, I did.
12  Q. Where did you go?
13  A. I don't remember.
14  Q. Did you go somewhere?
15  A. Yes.
16  Q. Why?
17  A. Because there was an overdose.
18  Q. Who dispatched you to the location of the overdose?
19  A. The radio.
20  Q. What did you understand -- withdrawn.
21      What did you do when you arrived at the scene?
22  A. I spoke to the sector car that was first responding.
23  Q. What do you mean the sector car?
24  A. It's the radio car that responds to all radio runs.
25  Q. How much later after the radio car did you arrive?

1  A. Approximately 25 minutes.
2  Q. What did you do after you spoke to the sector car officer?
3  A. I went up to the second floor to observe the body in the
4  room that it was found in.
5  Q. What did you observe in that room?
6  A. I observed Mr. Ogno laying on the floor. I observed a
7  needle next to his bed, glassines of heroin next to his bed,
8  and also two cell phones on his bed.
9      MR. FINKEL: One moment, your Honor.
10      Ms. Dunbar, if you can display for the witness what
11  has been marked for identification as Government Exhibit 262.
12  Q. What are we looking at here?
13  A. Mr. Ogno's room.
14  Q. When?
15  A. The day of the overdose.
16  Q. Is that a fair and accurate representation of what you saw
17  in Mr. Ogno's room?
18  A. Yes.
19      MR. FINKEL: Your Honor, the government offers 262.
20      MR. QUIJANO: No objection.
21      THE COURT: 262 is in evidence.
22      (Government's Exhibit 262 received in evidence)
23      MR. FINKEL: May we publish?
24      THE COURT: Yes, you may.
25      MR. FINKEL: Ms. Dunbar, if we can display for the

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1 witness what has been marked for identification as Government
2 Exhibit 263.
3 BY MR. FINKEL:
4 Q. Detective Slevin, what are we looking at in 263?
5 A. This is Mr. Ogno's bed on the day of his overdose.
6 Q. Is that a fair and accurate representation of what you saw
7 that night?
8 A. Yes.
9        MR. FINKEL: Your Honor, the government offers 263.
10       MR. QUIJANO: No objection.
11       MS. O'NEILL: No objection.
12       THE COURT: 263 is in evidence.
13       (Government's Exhibit 263 received in evidence)
14       MR. FINKEL: Can we publish?
15 BY MR. FINKEL:
16 Q. Detective Slevin, what, if anything, did you notice on the
17 nightstand in that photograph?
18 A. There was a hypodermic needle next to the bed.
19 Q. Can you circle it on your screen?
20       MR. FINKEL: Your Honor, if the record could reflect
21 that Detective Slevin circled in the center of the picture
22 right by the nightstand.
23       THE COURT: All right. The record will so reflect.
24       MR. FINKEL: Ms. Dunbar, if we can display for the
25 witness what has been marked for identification as Government

1 Exhibit 208.
2 BY MR. FINKEL:
3 Q. What are we looking at here, Detective Slevin?
4 A. The hypodermic needle that was next to the bed.
5        MR. FINKEL: Your Honor, the government offers 208.
6        MR. QUIJANO: No objection.
7        MS. O'NEILL: No objection.
8        THE COURT: 208 is in evidence.
9        (Government's Exhibit 208 received in evidence)
10       MR. FINKEL: Can we publish, please.
11       Ms. Dunbar if we display for the witness what has been
12 marked for identification as Government Exhibit 211.
13 BY MR. FINKEL:
14 Q. Detective Slevin, what are we looking at here?
15 A. The glassines of heroin that were found next to the bed.
16 Q. Is that a fair and accurate representation of what you saw
17 that day?
18 A. Yes.
19       MR. FINKEL: The government offers 211.
20       MR. QUIJANO: No objection.
21       MS. O'NEILL: No objection.
22       THE COURT: 211 is in evidence.
23       (Government's Exhibit 211 received in evidence)
24       MR. FINKEL: May we publish?
25       THE COURT: Yes, you may.

1 BY MR. FINKEL:
2 Q. Detective Slevin, I am circling towards the center of the
3 photograph. What is it that I just circled?
4 A. It's a rubber band.
5        MR. FINKEL: Ms. Dunbar, you can take that down.
6        And if you can display for the witness Government
7 Exhibit 209.
8 Q. Detective Slevin, what are we looking at here?
9 A. It's Mr. Ogno's body the day of the overdose.
10       MR. FINKEL: The government offers 209.
11       MR. QUIJANO: We stand by our prior objection, your
12 Honor, previous objection.
13       MS. O'NEILL: No objection.
14       THE COURT: The objection is overruled. 209 is
15 received in evidence.
16       (Government's Exhibit 209 received in evidence)
17       MR. FINKEL: May we publish?
18       THE COURT: Yes, you may.
19       MR. FINKEL: We can take that down.
20 BY MR. FINKEL:
21 Q. Detective Slevin, after you went to the room where
22 Mr. Ogno's body was found, what, if anything, did you do next?
23 A. I went downstairs to speak with the family.
24 Q. Did you speak with certain members of the family?
25 A. Yes, I did.

1 Q. What did you do after you spoke with certain members of his
2 family?
3 A. I went back upstairs to get the two cell phones that were
4 on the bed.
5 Q. Without going into the substance of what they told you, who
6 of the family did you speak with?
7 A. The girlfriend.
8 Q. How did the girlfriend seem to you?
9 A. She was very upset.
10 Q. You said after you spoke with the girlfriend you went into
11 the bedroom again. What, if anything, did you do when you got
12 to the bedroom?
13 A. I retrieved the two cell phones that were on the bed.
14 Q. What did you do after you retrieved the two cell phones?
15 A. I brought the cell phones downstairs.
16 Q. Taking a step back for a second, when you say the
17 girlfriend seemed very upset, what do you mean by that?
18 A. She was very upset because she was the one who found the
19 body of her boyfriend. She was very distraught.
20 Q. Can you describe what you mean? What exactly did you see?
21 A. She was crying; she was upset.
22 Q. Going back, you went into the bedroom and you said you
23 retrieved the cell phones. What, if anything, did you do next?
24 A. I went back downstairs, and I walked over to the
25 girlfriend.

1 Q. Did you speak with the girlfriend again?
2 A. Yes.
3 Q. What, if anything, did you do after speaking with the
4 girlfriend?
5 A. I showed her the two cell phones that we found. She said
6 that --
7 Q. Don't tell me what she said. What, if anything, did you do
8 after you showed her the cell phones?
9 A. I asked her if she knew the PIN number.
10 Q. After you asked her if she knew the PIN number, what, if
11 anything, did you do?
12 A. I looked at the text messages.
13 Q. For both phones or just one?
14 A. Just one.
15 Q. Why did you decide only to look at one?
16 A. She said the other phone, he wasn't using it, it was off.
17    MR. QUIJANO: Objection, your Honor.
18    THE COURT: Overruled.
19    MR. QUIJANO: Could we have the last question and
20 answer read back, please.
21    (Record read)
22 Q. Detective Slevin, is that your answer, that she told you
23 the phone was off?
24 A. What do you mean by the question?
25 Q. Detective Slevin, why did you only look at one of the

1 Q. What does it say below that at 11:24 a.m.?
2 A. "OK. We're having turkey."
3 Q. What does it say below that?
4 A. It says, "OMW, now about ten minutes."
5 Q. What does it say below that?
6 A. It says "OK."
7 Q. And below that?
8 A. "So you want to give me the bunny, I will owe it to you
9 some day."
10 Q. What does it say below that at 11:28?
11 A. "That's what we said we are doing, right?"
12 Q. What does it say at 11:33?
13 A. "Yes, sir."
14 Q. At 11:34, what does the "P" say?
15 A. "Here."
16 Q. Did there come a time as part of this investigation that
17 you obtained a subpoena?
18 A. Yes.
19 Q. What phone number did you obtain a subpoena on?
20 A. Mr. Ogno's.
21 Q. What was the phone number?
22 A. I would have to look at my DD-5.
23 Q. Do you recall?
24 A. I don't recall.
25 Q. If you can look at 3511 -- there should be another binder

1 phones?
2 A. She said the other phone he wasn't using.
3    MR. FINKEL: Displaying for the witness what has been
4 marked for identification as Government Exhibit 210.
5 Q. What is this?
6 A. That was the text message that was on the phone.
7 Q. How did you capture this?
8 A. I took a picture of it with my department cell phone.
9 Q. Is this a fair and accurate representation of what you saw?
10 A. Yes.
11    MR. FINKEL: The government offers 210.
12    MR. QUIJANO: No objection.
13    THE COURT: 210 is in evidence.
14    (Government's Exhibit 210 received in evidence)
15    MR. FINKEL: May I publish?
16    THE COURT: Yes, you may.
17 BY MR. FINKEL:
18 Q. Detective Slevin, in 210, what does it say at the top?
19 A. "Paul D."
20 Q. What does it say next to the "P"?
21 A. "Will do."
22 Q. Below that, at 11:03, what does it say?
23 A. "You're coming to me, right?"
24 Q. Below that, next to the "P," what does it say?
25 A. "I'm getting your MoneyGram and then I'm coming to dinner."

1 up there, probably to your left, a little bit smaller. If you
2 can turn to 3511-12, at page 29.
3    If you can just look at that and let me know if it
4 refreshes your recollection.
5 A. Yes, it does.
6 Q. What are the last four digits of the phone number that you
7 got a subpoena on?
8 A. 0111.
9 Q. What is the full phone number?
10 A. 347-681-0111.
11 Q. Detective Slevin, turning back to Government Exhibit 210,
12 when you looked through the phone, were there additional text
13 messages that came later in time on that text chain?
14 A. No.
15 Q. Based on what you were looking at, were you able to
16 ascertain the date of those text messages?
17 A. No.
18 Q. Did you conduct any additional interviews as part of -- let
19 me take a step back.
20    Why were you selected to go to Michael Ogno's home on
21 the date of his overdose?
22 A. I was on the catch in regards to the overdose.
23 Q. What do you mean by that?
24 A. We have a system where we have 12 investigators and you get
25 assigned the day and time that you respond to the overdoses

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1   that come over.
2   Q. That evening did you contact any other detectives that you
3   work with?
4   A. Yes, I did.
5   Q. Who did you contact?
6   A. Detective Truscelli.
7   Q. That evening who was responsible for the Michael Ogno
8   investigation?
9   A. I was.
10  Q. Did you take additional steps in the investigation after
11  that date?
12  A. Yes, I did.
13  Q. Did you interview anyone?
14  A. Yes, I did.
15  Q. Did there come a time, if ever, when the Ogno case was
16  administratively linked to another case?
17  A. Yes, it was.
18  Q. When was that?
19  A. I don't remember.
20  Q. Is there anything that would refresh your recollection?
21  A. My DD-5.
22  Q. If you can turn to page 42 of the document you're looking
23  at, 3511-12.
24      Does that refresh your recollection?
25  A. Yes, it does.

1   Q. What date?
2   A. January 25, 2018.
3   Q. What does it mean for a case to become administratively
4   linked?
5   A. You link it to another case that is in regards to the same
6   incident.
7   Q. What case was the Ogno case administratively linked to on
8   January 25, 2018?
9   A. Case number 2017-106.
10  Q. What case is that, Detective?
11  A. The Paul Van Manen case.
12  Q. Whose decision was it to link the cases on January 25,
13  2018?
14  A. My supervisor.
15  Q. What is his name?
16  A. Sergeant Quinn.
17  Q. Prior to that date, who was the investigator responsible
18  for the Michael Ogno investigation?
19  A. I was.
20      MR. FINKEL: Can I have a moment?
21      THE COURT: Yes.
22      MR. FINKEL: Nothing further. Thank you.
23  CROSS-EXAMINATION
24  BY MR. QUIJANO:
25  Q. Good afternoon, Detective Slevin.

1   A. Good afternoon.
2   Q. So you were originally part of the Staten Island
3   investigation of Paul Van Manen before this case became a
4   federal investigation, correct?
5   A. Correct.
6   Q. And your involvement in that investigation started
7   approximately when, September of 2017?
8   A. I don't recall the date.
9   Q. It was a few months earlier than the Ogno incident you have
10  been describing, right?
11  A. Correct.
12  Q. You were on it for about four or five months, does that
13  sound correct?
14  A. Yes.
15  Q. Detective Truscelli was the lead investigator in that
16  investigation, correct?
17  A. Yes, he was.
18  Q. You essentially were working for him, as far as that
19  investigation went, right?
20  A. We were assisting him.
21  Q. So on December 1st, when you got this call, you went down
22  there initially without any connection to this Van Manen
23  investigation that had been going on, this was a separate call
24  altogether because you were on duty in terms of a possible, any
25  kind of overdose case that came in?

1       MR. FINKEL: Objection as to form.
2       THE COURT: Overruled.
3   Q. Did you understand my question?
4   A. Yes.
5   Q. And the answer is?
6   A. Correct.
7   Q. In fact, when you first went down there, you had no reason
8   to believe it had anything to do with the Van Manen
9   investigation that had been going on, correct?
10  A. We knew that 225 Malone was also on the wire.
11  Q. Because of Michael Ogno.
12  A. Correct.
13  Q. You did some surveillance of Michael Ogno before December
14  1st?
15  A. No, I did not.
16  Q. But you certainly were aware of who he was?
17  A. Correct.
18  Q. At that point, when you went down on December 1st, were you
19  also aware of an individual named Derek Yung?
20  A. No, I was not.
21  Q. That never came up in the surveillance and investigation
22  with Detective Truscelli?
23  A. Not to my knowledge.
24  Q. OK. Now, when you arrived at the scene, you mentioned some
25  of the people who were there. The girlfriend, that's Jessica

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  Fyfe, is that correct?
2  A. Correct.
3  Q. Was Michael Ogno's mother there?
4  A. Yes, she was there.
5  Q. You spoke with her also?
6  A. We tried to. She was very upset and distraught; we
7  couldn't talk to her.
8  Q. You were not able to speak with her?
9  A. Not clearly.
10  Q. There was also a police officer, Detective Andrew Lassen,
11  he was there, wasn't he?
12  A. Not to my knowledge.
13  Q. You didn't ascertain that there was a family relative
14  present who was a detective that evening?
15  A. I knew he was a detective; I didn't know his name though.
16  Q. You knew he was a family member, correct?
17  A. Correct.
18  Q. And you didn't know -- did you know who he was in
19  relationship with the police?
20  A. I knew he was a detective with the police department,
21  correct.
22  Q. Did you also obtain some information of other people that
23  had been in that home earlier, including Anthony Ogno, the
24  deceased brother?
25  A. Yes, I did.

1  Q. Did you obtain information that in fact an overdose had
2  happened at that same premises a few months earlier involving
3  Anthony Ogno's girlfriend?
4  A. No, I did not know that.
5  Q. Now, how soon after you first arrived did you -- withdrawn.
6      There came a point in time when you communicated with
7  Detective Truscelli about what was going on on December 1st,
8  right?
9  A. Correct.
10  Q. Did you call him from the location when you first arrived
11  or did you first contact him later?
12  A. I contacted him later.
13  Q. Do you recall how long after December 1st, the next day?
14  A. It was the same night of the overdose.
15  Q. And among other things, you told him that you believed Paul
16  Van Manen might be involved in this, correct?
17  A. Correct.
18  Q. Detective Truscelli had been investigating Paul Van Manen
19  for some time, correct?
20  A. Correct.
21  Q. In fact, it even predated the investigation that you were
22  involved in in 2017, correct?
23      MR. FINKEL: Objection.
24      THE COURT: Overruled.
25  Q. Correct?

1  A. Correct.
2  Q. Is it fair to say that Detective Truscelli was very
3  interested when you told him this?
4  A. What do you mean by fair to say?
5  Q. Well, did he seem very, very interested in this?
6  A. Yes, he was interested; he was interested.
7  Q. Did you learn that Anthony Ogno had been arrested earlier
8  that day?
9  A. Yes, I did.
10  Q. Now, you were able to talk with the girlfriend; I
11  understand she was distraught, but you did interview her to a
12  certain extent, correct?
13  A. Correct.
14  Q. And she gave you some information, correct?
15  A. Correct.
16  Q. As a result of that, about five days later, you had another
17  discussion with this young lady -- her name is Jessica Fyfe,
18  correct?
19  A. Yes.
20  Q. That was following up on the investigation that started
21  that evening on the 1st, correct?
22  A. Correct.
23  Q. Am I correct that what you discussed was essentially the
24  subject matter of what she had provided you earlier on December
25  1st?

1  A. Correct.
2  Q. Now, as part of your investigation, you also started to
3  focus on Derek Yung, is that correct?
4  A. I didn't, no.
5  Q. The investigation that was going on about the Ogno
6  overdose, did the investigation start to focus on Derek Yung or
7  at least -- did it start to focus on Derek Yung also?
8  A. No.
9  Q. Not to your knowledge or no?
10      MR. FINKEL: Objection. Asked and answered.
11      THE COURT: Overruled.
12  A. The girlfriend told us about Derek Yung that --
13      MR. FINKEL: Objection. Calls for hearsay.
14  Q. There was no follow-up investigation as to Derek Yung?
15  A. Not to my knowledge, no.
16  Q. At least for this portion of time, you were the lead
17  investigator in this investigation, the Michael Ogno overdose,
18  correct?
19  A. Correct.
20  Q. So presumably -- withdrawn.
21      To be clear, by December 1st, Detective Truscelli was
22  no longer involved in a formal investigation of Paul Van Manen,
23  that investigation had stopped once it was absorbed by the
24  federal authorities, correct?
25  A. Not to my knowledge.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1 Q. You don't know whether Truscelli was still involved in a
2 formal investigation?
3 A. No.
4 Q. He was not or you don't know?
5 A. No, I don't know.
6 Q. To be clear, I'm talking about the investigation that you
7 were involved in starting in September, the surveillance you
8 talked about on direct, that investigation. Isn't it true that
9 that investigation had ended prior to December 1st?
10 A. I'm not sure of the exact date when it was closed.
11 Q. This is your investigation. It was sometime before
12 December 1st, right?
13 A. Are you talking about the Paul Van Manen case or Michael
14 Ogno?
15 Q. I am talking only about the Staten Island Paul Van Manen
16 investigation headed by Truscelli. That investigation is shut
17 down prior to December 1st, correct?
18 A. Correct.
19 Q. In fact, it shut down around September, isn't that true?
20 A. Correct.
21 Q. Now, after December 1st, there came a point in time where
22 you had a phone interview, another follow-up interview with
23 Jessica Fyfe, is that correct?
24 A. Correct.
25 Q. That would have been about five, six days after, does that

1 sound right?
2 A. It sounds about right.
3 Q. Did you tell Truscelli about that interview, or was he
4 involved in that interview in any way?
5 A. Yes, he was involved.
6 Q. Is it correct to say that as you continued your
7 investigation of the Michael Ogno overdose, you kept advising
8 Detective Truscelli what was going on and, in fact, often he
9 was assisting you in the investigation, isn't that correct?
10 A. Correct.
11 Q. Now, he wasn't officially assigned to this particular
12 investigation by your precinct, correct?
13 A. Correct.
14 Q. But he was really interested in this, wasn't he? Isn't
15 that why you brought him along and kept telling him what was
16 going on?
17 A. He was assisting me in regards to this case.
18 Q. Well, you thought he would be interested in Paul Van Manen,
19 correct?
20 A. Correct.
21 Q. Now, after the December 6 interview on the phone with
22 Jessica Fyfe, you have at least one or two other contacts with
23 Ms. Fyfe, is that correct?
24 A. No.
25 Q. To the best of your knowledge, did anyone -- well, any

1 police, specifically, anyone involved with the investigation,
2 formally or otherwise, did they have any more contact with
3 Jessica Fyfe?
4 A. Not to my knowledge, no.
5 Q. You're not aware of police from your precinct having a
6 conversation with her first at a bakery?
7 A. No.
8 Q. Well, after the December 6 phone interview, isn't there a
9 point in time where you and Truscelli go to her house and have
10 a discussion with her?
11 A. Yes.
12 Q. To be clear, so after December 6, you do have further
13 contact with her?
14 A. In regards to December 5, I believe it was a clerical
15 error. That's when we went to the house. It wasn't a
16 telephone interview; we went to the house.
17 Q. A clerical error in the DD-5?
18 A. Correct.
19 Q. Oh. And that's when you and Truscelli go to the house?
20 A. Correct.
21 Q. She gave you some -- don't tell us what it was -- she gave
22 you some information then, right, relating to what happened on
23 December 1st, correct?
24 A. Correct.
25 Q. And I am correct that you or Truscelli then ask her to

1 follow up on it or to do something affirmative on her own, is
2 that correct?
3 A. Not to my knowledge, no.
4 Q. OK. So you went to her house about six days afterwards,
5 right?
6 A. Correct.
7 Q. And you prepared a DD-5 in relationship to that, correct?
8 A. Correct.
9 Q. And you put down what the purpose or at least what was
10 covered in that interview, correct?
11 A. Correct.
12 Q. Did you put that Truscelli was with you in that report, do
13 you remember?
14 A. I don't recall.
15 Q. Could you look at your DD-5, perhaps just to refresh your
16 recollection -- I think that's 3511-11, page 157 -- and just
17 read it to yourself.
18     Does that refresh your recollection about this meeting
19 as well as the preparation of this report?
20 A. Yes, it does.
21 Q. You went over this report with the government prior to
22 testifying, correct?
23 A. Yes, I did.
24 Q. I assume several times, correct?
25 A. Correct.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1 Q. Did you ever clarify the error that it was not a telephone
2 interview?
3 A. I didn't see that error.
4 Q. You didn't see that as an error?
5 A. No, I didn't notice the error.
6 Q. When did you first notice it was an error?
7 A. Just now.
8 Q. All right.
9     I am correct in your report you don't note that
10 Detective Truscelli is with you, correct?
11 A. Correct.
12 Q. And there is no indication of you or Detective Truscelli
13 asking Ms. Fyfe to follow up on something or to do something
14 affirmative, is that correct?
15 A. That's correct.
16 Q. This was an overdose investigation. I mean, you try to be
17 as accurate as possible in preparing these DD-5s, these
18 reports, that are tracking the investigation, correct?
19 A. Correct.
20 Q. Did you intentionally leave out that information, the part
21 specifically about -- not just the subject matter of what was
22 discussed, but if you or Truscelli asked her to do something
23 affirmative as a result of this interview?
24     MR. FINKEL: Objection. It mischaracterizes the
25 witness's testimony.

1     THE COURT: Overruled.
2 Q. Can you answer it?
3 A. Not to my knowledge. I didn't ask her to do anything.
4 Q. At any point after December 1st, did you ever ask Jessica
5 Fyfe to do something affirmative in relationship to the
6 investigation?
7 A. No, I did not.
8 Q. To the best of your knowledge, did anybody else involved in
9 the investigation ever ask Jessica Fyfe to do something
10 affirmative after this December 6th interview?
11 A. To the best of my knowledge, no.
12 Q. What was the purpose of going to do this interview?
13 A. We just wanted to see if we could talk to her when she was
14 not upset and she's more clearheaded.
15 Q. About what she knew about what happened that night,
16 correct?
17 A. Correct.
18 Q. Do you recall if you learned something in the second
19 interview that you hadn't known before when you were there on
20 December 1st with Fyfe?
21 A. Can I review my DD-5?
22 Q. Sure. I assume it's the same one, 3511-11.3.
23 A. She gave us more information --
24     MR. FINKEL: Objection. I think the question was a
25 yes or no about what he remembers.

1     THE COURT: Does it refresh your recollection?
2 Q. What do you remember?
3 A. It refreshes my recollection now, yes.
4 Q. And what was it?
5 A. She gave us more information in regards --
6     MR. FINKEL: Objection. It calls for hearsay.
7 Q. She gave you some additional information that you hadn't
8 known about on December 1st, correct?
9 A. Correct.
10 Q. And this was a result of information that she had learned
11 since you met with her on December 1st, is that fair?
12     MR. FINKEL: Objection. Foundation.
13     THE COURT: Overruled.
14 Q. Is that fair?
15 A. Not to my knowledge. We just talked to her and that's what
16 she told us.
17 Q. Forgive me, maybe I didn't make my question clear. What
18 she told you, and I don't want the details, but what she told
19 you was the result of something she had learned since December
20 1st when you spoke with her, isn't that true?
21 A. I think she knew that beforehand.
22     THE COURT: She didn't tell you anything new,
23 Detective?
24     THE WITNESS: No. She told us something new, yes.
25 Q. And that something new, what I am asking, isn't it true

1 that she told you that this was something that she learned
2 after you had met with her on December 1st, subsequent to the
3 December 1st interview, something new, right?
4 A. Correct.
5 Q. And she told you how she learned this, correct?
6 A. Correct.
7 Q. Now, at any point do you have another discussion with her
8 at a bakery?
9 A. No.
10 Q. Do you know if anyone involved in the investigation had
11 another discussion with her about the December 1st incident at
12 a bakery?
13 A. Not to my knowledge, no.
14 Q. You would know, right; you're leading this particular
15 investigation, right?
16     If there had been another interview or contact with
17 Jessica Fyfe, that would be reported to the investigation,
18 correct?
19 A. Sometimes other units go and speak to the victims. I'm not
20 sure.
21 Q. I am asking you something a little bit different. If after
22 this interview at her house somebody involved in the
23 investigation had had another interview with her that took
24 place at a bakery, wouldn't the results of that interview have
25 made it into a DD-5 and been reported to the investigation?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1      MR. FINKEL: Objection. It's been asked and answered
2  three times.
3      THE COURT: Overruled.
4  A. Not to my knowledge.
5  Q. I'm not asking if it happened. I am asking if it happened,
6  it would have been reported to the investigation, it would have
7  been in a DD-5, right?
8  A. Correct.
9  Q. It should have been, right?
10  A. Correct.
11  Q. That's the correct protocol, right?
12  A. Correct.
13  Q. That's why you prepare these DD-5s, correct?
14  A. Correct.
15  Q. I am also correct that as far as you know, there is no DD-5
16  that talks about another interview with Jessica Fyfe that took
17  place at a bakery, am I correct about that?
18  A. Correct.
19  Q. Who initiated the interview and the visit to the house?
20  Did you call her or did she reach out to you folks, do you
21  remember?
22  A. I don't recall.
23  Q. Do you recall, when you went there, was it the result of
24  having received new information from Jessica Fyfe that you
25  hadn't received on December 1st?

1  A. We were just going to do a reinterview with regards to the
2  Michael Ogno overdose.
3  Q. Just a routine follow-up on the original investigation,
4  correct?
5  A. Correct.
6  Q. If I am following this correctly, after the December 6th
7  interview at her house, did you have any other contact with
8  Jessica Fyfe?
9  A. No, I did not.
10  Q. And to the best of your knowledge, anyone else connected
11  with the investigation, Truscelli or anyone else, did they have
12  any other contact with Jessica Fyfe after the December 6th
13  interview at her house?
14  A. Not to my knowledge.
15  Q. The new information that you received from Jessica Fyfe,
16  you told the government about this, right, the details of that
17  information, without telling us what that is, right?
18  A. Correct.
19  Q. Do you recall when you told the government this, the
20  details of what Jessica Fyfe told you at the second interview?
21  Because it's not in your report, right?
22      MR. FINKEL: Objection.
23      MR. QUIJANO: Withdrawn.
24  Q. In your DD-5, there is no mention or description of the new
25  information, any new information that Jessica Fyfe gave, is

1  that correct?
2      MR. FINKEL: Objection. The DD-5 is not in evidence.
3      MR. QUIJANO: He prepared it.
4      THE COURT: It's still not in evidence. Objection
5  sustained.
6  Q. When did you first tell the government, these prosecutors,
7  about the new information you learned from Fyfe on the 6th, do
8  you recall?
9  A. No, I don't recall.
10  Q. When did you start having involvement with this
11  prosecution?
12  A. About a week ago.
13  Q. Do you recall at any time since you personally got involved
14  in this prosecution telling the government about the details of
15  what Fyfe had told you?
16  A. No.
17  Q. Did you relay the information of what Fyfe had told you to
18  anyone else -- let's go back to the Staten Island -- anybody
19  else in the investigation or any other fellow officer or
20  detective?
21  A. Just Detective Truscelli.
22  Q. Who was not even involved in the official investigation of
23  the Ogno overdose.
24      MR. FINKEL: Objection.
25      THE COURT: You can ignore that observation, ladies

1  and gentlemen of the jury.
2  Q. Other than that, it was not reported to anyone, as far as
3  you know?
4  A. No.
5  Q. As far as you know, did Detective Truscelli follow up on
6  the new information that Jessica Fyfe had told you?
7  A. Not to my knowledge.
8  Q. Again, without telling us what it was, didn't you consider
9  it fairly important information?
10  A. Yes.
11  Q. So why don't you report it or follow up on it?
12      MR. FINKEL: Objection. It mischaracterizes the
13  witness's testimony.
14      THE COURT: Sustained.
15  Q. Do you remember today putting that important information in
16  your DD-5?
17  A. Yes, I do.
18  Q. You put it in here?
19  A. Yes, I did.
20      THE COURT: Can we have a question, please.
21      MR. QUIJANO: Yes, your Honor.
22  Q. Now, you were asked some questions on direct examination
23  about the scene where you find Michael Ogno up in his bedroom,
24  correct?
25  A. Correct.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  Q. Did you find any Xanax or pills up there, that you recall?
2  A. No, I did not.
3  Q. You don't recall?
4  A. I don't recall.
5  Q. If you had, it would have been memorialized, correct?
6  A. It would have been vouchered, correct.
7  Q. And there is no voucher that you're aware of of Xanax or
8  pills, correct?
9  A. Correct.  Not to my knowledge.
10 Q. You also recovered two telephones, is that correct?
11 A. Correct.
12 Q. And you put in subpoenas for both?
13 A. I don't remember.
14 Q. There were two phone numbers.  I believe you told us one of
15 them ended in 0111, is that correct?
16 A. Can I review my DD-5?
17 Q. Sure.  That would be 3511-12, I think page 29, to refresh
18 your recollection.
19 A. Yes.
20 Q. You also put in a subpoena for the other phone.  And if you
21 need to refresh your recollection of that, it's 3511-12, page
22 25.  And I believe that was a phone ending in 6275, is that
23 correct?
24 A. Correct.
25 Q. This would have been the Samsung Galaxy, is that correct?

1  A. Samsung, correct.
2  Q. And the other phone was the iPhone, right?
3  A. Correct.
4  Q. I am going to refer to them in that capacity.
5       Now, if I heard you correctly, you indicated that one
6  of the things you learned on December 1st was that not only did
7  Ogno have two phones, but he was using one more often?  I am
8  not quite sure what you said.  What was the distinction between
9  the two phones?
10 A. He wasn't using one of the phones.
11 Q. Now, you were asked questions about the iPhone, correct,
12 the extraction or the photo you took of the iPhone?
13      MR. FINKEL: Objection. It mischaracterizes the
14 witness's testimony.
15 Q. The exhibit that is still visible that has some text
16 exchanges, do you see that?
17      THE COURT: What is that exhibit number?
18      MR. FINKEL: 210.
19 Q. Which phone was that?
20 A. It's the Samsung.
21 Q. You know what an extraction is in relationship to a phone,
22 correct?
23 A. Correct.
24 Q. An extraction was made of this phone?
25      MR. FINKEL: Objection.  Foundation.

1  Q. Do you know?
2       THE COURT: Overruled.
3  A. Could you repeat the question?
4  Q. Was an extraction made for this phone, for the Galaxy?
5  A. There was a phone subpoena for it, yes.
6  Q. No extraction was made for the other phone, the iPhone, is
7  that right?
8  A. Not to my knowledge, no.  We did two subpoenas for both
9  phones.
10 Q. I know.  But no one ever looked inside the other phone?
11      MR. FINKEL: Objection.
12      THE COURT: Overruled.
13 Q. It's your investigation.  Do you know if anyone ever looked
14 inside the other phone, did an extraction to see what the usage
15 was in the other phone?
16 A. For the iPhone, no.
17 Q. Now, how long were you involved in this investigation, the
18 Ogno OD?  It started on December 1st.  How long were you
19 officially involved in the investigation, till when?
20 A. Can I look at my DD-5?
21 Q. Of course.
22 A. Till January 25, 2018.
23 Q. In the time that you were involved in the investigation,
24 did you ever interview Anthony Ogno?
25 A. No, I did not.

1  Q. Did you ever interview Derek Yung?
2  A. No, I did not.
3  Q. Did you ever interview a gentleman named Angel, who was
4  associated with a gym?
5       MR. FINKEL: Objection.
6       THE COURT: Overruled.
7       MR. FINKEL: It's stating facts not in evidence.
8       THE COURT: Overruled.  He is asking him.
9  Q. Detective?
10 A. No, I did not.
11 Q. Why didn't you get an extraction of the other phone, the
12 iPhone, is there a reason?
13 A. Because we only got the text messages from the Samsung.
14 Q. You are investigating an overdose.  You didn't think you
15 might want to see what the other phone had?  No?  OK.
16      MR. QUIJANO: Nothing further, your Honor.
17      THE COURT: Ms. O'Neill.
18      MS. O'NEILL: We have no questions.
19      MR. FINKEL: Just one moment, your Honor.
20 REDIRECT EXAMINATION
21 BY MR. FINKEL:
22 Q. Detective Slevin, you recall you were asked a series of
23 questions about your DD-5s?
24 A. Yes.
25 Q. In the course of preparing for the government, did you

A-323

J588VAN4       Slevin - Redirect       Page 442

1   review your DD-5s?
2 A. Yes, I did.
3 Q. Did you read them?
4 A. Yes, I did.
5 Q. Did you notice any other mistakes in them?
6 A. No.
7 Q. Detective Slevin, do you know who all the government's
8   witnesses are in this trial?
9 A. No.
10 Q. Do you know who else the government is going to call?
11 A. No.
12 Q. Detective Slevin, I think this was talked a bit about both
13   on direct and cross. Is it your understanding at some point
14   your investigation was -- withdrawn.
15       It is your understanding at some point your
16   investigation merged into the strike force investigation of
17   Paul Van Manen?
18 A. It was merged into the Staten Island overdose Paul Van
19   Manen investigation.
20 Q. What is your understanding of what happened to that
21   investigation with respect to strike force?
22 A. Strike force took it over.
23 Q. Do you know what investigative steps strike force took
24   after that happened?
25 A. No.

J588VAN4       Page 443

1 Q. Do you know if strike force did additional work on the
2   Michael Ogno death?
3 A. No.
4       MR. FINKEL: One moment.
5       Nothing further. Thank you, Detective.
6       THE COURT: You're excused, Detective. Thank you very
7   much.
8       (Witness excused)
9       THE COURT: Ladies and gentlemen, we will take our
10   afternoon recess now. We will resume at 3:30.
11       (Jury exits courtroom)
12       (Recess)
13       (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

J588VAN4       Page 444

1       MR. FINKEL: A brief possible application. Dr.
2   Cederroth, who is the medical examiner from OCME, is scheduled
3   to testify tomorrow either in the Bronx or Brooklyn. The
4   parties have conferred and we feel like we will be able to get
5   both the direct and cross in before the end of the day at 4:30,
6   but if there is just a few additional minutes, we would
7   appreciate the Court's indulgence to extend the trial day just
8   to get the rest of Dr. Cederroth's testimony in. Hopefully
9   that won't be necessary.
10       THE COURT: Today or tomorrow?
11       MR. FINKEL: She is next.
12       THE COURT: OK.
13       MR. FINKEL: Thank you, your Honor.
14       THE COURT: Are we all set?
15       (Continued on next page)
16
17
18
19
20
21
22
23
24
25

J588VAN4       Cederroth - Direct       Page 445

1       (Jury present)
2       THE COURT: Call the next witness.
3       MR. FINKEL: The government calls Dr. Terra Cederroth.
4       THE DEPUTY CLERK: State and spell your full name for
5   the record.
6       THE WITNESS: Terra Cederroth, T-E-R-R-A,
7   C-E-D-E-R-R-O-T-H.
8   TERRA CEDERROTH,
9       called as a witness by the government,
10       having been duly sworn, testified as follows:
11       THE COURT: Please sit down, Doctor, and make yourself
12   comfortable.
13       Mr. Finkel, go ahead.
14   DIRECT EXAMINATION
15   BY MR. FINKEL:
16 Q. Good afternoon.
17 A. Good afternoon.
18 Q. Dr. Cederroth, where are you employed?
19 A. I am employed at the Office of Chief Medical Examiner of
20   the City of New York.
21 Q. Is that commonly known as the OCME?
22 A. Yes.
23 Q. Could you just briefly describe for the jury what the OCME
24   is?
25 A. So the OCME is a government agency for the city of New

1 York, and we deal with investigating certain types of death
2 that fall under our jurisdiction. These are deaths that are
3 either unwitnessed, sudden, unexpected, or violent in any way,
4 anything that has to do with a suicide or a homicide or an
5 accident, those are the types of deaths that fall under our
6 jurisdiction and we deal with determining cause and manner of
7 death.
8 Q. What is your position at OCME?
9 A. I am a city medical examiner 2.
10 Q. When did you start at OCME?
11 A. I started July 1, 2016.
12 Q. What are your duties and responsibilities as a city medical
13 examiner?
14 A. So as a city medical examiner, certain cases come to us
15 where we are asked to determine the cause and manner of death.
16 Those are the types of cases I just described. In doing so, we
17 perform in some cases autopsies, and we also perform certain
18 studies such as toxicology. We also take sections to look at
19 under a microscope, and all of that is to determine the cause
20 and manner of death. We are also a teaching institution so we
21 are responsible for teaching medical students and residents
22 that rotate in our office. And we also sometimes are asked to
23 testify in court.
24 Q. Prior to joining OCME, where, if anywhere, did you work?
25 A. Before OCME, I was finishing my residency in Boston,

1 Massachusetts.
2 Q. How long have you been with OCME?
3 A. Since July 1, 2016.
4 Q. Do you have any professional licenses?
5 A. Yes.
6 Q. What are they?
7 A. I have a medical license from the state of New York.
8 Q. And that's an MD?
9 A. Yes.
10 Q. Can you describe briefly for the jury your educational
11 training that allows you to be certified as an MD?
12 A. Yes. So starting with college, I went to Tufts University
13 in Boston, where I earned a bachelor of science with a
14 concentration of biology. After that I went to four years of
15 medical school at Tufts University Medical School, also in
16 Boston, Massachusetts, where I earned my medical degree. After
17 that I did a residency in anatomical and clinical pathology,
18 and that was at Harvard Medical School, the hospital was Beth
19 Israel Deaconess Medical Center, in Boston. And after that I
20 performed a one-year training fellowship in forensic pathology
21 at the Office of Chief Medical Examiner in the city of New
22 York.
23 Q. Just to be clear, do you have a specialty as an MD?
24 A. Yes.
25 Q. What is it?

1 A. I'm a forensic pathologist.
2 Q. Let's take a step back. What is pathology?
3 A. So pathology is a specialty within the field of medicine.
4 It's something that we specialize in and it deals specifically
5 with determining disease states and learning to diagnose
6 disease. More commonly you might know, when you go and have a
7 biopsy taken, for instance a breast biopsy or a skin biopsy,
8 the pathologist then looks at that under the microscope and
9 tries to determine what kind of tumor it is, or it can be an
10 infection, things like that. We also deal with any type of
11 disease of the blood as well as the organs and tissues.
12     Then forensic pathology is a subspecialty within the
13 field of pathology. Like a pediatrician can subspecialize in
14 neurology or things like that or a surgeon can be a breast
15 surgeon. Well, a pathologist can become a forensic
16 pathologist, and in that case we deal specifically with
17 determining cause and manner of death in forensic cases, which
18 are the ones I described earlier.
19 Q. And that's your specialty, forensic pathology?
20 A. That's my subspecialty.
21 Q.     As part of your job, do you conduct autopsies?
22 A. Yes.
23 Q. What is an autopsy?
24 A. So an autopsy is the examination of the body after death.

1 It is comprised of two components. There is both the external
2 examination and the internal examination. During the external
3 examination, we look at the outside of the body for any kind of
4 evidence of disease or injury. We look also at tattoos and
5 scars. And then we do an internal examination, where we also
6 look at the internal organs, and we are looking for any kind of
7 disease or injury.
8 Q. Approximately how many autopsies have you performed in your
9 career?
10 A. About 700.
11 Q. Have you also observed or assisted in autopsies?
12 A. At least that many.
13 Q. Have you testified at trials before as an expert in
14 forensic pathology?
15 A. Yes, I have.
16 Q. Approximately how many times?
17 A. 13 times.
18 Q. Were you qualified as an expert in forensic pathology
19 during those testimonies?
20 A. Yes.
21 Q. Have you ever been denied expert qualification in the field
22 of forensic pathology?
23 A. I have not.
24     MR. FINKEL: Your Honor, at this time the government
25 requests that Dr. Cederroth be qualified as an expert witness

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  in forensic pathology.
2     THE COURT: Any objection?
3     MS. SIDERIS: No objection.
4     MS. O'NEILL: No objection.
5     THE COURT: Dr. Cederroth is recognized as an expert
6  in forensic pathology.
7  BY MR. FINKEL:
8  Q. Dr. Cederroth, you explained a little bit about what an
9  autopsy is. What is the purpose of performing an autopsy?
10 A. The purpose of performing an autopsy is to determine why
11 somebody died, and that is what we call determining the cause
12 of death; and something that we also try to determine is the
13 manner of death.
14 Q. Before performing an autopsy, is it often the case that a
15 medical examiner might form an initial opinion regarding the
16 cause of death?
17 A. We often have an idea of what type of death it is or what
18 type of case we are looking at, and that depends a lot on the
19 scene investigation and what we know before starting an
20 autopsy.
21 Q. Doctor, in your practice, is it common for you to evaluate
22 deaths resulting from a drug overdose?
23 A. Yes.
24 Q. About what percentage of the autopsies you have performed
25 at OCME involve drug overdose?

1  could lead to cause of death?
2  A. So opioids, when used properly, as I mentioned before, can
3  relieve pain and help with anesthesia in certain procedures.
4  But if they are taken in excess, they can cause drowsiness,
5  sedation, and can cause something called respiratory
6  depression, which is slowing of the breathing; and to a certain
7  extent, if you breathe too slowly, it also causes your heart
8  rate to go down, your respiratory rate to go down, and it can
9  eventually lead to coma and death.
10 Q. What is an overdose?
11 A. An overdose is precisely when that occurs and the
12 medication or the drug is taken in excess of what is just
13 expected for pain relief and somebody actually takes too much
14 of it and can lead to death.
15 Q. If an individual is suffering from an overdose, what risks
16 are there, if any, to the health of that individual?
17 A. They can die.
18 Q. Why?
19 A. Because of precisely what I was mentioning a second ago.
20 The respiratory depression is something that is very
21 life-threatening and can lead to death.
22 Q. If someone is suffering from an opioid overdose, are there
23 any steps that can be taken to revive them?
24 A. If used immediately, there is a medication called naloxone,
25 also known as Narcan, that can be administered to the patient.

1  A. It's hard to say, but I would estimate between a quarter
2  and a third of my cases.
3  Q. Have you previously conducted autopsies in which an opioid
4  overdose was the cause of death?
5  A. Yes.
6  Q. What is an opioid?
7  A. So an opioid medication is a class of drugs that are both
8  illegal and prescription drugs that are used for pain relief or
9  what we call analgesia. So these are things that are commonly
10 know as heroin, fentanyl is a more common one, but more common
11 prescription medications, like morphine, OxyContin, Vicodin,
12 things like that.
13 Q. How are opioids different from other types of drugs, like
14 cocaine for example?
15 A. Opioids as a class tend to produce the effect of pain
16 relief and analgesia; they cause sedation and sort of
17 drowsiness, or in a certain way they are downers. Whereas
18 cocaine has very much the opposite effect and is a little bit
19 more of an upper that causes you to be more alert and more
20 excited. So they have opposing effects.
21 Q. What type of drug is heroin?
22 A. Heroin is an opioid medication.
23 Q. What about fentanyl?
24 A. Also an opioid medication.
25 Q. Can you briefly explain what exactly an opioid does that

1  If done in a timely manner, it can reverse the effects of the
2  opioid and can save them.
3  Q. You mentioned before that there is a scene investigation
4  that often occurs. What exactly is that?
5  A. So for the cases that we receive at the medical examiner's
6  office, before we see the body an examiner or a medicolegal
7  investigator will go to the scene where the body is found and
8  investigate the scene. So this can be where the person was
9  found, either at home or in the woods or in the street or in
10 the hospital, and they go and investigate how the person was
11 found, what position they were in; and, also, they make note of
12 other things, such as objects that were found around the
13 decedent, or things that were in the fridge, or alcohol or
14 drugs that were found at the scene.
15    So we receive this information when we start our case,
16 before we even start our case, and we also receive the
17 photographs of the place where the person was found and how
18 they were found. So this is something we review before we
19 begin a case.
20 Q. How is, if at all, the information from the scene
21 investigation important to your autopsies?
22 A. It's important in helping us determine both the cause and
23 the manner of death. It also sort of guides our autopsy in
24 terms of what needs to be done and what steps need to be taken.
25 And it sort of gives an idea -- gives us an idea, at least we

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

**CORRECTED**
**May 8, 2019**

1  hope, of where the case may be going.
2  Q. Dr. Cederroth, when someone dies from an opioid overdose,
3  what would you expect to find in their autopsy?
4  A. Very often these are negative autopsies; they can have
5  completely normal looking organs and no injuries whatsoever,
6  and the results will come through the toxicology. However,
7  what we can find to suggest an overdose is often very heavy
8  lungs, called pulmonary edema. And that's because of what I
9  mentioned before, the respiratory depression, it causes fluid
10  to come in and accumulate in the lungs, so they have very wet
11  and heavy lungs. Otherwise, we also sometimes find urinary
12  retention, so they have distended urinary bladders, a lot of
13  urine. Another thing is they might have a swollen brain, and
14  that's also because of fluid entering the brain as it does not
15  receive enough oxygen.
16  Q. What might you find, if anything, in the trachea?
17  A. So pulmonary edema, fluid in the lungs, it might actually
18  back up into the trachea, which is the main airway, and it
19  bubbles up into the trachea and you might get foam in the
20  trachea.
21  Q. What would you expect to find in the toxicology report?
22  A. The toxicology report would give you the drugs that were in
23  the person's system, and that could be heroin, fentanyl, or any
24  of the other opioids.
25  Q. When someone overdoses from heroin, would you typically

1  expect to find heroin in the toxicology report?
2  A. No.
3  Q. Why not?
4  A. So heroin has a very short half-life. That means that it
5  survives -- the actual drug doesn't stay for very long in
6  somebody's system, just a few minutes. It's very rapidly
7  metabolized in the blood and turns into different metabolites,
8  which are breakdown products of heroin.
9  Q. Is there a particular metabolite that is associated with
10  heroin?
11  A. Yes. There are two of them that we see. Morphine is one
12  of the metabolites. And another one is called
13  6-monoacetylmorphine, also known as 6-MAM. Those are the two,
14  if we see them in the toxicology, it indicates that there was
15  heroin present at the time of death.
16  Q. Is that 6-MAM or 6-MAN?
17  A. 6-MAM.
18  Q. What have you done to prepare for your testimony today?
19  A. I met with you, and I reviewed the case file for this
20  autopsy and the toxicology results.
21  Q. Doctor, did you perform an autopsy of an individual
22  identified to you as Michael Ogno?
23  A. I did.
24  Q. Was that on December 2, 2017?
25  A. It was.

1  Q. Before performing the autopsy on Mr. Ogno, what, if
2  anything, did you know about the circumstances in which his
3  body was found?
4  A. I read the scene investigation by our medicolegal examiner.
5  So I knew that he was found at home, in his bedroom, on the
6  ground, behind a locked door. And I knew some things about who
7  found him, at what time, and what was in the room with him.
8  Q. Dr. Cederroth, if you could speak just a little closer to
9  the mic.
10  A. Is this better?
11  Q. That's much better.
12  Did you review any photographs that were taken from
13  the scene?
14  A. Yes, I did.
15  Q. Prior to performing the autopsy on Mr. Ogno, were you able
16  to rule out any possible causes of death?
17  A. It's difficult to rule out causes of death just with the
18  scene investigation. However, in reviewing the photographs
19  taken from the scene and the investigative report, there was no
20  suspicion of injury or foul play. So it wasn't ruled out, but
21  it was something that I was less worried about.
22  Q. Just to be clear, how, if at all, did the scene
23  investigation with respect to Michael Ogno's discovery impact
24  your autopsy?
25  A. It shouldn't and it didn't impact my autopsy. However, it

1  did guide me towards the fact that this was likely not a
2  homicide or a violent death in any way. So I didn't take
3  precautions that I would take in those cases, such as clipping
4  the fingernails or taking a sexual assault collection kit. I
5  just performed the regular autopsy like I normally would.
6  Q. Why would you clip the fingernails?
7  A. That is in homicide cases because people can have DNA under
8  their fingernails. So in cases where we suspect there has been
9  foul play or a struggle, we might take the fingernails, and
10  that's not something I did in this case.
11  MR. FINKEL: Ms. Dunbar, if we can put up Government
12  Exhibit 904, and if we can turn to the second page of that,
13  please, page 2.
14  Just zoom in a bit on the whole picture.
15  Q. Dr. Cederroth, do you recognize the handwriting on this
16  page?
17  A. Yes, I do.
18  Q. Whose is it?
19  A. It's mine.
20  Q. What are we looking at?
21  A. So this is a body diagram that we use very commonly in
22  autopsies to document the external findings of the autopsy.
23  And this is the particular diagram that I used for Michael Ogno
24  on the 2nd of December 2017, and it has my notes about what my
25  findings were for the external exam.

1 Q. Dr. Cederroth, I am circling in the center some writing.
2   Do you see that, it's in red?
3 A. Yes.
4 Q. What does that say?
5 A. So we have a lot of shorthand, of course. This says SOSV,
6   and that means scars overlying subcutaneous veins, and that's
7   also known as track marks.
8 Q. What is a track mark?
9 A. Track marks are scars that we commonly see over the veins
10   of people who inject drugs.
11 Q. Can you just circle on your screen where the track marks
12   were that you observed?
13 A. Right here on the left antecubital fossa, which is the
14   front of the elbow.
15 Q. It appears that there is some shading on the chest area and
16   back area. What does that indicate?
17 A. I noticed that in that area there was a lot of thick
18   scarring and irregular skin on his chest and back, and I was
19   making note of it.
20 Q. There are a few indications. Here is one. What does that
21   say?
22 A. It says "prof mono." So we always make a note of tattoos
23   on people, and we want to indicate whether they are
24   professional or amateur and whether they are monochromatic or
25   polychromatic, meaning one or several colors. So prof mono is

1   my shorthand for saying that he had a professional
2   monochromatic tattoo in that area.
3 Q. Was there anything else notable in the external exam?
4 A. No. Otherwise he was a healthy looking individual.
5 Q. Were there any signs of trauma?
6 A. No.
7 Q. What is trauma?
8 A. Trauma is any kind of injury. Trauma we would expect, if
9   somebody was in a car accident or jumped off the roof of a
10   building, we would likely see a lot of external injuries. In
11   this case, I did not see anything; I didn't see any evidence
12   that he had been hurt or had hurt himself in any way.
13 Q. Does the absence of trauma inform the autopsy process in
14   terms of determining the cause of death?
15 A. It certainly helps guide us towards a particular autopsy
16   and towards particular steps that we will take.
17 Q. How did it guide you in this case with Mr. Ogno?
18 A. So because I didn't suspect any trauma, I knew that I would
19   just perform an external exam and internal exam and wouldn't
20   need to do the extra steps that I mentioned before, clipping
21   fingernails or collecting DNA.
22 Q. After conducting the external exam, did you move on to the
23   internal exam?
24 A. Yes, I did.
25     MR. FINKEL: Ms. Dunbar, if we can go to page 1, same

1   exhibit.
2 Q. Just briefly, what is an internal exam?
3 A. So an internal exam, we make surgical-like incisions in the
4   front of the body and around the head, and we remove and
5   examine all of the internal organs, including the brain. We
6   are looking for any signs of disease or injury.
7     MR. FINKEL: Ms. Dunbar, if you can zoom in on the
8   lower left.
9 Q. Dr. Cederroth, whose handwriting is that?
10 A. This is mine, unfortunately.
11 Q. What do you mean?
12 A. It's just chicken scratch, you know, doctor's writing.
13   illegible.
14 Q. Dr. Cederroth, next to where it says "head, brain, neck,"
15   can you read what that says all the way to the end in your
16   handwriting?
17 A. Yes. It says slight edema, SL edema.
18 Q. What does that mean?
19 A. So this means that when I was examining the brain, I noted
20   that it was swollen, that there was edema. That means that
21   fluid comes into the brain and makes it appear swollen.
22 Q. What does that indicate to you?
23 A. Like I mentioned before, in opioid overdoses, there tends
24   to be swelling of the brain, and I was making note of that.
25 Q. And below that where it says "R lung" and "L lung," again,

1   if you could read to the end what is in your handwriting.
2 A. So it says right lung and left lung, and then there are
3   weights and grams. And I wrote edema and trachea, meaning that
4   I saw edema or fluid in the lungs, and that there was also
5   fluid in the trachea.
6 Q. What did the presence of fluid in the lungs and trachea
7   indicate to you?
8 A. Again, these are not specific for, but often found in
9   opioid overdose cases.
10 Q. And sort of towards the bottom next to "gastric," can you
11   read that?
12 A. It says "BR fluid," brown fluid.
13 Q. What does that mean?
14 A. It just means that I was describing what I found in the
15   stomach, and it was a brown fluid without fragments of food or
16   pills or anything like that.
17     MR. FINKEL: If we can zoom out.
18 Q. Dr. Cederroth, what do the terms rigor mortis and livor
19   mortis mean?
20 A. So rigor mortis and livor mortis are things that we look at
21   on the body after death and it can help us sort of determine
22   when somebody died. Rigor mortis is the stiffening of the body
23   after death. You probably know that bodies become stiff for a
24   while, and then when decomposition sets in, that stiffness goes
25   away, and that's called rigor mortis. Livor mortis is a

1  discoloration that the body gets. It's a pink to purple
2  discoloration, and it's because of blood settling in the body
3  on the areas of the body that are dependent on gravity. So if
4  you're lying on the ground on your back, livor mortis will set
5  in the back. So those are two things that we always look at in
6  every body that is indicative of a postmortem change.
7  Q. What did you observe with respect to those observations in
8  this patient?
9  A. So my two plus signs next to rigor mortis means that I
10  observed moderate rigor mortis. And what I wrote for livor
11  mortis is fixed and posterior, meaning that it was no longer
12  blanching. Blanching is when you apply pressure to livor
13  mortis and it blanches and it goes away. And when it becomes
14  fixed, you apply pressure but it doesn't go away.
15  Q. What does that indicate to you?
16  A. It's not very helpful in terms of time of death
17  determination, but it gives me an idea or a range of when the
18  body died.
19  Q. When was that?
20  A. So it's a very wide range and it has many different
21  factors. So it's hard to use really specifically, but usually
22  it becomes fixed within about six or so hours after death, and
23  usually goes away about 12 to 14 hours after death.
24  Q. So what does that mean here?
25  A. It means that it's consistent with the time in between when

1  he was last seen alive and when he was found dead.
2  Q. After performing the external and internal exam, were you
3  able to rule out any causes of death?
4  A. Yes.
5  Q. Which were you able to rule out?
6  A. I was able to rule out that any trauma or injury caused his
7  death. Also, that any natural disease caused his death, such
8  as a heart attack or a ruptured cerebral aneurysm or something
9  like that.
10  Q. After performing the external and internal examination on
11  December 2nd, did you at that time have an opinion about Mr.
12  Ogno's cause of death?
13  A. Yes, I had an idea.
14  Q. Were you able at that time to determine the cause of death?
15  A. No.
16  Q. Why not?
17  A. Because I needed the toxicology results in order to
18  determine his cause of death.
19  Q. What do you need to do in order to get toxicology results
20  from a patient?
21  A. So during the autopsy we collect samples for toxicology.
22  We collect blood, urine, gastric contents, brain, liver, bile,
23  and also vitreous fluid, which is the fluid from the eyeballs,
24  and we send all of that to the toxicology lab, and they will
25  usually test some of those samples in order to determine the

1  contents of the toxicology at that time.
2  MR. FINKEL: Ms. Dunbar, if we can put up 903, which
3  is in evidence, the last page of that document, please.
4  Q. Dr. Cederroth, can you tell the jury what that indicates?
5  A. So that says pending.
6  Q. What does that mean?
7  A. So this is a sheet that I submit to the toxicology
8  department so that they know some details about the case, and
9  they want to know if the manner of death has been determined at
10  the time of autopsy. So the manner of death is homicide,
11  suicide, accident, natural, therapeutic complication,
12  undetermined or pending. Pending means that we are waiting for
13  more results to determine the cause of death. So that's what I
14  indicated on this form.
15  Q. Just for the record, I circled where it said "pending." Do
16  you agree that it is to the right in the middle of the
17  document?
18  A. Yes.
19  Q. There is some writing underneath "brief case details." Do
20  you see that?
21  A. Yes.
22  Q. What does it say?
23  A. It says, 26-year-old male, status post, apparent drug
24  overdose with needle and paraphernalia at scene.
25  Q. What does that indicate and why did you write that?

1  A. So we always give them about a one-line summary of the case
2  so that they know what kind of testing they may have to perform
3  for the toxicology.
4  Q. Did there come a time when you received back the results of
5  the toxicology panel for Michael Ogno?
6  A. Yes.
7  MR. FINKEL: Ms. Dunbar, if we can put up 906, which
8  is in evidence.
9  Just zoom in.
10  Q. Dr. Cederroth, what are we looking at here?
11  A. So this is the toxicology result sheet.
12  Q. When is this report dated?
13  A. This is dated December 21, 2017.
14  Q. Under results, I believe it says "blood femoral." Do you
15  see that?
16  A. Yes.
17  Q. What does that indicate?
18  A. So that indicates that the source that they used to test,
19  because I submitted all the things that are stated at the top,
20  I submitted blood, bile, urine, gastric contents, brain, liver
21  and vitreous fluid, and they tested the femoral blood. Femoral
22  blood is the blood that we collected from the big vein in the
23  leg.
24  Q. Does femoral blood as opposed to blood from a different
25  location have any impact on -- does it have any meaning to you

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  as a doctor?
2  A. Yes. We tend to prefer testing femoral blood or peripheral
3  blood because it's more accurate. Sometimes when we test blood
4  from the heart there is something called postmortem
5  redistribution, where the concentrations of certain drugs may
6  be very elevated and it may be more difficult for us to
7  interpret levels, so we prefer to test peripheral blood,
8  meaning blood that's outside of the heart, and our preferred
9  place to collect it is the femoral vein.
10 Q. Let's go through the results.
11      Right beneath blood it says morphine. What is that?
12 A. So as I mentioned, morphine is by itself also an opioid,
13  but in combination with the line below, which says
14  6-monoacetylmorphine, or 6-MAM, those two together suggests the
15  presence of heroin.
16 Q. And the level of morphine, less than 50NG per ML, what does
17  that mean?
18 A. It means that the toxicology lab doesn't report a specific
19  amount, but they said that it was present.
20 Q. Is that a particularly high level?
21 A. No.
22 Q. Dr. Cederroth, do you have an opinion looking at the
23  toxicology results about whether or not Mr. Mr. Ogno ingested
24  heroin prior to his death?
25 A. This result tells me that he did.

1  Q. Even though the results do not say heroin?
2  A. That's right.
3  Q. Why is that?
4  A. Because the presence of morphine and 6-monoacetylmorphine
5  in the toxicology indicate that somebody ingested heroin.
6  Q. How much heroin does it take to cause an overdose?
7  A. Very little. It depends on the individual, it depends on
8  how you are taking heroin, and most importantly, it depends
9  what other drugs they may have co-ingested with the heroin.
10 Q. Are you familiar with the term "laced"?
11 A. Yes.
12 Q. What does that mean?
13 A. It means that a certain drug may have been laced or
14  combined with another one. Usually, for instance, heroin can
15  be laced with fentanyl, or cocaine can be laced with fentanyl,
16  or various drugs can be laced with other drugs.
17 Q. Below 6-MAM it indicates fentanyl, is that right?
18 A. Yes.
19 Q. How common is it in your practice as a medical examiner to
20  see in toxicology reports heroin and fentanyl together?
21 A. Very common.
22 Q. What impact, if any, has the presence of fentanyl had on
23  your work at the medical examiner's office?
24      MS. SIDERIS: Objection.
25      THE COURT: Overruled.

1  A. In recent years it has become increasingly present in our
2  toxicology results, and, unfortunately, nationally, it's become
3  a very common drug of abuse and a very common drug to cause
4  overdoses.
5  Q. What is the level of fentanyl that was found in Mr. Ogna's
6  blood?
7  A. 14 nanograms per milliliter.
8  Q. Is that a particularly high concentration?
9  A. It's high, but I have seen higher.
10 Q. What do you consider to be a high concentration of
11  fentanyl?
12 A. Frankly, any fentanyl present is enough to explain death.
13  I have seen levels of 8 and above and consider that high, but I
14  have seen higher than 14 as well. And certainly our toxicology
15  labs have seen levels higher than this.
16 Q. Dr. Cederroth, standing alone, even without considering the
17  combined effects of heroin or other drugs, is 14 nanograms per
18  milliliter a potentially fatal concentration of fentanyl?
19 A. Yes.
20 Q. The next substance listed is norfentanyl. What is that?
21 A. It is a metabolite of fentanyl.
22 Q. What do you mean by that?
23 A. So just as I was explaining before, heroin breaks down to
24  metabolites. It means that it's metabolized in the blood.
25  It's broken down by the body to different components, in the

1  case of heroin, morphine and 6-monoacetylmorphine. Similarly,
2  fentanyl is broken down to norfentanyl and other metabolites in
3  the blood.
4  Q. Is the half-life of fentanyl longer or shorter than heroin?
5  A. The half-life of fentanyl is longer.
6  Q. What does that mean?
7  A. That means that it sticks around in the blood for much
8  longer than heroin does.
9  Q. Below that, 4-ANPP. What is that?
10 A. So that is -- I forget what it stands for exactly, but it
11  is a component of fentanyl that is used in the manufacture of
12  fentanyl, and it's commonly found in fentanyl cases, where we
13  find fentanyl we will also find 4-ANPP.
14 Q. Can you pronounce the next one?
15 A. Alpha-Hydroxyalprazolam.
16 Q. What is that?
17 A. That is a metabolite of alprazolam.
18 Q. And below it says alprazolam?
19 A. Yes.
20 Q. What is alprazolam?
21 A. It's commonly known as Xanax; it's a benzodiazepine
22  medication. Also, it's commonly used to reduce anxiety or it's
23  used in panic disorder; it's used as a muscle relaxant, things
24  like that.
25 Q. Is the level of 66 nanograms per milliliter a particularly

J588VAN4    Cederroth - Direct    Page 470

1   high level for alprazolam?
2   A. No.
3   Q. What is alprazolam used for generally?
4   A. So what I just mentioned. It's used for people with panic
5   disorder, anxiety, difficulty sleeping. It's used as a muscle
6   relaxant. And people who also have alcohol withdrawal
7   sometimes use it. It's in the class of medications known as
8   benzodiazepines.
9   Q. Other than heroin metabolites, fentanyl, fentanyl
10   metabolites, alprazolam, and alprazolam metabolites, were there
11   any other substances detected in Mr. Ogno's blood?
12   A. No.
13   Q. What does mix-drug intoxication mean?
14   A. That means that somebody had an intoxication and that more
15   than one drug were present in the system at the time.
16   Q. What are synergistic effects?
17   A. Synergy is when drugs can potentiate each other or make
18   each other stronger when they are present together.
19   Q. Dr. Cederroth, after reviewing the toxicology report, were
20   you able to conclude Mr. Ogno's cause of death?
21   A. Yes.
22   Q. What was that?
23   A. It was an acute intoxication by the combined effects of
24   heroin, fentanyl, and alprazolam.
25   Q. Dr. Cederroth, was the alprazolam alone enough to kill Mr.

J588VAN4    Cederroth - Direct    Page 471

1   Ogno?
2   A. At this level, I don't believe so, no.
3   Q. In other words, if Mr. Ogno had only alprazolam and
4   alprazolam metabolites in his bloodstream, based on your
5   autopsy on December 1st, do you think that would have been
6   enough to kill him?
7   A. No.
8      MR. FINKEL: Ms. Dunbar, if we can bring up 902, which
9   is in evidence.
10   Q. Right in the center it says cause of death. Can you just
11   read that?
12   A. Cause of death: Acute intoxication by the combined effects
13   of fentanyl, heroin, and alprazolam.
14      (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

J582van5    Cederroth - Cross    Page 472

1   BY MR. FINKEL:
2   Q. Dr. Cederroth, referring to your internal exam of Mr. Ogno,
3   did the observations that you had of his internal organs -- are
4   they consistent with this cause of death?
5   A. Yes.
6   Q. When did you determine the cause of death in this case?
7   A. When I received the toxicology report, and I amended the
8   death certificate on the same day, which was December 21, 2017.
9   Q. Doctor, have you performed autopsies in which the cause of
10   death cannot be determined?
11   A. Yes.
12   Q. Have you performed autopsies in which you were unsure about
13   the cause of death?
14   A. Yes.
15   Q. Dr. Cederroth, is this one of those cases?
16   A. No.
17      MR. FINKEL: Nothing further. Thank you.
18      THE COURT: Ms. Sideris.
19   CROSS-EXAMINATION
20   BY MS. SIDERIS:
21   Q. Good afternoon, Dr. Cederroth.
22   A. Good afternoon.
23   Q. So as a medical examiner, what you do is essentially
24   conduct a death investigation, is that right?
25   A. That's right.

J582van5    Cederroth - Cross    Page 473

1   Q. You talked about it on your direct examination, some of the
2   information that you like to collect before giving your own
3   conclusion on the cause of death.
4   A. Yes.
5   Q. You collect information from various sources about the
6   deceased?
7   A. Yes.
8   Q. Information from the scene --
9   A. Yes.
10   Q. -- where an individual died?
11      Information from law enforcement --
12   A. That's right.
13   Q. -- when you can.
14      And from family members of the deceased, right?
15   A. Yes, as well.
16   Q. So in this case, a source of information for you was the
17   medicolegal investigator, correct?
18   A. That's right.
19   Q. His name was John Lazzara (ph)?
20   A. Yes.
21   Q. And what you learned from John Lazzara in forming your
22   conclusions on the cause of death is that Michael Ogno was last
23   seen alive at about 9 a.m. on the morning of December 1, is
24   that right?
25   A. Yes, that's right.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  Q.  He was found unresponsive on the floor in a room?
2  A.  Yes.
3  Q.  And he was then -- he was pronounced dead at the scene by
4    John Lazzara at 11:36 p.m. on December 1, right?
5  A.  I would have to read the report.  I'm not sure that John
6    Lazzara pronounced death.  It might have been the emergency
7    medical personnel that was present at the scene.
8  Q.  Okay.  You learned from -- another piece of information you
9    learned is that Michael Ogno had a history of drug use for
10   years?
11  A.  Yes.
12  Q.  That he was using oxycodone?
13  A.  Yes.
14  Q.  And heroin?
15  A.  Yes.
16  Q.  And Xanax?
17  A.  Yes, I do believe I knew that as well.
18  Q.  You learned that there was a syringe found on the
19   nightstand next -- in the room where he was found?
20  A.  Yes, that was also mentioned in the report.
21  Q.  Do you know if it was used?
22  A.  No, I have no idea.
23  Q.  You know that there was no Xanax found in the room where
24   Michael Ogno was?
25  A.  I would have to review the report.  I don't recall.

1  Q.  Are you familiar with the term "trace evidence"?
2  A.  Yes.
3  Q.  And "biological evidence"?
4  A.  Yes.
5  Q.  You are not aware of any trace evidence -- I'm sorry, can
6    you explain what trace evidence is?
7  A.  So trace evidence --
8        MR. FINKEL:  Objection.  Beyond the scope.
9        THE COURT:  Overruled.
10  A.  So trace evidence is essentially any kind of small things
11   that may be found at the scene that may be important for a
12   case.  In other cases it may be fibers or residue of some sort
13   that may be collected by an investigator at the time or by
14   police.
15  Q.  Okay.  And "biological evidence" you said you were familiar
16   with?
17  A.  Yes.
18  Q.  And what does that refer to?
19  A.  So biological evidence is a type of evidence that is
20   from -- usually from human or animal source, usually human, and
21   it can be DNA or secretions or things like that that come from
22   a person that may be important in investigating the death.
23  Q.  You are not aware of any trace evidence or any type of
24   evidence recovered from the death scene that linked anyone else
25   to the death of Michael Ogno, are you?

1  A.  I am not aware of it, no.
2  Q.  As the medical examiner, you signed the death certificate,
3    correct?
4  A.  Yes.
5  Q.  And you wrote in this case that the immediate cause of
6    death was overdose caused by the combined effects of Xanax,
7    fentanyl and heroin, is that right?
8  A.  I did not say overdose.  I said acute intoxication by the
9    combined effects of fentanyl, heroin, and alprazolam.
10  Q.  I'm sorry.
11        Perhaps to state the obvious, it is critically
12   important that, as a medical examiner, you be accurate as to
13   the cause of death, correct?
14  A.  Yes.
15  Q.  And the manner of death.
16  A.  Yes.
17  Q.  And the time of the injury or time of death if you are able
18   to.
19  A.  It's -- that's not true.  We often cannot determine the
20   exact time of death and the time that death is pronounced is
21   just the time that somebody actually finds the body and
22   pronounces death, but that is not necessarily the time of
23   death.
24  Q.  Okay.  Thank you.
25        And if I understood you correct on your direct

1  examination, in this case you were not able to narrow it down
2  from the time of death from the last time he was seen alive
3  until when he was pronounced dead, right?
4  A.  No.  It is some time in between those two.
5  Q.  It is some time in between 9 a.m. and 11:36 p.m.?
6  A.  Yes.
7  Q.  Okay.
8        So on December 2 when you completed the autopsy of
9  Michael Ogno, you had not yet established a cause of death or a
10   manner of death, correct?
11  A.  That's right.
12  Q.  Because it was pending further studies?
13  A.  Yes.
14  Q.  And that was the toxicology report?
15  A.  Yes.
16  Q.  And you received that report on December 21, 2017, is that
17   correct?
18  A.  Yes.
19  Q.  Which confirmed your conclusions on your death certificate
20   from December 2, correct?
21  A.  Well, on December 2, my death certificate said "pending
22   further studies."  So I was able to, on December 21, with the
23   toxicology, amend the death certificate to reflect the
24   findings.
25  Q.  Okay.  I'm sorry.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

J582van5  Cederroth - Cross  Page 478

1  So I was on December 21st, that you concluded the
2  cause of death was acute intoxication by the combined effects
3  of fentanyl, heroin, and alprazolam.
4  A. Yes.
5  Q. Which that is Xanax, right?
6  A. Yes.
7  Q. The term "route of administration" refers to how a
8  substance gets inside one's body, is that correct?
9  A. Yes.
10  Q. It can be injected?
11  A. Yes.
12  Q. Or swallowed or sniffed?
13  A. Right.
14  Q. Were you able to conclude the route of administration for
15  the fentanyl in this case?
16  A. No.
17  Q. Or for the heroin in this case?
18  A. No.
19  Q. Or for the Xanax?
20  A. No.
21  Q. Were you able to make a determination of whether the
22  fentanyl and heroin found in Michael Ogno were injected
23  together?
24  A. I have no idea.
25  Q. So you didn't determine whether any of the three drugs were

J582van5  Cederroth - Cross  Page 479

1  injected all at once or over a period of time, correct?
2  A. There is no way to tell if they were injected together or
3  separately, but they were all present in or around the time of
4  death, so they were all taken within a short amount of time
5  before death.
6  Q. And it is impossible to tell the order of sequence of these
7  three drugs, correct?
8  A. It is not possible.
9  Q. You would agree that the combination of these three drugs
10  together would produce a different effect on a user than if
11  ingested separately, correct?
12  A. Yes.
13  Q. So the simultaneous use of low levels or any levels of
14  heroin, fentanyl, and Xanax would be more dangerous than the
15  use of just one of those drugs by themselves, correct?
16  A. Yes.
17  Q. So you have investigated deaths where more than one drug
18  interacted with another drug to cause or contribute to a
19  person's death, is that correct?
20  A. Yes.
21  Q. And in this case, you cannot conclude that a specific drug
22  was more important than another one, correct?
23  A. Well, if I can elaborate?
24  THE COURT: Yes.
25  THE WITNESS: Thank you.

J582van5  Cederroth - Redirect  Page 480

1  A. So the combination of all the drugs is what killed Michael
2  Ogno. Because all three of them were present in his blood, I
3  can't ignore one or the other. However, in terms of how
4  dangerous a drug can be, alprazolam, for instance, taken by
5  itself in low doses, usually will not cause death. However,
6  any quantity, even small, of fentanyl or heroin can cause an
7  overdose and death.
8  Q. Thank you.
9  MS. SIDERIS: One moment.
10  (Counsel confer)
11  MS. SIDERIS: Thank you, Dr. Cederroth. No further
12  questions?
13  THE COURT: Ms. O'Neill?
14  MS. O'NEILL: No questions.
15  MR. FINKEL: Brief redirect, your Honor?
16  REDIRECT EXAMINATION
17  BY MR. FINKEL:
18  Q. Dr. Cederroth, you were asked some questions about the
19  sequencing of the drugs found in Mr. Ogno's blood. Do you
20  remember that?
21  A. Yes.
22  Q. Are you able to tell whether or not the drugs were taken
23  together or whether they were sequenced separately?
24  A. No, I am not able to determine that.
25  Q. Does that impact your determination in this case?

J582van5  Cejovic - Direct  Page 481

1  A. No.
2  Q. Dr. Cederroth, am I correct that your role -- withdrawn.
3  Dr. Cederroth, are you aware of any other
4  investigative steps taken by, for example, the NYPD, DEA, HSI,
5  or any other law enforcement agencies with respect to Michael
6  Ogno?
7  A. No.
8  MR. FINKEL: Thank you, Dr. Cederroth.
9  THE COURT: Doctor, you are excused. Thank you very
10  much.
11  THE WITNESS: Thank you.
12  (Witness excused)
13  MR. FINKEL: Your Honor, the government calls Jasmin
14  Cejovic.
15  JASMIN CEJOVIC,
16  called as a witness by the government,
17  having been duly sworn, testified as follows:
18  THE COURT: Please sit down, Mr. Cejovic.
19  Okay, Mr. Finkel.
20  DIRECT EXAMINATION
21  BY MR. FINKEL:
22  Q. Mr. Cejovic, could you just pull the microphone down so
23  everyone can hear you.
24  Mr. Cejovic, do you have any nicknames?
25  A. Yes.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  Q. What are they?
2  A. Min, M-I-N, and Manny, M-A-N-N-Y.
3  Q. Where did you grow up?
4  A. Staten Island, New York.
5  Q. What area of Staten Island?
6  A. Rosebank.
7      MR. FINKEL: Ms. Dunbar, if you can please bring up
8  what is in evidence as Government Exhibit 401.
9  BY MR. FINKEL:
10 Q. Mr. Cejovic, do you recognize that map in front of you?
11 A. Yes.
12 Q. What is it?
13 A. Staten Island.
14 Q. Can you draw a circle with your finger around the
15 approximate area of Rosebank?
16 A. Right around there.
17 Q. Where do you currently reside?
18 A. Metropolitan Detention Center.
19 Q. Is that commonly known as the MDC?
20 A. Yes.
21 Q. What is the MDC?
22 A. A facility for inmates.
23 Q. A prison?
24 A. Yes.
25 Q. Why do you live in a prison?

1  A. Because I committed crimes.
2  Q. Which ones?
3  A. Conspiracy to sell heroin and fentanyl, conspiracy to sell
4  crack cocaine, and I am also responsible for the death of
5  Thomas Masseria.
6  Q. Are you responsible for any other overdoses?
7  A. Yeah, actually, and I seriously bodily injured a person.
8  Q. Did you plead guilty to those crimes or did you go to
9  trial?
10 A. No, I pleaded guilty to those crimes.
11 Q. Mr. Cejovic, did you plead guilty to those crimes or did
12 you go to trial?
13 A. I pleaded guilty to all of those crimes.
14 Q. Why did you plead guilty?
15 A. Because I'm guilty of all of those crimes.
16     MR. FINKEL: If we can, Ms. Dunbar, put up what is in
17 evidence as Government Exhibit 102.
18 BY MR. FINKEL:
19 Q. Do you recognize that individual?
20 A. Yes.
21 Q. Who is that?
22 A. Medin Dino Kosic.
23 Q. Is Dino his middle name?
24 A. No, a nickname.
25 Q. How did you first meet Dino?

1  A. Through a schoolyard in junior high school where we used to
2  play basketball, hang out, a bunch of friends. But he is older
3  than me, so, he didn't go to school there.
4  Q. Mr. Cejovic, let me direct your attention to 2015
5  approximately to January 2018. Can you describe briefly your
6  relationship with Mr. Kosic?
7  A. It was strictly business, as in selling drugs, selling
8  drugs.
9  Q. What is the term "a connect"? Have you heard the term "a
10 connect"?
11 A. A connect is a supplier for the drugs.
12 Q. Who was your primary connect between January 2015 -- excuse
13 me, between approximately 2015 and January 2018?
14 A. Medin Dino Kosic.
15 Q. What ways, if any, did you communicate with Mr. Kosic?
16 A. Through phones, work phones basically phones you there
17 throw away every month, two weeks, or whatever the case may be,
18 and in person.
19 Q. How many times have you spoken with him?
20 A. Thousands.
21 Q. Are you familiar with his voice?
22 A. Yes.
23     MR. FINKEL: Your Honor, if we could pass up to the
24 jury packets of transcripts?
25     THE COURT: Yes.

1      MR. FINKEL: Your Honor, if I can instruct the jury to
2  take out the first -- what should be the first transcript in
3  that package, which is marked as 302CT; and, with your Honor's
4  permission, the government is going to play what's in evidence
5  and marked as GX302C which is, for the record, a recording from
6  July 7, 2017 from an phone number ending in 8473 to a phone
7  number ending in 3683.
8      THE COURT: All right.
9      (Audio played)
10 BY MR. FINKEL:
11 Q. Mr. Cejovic, do you recognize the voices on that call?
12 A. Yes.
13 Q. Whose voices are they?
14 A. My voice and Medin Kosic.
15 Q. What was that call about?
16 A. It was about -- let me read this one second.
17     All right. I was gonna -- I was waiting to grab money
18 for somebody so that person could go see somebody that was
19 holding drugs for Medin Kosic.
20 Q. What kind of drugs?
21 A. Heroin.
22 Q. Mr. Cejovic, when, if ever, did you learn that Dino sold
23 heroin?
24 A. End of 2014.
25 Q. Where were you in 2014 when you learned that Dino sold

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1  heroin?
2  A. At a bar in Duncan Hills, Staten Island, New York.
3  Q. What, if anything, did Dino say to you at that bar in 2014
4   about selling heroin?
5  A. Well, he pulled out a wad of cash, a lot of it, and I never
6   seen him with a lot of money before. And I just asked him how
7   did he get that money? And he said he was selling drugs. And
8   then I told him -- I asked him what drugs? He said heroin.
9  Q. At that time, in 2014, at that bar, were you selling any
10   drugs?
11  A. Yeah.
12  Q. What kind?
13  A. I was selling marijuana, MDMA, a/k/a Mollie, Xanax,
14   cocaine, also Percocets.
15  Q. In 2014, after that night at the bar when Dino told you he
16   sold heroin, over the next several months can you describe your
17   relationship with Dino?
18  A. That time we were just partying together at that time,
19   because he was making money, I was doing whatever I was doing
20   making my money, and we were just partying, those few months
21   after, a lot together.
22  Q. During that time period from that night at the bar up until
23   the end of 2014, how many times, if ever, did you see Dino
24   provide someone with a large amount of cash?
25  A. One time.

1  Q. Who, if anyone, did Dino provide the cash to?
2  A. To Mirsad Bogdanovic.
3      MR. FINKEL: Ms. Dunbar, if you can put up what's been
4   marked in evidence as Government Exhibit 106.
5  Q. Mr. Cejovic, who is that?
6  A. Mirsad Bogdanovic.
7  Q. What were the circumstances under which Dino provided
8   Mirsad Bogdanovic this large amount of cash you mentioned?
9  A. Can I tell my part, my story?
10  Q. Yes. Please answer the question.
11  A. All right. I was with Dino going out to a club, and he had
12   said he had to drop money to somebody, and it ended up being
13   Mirsad Bogdanovic. And I never knew him at that time, who he
14   was. I just heard of him. Then that's how I found out he was
15   selling drugs for Mirsad Bogdanovic.
16  Q. When Dino told you on the way to Mr. Bogdanovic's that he
17   had to drop some money off, what was your understanding of why
18   he had to drop some money off?
19  A. Because he was selling drugs for him, heroin.
20  Q. Why did you believe that?
21  A. Because he told me.
22  Q. At that time, the time of this cash transaction, in 2014,
23   based on your conversations with Dino, what was your
24   understanding about how Dino or Medin Kosic sold heroin?
25  A. Could you repeat that question one more time?

1  Q. Certainly.
2      At that time in 2014, based on your conversations with
3   Dino, what was your understanding of how Dino sold heroin?
4  A. How he sold heroin? He sold it in bundles.
5  Q. Who did he get the heroin from --
6  A. He got --
7  Q. -- at that time?
8  A. He got the heroin from Mirsad Bogdanovic.
9  Q. In 2014, around that time, did Dino tell you who, if
10   anyone, he was providing heroin to?
11  A. Yeah.
12  Q. Who?
13  A. Paul Van Manen.
14  Q. Do you see Mr. Paul Van Manen in the courtroom today?
15  A. Yes.
16  Q. Can you identify him by an article of clothing?
17  A. He has a tie and a shirt. He is putting his hand up.
18      MR. FINKEL: Your Honor, if the record could reflect
19   the witness has identified the defendant?
20      THE COURT: Yes.
21      Is this a convenient place to break now?
22      MR. FINKEL: Yes, it would.
23      THE COURT: Ladies and gentlemen, remember my
24   instructions now. Don't discuss the case, don't do any
25   independent research, keep open minds, and we will see you

1  tomorrow morning at 9:30 when we resume. Leave all your
2  materials here. Don't take them with you.
3      MR. FINKEL: You can leave your transcripts on your
4   chair. That would be very helpful. Thank you.
5      (Continued on next page)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 8, 2019

1    (Jury not present)

2    THE COURT: Okay.

3    (Witness not present)

4    THE COURT: How are we doing in terms of witnesses?

5    MR. FINKEL: I'm sorry?

6    THE COURT: How are we doing in terms of witnesses?

7    MR. FINKEL: We made pretty good progress today, your

8    Honor.  After Mr. Cejovic, who will take some time, the next

9    several of our witnesses will be relatively quick.  I think at

10   this point . . .

11   (Counsel confer)

12   MR. FINKEL: We still anticipate that we would rest

13   around Monday or Tuesday, again, depending on length of cross.

14   THE COURT: The cross could help if there weren't so

15   many conferences.

16   MR. QUIJANO: I'm sorry?

17   THE COURT: We could help proceed more rapidly if

18   there weren't so many conferences.  Every time you have a

19   question you have consultation, then pause, then question, then

20   another conference.  So I hope you could expedite matters.

21   MR. QUIJANO: Of course.

22   THE COURT: Get through the examination and

23   cross-examinations as quickly as possible.

24   I would hope that you would be able to finish by

25   Friday, Mr. Finkel.  Is that possible?

1    MR. FINKEL: Your Honor, I don't think that's

2    possible, your Honor.  We had hoped to do that as well.  Things

3    have moved a bit slower than we have hoped.

4    THE COURT: All right.  I will have the jury charge

5    for you on Friday, so you will have plenty of time to review

6    that and we will schedule our conference on the jury charge for

7    Monday afternoon or Tuesday afternoon.

8    MS. FENDER: Very good, your Honor.

9    MS. O'NEILL: Very well.

10   THE COURT: Okay.  Good night.

11   MR. FINKEL: Thank you, your Honor.

12   (Adjourned to Thursday, May 9, 2019, at 9:30 a.m.)

1                INDEX OF EXAMINATION

2    Examination of:                              Page

3    ARTHUR TRUSCELLI

4    Direct By Mr. Finkel . . . . . . . . . . . . . 281

5    Cross By Mr. Quijano . . . . . . . . . . . . . 337

6    Redirect By Mr. Finkel . . . . . . . . . . . . 365

7    Recross By Mr. Quijano . . . . . . . . . . . . 370

8

9    PAUL MICHAEL ANDERSON

10   Direct By Ms. Ghosh . . . . . . . . . . . . . 371

11

12   DANIEL SLEVIN

13   Direct By Mr. Finkel . . . . . . . . . . . . . 385

14   Cross By Mr. Quijano . . . . . . . . . . . . . 419

15   Redirect By Mr. Finkel . . . . . . . . . . . . 441

16

17   TERRA CEDERROTH

18   Direct By Mr. Finkel . . . . . . . . . . . . . 445

19   Cross By Ms. Sideris . . . . . . . . . . . . . 472

20   Redirect By Mr. Finkel . . . . . . . . . . . . 480

21

22   JASMIN CEJOVIC

23   Direct By Mr. Finkel . . . . . . . . . . . . . 481

24

25

1                GOVERNMENT EXHIBITS

2    Exhibit No.                              Received

3    206H  . . . . . . . . . . . . . . . . . . . 282

4    402  . . . . . . . . . . . . . . . . . . . . 286

5    222 and 223  . . . . . . . . . . . . . . . . 288

6    221  . . . . . . . . . . . . . . . . . . . . 289

7    229 through 233  . . . . . . . . . . . . . . 292

8    113  . . . . . . . . . . . . . . . . . . . . 296

9    9 and 9A  . . . . . . . . . . . . . . . . . . 302

10   248  . . . . . . . . . . . . . . . . . . . . 310

11   251 through 259  . . . . . . . . . . . . . . 314

12   260  . . . . . . . . . . . . . . . . . . . . 318

13   301CV  . . . . . . . . . . . . . . . . . . . 319

14   201  . . . . . . . . . . . . . . . . . . . . 326

15   301  . . . . . . . . . . . . . . . . . . . . 327

16   203  . . . . . . . . . . . . . . . . . . . . 333

17   204  . . . . . . . . . . . . . . . . . . . . 334

18   19 and 19A  . . . . . . . . . . . . . . . . . 336

19   503  . . . . . . . . . . . . . . . . . . . . 374

20   602  . . . . . . . . . . . . . . . . . . . . 375

21   601A  . . . . . . . . . . . . . . . . . . . . 375

22   501 and 902 through 907  . . . . . . . . . . 384

23   247, 248, and 250  . . . . . . . . . . . . . 391

24   509, 20 and 20A  . . . . . . . . . . . . . . 407

25   262  . . . . . . . . . . . . . . . . . . . . 409

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH  CHARLTON

CORRECTED
May 9, 2019

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
    UNITED STATES OF AMERICA,            New York, N.Y.
 3
          v.                             18 Cr. 30(PAC)
 4
    PAUL VAN MANEN and KENNETH
 5  CHARLTON,
 6              Defendants.
    ------------------------------x      Trial
 7
                                         May 9, 2019
 8                                       9:30 a.m.
    Before:
 9
                   HON. PAUL A. CROTTY,
10
                                         District Judge
11                                       - and a Jury-
12                     APPEARANCES
    GEOFFREY S. BERMAN
13       United States Attorney for the
         Southern District of New York
14  BY:  JESSICA K. FENDER
         RYAN B. FINKEL
15       CATHERINE E. GHOSH
         Assistant United States Attorneys
16
    QUIJANO & ENNIS, P.C.
17       Attorney for Defendant Van Manen
    BY:  PETER E. QUIJANO
18       ANNA N. SIDERIS
19  O'NEILL & HASSEN
         Attorney for Defendant Charlton
20  BY:  GRAINNE E. O'NEILL
21  THE LAW OFFICE OF CARLOS M. SANTIAGO
         Attorney for Defendant Charlton
22  BY:  CARLOS M. SANTIAGO, JR.
23
    ALSO PRESENT:
24
    MADISON DUNBAR, Paralegal, U.S. Attorney's Office
25  WILLIAM COLEMAN, Paralegal, U.S. Attorney's Office
```

1  (Trial resumed; jury not present)

2  THE COURT: Everybody here?

3  MR. FINKEL: Good morning, your Honor.  If I may just
4  put a few things on the record for the Court.

5  THE COURT: Yes.

6  MR. FINKEL: First, we were notified last night after
7  the trial by the Charlton defense team they have another
8  possible witness.  They have identified that witness as Scott
9  Ackerman.  They have provided no additional information.  It's
10  a fairly common name.  We have inquired whether that is an
11  individual with an alias of Scotty Thumbs, who is a person that
12  Mr. Santiago I believe spoke about on the cross of Shaun
13  Sullivan.  It's unclear to us when defense counsel learned
14  about this possibility of this additional witness.  We would,
15  in part to expedite whatever defense case will be put on, we
16  would ask the Court to inquire about who this Scott Ackerman is
17  and what the scope of his testimony will be.

18  THE COURT: Ms. O'Neill.

19  MS. O'NEILL: I don't know that I am required to tell
20  the government about the investigative steps that we are taking
21  to try to defend Mr. Charlton's case.  However, I will tell the
22  Court our investigator found Scotty Thumbs yesterday about a
23  hour before we e-mailed the government.

24  THE COURT: So Scott Ackerman is in fact Scotty
25  Thumbs?

1  MS. O'NEILL: Yes.  He is a homeless man.  It has been
2  very difficult -- our investigator, as I informed the
3  government, is looking for heroin addicts who are familiar with
4  Mr. Charlton, and to find out if we can put on a defense case.
5  We located one of the heroin addicts a week or so ago from the
6  phone.  And Mr. Ackerman is homeless, he panhandles, and our
7  investigator has been looking at various locations where he
8  panhandles and had been unable to locate him.  I had no idea we
9  were going to be able to find him yesterday, but he did.  So
10  immediately I informed the government.

11  THE COURT: So you don't know what he is going to
12  testify to?

13  MS. O'NEILL: No.  I have not interviewed him.

14  MR. FINKEL: We appreciate that and it's good to know
15  that Scott Ackerman is the Scotty Thumbs about which we
16  inquired moments ago.

17  Charlton's defense team was asked before voir dire if
18  there was any other possible witnesses.  It seems as though
19  their investigator has been looking for additional witnesses.
20  This name Scott Ackerman was not in the possible people and
21  places list that was read to the jury to see if there were any
22  potential conflicts.  It would be helpful to know if this is
23  the complete universe now and Scott Ackerman is it.

24  Also, the parties have reached an agreement about when
25  26.2 material would be exchanged.  I understand Ms. O'Neill's

1  representation that there is no 26.2 material.  I certainly
2  will take her at her word at that.  But again, to expedite what
3  will be a defense case, it would be helpful to understand some
4  general sense of the topics of which this individual will
5  testify.

6  MS. O'NEILL: The government has continued to provide
7  us with 3500 material throughout the trial.  There is no 26.2
8  material.  It is a common practice among defense investigators
9  to not take notes when they are conducting interviews.  Our
10  investigator is looking for other people.  We received the
11  phone a week before the trial so the government and defense
12  would have time to review the phone and investigate, and that's
13  what we have been doing.

14  THE COURT: I don't think they can do better than
15  that, Mr. Finkel.

16  MR. FINKEL: My last question would be, is there any
17  other possible witnesses?

18  THE COURT: Anything is possible.

19  MR. FINKEL: Fair enough.

20  A few other brief items.

21  THE COURT: Why didn't you do this before while we
22  were waiting for the jury?  I have been here since quarter of 9
23  this morning.  You always want to make a record.  Can you do
24  this after Mr. Cejovic testifies or when we take our morning
25  break?

J598VAN1                                          Page 499

1    MR. FINKEL: We can do it during the break.
2  Certainly, your Honor.
3    THE COURT: Marshals, you want to bring Mr. Cejovic
4  out.  Thank you.
5    (Continued on next page)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

J598VAN1          Cejovic - Direct          Page 500

1    (Jury present)
2  JASMIN CEJOVIC, resumed.
3    THE COURT: Mr. Cejovic, I want to remind you you're
4  still under oath.  You have to answer the questions truthfully.
5    THE WITNESS: Yes, your Honor.
6    THE COURT: Mr. Finkel.
7    MR. FINKEL: Thank you, your Honor.
8    Ms. Dunbar, if we can display what is in evidence as
9  Government Exhibit 101.
10 DIRECT EXAMINATION (Continued)
11 BY MR. FINKEL:
12 Q.  Mr. Cejovic, do you recognize that individual?
13 A.  Yes.
14 Q.  Who is it?
15 A.  Paul Van Manen.
16 Q.  Let's take a step back for a second.
17    When did you start selling heroin?
18 A.  End of 2014, 2015, around there.
19 Q.  Why did you start selling heroin?
20 A.  Because I wanted to make money.
21 Q.  Who, if anyone, did you speak with about your desire to
22 start selling heroin?
23 A.  Medin Dino Kosic.
24 Q.  In that initial conversation about your desire to start
25 selling heroin, where did it take place?

J598VAN1          Cejovic - Direct          Page 501

1 A.  At his house.
2    MR. FINKEL: Ms. Dunbar, if you can put up what I
3  believe is in evidence as Government Exhibit 244.
4 Q.  Do you recognize that location, Mr. Cejovic?
5 A.  Yes.
6 Q.  What is it?
7 A.  Medin Dino Kosic's house.
8 Q.  Is that where that conversation about your desire to start
9  selling heroin took place?
10 A.  Yes.
11 Q.  Why did you decide to speak to Dino about your desire to
12 start selling heroin?
13 A.  Because he sold heroin.
14 Q.  During that first conversation, what did Dino tell you
15 about how to sell heroin?
16 A.  He told me to sell the bundles for the 60 because I would
17 take over on the customers.
18 Q.  You would undercut them?
19 A.  Yeah.
20 Q.  What is a glassine?
21 A.  It's like -- it's a small thin envelope, glassine envelope;
22 it's what you put heroin in.
23 Q.  What is a bundle?
24 A.  Ten bags of dope, of heroin.
25 Q.  Ten glassines?

J598VAN1          Cejovic - Direct          Page 502

1 A.  Ten glassines.
2 Q.  What are some other slang terms for a bundle?
3 A.  Me, personally, I use the word bundle.
4 Q.  What about the term bun, does that have a meaning to you?
5 A.  Yes.
6 Q.  What does bun mean?
7 A.  One bundle.
8 Q.  What about bunny, does that have a meaning to you?
9 A.  I never used that word.
10 Q.  Have you heard that word in narcotics trafficking?
11 A.  No.
12 Q.  What about a sleeve, what is a sleeve?
13 A.  Ten bundles.
14 Q.  What is a brick?
15 A.  To me, a kilo.  And heroin game, it's five bundles.
16 Q.  What did Dino tell you about how to find customers?
17 A.  He really didn't tell me much how to find customers.
18 Q.  Do you have an understanding why that was?
19 A.  Because he got customers from another person.
20 Q.  Who was that?
21 A.  Mike Mirsad -- I mean, Mirsad Bogdanovic.
22 Q.  What other advice during that first meeting did Dino tell
23 you about selling heroin?
24 A.  Just stay low, basically stay away from police or anybody
25 that makes anything obvious that I'm selling heroin.

---

J598VAN1      Cejovic - Direct      Page 503

1   Q. What does that mean, stay low?
2   A. Like, don't be all out there.
3   Q. What do you mean?
4   A. Like, don't to be a showoff.
5   Q. Why was that?
6   A. You don't want to draw attention to yourself.
7   Q. Why not?
8   A. Because we are selling heroin.
9   Q. So why don't you want to draw attention when you're selling
10   heroin?
11   A. Because we are doing something illegal.
12   Q. At that first meeting, did Dino provide you heroin?
13   A. Yeah.
14   Q. How much?
15   A. Five bundles.
16   Q. How much did you pay him at that time for those five
17   bundles?
18   A. I didn't pay him nothing. I got it on credit.
19   Q. Did you sell those five bundles?
20   A. Yeah, I sold them.
21   Q. How long did it take you, approximately, to sell those five
22   bundles?
23   A. Two days, the most.
24   Q. How did you do it?
25   A. I knew people that abused pills, so basically opioids, they

---

J598VAN1      Cejovic - Direct      Page 504

1   abuse Percocets, opioids, and when they couldn't find opioids,
2   they would want heroin, and that's how I found them.
3   Q. Where did you sell those five?
4   A. Neighborhoods in Staten Island.
5   Q. Did you end up selling more heroin?
6   A. Yes.
7   Q. Did you get that additional heroin from Dino as well?
8   A. Correct.
9   Q. How did that work?
10   A. I sold the five bundles in two days, and I came back for
11   another five, another five bundles.
12   Q. Did you pay cash for those five bundles?
13   A. No, on credit.
14   Q. How long did it take for you to sell those five bundles?
15   A. A day and a half, two days.
16   Q. Mr. Cejovic, what concerns did you have, if any, about
17   selling heroin at first at that time?
18   A. If it's too strong, people can die from it.
19   Q. Approximately how long did it take for you to build up your
20   business so you were selling more than five bundles at a time?
21   A. Two to three months.
22   Q. At that time period, around two to three months,
23   approximately how many bundles at a time were you buying from
24   Dino?
25   A. 20 to 30 bundles every day or every other day.

---

J598VAN1      Cejovic - Direct      Page 505

1   Q. Were you paying cash each time you saw Dino?
2   A. Eventually I was.
3   Q. How did you sell the 20 to 30 bundles?
4   A. The same way I did before, in neighborhoods, same
5   customers, new customers.
6   Q. How did you find those customers?
7   A. I had a friend that sold crack cocaine and people that used
8   crack cocaine also use heroin. They just strictly drug
9   addicts, they will use whatever. Also, other customers
10   referred me to other customers.
11   Q. Am I correct that you sold, you said, 20 to 30 bundles for
12   three months through about a year into your selling of heroin,
13   is that right?
14   A. Yes.
15   Q. After about a year -- withdrawn.
16     A year into selling heroin, approximately how many
17   bundles per week were you selling?
18   A. 300 to 500.
19   Q. That's per week?
20   A. Yeah, per week.
21   Q. How long did you sell 300 to 500 bundles per week?
22   A. For like two years and a half.
23   Q. Through the midpoint, approximately, of 2017?
24   A. Yeah, about that.
25   Q. In order to sell that much heroin, did you have help?

---

J598VAN1      Cejovic - Direct      Page 506

1   A. Yes.
2   Q. How much money were you earning per week when you were
3   selling 3 to 500 bundles of heroin?
4   A. 3 to 5,000 dollars.
5   Q. A week?
6   A. Yeah, a week.
7   Q. What did you spend that money on?
8   A. Drugs, clubs, girls, clothes, jewelry. I was paying my
9   bills with the money, gifts. I bought a dog. Rentals, I was
10   paying for rentals. Lending people money, doing favors.
11   That's pretty much it.
12     MR. FINKEL: If I can ask the jury and the Court to
13   turn in their packet to what has been marked as Government
14   Exhibit 306A, which is in evidence. This is a call from
15   November 27, 2017, at approximately 1846.
16     The packet might have at the top of it from yesterday
17   306C. It should be the document beneath 306C.
18     THE COURT: Are we looking for 306A?
19     MR. FINKEL: That's right, your Honor.
20     Again, this is a call on November 27, 2017, at
21   approximately 1846. And it's between numbers ending in 9263
22   and 4957.
23     Ms. Dunbar, if you could play it.
24     (Audio played)
25     MR. FINKEL: Let's pause right there, please.

---

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH  CHARLTON

CORRECTED
May 9, 2019

1   BY MR. FINKEL:
2   Q. Mr. Cejovic, do you recognize the voice that said "all
3    right, your boys are on their way"?
4   A. Yes.
5   Q. Whose voice is that?
6   A. Medin Dino Kosic.
7   Q. What about the other voice talking about relapsing, whose
8    voice is that?
9   A. Me.
10       MR. FINKEL: Ms. Dunbar, you can continue.
11       (Audio played)
12       MR. FINKEL: Pause it right there, please.
13   Q. Mr. Cejovic, when you said, "I need, I need 52, I got 15 to
14    50," what did that mean?
15   A. I needed 52 bundles.
16   Q. Then when you said, "So you want to take off what you owe
17    me," what did that mean?
18   A. Dino owed me some money.
19   Q. Why would Dino owe you money?
20   A. I sold him these couches that I had.
21       MR. FINKEL: We can keep playing from there.
22       (Audio played)
23       MR. FINKEL: Let's stop right there, please.
24   Q. Mr. Cejovic, during your time selling drugs from
25    2015 -- withdrawn.

1       When were you arrested in this case?
2   A. January 17, 2018.
3   Q. During your time selling heroin from sometime in 2014 to
4    2015 up until your date of your arrest in 2018, what was Dino's
5    phone number?
6   A. I think a 917 number.  I'm not too sure.
7   Q. Did he have one phone number?
8   A. No, he had a bunch.
9   Q. How many did he have?
10   A. At that time, two.  But as in general you mean?
11   Q. I mean phones you would use to talk to him about heroin.
12   A. Yeah.
13   Q. How many phone numbers did he have from 2015 through 2018?
14   A. Oh, all right.  50 to 100.
15   Q. How many phones numbers did you have with respect to phones
16    you used to sell heroin?
17   A. About the same amount, maybe more.
18   Q. You had 50 to 100 phones?
19   A. Phone numbers.
20   Q. Phone numbers?
21   A. Yeah, phone numbers.
22   Q. Did you use more than one phone?
23   A. Yes.
24   Q. Would you keep all your phones?
25   A. No, I would throw them away.

1   Q. How did you throw them away?
2   A. I would break them piece by piece, throw them in separate
3    blocks, like each garbage can as I'm walking.
4   Q. Why did you do that?
5   A. Because I didn't want anybody to find what was in that
6    phone.
7   Q. Why?
8   A. 'Cause I was -- I had a lot of criminal activity on that
9    phone.
10   Q. Did you discuss how you disposed of phones with Dino?
11   A. I'm not sure.
12   Q. Did you discuss getting new phones with Dino?
13   A. Yes.
14   Q. What was that discussion about?
15   A. I was getting new phones so our phones weren't tapped, to
16    make sure they weren't tapped by police, whatever agency that
17    goes against criminal activity.  That's pretty much it.
18   Q. Have you heard about the term "connect"?  Do you remember
19    speaking about that?
20   A. That's correct.
21   Q. What did you say a connect was again?
22   A. A supplier of drugs.
23   Q. How many connects did you have for heroin?
24   A. Three to four.
25   Q. Who was your primary connect?

1   A. Medin Dino Kosic.
2   Q. What were your other connects?
3   A. One connect, I don't know the name, a guy from the Lower
4    East Side, I forgot his name.  One connect, this guy O from
5    downtown Brooklyn.  And another connect I had through my friend
6    Anthony Nicoletti.
7   Q. To your knowledge, did any of those connects lace their
8    heroin with fentanyl?
9   A. I have no clue.
10   Q. What did Dino tell you about whether or not there was
11    fentanyl in the heroin you got from him?
12   A. He assured them wasn't.
13   Q. How many times did you use the heroin that Dino provided to
14    you?
15   A. Zero.
16   Q. Mr. Cejovic, what does heroin mixed with fentanyl look
17    like?
18   A. I don't know.
19   Q. Mr. Cejovic, what does heroin mixed with fentanyl smell
20    like?
21   A. I don't know.
22   Q. Mr. Cejovic, were you able to verify whether or not Dino's
23    statement that there was no fentanyl in his heroin was true?
24   A. If I had to test it, yes, but I never tested it.
25   Q. Were you able to verify whether or not that statement was

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  true?
2  A. No.
3  Q. Let's back up a second.
4      MR. FINKEL: If we can put GX 101 back up again,
5  please.
6  Q. Mr. Cejovic, back in 2014, before you began selling heroin,
7  what did Dino tell you about his relationship with Paul Van
8  Manen?
9  A. He just told me to sell him heroin.
10  Q. When he told you that, what was your reaction?
11  A. I was very surprised.
12  Q. At that time, had you met Paul Van Manen?
13  A. Yes.
14  Q. Where?
15  A. In my neighborhood, in Rosebank.
16  Q. Where?
17  A. Hylan and Bay Street, he had a deli there.
18      MR. FINKEL: If we can put up GX 274 for the witness,
19  please.
20  Q. Do you recognize that image?
21  A. Yes.
22  Q. What is that?
23  A. That was the deli that was owned by Paul Van Manen.
24  Q. Is that how it looked when it was owned by Paul Van Manen?
25  A. No.

1  Q. What is different about it?
2  A. Just the name, the signs.
3  Q. Is that a fair and accurate representation of the location?
4  A. Yes.
5      MR. FINKEL: The government offers 274.
6      MS. O'NEILL: No objection.
7      MS. SIDERIS: No objection.
8      THE COURT: 274 is in evidence.
9      (Government's Exhibit 274 received in evidence)
10      MR. FINKEL: Publish, please.
11  BY MR. FINKEL:
12  Q. What was the name of the deli when Paul Van Manen owned it?
13  A. Bada Bing deli.
14      MR. FINKEL: If we can put up 405, which I don't
15  believe is in evidence, for the witness.
16  Q. What are we looking at here, Mr. Cejovic?
17  A. Staten Island; Rosebank, Staten Island.
18  Q. That's where you're from?
19  A. Yes.
20  Q. What is that point, the red point, what is that approximate
21  location?
22  A. My house.
23      MR. FINKEL: Your Honor, the government offers 405.
24      MS. SIDERIS: No objection.
25      MS. O'NEILL: No objection.

1      THE COURT: 405 is in evidence.
2      (Government's Exhibit 405 received in evidence)
3      MR. FINKEL: If we can publish it, please.
4  BY MR. FINKEL:
5  Q. Mr. Cejovic, am I correct you lived with your parents
6  growing up?
7  A. Yes.
8  Q. In that house?
9  A. Yes.
10  Q. Your screen in front of you, it's a touchscreen; if you
11  touch it, it will indicate on the screen. Can you indicate by
12  drawing a circle the approximate location of the Bada Bing deli
13  that Paul Van Manen owned?
14  A. Where it was?
15  Q. Yes.
16  A. From my house to that?
17  Q. Yes, please.
18  A. Right there to there.
19  Q. How long did it take to walk from the house you grew up in
20  and Bada Bing deli?
21  A. Five minutes.
22  Q. So it was close to your mom's house, wasn't it?
23  A. Yes.
24      MR. FINKEL: If the record could reflect that the
25  witness indicated that the deli is located a few blocks from

1  the red mark on Exhibit 405.
2      THE COURT: Yes.
3      MR. FINKEL: We can take that down.
4  BY MR. FINKEL:
5  Q. Mr. Cejovic, in 2014, again, before you started selling
6  heroin, what, if anything, did Dino ask you to do with respect
7  to his heroin sales with Paul?
8  A. Well, he didn't ask me to do anything. He just told me to
9  take a ride with him at first, but I didn't know where he was
10  going.
11  Q. What did he say to you when you were in the car together?
12  A. In the beginning of that ride, he didn't say much; we were
13  just talking about life, other stuff. But when we got further
14  from my neighborhood, I asked him where we were going, and he
15  said, I'm going to Paul Van Manen's house.
16  Q. Did you ask him why?
17  A. I asked him why, yeah.
18  Q. What did he tell you?
19  A. He said that his -- I don't know what the relationship was
20  between him and Paul Van Manen, but his alleged boyfriend stole
21  drugs or cash. I forgot what it was at that time. It could be
22  either one. And when he said that, when Dino said that, he
23  wanted to go knock on the door and see what was going on. So I
24  was in the car. And that's pretty much.
25  Q. What was your understanding of why Dino brought you along

| J598VAN1 Cejovic - Direct Page 515 | J598VAN1 Cejovic - Direct Page 517 |

1  on that ride?
2  A. At first I didn't understand why. He just told me to take
3  a ride. After the situation that we are talking about, I found
4  out why.
5  Q. By the way, on that ride, what, if anything, did Dino say
6  to you about Paul purchasing heroin from him?
7  A. He just said he was a good customer.
8  Q. What did you understand that to mean?
9  A. Somebody that buys a lot of heroin.
10  Q. Did Dino refer to him as Paul Van Manen in that car ride?
11  A. No.
12  Q. What did he call him?
13  A. He called him homo, deli guy.
14  Q. And by hearing deli guy, you associated it with the Paul
15  Van Manen we were talking about?
16  A. Yeah.
17  Q. That name homo, have you used that name to refer to Paul
18  Van Manen?
19  A. I think I did before, yes.
20  Q. Have you used other homophobic names to refer to Paul Van
21  Manen?
22  A. I think so. I think I did before.
23  Q. Do you have negative feelings about people's sexual
24  orientation?
25  A. No, not at all.

1  Q. Who broke up the fight?
2  A. Dino broke up the fight.
3  Q. Returning to your heroin sales, at first where did you pick
4  up the majority of your heroin, what location?
5  A. Majority from 72nd Street, between 18th and 19th Ave., in
6  Brooklyn, New York.
7  MR. FINKEL: Ms. Dunbar, can we put up GX 202 for the
8  witness. I believe this is in evidence.
9  Q. Mr. Cejovic, do you recognize this location?
10  A. Yes.
11  Q. What is it?
12  A. It's the house I picked up heroin from.
13  Q. Whose house is it?
14  A. Anthony Francese's house.
15  Q. When you would go to pick up heroin from Anthony Francese's
16  house, how would you get there?
17  A. I would drive there, over the Verrazzano Bridge from Staten
18  Island to Brooklyn, and take the Belt Parkway or local streets
19  through Brooklyn.
20  MR. FINKEL: If we can put up for the witness GX 105.
21  This is in evidence.
22  Q. Do you recognize this individual?
23  A. Yes.
24  Q. Who is the individual in GX 105?
25  A. Anthony Francese.

| J598VAN1 Cejovic - Direct Page 516 | J598VAN1 Cejovic - Direct Page 518 |

1  Q. After that conversation in the car, where did Dino drive
2  you to?
3  A. He drove me to his house, to Paul Van Manen's house.
4  Q. What happened when you got there?
5  A. Dino knocked on the door. Nobody answered. Then me and
6  Dino drove away to a store right around the area to get
7  something to eat.
8  Q. What happened when you got to the store?
9  A. When we got to the store, me and Dino, we went inside the
10  deli. We ran into his alleged boyfriend, Paul Van Manen's
11  boyfriend at that time. And Dino and his boyfriend, Paul Van
12  Manen's boyfriend got into an argument. Then I got involved.
13  Then after I got involved.
14  Q. Let me stop you right there. What was the argument about?
15  A. It was about the situation that happened at Paul Van
16  Manen's house, with the money or the drugs, I don't know which
17  one was it at that time. And that's what the argument was
18  about.
19  Q. What happened after the argument?
20  A. After the argument, Paul -- his alleged boyfriend Anthony
21  at the time, I got in an argument because he was yelling at
22  Dino. So then me and him went outside, me and Anthony went
23  outside and got into a fight.
24  Q. You punched Anthony?
25  A. I punched him first.

1  Q. Mr. Cejovic, when approximately did you start picking up
2  heroin from Anthony Francese's house?
3  A. I think the summer of 2015 or fall, around there.
4  Q. Why did you start picking up heroin from Anthony Francese's
5  house at that time?
6  A. It made it more convenient for Dino.
7  Q. How do you know that?
8  A. Because Dino told me.
9  Q. Prior to when you picked up heroin from Anthony Francese's
10  house, where were you picking up your heroin from?
11  A. I was picking up either at Dino's house, sometimes, that
12  rarely happened, or he had another guy who worked for him, we
13  called him the Greek.
14  Q. Returning to the time when you were picking up heroin from
15  Anthony Francese's house, how often did you go to Anthony
16  Francese's house to pick up heroin?
17  A. Every day, every other day.
18  Q. Did other people pick up heroin from Anthony Francese's
19  house?
20  A. Yes.
21  Q. Who?
22  A. Paul Van Manen, Shaun Sullivan, Freddy, but I call him
23  Teddy, I never knew him as Freddy, and Shaun's wife Diane. And
24  people that also worked for me picked up heroin from the house.
25  Q. Do you know The Greek's first name?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

J598VAN1          Cejovic - Direct          Page 519

1  A. I think it's Chris.
2  Q. When did you and those who picked up for you stop picking
3   up heroin from Anthony Francese's house?
4  A. When I got into altercation with him.
5  Q. When was that, approximately?
6  A. Oh, I'm sorry. Let me rephrase that.
7      I got into altercation with him. Then for a while I
8  stopped picking up heroin from him, from the house. Then again
9  I started picking up heroin, maybe a few months later.
10 Q. Thank you for that clarification.
11     I am asking overall, did there come a time when you
12 and other people who worked for you or helped you stopped
13 completely picking up heroin from Anthony Francese's house?
14 A. Yes, when he moved.
15 Q. When was that, approximately?
16 A. I think fall 2017.
17 Q. When you went to Anthony Francese's house or had others go
18 to Anthony Francese's house, how much heroin would you pick up
19 each time, approximately?
20 A. 40 to 100 bundles.
21 Q. What about other people who picked up heroin?
22     MS. SIDERIS: Objection.
23     THE COURT: Overruled.
24 A. How much they picked up? I wouldn't know exactly, but I
25 can round the number out.

J598VAN1          Cejovic - Direct          Page 520

1  Q. OK.
2      MS. SIDERIS: Objection, your Honor. Foundation.
3      THE COURT: Overruled.
4  A. Some people pick up 40, 50, 60.
5  Q. So you said you would pick up between 40 and 100 each time
6   you went to Anthony Francese's house?
7  A. Between those numbers. It depended what people wanted.
8  Q. So in an average week, how many bundles would you pick up
9   from Anthony Francese's house?
10 A. 300 to 500.
11 Q. For how long were you picking up 300 to 500 bundles from
12 Anthony Francese's house per week?
13 A. A year and a half.
14 Q. So for a year and a half you were picking up between 300 to
15 500 bundles per week from Anthony Francese?
16 A. Let me rephrase that. Year and a half to two years, around
17 there. I don't know exactly when. But yeah, that's correct.
18 Q. The heroin that you would pick up from Anthony Francese,
19 what did it look like?
20 A. It was white bags, glassine envelopes, and it was ten
21 glassine envelopes wrapped around one bundle, and it was
22 bundles wrapped on top of bundles, like five bundles together,
23 and then you have 5, 10, 15, 20, 25, lined up.
24     MR. FINKEL: If we could put up GX 212G in evidence.
25 Q. Did it look like that?

J598VAN1          Cejovic - Direct          Page 521

1  A. Yeah. That looks like 15 bundles to me. It looks like
2   it's stacked here.
3      MR. FINKEL: We can take this down.
4  A. Maybe less.
5  Q. Mr. Cejovic, did the heroin you picked up from Anthony
6   Francese's house, did it have any stamps on it?
7  A. No.
8  Q. Is that something that you are aware of other heroin
9   traffickers doing, putting stamps on glassines?
10 A. Yes.
11 Q. What color were the bags that you would pick up from
12 Anthony Francese's house?
13 A. Usually white, most of the time white, yeah.
14 Q. Any other colors?
15 A. Once in a while, maybe light blue. I don't know what other
16 colors, but that I could remember.
17 Q. How were the bags folded, if at all?
18 A. They were tall bags so they would fold it right over.
19 Q. How many times?
20 A. Just once.
21 Q. How was a bundle of ten glassines held together?
22 A. In a rubber band wrapped around twice.
23 Q. Did Anthony Francese tell you who else picked up heroin
24 from his house?
25 A. Yes.

J598VAN1          Cejovic - Direct          Page 522

1  Q. What did he tell you?
2  A. Ways I would find out through him is if I needed more and
3  he would tell me he has to hold these for somebody else, and
4   sometimes he would say a name.
5  Q. What are the names he would say when he was holding heroin
6   for a certain person?
7  A. The names I remember are Shaun Sullivan and Paul Van Manen.
8  Q. Where was the heroin stored in Anthony Francese's house?
9      MS. SIDERIS: Objection.
10     THE COURT: Overruled.
11 A. Behind a bar, but sometimes different places, but when he
12 pulled it out, that's the one place I remember.
13 Q. Did you see that?
14 A. That I seen personally, yes.
15 Q. What level of the house was that?
16 A. The basement.
17 Q. You were in the basement at Anthony Francese's house?
18 A. Yes.
19 Q. You picked up heroin there?
20 A. Yes.
21 Q. You saw that?
22 A. Yes.
23 Q. That occasion when Anthony Francese told you that he was
24 reserving bundles of heroin for Paul Van Manen, how many
25 bundles of heroin was he reserving for Paul Van Manen?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  A. I don't know exactly, because I would ask him for an extra
2  20 or 30 and he said, no, these are for him. I wouldn't know
3  how much is there all together because I wouldn't really ask.
4  Q. When you asked for the 20 and 30, how many bundles did you
5  see?
6  A. What he had left? 50, 80, depends who got there first
7  before me.
8  Q. I am talking about that occasion when he told you he was
9  reserving bundles of heroin for Paul Van Manen.
10  A. I can't remember.
11  Q. Mr. Cejovic, I just want to be clear about something. Did
12  you ever see Paul Van Manen sell heroin?
13  A. No.
14  Q. Did you ever see Paul Van Manen pick up heroin from Anthony
15  Francese?
16  A. No.
17  Q. Did you ever see Paul Van Manen pick up heroin from Medin
18  Kosic.
19  A. No.
20  Q. Did you ever see Paul Van Manen near Medin Kosic?
21  A. Yes.
22  Q. When was that?
23  A. In Brooklyn, when I picked up off Medin Kosic, I seen him
24  down the block parked.
25  Q. When was that?

1  A. I'm trying to think. When was it? I think 2016, 2017, one
2  of those years.
3  Q. On that occasion -- you were going to Brooklyn why?
4  A. To pick up heroin.
5  Q. Where were you going to pick up the heroin from?
6  A. In Brooklyn, Bensonhurst.
7  Q. Who were you going to meet in Bensonhurst to pick up
8  heroin?
9  A. Medin Dino Kosic.
10  Q. Why did you know to go to Bensonhurst to meet Dino to pick
11  up heroin?
12  A. He told me over the phone to meet him there.
13  Q. What exactly happened? While you were traveling there,
14  what did you see?
15  A. When I was traveling there, I was going through Brooklyn,
16  and then when I was pulling to the location where Medin Dino
17  Kosic was, I passed where Paul Van Manen was parked.
18  Q. And you saw Paul Van Manen?
19  A. Yeah.
20  Q. Would you characterize Dino as someone who is lazy?
21  A. Yes.
22  Q. Have you spoken with Paul Van Manen?
23  A. Yes, I did.
24  Q. More than once?
25  A. Yeah.

1  Q. Many times?
2  A. Yeah, quite a few times.
3  Q. Were you able to recognize his voice?
4  A. Yes.
5      MR. FINKEL: If I can ask the jury and the Court to
6  turn to the next transcript in their packet, which should be
7  Government Exhibit 301M, as in Mary.
8      This is a call from October 22, 2017, at approximately
9  1423, and it's between the numbers ending 8865 and 0111.
10      Ms. Dunbar, if you could play that, please. It's in
11  evidence.
12      (Audio played)
13      MR. FINKEL: Stop right there, please.
14  BY MR. FINKEL:
15  Q. Mr. Cejovic, do you recognize the voice that said, "Yeah,
16  what's up son?", and then "what's going on?"
17  A. Yeah.
18  Q. Whose voice is that?
19  A. Paul Van Manen.
20      MR. FINKEL: Ms. Dunbar, if you can play from the
21  beginning.
22      (Audio played)
23  Q. Mr. Cejovic, we talked a bit before about other heroin
24  connects you had. I think you said someone named Anthony,
25  someone you identified as O, and someone on the Lower East

1  Side. Does that sound right?
2  A. Yes.
3  Q. When you purchased heroin from those individuals, did they
4  come in bundles?
5  A. Only from one person.
6  Q. Who was that?
7  A. It was O.
8  Q. Did O's bundles have any stamps on them?
9  A. No. The bags was printed with a name, but to me that's not
10  a stamp, because a stamp is really stamped.
11  Q. The bags had a preprinted name on it?
12  A. Yeah, preprinted.
13  Q. When you say bags, you mean glassines?
14  A. That's correct.
15  Q. What did the glassines that you got from O say on them?
16  A. Pray for death.
17  Q. Based on your understanding of people who sell heroin, is
18  it somewhat common to see bags that have names on them or
19  stamps?
20  A. It's common.
21  Q. And Anthony, how did you purchase heroin from Anthony, how
22  it was packaged?
23  A. It came just in grams and like a rock form, a powder of
24  heroin.
25  Q. Did you sell it like that or did you put it in bundles?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH  CHARLTON

**CORRECTED**
May 9, 2019

1 A. No, I put it in bags and I bagged it up myself.
2 Q. You personally?
3 A. Yes.
4 Q. What about the individual on the Lower East Side, how was
5   it sold to you, the heroin?
6 A. The same way I got it from Anthony, just in rock form or
7   powder.
8 Q. Did you package it into bundles?
9 A. I packaged it myself.
10 Q. Did there come a time when you stopped buying heroin from
11   Anthony?
12 A. Yes.
13 Q. Why?
14 A. Because he went to jail.
15 Q. Did he ask you to bail him out of jail?
16 A. Yes.
17 Q. Did you?
18 A. No.
19 Q. Was he upset about that?
20 A. Yes.
21 Q. When he got out of jail, did you see Anthony again?
22 A. Yes.  Three times, two to three times.
23 Q. Did you have an altercation with him during any of those
24   times?
25 A. The last time I seen him, yes.

1 Q. What happened?
2 A. He pulled up to the convenient parking lot, it's right next
3   door to my parents' house.  He got out of the car.  I was with
4   this guy John Kosonik.  John Kosonik was parked a few cars down
5   from the lot.  There's a bunch of cars there.  It was early in
6   the morning.  He pulled up, got out of the car, said what's up,
7   started talking to me aggressively.  I also did back.
8       So he wanted to walk and talk with me.  So I started
9   to walk.  I tried to bring him in front of my house 'cause I
10   had bats in front of my house in case he trying to stab me or
11   shoot me, pull out a gun.  When he walked, he sucker-punched me
12   from the side, sucker punch right here.  He hit me in my nose
13   first.  Then my eyes got watery, I couldn't see.  He
14   sucker-punched me and hit me again.  He kept on hitting me.  I
15   fell down to my knees.  Started bashing my head into a
16   guardrail.
17       Then John Kosonik got out of the car, seen it from a
18   distance, and broke up the fight, got him off of me.  He chased
19   him with a little mini bat.  And they were arguing.  That's all
20   I could remember.  I was still, like, conscious.  Then I got up
21   from the floor.  I was bleeding or whatever in my face.  Then
22   we started arguing again.  I spit at him.  And then we started
23   fighting, and he pulled a knife out and stabbed me twice in my
24   back.
25 Q. Did you go to the hospital?

1 A. Yeah.  I went to the hospital.
2 Q. How long were you in the hospital for?
3 A. For a hour.
4 Q. Did you get out of the hospital?
5 A. Yes.
6 Q. You said you got stabbed in the back?
7 A. Yeah.  Twice right here next to my spine.
8 Q. After you got out of the hospital, did any of Dino's
9   associates with respect to heroin, did you see any of them?
10 A. One person.
11 Q. Who was that?
12 A. I call him -- we call Gordo.
13       MR. FINKEL: Ms. Dunbar, if you could display for the
14   witness what has been marked as Government Exhibit 107.
15 Q. Do you recognize this individual?
16 A. Yes.
17 Q. Who is that?
18 A. Gordo.
19       MR. FINKEL: The government offers 107.
20       MS. SIDERIS: No objection.
21       MS. O'NEILL: No objection.
22       THE COURT: 107 is in evidence.
23       (Government's Exhibit 107 received in evidence)
24 Q. Prior to your arrest in this case, did you know Gordo's
25   real name?

1 A. No.
2 Q. After you got out of the hospital and you said he visited
3   you, what did he tell you, if anything?
4 A. Well, he didn't visit me intentionally.  I was just in the
5   car with Dino.  We was in Brooklyn.  We pulled up.  Then he
6   came to the car, seen me in the car, heard what happened from
7   Dino, I guess over the phone.  I don't know, I'm not sure how
8   he found out.  Then he told me to hold my head and keep doing
9   my thing and just be safe.
10 Q. What did you understand that to mean when he said keep
11   doing your thing?
12 A. That's what Gordo said to me.  To keep making money.
13 Q. Keep making money, what did that mean?
14 A. Keep selling heroin.
15       MR. FINKEL: Your Honor, if I could direct the jury
16   and the Court's attention to the next transcript in their
17   packet.  It's 306AL.
18 Q. While the Court and jury are pulling that out, are you able
19   to recognize Gordo's voice?
20 A. Yes.
21       MR. FINKEL: 306AL.  It should be the next transcript
22   in your packet.
23       This is a call from November 22, 2017, at 1717, and
24   it's between numbers ending in 9623 and 6712.
25       (Audio played)

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

---

J598VAN1      Cejovic - Direct      Page 531

1      MR. FINKEL: Let's pause it right there.
2    Q. Do you recognize the voice that said, "Nothing, crossing
3    the Goethals I think"?
4    A. Yes.
5    Q. Whose voice is that?
6    A. Gordo.
7      (Audio played)
8    Q. How would you characterize your relationship with Anthony
9    Francese?
10    A. My relationship with Anthony Francese, not so well.
11    Q. You mentioned before you had an altercation with him. Did
12    you slap him?
13    A. Yes.
14    Q. After the time you slapped him, were you able to pick up
15    bundles from his house?
16    A. No, not anymore.
17    Q. Did someone else pick up bundles for you?
18    A. Yes.
19    Q. Who were the people that picked up bundles for you?
20    A. Well, I had to pick up Medin Dino Kosic to take him to
21    Anthony Francese's house to get the heroin for me.
22      MR. FINKEL: Ms. Dunbar, if you can put up what has
23    been marked for identification as Government Exhibit 104, which
24    is in evidence.
25    Q. Mr. Cejovic, do you see the image on your screen?

---

J598VAN1      Cejovic - Direct      Page 532

1    A. Yes.
2    Q. Who is that?
3    A. Kenny.
4    Q. Do you know his last name?
5    A. I think it's Charlton.
6    Q. Do you see Kenny in the courtroom here today?
7    A. Yes.
8    Q. Can you point him out?
9    A. He's the bald head next to the dude with the glasses.
10      MR. FINKEL: Your Honor, if the record could reflect
11    the witness has identified the defendant, Kenneth Charlton, as
12    Kenny.
13      THE COURT: Yes.
14    Q. When you were selling heroin, what are some of the ways
15    Kenny would help you sell heroin?
16    A. He would find customers for me 'cause he owed me money.
17    Q. What are the methods in which you would communicate with
18    Kenny when you were selling heroin?
19    A. Over the phone and also in person.
20    Q. How many times do you think you have spoken to Kenny?
21    A. A few hundred.
22    Q. Are you familiar with his voice?
23    A. Yes.
24      MR. FINKEL: You can turn in your packets to 303D. We
25    are going to skip one and move to the next one. It should be

---

J598VAN1      Cejovic - Direct      Page 533

1    303D. This is a call between the numbers ending in 6189 and
2    5083 from August 21, 2017, at 1732.
3      Ms. Dunbar, if you could play that please.
4      (Audio played)
5      MR. FINKEL: Pause right there, please.
6    BY MR. FINKEL:
7    Q. Mr. Cejovic, do you recognize the voice that said, "What up
8    son? You coming to the island now?"
9    A. Yes.
10    Q. Whose voice is that?
11    A. Kenny.
12      MR. FINKEL: Continue playing.
13      (Audio played)
14      MR. FINKEL: Let's stop right there.
15    Q. Mr. Cejovic, on line 13 of that transcript, when Mr.
16    Charlton said, "I'm trying to get you customers," what did you
17    understand that to mean?
18    A. Trying to get me customers that use heroin.
19    Q. What did you understand him to mean when he said, I've been
20    giving out your number?
21    A. Giving out my number to other customers.
22    Q. What number?
23    A. The number I used to sell drugs.
24    Q. Why would Mr. Charlton be giving out your number to other
25    individuals?

---

J598VAN1      Cejovic - Direct      Page 534

1    A. Because I supplied heroin.
2    Q. What did you understand him to mean when Mr. Charlton said
3    the people at the program?
4    A. He went to a program, it was a methadone clinic, methadone
5    clinic, and that's the program he went to.
6    Q. Is it your understanding that he gave out your number to
7    people at the methadone clinic?
8    A. One second. Sorry.
9      Oh, OK. I see. I'm sorry.
10      Yeah. A program that he went to, a methadone clinic.
11    Q. My question is, is it your understanding that he gave out
12    your number to people at the methadone clinic in case they were
13    trying to buy heroin?
14    A. Yes.
15    Q. This call also mentions a person named Nicole?
16    A. Correct.
17    Q. What is your understanding of why Mr. Charlton mentioned
18    this person Nicole to you?
19    A. Nicole was an old customer of his that had bought heroin.
20    Q. What do you mean by Nicole was an old customer of his, do
21    you mean Mr. Charlton?
22    A. Yes, Kenny. I'm sorry.
23    Q. What do you mean that Nicole was an old customer of Mr.
24    Charlton's?
25    A. She used to buy heroin off of him.

---

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  Q.  Is it your understanding he was now referring Nicole to you
2    to buy heroin?
3  A.  Yes.
4  Q.  Was this an understanding that you and Mr. Charlton had
5    where he would recruit customers for you in order to lower the
6    amount of money he owed you?
7  A.  Yes.
8  Q.  That understanding that you had with Mr. Charlton to bring
9    you customers in exchange for him having to pay you less money
10   for heroin, how many customers in total do you think Mr.
11   Charlton brought you?
12  A.  Over the amount of time I knew him, 50 the most.
13  Q.  Mr. Cejovic, approximately how many bundles of heroin do
14   you believe you sold to the customers that Mr. Charlton
15   referred to you as part of your agreement?
16  A.  A few hundred, like 300 the most.
17  Q.  Let's take a step back.
18        When did you first meet Mr. Charlton?
19  A.  I think in 2015 -- I think 2015.  Yeah, '15.
20  Q.  What neighborhood in Staten Island did you meet him?
21  A.  Where I met him at?  In Midland.
22  Q.  When you first met Mr. Charlton, what was your relationship
23   with him at first?
24  A.  He was just a customer.
25  Q.  Later he became more than just a customer?

1  A.  He was just -- to me he was just a customer all the time.
2  Q.  At first, how much heroin did Mr. Charlton buy from you?
3  A.  At first, he bought one or two bundles.
4  Q.  Now, generally, when you sold heroin, were you able to tell
5    whether someone was buying heroin from you for personal use or
6    to resell?
7  A.  Yes.
8  Q.  How were you able to make that determination?
9  A.  Their appearance, the way they spoke, and the amount they
10   bought.
11  Q.  What do you mean the amount they bought?
12  A.  Well, usually users would buy one to five bundles, around
13   that range, sometimes a little more, maybe, but that's the
14   usual range.  But a reseller will buy ten or more bundles.
15  Q.  What do you mean by the difference between how users and
16   resellers spoke?
17  A.  Users talk about how they want to get high, how it fulfills
18   their high, their needs.  And a reseller wants to make money,
19   so they going to talk about the money they want to make.
20  Q.  Is there a difference between locations in which you would
21   meet sellers and meet users?
22  A.  Yes.
23  Q.  Was a reseller of heroin also just a customer to you?
24  A.  Some people, depends on my relationship with them.
25  Q.  Did there come a time, if ever, that Kenny started buying

1    from you to resell?
2  A.  Yes.
3  Q.  When approximately was that?
4  A.  To my knowledge, I think summer of 2015 or fall of 2015.
5  Q.  How did you know that Mr. Charlton was buying heroin from
6    you to resell?
7  A.  'Cause he told me he was sending me customers and -- no, he
8    wasn't sending me customers.  He was picking up for other
9    people.  And then it got annoying for me to go back and forth
10   to keep going to see him for him to see other people.  So Kenny
11   just said, I'll buy enough so I can resell to his people.
12  Q.  So it was his idea?
13  A.  Yeah.  I also put that thought in his head.
14  Q.  It was an understanding between the two of you that he was
15   going to buy from you to resell?
16  A.  Yes.
17  Q.  When you had this discussion about Kenny -- withdrawn.
18        When you had this discussion about Mr. Charlton buying
19   heroin from you to resell, did you threaten Mr. Charlton during
20   that discussion?
21  A.  Repeat that question.
22  Q.  Sure.  The discussion, the one we were just talking about
23   between Mr. Charlton and you about Mr. Charlton reselling
24   heroin, did you threaten him at all during that discussion?
25  A.  No.

1  Q.  Around this time period when Mr. Charlton started buying
2    heroin from you to resell, at that time, how many bundles of
3    heroin was he buying from you at a time?
4  A.  That time, at the beginning, ten bundles at a time, every
5    day, every other day bought ten bundles.
6  Q.  For how long was he buying ten bundles every day, every
7    other day?
8  A.  A month, two months, around that range.
9  Q.  What happened after that?
10  A.  He ended up owing me money.
11  Q.  Would you stay in contact with him?
12  A.  Yeah, I did.
13  Q.  Would he stop buying the ten bundles every couple of days
14   after two months or so?
15  A.  Yeah, he would stop buying.
16  Q.  Would you stay in contact with him after he would stop
17   buying?
18  A.  I would try to reach out to him.  Most of the time he
19   wouldn't answer.
20  Q.  After a period of time, would you reconnect with Mr.
21   Charlton?
22  A.  Yes.
23  Q.  What would happen when you reconnected with Mr. Charlton?
24  A.  We would discuss about -- me and Kenny would discuss about
25   the money he owed me, and I would try to figure out a way he

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  could -- I could take that money off his bill that he owed me.
2  That's pretty much it.
3  Q.  You would reach an understanding about that?
4  A.  Yes.
5  Q.  Would he start buying from you again, Mr. Charlton?
6  A.  Yes.
7  Q.  How much heroin would Mr. Charlton start buying from you
8  again, at first?
9  A.  One or two bundles.
10  Q.  After buying one or two bundles, did there come a time when
11  Mr. Charlton would start buying more than one or two bundles?
12  A.  Yeah.
13  Q.  How much would he buy then?
14  A.  It slowly progressed.  It would be five, and then when he
15  decided to resell, started selling it, he would buy ten.
16  Q.  This cycle of him buying a few and then buying a bunch more
17  to resell, and then disappearing for a couple of months and
18  coming back, that happened several times?
19  A.  Yes.
20  Q.  That sort of happened between your entire relationship with
21  Mr. Charlton from 2015 to the time of your arrest?
22  A.  Yes.
23  Q.  Mr. Cejovic, approximately how many times do you believe
24  that Mr. Charlton bought heroin from you that he was going to
25  resell?

1  A.  A hundred times.
2  Q.  What is your approximation of the total amount of bundles
3  that Mr. Charlton purchased from you?
4  A.  400 bundles.
5  Q.  What was the most that Mr. Charlton ever purchased from you
6  on one occasion?
7  A.  20 bundles.
8  Q.  When you sold bundles of heroin to Mr. Charlton, what did
9  you charge him?
10  A.  I charged him different prices.
11  Q.  When he was purchasing heroin -- withdrawn.
12        When Mr. Charlton was purchasing heroin from you to
13  resell, what was the price you charged him for a bundle?
14  A.  $50.
15  Q.  Would you charge him 45 at times?
16  A.  Yeah.
17        MS. SIDERIS: Objection.
18        THE COURT: Overruled.
19  Q.  The $45 price per bundle, was that a price you offered to
20  any customer?
21  A.  No.
22  Q.  What was your general retail price for a bundle of heroin?
23  A.  60 to 70 dollars.
24  Q.  Did you have an understanding of what Mr. Van Manen's
25  general price was?

1  A.  Yes.
2  Q.  What was it?
3  A.  $80 a bundle.
4        MR. FINKEL: If I could ask the jury and the Court to
5  turn to the next transcript in their packet, which is marked
6  and in evidence as Government Exhibit 303E.  This is a call
7  from August 26, 2017, and it's between the numbers ending in
8  6189 and 5083.
9        Ms. Dunbar if you can begin to play.
10        (Audio played)
11        MR. FINKEL: We can pause it right there.
12  Q.  The person who said "you good," did you hear that?
13  A.  Yes.
14  Q.  Who said that?
15  A.  Kenny.
16  Q.  What does that mean "you good"?
17  A.  If I had the heroin.
18        MR. FINKEL: Keep playing, please.
19        (Audio played)
20        MR. FINKEL: Stop right there, please.
21  Q.  Mr. Cejovic, just to be clear, whose voice is that talking
22  about the Verrazzano Bridge?
23  A.  Me.
24        MR. FINKEL: Ms. Dunbar, if you can continue playing,
25  please.

1        (Audio played)
2  BY MR. FINKEL:
3  Q.  Mr. Cejovic, the reference to "one" during that call, what
4  does that mean to you?
5  A.  One bundle.
6  Q.  Is it your understanding that Mr. Charlton was buying a
7  bundle for his personal use or to resell?
8  A.  His personal use.
9  Q.  There is a discussion at the end of this call in which you
10  say, "Don't tell him that I charge you 45."  Do you see that?
11  A.  Yes.
12  Q.  What does that mean?
13  A.  I didn't want Kenny to tell another person that I sold
14  heroin to that I am charging Kenny $45 because I charge the
15  other guy more money.
16  Q.  Is that because you sold heroin to Mr. Charlton at a price
17  that you didn't offer to all your customers?
18  A.  Yes.
19  Q.  What is methadone?
20  A.  To my knowledge, it's a drug --
21        MS. SIDERIS: Objection.
22        THE COURT: Overruled.
23        What is methadone, Mr. Cejovic?
24        THE WITNESS: It's a drug that ex-heroin users use so
25  they won't go back to using heroin, so they won't get sick.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  Q. What is your understanding about where methadone is
2  obtained?
3  A. Doctors provide it at clinics.
4        MR. FINKEL: If we can turn to the next document in
5  the packet.
6        THE COURT: What is that number?
7        MR. FINKEL: 303A, your Honor.
8        This is a call from August 15, 2017, at approximately
9  1528, and it's between the numbers ending in 6189 and 5083.
10        Ms. Dunbar, if you can please play it.
11        (Audio played)
12        MR. FINKEL: Let's stop right there.
13  BY MR. FINKEL:
14  Q. Mr. Cejovic, the individual who said "see if I can" --
15  excuse my language -- "fucking get anything that's fucking owed
16  to me," do you recognize that voice?
17  A. Yes.
18  Q. Whose voice is that?
19  A. Kenny.
20  Q. What did you understand that to mean, if I can get anything
21  that's owed to me?
22  A. People owe him money.
23  Q. For what?
24  A. For heroin.
25        MR. FINKEL: We can keep playing.

1  Q. Just one time?
2  A. No, he bought a few times off me.
3  Q. In total, how many bundles did he buy from you?
4  A. 20, 20 bundles.
5        MR. FINKEL: If we can, Ms. Dunbar, put up for the
6  witness what has been marked as Government Exhibit 303I. And
7  this is a text message on August 16, 2017, and it's between the
8  numbers we have been talking about, 5083 and 6189.
9  Q. Do you see that, Mr. Cejovic?
10  A. Yes.
11        MR. FINKEL: At this time, the government offers 303I.
12        MS. SIDERIS: No objection.
13        MS. O'NEILL: No objection.
14        THE COURT: It's in evidence.
15        (Government's Exhibit 303I received in evidence)
16  BY MR. FINKEL:
17  Q. Mr. Cejovic, if you can read the text from the 5083 number?
18  A. It says, "Bro, call me ASAP. I got someone who needs five
19  full now, and if it's good, love you, 10:15 every day, but you
20  got to get ahold of him now before his regular guy comes."
21  Q. Who is that text message from?
22  A. Kenny.
23  Q. Who is it to?
24  A. To me.
25  Q. What is Mr. Charlton telling you in this text message?

1        (Audio played)
2        MR. FINKEL: Let's stop right there.
3  Q. Mr. Cejovic, in this conversation, is Mr. Charlton
4  discussing about money that he owes you?
5  A. Yes.
6  Q. When you sold Mr. Charlton heroin, did you require him to
7  pay cash all the time?
8  A. Yes.
9  Q. Did he always pay you cash when he got heroin from you?
10  A. No.
11  Q. How would that work?
12  A. I would credit him, give it to him and -- give the heroin
13  to Kenny and tell him to pay me later.
14        MR. FINKEL: Ms. Dunbar, if you could continue
15  playing, please.
16        (Audio played)
17  Q. Who is Damian?
18  A. A customer of Kenny that buys heroin.
19  Q. Why was Mr. Charlton going to call Damian?
20  A. 'Cause Kenny was going to refer Damian to me, to buy heroin
21  off me.
22  Q. What kind of customer was Damian?
23  A. He was a user.
24  Q. How many bundles did he buy from you?
25  A. One to four, around that range.

1  A. Kenny is telling me to call him as soon as possible. Kenny
2  has someone who needs five full bundles, at that moment when he
3  texted me. And Kenny said, "If it's good, love you, 10 to 15
4  every day." 10 to 15 every day means 10 to 15 bundles. But I
5  have to get ahold of him now before the guy Kenny was with, his
6  regular guy is coming.
7  Q. What do you mean "regular guy"?
8  A. A connect.
9  Q. What do you mean by regular?
10  A. His usual connect, regular connect.
11        MR. FINKEL: This next exhibit is 303B. I don't
12  believe the packets has a transcript for this one. It is dated
13  August 16, 2017 and it's between -- it should be next in your
14  packet. Apologies for that. It's marked 303B. This is a call
15  from August 16, 2017, at 1702, and it's between the numbers
16  6189 and 5083.
17        If we can play that, Ms. Dunbar.
18        (Audio played)
19        MR. FINKEL: Pause it right there.
20  BY MR. FINKEL:
21  Q. The individual who said "Shalom," with the number ending
22  5083, do you recognize that voice?
23  A. Yes.
24  Q. Whose voice is that?
25  A. Kenny.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  Q. The next individual who spoke and said, "Yo, what's up,
2  bro?" with the number ending 6189, do you recognize that voice?
3  A. It's me.
4       MR. FINKEL: Keep playing.
5       (Audio played)
6       MR. FINKEL: Let's stop right there.
7  Q. Mr. Cejovic, around line 4 or 5 in the transcript -- I'm
8  sorry, line 6, when Mr. Charlton says that "you already
9  seen" -- with an expletive -- "this guy."  Do you see that?
10      THE COURT: Line 6 and 7, Mr. Cejovic.
11 A. Yes.
12 Q. Mr. Cejovic, what did you understand that to mean when Mr.
13 Charlton said that you already seen this guy?
14 A. I already seen the guy that Kenny was with a customer.
15 Q. What is your understanding on why Mr. Charlton was telling
16 you about this person and that you already seen him?
17 A. Kenny was going to refer that person to me as a customer.
18 Q. Who is this person?
19 A. Frankie.
20      MR. FINKEL: You can keep playing.
21      (Audio played)
22      MR. FINKEL: Let's pause right there.
23 Q. Mr. Cejovic, what did you understand Mr. Charlton to mean
24 when he said Frankie is ready for you?
25 A. Frankie was ready to buy heroin from me.

1  Q. Looking back up in the transcript around line 11, when Mr.
2  Charlton said that he was going to hook him up with you, what
3  did you understand that to mean, "hook him up with you"?
4  A. He was going to refer him, refer Frankie, to me.
5  Q. Who was going to refer who to who?
6  A. Kenny was going to refer Frankie to me.
7  Q. Why?
8  A. Because I was a supplier, I had the heroin, and Frankie was
9  a customer of mine already.
10 Q. Did all of your customers refer other customers to you?
11 A. Only a few, a select few.
12 Q. Mr. Charlton was one of those few?
13 A. Yes.
14 Q. There is a reference in this call to Min.  What does that
15 mean?
16 A. Me, that's my nickname.
17      MR. FINKEL: Keep playing, please.
18      (Audio played)
19      MR. FINKEL: Pause right there.
20 Q. What did you understand that to mean when Mr. Charlton told
21 you that he would grab five now, and if it's good, man, I get
22 10 to 15 every day?
23 A. He meant he'll grab five bundles of heroin now, Frankie
24 meant that, and if it's good, Frankie will grab 15 to 20
25 bundles of heroin every day.

1       MR. FINKEL: If we can put up for the witness
2  Government Exhibit 303J.
3  Q. This is a text message dated August 17, 2017, and it's
4  between the numbers -- I believe, Mr. Cejovic, you just
5  identified 5083 as having the voice of Mr. Charlton and 6189 as
6  having your voice, is that right?
7  A. Yes.
8       MR. FINKEL: The government offers 303J.
9       MS. SIDERIS: No objection.
10      MS. O'NEILL: No objection.
11      THE COURT: 303J is in evidence.
12      (Government's Exhibit 303J received in evidence)
13      MR. FINKEL: If we can publish it, please.
14 Q. In that first message at 1335, from the 5083 number, can
15 you read it, please, after the message part missing, from
16 "now."
17 A. "Now anyway Damian just texted me, wants your number
18 again."
19 Q. What is the next text message?
20 A. "OK.  Give him my number."
21 Q. Who said "OK, give him my number"?
22 A. Me.
23 Q. Who sent the other text messages, the 5083 text messages?
24 A. Kenny.
25 Q. Can you read the next text message from 5083?

1  A. "I am right now and don't forget everyone.  I have been
2  trying to hook you up with, is coming around eventually, we
3  help each other out and you helped me, thank you, I'm trying
4  brother."
5  Q. Is this the Damian you referred to before?
6  A. Yes.
7  Q. Again, why did you tell Mr. Charlton to give -- withdrawn.
8       Why did you tell Mr. Charlton to give Damian your
9  number?
10 A. Why did I tell Kenny to give Damian my number?
11 Q. Correct.
12 A. Because he was a customer that bought heroin.  Damian was a
13 customer that bought heroin.
14 Q. What is your understanding of Mr. Charlton when he said
15 "trying to hook you up"?
16 A. Kenny was trying to hook me up with customers.
17 Q. Is that why he said, We help each other out and you help
18 me?
19 A. Kenny said that, yes.
20      MR. FINKEL: Can you put up 303K for the witness.
21 Q. Mr. Cejovic, this is another text message.  This one is
22 dated August 21, 2017.  Is this between those two phone numbers
23 5083 and 6189?
24 A. Yes.
25      MR. FINKEL: The government offers 303K.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1    MS. SIDERIS: No objection.
2    MS. O'NEILL: No objection.
3    THE COURT: 303K is in evidence.
4    (Government's Exhibit 303K received in evidence)
5  Q. Mr. Cejovic, can you read the text message from the 5083
6  number?
7  A. "I have one of my old customers who gets every day, I told
8  her 50. Her name is Nicole. She's going to be calling you
9  from 929-423-6056."
10 Q. Who is that text message from?
11 A. Kenny.
12 Q. To who?
13 A. To me.
14 Q. What did you understand it to mean when Mr. Charlton said
15 that he has one of his old customers?
16 A. Somebody that bought heroin off Kenny in the past.
17 Q. What did you understand it to mean that one of Mr.
18 Charlton's old customers gets every day?
19 A. That person buys every day, buys heroin every day.
20 Q. That person buys heroin every day from whom?
21 A. In the past, off Kenny.
22 Q. What was he doing here with respect to that person?
23 A. Kenny would refer her to me.
24 Q. What is this person's name?
25 A. Nicole.

1    THE COURT: Would this be a convenient place to take
2  our morning break?
3    MR. FINKEL: It would, your Honor.
4    THE COURT: We will take a 15-minute break.
5    (Jury exits courtroom)
6    (Continued on next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    THE COURT: Please be seated.
2    Mr. Finkel, you want to continue to make your
3  observation?
4    MR. FINKEL: Yes, your Honor. Thank you.
5    The other issue is the government expects, depending
6  on the length of the cross of Mr. Cejovic, to call this
7  afternoon Jessica Fyfe. Jessica Fyfe, as your Honor knows, is
8  the individual with whom the government seeks to introduce an
9  excited utterance.
10   THE COURT: Yes.
11   MR. FINKEL: I believe Detective Slevin laid in part a
12 foundation to allow that excited utterance in. Later today the
13 government will intend to do the same with Ms. Fyfe. My plan,
14 and I seek the Court's guidance on this, I don't want to elicit
15 a comment if the Court is going to sustain the objection, is to
16 simply ask the Court if I may proceed before asking the
17 question, What, if anything, did you tell the detectives that
18 day? Is that a suitable plan for the parties and the Court?
19   MS. SIDERIS: If I remember, the statement the
20 government would like to elicit is what Ms. Fyfe yelled at the
21 time she first saw Ogno's body.
22   THE COURT: That's my recollection too. That's what
23 she told Detective Slevin who didn't arrive until much later.
24   MR. FINKEL: Your Honor, there are two excited
25 utterances. Both happened approximately about an hour after

1  she discovered the body. As Detective Slevin mentioned
2  yesterday, when he spoke with Ms. Fyfe, she seemed distraught,
3  I think he said very distraught. It was during that time that,
4  as Ms. Fyfe will explain, in her moment of being very
5  distraught and upset, understandably so, she just started
6  saying a lot of things, including that, it was Paul, it was
7  Paul. And that was within the hour of seeing, as a shock, when
8  she broke down the door by force to get into her boyfriend's
9  room and saw his dead body lying there.
10   So as the government has briefed, and I know your
11 Honor has reserved a ruling on this, we think that Ms. Fyfe,
12 along with Detective Slevin's testimony, will lay an adequate
13 foundation and indicate to the Court that this is a proper
14 excited utterance that is allowed to be admitted under Federal
15 Rules of Evidence.
16   MS. SIDERIS: What the government has proffered is,
17 yes, Ms. Fyfe was excited. It was a startling event. But the
18 Second Circuit has said that alone is not enough to overcome
19 the hearsay exception. The substance of what she is saying is
20 based on no knowledge. Detective Slevin did not testify as to
21 what Ms. Fyfe knew that day about Mr. Ogno's drug use, or even
22 at all what she knew, or the day before.
23   THE COURT: Are you finished, Ms. Sideris?
24   MS. SIDERIS: No. It's not enough that Ms. Fyfe was
25 excited or that it was a startling event. The substance of her

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

**CORRECTED**
May 9, 2019

1  statement is one that would require knowledge. She is saying,
2  It was Paul, based on knowledge she had from months ago, if I
3  understand, or at least one month ago. If her excited
4  utterance was, Oh, my God, he's dead, yes, that would be a
5  proper hearsay exception and excited utterance.
6          The case that we cited in our motion on this issue was
7  an excited utterance of someone observing a shooting. And
8  there the Second Circuit said that doesn't come in because
9  there is no evidence that the person speaking could see what
10 she was excitedly uttering.
11         MR. FINKEL: Your Honor, that Second Circuit case is
12 distinguishable, as we laid out in our papers. What the Second
13 Circuit requires, and what Ms. Fyfe will demonstrate to the
14 Court, I believe later this afternoon, is that she did have
15 some personal knowledge. And all the Court needs to determine
16 is that a reasonable trier of fact can determine that she had
17 some personal knowledge of those facts.
18         THE COURT: I am going to read the papers again and
19 see what I said in my decision. I will let you know right
20 after lunch. That's long before Ms. Fyfe is going to take the
21 stand.
22         MR. FINKEL: My point was that, I understood the
23 Court's ruling to be that it was reserved depending on what Ms.
24 Fyfe testifies to, and I was merely raising this to say that I
25 am going to try to lay the foundation.

1          THE COURT: I understand.
2          MS. SIDERIS: Your Honor, if I may, just one comment.
3  I don't expect that Ms. Fyfe will have any knowledge of Michael
4  Ogno's activities that day.
5          MR. FINKEL: Your Honor, that is not the standard.
6  What counsel is talking about is appropriate cross-examination,
7  and that's why Ms. Fyfe will be on the stand. So that they can
8  challenge Ms. Fyfe's excited utterance. This is not a
9  situation in which the witness is unavailable. The witness is
10 here and will be subject to cross-examination, and I am sure
11 that defense counsel will try to get that out on cross. But
12 the issue is whether or not the federal rules provide a basis
13 here to allow the excited utterance in, and as we briefed, I
14 think the answer to that is yes.
15         Two other brief points, if I may?
16         THE COURT: Yes.
17         MR. FINKEL: With respect to Ms. Fyfe in addition,
18 yesterday defense counsel for Mr. Van Manen put on the
19 record -- this is at 381 of the transcript -- that we do not
20 believe we can elicit this information from Ms. Fyfe. That's
21 the information of the statement that was allegedly made by
22 Anthony Ogno to Jessica Fyfe, which your Honor has ruled is
23 hearsay.
24         So based on counsel's statement, it's my
25 understanding, it's the government's understanding, that they

1  will not try to cross Ms. Fyfe, in the way they tried to cross
2  Detective Slevin yesterday, about the statements made by
3  Anthony Ogno, or may have been made by Anthony Ogno, because
4  they have stated to this Court that they do not believe they
5  can elicit that information from Ms. Fyfe. I just want to put
6  that on the record.
7          MS. SIDERIS: Your Honor, the substance of that
8  statement the Court has ruled on. The events of the
9  investigation and her interaction, meetings that she had, that
10 is fair for cross-examination.
11         MR. FINKEL: To be clear, the government doesn't
12 object to questions about, Did you meet with detectives? When
13 did you meet with detectives? What the government objects to
14 are insinuations about, And you told the detectives this,
15 correct? And the detectives told you that, correct? That is
16 improper hearsay. And my understanding, based on defense
17 counsel's comment yesterday, they do not intend to elicit that.
18 So I just wanted to put that on the record and make that clear.
19         MS. SIDERIS: I do not intend on eliciting or
20 injecting the statement that Anthony Ogno -- didn't Anthony
21 Ogno tell you X? The Court ruled on that issue. The
22 government mentioned trying to elicit like the defense tried to
23 elicit testimony from the detective. I am not entirely sure
24 what that means. As I said yesterday, I believe that was a new
25 information and would have been a different exception to the

1  hearsay, or it wasn't hearsay. So I am not sure I am entirely
2  following the government. But I do understand the Court's
3  ruling was that the statement can't come in.
4          THE COURT: Thank you. I am better informed.
5          MR. FINKEL: The last point, your Honor, and this is
6  very brief.
7          THE COURT: I hope so. We are supposed to take a
8  break. I need a break too.
9          MR. FINKEL: When the government offered a bunch of
10 recordings on the CDs with Mr. Sullivan, in reviewing and
11 confirming everything on the transcript is correct, the
12 government learned that there were four exhibits which were not
13 on the CDs, and therefore are not offered into evidence, and we
14 ask that they be withdrawn. They are 301AL, 301BM, 303C, and
15 303G. Since they were not offered, we just ask that the record
16 reflect that they are not in evidence.
17         THE COURT: The record will reflect that.
18         MR. FINKEL: Thank you, your Honor.
19         THE COURT: See you in five minutes.
20         (Recess)
21         MS. FENDER: Should we get the witness up on the
22 stand, your Honor.
23         THE COURT: Yes, please.
24         Hold on for a second.
25         MS. SIDERIS: We are just waiting on Ms. O'Neill, your

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1　Honor.
2　　(Jury present)
3　JASMIN CEJOVIC, resumed.
4　　　THE COURT: Please be seated.
5　　Mr. Finkel.
6　　　MR. FINKEL: Ms. Dunbar, if you can put back up 303K,
7　which is in evidence.
8　BY MR. FINKEL:
9　Q. Do you see the text message on your screen, Mr. Cejovic?
10　A. Yes.
11　Q. When Mr. Charlton said, "I told her 50, her name is
12　Nicole," what did you understand 50 to mean?
13　A. It was $50 for a bundle.
14　　　MR. FINKEL: We can take that down.
15　　If we can put up for the witness what has been marked
16　as Government Exhibit 108.
17　Q. Do you recognize that individual?
18　A. Yes.
19　Q. Who is that?
20　A. Shaun Sullivan.
21　　　MR. FINKEL: The government offers 108.
22　　　MS. O'NEILL: No objection.
23　　　MS. SIDERIS: No objection.
24　　　THE COURT: 108 is in evidence.
25　　(Government's Exhibit 108 received in evidence)

1　　　MR. FINKEL: If we can publish it, please.
2　BY MR. FINKEL:
3　Q. You mentioned him a few times before during your testimony,
4　is that right?
5　A. Yes.
6　Q. Have you met Mr. Sullivan?
7　A. Yes.
8　Q. How many times?
9　A. 20 times.
10　Q. Did you ever have interaction with him -- withdrawn.
11　　Did there come a time, if ever, when you exchanged
12　heroin with him?
13　A. Yes.
14　Q. How many times?
15　A. Two times.
16　Q. Can you tell us about the first time?
17　A. The first time, I called Dino to pick up my heroin off him.
18　Q. You called Dino to pick up your heroin off who?
19　A. Off Dino. Off Dino at the moment. It was 40 to 60
20　bundles, around that range. And Dino was busy doing something,
21　so Dino referred me to go see Shaun, because Shaun was holding
22　the heroin for him. Shaun was doing a favor for Dino. So I
23　went to go see Shaun myself.
24　Q. Where did you see Shaun?
25　A. I seen Shaun in Staten Island, New York, on Forest Ave.

1　Q. What year was that?
2　A. 2016.
3　Q. What happened the second time you saw Mr. Sullivan with
4　respect to heroin?
5　A. I saw Shaun Sullivan for the same reason.
6　Q. What reason was that?
7　A. Shaun Sullivan was doing a favor for Medin Dino Kosic.
8　Q. Can you explain what you mean by Shaun Sullivan was doing a
9　favor for Mr. Kosic?
10　A. Shaun was holding the bundles for Medin Dino Kosic to see
11　me.
12　Q. Mr. Sullivan gave you bundles at that time?
13　A. Correct. Yes.
14　Q. What time period was that, the second time you picked up
15　heroin, per Mr. Kosic's instructions, from Mr. Sullivan?
16　A. Around the same time I seen Shaun the first time, 2016, I
17　think the same week.
18　Q. Let's talk a bit more about your sale of heroin.
19　　What, if anything, did your customers tell you about
20　the heroin you sold?
21　A. It was good heroin.
22　Q. Did they tell you whether or not it reminded them of anyone
23　else's heroin?
24　A. Yes.
25　Q. What did your customers tell you about whether or not the

1　heroin you sold them reminded them of anyone else's heroin?
2　A. My customers -- well, one of my customers said that my
3　heroin looked like Paul Van Manen's heroin.
4　Q. What did that customer say the similarities were between
5　your heroin and Mr. Van Manen's heroin?
6　A. Same color bags, the heroin tastes the same, and the bags
7　are the same size.
8　Q. What was your reaction to that customer when he told
9　you -- let me take a step back for a second.
10　　When your customers would tell you that your heroin
11　was good, what did that mean?
12　A. It got them high.
13　Q. When that customer told you that he believed your heroin
14　was similar to Paul Van Manen's heroin, what reaction did you
15　have to that customer, if any?
16　A. I wasn't surprised.
17　Q. Why were you not surprised?
18　A. Because I was in the area where Paul Van Manen sold heroin.
19　Q. Did you also have an understanding of where Paul Van Manen
20　got his heroin from?
21　A. Yes.
22　Q. Is that the same place you got your heroin from?
23　A. Yes.
24　Q. What did you say to that customer after he told you that
25　your heroin was similar to Paul Van Manen's heroin?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

J598VAN1          Cejovic - Direct          Page 563

1 A. I said, Oh, really, I don't know who that is.
2 Q. Was that true?
3 A. Yes.
4 Q. You didn't know who that was?
5 A. No, that's not true. I lied to the customer.
6 Q. Why did you lie to the customer?
7 A. Because I didn't want the customer to know that I knew Paul
8   Van Manen.
9 Q. Did there come a time, if ever, when you reached out
10  directly to Paul Van Manen to acquire heroin from Mr. Van
11  Manen?
12 A. Yes.
13 Q. How did you do that?
14 A. Well, I called Paul Van Manen through Facebook Messenger to
15  look for Dino Medin Kosic because Medin Kosic wasn't answering
16  none of our phone calls.
17 Q. Let me stop you right there.
18     Did you speak to Mr. Van Manen on Facebook Messenger
19  or did you speak to him on the phone?
20 A. On the phone, but through Facebook Messenger, through the
21  app.
22 Q. Through the app?
23 A. Yes.
24 Q. What did you ask Mr. Van Manen when you spoke to Mr. Van
25  Manen on the Facebook app?

J598VAN1          Cejovic - Direct          Page 564

1 A. I asked him if he seen Dino, and he said he hasn't. We
2   were talking about Dino.
3 Q. Did Mr. Van Manen ask you who Dino was?
4 A. No.
5 Q. OK. Sorry. Continue.
6 A. Paul Van Manen said he don't know where Dino is. We got
7   into -- I don't know what else we talked about, me and Paul Van
8   Manen, but then I asked Paul Van Manen if he had another
9   connect, another supplier of heroin.
10 Q. What did Mr. Van Manen say?
11 A. He said he's trying to get -- Paul Van Manen said he's
12  trying to get heroin, he'll let me know.
13 Q. Why did you reach out to Mr. Van Manen to try to get in
14  contact with Dino?
15 A. 'Cause I knew Dino supplied Paul Van Manen.
16 Q. Mr. Cejovic, have you ever sold or given heroin that you
17  obtained from Anthony or the guy on the Lower East Side or from
18  O to Mr. Van Manen?
19 A. No.
20 Q. Mr. Cejovic, do you know an individual who is known by the
21  name Chopper?
22 A. Yes.
23 Q. What is the nature of your relationship between you and
24  Chopper?
25 A. He was a customer.

J598VAN1          Cejovic - Direct          Page 565

1 Q. How did you meet him?
2 A. I don't remember how I met him.
3 Q. Do you remember when you met him?
4 A. Yes.
5 Q. When?
6 A. 2016, I think in the summer.
7     MR. FINKEL: If I can ask the Court and the jury to
8   turn in their packet, skip the next transcript, and go to 306B.
9     THE COURT: What is the date?
10    MR. FINKEL: Your Honor, the date is November 28,
11  2017. And this is a call at approximately 1802, 6:02 p.m. And
12  this is a call between numbers ending in 9263 and 4957.
13    (Audio played)
14    MR. FINKEL: Stop right there, please.
15 BY MR. FINKEL:
16 Q. Mr. Cejovic, the individual using the 9263 number who said
17  hello, did you recognize that voice?
18 A. Yes.
19 Q. Whose voice is that?
20 A. Dino.
21 Q. And the individual using 4957 number who said, "Yeah, I
22  need to see you," whose voice is that?
23 A. Me.
24 Q. What does that mean, "I need to see you"?
25 A. I needed to see -- to my knowledge, the way me and Dino

J598VAN1          Cejovic - Direct          Page 566

1   spoke, I was saying I needed to see him for heroin.
2     MR. FINKEL: Ms. Dunbar, if you can start again from
3   the beginning and play.
4     (Audio played)
5     MR. FINKEL: Stop there.
6 Q. Mr. Cejovic, when you said you need to see him just for 12,
7   what does 12 mean?
8 A. 12 bundles.
9     MR. FINKEL: Keep playing.
10    (Audio played)
11 Q. What did that mean at the end, "I just spoke to this lady,"
12  that you said?
13 A. I think -- give me a second.
14 Q. Take your time.
15 A. What day was it? I think I was -- I think I was going to
16  see this therapist, and I told him I spoke to this lady for
17  something. I forgot what it was.
18 Q. That lady wasn't about a customer for heroin?
19 A. No, no, no.
20 Q. Earlier during your testimony we listened to Exhibit 306A,
21  in which you said you need 52. I believe you said that that
22  was 52 bundles of heroin, is that right?
23 A. Yes.
24 Q. And that was November 27, 2017. Is that the day before
25  this call on November 28, 2017?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1 A. You said November 27, 2017?
2 Q. So that call in which you referenced the 52, that was
3 November 27, 2017, and this call we just listened to, GX 306B,
4 is from November 28, 2017. That's the next day, right?
5 A. Yes.
6 Q. What happened to those 52 bundles if now you're asking Dino
7 for an additional 12?
8 A. I sold the 52 bundles.
9         MR. FINKEL: At this time, the government will read a
10 stipulation into the record. It's Government Exhibit 512.
11         THE COURT: All right.
12         MR. FINKEL: This is a stipulation concerning foreign
13 language translation.
14         It is hereby stipulated and agreed by the parties:
15         Government Exhibit 306E-T is a true and accurate copy
16 of a transcript and translation of the recording marked as
17 Government Exhibit 306E.
18         Government Exhibit 306F-T is a true and accurate copy
19 of a transcript and translation of the recording marked as
20 Government Exhibit 306F.
21         It is further stipulated and agreed that this
22 stipulation, which is Government Exhibit 512, and Government
23 Exhibits 306E-T and 306F-T may be received into evidence.
24         Your Honor, at this time the government offers 512,
25 306E-T and 306F-T.

1         MS. O'NEILL: No objection.
2         MS. SIDERIS: No objection.
3         THE COURT: They will be received in evidence.
4         (Government's Exhibits 512, 306E-T and 306F-T received
5 in evidence)
6 BY MR. FINKEL:
7 Q. Mr. Cejovic, what languages do you speak?
8 A. English and Albanian.
9 Q. To your knowledge, what languages do Mr. Kosic speak?
10 A. English and Albanian.
11         MR. FINKEL: If I can ask the Court and the jury to
12 turn to the next transcript in their packet, which is 306F-T.
13 And this is a call dated November 28, 2017, at approximately
14 1930, 7:30, and it's between the 9263 number and the 4957
15 number.
16         Ms. Dunbar, if you can play it, please.
17         I will just direct the jury -- well, we can play it.
18         (Audio played)
19         MR. FINKEL: Pause it right there.
20 BY MR. FINKEL:
21 Q. The individual who said "hello" in the beginning, with the
22 9263 number, whose voice is that?
23 A. Dino.
24 Q. And the individual who said, "What's the deal," with the
25 4957 number, whose voice is that?

1 A. Me.
2         MR. FINKEL: Ms. Dunbar, if you can start again and
3 play it.
4         (Audio played)
5         MR. FINKEL: Let's stop it right there.
6 BY MR. FINKEL:
7 Q. Mr. Cejovic, is this a phone call soon after the call we
8 just listened to about the 12 that you needed from Mr. Kosic?
9 A. I think so.
10 Q. And when Mr. Kosic is saying that he can't do that for you,
11 what did you understand that to mean?
12 A. To my knowledge, he thinks I don't have the money for the
13 12 bundles.
14 Q. When you said, "I got the bread," what did that mean?
15 A. I have the money.
16         MR. FINKEL: Keep playing.
17         (Audio played)
18         MR. FINKEL: Pause it right there.
19 Q. What language was Mr. Kosic just speaking?
20 A. Albanian.
21         MR. FINKEL: I will direct the jury and also let the
22 Court know that this has two columns, and the column on the
23 right represents the Albanian language transcript and the
24 English translation, which the parties stipulated to, is on the
25 left.

1 Q. Mr. Cejovic, can you read what Mr. Kosic said, which is at
2 line 12 on 306F-T?
3 A. Give me one second.
4 Q. In English, please.
5 A. Which packet?
6 Q. 306F-T.
7         MR. FINKEL: May I approach, your Honor.
8         THE COURT: Yes, you may.
9         MR. FINKEL: I am handing the witness 306F-T.
10 A. Thank you.
11         OK. All right.
12 Q. Do you see that on line 12?
13 A. Line 12. Yes.
14 Q. Can you read the English, please?
15 A. "Who else bro had a store by..."
16 Q. Line 12, please.
17 A. Line 12?
18         THE COURT: It starts with the word Dino.
19 A. Dino right there. It says, "Who else bro had a store
20 by..."
21 Q. I think you're on page 3. Page 2.
22 A. Page 2. I'm sorry.
23         "All right. I'm calling right now with the one that
24 had the store by your house."
25         MR. FINKEL: Keep playing, Ms. Dunbar.

J598VAN1      Cejovic - Direct      Page 571

1      (Audio played)
2      MR. FINKEL: Pause right there.
3 Q. Mr. Cejovic, can you keep reading in English what you said.
4      Line 17.
5 A. "What happened?"
6 Q. What did Mr. Kosic respond at line 18?
7 A. "Who had the store bro?"
8 Q. What did you respond at line 20?
9 A. "Had the store, where? What you talkin about?"
10 Q. Then what did Mr. Kosic say?
11 A. "Down by your mum's place bro."
12      MR. FINKEL: Ms. Dunbar, can you keep playing.
13      (Audio played)
14      (Continued on next page)

J592van2      Cejovic - Direct      Page 572

1 Q. Mr. Cejovic, who had the store down by your mom's house?
2 A. Paul Van Manen.
3 Q. To your understanding, when you are on this call, who was
4      Mr. Kosic referring to at that time?
5 A. Paul Van Manen.
6      MR. FINKEL: Ms. Dunbar, keep playing.
7      (Audio played)
8      MR. FINKEL: Let's pause it right there.
9 BY MR. FINKEL:
10 Q. Mr. Cejovic, can you read at line 6 in English what
11      Mr. Kosic said?
12 A. On page 2 or 3?
13 Q. Page 3 now. Thank you.
14 A. Okay. "I didn't say it's right over there. You will see
15      that man."
16 Q. And what did -- and what did you say in response?
17 A. "Which man you talking about?"
18 Q. And what did Mr. Kosic say in response?
19 A. "Who else, bro, had a store by?"
20 Q. And what man was Mr. Kosic talking about?
21 A. Paul Van Manen.
22      MR. FINKEL: Ms. Dunbar, keep playing, please.
23      (Audio played)
24      MR. FINKEL: Stop right there, please.
25 BY MR. FINKEL:

J592van2      Cejovic - Direct      Page 573

1 Q. Mr. Cejovic, to your knowledge, why didn't Dino just say
2      Paul Van Manen?
3 A. He didn't want to say his name over the phone.
4 Q. Why wouldn't, to your knowledge, Dino want to say Paul
5      Van Manen's name over the phone?
6 A. Because Paul Van Manen was a drug dealer.
7 Q. And I believe you said a moment later in the call that you
8      were in the city. What did that mean?
9 A. I was in Manhattan.
10 Q. Can you just explain what, to your knowledge, Mr. Kosic was
11      trying to communicate to you and why he was trying to refer to
12      Mr. Van Manen on this call on November 28 in the evening, at
13      8:25?
14 A. To my knowledge, that day, somebody -- a customer of mine
15      needed heroin, so Dino didn't have no more heroin on him, and
16      Paul Van Manen had the rest of the heroin. So he was going to
17      have -- I was going to have somebody go see Paul through Dino.
18 Q. And how was this all arranged?
19 A. I called Dino. I asked him -- I think it was ten, 12
20      bundles I asked him, and then Dino said, I have nothing on me.
21      Paul has the rest. But he didn't say his name to me. He
22      referred me to the guy who has a store by the house has it. So
23      I told him I'm going to have my customer go see Paul, go grab
24      it from him.
25 Q. And that was Chopper?

J592van2      Cejovic - Direct      Page 574

1 A. Yeah, that was Chopper.
2 Q. If we can turn to the next transcript in the packet, this
3      is 306U, and this is a call from that same day, November 28,
4      2017, at 2013, so just a bit later that night.
5      I just want to make sure the jury has the transcripts
6      they need, finding what they need.
7      THE COURT: What's the number again, Mr. Finkel?
8      MR. FINKEL: It is 306UT, and it is November 28 at
9      2013.
10      THE COURT: Thank you.
11 BY MR. FINKEL:
12 Q. This is a call between the 9263 number and the 4957 number.
13      MR. FINKEL: Ms. Dunbar, could you play it, please?
14      (Audio played)
15      MR. FINKEL: Stop it right there.
16 BY MR. FINKEL:
17 Q. Mr. Cejovic, the individual using the number 9263, do you
18      recognize that voice who said, "yeah," in the beginning of the
19      call?
20 A. Yes.
21 Q. Who is that?
22 A. Dino.
23 Q. And the individual using the 4957 number who said "yeah,
24      listen, it's going to be after 10," whose voice is that?
25 A. Me, my voice.

---

1          MR. FINKEL: Ms. Dunbar, keep playing.
2          (Audio played)
3     BY MR. FINKEL:
4  Q. This is a call from November 28, 2017, right?
5  A. Yes.
6  Q. That same day?
7  A. Yes.
8  Q. And during this call, at line 6 in the transcript, you
9     said, "Is that cool?  So let him know, please," who is the
10    "him" that you were referring to in Exhibit 306U?
11  A. Paul Van Manen.
12  Q. And what did you understand Dino to mean when he said "you
13    might have to go to Jersey"?
14  A. I might have to go to Jersey to pick up the heroin.
15  Q. Who, to your knowledge, was in Jersey?
16  A. Paul Van Manen.
17          MR. FINKEL: If the jury and the court can turn to
18    what should be the next transcript in your packet which is
19    306C, and this is a call from that same day, November 28, 2017,
20    just a bit later at 2025.
21          THE COURT: 306V?
22          MR. FINKEL: 306C.
23          Ms. Dunbar, if you could play that call, please.
24          (Audio played)
25          MR. FINKEL: Pause it right there.

---

1     BY MR. FINKEL:
2  Q. Whose voice is that that said "all right, he's going after
3     10, right" using the 4957 number?
4  A. My voice.
5  Q. And whose voice is, "yeah, that's what he said," using the
6     9263 number?
7  A. Dino.
8          MR. FINKEL: Ms. Dunbar, please continue.
9          (Audio played)
10          MR. FINKEL: Stop right there, please.
11     BY MR. FINKEL:
12  Q. When Mr. Kosic said "let me call him now, man," who was the
13    "him," to your knowledge, that Mr. Kosic was referring to?
14  A. Paul Van Manen.
15  Q. And what did you mean when you said -- when you used an
16    expletive, "he's my dude.  He is Gucci"?  Who are you referring
17    to?
18  A. Chopper.
19  Q. And why were you explaining that he is your dude?
20  A. He was a good customer and he is not all out there like
21    making things obvious what we were doing.
22  Q. What do you mean by "he is Gucci"?
23  A. He is good.
24          MR. FINKEL: Can you keep playing that?
25          (Audio played)

---

1          MR. FINKEL: If I could ask the jury and the court to
2     turn to what should be the next transcript in their packet,
3     which is 306V.  This was on November 28, 2017, at 2020, so just
4     a few minutes prior, and this is a call between the numbers
5     9263 and 9918.
6          Ms. Dunbar, if you could play that call, please.
7          (Audio played)
8          MR. FINKEL: Pause it right there, please.
9     BY MR. FINKEL:
10  Q. Mr. Cejovic, do you recognize the voice using the 9918
11    number that said, "Yeah, what up, kid"?
12  A. When he said "yo" I didn't recognize it.  After I recognize
13    it.
14  Q. Okay, and whose voice was that?
15  A. Paul Van Manen.
16  Q. And the voice who said "hello" using the 9263 number, did
17    you recognize that voice?
18  A. Yes.
19  Q. Whose?
20  A. Dino.
21          MR. FINKEL: Ms. Dunbar, can you roll it back a few
22    seconds and play it?
23          (Audio played)
24          MR. FINKEL: If we could turn to the next transcript
25    in the packet, this is Government Exhibit 306G.  This is a call

---

1     from that same night, November 28, 2017.  This is a few minutes
2     later at 2027, and it's a call between the 9263 number and the
3     9918 number.
4          Ms. Dunbar, if you could play that, please.
5          (Audio played)
6          MR. FINKEL: Could you pause it right there.
7     BY MR. FINKEL:
8  Q. Mr. Cejovic, the individual using the 9918 number who said
9     "after 10 what do you mean," whose voice is that?
10  A. Paul Van Manen.
11  Q. And the individual using the 9263 number who said, "yeah,
12    you going to be there after ten?" whose voice is that?
13  A. Dino.
14          MR. FINKEL: Ms. Dunbar, if you could roll it back
15    about five seconds and play it to the end.
16          (Audio played)
17     BY MR. FINKEL:
18  Q. Mr. Cejovic, did you hear Dino's reference to 12?
19  A. Yes.
20          MR. FINKEL: If I can ask the jury to turn to what
21    should be the next transcript in their packet, which is 306I.
22    I just want to make sure the members of the jury have the
23    packets they need or are finding the transcripts they need.
24          I am handing a juror a transcript.
25          So this is 306I.  This is a call from that same

---

J592van2      Cejovic - Direct      Page 579

1  evening, November 28, 2017. This is at 2045, 8:45, and it is
2  between the 9263 number and the 4957 number. It is about 18
3  minutes later.
4        Ms. Dunbar, please play the call.
5        (Audio played)
6  BY MR. FINKEL:
7  Q. Who are the voices on that call, Mr. Cejovic?
8  A. My voice and Dino.
9  Q. And the "he" that you and Mr. Kosic are referring to, who
10  is the "he" that you are referring to in 306I, which is the
11  call from November 28 at 2045?
12  A. Paul Van Manen.
13        MR. FINKEL: I am going to ask the jury and the court
14  to turn to what should be the next transcript in your packet.
15        I am handing one of the jurors the rest of the
16  packets. This is 306AA, and it is the same evening, November
17  28, 2017, at 2202 and it is a call -- and the number is 9263 is
18  and 9918.
19        Ms. Dunbar, can you play that, please.
20        (Audio played)
21  BY MR. FINKEL:
22  Q. Do you recognize the voices on that call, Mr. Cejovic?
23  A. Yes.
24  Q. Who?
25  A. Dino's voice and Paul Van Manen.

J592van2      Cejovic - Direct      Page 580

1        MR. FINKEL: If we can turn to the next transcript in
2  the packet, which should be 306AB. This is a call from that
3  same evening at 2236, about 34 minutes later. And this is
4  between the 9263 and 4957 numbers.
5        Ms. Dunbar, can you play it, please?
6        (Audio played)
7  BY MR. FINKEL:
8  Q. Mr. Cejovic, whose voices are on that call?
9  A. My voice and Dino.
10  Q. And when you said -- am I correct that you said: "What's
11  the deal? Can he go yet?"
12  A. I was referring to Chopper.
13  Q. Is the "he"?
14  A. Yes.
15  Q. And where were you asking if Chopper could go?
16  A. To see Paul Van Manen in Jersey.
17        MR. FINKEL: If we can turn to the next transcript in
18  the packet, it is 306D. This is the same evening, November 28,
19  2017, at 2318, and it is between the 9263 and 4957 numbers.
20        Ms. Dunbar, can you play that, please?
21        (Audio played)
22  BY MR. FINKEL:
23  Q. Mr. Cejovic, who are the voices on that call?
24  A. My voice and Dino.
25  Q. And what is Dino telling you?

J592van2      Cejovic - Direct      Page 581

1  A. He is telling me -- let me read this one more time. Sorry.
2        He is telling me Paul Van Manen sees Chopper by the
3  white truck. He is waiting outside looking at him, looking at
4  Chopper.
5  Q. While you were talking to Dino, how were you communicating,
6  if at all, with Chopper?
7  A. Through text or another phone at that time. I don't
8  exactly remember.
9        MR. FINKEL: If the jury and the court can turn to the
10  next -- what should be the next transcript in your packet. This
11  is 306AF, same evening, November 28, 2017, at 2322, it is about
12  four minutes later, this is between the 9263 and 4957 numbers.
13        Ms. Dunbar, can you play that call, please?
14        (Audio played)
15  BY MR. FINKEL:
16  Q. Mr. Cejovic, who are the voices on that call?
17  A. My voice and Dino.
18  Q. What was the reference to 119?
19  A. The motel room that Paul Van Manen was in.
20  Q. What do you mean by that?
21  A. At that time he was living in a motel.
22  Q. In Room 119?
23  A. Yeah. To my knowledge, yes.
24  Q. Did you come to have a discussion with Chopper about what
25  transpired, if anything, between him and Paul Van Manen on the

J592van2      Cejovic - Direct      Page 582

1  evening of November 28, 2017?
2  A. Yes.
3  Q. What did Chopper tell you?
4  A. Chopper said everything went well, the bags, nothing was
5  missing. He gave him the cash.
6        MS. SIDERIS: Objection.
7  A. He gave Paul Van Manen the cash.
8        THE COURT: Overruled.
9  A. He gave Paul Van Manen the cash and everything went well.
10  Q. Generally speaking, what happened to the heroin business in
11  the fall of 2017?
12  A. Of Paul's heroin business?
13  Q. No, just overall.
14  A. Overall?
15  Q. Overall heroin business in the fall of 2017, what happened?
16        MS. SIDERIS: Objection.
17        THE COURT: Overruled.
18  Q. Based on your knowledge.
19  A. Based on my knowledge, things started going downhill.
20  Q. What do you mean by that?
21  A. We -- me and Dino figured we were being followed by police.
22  While we were driving to go pick up drugs, make sales, even
23  just to take a casual drive anywhere, we were being followed by
24  police, and people were getting arrested.
25  Q. Was anything else happening that caused the business to

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1     slow down a bit in the fall?
2  A. To my knowledge -- people got arrested, yeah. I was losing
3     customers also.
4  Q. Why?
5  A. They started buying from other people or they got clean.
6  Q. Any other reasons?
7  A. To my knowledge, that's about it.
8  Q. Do you know an individual named Thomas Masseria?
9  A. Yes.
10  Q. How did you first meet him?
11  A. I met him through this guy Colombia.
12  Q. A person named Colombia?
13  A. I'm sorry?
14  Q. A person named Colombia?
15  A. Yeah.
16  Q. Can you describe generally your relationship with Thomas?
17  A. At first he was a customer of mine and then, as we seen
18     each other more, we built a friendship.
19  Q. I want to direct your attention to September -- the month
20     of September in 2016. Were you selling heroin in September of
21     2016 to Tom Masseria?
22  A. Yes.
23  Q. What, if anything, happened to Tom in September of 2016?
24  A. I -- he passed away due to heroin.
25  Q. Where did he get the heroin from?

1  A. From me.
2  Q. Did you admit your culpability to Mr. Masseria's death as
3     part of your plea agreement with the government?
4  A. Yes.
5  Q. Now, Mr. Cejovic, when you were first arrested in this
6     case, what crimes were you charged with when you were first
7     arrested?
8  A. I was arrested for conspiracy to sell heroin and fentanyl.
9  Q. What was the mandatory minimum amount of time that you
10     faced as a result of that charge when you were first arrested?
11  A. Mandatory minimum of ten years and max life.
12  Q. To your knowledge, how did the government learn that the
13     heroin you sold to Mr. Masseria caused his death?
14  A. I told them about it.
15  Q. After you told the government about selling heroin to
16     Mr. Masseria, what happened to your charges?
17  A. I got charged for selling heroin to Thomas Maas.
18  Q. As a result, did the mandatory minimum you were facing
19     change?
20  A. Yeah.
21  Q. I want to talk about some of the other crimes you have
22     committed. As part of your cooperation with the government,
23     were you required to disclose all of the other crimes you have
24     committed?
25  A. Yes.

1  Q. We discussed earlier that you sold some drugs, right?
2  A. Yes.
3  Q. How long did you sell cocaine for?
4  A. Since 2013 to 2018 -- to my arrest, 2018.
5  Q. Approximately how much in total cocaine did you sell?
6  A. 20 kilos?
7  Q. What about Xanax? Did you sell Xanax?
8  A. Yes.
9  Q. Approximately how much Xanax did you sell?
10  A. About 4,000 pills.
11  Q. Did you sell MDMA?
12  A. Yes.
13  Q. How much?
14  A. Ten kilos.
15  Q. Did you sell marijuana?
16  A. Yes.
17  Q. How much?
18  A. 20 pounds.
19  Q. Did you sell oxy?
20  A. Yes.
21  Q. How much?
22  A. About 3 to 4,000 pills, that range.
23  Q. Did you tell LSD also and mushrooms?
24  A. Yes.
25  Q. What drugs have you used?

1  A. Cocaine, Xanax, Percocets, and marijuana, I did mushrooms
2     before and MDMA.
3  Q. Have you taken oxy before?
4  A. Yeah.
5  Q. Oxycodone?
6  A. Yeah.
7  Q. To your knowledge how did the government find out about the
8     extent of your drug dealing and your drug use?
9  A. I told them about it.
10  Q. Were there occasions when the police tried to arrest you
11     and you lied to the police about whether you had drugs on you?
12  A. Yes, a few occasions.
13  Q. Did one of those occasions involve crack?
14  A. Yes.
15  Q. How many fights have you been in?
16  A. A hundred, maybe more.
17  Q. Did there come a time where you got into a fight near
18     Mr. Van Manen's deli?
19  A. Yes.
20  Q. Did anyone use weapons in that fight?
21  A. Yes.
22  Q. Did you use a weapon in that fight?
23  A. No, I didn't.
24  Q. Did you hit anyone in that fight?
25  A. Yes.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1 Q. Have you ever used a weapon in a fight?
2 A. Yes, one time.
3 Q. Who did you hit with a weapon?
4 A. A lady.
5 Q. She go to the hospital to your knowledge?
6 A. No.
7 Q. Did you ever use a weapon any other time?
8 A. No.
9 Q. During that fight when the police -- did the police arrive?
10 A. Yes.
11 Q. What kind of weapon did you use, by the way?
12 A. It was a stick.
13 Q. When the police arrived, what did you do?
14 A. I ran.
15 Q. Have you ever been arrested for violence in your home?
16 A. Yes.
17 Q. What about stealing? Have you ever been involved in a
18   burglary?
19 A. Yes.
20 Q. How old were you?
21 A. I think 22, 23. Around that age.
22 Q. What was your part in the burglary?
23 A. Just a lookout.
24 Q. And what did the other people you burglarized the place
25   with do?

1 Q. What were the circumstances that you used a gun?
2 A. I shot a gun in a park.
3 Q. At what?
4 A. At bottles.
5 Q. How old were you?
6 A. I think 22, 23 around that time, same age.
7 Q. Why did you shoot a gun in a park at bottles?
8 A. It was my friend's birthday and we decided to do it.
9 Q. Did you ever own a gun?
10 A. No, never.
11 Q. Did you ever drive a car without a license?
12 A. Yes.
13 Q. Did you ever have a driver's license?
14 A. No.
15 Q. Have you ever been in a car accident?
16 A. Yes, a few times.
17 Q. While you were driving?
18 A. Yes.
19 Q. Did you flee the scene?
20 A. Yes.
21 Q. Did you ever get into a car accident as a result of an
22   argument with your girlfriend?
23 A. Yes.
24 Q. What exactly happened?
25 A. I was -- that day I was going to go pick up heroin in

1 A. They stole cash.
2 Q. From who?
3 A. From a stripper we knew.
4 Q. From her home?
5 A. Yeah, from her home.
6 Q. Were any weapons involved in that?
7 A. Just a crowbar to open the door.
8 Q. Did you use the crowbar?
9 A. No.
10 Q. How much money did you make?
11 A. 500 bucks.
12 Q. Did you ever steal anything from Mr. Van Manen's deli?
13 A. Yes.
14 Q. What did you steal?
15 A. Beer.
16 Q. Anything else?
17 A. Candy.
18 Q. Ever walk out on a check before?
19 A. Yes, a few times.
20 Q. More than once?
21 A. Yeah.
22 Q. You ever stolen a bike?
23 A. Yes.
24 Q. Have you ever used a gun?
25 A. Yes.

1   Brooklyn, and my ex-girlfriend wanted to get her nails done,
2   but she also wanted to take a ride with me.
3 Q. Let me just draw your attention to the car accident. Did
4   you back up your car?
5 A. Yeah.
6 Q. And what did you hit?
7 A. I hit a car behind me. I was backing out of parking spot.
8 Q. Did you see if anyone was in it?
9 A. Yes. When I looked back, yes.
10 Q. Who was in it?
11 A. A man and two kids in the back.
12 Q. How old were the kids?
13 A. Ten, 13.
14 Q. What did you do after you hit the car?
15 A. I flee the scene.
16 Q. Where did you drive to?
17 A. I drove like a dead-end block in Rosebank.
18 Q. Did your girlfriend remain at the scene at that time?
19 A. No. She was in the car with me.
20 Q. Did you ever learn what happened to those children?
21 A. Yes.
22 Q. What happened?
23 A. They were fine.
24 Q. Have you been in other accidents without a license?
25 A. Yes.

**J592van2**　　Cejovic - Direct　　Page 591

1　Q. Did you ever ask a customer to rent you a car under his
2　　name?
3　A. Yes, a few times.
4　Q. On one of those occasions, did you get into an accident
5　　with the customer's car?
6　A. Yes.
7　Q. And what happened after you got into the accident? What
8　　did you hit?
9　A. I hit a parked car.
10　Q. And did you call the police?
11　A. No.
12　Q. Who did you call?
13　A. The customer.
14　Q. And why did you call the customer?
15　A. Because I was telling him to get down there as soon as
16　　possible because I'm going to flee the scene and, yeah, that's
17　　what happened.
18　Q. And the customer called the police?
19　A. No.
20　Q. How does the government know about these car accidents?
21　A. I told them about it.
22　Q. Have you ever been in a car when someone tried to hit
23　　someone with the car?
24　A. Yes.
25　Q. Who was driving?

**J592van2**　　Cejovic - Direct　　Page 592

1　A. My friend.
2　Q. Did you tell the driver to hit someone with the car?
3　A. No, I didn't tell him.
4　Q. Did the car hit someone?
5　A. Yes.
6　Q. How does the government know about this to your knowledge?
7　A. I told them about it.
8　Q. Did there come a time when you were arrested on this case?
9　A. Yes. On this case?
10　Q. When you were arrested and law enforcement officers showed
11　　up at your house, what, if anything, did you tell them?
12　A. They showed a picture of me, asked me if it was me. They
13　　couldn't tell. And I told them no, it wasn't me. I lied to
14　　them.
15　Q. Was that true?
16　A. It was true that was me, yes.
17　Q. Did you lie to the law enforcement officers?
18　A. Yes.
19　Q. How does the government know about that, to your knowledge?
20　A. I told them about it.
21　Q. After you were arrested, did the court let you out on bail?
22　A. Yes.
23　Q. What did you do when you got home?
24　A. I threw away the drugs in my house and I destroyed the
25　　phone that I used to sell drugs on.

**J592van2**　　Cejovic - Direct　　Page 593

1　Q. Why did you do that?
2　A. Because I didn't want the government finding out about any
3　　other evidence I had.
4　Q. To your knowledge how did the government learn that you
5　　destroyed this evidence?
6　A. I told them about it.
7　Q. While you were out on bail, were you supposed to follow
8　　certain rules?
9　A. Yes.
10　Q. What rules were you supposed to follow?
11　A. I was supposed to go to appointments I had or wherever I
12　　was telling my pretrial I was going to. And I had a job. I
13　　was supposed to go to work and home.
14　Q. When you say pretrial, you mean your pretrial officer,
15　　supervised release?
16　A. Yes.
17　Q. Were you also on home detention?
18　A. Yes. I had an ankle monitor.
19　Q. What does that mean to be on home detention?
20　A. I could only go certain places.
21　Q. Did you violate the conditions of your pretrial release?
22　A. Yes.
23　Q. Did you travel to New Jersey when you weren't allowed to?
24　A. Yes, one time I did.
25　Q. Did you go shopping when you weren't supposed to?

**J592van2**　　Cejovic - Direct　　Page 594

1　A. Shopping? No. I told them I was going shopping all the
2　　time.
3　Q. Okay. Did you use drugs when you were on pretrial release?
4　A. Yes.
5　Q. What kind?
6　A. I used cocaine three times and marijuana four times.
7　Q. Were you allowed to do that?
8　A. No.
9　Q. To your knowledge how does the government know that you
10　　used cocaine and marijuana in violation of the conditions of
11　　your pretrial release?
12　A. I told them about it.
13　Q. Did you go out partying when you were on pretrial release?
14　A. Yes, a few times.
15　Q. Were you allowed to do that?
16　A. No.
17　Q. How does the government know about that?
18　A. I told them about it.
19　Q. Did you ever lie to your Pretrial Services officer?
20　A. Yes.
21　Q. How did you lie to the Pretrial Services officer?
22　A. I told them that I was at work, told my pretrial officer I
23　　was at work, and I wasn't.
24　Q. And did you get anything in order to validate that lie?
25　A. Yeah, I forged three checks.

J592van2     Cejovic - Direct     Page 595

1 Q. Did you make a rap video when you were on pretrial release?
2 A. Yes.
3 Q. After you pled guilty, did you go to prison?
4 A. Yes.
5 Q. Did you use a cell phone when you were in prison?
6 A. Yes, one time I did.
7 Q. Are you allowed to do that?
8 A. No.
9 Q. Did you let other inmates use your PIN?
10 A. Yes.
11 Q. What do I mean by PIN? Do you know?
12 A. It's a pack number for -- only you could use it to call
13    whoever you want to call in your contact list. So I let
14    another inmate use it because he ran out of minutes.
15 Q. Is that allowed?
16 A. No.
17 Q. Do you lie to inmates about what you have eaten in prison?
18 A. Yes.
19 Q. To your knowledge how does the government know about this?
20 A. I told them all this.
21      MR. FINKEL: Ms. Dunbar, if you can put up for the
22    witness what has been marked for identification as Government
23    Exhibit 1002.
24 Q. Mr. Cejovic, do you see that document in front of you?
25 A. Yes.

J592van2     Cejovic - Direct     Page 596

1 Q. Do you recognize it?
2 A. Yes.
3 Q. What is it?
4 A. My cooperation agreement.
5      MR. FINKEL: Your Honor, the government offers 1002.
6      MS. SIDERIS: No objection.
7      MS. O'NEILL: No objection.
8      THE COURT: It is in evidence.
9      (Government's Exhibit 1002 received in evidence)
10 BY MR. FINKEL:
11 Q. When is it dated?
12      MR. FINKEL: If you could publish it, please,
13    Ms. Dunbar.
14 A. May 3, 2019.
15 Q. How many cooperation agreements have you signed with the
16    government?
17 A. Two.
18 Q. What's the difference between the first and the second?
19 A. One of them didn't have -- the first one didn't have a
20    charge that I am being charged with now.
21 Q. What charge is that?
22 A. Selling heroin to somebody that got injured from it.
23 Q. What do you mean "got injured from it"?
24 A. They overdosed, but they didn't pass away.
25 Q. And why did you plead guilty to that?

J592van2     Cejovic - Direct     Page 597

1 A. Because I'm guilty of that.
2 Q. And how did the government find out about it?
3 A. Told them about it.
4 Q. Why didn't you tell the government about that before you
5    signed your first cooperation agreement?
6 A. I didn't remember.
7 Q. Is this the cooperation agreement that's the operative
8    cooperation agreement between you and the government to your
9    knowledge?
10 A. Yes.
11 Q. Go to the last page, please. Is that your signature?
12 A. Yes.
13 Q. Is that your attorney's signature?
14 A. Yes.
15 Q. After you signed your cooperation agreement, what crimes --
16    let me backup.
17      After you signed your first cooperation agreement,
18    what crimes did you plead guilty to?
19 A. Conspiracy to sell heroin and fentanyl, conspiracy to sell
20    crack -- cocaine base and cocaine, and also I'm responsible for
21    the death of Thomas Masseria.
22 Q. And your second cooperation agreement, what else did you
23    plead guilty to?
24 A. To those three charges I just said just now on the second
25    one, and also for seriously bodily injuring a person.

J592van2     Cejovic - Direct     Page 598

1 Q. Why did you plead guilty on that?
2 A. Because I'm guilty of all those crimes.
3 Q. To your knowledge, how did the government learn about the
4    crack conspiracy and the death of Thomas Masseria?
5 A. I told them about it.
6 Q. Have you been sentenced for your crimes?
7 A. No.
8      MR. FINKEL: Ms. Dunbar, you can take that down.
9 Q. What is your understanding of the maximum possible sentence
10    you face?
11 A. 20 years in prison. Oh, no, life.
12 Q. What's your understanding of the mandatory minimum you
13    face?
14 A. 20 years in prison.
15 Q. Who is going to sentence you?
16 A. Judge Crotty.
17 Q. What is your understanding of what you agreed to do under
18    the cooperation agreement?
19 A. Tell the truth, testify, and cooperate when the government
20    needs it.
21 Q. And what is your understanding of what the government will
22    do if you live up to that obligation?
23 A. Write me a 5K1 letter.
24 Q. To your understanding, what is a 5K1 letter?
25 A. It's a letter from the prosecution.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

---

1 Q. And what does the letter do?
2 A. It breaks my mandatory minimum so that Judge Crotty could
3    sentence me under 20 years.
4 Q. What's your understanding of what information will go in to
5    the 5K1 letter?
6 A. Everything I pleaded to -- everything I pleaded guilty to,
7    everything I told you.
8 Q. All that other conduct we talked about today?
9 A. Yes, everything.
10 Q. The fights?
11 A. Everything.
12 Q. Drug dealing?
13 A. Everything.
14 Q. The lies.
15 A. Yup.
16 Q. What promises have you been given about what sentence you
17    will receive?
18 A. No promises.
19 Q. What is your understanding about whether the government
20    will recommend a specific sentence to the judge in your case?
21 A. Government doesn't recommend anything.
22 Q. Even if the government sends a 5K1 letter to the judge,
23    does the judge have to sentence you to less prison time?
24 A. No.
25 Q. Even with the 5K1 letter, what is your understanding of the

---

1    maximum sentence you face?
2 A. Max life in prison.
3 Q. Are you hoping to get a lower sentence because you
4    cooperated?
5 A. Yes.
6 Q. Do you know whether you will receive a lower sentence
7    because you cooperated?
8 A. I have no clue.
9 Q. As you understand it, what would happen if you were to lie
10    here today?
11 A. I would not get that 5K1 letter.
12 Q. What would happen to your cooperation agreement?
13 A. It would be torn apart.
14 Q. And if it's torn apart, what sentence are you facing?
15 A. Mandatory minimum of 20 years and life in prison max.
16 Q. If you lose your cooperation agreement, can you withdraw
17    your guilty plea?
18 A. Nope.
19 Q. What determines if you get a 5K1 letter?
20 A. If I tell the truth.
21 Q. As you understand it, does anyone have to be convicted in
22    this trial or any trial for you to receive the 5K1 letter?
23 A. No.
24 Q. What happens if you tell the truth and no one is convicted
25    at this trial? Do you get the letter?

---

1 A. Yes, I still get that letter.
2 Q. What happens if you lie but someone is convicted in this
3    trial? Can you get that letter?
4 A. No.
5 Q. And what would happen to your cooperation agreement?
6 A. It would be torn apart.
7      MR. FINKEL: Just one moment, please.
8      (Counsel confer)
9 BY MR. FINKEL:
10 Q. And if you lie today, is your understanding you could also
11    be charged with perjury?
12 A. Yes.
13      MR. FINKEL: Nothing further.
14      THE COURT: Ms. Sideris.
15      MS. SIDERIS: With the court's permission, Ms. O'Neill
16    will go first.
17      THE COURT: Okay. Ms. O'Neill.
18 CROSS-EXAMINATION
19 BY MS. O'NEILL:
20 Q. You aren't addicted to heroin.
21 A. I'm sorry?
22 Q. You aren't addicted to heroin.
23 A. No.
24 Q. You don't use heroin.
25 A. No.

---

1 Q. You sold heroin.
2 A. Yes.
3 Q. You sold heroin to make money.
4 A. Yes.
5 Q. You wanted to party.
6 A. Yes.
7 Q. So you sold heroin for money to party.
8 A. Yes.
9 Q. You wanted to buy expensive things.
10 A. Yes.
11 Q. So you sold heroin to buy expensive things.
12 A. Yes.
13 Q. You wanted a fur coat.
14 A. Yes.
15 Q. So you sold heroin to get a fur coat.
16 A. Yes.
17 Q. You wanted to buy a fancy watch.
18 A. Yes.
19 Q. So you sold heroin to buy a fancy watch.
20 A. Yes.
21 Q. And you even wanted to buy your mother a fancy watch.
22 A. Yes, I did.
23 Q. And you sold heroin to buy your mother a fancy watch.
24 A. Yes.
25 Q. You wanted to travel.

---

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  A. Yes.
2  Q. So you sold heroin to travel.
3  A. Yes.
4  Q. You didn't sell drugs just to survive.
5  A. At that time, no.
6  Q. You wanted to live the high life.
7  A. Yes.
8  Q. You are a rapper.
9  A. Entertainer.
10 Q. You put out a rap video while you were out on bail in this
11    case.
12 A. Yes.
13 Q. You posted that video on YouTube.
14 A. Yes.
15 Q. You posted as the rap persona Min Too Wavy.
16 A. Yes.
17 Q. "Wavy" means cool, right?
18 A. Yeah, like I'm riding a wave, yeah.
19 Q. Like a minor wave, it means cool.
20 A. Yeah.
21 Q. So too wave means you are too cool or too like a minor
22    wave, right?
23 A. Yes.
24 Q. In your rap, you said that you had a lot of things to
25    serve.  Right?

1  A. Yes.
2  Q. And that means sell drugs.
3  A. Yes.
4  Q. And then later you said "yesterday I sold like three
5    bricks."  Right?
6  A. Yes.
7  Q. Now --
8        MR. FINKEL: Objection, your Honor.  The court's ruled
9  on this issue.
10       THE COURT: Overruled.
11 BY MS. O'NEILL:
12 Q. You have mentioned earlier that bricks can be five bundles
13    of heroin, right?
14 A. To certain people, yes.
15 Q. And bricks can also be a kilogram of drugs, right?
16 A. Yes.
17 Q. And when you said "yesterday I sold like three bricks" in
18    your rap, you were talking about kilograms of heroin or
19    cocaine, right?
20 A. Yes.
21 Q. In the video you also said you count so much money your
22    hand still twitches.
23       MR. FINKEL: Objection.  Same objection, your Honor.
24       THE COURT: Overruled.
25 BY MS. O'NEILL:

1  Q. You are saying I make a lot of money from selling drugs,
2    right?
3  A. Yes.
4  Q. You later say in your rap video that you beat your case,
5    right?
6        MR. FINKEL: Your Honor, could we have a quick sidebar
7  on this issue?
8        THE COURT: Yes.
9        (Continued on next page)

1        (At the sidebar)
2        THE COURT: Yes?
3        MR. FINKEL: Your Honor, the court ruled on this
4  issue.
5        THE COURT: Yes.  I thought my ruling was --
6        MS. O'NEILL: Your ruling was that we couldn't play
7  the rap video --
8        MR. FINKEL: Excuse me, Ms. O'Neill.
9        The ruling was that the rap video was excluded.  What
10 Ms. O'Neill is now doing is doing an end run around this
11 court's ruling by reading, line by line, from the lyrics of the
12 rap video as transcribed by them.
13       THE COURT: That's what I said she could do.
14       MS. O'NEILL: Yeah, that was what the ruling was.
15       MR. FINKEL: Every single line of the rap video?  I
16 did not understand the court's ruling to be -- it's just simply
17 getting the entire rap video in contravention --
18       THE COURT: No, no, no.  The visual aspects of the
19 video won't come in.  I think -- where is my opinion?
20       MR. FINKEL: I can certainly pull it in a second, your
21 Honor.
22       THE COURT: Wait a minute.
23       MR. FINKEL: The issue is that the rap video, as this
24 was described in our briefing and I thought was ruled on by the
25 court, has a lot of objectionable things in it and also things

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

| J592van2 | Cejovic - Cross | Page 607 |

1   that are vague, that are vague and could be interpreted in many
2   different ways. And the context isn't necessarily clear, and
3   that is part of the reason why the court kept this out. And
4   now what --
5           THE COURT: No, no, no, no. I kept out the video. I
6   didn't keep out the lyrics. He wrote the lyrics. The lyrics
7   are different than the video. That's what I said.
8           MS. O'NEILL: If I may, without this, exactly what I
9   understood the court's ruling to be and we can nip this in the
10  bud, I'm just talking about his drug dealing in the case. I'm
11  not talking about his use of sexist language or anything like
12  that.
13          THE COURT: Let me get the --
14          MS. O'NEILL: This is not at all what I thought your
15  ruling was. I thought you had ruled that we couldn't play the
16  video, but that I could question the witness about the video.
17          THE COURT: The lyrics.
18          MS. O'NEILL: Yeah, the lyrics. The lyrics. Not what
19  he is doing in the video.
20          MR. FINKEL: Your Honor, I think Ms. O'Neill has had
21  some discussion with Ms. Fender, and it's now my understanding
22  that Charlton's defense team is not seeking to introduce some
23  of the more objectionable phrases, which is part of the
24  government's motion on this, stuff about misogyny, things like
25  that, objectionable lyrics, etc. It is merely being used to

| J592van2 | Cejovic - Cross | Page 608 |

1   discuss with the defendant -- with the witness his drug use and
2   drug sales. Is that correct?
3           MS. O'NEILL: Yes.
4           MS. FENDER: We will withdraw the objection.
5           MR. FINKEL: Then we withdraw the objection.
6           MS. O'NEILL: Thank you, your Honor.
7           THE COURT: Okay.
8           (Continued on next page)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| J592van2 | Cejovic - Cross | Page 609 |

1           (In open court)
2           THE COURT: All right, Ms. O'Neill.
3   BY MS. O'NEILL:
4   Q. I am going to go back to the rap video, okay?
5   A. Okay.
6   Q. So later in the video you said you beat your case, right?
7   A. Yes.
8   Q. And then in the video you said the drugs are laced, right?
9   A. Yes.
10  Q. Now in this case, you pled guilty to distributing heroin
11  laced with fentanyl?
12  A. Yes.
13  Q. People died.
14  A. Yes.
15  Q. Other people overdosed.
16  A. Yes.
17  Q. You made this video after you had been charged with these
18  crimes, right?
19  A. Yes. It's entertainment.
20  Q. Excuse me?
21  A. It's entertainment.
22  Q. You made this video as entertainment after people had died
23  from heroin laced with fentanyl that you sold.
24  A. When I said drugs were laced, I meant coke in a blunt
25  because I did that before.

| J592van2 | Cejovic - Cross | Page 610 |

1   Q. You made this video about drugs being laced after you had
2   been charged with selling heroin laced with fentanyl, correct?
3   A. Yes.
4   Q. You made this video about drugs being laced after you had
5   decided to cooperate with the government. Right?
6   A. Yes.
7   Q. Now, you didn't tell the government about this video until
8   about a month ago, right?
9   A. I don't remember exactly when I told them.
10  Q. You have been meeting a lot with the government, correct?
11  A. Yes.
12  Q. And in those meetings, some of the U.S. Attorneys are
13  there, right?
14  A. Um-hmm.
15  Q. And some of the agents are there.
16  A. Yes.
17  Q. And at the meetings there is usual someone taking notes,
18  correct?
19  A. Yes.
20  Q. So would it refresh your recollection to see the notes that
21  the agent made on the day that you first mentioned the rap
22  video?
23  A. Yes.
24          MS. O'NEILL: If we can have the Elmo just for the
25  witness and the parties. Maybe it is not on. Do you know how

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

**CORRECTED**
May 9, 2019

1  to turn it on. The power button is on. Now it is more on.
2      THE DEPUTY CLERK: Now it should be up.
3      MS. O'NEILL: I'm showing the witness what's been
4  marked for the government as 3501-3, and I am showing them page
5  6. And I'm going to mark this as Defense Exhibit A for the
6  purposes of identification.
7  BY MS. O'NEILL:
8  Q. I am going to direct your attention to a single line in
9  this, in these notes. It is very difficult to read. I
10  apologize in advance for that. I did not make these notes.
11      Can you read the line where you first told the
12  government?
13  A. These are the notes?
14  Q. Yes.
15  A. Uhm. . .
16      MR. FINKEL: Your Honor, I think the question should
17  be whether or not it refreshes the witness's recollection.
18      THE COURT: I think that's right, Ms. O'Neill.
19  BY MS. O'NEILL:
20  Q. Does reading this line refresh your recollection that you
21  told the government about making the video?
22      MR. FINKEL: Objection. Misstates the witness's
23  testimony.
24      THE COURT: Overruled.
25      MR. FINKEL: The question was when.

1  A. I'm sorry. Repeat that question.
2      THE COURT: Does this refresh your recollection?
3  Q. Does this refresh your recollection, first, that you told
4  the government about making this video in this meeting?
5  A. Is there a date?
6  Q. All right. Here is the date of the interview that is
7  3501-3. Do you see the date?
8  A. Um-hmm.
9  Q. Now this is from the same interview that was dated that
10  date, and here I am showing you the line where one of the
11  people from the government wrote this.
12  A. It was on 3 -- it said 3/20, right?
13      MR. FINKEL: Objection. I just ask that the witness
14  not read from a document not in evidence, and I believe the
15  question pending is whether or not --
16      THE COURT: Does it refresh your recollection that it
17  was on March 20?
18      THE WITNESS: No.
19  Q. Does it refresh your recollection that you told the
20  government about a month ago that you made the rap video?
21  A. A month ago, no, I don't refresh my recollection.
22  Q. Okay.
23      Now, you don't give heroin away for free, right?
24  A. No.
25  Q. You sell it.

1  A. Yes.
2  Q. That's how you make your money.
3  A. Yes.
4  Q. And you sell heroin because it makes you a lot of money,
5  right?
6  A. Yes.
7  Q. You made about $200,000 in a year selling heroin.
8  A. 200, 300,000, yes.
9  Q. 200 or $300,000 in a year.
10      And you sell heroin to addicts, right?
11  A. Addicts and sellers.
12  Q. Addicts and sellers. First I want to talk about addicts,
13  okay?
14  A. Okay.
15  Q. Now, addicts can be hard to deal with.
16  A. In a way, yes.
17  Q. They sometimes call you over and over again.
18  A. Yes.
19  Q. They text you over and over again.
20  A. Yes.
21  Q. And once they call you, they sometimes want their drugs
22  immediately, right?
23  A. Yes.
24  Q. They ask you to come quickly.
25  A. Yes.

1  Q. They sometimes beg you to come quickly, right?
2  A. Yes.
3  Q. Addicts are a headache.
4  A. Depending, yes.
5  Q. Depending on the addict, they are a headache.
6  A. Yeah, there is functional addicts and addicts that are not
7  really functional.
8  Q. So nonfunctional addicts are a headache.
9  A. Yes.
10  Q. That would be addicts who aren't working.
11  A. Sorry. Repeat that again.
12  Q. That would be addicts who are out of work, right?
13  A. I had addicts out of work that functioned, so I can't
14  really say that.
15  Q. Okay.
16      Some of these addicts that are not as functional as
17  others exaggerate, right?
18  A. They exaggerate, yes.
19  Q. Let's talk about nonfunctional addicts, okay?
20  A. Okay.
21  Q. And these nonfunctional addicts, they tell you half-truths,
22  right?
23  A. Yeah.
24  Q. And these addicts tell you lies.
25  A. Yeah, they tell me lies.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  Q.  In one of your meetings with the government, you talked
2  about where addicts go, what addicts will do, and how they
3  travel to you to get heroin, and what you said is that addicts
4  will call -- when addicts call you to buy heroin --
5      MR. FINKEL: Objection. Counsel is reading from a
6  document that is not in evidence.
7      MS. O'NEILL: I'm not reading from a document. I am
8  cross-examining.
9      MR. FINKEL: I believe Ms. O'Neill is reading from
10  notes that are not in evidence.
11      THE COURT: Sustained.
12  BY MS. O'NEILL:
13  Q.  Addicts call you to see if you are good.
14  A.  Yes.
15  Q.  Meaning have heroin, right?
16  A.  Yes.
17  Q.  And then they wait for you for hours.
18  A.  Yeah, depending what day, where I'm at, what I am doing.
19  Q.  They will meet you on street corners.
20  A.  I really don't meet addicts on street corners. I meet them
21  on a block, middle of a block.
22  Q.  So you meet addicts on the middle of a block, right?
23  A.  Yes.
24  Q.  And they will wait for you on that middle of the block,
25  right?

1  A.  Yeah.
2  Q.  And they will pretty much meet you anywhere, right?
3  A.  Yeah.
4  Q.  Addicts sometimes sell their possessions for money, right?
5  A.  Yes.
6  Q.  And they give that money to you.
7  A.  Yes.
8  Q.  When addicts can't get that money, sometimes they beg you
9  for heroin, right?
10  A.  Yeah. Sometimes they do, yeah.
11  Q.  And when they can't get that money, they sometimes lie to
12  you, right?
13  A.  There is only certain ways I can know if they are lying.
14  Q.  Sometimes you believe that addicts lie to you, right?
15  A.  Sometimes, yeah.
16  Q.  And they will tell you that the money is coming, right?
17  A.  Yes.
18  Q.  And they will tell you that they are good for it.
19  A.  Yes.
20  Q.  They will tell you how sick they are.
21  A.  Yes.
22  Q.  They will tell you they are getting paid tomorrow.
23  A.  Yes.
24  Q.  They will tell you whatever they can think of to try to get
25  you to give them heroin, right?

1  A.  Yes.
2  Q.  And addicts will give you their rent money, right?
3  A.  I don't know that.
4  Q.  Addicts . . .
5      You had a Twitter account, right?
6  A.  Yes.
7  Q.  It was in the account the name was IAmWavyIDGAF, right?
8  A.  Yes.
9      MR. FINKEL: Your Honor, can I just ask if we can make
10  room at another table; that Ms. O'Neill not have a binder of
11  documents that are not in evidence in view of the jury?
12      THE COURT: The jury is not looking at it. Everybody
13  has binders.
14      MR. FINKEL: Thank you.
15  BY MS. O'NEILL:
16  Q.  So on your Twitter account, you tweeted about your life,
17  right?
18  A.  Yes.
19  Q.  It was an active Twitter account, right?
20  A.  Yes.
21  Q.  And I would like to show you -- do you remember tweeting
22  that you get people's rent money and put it in your pocket?
23  A.  I don't remember. I tweeted a bunch of stuff.
24  Q.  Yeah.
25      So I'm going to show you what I am going to mark as

1  Defense Exhibit B for purposes of identification just for the
2  parties.
3      So I am going to direct your attention to a particular
4  tweet. Do you see this is your Twitter account?
5  A.  Yes.
6  Q.  Do you recognize it as your Twitter account?
7  A.  Yes. I think you misinterpreted that, though.
8      MR. FINKEL: Your Honor, I believe the question is
9  whether or not this refreshes the witness's recollection, which
10  is what I understood Ms. O'Neill to be doing.
11      THE COURT: Ms. O'Neill.
12  BY MS. O'NEILL:
13  Q.  Okay. Does this refresh your recollection --
14  A.  Yes.
15  Q.  -- that you tweeted you get rent money from addicts?
16  A.  No. That's not what I mean.
17  Q.  Okay.
18  A.  What I mean is I'm --
19      MR. FINKEL: No. Objection. I think this is now
20  interpretation of a document that is not in evidence. The
21  government objects to that.
22      MS. O'NEILL: Okay. I will move this into evidence.
23      MR. FINKEL: Objection. It is hearsay.
24      THE COURT: Sustained.
25  BY MS. O'NEILL:

1 Q. Sometime addicts try to scam you, right?
2 A. Sometimes, yeah.
3 Q. They try to rip you off.
4 A. Yeah.
5 Q. They try to make you will feel sorry for them.
6 A. Yes.
7 Q. And then sometimes addicts actually play you against other
8 dealers, correct?
9 A. Repeat that again.
10 Q. Sometimes -- let me take a step back.
11      Addicts have multiple dealers, right?
12 A. I don't know if they have multiple dealers.
13 Q. Some addicts have multiple dealers.
14 A. I don't have what they have.
15 Q. You know that some addicts have multiple dealers, right?
16 A. I don't know that. I can't say that someone else has.
17 Q. Addicts play you off of other dealers, right?
18 A. What do you mean by play me?
19     (Pause)
20     THE COURT: Do you have a question, Ms. O'Neill?
21     MS. O'NEILL: Yes.
22 BY MS. O'NEILL:
23 Q. You told the government -- you met with the government on
24 April 5 of this year, right?
25 A. Correct.

1 Q. It was one of your many proffer sessions, correct?
2 A. Yes.
3 Q. And at that session you told the government that addicts
4 played you dealers off each other, right?
5 A. Repeat that again.
6 Q. At this session, you told the government that addicts
7 played you off of each other, meaning played dealers off of
8 each other, right?
9 A. I still don't understand what you mean by play off of each
10 other.
11 Q. Addicts try to use you to lower the rates?
12 A. Okay, yes.
13 Q. Addicts try to say, hey, I'm getting heroin for cheaper
14 than you are selling it, you need to lower your rate, right?
15 A. Yes.
16 Q. Addicts say, oh, this other dealer came to where I was
17 faster than you did to get you to come faster, right?
18 A. Yes.
19 Q. Addicts play dealers off of each other, right?
20 A. That way you mean, yes.
21 Q. Yes, that is what I mean. Sorry for the confusion.
22 A. It's all right.
23 Q. Now, the heroin you sold came in packets, correct?
24 A. Yes.
25 Q. It was ten packets in one bundle, correct?

1 A. Yeah, ten glassine envelopes.
2 Q. Ten glassine envelopes, okay. And you didn't sell people
3 individual packets, right?
4 A. What do you mean by individually, a glassine.
5 Q. You didn't sell customers a single packet at a time?
6 A. No. I sold a whole bundle.
7 Q. You sold the entire bundle of ten.
8 A. Yes. Sometimes I sell half.
9 Q. Sometimes you sold five.
10 A. Yeah.
11 Q. But most of the time you sold at least ten at a time,
12 right?
13 A. Yes.
14 Q. And you didn't drive to someone's house to sell them two
15 packets, correct?
16 A. I used to in the beginning when I was selling. Eventually
17 I didn't.
18 Q. In the very beginning you sold heroin by packets, right?
19 A. Yeah.
20 Q. And then you progressed to bundles, right?
21 A. No, I always sold bundles. I just sold half sometimes.
22 But in the beginning I used to drive it to people's house for
23 one or two bundles, yeah.
24 Q. In the beginning.
25 A. Yeah.

1 Q. In the first month and a half?
2 A. For like the first year.
3 Q. For the first year.
4 A. Yeah.
5 Q. All right.
6     Now, you sold bundles for different prices to
7 different people, correct?
8 A. Yes.
9 Q. And you sold bundles to different people at different
10 prices -- withdrawn.
11     You sold bundles to people at different prices at
12 different time periods, right?
13 A. Yes.
14 Q. So in other words, there were certain people that you sold
15 for $50 a bundle, right sometimes, and then later you would
16 sell to that person for $60 a bundle.
17 A. Yes.
18 Q. Correct? Okay.
19     And when someone brought -- okay. Now, ten bundles is
20 a sleeve, right?
21 A. Yes.
22 Q. And when someone bought a sleeve, it was cheaper than
23 buying a single -- cheaper per bundle than a single bundle,
24 right?
25 A. Yes, $50 a bundle for ten bundles.

| J592van2 | Cejovic - Cross | Page 623 |
|---|---|---|

1 Q. And when people -- so when people buy larger quantities of
2 heroin, the price for the heroin goes down, right?
3 A. Yes.
4 Q. Per packet, let's say?
5 A. Yes.
6 Q. So the more heroin someone bought at a time, the cheaper it
7 was per packet for them, correct?
8 A. Yes.
9 Q. Now, I want to talk more about addicts. Addicts can do
10 different amounts of heroin in a day, right?
11 A. Yes.
12 Q. Some addicts only do a packet a day, right?
13 A. Yeah, depending on the tolerance, yes.
14 Q. And some addicts do more than one packet a day.
15 A. Yes.
16 Q. Some addicts do a bundle a day, right?
17 A. Yes.
18 Q. And some addicts even do more than one bundle a day.
19     MR. FINKEL: Objection. Foundation.
20 Q. If you know.
21     THE COURT: Overruled.
22 Q. Right?
23 A. Yes.
24 Q. And you sold to some addicts, right?
25 A. Yes.

| J592van2 | Cejovic - Cross | Page 624 |
|---|---|---|

1 Q. But you mostly sold heroin by the bundle, correct?
2 A. Yes.
3 Q. And how you sold heroin is that you would drive in your car
4 to meet your customers, correct?
5 A. Yes.
6 Q. It was a delivery service, right?
7 A. Yes, both ways, picked up off me and I went to them.
8 Q. So sometimes addicts picked up from where you were, right?
9 A. Yes.
10 Q. And sometimes you delivered the heroin to them, right?
11 A. Yes.
12 Q. And sometimes you had someone else drive to deliver the
13 heroin, correct?
14 A. Yes.
15 Q. Now, in your experience, you have seen addicts spending
16 time with other addicts, right?
17 A. Yeah, around, yeah.
18 Q. And sometimes you have seen addicts use heroin with other
19 addicts, right?
20 A. You mean like doing it in front of me?
21 Q. No, I don't mean do it in front of you, buy it for
22 themselves and other people together?
23 A. Yes.
24 Q. Sometimes addicts put their money together to buy heroin,
25 correct?

| J592van2 | Cejovic - Cross | Page 625 |
|---|---|---|

1 A. Yes.
2 Q. And they do this so they can get a better price, right?
3 A. Yes.
4 Q. They do this so they can get a larger amount of heroin,
5 right?
6 A. Yes.
7 Q. And they do this so that you can drive -- you will drive to
8 them, right?
9 A. Yes.
10 Q. You don't deliver small amounts of heroin.
11 A. At one point, no, I didn't.
12 Q. So addicts pool their money together so that you will come
13 to them to deliver the heroin, right?
14 A. Yes.
15 Q. Now, one of the ways you said you make a sale is by driving
16 your car to the customer, right?
17 A. Yes.
18 Q. And sometimes you go into that customer's house.
19 A. Yes.
20 Q. But sometimes you have to meet them on the street, right?
21 A. Yes.
22 Q. And when you meet a customer on the street, the customer
23 gets in your car, right?
24 A. Yes.
25 Q. And you make a quick exchange. Correct?

| J592van2 | Cejovic - Cross | Page 626 |
|---|---|---|

1 A. Yes.
2 Q. Money for drugs.
3 A. Yes.
4 Q. And then the customer leaves, right?
5 A. Repeat it again. I'm sorry. Excuse me.
6 Q. No problem.
7     And then the customer leaves your car, right?
8 A. Yes.
9 Q. And sometimes maybe you drive a little ways so as not to
10 attract attention.
11 A. I'm sorry. Say it again.
12 Q. Sometimes when the customer gets in your car, you drive a
13 little ways so as not to attract attention.
14 A. Yeah, I drive other ways, yes.
15 Q. And then you go off and you make your next delivery,
16 right?
17 A. Yeah, wherever I go, yeah.
18 Q. And so when you delivered to addicts who pooled their
19 money, you don't want all the addicts getting in your car at
20 once, right?
21 A. No.
22 Q. You want one person to get in your car, right?
23 A. Depends who is with them. One or two.
24 Q. Okay. The fewer people that get in your car, the less
25 suspicious it is, right?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  A. Yeah. Sometimes they're with somebody else, so two people,
2  they could be buying for ten people those two people.
3  Q. But you don't want ten people to get in your car at once to
4  buy.
5  A. Ten people can't fit in my car.
6  Q. You don't want ten people to get in your car, right?
7  A. Either way, yeah.
8  Q. So that makes it less suspicious, right?
9  A. In a way, yeah.
10  Q. If ten addicts are surrounding your car all at once, it
11  could attract attention, right?
12  A. If they don't look like addicts, yeah. There are people
13  that buy off me that don't look like addicts at all.
14  Q. So if people that look like addicts are all buying heroin
15  together, you don't want ten addict-looking people to go to
16  your car, correct?
17  A. No.
18  Q. Okay. Thank you.
19      You just want one or maybe two people to go to your
20  car, correct?
21  A. Yes.
22  Q. That way fewer people can identify you, right?
23  A. Yeah, because some people I don't want to know I'm selling
24  heroin.
25  Q. And police are less likely to notice, right?

1  A. Correct.
2  Q. You want to keep your interactions simple, correct?
3  A. Yes.
4  Q. Now, when you met Kenny, you knew he was addicted to
5  heroin, correct?
6  A. Yes, I did.
7  Q. One of your customers introduced you, right?
8  A. Yeah. I don't remember who. It was somebody, yeah.
9  Q. And you gave him your number.
10  A. Yes.
11  Q. And so that he could use it, right?
12  A. Yes.
13  Q. So that he could buy heroin from you.
14  A. Yes.
15  Q. And eventually he called you to buy heroin, right?
16  A. Yes.
17  Q. And then you sold him heroin, right?
18  A. Yes.
19  Q. And then he called you again, right?
20  A. Yes.
21  Q. And he --
22      THE COURT: Ms. O'Neill, is this a convenient place to
23  break for lunch?
24      MS. O'NEILL: Yes.
25      THE COURT: We will break now and we will resume at

1  2:00.
2      MS. O'NEILL: Thank you.
3      (Continued on next page)

1      (Jury not present)
2      THE COURT: Please be seated.
3      I have had an opportunity to reread my opinion and
4  order of May 3 with regard to Mr. Cejovic's testimony. I quote
5  the relevant part:
6      "The court believes that CW1 made and uploaded this
7  music video while out on bail as a coconspirator in this case
8  less than two months before he formally agreed to cooperate
9  with the government. It is relevant to his character for
10  truthfulness and the credibility of the testimony he will give
11  at trial.
12      "Additionally, some of the statements CW1 makes in
13  this video are also relevant to his character for truthfulness
14  as they appear to tout his ability to cooperate with law
15  enforcement while simultaneously continuing his criminal
16  conduct.
17      "The video itself, however, constitutes extrinsic
18  evidence of prior conduct that is not admissible," citing
19  Federal Rules of Evidence 608(b).
20      "Accordingly, the government's motion to preclude
21  CW1's music video is granted in part and denied in part. The
22  video itself is precluded and cannot be shown at trial. The
23  defendants may, however, ask CW1: (1) whether he made this
24  video and (2) about the relevant statements from the video that
25  they feel call his candor with the government during its

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  prosecution of this case in to question."
2      So I find the questions that were put by Ms. O'Neill
3  unobjectionable. I don't understand the government's
4  objection.
5      MS. FENDER: So, your Honor, if I may, just briefly,
6  we had the same understanding of your Honor's ruling.
7      THE COURT: Well, why did you only --
8      MS. FENDER: Because our concern was, your Honor, and
9  I will explain why we had that specific concern, that
10  Ms. O'Neill was starting to read line by line the transcript
11  that they prepared of the rap video. As your Honor is aware,
12  there are many objectionable materials in that rap video that
13  your Honor had precluded, and I underscore that I think this is
14  a very fair concern here because the defense exhibit that
15  Ms. O'Neill just tried to introduce -- I think it was Defense
16  Exhibit B, the Twitter account -- I noticed as Ms. O'Neill put
17  that up on the screen that, for instance, an unredacted N word
18  is in that exhibit as well, so it is that kind of concern that
19  it is really a line by line --
20      THE COURT: Did the jury see that?
21      MS. FENDER: No, they did not. It did not come into
22  evidence.
23      MS. O'NEILL: No.
24      MS. FENDER: We objected, your Honor, and your Honor
25  sustained that objection. But that's the concern.

1      So once Ms. O'Neill had reassured us she was only
2  asking those relevant questions about the drug testimony, we
3  withdrew our objection, consistent with your Honor's ruling.
4  Thank you.
5      THE COURT: But due to your objection, I had to call
6  for a sidebar. You withdrew your objection at the sidebar.
7      MS. FENDER: Yes, your Honor.
8      THE COURT: You called for a sidebar conference,
9  suggesting that something wrong was going on here.
10      MS. FENDER: Your Honor, on the next occasion we will
11  seek to speak with Ms. O'Neill first for us to make sure that
12  we are very clear on what the scope is because that is why we
13  had that concern.
14      THE COURT: Well, you keep asking for what in effect
15  are advisory rulings for fear of what the defendant is going to
16  do in its questioning. Now, I understand the rules of
17  evidence. They ask a question that's objectionable, then you
18  object. You don't project that somebody is going to do
19  something wrong and object to what hasn't been done yet.
20      MS. FENDER: Your Honor, again, I absolutely
21  appreciate that. I think that in this particular case the
22  reasons that we have the concern that I have articulated,
23  including, again, Defense Exhibit B in which I believe the
24  unredacted N word appeared.
25      Please correct me if I am wrong, Ms. O'Neill.

1      MS. O'NEILL: I have no idea whether it did.
2      THE COURT: All right.
3      Enjoy your lunch.
4      MR. QUIJANO: One point, your Honor, if I may. It is
5  related.
6      By my count, I think today and yesterday there have
7  been four objections of reading from a document not in
8  evidence. The objection has been made when a predicate
9  question is being asked of the witness about a prior statement
10  made in 3500 material. Most of the times we are actually
11  reading from our cross-examination outline. But even if we
12  were reading from the document itself, it is only to set up the
13  question of whether that statement was made before. The
14  government now has objected several times, raising the
15  objection as reading from documents not in evidence. It is not
16  what's going on, and I don't believe those are proper
17  objections and are simply destroying the flow of the
18  cross-examination.
19      THE COURT: Okay.
20      MS. O'NEILL: At some point the government objected
21  when I was just reading my cross-examination notes.
22      MR. QUIJANO: Which is what happened yesterday at
23  least on a couple of occasions. And on one occasion, yes, I
24  was reading from the 3500, but only to ask the language that we
25  thought was the prior inconsistent statement.

1      MR. FINKEL: Your Honor, I believe it is proper to
2  object to the reading of a document that is not in evidence,
3  particularly notes that are prepared by the government which
4  are not a transcription of what the witness has said prior or,
5  for example, DD-5s, which are a general summary but not
6  someone's individual statement. It isn't proper, and I think
7  those objections were properly sustained by this court.
8      MR. QUIJANO: They were not sustained.
9      MR. FINKEL: Excuse me, Mr. Quijano. Because I do not
10  believe that defense counsel should be allowed to end run
11  around the rules of evidence and this court's rulings by
12  reading documents effectively to the jury that are not in
13  evidence.
14      MR. QUIJANO: The question that was being posed or
15  trying to be posed was whether the witness had made the
16  following statements. If I am reading from my cross outline or
17  reading from a statement itself, that is not reading from a
18  document not in evidence. Quoting a particular statement, I am
19  going to ask about whether he made it before.
20      THE COURT: Thank you.
21      MR. FINKEL: Thank you.
22      (Luncheon recess)
23
24
25

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

J598VAN3          Cejovic - Cross          Page 635

1          AFTERNOON SESSION
2             2:00 p.m.
3          THE COURT: You want to bring Mr. Cejovic in.
4     (Jury present)
5     JASMIN CEJOVIC, resumed.
6          THE COURT: Please be seated.
7          Ms. O'Neill, you may proceed.
8     BY MS. O'NEILL:
9     Q. I want to take you back to when Kenny was buying heroin
10    from you.
11          You sold him heroin, right?
12    A. Yes.
13    Q. Since you first sold him heroin, you have been selling him
14    heroin?
15    A. Yes. Who's him?
16    Q. Kenny.
17    A. Yes.
18    Q. Since you first sold Kenny heroin, you sold him off and on,
19    right?
20    A. Yes.
21    Q. Until you stopped?
22    A. Yes.
23    Q. Now, he didn't call you every day, right?
24    A. When he was a daily customer, yeah, he called me every day,
25    before he disappeared.

J598VAN3          Cejovic - Cross          Page 636

1     Q. So he would disappear, right?
2     A. Yeah, because he owed me money.
3     Q. Because he owed you money?
4     A. Yeah.
5     Q. Then in the time that you were selling to him, he called
6     you every day, is that your testimony?
7     A. The time I was selling to him?
8     Q. Yes.
9     A. Every day or every other day.
10    Q. He didn't buy from you every week right?
11    A. Some weeks he didn't buy from me.
12    Q. There were many periods, including months, where he didn't
13    buy from you at all, right?
14    A. Two, three months, yes.
15    Q. He would buy from you for a while, right?
16    A. Yes.
17    Q. Then he would stop buying from you?
18    A. Yeah. Because he owed me.
19    Q. Or maybe he would try to get clean, right?
20    A. I don't know.
21    Q. Or he would buy from another dealer, right?
22    A. I don't know. When he disappears, I don't know what he
23    does.
24    Q. But you do know he bought from other dealers, right?
25    A. I don't know that.

J598VAN3          Cejovic - Cross          Page 637

1     Q. That's your testimony today?
2     A. I don't know exactly who he bought off of.
3     Q. When you met with the government, you told them that he
4     bought from other dealers. Do you remember that?
5     A. When exactly?
6     Q. You met with the government on March 20th of this year. Do
7     you remember that meeting?
8     A. I think so, yeah.
9     Q. I am going to show you just for the parties, this is the
10    proffer notes that someone in the room was taking.
11    A. OK.
12    Q. I am showing you what the government has marked as 3501-3.
13          The first page has the date, right?
14    A. Yes.
15    Q. I am going to show you with my pen the note here. Are you
16    able to read this?
17    A. What's the first words say on that, where you're pointing?
18    That one, yes.
19    Q. I am not 100 percent sure, but it looks like Charlton to
20    me.
21    A. That doesn't look like Charlton to me.
22          THE COURT: Does it refresh your recollection that you
23    said that?
24          THE WITNESS: No.
25    Q. This doesn't refresh your recollection that Mr. Charlton

J598VAN3          Cejovic - Cross          Page 638

1     bought from other dealers and you told the government that in
2     March?
3     A. No, it doesn't refresh my recollection.
4     Q. It doesn't refresh your recollection because you can't read
5     the handwriting, right?
6          MR. FINKEL: Objection.
7     A. No.
8          THE COURT: Sustained.
9          Strike the answer no.
10    A. No --
11          THE COURT: I sustained the objection to the question.
12    Q. Kenny was unreliable, right?
13    A. Unreliable on what?
14    Q. As a customer.
15    A. What do you mean as a customer, unreliable what? He
16    supposed to do something for me?
17    A. He wasn't a reliable customer. Sometimes he was there,
18    right, he would buy from you, and sometimes he wouldn't, right?
19    A. Any way he wasn't reliable because he owed me money.
20    Q. You knew that Kenny was a carpenter?
21    A. Yes, I knew.
22    Q. You knew he was a union carpenter?
23    A. Say that again.
24    Q. Do you know he was a union carpenter?
25    A. That's what he told me.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

---

J598VAN3     Cejovic - Cross     Page 639

1 Q. You know that he worked off and on?
2 A. That's what Kenny told me.
3     THE COURT: That's what Kenny told him. That's the
4 answer.
5 Q. Kenny told you that he worked off and on, right?
6     MR. FINKEL: Objection.
7     THE COURT: What is the objection?
8     MR. FINKEL: Relevance.
9     THE COURT: Overruled.
10 Q. Kenny told you that he worked off and on, right?
11 A. That's what he told me.
12 Q. That was depending whether there was work available to him
13 in part, right?
14     MR. FINKEL: Objection. Foundation.
15     THE COURT: Overruled.
16 Q. If you know.
17 A. That's what he told me.
18 Q. That's what he told you, right?
19 A. Yeah.
20 Q. He also told you that sometimes he was -- sorry. Let me
21 rephrase.
22     You also knew that he sometimes didn't work because he
23 was sick, right?
24     MR. FINKEL: Objection. Foundation.
25     THE COURT: Overruled.

---

J598VAN3     Cejovic - Cross     Page 640

1 A. Sick?
2 Q. Sometimes Kenny couldn't go to work because he was sick,
3 right?
4 A. That's what he told me.
5 Q. When he said sick, he meant heroin withdrawal, right?
6     MR. FINKEL: Objection.
7     THE COURT: Sustained.
8 Q. Now, when you were selling Kenny heroin, you knew he sold
9 his tools, right?
10     MR. FINKEL: Objection.
11     THE COURT: Overruled.
12 A. That's what he told me. To my knowledge, that's what he
13 told me.
14     THE COURT: You meant his carpenter's tools?
15     MS. O'NEILL: Yes.
16 Q. When you were selling Kenny heroin, you knew he was selling
17 parts of his motorcycle, right?
18     MR. FINKEL: Objection.
19     THE COURT: Overruled.
20 A. He sold and also rebought them. That's what he told me.
21 Q. You knew he was doing odd jobs, right?
22 A. What do you mean odd jobs, like side work?
23 Q. When you were selling Kenny heroin, you knew that sometimes
24 he did odd jobs?
25 A. What's an odd job?

---

J598VAN3     Cejovic - Cross     Page 641

1 Q. Meaning painting doors.
2 A. Side work.
3 Q. Yes.
4 A. That's what he told me.
5 Q. In fact, you knew that he was pulling weed sometimes to get
6 money for heroin?
7     MR. FINKEL: Objection.
8 A. I don't know that.
9     MR. FINKEL: I think the foundation here is a hearsay
10 foundation. I would just ask counsel inquire what his basic
11 knowledge is before going down this line of inquiry.
12     THE COURT: Overruled.
13 Q. When you were selling Kenny heroin, you knew he was playing
14 guitar on the street, right?
15 A. That I never knew.
16 Q. Oh, no. I will get back to that.
17     When you were selling Kenny heroin, you knew he was
18 homeless, right?
19 A. Homeless? When was he homeless? I don't know that because
20 he lived in different houses all the time. He moved place to
21 place.
22 Q. Now, I want to talk about your arrest. OK?
23 A. OK.
24 Q. When you were arrested in this case, you had some options,
25 right?

---

J598VAN3     Cejovic - Cross     Page 642

1 A. Yes.
2 Q. You had a choice to make?
3 A. Yes.
4 Q. You could face the charges and go to trial, right?
5 A. Yes.
6 Q. Or you could take a plea, right?
7 A. Yes.
8 Q. Or you could cooperate?
9 A. Yes.
10 Q. You could try to cooperate, right?
11 A. Yes.
12 Q. And you decided that you would try to cooperate, right?
13 A. I am cooperating, yes.
14 Q. Cooperating means meeting with the government, right?
15 A. Yes.
16 Q. It means answering the government's questions, right?
17 A. Yes.
18 Q. And also, it means providing them with substantial
19 assistance, correct?
20 A. What does substantial mean?
21 Q. Substantial meaning big, big assistance, a lot of
22 assistance.
23 A. I don't know that, big assistance. I just tell them the
24 truth and that's it.
25 Q. You read your cooperation agreement before you signed it,

---

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  right?
2  A. Yes.
3  Q. You entered into two different cooperation agreements in
4   this case, right?
5  A. Yes.
6  Q. The first cooperation agreement you signed on the 31st of
7   January, right?
8  A. Yes.
9  Q. You signed this contract with the United States government,
10   right?
11  A. Yes.
12  Q. It's a plea agreement, right?
13  A. Yes.
14  Q. And you read this before you signed it, right?
15  A. Yes.
16  Q. Now, I am showing you what I am marking as Defense Exhibit
17   C for the purposes of identification.
18       This is your first cooperation agreement, right?
19  A. Yes.
20  Q. You can see the date here, January 29, right?
21  A. Yes.
22  Q. Where my pen is.
23       Then I am going to go to the next few pages. This is
24   your signature here, right, Mr. Cejovic?
25  A. Yes.

1  Q. This is your attorney's signature, right?
2  A. Yes.
3  Q. This is the date here, the 31st, right?
4  A. Yes.
5  Q. And this is the prosecutor's signature, right?
6  A. Yes.
7  Q. You signed this cooperation agreement before you took a
8   plea in this case, the first plea, right?
9  A. Yes.
10       MS. O'NEILL: I would like to move what is Defendant's
11  Exhibit C into evidence.
12       MR. FINKEL: No objection.
13       THE COURT: C is in evidence.
14       (Defendant's Exhibit C received in evidence)
15       MS. O'NEILL: We can publish this to the jury.
16  Q. I am going to draw your attention to the fourth paragraph
17   down on page 3. I am highlighting around this paragraph.
18       It says here, "It is understood that should this
19  office determine either that the defendant has not provided
20  substantial assistance in an investigation or prosecution, or
21   that the defendant has violated any provision of this
22  agreement, such a determination will release this office from
23  any obligation to file a motion pursuant to 5K1.1." Correct?
24  A. Yes.
25  Q. So that's what substantial assistance means, that's where

1  you signed it?
2  A. Yes.
3  Q. Now, when you were talking in your meetings with the
4   government and your attorney, they told you that you had to be
5   truthful, correct?
6  A. Yes.
7  Q. You knew that if you were able to provide them with more
8   assistance, you would get more credit in the 5K letter,
9   correct?
10  A. My job is to tell the truth.
11  Q. You knew that if you testified at trial, the government
12   will say in the 5K that you testified at trial, right?
13  A. That I know.
14  Q. And if you provide them with limited information, that will
15   be also addressed in your letter.
16       So, for example --
17  A. What do you mean by limited?
18  Q. If no one had gone to trial in this case, you would
19   have -- the letter would have indicated that you helped them a
20   little bit and that was that, right?
21       MR. FINKEL: Objection to form.
22       THE COURT: Sustained.
23  Q. When we are talking about credit in exchange for your
24   cooperation, we are talking about credit off of your sentence,
25   right?

1  A. Yes.
2  Q. So you're cooperating with the government in exchange for
3   getting time off your sentence, is that correct?
4  A. It breaks my mandatory minimum.
5  Q. Now, you don't know exactly how much time you will get off,
6   right?
7  A. I don't know.
8  Q. You're hopeful you will get a lot of time off, right?
9  A. Yes.
10  Q. But you're not sure exactly how much?
11  A. No clue.
12  Q. But it does mean time that you have off your sentence,
13   right?
14  A. I don't know that.
15  Q. So when you were brought into this situation, where you
16   were arrested with your codefendants, you decided that you
17   would save yourself, correct?
18  A. Yes.
19  Q. You wanted to keep yourself out of jail?
20  A. Yes.
21  Q. So you decided that you would begin to help the government,
22   right?
23  A. Yes.
24  Q. In the hopes that you would stay out of jail?
25  A. Yes.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1 Q. Correct?
2     Now, at your initial arrest in this case, you saw the
3 indictment?
4 A. Yes.
5 Q. You were arrested with your codefendants, correct?
6 A. Yes.
7 Q. You saw some of them, right?
8 A. Yes.
9 Q. Some of them were going through detox, right? If you
10 remember.
11 A. I remember, actually.
12 Q. Kenny was going through withdrawals, right?
13 A. Yeah. He went to a methadone clinic, one of them.
14 Q. You were released on bail, right?
15 A. Yes.
16 Q. And Kenny stayed in jail, right?
17     MR. FINKEL: Objection.
18     THE COURT: Overruled.
19 A. Yes.
20 Q. In fact, the government consented to your release on bail,
21 right?
22 A. What do you mean by consent?
23 Q. The government agreed with your lawyer that you could be
24 released on bail, right?
25 A. Yes.

1 Q. And that consent was in part because you were going to
2 cooperate, correct?
3 A. The day I left out of jail? The day I got bail?
4 Q. The original date that you got bail.
5 A. I never agreed to cooperate. That wasn't my choice when I
6 got bail. I hired attorney and me and my attorney agreed to
7 cooperate.
8     MR. FINKEL: Objection as to the privileged
9 information.
10 Q. When you were originally arrested in this case, the agents
11 came to your door, right?
12 A. Yes.
13 Q. And you met with the agents, right?
14 A. Say it again.
15 Q. You met with the agents?
16 A. The day they came to my door?
17 Q. Yes.
18 A. When they came to my door, they arrested me, I went to
19 pretrial building.
20 Q. They arrested you and you spoke with them, is that correct?
21 A. To the agents?
22 Q. Yes.
23 A. I spoke to them for a few minutes.
24 Q. You told them information about this case?
25 A. About this case? They asked me for a name. I didn't know

1 the guy's name. I just knew the guy's nickname.
2 Q. You gave them information at your initial arrest, right?
3 You gave them a guy's nickname, correct?
4 A. Yeah, that's it.
5 Q. When you were initially arrested, you gave them a nickname
6 of a person that they were looking for, correct?
7 A. Well, I didn't give them. They asked if the name started
8 with the letter G, and I said yes. And they described the guy
9 to me.
10 Q. I am going to go back to when you were saying that you
11 never knew that Mr. Charlton was playing the guitar begging for
12 money. OK?
13 A. OK.
14 Q. So earlier, a few minutes ago, said that you were not
15 aware that Mr. Charlton was on the street playing the guitar
16 for money, correct?
17 A. Correct.
18 Q. So you understand that there was a wiretap on your phone,
19 right?
20 A. Yes.
21 Q. And in that wiretap all of your text messages were seized,
22 right?
23 A. Yes.
24 Q. And they intercepted your phone calls, right?
25 A. Yes.

1 Q. As part of that, you had an opportunity to review your
2 wiretaps, right?
3 A. Yes.
4 Q. With your lawyer?
5 A. Yes.
6 Q. To see what you said. OK?
7 A. Right.
8 Q. I am going to show you, just for the parties, what has been
9 previously marked USAO 004198.
10     MS. O'NEILL: I am now going to mark it as Defense
11 Exhibit D.
12 Q. This is one of the text messages from your wiretap.
13     You can recognize right up here, it says Cejovic
14 Jasmin, and this is your phone number 929-348-6189, correct?
15 A. Yes.
16     MR. FINKEL: Objection. I believe this document is
17 not in evidence.
18     THE COURT: I think you are getting ready to offer it
19 in evidence. Aren't you, Ms. O'Neill?
20     MS. O'NEILL: Yes. I am building a foundation to
21 offer it into evidence.
22 Q. This is a text message from a party to Min, correct, that's
23 your nickname?
24 A. Yes.
25 Q. And you can see the substance of the text message here,

1  right?
2  A. Yes.
3          MS. O'NEILL: I would like to offer this as Defense
4  Exhibit D.
5          MR. FINKEL: No objection.
6          THE COURT: It's received.
7          (Defendant's Exhibit D received in evidence)
8  Q. You can see the text message here, right, from a party?
9  A. Yeah. I'm reading it.
10  Q. This is from a party -- we're not sure who it is -- to Min,
11  right?
12  A. Yes.
13  Q. And this party is texting you; that's what SMS means,
14  right?
15  A. Yes.
16  Q. Texting you: "OMG. I forgot to tell you before, when I
17  got back on island, I stopped at my local deli and Kenny was
18  there with his poor dog playing the guitar and begging for
19  money." Right?
20  A. Yes.
21  Q. So you were aware that Kenny was playing the guitar for
22  money?
23  A. To my knowledge, Chopper, the guy that sent it, he makes up
24  things sometimes. So I don't know how true that was. So I'm
25  not going to say that's true or not. I didn't see it with my

1  own eyes so I don't know.
2  Q. At your initial arrest, you learned what you were charged
3  with, right?
4  A. Yes.
5  Q. You learned you were charged with distributing heroin?
6  A. Yes.
7  Q. And you learned that you were charged with participating in
8  Dino's conspiracy, right?
9  A. Yes.
10  Q. And you learned that you were charged with distributing a
11  kilo or more of heroin, correct?
12  A. Yes.
13  Q. And you learned that Kenny was charged with being a
14  participant in Dino's conspiracy, right?
15  A. Yes.
16  Q. And you learned that Kenny was accused of recruiting people
17  at a methadone clinic, is that correct?
18  A. Yes.
19  Q. Now, you first met with the government for a sit-down
20  meeting in February of 2018, the year you were arrested, right?
21  A. February what?
22  Q. February -- I will get that date for you.
23          You first met with the government on February 16th of
24  2018.
25  A. Yes.

1  Q. Do you recall that meeting?
2  A. Yes, I recall that meeting.
3  Q. At the first meeting, your lawyer was there, right?
4  A. Yes.
5  Q. And two prosecutors were there, correct?
6  A. Yes.
7  Q. And agents were there?
8  A. Yes.
9  Q. And they told you about a proffer agreement, right?
10  A. Yes.
11  Q. They had you sign the proffer agreement?
12  A. They didn't have me do nothing. I decided to sign.
13  Q. You decided to sign the proffer agreement. Excuse me. I
14  am not trying to put words in your mouth.
15          You wanted to give them information, right?
16  A. Yes.
17  Q. So that you could get a cooperation agreement?
18  A. Yes.
19  Q. And when you met with them, they asked you questions?
20  A. Correct.
21  Q. They were taking notes?
22  A. To my knowledge, yes.
23  Q. And they showed you some pictures, right?
24  A. I don't recall the pictures.
25  Q. They asked you to tell them about certain people, right?

1  A. They asked me about certain people.
2  Q. Exactly. They asked you about certain people. And when
3  they were asking you about certain people, they wanted to know
4  what you knew about those people, correct?
5  A. Yes.
6  Q. And you told them what you knew, right?
7  A. Yeah.
8  Q. At that meeting, you knew that they were trying to
9  prosecute people, right?
10  A. I don't know what they were doing. They just wanted to
11  know about people, and I told them.
12  Q. You knew you were being prosecuted in this case?
13  A. That I knew.
14  Q. You knew that other people were being prosecuted in this
15  case, right?
16  A. That I knew.
17  Q. So you knew they were prosecuting people, right?
18  A. Yes.
19  Q. And at that meeting, your goal was to get time off your
20  sentence, correct?
21  A. Yes.
22  Q. So you told them that you started selling in 2015, is that
23  correct?
24  A. Correct.
25  Q. And you told them about the people who supplied you with

| J598VAN3 Cejovic - Cross Page 655 | J598VAN3 Cejovic - Cross Page 657 |
|---|---|

**Page 655**

1   heroin, correct?
2  A. Yes.
3  Q. You told them about Dino, right?
4  A. Yes.
5  Q. You told them that Dino bought a BMW, right?
6  A. Yes.
7  Q. You told them about how Gordo supplied Dino, correct?
8  A. Yes.
9  Q. And you told them about how a woman supplied Gordo, right?
10  A. Yes.
11  Q. About how a Colombian man supplied that woman, right?
12  A. I don't know if it was a man. I said Colombian.
13  Q. A Colombian person supplied the woman with the heroin, is
14   that correct?
15  A. That's what I heard.
16  Q. That's what you told them that day, the first proffer
17   session, right?
18  A. Yes.
19  Q. And you also told them about a supplier named O, right?
20  A. Yes.
21  Q. You also told them about a supplier named Night, right?
22  A. Yes, actually, I did.
23  Q. You told them about several levels above you in the drug
24   organization, correct?
25  A. Yes.

**Page 656**

1  Q. You told them about Dino?
2  A. Yes.
3  Q. You told them about Gordo, right?
4  A. Yes.
5  Q. You told them about the woman, right?
6  A. Yes.
7  Q. And you told them about the Colombian, correct?
8  A. I didn't know about the Colombian. I just said the
9   Colombian.
10  Q. You told them it was a Colombian?
11  A. Yes.
12  Q. So you told them about the Colombian, correct?
13  A. Yes.
14  Q. And you told them about how the drugs were packaged, right?
15  A. Yes.
16  Q. You told them about where the drugs were stashed, right?
17  A. Yes.
18  Q. You told them about people with guns?
19  A. Yes.
20  Q. You told them about people who gambled for tens of
21   thousands of dollars, right?
22  A. Yes.
23  Q. You told them about cocaine dealers, right?
24  A. Yes.
25  Q. And then they asked you about Kenny Charlton, right?

**Page 657**

1  A. All my codefendants, yes.
2  Q. But they asked you about Kenny Charlton, correct?
3  A. Yes.
4  Q. And you talked about Kenny Charlton, right?
5  A. Yes.
6  Q. You knew Kenny was indicted?
7  A. Yes.
8  Q. He was one of your codefendants?
9  A. Yes.
10  Q. And you knew the government had charged Kenny with being a
11   recruiter, right?
12  A. Yes.
13  Q. You knew the government had charged Kenny with being a
14   member of this ring, right?
15  A. Yes.
16  Q. But you knew Kenny wasn't a bigwig, right?
17  A. I never said he's a bigwig.
18  Q. Because you knew he wasn't a bigwig, right?
19  A. Yes.
20  Q. You knew he wasn't a player, right?
21     MR. FINKEL: Objection to form.
22     THE COURT: Sustained.
23  Q. You knew Kenny wasn't important, right?
24  A. In a way, yes, to me he was important.
25  Q. He didn't go to fancy clubs with you, right?

**Page 658**

1  A. No.
2  Q. He didn't go on vacation with you, right?
3  A. No.
4  Q. He was a junkie?
5  A. Well, let me rephrase that. There's people I sold to that
6   I partied with that used too.
7  Q. And Kenny was not one of the people that you sold to that
8   you partied with?
9  A. He wasn't my friend.
10  Q. He was a junkie? Let's start there.
11  A. To me he was a customer.
12  Q. He didn't have a lot of money, right?
13  A. There's times he had money.
14  Q. He had some money sometimes?
15  A. Yes.
16  Q. But he didn't have a lot of money, right?
17  A. To my knowledge, no.
18  Q. In fact, he still owes you $500, doesn't he?
19  A. Yes.
20  Q. To you $500 is not a lot of money, right?
21  A. Yeah, it is.
22  Q. You met with the government on April 5th of this year. Do
23   you remember that?
24  A. Yes.
25  Q. You met with the government a lot this month?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1 A. Yes. Yes.
2 Q. I am going to draw your attention -- at that meeting, you
3  told the government that Mr. Charlton owes you $500, right?
4 A. Yes.
5 Q. And you said that that was not a lot of money, right?
6 A. I don't recall I said that.
7 Q. Would it help to refresh your recollection if I showed you
8  the notes of the session?
9 A. Yes, it would refresh my recollection.
10 Q. I am showing you what has been marked as 3501-4, page 8.
11      You can look where my finger is and you can try and
12  read what it says.
13 A. Yeah. I don't remember saying that.
14 Q. Kenny was sometimes dope sick, right?
15 A. Yes.
16 Q. And when he was dope sick, you didn't try to help him with
17  that, right?
18 A. I did before.
19 Q. You helped Kenny when he was dope sick?
20 A. Yeah. I gave him drugs when he was dope sick.
21 Q. You gave him drugs for free when he was dope sick?
22 A. I think I did before, maybe a bag or two, here and there.
23  But not a whole bundle.
24 Q. You didn't give him heroin regularly at cost, right?
25 A. What do you mean at cost?

1 Q. At the price that you bought it for.
2 A. No.
3 Q. You knew he was a carpenter, right?
4 A. Yes.
5 Q. You didn't hire him to do carpentry work around your house,
6  right?
7 A. At the time I lived with my parents. I wouldn't have a
8  customer come to my house to fix my house.
9 Q. Now, I want to go back to the first meeting with the
10  government that we talked about a few minutes ago.
11 A. Which meeting?
12 Q. The first meeting you had where you sat down with the
13  government in February of 2018.
14 A. Yes.
15 Q. Now, at that meeting, you told the government that since
16  2015, either you or Charlton would sell three to four bundles
17  of heroin per day to customers recruited from the methadone
18  program?
19 A. Yes.
20 Q. At that first meeting, you didn't tell them everything you
21  knew about Kenny?
22 A. I just told them what I knew at that moment.
23 Q. You didn't tell them he was an addict, right?
24 A. Did I tell them that? I don't recall if I told them that
25  or not.

1 Q. I am going to show you what the government has marked as
2  3501-11, just for the parties.
3      I am showing you the report from the meeting you had.
4      Do you recall what you said to the government about
5  Mr. Charlton?
6 A. It said since 2015?
7 Q. Right.
8 A. I wasn't selling 2015.
9 Q. So you didn't tell the government at that meeting that he
10  was an addict, right?
11 A. I told the government about everybody's drug use.
12 Q. You didn't tell them at that meeting that you didn't sell
13  to Kenny for months at a time, right?
14 A. I don't recall if I told them that or not.
15 Q. Would you like to see again the paragraph.
16      I am showing you again the report of your first
17  meeting, page 2. Here is the paragraph where you talked.
18 A. Could you repeat that question one more time?
19 Q. You didn't tell the government at that first meeting that
20  you didn't sell to Kenny for months at a time, right?
21 A. I think I did. I don't know. I'm not sure.
22 Q. You didn't tell them you didn't trust him with drugs,
23  right?
24 A. No, I never trusted him with drugs.
25 Q. You didn't tell the government at that first meeting that

1  you didn't trust Kenny with drugs, right?
2 A. It was April last year. I don't know. I can't recall.
3 Q. Would it refresh your recollection if I showed you again
4  what you said about Kenny?
5 A. Yes.
6 Q. So you didn't tell the government at that first meeting
7  that you didn't trust Mr. Charlton with drugs, right?
8 A. I told them a lot in the first meeting. But to this,
9  that's what it says I said. That's all.
10 Q. You didn't tell them that he bought from other dealers at
11  that first meeting, right?
12 A. Honestly, I don't know. It was last year.
13 Q. Would you like to review the paragraph again?
14 A. It says that, but there's nothing else to refresh my memory
15  what I told them.
16 Q. You didn't tell the government that he didn't know your
17  supplier, right?
18 A. I don't know.
19 Q. You didn't tell the government that he didn't know Paul Van
20  Manen, right?
21 A. I don't know. That first meeting you're talking about, I
22  don't know.
23 Q. I am talking about the first meeting where you first met
24  with the government.
25 A. I don't know.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH  CHARLTON

CORRECTED
May 9, 2019

1 Q. You didn't tell them that he didn't know Anthony Francese,
2  right?
3 A. I don't know.
4 Q. You didn't tell them he wasn't in the ring of people who
5  knew Dino, right?
6 A. I don't know.
7 Q. You didn't tell them that he was a junkie?
8 A. I don't know.
9 Q. You didn't tell them that he was a junkie that owed you
10  money, did you?
11 A. I told them I owed them money?
12 Q. In the first meeting you --
13 A. The first meeting, I don't know.  It happened last year.
14 Q. We are just talking about the first meeting.
15 A. I can't recall.
16 Q. At the first meeting, you told the government that Kenny
17  went to the methadone clinic to recruit customers, right?
18 A. That's what it says here, yes.
19 Q. Do you recall telling them that?
20 A. It says it right there, so I can recall it.
21 Q. At the first meeting, you told the government that Kenny
22  went to the methadone clinic starting in 2015, right?
23 A. I don't recall even if it says here that I told them that.
24 Q. Now, after that first meeting, you met with the government
25  many, many times, right?

1 A. After that, I met them a few more times.
2 Q. After that first meeting, you met with them many times
3  since then?
4 A. Yeah.  Right after?  Yeah.
5 Q. Each time you met with them, you were supposed to tell the
6  truth, correct?
7 A. Correct.
8 Q. And each time you met with them, you were supposed to tell
9  them everything you knew, right?
10 A. Correct.
11 Q. And you knew that you could be charged if you told them a
12  lie, right?
13 A. Correct.
14 Q. So in each time, you signed an agreement saying you would
15  tell the truth, right?
16 A. Yes.
17 Q. You knew that Kenny -- you believed that Kenny was going to
18  other dealers, right?
19 A. Do I believe he was going to dealers?
20 Q. Yes.
21 A. I do believe that, but I don't know that.
22 Q. When he was going to other dealers, he was buying drugs,
23  right?
24 A. I don't know.  I wasn't selling to him when he was going to
25  other dealers.

1 Q. Kenny texted another dealer to your phone once, right?
2 A. I'm sorry?
3 Q. Kenny texted another dealer to your phone, correct?
4 A. I don't know.
5 Q. Kenny and a man named Mike used to buy drugs together,
6  right?
7 A. Yes.
8 Q. From you, right?
9 A. Yes.
10 Q. They would pool their money and buy a bundle, right?
11 A. Yes.
12 Q. And sometimes Kenny would call you, right?
13 A. Yes.
14 Q. To buy the drugs, and sometimes Mikey would call you to buy
15  the drugs?
16 A. Yes.
17 Q. So when Kenny was buying drugs from you, he would text you
18  to see if you were good and if you could meet up with him and
19  Mikey sometimes, right?
20 A. Yes.
21 Q. He would say, are you ready to meet up with me, right?
22 A. Yes.
23 Q. And you knew that that meant come bring me drugs, right?
24 A. He asked if I was good, yes.
25 Q. Or when he said, are you ready?

1 A. Yes.
2 Q. And you also knew that when Kenny texted you and said, are
3  you coming by, that meant are you coming by to bring me heroin?
4 A. Yes.
5 Q. So you have seen the line sheets in your case, right?
6 A. Yes.
7     MS. O'NEILL: So this is USAO 003144, and I am marking
8  it as Defense Exhibit E.
9 Q. This was provided by the government, right, the line
10  sheets?
11 A. Yes.
12 Q. And you can see that you are a target, Cejovic Jasmin,
13  right?
14 A. Yes.
15 Q. And you can see that the date is August 17, 2017, right?
16 A. Yes.
17     MS. O'NEILL: I would like to move this into evidence.
18     MR. FINKEL: Objection.  Hearsay.
19     THE COURT: Overruled.  E is in evidence.
20     (Defendant's Exhibit E received in evidence)
21 Q. So this is a text message --
22     MS. O'NEILL: Can you publish this to the jury?
23 Q. This is a text message from Kenny to you.  It says, "Hey
24  Kev, it's Kenny and Mike.  Just finishing up, wondering if you
25  were coming by.  Sorry to bother you.  Thank you."  Right?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1 A. Who's Kev?
2 Q. It seems to me like Kev is another dealer.
3         MR. FINKEL: Objection.
4         THE COURT: Sustained.
5         The jury will ignore the observation by counsel.
6 Q. Your name is not Kev, right?
7 A. But that's to my number.
8 Q. Exactly.
9 A. Yeah. I don't know nobody named Kev.
10 Q. You don't work with anyone named Kev, right?
11 A. To my knowledge, no.
12         MS. O'NEILL: I was wondering, Ms. Dunbar, if you
13   could play Government Exhibit 303B, previously entered into
14   evidence. And for the jury, it's the 303B-T.
15         What we going to be playing is 303B and the transcript
16   is with a letter T.
17         THE COURT: What is the date, Ms. O'Neill?
18         MS. O'NEILL: The date is August 16, 2017, at 5:02 and
19   24 seconds.
20         (Audio played)
21         MS. O'NEILL: Can you stop it?
22 BY MS. O'NEILL:
23 Q. Right there you guys are talking about how he's going to be
24   pawning some tools, correct?
25 A. That's what he told me.

1 A. Yes.
2 Q. Frankie is a drug dealer?
3 A. At that time, yes.
4 Q. Frankie sold heroin at that time?
5 A. At that time.
6 Q. Is that correct?
7 A. Yes.
8 Q. And Kenny called Frankie?
9 A. That's what he said.
10 Q. That's what Kenny said.
11 A. Yes.
12 Q. That's because Kenny wanted to buy heroin from Frankie,
13   right?
14 A. That's what it said, yes.
15 Q. Then Kenny realized that Frankie already bought heroin from
16   you, right?
17 A. Wait. Let me go back to this. Let me just read this
18   again.
19 Q. Sure. Take your time.
20 A. I don't know if he met up with Frankie to call him.
21 Q. OK.
22 A. To me it seemed like he ran into him. He could have been
23   waiting for me somewhere, because I used to make people wait in
24   the same spot together and used to run into other customers.
25 Q. I am going to draw your attention to the call, where it

1 Q. That's what he told you, right?
2 A. Yes.
3         MS. O'NEILL: Can you play it again.
4         (Audio played)
5 Q. I want to talk some more about Frankie. OK?
6 A. Yes.
7 Q. This is someone you know as short Frankie?
8 A. Yes.
9 Q. And short Frankie was selling drugs for you, right?
10 A. He was buying and reselling.
11 Q. Short Frankie was buying drugs from you and then reselling
12   them, correct?
13 A. Yes.
14 Q. He was selling bundles of heroin at the time?
15 A. Yes.
16 Q. And you and Kenny in this conversation are talking about
17   short Frankie, right?
18 A. Yes.
19 Q. And Kenny told you that he was trying to hook up Frankie
20   with you, right?
21 A. Yes.
22 Q. But it didn't work out, right?
23 A. Yes.
24 Q. And it didn't work out because Frankie was already selling
25   your drugs, right?

1   says, "So I called fucking Frankie." That's on page 3, line
2   23.
3         THE COURT: What's the question?
4 Q. The question is, to your knowledge, Kenny called Frankie
5   up, right?
6 A. Yeah. It said that after.
7 Q. To buy heroin from Frankie, right?
8 A. That's what it's saying here.
9 Q. Then Kenny realized that Frankie bought heroin from you,
10   right?
11 A. He didn't say he was calling. He said, I was fucking
12   talking to a man. Then after it says that he called Frankie.
13 Q. It's saying that Kenny called Frankie, right, and he was
14   trying to buy heroin from him, right?
15 A. Yes.
16 Q. And Frankie sold the heroin for $70, right?
17 A. Yes.
18 Q. And they realized that it was the same heroin that you
19   sold, right?
20 A. Yes.
21 Q. So Kenny didn't buy the heroin from Frankie, right?
22 A. You saying Kenny bought the heroin from Frankie?
23 Q. That he didn't buy the heroin from Frankie.
24 A. Let me read this. One second.
25         Yeah, that's what it says here.

J598VAN3      Cejovic - Cross      Page 671

1 Q. He didn't buy the heroin because it was cheaper from you,
2    right?
3 A. Yes.
4 Q. Now, I want to talk to you about Nicole. OK?
5 A. OK.
6 Q. The government played a call between you and Kenny earlier
7    today, right?
8 A. Yes.
9 Q. It was Government Exhibit 303A-T.
10       That wasn't the first time you had heard that call,
11    right?
12 A. No.
13 Q. You heard that call in meetings with the government before,
14    right?
15 A. Yes.
16 Q. And they asked you about Nicole, right?
17 A. Yes.
18 Q. In those meetings, correct?
19 A. Yes.
20 Q. And you told the government -- they asked you what you
21    remembered about her, correct?
22 A. Correct.
23 Q. And you told the government that you didn't remember
24    Nicole, correct?
25 A. No, I didn't remember her.

J598VAN3      Cejovic - Cross      Page 672

1 Q. That's because Nicole never called you, correct?
2 A. I don't know if she ever called me or not.
3 Q. You don't remember Nicole, correct?
4 A. No, I don't remember her.
5 Q. Now, you mentioned earlier someone called Chris the Greek,
6    right?
7 A. Yes.
8 Q. And how people would pick up drugs from Chris the Greek,
9    correct?
10 A. Yes.
11 Q. Kenny wasn't one of the people who picked up drugs from
12    Chris the Greek, correct?
13 A. No.
14 Q. Now, there came a time when you and Kenny stopped working
15    together, correct?
16 A. Yes.
17 Q. When Kenny stopped buying heroin from you, right?
18 A. Yes.
19 Q. And that time was around the time of the Conor McGregor and
20    Floyd Mayweather fight, is that correct?
21 A. No, because I spoke to him that day; he was coming to meet
22    up with me.
23 Q. Do you remember telling the government that you stopped
24    dealing with Kenny around the time of the Conor McGregor and
25    Floyd Mayweather fight?

J598VAN3      Cejovic - Cross      Page 673

1 A. After that day I think I stopped.
2 Q. You stopped selling drugs to Kenny after the Conor McGregor
3    and Floyd Mayweather fight, is that correct?
4 A. I don't know exactly, but around that time.
5 Q. Around the time of the Conor McGregor and Floyd Mayweather
6    fight you stopped selling drugs to Kenny, correct?
7 A. Yes.
8 Q. Now, you were selling heroin in the North Shore of Staten
9    Island, correct?
10 A. North Shore and South Shore.
11 Q. In both shores of Staten Island, right?
12 A. Yes.
13 Q. A lot of your customers were working class guys, right?
14 A. Yeah.
15 Q. A lot of them had been roofers, right?
16 A. Yes.
17 Q. Carpenters, right?
18 A. Yes.
19 Q. Plumbers, right?
20 A. Yes.
21 Q. They were people who used to have jobs, right?
22 A. Yes.
23 Q. Or maybe some of them still had jobs, right?
24 A. Yes.
25 Q. And they fell prey to heroin addiction, correct?

J598VAN3      Cejovic - Cross      Page 674

1 A. Yes.
2 Q. And a lot of these people needed heroin in order to go to
3    work, correct?
4 A. Yes.
5 Q. In other words, if they were too sick, they weren't able to
6    go to work, correct?
7 A. I don't know about every customer.
8 Q. Not every customer. Sorry if you have that misimpression.
9 A. Some customers still went to work.
10 Q. Some of your customers sometimes were too sick to go to
11    work, is that correct?
12 A. Some of them, yes.
13 Q. And sometimes your customers would ask you if they could
14    buy heroin so they could go to work, is that correct?
15 A. Yes.
16 Q. And sometimes some of them said, I'm going to work, can you
17    front me the heroin, I'm getting paid tomorrow, is that
18    correct?
19 A. Yes.
20 Q. Now, you met with the government about a month ago?
21 A. Yes.
22 Q. And they asked you about selling to people on credit,
23    correct?
24 A. Yes.
25 Q. And you told them you didn't sell to very many people on

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1 credit, right?
2 A. Yes.
3 Q. Then you told them that you keep track of all the people
4 you sold to on credit in your notes app on your phone, right?
5 A. Yes.
6 Q. So you knew Kenny was a drug addict, right?
7 A. Yes.
8 Q. You knew he had a bad addiction, right?
9 A. Yes.
10 Q. You were introduced to him as a drug addict, right?
11 A. Yes.
12 Q. You knew he personally used about two or three bundles a
13 day, correct?
14      MR. FINKEL: Objection. Foundation.
15      THE COURT: Sustained.
16 Q. You knew when Kenny was buying for personal use from you,
17 right?
18 A. Two or three, maybe one or three.
19 Q. You knew how many drugs Kenny was using, right?
20 A. I had a clue. I didn't know exactly.
21 Q. You had a clue how many drugs Kenny was using?
22 A. Yes.
23 Q. And he was using two or three bundles a day, right?
24 A. Around there.
25 Q. You didn't trust him with drugs, right?

1 A. No.
2 Q. You didn't trust him with drugs because he might use them,
3 right?
4 A. No, because he owed me money.
5 Q. Now, you told the government that you normally sold heroin
6 for $60 a bundle, right?
7 A. Yes.
8 Q. And you told the government earlier in April that you would
9 sell bundles of heroin to Kenny for $60, right?
10 A. Yes.
11 Q. Then you told them that Kenny would resell for 70 or 80,
12 right?
13 A. No. Let me rephrase that. It depended what he bought from
14 me when he wanted to resell. If he bought ten bundles, I
15 charged $50 each. So it's $500 for a sleeve. Then he would
16 resell them for 60, 70, 80, whatever he did.
17 Q. In April of 2017, you sold heroin to someone who was
18 working with the police. Do you remember that?
19 A. Me?
20 Q. Yes.
21 A. I sold to someone who worked with the police?
22 Q. Yes.
23 A. No.
24 Q. You don't know that you sold heroin to a confidential
25 informant?

1 A. No.
2 Q. Now, you reached out to Kenny in January of 2018, is that
3 correct?
4 A. I'm sorry. When?
5 Q. In January of 2018, before you were arrested, you reached
6 out to Kenny, right?
7 A. Yes.
8 Q. You were interested in seeing if Kenny wanted to buy
9 heroin, correct?
10 A. Yes.
11 Q. Kenny still owed you that $500, right?
12 A. Yes.
13 Q. He owes you that today, right?
14 A. Yes.
15 Q. And you told him to get people together, right?
16 A. Yes.
17 Q. You meant get people together to buy heroin, right?
18 A. To get customers, new customers, yeah.
19 Q. You said get people together, right?
20 A. To get new customers, that's what I meant.
21 Q. You meant for him to get people together to buy heroin.
22      MR. FINKEL: Objection to the preamble.
23      THE COURT: Sustained.
24 Q. He wrote back to you "working on it," correct?
25 A. Yes.

1 Q. And he never got those people together, right?
2 A. I don't exactly remember that day. It was my birthday. I
3 think it was January 10. Can you check the date?
4 Q. Did Kenny ever contact you again to get customers?
5 A. After that, I don't know. I got arrested around that time
6 so I don't know.
7      (Continued on next page)

| J592van4 | Cejovic - Cross | Page 679 |
|---|---|---|

1 Q. Let me show you the date.

2    You don't recall Kenny ever getting customers together

3 for you after you contacted him in January, right?

4 A. What was the date?

5 Q. In January, Kenny never got any customers for you, right?

6 A. I don't recall.

7 Q. Okay. Now, Kenny went to the methadone clinic on Seguine?

8 A. Yes.

9 Q. And he went there for treatment, right?

10 A. Yes.

11 Q. He told you he wanted to get clean, right?

12 A. He did say that to me.

13 Q. He didn't want to be an addict, right?

14 A. He did say that to me.

15 Q. Earlier today you told the court that you used to sell

16 pills, right?

17 A. Yes.

18 Q. You met with the government in August of 2018, right?

19 A. Yes.

20 Q. You told the government that you sold pills then.

21 A. I sold pills before, yes.

22 Q. In August of 2018, you told the government that you sold

23 pills, right?

24 A. Yes.

25 Q. And you told them you sold pills occasionally, right?

| J592van4 | Cejovic - Cross | Page 680 |
|---|---|---|

1 A. Yes.

2 Q. You met with the government many, many more times, right?

3 A. Yes.

4 Q. And just a few days ago, April 25, you met with them again,

5 right?

6 A. Yes.

7 Q. And you told the government that you sold 4,000 pills,

8 right?

9 A. Around there, yes.

10 Q. Now, you sold cocaine, right?

11 A. Yes.

12 Q. On April 30, you told the government you sold between five

13 and ten kilos of cocaine, right?

14 A. Yes.

15 Q. And then the next day, on May 1, you told the government

16 that you sold between ten and 20 kilos of cocaine, right?

17 A. Yes.

18 Q. Now, when you were out on bond -- you he were released on

19 bond in this case, right?

20 A. Yes.

21 Q. And as a condition of your bond, you had to meet with a

22 probation officer, right?

23 A. Yes.

24 Q. The probation officer had certain requirements, right?

25 A. Yes.

| J592van4 | Cejovic - Cross | Page 681 |
|---|---|---|

1 Q. If you didn't meet those requirements, you could get sent

2 back to jail.

3 A. Yes.

4 Q. One of the conditions was that you wear an ankle bracelet.

5 A. Yes.

6 Q. An ankle bracelet is a little machine, right?

7 A. Yes, around my ankle.

8 Q. It keeps track of where you go?

9 A. Yes.

10 Q. And it alerts your probation officer if you go somewhere

11 you shouldn't, right?

12 A. Yes.

13 Q. And one of the requirements was that you get a job, right?

14 A. Nobody required. I told them I wanted to get a job, and I

15 got a job on my own.

16 Q. And you were allowed to leave your house for work, right?

17 A. Yes.

18 Q. You were allowed to leave your house for doctors'

19 appointments, right?

20 A. Yes.

21 Q. You were allowed to leave your house for lawyers' visits,

22 right?

23 A. Yes.

24 Q. And your probation officer knew when you left the house,

25 right?

| J592van4 | Cejovic - Cross | Page 682 |
|---|---|---|

1 A. Yes.

2 Q. You had to tell the probation officer in advance, right?

3 A. Yes.

4 Q. But sometimes -- so you told your probation officer when

5 you went to work, right?

6 A. Yes.

7 Q. And sometimes -- but sometimes when you told your probation

8 officer that you were going to work, you were actually going

9 somewhere else, right?

10 A. Yes.

11 Q. You went to a strip club, right?

12 A. I went to a strip club when I had the bracelet off, yes.

13 Q. And you went to a nice restaurant, right?

14 A. Yes.

15 Q. When your probation officer thought you were going to work,

16 right?

17 A. Let me rephrase that, not when he thought I was going to

18 work. I did it when I had my ankle bracelet off. Because they

19 took my ankle bracelet off -- I had a slipped disk in my back,

20 so I got x-rays done, and then that's when I went out.

21 Q. You were not allowed to go to a strip club, right?

22 A. No.

23 Q. Now, the probation officer didn't just take your word for

24 it that you were going to work. She made you show proof,

25 right?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  A. He made me show proof.
2  Q. He made you show proof. He made you show proof that you
3    were working, right?
4  A. Yes.
5  Q. And what you did was you showed the probation officer some
6    checks, right?
7  A. All my pay stubs.
8  Q. You showed your probation officer all your pay stubs,
9    right?
10  A. Yes.
11  Q. To prove that you were working, right?
12  A. Yes.
13  Q. To prove that you were working when you were supposed to
14    be, right?
15  A. Yes.
16  Q. To prove that you had told the truth to the probation
17    officer, correct?
18  A. Yes.
19  Q. And you wanted to go somewhere other than work, correct?
20  A. Yes, in January.
21  Q. You wanted -- so you and your boss, right, got together and
22    you made a fake check, right?
23  A. No. I didn't get together with him. He just wrote the
24    checks for me and I picked them up.
25  Q. Your boss wrote a check for work that you didn't do, right?

1  A. Yes.
2  Q. With the understanding that you wouldn't cash the check,
3    right?
4  A. No, I didn't cash the check.
5  Q. Right. Your boss wrote the checks, right?
6  A. Yes.
7  Q. And your boss believed that you were not going to cash the
8    check, right?
9  A. Yes.
10  Q. You intended to show the check to the probation officer,
11    correct?
12  A. Yes.
13  Q. And then you were going to rip up the check, right?
14  A. Yes.
15  Q. And this was to convince the probation officer that you had
16    been at work, right?
17  A. Yes.
18  Q. When you weren't at work, right?
19  A. Yes.
20  Q. Now, you went back into jail when you pled guilty the first
21    time, correct?
22  A. Yes.
23  Q. That was on January 31, right?
24  A. Yes.
25  Q. And when you went to jail, you went to the MDC, right?

1  A. I went to MCC first.
2  Q. You went to MCC at first, and MCC is located right here,
3    right?
4  A. Yes.
5  Q. And MDC is located in Brooklyn, right?
6  A. Yes.
7  Q. And now you are housed at MDC, right?
8  A. Yes.
9  Q. And while you have been in jail, you have engaged in
10    further crimes, right?
11  A. Yes.
12  Q. One of the things you did is you exchanged someone's phone
13    minutes, right?
14  A. Yes.
15  Q. You let someone use your phone, right?
16  A. Yes.
17  Q. In exchange for money, right?
18  A. In exchange for money?
19  Q. Yes.
20  A. No. I just let somebody use my minutes.
21  Q. Okay.
22  A. I bought minutes off somebody before, yes, like I bought
23    their minutes.
24  Q. Okay. So you know there are people in jail who have very
25    little money, right?

1  A. They have very little money in jail?
2  Q. Yes.
3  A. I don't know what they have.
4  Q. Some people want to sell their phone minutes, right?
5  A. I don't know what they need to do.
6  Q. Okay. Some people sell their phone minutes, right?
7  A. Yes.
8  Q. Because -- and people in jail need money in jail, right?
9  A. I need money in jail, yes.
10  Q. People in jail need money to buy extra food, right?
11  A. Yeah, commissary, yes.
12  Q. The food in prison is terrible, right?
13  A. Some of it, yes.
14  Q. You don't like to eat the regular prison food, right?
15  A. Some of it, yes.
16  Q. And what you do is you buy additional food, right?
17  A. Yeah, commissary.
18  Q. Commissary. You buy commissary so you can eat food that
19    tastes better, right?
20  A. Yes.
21  Q. The food that you want to eat.
22  A. Yes.
23  Q. Or at the very least would prefer to eat, right?
24  A. Yes.
25  Q. And you also use the commissary to buy shampoo.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1 A. Clothes.
2 Q. Clothes.
3 A. Snacks, soda, coffee, tea.
4 Q. Right. You are not supplied with a lot of things in jail,
5 right?
6 A. No.
7 Q. So you need --
8 THE COURT: Would you get to something relevant soon,
9 Ms. O'Neill?
10 MS. O'NEILL: Yes, I am getting there. Thank you,
11 Judge.
12 BY MS. O'NEILL:
13 Q. So some people have to sell their phone minutes in order to
14 get these essential items, is that correct?
15 A. If that's what they tell me, that's what they tell me, but
16 I don't know.
17 Q. Okay. Some people sell their phone minutes and then they
18 spend the money that you give them on commissary, is that
19 correct?
20 MR. FINKEL: Objection.
21 A. I don't know what they do.
22 THE COURT: Sustained, sustained.
23 MS. O'NEILL: Okay, okay.
24 THE COURT: Get to something relevant, will you?
25 MS. O'NEILL: Okay.

1 BY MS. O'NEILL:
2 Q. Now, you know that there are other cooperators in MDC,
3 right?
4 A. All over.
5 Q. Right. And you know that the cooperators are meeting with
6 their United States Attorneys, right?
7 A. Yes.
8 Q. And they are meeting with their agents, right?
9 A. Yes.
10 Q. And one of the things that the cooperators do is they
11 report things that other inmates do to the United States
12 Attorney, right?
13 A. Yes.
14 Q. Okay. Now, I want to talk about your first cooperation
15 agreement, which is in evidence as Defense Exhibit C, if we
16 could show it to the jury.
17 Now, after you signed this cooperation agreement, you
18 informed the government of further crimes that you had
19 committed, correct?
20 A. Yes.
21 Q. You had been told when you were first arrested that you
22 needed to be truthful with the government, correct?
23 A. Yes.
24 Q. You had been told that the truth means the whole truth,
25 correct?

1 A. Correct.
2 Q. It means the truth that you know, right?
3 A. Correct.
4 Q. You are not allowed to hide anything from the government,
5 correct?
6 A. Correct.
7 Q. And in exchange for telling the truth, you were hoping to
8 get time off your sentence, correct?
9 A. Yes.
10 Q. You wanted to get what's called a 5K letter, right?
11 A. Yes.
12 Q. And you were on the path towards getting that 5K letter at
13 the end of January of this year, is that correct?
14 A. Yes.
15 Q. And after you met with them and signed the cooperation
16 agreement and pled guilty before Judge Crotty, right --
17 A. Correct.
18 Q. -- you told them that -- about new crimes, right?
19 A. Correct.
20 Q. You told them about crimes you hadn't told them about
21 before, is that correct?
22 A. Correct.
23 Q. And in preparation for your testimony here today, you have
24 met with the government many times, right?
25 A. Correct.

1 Q. After you signed that cooperation agreement, the first
2 cooperation agreement.
3 A. Correct.
4 Q. And you met with them on March 20?
5 A. Correct.
6 Q. April 5?
7 A. Correct.
8 Q. April 11?
9 A. Correct.
10 Q. April 16?
11 A. Correct.
12 Q. April 25?
13 A. Correct.
14 Q. April 22?
15 A. Correct.
16 Q. April 30?
17 A. Correct.
18 Q. And then since then you have met with them several times,
19 right?
20 A. Yes.
21 Q. Now, at the meeting on April 30, you told the government
22 about crimes you hadn't told them about before, right?
23 A. Yes.
24 Q. You had told them that you were in 100 fights in the past,
25 right?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1 A. Yes.
2 Q. And at this meeting with the government, you were in the
3   room, they were asking you again about prior bad acts, right?
4 A. Yes.
5 Q. They were asking you to tell them about the prior crimes
6   you had committed, right?
7 A. Yes.
8 Q. And Mr. Finkel was there.
9 A. Yes.
10 Q. And agents were there, right?
11 A. Yes.
12 Q. And at that meeting, that meeting was the first time you
13   told the government that you had slapped a woman across the
14   face, right?
15 A. Yes.
16 Q. In a bar fight, right?
17 A. Yes.
18 Q. The first time you told them this was six days ago, right?
19 A. Yes.
20 Q. And at that same meeting you also told them that someone
21   overdosed from drugs that you sold, right?
22 A. Yes.
23 Q. You had never told the government about this before.
24 A. No.
25 Q. You couldn't remember this person's name, right?

1 A. I -- I didn't sell to the person directly, so I didn't
2   know.
3 Q. You didn't know their name, right?
4 A. No, I don't know who they were.
5 Q. And you had never previously told the government about this
6   overdose, right?
7 A. No.
8 Q. Now, the government didn't rip up your cooperation
9   agreement, right?
10 A. No.
11 Q. They didn't send you back to jail, right?
12 A. I'm still in jail.
13 Q. Well, I guess -- they didn't send you back with the 20-year
14   mandatory minimum, right?
15 A. No.
16 Q. They didn't say, You are done, Mr. Cejovic, we are not
17   going to help you get under the mandatory minimum, right?
18 A. No, they didn't say that.
19 Q. They said, oh, we will give you another cooperation
20   agreement, right?
21 A. Yes.
22 Q. The government didn't stop working with you, right?
23 A. No.
24 Q. They didn't charge you for making false statements, right?
25 A. I never made a false statement, but. . .

1 Q. Okay.
2 A. Yes.
3 Q. So they just gave you a new cooperation agreement, right?
4 A. Yes.
5 Q. And then you pleaded guilty again, right?
6 A. Yes.
7 Q. You pleaded guilty on May 3, right?
8 A. Yes.
9 Q. About six days ago, right?
10 A. Yes.
11 Q. And this time, in addition to pleading guilty to
12   distributing heroin laced with fentanyl, right?
13 A. Yes.
14 Q. And an overdose death?
15 A. Yes.
16 Q. You pleaded guilty to an additional serious bodily harm,
17   right?
18 A. Yes.
19 Q. Serious bodily harm to a person whose name you don't know,
20   right?
21 A. I never sold to the person, so I don't know.
22 Q. The person overdosed on heroin that you sold to someone
23   else, right?
24 A. I sold to one person, they sold to that person, yes.
25 Q. Right. You still have the same exact mandatory minimum as

1   you had before, right?
2 A. Yes.
3 Q. Your mandatory minimum is now 20 years, right?
4 A. Yes.
5 Q. Before it was 20 years also, right?
6 A. Yes.
7 Q. And the 5K letter, you still hope to get the 5K letter,
8   right?
9 A. I don't know yet.
10 Q. You hope to get the 5K letter.
11 A. Yes.
12 Q. You know you hope to get the 5K letter, right?
13 A. Of course.
14 Q. That 5K letter will allow the judge to sentence you under
15   the 20-year mandatory minimum, right?
16 A. Yes.
17 Q. And the government decides whether to write the 5K letter,
18   right?
19 A. Yes.
20 Q. And that's the same government that didn't rip up your
21   cooperation agreement, right?
22 A. Yes.
23 Q. That's the same government that allowed you to be here
24   today, right?
25 A. Yes.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1　Q. To testify, right?
2　　　It is the same government that allowed you to be here
3　today to testify, right?
4　A. Yes.
5　Q. And they are the same government that's allowing you to try
6　to trade your time for Mr. Charlton's, correct?
7　　　MR. FINKEL: Objection.
8　　　THE COURT: Sustained.
9　　　MS. O'NEILL: I have no more questions.
10　　　THE COURT: All right, ladies and gentlemen, we will
11　take our afternoon recess now. We will resume at 3:30.
12　　　(Continued on next page)
13
14
15
16
17
18
19
20
21
22
23
24
25

1　　　(Jury not present)
2　　　THE COURT: See you at 3:30.
3　　　(Recess)
4　　　(Jury present)
5　　　THE COURT: Ms. Sideris.
6　　　MS. SIDERIS: Thank you, your Honor.
7　CROSS-EXAMINATION
8　BY MS. SIDERIS:
9　Q. Good afternoon Mr. Cejovic.
10　A. Good afternoon, ma'am.
11　Q. I only have a few questions.
12　A. Okay.
13　Q. You first met Paul Van Manen when you were a teenager,
14　right?
15　A. Correct.
16　Q. You went to his deli in Staten Island?
17　A. Correct.
18　Q. And that was called Close to Home?
19　A. He had it -- actually he had a deli also Close to Home, but
20　I forgot about that deli. But I met him at Bada Bing Deli.
21　Q. You didn't hang out at Close to Home?
22　A. I didn't know he was the owner at that time when I hung out
23　there.
24　Q. So you now know he owned a deli called Close to Home,
25　right?

1　A. Yeah. I actually forgot, yes.
2　Q. And that's the one you hung out as a teenager?
3　A. I hung out at Bada Bing Deli.
4　Q. And that's the deli where you bought or -- withdrawn.
5　　That's where you stole cigarettes from?
6　A. Beer.
7　Q. Bada Bing?
8　A. Yes.
9　Q. And Bada Bing is the deli where you would sell weed
10　outside?
11　A. Yeah, I sold weed around there.
12　Q. You knew him as Pauley, right?
13　A. Just as Pauley, yeah, Pauley.
14　Q. And you learned from Kosic that Paul was a customer of
15　Kosic's right?
16　A. Correct.
17　Q. That's how Kosic would refer to Paul, as his customer,
18　right?
19　A. Correct.
20　Q. Or sometimes he would refer to him as "homo."
21　A. Correct.
22　Q. You mentioned that you had nicknames for Paul other than
23　"homo," right?
24　A. I did call him something else before, yes.
25　Q. What were your other nicknames for Mr. Van Manen?

1　A. I called him the fag.
2　Q. The fag.
3　　What else?
4　A. Deli guy.
5　Q. Deli guy?
6　　You were aware that, as a customer, Paul didn't get
7　the same rate as you did when buying heroin from Kosic, right?
8　A. Correct.
9　Q. So you paid $35?
10　A. Correct.
11　Q. And you knew that Paul paid $45?
12　A. Yes, correct.
13　Q. You and Kosic were in business together, right?
14　A. Correct.
15　Q. And Paul was sometimes bad for business.
16　A. To my knowledge, to Kosic, sometimes, yes.
17　Q. He was sometimes competition, right?
18　A. To me? No, not at all.
19　Q. Well, I believe you talked a little bit about this on
20　direct or, I'm sorry, on cross-examination that Paul would --
21　I'm sorry, addicts would try to play you dealers off of each
22　other, right?
23　A. Yes, they would say that, yeah, they would do that.
24　Q. And you knew Paul was an addict?
25　A. Yeah, he used drugs.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1 Q. When you first heard that Pauley was selling heroin, you
2   were surprised, right?
3 A. Yeah, I was very surprised.
4 Q. Because you had always known him as the guy who owned the
5   deli.
6 A. Yeah. That's all I knew him.
7 Q. And you told Kosic you didn't think Pauley had the balls to
8   sell heroin, right?
9 A. Yeah, that's correct.
10 Q. You talked a little bit -- well, you talked a lot on your
11   direct examination and your cross-examination about your
12   cooperation agreement.
13 A. Correct.
14 Q. And your understanding of your guilty plea pursuant to that
15   cooperation agreement, right?
16 A. Correct.
17 Q. Now, you understood that, for pleading guilty to the
18   heroin-fentanyl conspiracy, you faced a mandatory minimum
19   sentence of ten years, right?
20 A. Correct.
21 Q. And because you were held responsible for the death
22   of another, the overdose, your mandatory minimum is now 20
23   years, right?
24 A. Correct.
25 Q. So you are facing a mandatory minimum of 20 years and a

1       MS. O'NEILL: Objection.
2       THE COURT: Overruled.
3 A. No.
4 Q. Would you have to have some level of trust with a customer
5   in order to sell them heroin on credit?
6 A. Yes.
7 Q. Do you remember on cross you were shown some notes from
8   meetings you attended with the government?
9 A. Correct.
10 Q. Had you ever seen those notes before today?
11 A. Never.
12 Q. When people -- when you were meeting with the government
13   and someone was taking notes, did you have an opportunity to
14   review those notes?
15 A. Not at all.
16 Q. Do you know what they were writing?
17 A. I have no clue.
18 Q. Did you adopt those notes as your own statements?
19 A. No.
20 Q. Do you know if those notes are correct?
21 A. No.
22 Q. You were asked -- talking about you were asked a bunch of
23   questions about meetings that you had with the government and
24   questions they asked you, right?
25 A. Correct.

1   maximum of life.
2 A. Right.
3 Q. That's your potential sentence, right?
4 A. Correct.
5 Q. And now, as a result of cooperating, you are facing a
6   sentence of zero, zero years?
7 A. To life.
8 Q. To life, right.
9       So you could -- on the day you are sentenced, you
10   could walk out of jail. That's your understanding, right?
11 A. Correct.
12 Q. So when you made the rap video after you pled guilty, is
13   that what you meant when you said "I beat the case"?
14 A. No.
15       MS. SIDERIS: Thank you.
16       No more questions, your Honor.
17       THE COURT: Mr. Finkel.
18       MR. FINKEL: Thank you, your Honor.
19 REDIRECT EXAMINATION
20   BY MR. FINKEL:
21 Q. Mr. Cejovic, do you recall you were asked some questions on
22   direct about how you sold to other customers?
23 A. Correct.
24 Q. Did you allow all of your customers to purchase heroin from
25   you on credit?

1 Q. Did they only ask you about individuals involved in this
2   case?
3 A. No.
4 Q. Did they ask you about individuals that you may be involved
5   with in potentially other cases?
6 A. Yes.
7 Q. And how long did it -- well, did it take you more than one
8   meeting for you to reveal all the information you knew about
9   all the things the government was asking?
10 A. No.
11 Q. You told everything you knew in one meeting?
12 A. No, no. Sorry. I didn't mean that.
13 Q. What did you mean?
14 A. It took me quite a few meetings to --
15 Q. Several meetings?
16 A. Several actually, yeah, to tell everything.
17 Q. In the course of those meetings, as the government asked
18   you questions and you revealed additional information, did you
19   recall additional things?
20 A. Did I add a few other things?
21 Q. Withdrawn. Let me rephrase the question.
22 A. Um-hmm.
23 Q. During the meetings that you had with the government, the
24   government would ask you questions and you would provide
25   answers about a variety of topics that also caused you to

J592van4    Cejovic - Redirect    Page 703

1 remember additional things?
2 A. Yes.
3 Q. And is one of those additional things you learned about the
4 substantial bodily injury, the overdose that you were
5 responsible for?
6 A. Yes.
7 Q. And after you told the government that, did you plead
8 guilty to it?
9 A. Yes.
10 Q. And is it your understanding that the things you told the
11 government perhaps in the last meeting or any meeting will end
12 up, if you get a 5K letter, in the 5K?
13 A. Everything will end up in the 5K.
14 Q. Good and bad.
15 A. Yes.
16 Q. You were asked some questions on cross about the potential
17 impact of your cooperation on your sentence. Do you know what
18 your sentence will be?
19 A. I have no clue.
20 Q. Do you know if your cooperation will benefit your sentence
21 one way or another?
22 A. I have no clue.
23 Q. You were asked some questions on direct about whether or
24 not you were required to tell the truth here today. Remember
25 that?

J592van4    Cejovic - Redirect    Page 704

1 A. Yes.
2 Q. Are you required to tell the truth here today?
3 A. Yes.
4 Q. Is that just for the government's questions or for defense
5 counsel's questions, too?
6 A. For everyone in here.
7 Q. Is it your understanding that if you lie to defense
8 counsel, your cooperation agreement will be ripped up?
9 A. Yes.
10 Q. Am I right that you viewed everyone you sold heroin to as a
11 customer?
12 A. Yes.
13 Q. Whether they were reselling or not?
14 A. Everybody was a customer to me.
15 Q. Whether you trusted them or not?
16 A. Yes.
17 Q. Whether you gave them a bargain or not?
18 A. Yes.
19 Q. Whether you asked them to do things for you or not?
20 A. Yes.
21 Q. Like help you?
22 A. Yes.
23 Q. Mr. Cejovic, do you know every individual that, for
24 example, Paul Van Manen worked with to sell heroin?
25 A. Just one.

J592van4    Cejovic - Redirect    Page 705

1 Q. Who is that?
2 A. Dino, Dino Kosic.
3 Q. Do you know the name Doreen Spinelli?
4 A. Who?
5 Q. Doreen Spinelli?
6 A. Doreen Spinelli? It sounds familiar, but I'm not too sure.
7 Q. What about Francesca Belfield?
8 A. I dealt with a Francesca.
9 Q. Did you deal with a Francesca Belfield?
10 A. I don't know her last name, but I dealt with a Francesca.
11 Q. What about Taylor Tejon (ph)?
12 A. Who?
13 Q. Taylor Tejon.
14 A. I know a Taylor from -- that Taylor from the neighborhood,
15 but I don't think I ever dealt with her.
16 Q. All the people who helped you to sell heroin, to your
17 knowledge, does Paul Van Manen know who all of those people
18 are?
19 A. To my knowledge, I don't think so.
20 Q. You were asked a bunch of questions about the checks that
21 you showed to your Pretrial Services officer. To be clear, to
22 your knowledge, how does the government know that you showed
23 false checks to your Pretrial Services officer?
24 A. I told them about it.
25 Q. Is that something that, if you get a 5K, that will go in

J592van4    Cejovic - Redirect    Page 706

1 your 5K?
2 A. Correct.
3 Q. Do you know what the government's evidence is in this case?
4 A. I only know my evidence.
5 Q. Do you know who the government's other witnesses are?
6 A. No.
7 Q. Do you know if your testimony is helping or hurting the
8 government?
9 A. I have no clue.
10 Q. You were asked some questions about whether or not you
11 could get time served. Has anyone told you or promised you
12 that you would get time served?
13 A. No, not at all.
14 Q. I believe Ms. O'Neill asked you a question and you said you
15 never made a false statement to the government, and you weren't
16 able to explain what you meant. Do you remember that?
17 A. Yes.
18 Q. What did you mean when you said you never made a false
19 statement to the government?
20 A. I always told the truth.
21         MR. FINKEL: One moment.
22         (Counsel confer)
23         MR. FINKEL: Nothing further, your Honor.
24         MS. O'NEILL: I just have one question.
25         THE COURT: One question.

UNITED STATES OF AMERICA, V                  **CORRECTED**
PAUL VAN MANEN and KENNETH CHARLTON          **May 9, 2019**

1    RECROSS EXAMINATION
2    BY MS. O'NEILL:
3 Q. Who was taking the notes in the most recent meetings?
4 A. The most?
5 Q. In the recent meetings you were having. In the meetings
6   with the government, AUSA Finkel was taking the notes, correct?
7 A. Yeah, he was taking notes.
8      MS. O'NEILL: Okay.
9      THE COURT: You are excused, Mr. Cejovic.
10      THE WITNESS: Thank you, your Honor. Have a good one.
11      (Witness excused)
12      THE COURT: Before you call your next witness, I will
13 see the counsel at the sidebar.
14      (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

1      (At the sidebar)
2      THE COURT: Now, with respect to, is it Ms. Fyfe?
3      MS. SIDERIS: Yes.
4      THE COURT: I think as long as the government
5 establishes that she has a basis for knowing personal
6 knowledge, I'm going to allow her to testify about the Pauley,
7 it was Pauley that did it or whoever she says, and he ODed, it
8 was Pauley who did it. So long as there is a basis for her
9 personal knowledge, and it doesn't have to be a very high
10 showing. So long as there is some basis for personal knowledge
11 about Ogno's dealing with Van Manen, I'm going to allow the
12 excited utterance in.
13      With regard to the hearsay statements made to witness
14 number 1, this is on the defense motion, I am going to adhere
15 to my ruling of May 3 where I denied that for the reasons
16 stated.
17      MS. FENDER: Thank you, your Honor.
18      THE COURT: Do you want to call your next witness?
19      MR. FINKEL: Yes, your Honor.
20      (Continued on next page)
21
22
23
24
25

1      (In open court)
2      MR. FINKEL: Your Honor, the United States calls
3 Jessica Fyfe.
4    JESSICA FYFE,
5      called as a witness by the government,
6      having been duly sworn, testified as follows:
7      THE COURT: Please sit down, Ms. Fyfe. Pull yourself
8 right up to the microphone.
9      All right, Mr. Finkel.
10      MR. FINKEL: Thank you, your Honor.
11 DIRECT EXAMINATION
12 BY MR. FINKEL:
13 Q. Good afternoon Ms. Fyfe.
14 A. Hi.
15 Q. Ms. Fyfe, where do you reside?
16 A. Staten Island, New York.
17 Q. What neighborhood?
18 A. Beginning of Annandale.
19 Q. Did you grow up in Staten Island?
20 A. Yes.
21 Q. Are you employed right now?
22 A. Yes.
23 Q. What do you do?
24 A. I am a medical assistant, scribe, and a biller.
25 Q. What does it mean to be a scribe?

1 A. I write the doctor's notes.
2 Q. And do you do that in Staten Island?
3 A. Yes.
4 Q. And Ms. Fyfe, in November of November 17, what was your
5 relationship status?
6 A. Together with Michael Ogno.
7      MR. FINKEL: Ms. Dunbar, if you can display for the
8 witness what has been marked for identification as Government
9 Exhibit 275.
10 A. That's me and Mike.
11      MR. FINKEL: Your Honor, the government offers 275.
12      THE COURT: Objections?
13      MS. SIDERIS: No objection.
14      MS. O'NEILL: No objection.
15      THE COURT: 275 is in evidence.
16      (Government's Exhibit 275 received in evidence)
17      MR. FINKEL: If we can publish it.
18 BY MR. FINKEL:
19 Q. Ms. Fyfe, do you remember when that photograph was taken?
20 A. No.
21 Q. Ms. Fyfe, how long did you date Mr. Ogno for?
22 A. Almost two years.
23 Q. When did you first meet Mr. Ogno?
24 A. Around 2015.
25 Q. Did you start dating when you first met him?

 1  A.  No.
 2  Q.  Where did you first meet him?
 3  A.  I met him at work, Stop & Shop, which is a grocery store.
 4  Q.  What did you do at Stop & Shop?
 5  A.  At the beginning I was a cashier.
 6  Q.  And what was Mr. Ogno doing at Stop & Shop?
 7  A.  He was the grocery boy.
 8  Q.  How long after you met him did you start dating Mr. Ogno?
 9  A.  About six months.
10  Q.  And after you started dating him, did there come a time
11   that you learned that Mr. Ogno used some drugs?
12  A.  Yes.
13  Q.  And how long were you dating when you learned that Mr. Ogno
14   used some drugs?
15  A.  About six months in.
16  Q.  How did you learn about six months in that Mr. Ogno used
17   some drugs?
18  A.  I saw a text message from a girl on his phone, and when I
19   questioned him about it, I told him that I believed he was
20   cheating on me.
21  Q.  Let me stop you right there.  I'm sorry.  And did he
22   respond when you asked him if he was cheating?
23  A.  Yes.
24  Q.  And what did he tell you?
25  A.  No, and then he told me.

 1  Q.  What did he tell you exactly?
 2  A.  That he was getting Xanax.
 3  Q.  What was your reaction when you learned that Mr. Ogno was
 4   using Xanax?
 5  A.  I wasn't too worried because, under my impression, it was
 6   for medical use.
 7  Q.  And did there come a time when you learned that Mr. Ogno
 8   was taking oxycodone?
 9  A.  Yes.
10  Q.  And how long were you dating when you learned that?
11  A.  About eight months in.
12  Q.  About two months after you learned about the Xanax?
13  A.  Yes.
14  Q.  And what was your reaction when you learned that Mr. Ogno
15   was also using oxy?
16  A.  I was more, like, we have got to get you some help.
17  Q.  Did you try to get him some help?
18  A.  Yes.
19  Q.  What did you do?
20  A.  I took him to the rehab center.
21  Q.  Is this about eight months in to your relationship?
22  A.  Yes.
23  Q.  What year is this?
24  A.  2016.
25  Q.  Do you know what month?

 1  A.  No.
 2  Q.  Did Mr. Ogno go to rehab?
 3  A.  Yes.
 4  Q.  How long was Mr. Ogno in rehab for?
 5  A.  Three to five days.
 6  Q.  This is in 2016?
 7  A.  Yes.
 8  Q.  And when Mr. Ogno was in rehab in 2016, what did he do with
 9   his phones while he was in rehab?
10  A.  I had them.
11  Q.  And while Mr. Ogno was in rehab in 2016, when you had his
12   phones, did they ring or did they have any text messages?
13  A.  Yes.
14  Q.  Who is someone that you received text messages from when
15   you were holding Mr. Ogno's phones in 2016?
16  A.  A man named Angel.
17  Q.  What did Angel's text messages indicate to you, if
18   anything, in 2016?
19  A.  That he wanted his money.
20  Q.  Did you take any action to give this Angel his money?
21  A.  Yes.
22  Q.  How did you do that?
23  A.  After receiving numerous amount of text messages from him I
24   answered him back saying it was Jess, I will give you the
25   money, where should we meet.

 1  Q.  Why did you do that, Ms. Fyfe?
 2  A.  Because I felt as if when he came out it would be a trigger
 3   for him, and I wanted to just erase it and for it to go away.
 4  Q.  What would be a trigger for who?
 5  A.  I'm sorry.  Mike to be a trigger to receive a text message
 6   from Angel, to then have to meet with him in person.
 7  Q.  Did you have an understanding at that time what Angel had
 8   sold Mike, if anything?
 9  A.  No.
10  Q.  Did you ever come to have an understanding of what Angel
11   sold Mike?
12  A.  Yes.
13  Q.  And what was that?
14  A.  Either the Xanax or the oxycodone.
15       THE COURT: Either the Xanax or the what?
16       THE WITNESS: The oxycodone.
17       THE COURT: Oh, thank you.
18  BY MR. FINKEL:
19  Q.  At this time in 2016, when you met with Angel, to your
20   knowledge, was Mr. Ogno using heroin?
21  A.  No.
22  Q.  After Michael came out of rehab in 2016, was he clean for
23   some time?
24  A.  Yes.
25  Q.  For how long?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1 A. About a month or two.
2 Q. And after a month or two, what, if anything, did you
3   observe with respect to Mr. Ogno's behavior?
4 A. He was staying in the bathroom longer, he had some mood
5   swings, he was irritable.
6 Q. And did you confront him about these changes in his
7   behavior?
8 A. Yes.
9 Q. And what did he tell you?
10 A. At first he wasn't coughing anything up. Then eventually
11   he told me that he was on heroin.
12 Q. When you say coughing up, you just mean that he wasn't
13   talking about it, not that he was actually coughing.
14 A. Yeah, like he was like bluffing. He didn't really want to
15   go into conversation, kind of ignoring my questions until I
16   just wouldn't give up.
17 Q. At this time, how long had you been dating Mr. Ogno?
18 A. Almost a year.
19 Q. Is this still 2016?
20 A. I would say beginning of 2017.
21 Q. In the beginning of 2017, did you come to understand how
22   Mr. Ogno obtained his heroin?
23 A. Yes.
24 Q. And how was that?
25 A. He would text a girl, Francesca. She --

1 Q. Let me stop you right there, I'm sorry, Ms. Fyfe.
2     MR. FINKEL: Ms. Dunbar, if you could put up what's in
3   evidence as GX 111. Sorry not 111, 113.
4   BY MR. FINKEL:
5 Q. Ms. Fyfe, do you recognize the individual in Government
6   Exhibit 113?
7 A. Yes.
8 Q. Who is that?
9 A. Francesca.
10 Q. What color earrings is she wearing in that picture?
11 A. Like a lime green.
12 Q. And why did you understand, again, in January or early 2017
13   that Francesca was selling heroin to Mr. Ogno?
14 A. He told me and I witnessed it.
15 Q. Approximately how many times did you witness it?
16 A. 20 tops.
17 Q. And what exactly did you witness? Was there any sort of
18   pattern or commonality among those 20 times?
19 A. Yes it was usually during the night. She would come in
20   like a khaki colored van, and she would either come out and
21   they would be outside or he would go into the car and then he
22   would come back out and come inside.
23 Q. Who is the "he" that would go in and out and come back
24   outside to meet Francesca?
25 A. Michael.

1 Q. Did Michael -- for how long did Michael buy heroin from
2   Francesca?
3 A. A couple of months.
4 Q. And after a couple of months, did he start buying heroin
5   from someone else?
6 A. Yes.
7 Q. Why did he start buying heroin from someone else --
8     MS. SIDERIS: Objection.
9     THE COURT: Overruled.
10 A. Because he told me that Francesca was locked up for
11   something else.
12 Q. Ms. Fyfe, after Francesca got locked up, based on -- to
13   your knowledge, who did Michael Ogno start buying heroin from?
14     MS. SIDERIS: Objection.
15     THE COURT: Overruled.
16 A. Paul.
17 Q. How do you know that?
18 A. He told me.
19 Q. Do you know this Paul's last name?
20 A. No.
21 Q. To your knowledge, how did Mr. Ogno meet Paul?
22 A. From one of his friends he went to school with.
23 Q. Do you know that friend's name?
24 A. No.
25 Q. What do you mean the friend -- what school are you talking

1   about?
2 A. Farrell High School.
3 Q. Mr. Ogno went to Farrell High School?
4 A. Yes.
5 Q. And this friend also went to Farrell High School?
6 A. Yes.
7 Q. But you don't know the friend's name?
8 A. Not right now, but I did know it.
9 Q. Is it okay if I refer to him as the person from Farrell,
10   the individual from Farrell, just so everyone knows who I am
11   talking about?
12 A. Yes.
13 Q. How many times have you met this individual from Farrell?
14 A. Three times in total.
15 Q. When was the last -- well, when was the first time you met
16   him?
17 A. In the beginning of 2017 I just met him.
18 Q. And the second time, when approximately did you meet him
19   the second time, the individual from Farrell?
20 A. Around August 2017.
21 Q. What were the -- where did you meet the individual from
22   Farrell in August 2017?
23 A. At a block party.
24 Q. Where was the block party?
25 A. On my block.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

---

J592van4                Fyfe - Direct                Page 719

1  Q. And was Mr. Ogno also there?
2  A. Yes.
3  Q. Did you see -- you said you saw the individual from Farrell
4  a third time. When was the third time you saw the individual
5  from Farrell?
6  A. At Mike's mass.
7  Q. So let's talk about what you know about Michael buying
8  heroin from a Paul. Did you ever observe Michael contacting
9  Paul?
10 A. Yes.
11 Q. In what ways did he contact him?
12 A. Text message, phone --
13 Q. And you -- I'm sorry.
14 A. Phone call.
15 Q. And you observed these things?
16 A. Yes.
17 Q. And, to your knowledge, how much heroin would Michael buy
18 from Paul?
19 A. It depended on how much money he had or if there was like a
20 deal, ten baggies for a hundred.
21 Q. Ten bags, he would get it for a hundred?
22 A. Yes.
23 Q. Did that ten bags have a particular name that you knew
24 about?
25 A. They could be, like, bundles.

---

J592van4                Fyfe - Direct                Page 720

1  Q. Did you approve -- withdrawn.
2      How long had you been dating Mr. Ogno when you learned
3  that Paul was selling him heroin?
4  A. A year and a couple of months in.
5  Q. Did you approve of Mr. Ogno's heroin use?
6  A. No.
7  Q. Was it difficult on your relationship?
8  A. Yes.
9  Q. At that time, why did you decide to stay with him?
10 A. Because I fell in love with who Mike really was as a
11 person, and I wasn't going to leave him during his troubled
12 times.
13 Q. Ms. Fyfe, did there ever come a time when you drove
14 Mr. Ogno to Paul?
15 A. Yes.
16 Q. How many times did you do that?
17 A. Maximum five.
18 Q. And why did you do that?
19 A. Because he was getting really bad at one point.
20 Q. And by "he," I'm sorry --
21 A. Michael was getting really bad at one point, and there were
22 certain times and zip codes Paul wouldn't drive to, so we would
23 have to go to him.
24 Q. And those five times that you drove Michael to see Paul,
25 did you go to the same place each time?

---

J592van4                Fyfe - Direct                Page 721

1  A. Yes.
2  Q. And what place was that?
3  A. A motel.
4  Q. Where was the motel?
5  A. In New Jersey.
6  Q. And you drove there?
7  A. Yes.
8  Q. How did you get there?
9  A. The bridge.
10     MR. FINKEL: Ms. Dunbar, if we can display what is in
11 evidence as Government Exhibit 223.
12 BY MR. FINKEL:
13 Q. Ms. Fyfe do you recognize that image?
14 A. Yes.
15 Q. What is Government Exhibit 223?
16 A. The motel that I drove to to get to Paul's.
17 Q. And when you drove Mr. Ogno to this motel, what, if
18 anything, did you observe?
19 A. Mike had to FaceTime Paul to show that he was there, so I
20 saw Paul on FaceTime. Mike would get out of the car and then
21 go to Paul's hotel room, which he would open the door and let
22 him in.
23 Q. Ms. Fyfe, in the fall of 2017, to your knowledge, how many
24 phones did Mr. Ogno have?
25 A. Two.

---

J592van4                Fyfe - Direct                Page 722

1  Q. Why did he have two?
2  A. His iPhone went out of use, so due to that he bought
3  himself a Samsung; and then when the iPhone got turned back on,
4  he had two phones.
5  Q. Did you know the passcodes to them?
6  A. Yes.
7      MR. FINKEL: Ms. Dunbar, if we can show Government
8  Exhibit 301M.
9      THE COURT: What date is that?
10     MR. FINKEL: It is October 22, 2017. It is a phone
11 call between a number ending in 8865 and a number ending in
12 0111 and it is at 1423. I don't think the jury has transcripts
13 for that they are just short calls.
14     (Audio played)
15 BY MR. FINKEL:
16 Q. Ms. Fyfe, the caller using 0111 said "the same thing as
17 last night." Did you hear that voice?
18 A. Yes.
19 Q. Whose voice was that?
20 A. Michael.
21     MR. FINKEL: Ms. Dunbar, if we can play what's in
22 evidence as Government Exhibit 301J.
23     (Audio played)
24     MR. FINKEL: Stop it there.
25 BY MR. FINKEL:

---

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

J592van4          Fyfe - Direct          Page 723

1  Q. Do you recognize the voice who said "I have 20"?
2  A. Yes.
3  Q. Whose voice is that?
4  A. Michael.
5  Q. Ms. Fyfe I want to direct your attention to November of
6  2017, the later half of the month.  At that time how would you
7  describe Mr. Ogno?
8  A. He was zombielike.
9      (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

J598VAN5          Fyfe - Direct          Page 724

1  Q. What do you mean by that?
2  A. He wasn't himself.  He was in and out, mood swings, just
3  not who he is.
4  Q. What was your relationship like at that time?
5  A. We were still together.
6  Q. Were you living together?
7  A. No.
8  Q. Where were you living at that time, the end of November in
9  2017?
10  A. Well, even though we weren't living together, I slept over
11  his house every night.
12  Q. What street was his house on?
13  A. Malone.
14      MR. FINKEL: Ms. Dunbar, if you can display what is in
15  evidence as Government Exhibit 201.
16  Q. Do you recognize that?
17  A. Yes.
18  Q. What is Government Exhibit 201?
19  A. That's Michael's house.
20  Q. If you didn't stay at Michael's house, where would you
21  stay?
22  A. My house.
23  Q. Ms. Fyfe, let me direct your attention to November 30,
24  2017.  What did you do that day?
25  A. I worked all day.

J598VAN5          Fyfe - Direct          Page 725

1  Q. At the Stop & Shop?
2  A. I was working in the doctor's office at this point.
3  Q. After you left that night, did you see Michael?
4  A. No.
5  Q. Did you speak with him?
6  A. Yes.
7  Q. Did you go over to Michael's house that night?
8  A. No.
9  Q. Why not?
10  A. I worked a very long day that day, and he was texting me
11  all day.  He was very upset.  I was kind of ignoring it.  I
12  worked all day.  I just wanted to go home.  So I just told him
13  I will go to my house, sleep in my own bed, and I will see you
14  tomorrow.
15  Q. That next morning, when you woke up in your house, did you
16  speak with Michael?
17  A. Yes.
18  Q. What time was that?
19  A. Around 9:00 in the morning.
20  Q. What did you do after you woke up?
21  A. I got dressed and I went to the mall with my mom.
22  Q. Did you speak with Michael when you were at the mall?
23  A. I was texting him, but there was no reply.
24  Q. What time were you at the mall?
25  A. Around noon till the end of the day, which is around 8,

J598VAN5          Fyfe - Direct          Page 726

1  9:00.
2  Q. When, approximately, was the last time you heard from
3  Michael Ogno on December 1st?
4  A. Around 10:00 in the morning.
5  Q. When you were at the mall with your mom and Mr. Ogno wasn't
6  texting you back, were you surprised?
7  A. No.
8  Q. What did you do after you left the mall?
9  A. I went home.
10  Q. When you got home, did you try to contact Michael Ogno?
11  A. Yes.
12  Q. Did he respond?
13  A. No.
14  Q. Was that a surprise?
15  A. Yes.
16  Q. Why were you surprised?
17  A. Because at that point I realized I hadn't talked to him all
18  day, and I was calling him, FaceTiming him, calling him,
19  FaceTiming him, no answer.
20  Q. Did you continue trying to call him and FaceTime him that
21  night?
22  A. Yes.
23  Q. What were you thinking that evening when you weren't able
24  to get in touch with Mr. Ogno?
25  A. When I was at the mall?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

**CORRECTED**
**May 9, 2019**

1 Q. No. When you got home from the mall and you were trying to
2 get in touch with him the evening of December 1st, what were
3 you thinking at that time?
4 A. I just had a bad pit in my stomach.
5 Q. Did there come a time where you decided to go to Michael's
6 house?
7 A. Yes.
8 Q. Did you go alone?
9 A. No.
10 Q. Who did you go with?
11 A. My mom.
12 Q. Did you usually travel to Michael's house with your mother?
13 A. No.
14 Q. Why did you travel to Michael's house with your mother on
15 December 1st?
16 A. Because of that bad pit in my stomach.
17 Q. When you arrived at Michael's house on December 1st, what
18 did you see when you first got there?
19 A. It was dark.
20 Q. Was that usual?
21 A. No.
22 Q. Did you go inside?
23 A. Yes.
24 Q. How did you get inside?
25 A. I broke into the side door.

1 Q. You didn't have the key?
2 A. No.
3 Q. Why did you break in?
4 A. Because it was dark and I didn't hear any noise. And the
5 front door is usually unlocked and it wasn't unlocked. I was
6 banging on the door, no answer. So I just went with my gut and
7 I went inside.
8 Q. Did your mom come with you?
9 A. No.
10 Q. When you first walked in, did you see anyone else in the
11 house?
12 A. No.
13 Q. Did you go upstairs?
14 A. Yes.
15 Q. When you got upstairs, did you see anyone?
16 A. Yes.
17 Q. Who did you see?
18 A. I saw Cathy laying on the floor.
19 Q. Who is Cathy?
20 A. Michael's mother.
21 Q. What was your understanding of why she was laying on the
22 floor?
23 A. Because she was drunk.
24 Q. Did you go to Michael's room?
25 A. Yes.

1 Q. Were you able to open the door?
2 A. No.
3 Q. Why not?
4 A. It was locked.
5 Q. What did you do next?
6 A. I started throwing my body against the door to try to open
7 it. It wasn't opening. I was banging on the door. I tried to
8 get some tools to open it. So I just kept throwing my body
9 against it until it finally opened.
10 Q. How long did that take?
11 A. Five minutes.
12 Q. Ms. Fyfe, what did you see when you broke open the door to
13 Mr. Ogno's room on December 1st?
14 A. I saw him on the floor facedown crumpled up. I ran over to
15 him. I put my hand on his back and he was frozen cold.
16 Q. Did you see anything else in the room?
17 A. At the moment I just focused on him.
18 Q. What reaction did you have?
19 A. I screamed.
20 Q. Did your mom come in after that?
21 A. Yes. When I screamed, that's when my mother came in.
22 Q. How were you feeling at this moment?
23 A. Numb.
24 Q. What did you do next?
25 A. I called 911. They told me I had to try to resuscitate

1 him. So I tried to pull him over. When I got him over, I had
2 to pull his shirt up and try to resuscitate him and it wasn't
3 working. He was blue and he was all scrunched up.
4 Q. Did an ambulance come?
5 A. Yes.
6 Q. About how much later?
7 A. Maybe five minutes after the phone call.
8 Q. Did the police come?
9 A. Yes.
10 Q. About how much later?
11 A. About ten minutes later.
12 Q. How were you feeling when the police arrived?
13 A. Adrenalin rush, still numb and in shock.
14 Q. Did detectives come after the police first came?
15 A. Yes.
16 Q. How were you feeling when the detectives came?
17 A. I ran over to them and I said --
18 Q. Sorry. Before we get there. How were you feeling when the
19 detectives came?
20 A. Still the same way, numb, shock, adrenalin rush.
21 Q. Ms. Fyfe, what did you do when you saw the detectives?
22 A. I ran over to them.
23     MS. SIDERIS: Your Honor, objection.
24     THE COURT: Overruled.
25 A. And I told them, I know who did this, I'll tell you

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  everything, I know where he lives, and his name is Paul.
2  Q. How long were you at Mr. Ogno's house that night?
3  A. I'm sorry?
4  Q. How long were you at Mr. Ogno's house that night?
5  A. Until 4:00 in the morning.
6  Q. Were there other people who arrived?
7  A. Yes.
8  Q. Who?
9  A. Well, all the neighbors were out. His uncle came over with
10  his cousin. My dad and my sister came by. Then there was just
11  a ton of ambulance, police and detectives.
12  Q. Those people you mentioned, your uncle, your cousin, were
13  any of them NYPD officers?
14  A. Michael's cousin was an NYPD officer.
15  Q. That conversation you just told us about with the
16  detectives, was he one of the detectives that you had that
17  conversation with?
18  A. I told him, yes, the same thing.
19  Q. In the next few days did you go to a bakery?
20  A. Yes.
21  Q. Who were you with when you went to the bakery?
22  A. My friend Nicole.
23  Q. Why did you go to the bakery with Nicole?
24  A. She dragged me out of my house and made me go.
25  Q. Why?

1  A. To try to cheer me up.
2  Q. Who did you see at the bakery?
3  A. One of the detectives I saw that night at Mike's house.
4  Q. Based on your observations, did he appear to be on official
5  business that day?
6  A. No.
7  Q. What did it appear to be that he was doing, based on what
8  you saw?
9  A. He was with a girl so I thought he was on a date.
10  Q. Did you talk with him?
11  A. Yes.
12  Q. After you talked with the detective, did there come a time
13  when detectives came to your house?
14  A. Yes.
15  Q. And you talked with them?
16  A. Yes.
17  Q. How long was that conversation at the bakery?
18  A. Five minutes, tops.
19  Q. Was it an official interview, as far as you could tell?
20  A. No.
21      MS. SIDERIS: Objection.
22      THE COURT: Overruled.
23  A. No.
24  Q. When the detectives came to your house a few days later,
25  did that seem to be to you an official interview?

1      MS. SIDERIS: Objection.
2      THE COURT: Overruled.
3  A. Yes.
4  Q. Were they taking notes?
5  A. Yes.
6      THE COURT: Were they taking notes?
7      THE WITNESS: Yes.
8  Q. How many detectives came that day?
9  A. Two.
10  Q. Did the detectives ask you to do anything?
11      Without telling me what they said, did they ask you to
12  do anything?
13  A. Yes.
14  Q. Did you do the thing that they asked you to do?
15  A. Yes.
16  Q. Did that involve speaking with Anthony Ogno?
17  A. Yes.
18  Q. When you spoke with Anthony Ogno, did you relay what he
19  told you to the detectives?
20  A. Yes.
21  Q. When was Michael Ogno's funeral?
22  A. Around the 7th or 8th of December.
23  Q. Who spoke at the funeral?
24  A. I did.
25  Q. And you mentioned you saw the individual from Farrell

1  there?
2  A. Yes.
3  Q. Ms. Fyfe, around this time, late November, early December,
4  what were the last four digits of your phone number?
5  A. 4911.
6  Q. Ms. Fyfe, did Michael Ogno have any nicknames for you?
7  A. Yes.
8  Q. What were they?
9  A. Babe, Jess and Stinks.
10      MR. FINKEL: Thank you, Ms. Fyfe.
11      THE COURT: Ms. Sideris.
12  CROSS-EXAMINATION
13  BY MS. SIDERIS:
14  Q. Good afternoon, Ms. Fyfe.
15  A. Good afternoon.
16  Q. I'm sorry for your loss.
17  A. Thank you.
18  Q. You said that you first met Michael at Stop & Shop around
19  2015?
20  A. Yes.
21  Q. And after six months the two of you began dating?
22  A. Around.
23  Q. You said you slept over each other's homes?
24  A. Yes.
25  Q. Both you and Michael lived with your parents at this time,

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 9, 2019

1  right, while you were dating, is that correct?
2  A. Yes.
3  Q. So you knew Michael's family. You knew his mother Cathy?
4  A. Yes.
5  Q. And his brother John Ogno?
6  A. I knew of him.
7  Q. You knew his brother Anthony Ogno, right?
8  A. Yes.
9  Q. Michael and his brother Anthony painted your parents' home
10  together, right?
11  A. Yes.
12  Q. You talked about six months into your relationship that you
13  saw some text messages on Michael's phone from a woman, right,
14  when you believed he may have been cheating on you?
15  A. Yes.
16  Q. And you confronted him about those texts, right?
17  A. Yes.
18  Q. And he explained to you that it was about Xanax?
19  A. Yes.
20  Q. And at first he told you that it was his brother Anthony
21  Ogno who was getting the Xanax?
22  A. Yes.
23  Q. Because you were aware that Anthony Ogno was an addict
24  also, right?
25  A. Yes.

1  Q. Then Michael eventually admitted to you that he was
2  addicted to Xanax?
3  A. Yes.
4  Q. And oxycodone?
5  A. Later on, not at the same time.
6  Q. You talked about convincing him to go into a rehab
7  facility, right?
8  A. Yes.
9  Q. How many times was that?
10  A. Twice.
11  Q. During one of his rehab visits, you were holding on to his
12  phone. You talked about that on the direct examination, right?
13  A. Both times.
14  Q. And on the phone you saw text messages from someone named
15  Angel?
16  A. Yes.
17  Q. And you knew Angel was someone who Michael had met at the
18  gym?
19  A. Yes.
20  Q. And he would get pills from Angel?
21  A. I didn't know at the time.
22  Q. The text message was about Michael owing Angel money?
23  A. Yes.
24  Q. For drugs?
25  A. I didn't know that.

1  Q. The amount that was owed to Angel was $75, is that right?
2  A. Yes.
3  Q. You said the reason that you didn't -- you agreed to go
4  meet Angel because you didn't want Michael meeting him when he
5  got out of rehab, right?
6  A. Yes.
7  Q. And that's because you understood it had to do with drugs?
8  A. I retract what I said, yes.
9  Q. Just so we are clear, you retract that, you were aware that
10  it had to do with drugs?
11  A. Yes.
12  Q. So you met Angel and you knew that you were paying off a
13  $75 debt for drugs?
14  A. Yes.
15  Q. Thank you.
16        At some point Michael was fired or quit the job where
17  you two met at Stop & Shop, right?
18  A. Yes.
19  Q. And after that he got a job at a CVS?
20  A. Yes.
21  Q. Was that after one of his rehab visits?
22  A. I don't remember.
23  Q. So soon after he started the job at CVS, you discovered
24  that he was using pills again, is that correct?
25  A. Yes.

1  Q. And it was oxy as well as Xanax, right?
2  A. That's what he told me, yes.
3  Q. That's after you confronted him about using drugs again,
4  right?
5  A. What do you mean?
6  Q. Well, did you ask him about using drugs, and he told you he
7  got it from a fellow employee at CVS?
8  A. He was using the Xanax. I didn't know about the oxycodone.
9  He quit Stop & Shop, got hired at CVS. That's when I found out
10  about the oxycodone. Then I took him to the rehab.
11  Q. And he told you that he was getting the oxy from a fellow
12  employee at CVS, right?
13  A. He told me one time he got it from that guy.
14  Q. You don't know where he was getting it the other times,
15  right?
16  A. No.
17  Q. This was around the same time that Michael met Angel,
18  right?
19  A. He knew Angel.
20  Q. From before?
21  A. Yes.
22  Q. Did you ever learn that Michael had been using drugs since
23  high school?
24  A. Yes.
25  Q. And the first time you started to suspect that Michael had

1 been using heroin, when was that?
2 A. Around the beginning of 2017.
3 Q. You confronted him about using heroin, right?
4 A. I confronted him about suspicious behavior.
5 Q. And that was he was going to the bathroom a lot, you said?
6 A. Yes.
7 Q. After you confronted Michael, he admitted to you that he
8 was using heroin?
9 A. Yes.
10 Q. Did he admit to you for how long he had been using heroin?
11 A. No.
12 Q. When did you learn how long he had been using heroin?
13 A. So when I initially found out, the conversation was kind of
14 over because I didn't know how to deal with it. Days and weeks
15 leading on, then he informed me about how he was previously on
16 it. He's always on and off. He would do cold turkey to try to
17 get off, go to rehabs, things like that.
18 Q. So you said that you learned eventually one of the people
19 he bought -- he bought heroin from someone named Paul?
20 A. Yes.
21 Q. And that he met Paul through a Chinese kid?
22 A. Yes.
23 Q. The Chinese kid was actually a friend from grade school,
24 right?
25 A. I was informed it was Farrell High School.

1 Q. You're aware that his name was Derek Yung?
2 A. At the time I must have known it, but right now I don't
3 remember.
4 Q. Because you mentioned Derek Yung to the NYPD, right, when
5 you talked to them after Michael's death?
6 A. I must have.
7 Q. Well, you don't remember everything you told the NYPD,
8 right?
9 A. I do remember. I just don't remember names. I didn't
10 remember his name, but if I saw him in front of me right now, I
11 can point him out.
12 Q. You spoke to the police after Michael died, right, a couple
13 of times at least?
14 A. Yes.
15 Q. And you don't remember every single thing that you told
16 them, right?
17 A. Meaning?
18 Q. Let me withdraw it.
19 Do you remember telling the police about Derek Yung?
20 A. I do remember telling them, but I don't remember his name.
21 Q. You don't remember using the name Derek Yung when you spoke
22 to the police?
23 MR. FINKEL: Objection. Asked and answered.
24 THE COURT: Sustained.
25 Ms. Sideris, it's 4:30. Would this be a convenient

1 time to break?
2 MS. SIDERIS: Yes, your Honor.
3 THE COURT: We will break now, ladies and gentlemen.
4 Remember, we start tomorrow morning at 9:00, and we
5 will go until 1:00. We will take one short break in the middle
6 of the day. Remember my instructions now. Don't talk about
7 the case, don't do any independent research, keep open minds.
8 We will see you tomorrow at 9. We will have the coffee and tea
9 in before 9:00 and we will promptly start at 9 and go to 1:00.
10 Mr. Gonzalez will not be with us. Bill Ryan will be the
11 courtroom deputy tomorrow.
12 Thank you very much. Safe home.
13 (Jury exits courtroom)
14 MR. FINKEL: Your Honor, before we excuse Ms. Fyfe, I
15 just want to put on the record the government is not going to
16 have any substantive conversations with Ms. Fyfe, but as has
17 been disclosed to defense counsel, we have arranged for her
18 travel, and we will do so sending her home and also tomorrow so
19 she can get to court in time.
20 THE COURT: But you're not going to talk to her.
21 MR. FINKEL: I personally will not, but people from
22 our office will.
23 THE COURT: They are not going to talk to her about
24 her testimony.
25 MR. FINKEL: No, not at all.

1 THE COURT: Is that acceptable?
2 MS. SIDERIS: Yes, your Honor.
3 THE COURT: Thank you very much.
4 Now, where do we stand on witnesses?
5 MR. FINKEL: We made good progress today. I think the
6 next several witnesses that the government has are relatively
7 short. There is one witness that's another cooperating
8 witness, which will likely be a bit longer. At this point, I
9 think if we made good progress tomorrow, it's conceivable we
10 will rest on Monday, possibly Tuesday, depending on cross.
11 THE COURT: Are you going to submit the revised
12 charges on the reduced drug amounts?
13 MR. FINKEL: Yes.
14 THE COURT: When are you going to do that? Because I
15 would like to distribute the draft charge tomorrow at the end
16 of the day.
17 MR. FINKEL: We will submit them tonight.
18 THE COURT: Thank you.
19 Anything from the defendants that they want to
20 include, in addition to what you have already sent me, I would
21 appreciate it.
22 Thank you very much. Goodnight.
23 (Adjourned to May 10, 2019, at 9:00 a.m.)
24
25

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      UNITED STATES OF AMERICA,              New York, N.Y.
 3
              v.                             18 Cr. 30(PAC)
 4
      PAUL VAN MANEN and KENNETH
 5    CHARLTON,
 6                    Defendants.
      ------------------------------x        Trial
 7
                                             May 10, 2019
 8                                           9:00 a.m.
      Before:
 9
                        HON. PAUL A. CROTTY,
10
                                        District Judge
11                                    - and a Jury-
12                    APPEARANCES
      GEOFFREY S. BERMAN
13         United States Attorney for the
           Southern District of New York
14    BY:  JESSICA K. FENDER
           RYAN B. FINKEL
15         CATHERINE E. GHOSH
           Assistant United States Attorneys
16
      QUIJANO & ENNIS, P.C.
17         Attorney for Defendant Van Manen
      BY:  PETER E. QUIJANO
18         ANNA N. SIDERIS
19    O'NEILL & HASSEN
           Attorney for Defendant Charlton
20    BY:  GRAINNE E. O'NEILL
21    THE LAW OFFICE OF CARLOS M. SANTIAGO
           Attorney for Defendant Charlton
22    BY:  CARLOS M. SANTIAGO, JR.
23
      ALSO PRESENT:
24
      MADISON DUNBAR, Paralegal, U.S. Attorney's Office
25    WILLIAM COLEMAN, Paralegal, U.S. Attorney's Office
```

 1    ( Trial resumed; jury not present)

 2        THE COURT: Good morning. Please be seated.

 3        Mr. Quijano, I understand there is something that you

 4    would like to say.

 5        MR. QUIJANO: Yes, your Honor, very briefly. And to

 6    be clear, I'm not revisiting the court's decision and order

 7    regarding the excited utterance; however, at this point,

 8    Ms. Fyfe, the witness on the stand, has testified that, first,

 9    there was a bakery meeting with one of the officers who was

10    present on December 1. Presumably that has to be Officer

11    Slevin, contrary to what Slevin testified. She has also

12    testified that she told them about the statement itself, which,

13    again, is that Anthony Ogno said it could have been Paul, but

14    it could have been also someone else, Melissa's cousin who was

15    a heroin dealer.

16        THE COURT: Are you reading from the transcript?

17    (Counsel confer)

18        MR. QUIJANO: I'm sorry, your Honor, what is the

19    question?

20        THE COURT: You are reading from the transcript?

21        MR. QUIJANO: No, not that. The statement, obviously,

22    we haven't brought out, but she says on the stand that she

23    told Slevin what that statement was. Slevin has denied

24    getting that.

25        Second, she has testified so far that they did then

 1    subsequently ask her to do something, which she did, and

 2    reported back. Again, Slevin denied that and so did Truscelli.

 3    In light of that, we believe we should be entitled to bring out

 4    just what the statement was, the one level of hearsay for this

 5    purpose. It is now material and relevant as to whether the

 6    investigation that Truscelli and Slevin were conducting was not

 7    just flawed, but biased; that certainly once they had Paul

 8    Van Manen as the target, as the person who presumably sold the

 9    heroin, they did nothing with this information, they didn't

10    follow up on it, or anything along those lines.

11        And, worse, it appears that Officer Slevin perjured

12    himself on the stand when asked questions directly about this.

13    He has denied that happened. He has denied there was any

14    follow-up or anything like that. So just for the limited

15    purpose on the issue of whether the investigation was flawed

16    and prejudiced, we seek to get the following statement, that

17    Anthony Ogno responded it could be Paul or the cousin of his

18    ex-wife who was either a heroin dealer or knew a heroin dealer.

19    Again, not for the truth, only for what she conveyed to the

20    investigation and what apparently the investigation did with

21    that information, which was nothing.

22        THE COURT: Mr. Finkel.

23        MR. FINKEL: Your Honor, by my count, this is at least

24    the third time that defendants have asked you to reconsider

25    your ruling. There is nothing new here. The information about

 1    what Jessica Fyfe says she told the detectives has been in the

 2    3500 and has been produced. These arguments that are being

 3    made now were available to have been made when this issue was

 4    first briefed before you and when you first ruled and when you

 5    ruled at sidebar reaffirming your prior ruling. There is

 6    nothing new here.

 7        To the extent Detective Slevin had a memory that was

 8    inconsistent with what Jessica Fyfe's memory is, that certainly

 9    happens. That is not perjury. And, in any event, they had

10    Detective Slevin on the stand and were able to cross him and

11    did cross him about what he did and what he didn't do with

12    respect to the investigation. They have crossed

13    Detective Truscelli on that, as well, about what he did and

14    what he didn't do, and of course his bias, as well, with

15    respect to the investigation.

16        This is just, your Honor, frankly, another attempt to

17    end run around your ruling.

18        THE COURT: This is the third time I have considered

19    the matter, and on reconsideration of reconsideration, I am

20    going to adhere to my initial ruling, so your application is

21    denied, Mr. Quijano.

22        The jury is here, Bill?

23        THE DEPUTY CLERK: The jury is here, Judge.

24        MR. FINKEL: There is one brief issue, but I think we

25    can take it up at the break.

UNITED STATES OF AMERICA, V                                              CORRECTED
PAUL VAN MANEN and KENNETH  CHARLTON                                      May 10, 2019

1      THE COURT: Thanks.  Where is Ms. Fyfe?
2      MR. FINKEL: We will get her right now.
3      THE COURT: Bring the jury in, please.
4      (Continued on next page)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1   A.  Okay.
2          MS. SIDERIS: If you could just -- Ms. Dunbar, if you
3   could enlarge, because I don't know if I know how to.
4   Paragraph three or that whole box is fine.  Okay.
5   BY MS. SIDERIS:
6   Q.  Ms. Fyfe, I'm showing you interview notes, if you could
7   read to yourself.  If you want to specifically look at
8   paragraph 3.
9   A.  Yes.  I remember.
10  Q.  So after reviewing those notes, does that refresh your
11  recollection that, when speaking to the police, you informed
12  them that Derek Yung introduced Paul to Michael Ogno?
13  A.  Yes.
14  Q.  Okay.  Thank you.
15         Were you aware that Derek Yung was a heroin dealer?
16  A.  No.
17  Q.  You told us yesterday that you first discovered that
18  Michael was using heroin early in 2017.  Is that right?
19  A.  Yes.
20  Q.  And that was because you wouldn't stop asking him about
21  certain behavior that he finally told you.
22  A.  Yes.
23  Q.  You also told us yesterday that you learned later his
24  heroin use started a lot earlier than that, right?
25  A.  Meaning on and off before then, yes.

1      (Jury present)
2      THE COURT: Good morning.  Please be seated.
3   JESSICA FYFE, previously sworn
4      THE COURT: I want to remind you, Ms. Fyfe, you are
5   still under oath.  All right?
6      THE WITNESS: Yes.
7      THE COURT: Ms. Sideris.
8      MS. SIDERIS: Thank you, your Honor.
9   CROSS-EXAMINATION (continued)
10  BY MS. SIDERIS:
11  Q.  Good morning, Ms. Fyfe.
12  A.  Good morning.
13  Q.  We left off yesterday speaking about Derek Yung.
14         Do you remember that?
15  A.  Yes.
16  Q.  Now, you told the police when you spoke to them in December
17  2017 that Derek Yung introduced Paul to Michael Ogno, correct?
18  A.  I don't remember right now, but I guess.
19         MS. SIDERIS: Ms. Dunbar, can you please display
20  3505-10, page 1, 2, 3 -- page 3 for the witness.
21         (Counsel confer)
22         MS. SIDERIS: Or labeled as page 157 of 171, if that
23  helps.
24  Q.  I'm just going to show you something that may help with
25  refreshing your recollection.

1   Q.  Prior to early 2017.
2   A.  What do you mean by that?
3   Q.  Okay.  So you learned in early 2017 that Michael was using
4   heroin, right?
5   A.  Yes.
6   Q.  And then the two of you had a discussion about his heroin
7   use.
8   A.  Yes.
9   Q.  And based on that discussion, you learned that he had
10  actually started using heroin a lot earlier than 2017, right?
11  A.  From my understanding, it was on/off but during our
12  relationship, prior to that, during that first year, I did not
13  know that he was on -- he wasn't on it then.  He said before
14  then, maybe when his father passed away.
15  Q.  Okay.  Thank you.
16  A.  Um-hmm.
17  Q.  So he didn't tell you that it first started in high school?
18  A.  The heroin use?
19  Q.  Yes.  Sorry.
20  A.  All I know is that it was on and off for years.
21  Q.  Okay.  By the way, were you and Michael the same age?
22  A.  No.
23  Q.  What is the age difference between the two of you?
24  A.  Six years?
25  Q.  How old are you?

1  A. I'm 22.
2  Q. I just want to ask you a couple more questions about Angel
3  who we spoke about yesterday. You mentioned that Michael and
4  Angel met at a gym?
5  A. Yes.
6  Q. Do you recall the name of the gym was Retro Fitness?
7  A. Yes.
8  Q. And you saw Angel's name and number coming up in one of
9  Michael's phones, right?
10  A. His name, yes.
11  Q. Michael had him in his phone as Angel Gym, right?
12  A. I don't recall.
13  Q. After that meetup that you had with Angel, you never heard
14  from Angel again, right?
15  A. Correct.
16  Q. And you never saw Angel again?
17  A. I don't believe so.
18  Q. And to your knowledge, Michael never saw Angel again?
19  A. To my knowledge, yes.
20  Q. And to your knowledge, Michael never spoke with Angel from
21  the gym again.
22  A. I don't know that.
23  Q. So by early 2017, when you were aware of Michael's heroin
24  use, he explained to you that oxy, oxycodone, was so expensive
25  and heroin was a lot cheaper, right?

1  A. Yes.
2  Q. You had witnessed him going through some -- witnessed him
3  going through heroin withdrawal symptoms, right?
4  A. Yes.
5  Q. You saw him getting sick?
6  A. Yes.
7  Q. I'm not going to ask you to describe that, but just I am
8  right that it was extremely difficult for you to witness,
9  correct?
10  A. Yes.
11  Q. And it was so bad that you actually agreed to drive him to
12  purchase heroin or to obtain heroin.
13  A. Yes.
14  Q. There was one occasion when Michael was very sick and you
15  were with him and you drove him directly to a hospital, right?
16  A. He -- that day was the day that we were trying to get him
17  into rehab, and they wouldn't accept him so they said I had to
18  bring him to the hospital.
19  Q. Okay. And the -- and you drove him to the hospital
20  because -- was he sick when you drove him to the hospital?
21  A. No, not initially. They told us that he was not high
22  enough to be taken in to the rehab, so then we had to get him
23  to the hospital to try to get him into the rehab.
24  Q. Okay. Thank you.
25      On the occasion when Michael was sick with you and you

1  drove -- you had driven him then to see Paul in New Jersey,
2  right?
3  A. Wait, what?
4  Q. There was an occasion when Michael was sick and you drove
5  him to New Jersey.
6  A. Okay.
7  Q. That's when he was FaceTiming with Paul, correct?
8  A. One of the times, yes.
9  Q. One of the times, okay. Were you aware that Michael didn't
10  always have money to purchase heroin?
11  A. Can you elaborate on that?
12  Q. Sure. Were you aware that Paul would give Michael heroin
13  even though Michael did not pay him?
14  A. No.
15  Q. You mentioned Anthony Ogno yesterday, Michael's older
16  brother. Did you know his girlfriend, Anastasia?
17  A. Not personally.
18  Q. You were aware that Anthony lived at home with Michael and
19  his mom while you were dating, right?
20  A. Yes.
21  Q. And at some point while you and Michael were dating,
22  Anastasia, Anthony's girlfriend, moved in with them, right?
23  A. Yes.
24  Q. And they, Anthony and Anastasia lived downstairs in the
25  Ognos' home, right?

1  A. Yes.
2  Q. And Michael's bedroom was upstairs.
3  A. Yes.
4  Q. You would stay over the house in Michael's room and
5  Anastasia lived there, right?
6  A. Yes.
7  Q. Were you aware that Anastasia had a drug problem?
8  A. I knew that she had prescription pills. Other than that,
9  no.
10  Q. You were aware that Anastasia overdosed while at the Ogno
11  home?
12  A. Yes.
13  Q. It was a fatal overdose, right?
14  A. She didn't pass away in the house, though.
15  Q. She died on the way to the hospital, right?
16  A. Um-hmm.
17  Q. And you didn't know from where she was getting her drugs,
18  is that correct?
19  A. No.
20  Q. And Anastasia's overdose, that was the same year as
21  Michael's death, is that correct?
22  A. I don't remember when Anastasia passed away, honestly.
23  Q. Did you know Anthony Ogno's ex-wife Melissa?
24  A. Not personally.
25  Q. You knew that Anthony was arrested on the day of Michael's

J5a2van1      Fyfe - Cross      Page 757

```
 1  death, right?
 2  A. I found out afterwards, yes.
 3  Q. He is not still in custody.
 4  A. I don't know.
 5  Q. Well, you have seen him after he was arrested, right?
 6  A. For the mass, yes.
 7  Q. And his -- you are aware that his arrest was not in
 8  relation to Michael's death, right?
 9  A. To my understanding, yes.
10  Q. So Thanksgiving 2017 you spent with Michael, is that
11  correct?
12  A. Yes.
13  Q. And you were aware that he was doing heroin that day.
14  A. Yes.
15  Q. You noticed he was high.
16  A. Yes.
17  Q. And that made you really upset because it was Thanksgiving.
18  A. Yes.
19  Q. You told him that you were upset with him.
20  A. Yes.
21  Q. Are you aware of how Michael was using heroin?
22  A. Yes.
23  Q. How was that?
24  A. Intravenous.
25  Q. So he was using needles.
```

J5a2van1      Fyfe - Cross      Page 758

```
 1  A. Yes.
 2  Q. Are you aware of how often he needed to use heroin?
 3  A. I can't give a direct amount. I would just say frequently.
 4  Q. So he was aware that you didn't approve of his drug use.
 5  A. Yes.
 6  Q. And he tried as best he could to not do it in front of you.
 7  A. Yes.
 8  Q. Or talk about it in front of you.
 9  A. No. He always talked about it with me.
10  Q. So you believe that he quit heroin on Thanksgiving, right?
11  A. I don't believe it was that day. All I know is that we did
12  have a fight over it and I know that he was going to try to cut
13  down and go cold turkey with it.
14  Q. And by "cold turkey," you mean without any morphine?
15  A. I don't know -- what do you mean?
16  Q. What was your understanding of quitting cold turkey?
17  A. My understanding was just stopping.
18  Q. Okay. And when you say frequent use, that means daily,
19  right?
20  A. Yes.
21  Q. Multiple times a day?
22  A. I believe so.
23  Q. So Michael told you that he would try to quit. On
24  Thanksgiving, Michael told you he would try to quit heroin cold
25  turkey, right?
```

J5a2van1      Fyfe - Cross      Page 759

```
 1  A. It wasn't directly on Thanksgiving. He was high that day.
 2  It could have -- I know we had a fight that night. But the
 3  next day we had discussions, and so it wasn't exactly like
 4  pinpoint on that day he said I am quitting, it was just that we
 5  had a fight. But he was very high, he wasn't in the right
 6  state of mind, so further after that, yeah, we had discussions.
 7  Q. Now, were you with him during that last week after -- the
 8  week following Thanksgiving?
 9  A. Yes.
10  Q. You didn't sleep over each other's house -- or you didn't
11  sleep at his house every night that week, correct?
12  A. No.
13  Q. And you weren't with him when you went to work during the
14  day.
15  A. No.
16  Q. The day before Michael died, on November 30, you were
17  working, correct?
18  A. Correct.
19  Q. And the night before Michael died, you weren't with him.
20  A. Thursday night?
21  Q. Yes.
22  A. Yes.
23  Q. It's correct that you were not with him.
24  A. Correct.
25  Q. The day of December 1, you were not with Michael, right?
```

J5a2van1      Fyfe - Cross      Page 760

```
 1  A. No.
 2  Q. And before arriving at, I think you said, like around 11:00
 3  at night or maybe it was earlier, but before that night, you
 4  hadn't been to the house all day, right?
 5  A. Correct.
 6  Q. You didn't see him buying drugs from anyone, right, on
 7  December 1?
 8  A. Correct.
 9  Q. And you didn't see Michael using any drugs on December 1.
10  A. Correct.
11  Q. You didn't talk to him that day about buying heroin.
12  A. No.
13  Q. Or you didn't talk to him that day about buying any drugs,
14  right?
15  A. Correct.
16  Q. Had you seen him high since Thanksgiving?
17  A. I don't recall.
18  Q. At some point on the morning of December 1, Michael stopped
19  answering your calls, right?
20  A. Yes.
21  Q. And he stopped answering your texts?
22  A. Yes.
23  Q. You tried him on both of his phones.
24  A. Yes.
25  Q. He was using two phones at the same time. Right?
```

1  A.  I believe so, yes.
2  Q.  An iPhone that he used regularly.
3  A.  Yes.
4  Q.  And a Samsung Galaxy, right?
5  A.  Yes.
6  Q.  When you FaceTimed with Michael, that was using an iPhone,
7  right?
8  A.  Yes.
9  Q.  And that's how he would talk to Paul sometimes over
10  FaceTime?
11  A.  Only that one night.
12  Q.  And Michael would call and text you on either of the
13  phones?
14  A.  Yes.
15  Q.  The night that Michael died, you spoke to the police that
16  were at the house.
17  A.  Yes.
18  Q.  They interviewed you --
19  A.  Yes.
20  Q.  -- at some point?
21  A.  Yes.
22  Q.  In the home I believe you said was also Michael's cousin,
23  Andrew?
24  A.  Yes.
25  Q.  And that is Detective Lassen, right?

1  A.  I believe that's his last name.
2  Q.  Are you aware he lives in Staten Island?
3  A.  Yes.
4  Q.  But he is a Brooklyn detective, right?
5  A.  I didn't know that.
6  Q.  He was the one -- are you aware that he is the one who IDed
7  Michael's body?
8  A.  No.
9  Q.  But he was trying to help out the family that night, right?
10  A.  Yes.
11  Q.  He was talking to the police detectives.
12  A.  I don't know.
13  Q.  If you remember.
14  A.  It was crazy that night.
15  Q.  I understand.
16        His other cousin, Anthony Ogno, was not in the home
17  that night.
18  A.  You mean Michael's brother?
19  Q.  Michael's brother, yes.
20  A.  No, he was not.
21  Q.  A few days after Michael died, you ran into a detective at
22  a bakery, right?
23  A.  Yes.
24  Q.  And it was the detective -- you recognized the detective
25  from Michael's home the night he died, right?

1  A.  Yes.
2  Q.  Do you remember his name?
3  A.  No.
4  Q.  Does Detective Daniel Slevin sound familiar?
5  A.  I don't remember.
6  Q.  Without telling us what you said to the detective, you gave
7  him new information that you learned, right?
8  A.  Yes.
9  Q.  And not only new information, but information you learned
10  after Michael's death, right?
11  A.  Yes.
12  Q.  And based on what you told him, the detective scheduled a
13  time to interview you at your home at a later date, right?
14  A.  I believe, yes.
15  Q.  Do you remember how long after you ran into him at the
16  bakery and then he interviewed you at your home?
17  A.  No.
18  Q.  When the detective came to your home, it was the same
19  detective from the bakery, right?
20  A.  Yes.
21  Q.  The same detective who was at Michael's home the night he
22  died.
23  A.  The bakery guy?  Yes.
24  Q.  Yes.
25        And he brought with him one other detective.

1  A.  Yes.
2  Q.  Had you ever met the other detective before?
3  A.  I don't believe so.
4  Q.  So it was just the two of them who came to your home.
5  A.  Yes.
6  Q.  Do you remember the other detective's name?
7  A.  No.
8  Q.  Does Detective Truscelli sound familiar to you?
9  A.  I don't remember.
10  Q.  Now, you said on your direct examination that they
11  conducted a formal interview at your home.
12  A.  Define "formal."
13  Q.  Well, they both asked you questions.
14  A.  Um-hmm.
15  Q.  Is that correct?
16  A.  Yes.
17  Q.  They were both seemed to be listening to your questions --
18  to your answers.
19  A.  Yes.
20  Q.  They both were taking notes, right?
21  A.  I don't know if they were both taking notes, but I believe
22  maybe one of them was.
23  Q.  So at least one of them was taking notes based on your --
24  the conversation.
25        Do you remember about how long they were with you at

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH  CHARLTON

CORRECTED
May 10, 2019

1   your home that day?
2   A.  I don't believe it was that long.
3   Q.  By the way, the other detective who you were meeting for
4    the first time that day, he was older than the detective you
5    met at the bakery, right?
6   A.  He appeared older, yes.
7   Q.  Thank you.
8        Based on what you told them at your home during the
9    interview, this new information, they asked you to follow up on
10    that information, right?
11   A.  Well, it more likely went --
12   Q.  Without going into what --
13   A.  I'm not, I'm not.
14   Q.  -- they said.
15   A.  It more likely went the older detective I believe knew
16    Anthony.
17        MR. FINKEL: Objection as to speculation.
18        THE COURT: Overruled.
19   Q.  You may continue.
20   A.  But I don't know -- and I said I could talk to him.  He
21    knows me.  So I tried to reach out to talk to him.
22   Q.  Okay.  And you did that.  You talked to Anthony, right?
23   A.  Mmm, yeah.
24   Q.  And then you got back in touch with the detectives or the
25    one detective.

1   A.  Yes.
2   Q.  To tell them you did what you said you would, talk to
3    Anthony.
4   A.  Yes.
5   Q.  How did you get in touch with the detective?
6   A.  Text message.
7   Q.  So you text messaged the one from the bakery or was it the
8    other detective?
9   A.  I don't recall.
10   Q.  And the detective -- did he call you back?
11   A.  I don't remember.
12   Q.  Obviously you wanted to help the detectives to the extent
13    you could, right?
14   A.  Yes.
15   Q.  It was important because they were investigating Michael's
16    death.
17   A.  Yes.
18   Q.  On that point, the night of Michael's death, you were also,
19    to the extent you could, trying to be helpful to the police.
20   A.  Yes.
21   Q.  At first you were understandably very upset.
22   A.  Yes.
23   Q.  But eventually you were able to have a conversation with
24    the police, right?
25   A.  Yes.

1   Q.  And you told them what you believed was helpful.
2   A.  Yes.
3   Q.  You gave them Michael's phones -- withdrawn.
4        You gave them the codes to Michael's phones.
5   A.  Yes.
6   Q.  And you told them he used them both regularly.
7   A.  Yes.
8        MS. SIDERIS: One moment, your Honor.
9        (Counsel confer)
10        MS. SIDERIS: Ms. Fyfe, thank you very much.
11        MS. O'NEILL: We have no questions.
12        THE COURT: Redirect?
13        MR. FINKEL: No, your Honor.
14        Thank you, Ms. Fyfe.
15        THE COURT: Ms. Fyfe, thank you very much.
16        THE WITNESS: Thank you.
17        (Witness excused)
18        THE COURT: You can call your next witness.
19        MR. FINKEL: The government calls Brian Dunn.
20   BRYAN DUNN,
21    called as a witness by the government,
22    having been duly sworn, testified as follows:
23   DIRECT EXAMINATION
24   BY MR. FINKEL:
25   Q.  Good morning, sir.

1   A.  Good morning.
2   Q.  Where are you employed?
3   A.  New York Police Department.
4   Q.  How long have you been with the New York City Police
5    Department?
6   A.  A little under eight years.
7   Q.  And are you currently assigned to a particular unit at the
8    NYPD?
9   A.  Yes, I am.
10   Q.  What unit is that?
11   A.  It is Staten Island evidence collection team.
12   Q.  What does the evidence collection team do?
13   A.  We get requested by the precinct detective squads to
14    respond to certain crimes to collect certain DNA evidence,
15    fingerprint evidence.  We respond to certain shootings to
16    collect ballistic evidence.  We respond to overdose, drug
17    overdoses where we collect the drugs at the scene.  Any firearm
18    arrests we respond to to collect DNA evidence.
19   Q.  What is your rank?
20   A.  Police officer.
21   Q.  Officer Dunn, how long have you been with the evidence
22    collection team?
23   A.  A little over a year and a half, approximately 20 months.
24   Q.  Let me direct your attention to December 2017.  Did you
25    respond to an overdose death on 225 Malone Avenue --

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

---

J5a2van1          Dunn - Direct          Page 769

1  A. Yes.
2  Q. -- in Staten Island?
3  A. Yes, I did.
4  Q. Please just allow me to finish the question. Thank you,
5  Officer.
6      How long were you at 225 Malone Avenue for?
7  A. I would say anywhere between 20 and 30 minutes.
8  Q. What were your duties and responsibilities while you were
9  at 225 Malone for 20 to 30 minutes?
10 A. Basically just to collect the drug evidence that was
11 involved with the overdose.
12 Q. Now, can you talk a bit about the procedures for collecting
13 drug evidence? What do you do?
14 A. We would package the drugs, package the evidence, then I
15 would voucher it and send it to the police lab where it is up
16 to them if they test it or not, but basically --
17 Q. Let me stop you right there.
18 A. Yeah.
19 Q. What do you mean by "voucher it"?
20 A. We package it into a certain envelope and we -- vouchering
21 is just to basically say that I did it, I would seal it, sign
22 it, and send it to the lab.
23 Q. Is there a number assigned to the evidence that you would
24 voucher?
25 A. There is. Each envelope we use has a different number.

---

J5a2van1          Dunn - Direct          Page 770

1  Q. A unique number?
2  A. Yes.
3      MR. FINKEL: If we could show the witness what's been
4  marked for identification as Government Exhibit 18.
5  BY MR. FINKEL:
6  Q. Officer Dunn, if you could take a look at Government
7  Exhibit 18 and let us know if you recognize any of the
8  handwriting on the documents.
9  A. Yes, that's my handwriting.
10 Q. And what does that indicate to you, that your handwriting
11 is on the materials in Government Exhibit 18?
12 A. That is the ten white paper bags that I vouchered from the
13 scene on Malone Avenue.
14 Q. On December 1, 2017?
15 A. Yes.
16 Q. And what is the voucher number?
17 A. 5000129742.
18     MR. FINKEL: Your Honor, the government offers Exhibit
19 18.
20     MS. O'NEILL: No objection.
21     THE COURT: 18 is in evidence.
22     MR. QUIJANO: No objection.
23     THE COURT: 18 is in evidence.
24     (Government's Exhibit 18 received in evidence)
25     MR. FINKEL: Ms. Dunbar, if we can put up for the

---

J5a2van1          Dunn - Direct          Page 771

1  witness what has been marked as Government Exhibit 18B.
2  BY MR. FINKEL:
3  Q. Officer Dunn, what type of document are we looking at?
4  A. This is a property clerk invoice voucher for the NYPD.
5  Q. And what is a property clerk invoice voucher?
6  A. It is the system used. It is called PETS. it is Property
7  and Evidence Tracking System. And this is -- this is just a
8  paperwork that I associate with that envelope that gets sent to
9  the lab.
10 Q. And you created this record?
11 A. Yes.
12 Q. Was the record created at or near the time that you learned
13 the information about what you collected?
14 A. Yes.
15 Q. And is the record, to your knowledge, kept in the normal
16 course of NYPD business?
17 A. Yes.
18 Q. And is it a regular activity to make this record?
19 A. Yes.
20     MR. FINKEL: Your Honor, the government offers 18B.
21     MS. O'NEILL: No objection.
22     MR. QUIJANO: No objection.
23     THE COURT: 18B is in evidence.
24     (Government's Exhibit 18B received in evidence)
25     MR. FINKEL: Ms. Dunbar, if you could just zoom in on

---

J5a2van1          Dunn - Cross          Page 772

1  the inventory, to the left. Yup. Zoom out of that, please,
2  and if you could zoom in on the remarks.
3      Thanks Ms. Dunbar. Can you zoom out on that and at
4  the top right if you can zoom in at the bar code.
5  BY MR. FINKEL:
6  Q. What is that?
7  A. That is the PETS invoice number.
8  Q. 9742?
9  A. Yes.
10 Q. Officer Dunn, were you involved in the investigation
11 concerning Michael Ogno's death?
12 A. No.
13 Q. Did you have any involvement in the investigation
14 concerning Paul Van Manen?
15 A. No.
16 Q. How long were you at 225 Malone?
17 A. Between 20 and 30 minutes.
18     MR. FINKEL: One moment, please.
19     Nothing further, your Honor.
20     MR. QUIJANO: Very briefly.
21 CROSS-EXAMINATION
22 BY MR. QUIJANO:
23 Q. Good morning, Officer Dunn.
24 A. Good morning.
25 Q. So you responded to a call on the night -- well, I guess it

---

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH  CHARLTON

**CORRECTED**
May 10, 2019

1 would have been the early morning hours of December 2, is that
2 correct?
3 A. Yes.
4 Q. And the call was purely in relationship for your purposes
5 of collecting evidence?
6 A. Yes.
7 Q. Is that correct?
8 A. Yes.
9 Q. Was this a phone call or a radio run if you remember?
10 A. It was a phone call to our base.
11 Q. And you arrived at the residence I believe about 1:30, is
12 that correct?
13 A. I would have to double check the report.
14 Q. Would that be in your DD-5?
15 A. Yes.
16       MR. QUIJANO: Ms. Dunbar, can you show 3524-1.  I
17 think it is the second page.
18       (Counsel confer)
19       MR. QUIJANO: Your Honor, may I approach.
20       THE COURT: Yes.  Why don't you just show it to him.
21 BY MR. QUIJANO:
22 Q. Let me show you this document.  Read as much as you want,
23 and see if that refreshes your recollection.  Just tell me when
24 you are finished reviewing it, please.
25 A. Yeah.

1 Q. Having reviewed the document?  Does that refresh your
2 recollection as to what time you got there?
3 A. It looks like I got the call at 1:30 and I arrived at 1:50.
4 Q. Do you recall who made the initial call?  Was it
5 Detective Slevin?
6 A. No.  We get requested by the borough, so they call the
7 borough and the borough will call us.
8 Q. Do you know Detective Slevin?
9 A. I have had cases with him, yes.
10 Q. When you arrived, was Detective Slevin still there?
11 A. No.
12 Q. Were there any other police there when you arrived?
13 A. There was police, yes.
14 Q. Officer Ruiz?
15 A. Yes.
16 Q. And he assisted you, I believe, that day?
17 A. Yes.
18 Q. Okay.
19       Did you have any -- did you have -- withdrawn.
20       Was there a young lady there, you may have ascertained
21 was the girlfriend of the deceased?  Do you remember her?
22 A. Not that I talked to, no.
23 Q. Other than collecting the evidence you have testified
24 today, did you have any other involvement -- withdrawn.
25       Other than collecting the evidence, did you do

1 anything else while you were there or --
2 A. No.
3 Q. -- have any other discussions while you were there?
4 A. No.
5 Q. How long were you there?
6 A. Between 20 and 30 minutes.
7 Q. And no other involvement at all with this investigation,
8 correct?
9 A. Just collecting the evidence and my pictures.
10 Q. Do you know Detective Truscelli?
11 A. No, I don't.
12       MR. QUIJANO: Thank you, Officer.
13       THE WITNESS: Thank you.
14       MS. O'NEILL: No questions.
15       THE COURT: Redirect?
16       MR. FINKEL: Just one moment, your Honor?
17       (Counsel confer)
18 REDIRECT EXAMINATION
19 BY MR. FINKEL:
20 Q. Officer Dunn, besides the drug paraphernalia we looked at
21 before in Exhibit 18, do you recall if there were other things
22 you vouchered -- let me take a step back.  You were asked some
23 questions about the evidence you collected on cross.  Do you
24 remember that?
25 A. Yes.

1 Q. Other than the drug paraphernalia we looked at before, do
2 you recall if there was other evidence you collected?
3 A. I collected a hypodermic needle.
4 Q. Hypodermic needle.
5       MR. FINKEL: If we can show the witness what's been
6 marked for identification as Government Exhibit 17.
7 Q. Are you able to recognize Government Exhibit 17?
8 A. Yes.
9 Q. What is it?
10 A. It is a hypodermic needle inside a safety case.
11 Q. Is that the hypodermic needle you collected at the 225
12 Malone residence?
13 A. Yes.  That's my handwriting on the envelope.
14       MR. FINKEL: Your Honor, the government offers Exhibit
15 17.
16       MR. QUIJANO: No objection.
17       MS. O'NEILL: No objection.
18       THE COURT: 17 is in evidence.
19       MR. FINKEL: May we publish it?
20       THE COURT: Yes.
21       (Government's Exhibit 17 received in evidence)
22       MR. FINKEL: Ms. Dunbar, if we can display for the
23 witness what's been marked Government Exhibit 17B?
24 BY MR. FINKEL:
25 Q. Officer Dunn, there is a document on the screen in front of

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1  you. Do you see that?
2  A. Yes.
3  Q. It is Government Exhibit 17B.
4      What is that document?
5  A. That's a Property and Evidence Tracking System voucher.
6  Q. What evidence is this voucher tracking?
7  A. One hypodermic needle.
8  Q. Recovered from where?
9  A. 225 Malone.
10 Q. And like the previous property tracking document we looked
11 at, is this a document that's created at or near the time that
12 the information is acquired?
13 A. Yes.
14 Q. And is it kept in the regularly conducted business of the
15 NYPD?
16 A. Yes.
17     MR. FINKEL: Your Honor, the government offers Exhibit
18 17B.
19     MS. O'NEILL: No objection.
20     MR. QUIJANO: No objection.
21     THE COURT: 17B is in evidence.
22     (Government's Exhibit 17B received in evidence)
23     MR. FINKEL: If we could publish it, please.
24     THE COURT: Yes, you may.
25     MR. FINKEL: Ms. Dunbar, if you could zoom in on the

1  sender?
2      (Pause)
3      MR. FINKEL: Just one moment, your Honor.
4  Thank you, Officer Dunn.
5      THE COURT: Yes.
6      MR. QUIJANO: One moment, please, your Honor.
7      (Pause)
8      MR. QUIJANO: They don't teach this in law school.
9  May I approach the witness?
10     THE COURT: Yes.
11 CROSS-EXAMINATION
12 BY MR. QUIJANO:
13 Q. Officer, I'm going to show you Exhibit 17 in evidence. Do
14 you want gloves or you just won't touch it?
15 A. I won't touch it, no.
16 Q. How long have your duties been essentially this recovering
17 evidence from crime scenes?
18 A. About I would say 20 months.
19 Q. Was this the first time you were recovering evidence from a
20 possible heroin overdose?
21 A. No.
22 Q. This was not the first time you recovered a hypodermic
23 needle?
24 A. No.
25 Q. So you are familiar with these types of needles in

1  relationship to the use of heroin, is that correct?
2  A. Yes.
3  Q. Government Exhibit 17, now in evidence, am I correct that
4  that is not consistent with the type of needle that is usually
5  used to inject heroin?
6      MR. FINKEL: Objection. Foundation.
7      MR. QUIJANO: Based on his knowledge.
8      THE COURT: Overruled.
9  Q. Do you understand my question?
10 A. No.
11 Q. Okay. So looking at Government Exhibit 17, does that not
12 appear to be more of an intramuscular type of needle or syringe
13 as opposed to the type of syringe used to inject heroin, which
14 is usual a much shorter needle?
15     MR. FINKEL: Objection.
16     MR. QUIJANO: If he knows.
17     THE COURT: Overruled.
18 A. I can't answer that. I can't even see it. It's in the
19 safety container, so I can't really see the needle.
20 Q. And you don't recall from that evening whether it appeared
21 to be not the type of needle that's used to inject
22 intravenously as opposed to an intramuscular needle?
23 A. No, I don't recall.
24     (Counsel confer)
25     MR. QUIJANO: Your Honor, we just need a moment. We

1  just want to take the object -- the needle out of the package.
2      (Pause)
3      THE WITNESS: Just cut anywhere?
4      MR. QUIJANO: He can cut it, right?
5      MR. FINKEL: Yes.
6  A. (Witness complies).
7  Q. Now, Government Exhibit 17, that syringe, is not an
8  intravenous needle, is that correct? Would you agree with
9  that?
10 A. No, I don't know. I'm not sure.
11 Q. In your experience, needles, syringes that are recovered
12 used to inject heroin intravenously, aren't they, the needle
13 itself, isn't it much shorter than what appears to be the size
14 of the needle in Government Exhibit 17? The needle itself.
15 A. I have had overdoses where I have seen needles that long.
16 Q. Okay.
17     MR. QUIJANO: Thank you, your Honor. Nothing further.
18     MR. FINKEL: Nothing further.
19 Thank you, Officer Dunn.
20     THE COURT: Officer Dunn, thank you.
21     THE WITNESS: Thank you.
22     (Witness excused)
23     MR. FINKEL: Your Honor, before the government calls
24 the next witness, there is a legal issue to discuss regarding
25 that witness. If it's okay with the court is this time for an

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1   early break, perhaps?

2   THE COURT: All right. We will take a ten-minute

3   break.

4   (Continued on next page)

1   (Jury not present)

2   THE COURT: All right.

3   MR. FINKEL: Your Honor, the government's next witness

4   is a lab technician who is going to testify about tests that

5   were performed on drugs that were seized from defendant Kenneth

6   Charlton in 2012. That's outside the charged conspiracy time

7   frame. The government is offering that as 404(b) evidence. I

8   believe your Honor has ruled it is admissible under that basis.

9   The government has proposed a limiting instruction for the

10  court to consider after the evidence -- to be read to the jury

11  after that evidence has been introduced. We have had some

12  discussions with defendant Kenneth Charlton's counsel. They

13  have proposed their own language to us this morning. We don't

14  believe their language is adequate, so we just need to resolve

15  if there should be a limiting instruction; if there is, to what

16  extent. If I could pass up the government's proposed language,

17  which has been shared with the defense previously, to the

18  court.

19  THE COURT: Okay. Ms. O'Neill, do you have proposed

20  language?

21  MR. SANTIAGO: Your Honor, our proposal is simply just

22  to change the syntax of one of the sentences, just to shorten

23  it, so it would be very similar to the proposed language

24  already.

25  THE COURT: I have the government's language in front

1   of me. What would you like me to change?

2   MR. SANTIAGO: So basically the proposed language the

3   government has consists of essentially four components. We

4   have no objection to three of those components, 75 percent of

5   it.

6   So the first component is that the evidence concerning

7   a 2012 seizure of drugs from Kenneth Charlton is received for a

8   limited purpose. We have no argument with that.

9   The other components that we do not have a position on

10  or take argument up with are the last two components, which

11  would be that "you may not consider the evidence as a

12  substitute for proof that the defendant Kenneth Charlton

13  committed the crime charged in the indictment" and the last

14  component, which is, "I will" -- referring to you, your

15  Honor -- "provide more information to you about how you are to

16  consider the evidence concerning the 2012 seizure of drugs from

17  Kenneth Charlton when I provide my instruction on the law

18  before your deliberation. We have no objection to those issues

19  where we take issue is with that sandwiched-in component, which

20  states, "The government offered this evidence to demonstrate

21  the defendant's identity, intent, and knowledge, to establish

22  opportunity or the absence of mistake or accident with regard

23  to the offense charged in the indictment, and to demonstrate

24  the background of the narcotics conspiracy charged."

25  That is where we take issue. We believe that that

1   language is overly verbose and conflates a couple of issues,

2   and in order to really, I think, properly address it, it has to

3   be taught within the framework of 404(b). 404(b) has two

4   components. The second component is the limiting purpose in

5   which evidence can be admitted to. But the first component

6   starts with basically saying that it is prohibited to show that

7   on a particular occasion that person acted in accordance with

8   that character. So the weight of the analysis, when discussing

9   a limiting instruction, we believe, comes from that first prong

10  and then has to be addressed on what these limited purposes

11  are. So in order to do that, we believe that the issue really

12  here is that this is from a seizure of 2012, which is three

13  years before the charged conduct conspiracy. The charged

14  conduct conspiracy in and of itself is only three years. So we

15  are fast-forwarding so early in advance.

16  And what this really boils down to is that

17  Mr. Charlton has familiarity with heroin, and we believe that

18  the limiting instruction could be simplified for the jury to

19  understand to just simply say "the evidence concerning a 2012

20  seizure of drugs from Kenneth Charlton is received for a

21  limited purpose. The government's offered this evidence to

22  demonstrate the defendant's familiarity with heroin." That in

23  and of itself serves the purposes of both prongs of 404(3), the

24  first one with the weight that it's not supposed to be

25  admissible and the second prong saying for the limited purpose.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1    That limited purpose is to show that Mr. Charlton is familiar
2    with heroin.  It comports with their opening, with their
3    directs; it comports with our opening, our cross-examinations;
4    and it does not confuse the jury and add extra syntax to put
5    the words "Charlton" and "conspiracy" together.  And when the
6    government is doing this, regardless of their intent -- I'm not
7    discussing that the government is doing this in any malicious
8    way -- what they are kind of doing is letting the cat out of
9    the bag and saying "Charlton conspiracy," "Charlton narcotics
10   conspiracy."  It doesn't have to happen that way.
11       THE COURT: Let me hear from the government.  Do I
12   have a copy of your language?
13       MR. FINKEL: Of our language?  Yes.  I passed it up to
14   your Honor.  That's ours.  I believe that is our language.
15   That is our language.
16       THE COURT: It is eight lines and the word deliberate
17   in the final line.
18       MR. FINKEL: That's right, your Honor.
19       THE COURT: Did I get something from you,
20   Mr. Santiago.
21       MR. SANTIAGO: We got this last night.  I can just
22   submit their language --
23       THE COURT: Mark it up.
24       MR. SANTIAGO: Yes, that's fine.
25       MR. FINKEL: Your Honor, just briefly on this, 404(b),

1    as your Honor has ruled in this case, is broader than mere
2    being familiar with a drug.  It's properly admissible for
3    showing lack of mistake, for providing background into the
4    conspiracy.  None of that, I think, is controversial.  The
5    language that the government has used is adapted from language
6    this court approved in United States v. Vargas case, 18 Cr. 76,
7    which is where we adopted this language from.  We think it
8    properly --
9        THE COURT: Judge Abrams tried the case.  I was out
10   sick.
11       MR. FINKEL: Judge Abrams tried the case, your Honor,
12   but you ruled on this issue prior to the trial.  This language,
13   we think, captures what 404(b) allows, which the court has
14   ruled on.  I'm not going to belabor it more than that, your
15   Honor.
16       MR. SANTIAGO: Your Honor, if I may, it is our
17   position that what the government is doing is adding basically,
18   without fancy words, saying and this and this and this.  404(b)
19   at its base prohibits the confusion of the jury to believe that
20   on a particular occasion that the person acted in accordance
21   with that character.  It comes from that weight.  So in order
22   to have an establishment of fairness to our client, we believe
23   that the essence of what the instruction is is that
24   Mr. Charlton is familiar with heroin.  We are not denying that.
25   That is part of our defense.  So it can be served, all

1    interests can be served here if the limiting instruction simply
2    says Mr. Charlton has a familiarity with heroin.  It comports
3    with 404(b) prong two without throwing in essentially the
4    kitchen sink and allowing and this and that and this and that
5    and saying narcotics conspiracy and so on and so on.  I can
6    speak more on it, your Honor.
7        THE COURT: I know you can speak more on it, but I get
8    your point.
9        (Pause)
10       THE COURT: Mr. Santiago, your objection is overruled.
11   I'm going to give the government's charge.  I think it is more
12   consistent with Rule 402 or 404.
13       All right, Bill, bring in the jury.
14       MR. QUIJANO: Your Honor, will there be another break
15   today?
16       THE COURT: Yes.  This break was taken 40 minutes
17   after we started.  I was planning on a break at the two-hour
18   mark.
19       MR. QUIJANO: At the two-hour mark?
20       THE COURT: At the two-hour mark.  That would be
21   around 11:00.
22       MR. QUIJANO: Okay.
23       (Continued on next page)
24
25

1        (Jury present)
2    DIMITRI DEVITO,
3        called as a witness by the government,
4        having been duly sworn, testified as follows:
5        THE COURT: All right, Ms. Ghosh.
6        MS. GHOSH: Thank you, your Honor.  For the record,
7    the government calls Dimitri DeVito.
8    DIRECT EXAMINATION
9    BY MS. GHOSH:
10   Q.  Good morning, Mr. DeVito.
11   A.  Good morning.
12   Q.  Who do you work for?
13   A.  I work for the New York City Police Department police
14   laboratory.
15   Q.  Approximately how long have you worked for the police
16   laboratory?
17   A.  For approximately 11 months.
18   Q.  What is your position with the NYPD?
19   A.  I am a criminalist assigned to the controlled substance
20   analysis section of the lab.
21       (Continued on next page)
22
23
24
25

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

**CORRECTED**
**May 10, 2019**

1  Q. Is that laboratory accredited?
2  A. Yes, it is.
3  Q. What does that mean?
4  A. That means that our standard operating procedures, both
5    technical and administrative, are reviewed by an outside
6    accrediting body.
7  Q. What is your educational background?
8  A. I have a bachelor's of science in biomolecular sciences
9    from New York University Tandon School of Engineering.
10  Q. What, if any, internships or work study did you complete as
11    part of that degree?
12  A. Prior to my work at the police laboratory, I worked at
13    Roche Molecular Systems as a scientist and lab technician for
14    approximately two years, where I worked on a device that
15    performed DNA amplification in order to determine the presence
16    of various viruses and bacteria through oral and nasopharyngeal
17    swabs.
18  Q. Did you have any internships during your studies?
19  A. Yes, I did. I also interned for a year while attending
20    university, where I performed sequence analysis on various
21    bacterium that made up the human microbiome.
22  Q. Now, what are your duties and responsibilities as a
23    criminalist?
24  A. My duties as a criminalist involve analyzing evidence for
25    the presence or absence of controlled substances.

1  Q. What is a controlled substance?
2  A. A controlled substance is any substance that's controlled
3    by either the New York state or federal government.
4  Q. Are drugs like heroin included in that definition?
5  A. Yes, that's correct.
6  Q. What type of training have you received regarding
7    controlled substance analysis?
8  A. At the laboratory, I was part of a six-month training
9    program that involved written, oral and practical examinations,
10    as well as a practical and oral competency exam, which involved
11    me analyzing both known and unknown samples that contained
12    controlled and noncontrolled substances. At the completion of
13    this training, I was then put under supervised casework for a
14    period of time.
15  Q. Does that supervision continue?
16  A. While there is a supervisor present in the lab at all
17    times, I am on my own when analyzing cases.
18  Q. In your career, approximately how many times have you
19    tested samples for the presence or absence of controlled
20    substances?
21  A. Approximately 200 times.
22      MS. GHOSH: Your Honor, the government asks that Mr.
23    Devito be deemed an expert in the analysis of controlled
24    substances.
25      MR. QUIJANO: No objection.

1      MR. SANTIAGO: No objection.
2      THE COURT: He is recognized as an expert.
3      MS. GHOSH: Thank you, your Honor.
4  BY MS. GHOSH:
5  Q. Mr. Devito, were you assigned to a case in your laboratory
6    with lab file number 2012-102729?
7  A. Yes, that's correct.
8  Q. I am going to show you what has been marked for
9    identification as Government Exhibit 808.
10      MS. GHOSH: Ms. Dunbar, can you put that up for the
11    witness.
12  Q. Mr. Devito, do you recognize this?
13  A. Yes, I do.
14      MS. GHOSH: Ms. Dunbar, if you could just flip through
15    the pages of it so the witness can see them.
16  Q. Mr. Devito, generally speaking, what is this document?
17  A. I recognize this document as the summary of my analysis
18    performed, as well as my contemporaneous notes I took while
19    analyzing this particular case, as well as the instrumental
20    data that I was provided during the case.
21      MS. GHOSH: The government moves to admit Exhibit 808.
22      MR. QUIJANO: No objection.
23      MR. SANTIAGO: No objection.
24      THE COURT: 808 is in evidence.
25      (Government's Exhibit 808 received in evidence)

1      MS. GHOSH: At this point, I would also like to read a
2    portion of a stipulation that is already in evidence, which is
3    Government Exhibit 507. This is a stipulation concerning
4    seized narcotics and laboratory testing, and I am reading from
5    paragraph 9.
6      The contents of Government Exhibit 10 were seized from
7    Kenneth Charlton on September 5, 2012 and vouchered as
8    5000023132 by law enforcement officials. The contents of
9    Government Exhibit 10 were tested by analysts employed by a New
10    York City Police Department laboratory. The substance
11    contained in Government Exhibit 10 was in three glassine
12    envelopes, each containing a substance. The substance tested
13    positive for the presence of heroin, and was determined to
14    weigh approximately 0.084 grams without packaging. This
15    finding is contained in a lab report that has been marked
16    as Government Exhibit A.
17      The government moves to admit Government Exhibit 10.
18      MR. QUIJANO: No objection.
19      MR. SANTIAGO: No objection.
20      THE COURT: 10 is in evidence.
21      (Government's Exhibit 10 received in evidence)
22      MS. GHOSH: Mr. Finkel, if you could show the witness
23    and the jury what is now in evidence as Government Exhibit 10.
24  BY MS. GHOSH:
25  Q. Mr. Devito, do you have Exhibit 10 in front of you?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH  CHARLTON

**CORRECTED**
**May 10, 2019**

1  A.  Yes, I do.
2  Q.  What is that?
3  A.  I recognize this as evidence that I have previously
4  analyzed.
5  Q.  Do you have 808 on the screen in front of you still?
6  A.  Yes, I do.
7  Q.  Is Government Exhibit 10 the items that are reflected in
8  the report that you wrote as Government Exhibit 808?
9  A.  Yes, that's correct.
10  Q.  How do you know that what is in that bag is Government
11  Exhibit 10 is the substance that you tested?
12  A.  Excuse me.  Just one moment.
13  Q.  Of course.
14  A.  I'm sorry.  Could you please repeat the question?
15  Q.  So in Government Exhibit 10, in the bag in front of you,
16  how do you know that that's the substance that you tested?
17  A.  I recognize it based on the laboratory number that I wrote
18  here.  I also recognize it based upon my initials on all the
19  seals.  Additionally, when I filled out this envelope, I wrote
20  the laboratory number as well as the label that was provided by
21  the laboratory, as well as the voucher number which matches the
22  one that's written on my report, and also my signature here as
23  well.
24          MS. GHOSH:  Let the record reflect that the witness
25  has indicated various places on both sides of the evidence bag

1  where his initials and other handwriting appear.
2          THE COURT:  Yes.
3  Q.  Mr. Devito, how did you receive these items in Government
4  Exhibit 10 for testing?
5  A.  I initially received these items within a plastic security
6  envelope, which is sealed here.  Within that plastic security
7  envelope was the narcotic envelope.  And within the narcotic
8  envelope were items number 1A and 1B.
9  Q.  The narcotics envelope that you're referencing, is that the
10  manila envelope inside the evidence bag?
11  A.  Yes, that's correct.
12  Q.  Can you describe what things you did to prepare the samples
13  in that item for testing?
14  A.  After taking the evidence into my custody, I then proceeded
15  back to my workbench, where I then sterilized my work area,
16  wiped down all the instruments that I was going to use for
17  analysis.  I put on proper protective equipment, and then I
18  proceeded to open the plastic security envelope, remove the
19  narcotic envelope inside, and once I did that, I then opened
20  the narcotic envelope to perform an inventory of the evidence
21  that was inside of that.
22  Q.  Do you take any special precautions when you test an item
23  for the presence or absence of controlled substances?
24  A.  Yes, that's correct.  Like I previously mentioned, I am
25  always wearing a lab coat, I always have nitrile gloves on,

1  safety goggles, things of that nature.
2  Q.  Why do you do that?
3  A.  Because we don't necessarily know what we are working with
4  at any given time and it's just for the safety of us as
5  analysts.
6  Q.  You said that when you received that, you took some items
7  out of the narcotics envelope, is that correct?
8  A.  Yes, that's correct.
9  Q.  What was it that you removed from the narcotics envelope?
10  A.  I removed three glassine envelopes that contained solid
11  material.
12  Q.  Did you test all three of those glassine envelopes?
13  A.  I did not.
14  Q.  What did you test of those glassine envelopes?
15  A.  I selected one of the glassine envelopes at random, which I
16  then took a weight of.  After I took the weight of that
17  envelope and the sample inside of it, I proceeded to perform a
18  Marquis color test.
19          MS. GHOSH:  I am going to ask Ms. Dunbar to put up for
20  the witness Government Exhibit 1006, which is a demonstrative.
21  Q.  Mr. Devito, what is government demonstrative exhibit 1006?
22  A.  This is a spot well plate.
23  Q.  Did you have an opportunity to review this image before
24  testifying here today?
25  A.  Yes I did.

1  Q.  Would this image aid you in describing the Marquis color
2  test to the jury?
3  A.  Yes, it would.
4          MS. GHOSH:  The government moves to publish Exhibit
5  1006 as a demonstrative.
6          MR. QUIJANO:  No objection.
7          MR. SANTIAGO:  No objection.
8          THE COURT:  1006 can be published.
9  Q.  Mr. Devito, you mentioned the color test.  Can you explain
10  what that test is?
11  A.  Yes, of course.  The Marquis color test is using a liquid
12  Marquis reagent which is added to one of the wells in the
13  microwell plate, and at first it's observed that no color
14  change takes place.  We use that as a negative control to
15  ensure that there is no previous substance already in the plate
16  and that the plate is clear so that there is no previous
17  contamination.
18  Q.  Can I pause you there for one second.  Using the
19  touchscreen in front of you, could you circle where it is that
20  you put the item when you're doing the test so the jury can
21  see.
22  A.  In any one of these wells.  One color test is performed at
23  a time.
24          MS. GHOSH:  Let the record reflect that the witness
25  has circled the lower left-hand circular well in Government

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1  Exhibit 1006.
2       THE COURT: Yes.
3  Q. You mentioned a reagent.  What is a reagent?
4  A. A reagent is, in this particular case, a chemical that
5  reacts with the substance that I use as a presumptive test for
6  further analysis.
7  Q. So after you put the reagent into the item here in
8  Government Exhibit 1006 -- and the purpose of that was to
9  determine there was no contamination, is that right?
10 A. Yes, that's correct.
11 Q. What do you do next?
12 A. I then took a scoop of my sample in item number 1A, and I
13 added it to the liquid Marquis reagent where I noticed a purple
14 color change take place.
15 Q. You mentioned item 1A.  Can you just explain on Government
16 Exhibit 10 what you're referring to as item 1A?
17 A. Yes.  Item number 1A is this material here.  It was the
18 glassine envelope that I chose at random to analyze.
19 Q. Mr. Devito, can I just ask you to hold it up a little
20 higher.
21 A. Sorry.
22 Q. That's OK.
23      MS. GHOSH: Let the record reflect that Mr. Devito has
24 pointed to one of the glassines in Exhibit 10.
25 Q. After performing the Marquis color test, I believe you said

1  that there was a color change?
2  A. Yes, that's correct.
3  Q. What color did the -- is it the reagent?
4  A. Yes.
5  Q. What color did the reagent change to?
6  A. The reagent changed to a purple color.
7  Q. What does that result indicate?
8  A. The color change of purple is indicative of the presence of
9  opiates in a sample.
10 Q. What types of opiates could a purple color indicate?
11 A. Opiates such as heroin or morphine.
12 Q. To be clear, at this point are you able to tell which
13 opiate is present in the substance that you're testing?
14 A. No, I am not.
15 Q. If the substance were something other than an opiate, what
16 would happen to the color?
17 A. Depending on what the actual substance was, a different
18 color change could take place.
19 Q. After the Marquis color test, what did you do next with the
20 sample from Government Exhibit 10?
21 A. I then proceeded to a GC-MS analysis, GC-MS analysis being
22 gas chromatography-mass spectrometry analysis.
23 Q. Before running the test on the sample, did you take certain
24 steps?
25 A. Yes, I did.

1  Q. What steps did you take?
2  A. Can you just clarify?
3  Q. Sure.  You had mentioned earlier with the Marquis color
4  test that before testing the substance you run another test
5  with the reagent to ensure there is no contamination, is that
6  right?
7  A. I run another test with the reagent as far as the blank
8  spot well plate?
9  Q. Is that what you did with the Marquis color test?
10 A. Yes.
11 Q. OK.  Sorry.  I'm trying here.
12      So then turning to the GC-MS test, is there a similar
13 step that you go through to ensure there is no contamination
14 with the GC-MS instrument?
15 A. Yes.  So prior to actually running a sample for GC-MS
16 analysis, a blank sample is run to ensure that there is no
17 contamination from previous runs that had occurred on the
18 instrument.
19 Q. Could you please describe the GC-MS test at a high level?
20 A. Yes.  So as I previously mentioned, GC-MS stands for gas
21 chromatography-mass spectrometry.  That is a two-part
22 analytical technique that's used to separate components in a
23 mixture.
24      A better way to understand it would be, imagine that
25 you had three vehicles on a racetrack, say a Ferrari, a station

1  wagon and a sedan.  They all go around the racetrack at various
2  rates because one is faster than the other, and that is
3  reflective of what is known as the retention time in gas
4  chromatography, which is the amount of time it takes for a
5  sample to loop through the column of the instrument.
6       The second part would be the mass spectrometry.  So if
7  you imagine, after all the cars go around the racetrack at
8  various times, once they all get to the end, for some
9  inexplicable reason they all explode into a million pieces.
10 And then you go to look at the wreckage and you see all the
11 different pieces of the vehicles.  Clearly you could tell which
12 headlights and which fenders belong to the Ferrari versus the
13 station wagon, etc., because the fragmentation that occurs is
14 unique to specific compounds or chemicals.
15      MS. GHOSH: Ms. Dunbar, if you could put Exhibit 808
16 back up and turn to page 3 of that, please.
17 Q. Mr. Devito, can you explain first, just generally speaking,
18 what we are looking at on this page of Exhibit 808?
19 A. Yes.  So this page shows the instrumental data that is
20 outputted from the GC-MS instrument.
21 Q. In looking first at the top of the page, can you explain
22 what is depicted there?
23      MS. GHOSH: Ms. Dunbar, if you can zoom into the top
24 half of the page, please.
25      Perfect.  Thank you.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH  CHARLTON

**CORRECTED**
**May 10, 2019**

1 Q.  What are we looking at here?
2 A.  So may I circle stuff?
3 Q.  Yes, absolutely.
4 A.  So everything that's circled here is indicative of the
5    blank that was run prior to the sample.  As you note, there is
6    nothing here.  The only peak that you see here is just the
7    standard that we use within the blank to ensure that an
8    injection actually took place and that the run was successfully
9    performed.
10 Q.  If I can pause you for just a moment to have the record
11    reflect that the witness circled the three graphs at the top of
12    page 3 of Exhibit 808, and then circled the portion on the
13    left-hand graph between 1.5 and 2.5, approximately, where there
14    are no peaks, and the large peak between .5 and 1.0 on the left
15    of that.
16         THE COURT: Yes.
17 Q.  Go on, Mr. Devito.
18 A.  If you look to the right and you see these two, these
19    are -- this is extracted to show specific ions that are present
20    in abundance within heroin.  And as you could see here, there
21    is no peaks at all or any ions present to ensure that there is
22    no contamination of heroin previous to the sample being run.
23         MS. GHOSH: Let the record reflect that the witness
24    has now circled the two graphs on the right hand of the top
25    portion of page 3 of 808.

1         THE COURT: Yes.
2         MS. GHOSH: Ms. Dunbar, if you can now take us down to
3    the bottom half of page 3.
4         Thank you.
5 BY MS. GHOSH:
6 Q.  Mr. Devito, what are we looking at in these two graphs on
7    the right-hand side?
8         Starting with the bottom graph, can you explain that
9    one?
10 A.  On the right-hand side you said?
11 Q.  Yes.  Correct.
12 A.  So this bottom graph reflects the mass spectral data of a
13    known heroin standard that we have at the police laboratory.
14         The graph above that, if I may, is representative of
15    the sample that was run.
16 Q.  So the top graph is the sample from Exhibit 10 that you
17    tested, is that right?
18 A.  Yes, that's correct.
19 Q.  Then the bottom graph is just a standard heroin sample that
20    you compared Exhibit 10 to?
21 A.  Yes, that's correct.
22 Q.  What did these results indicate to you after you completed
23    the GC-MS analysis?
24 A.  At the conclusion of the GC-MS analysis, I was able to
25    conclude that heroin was present in item number 1A.

1         MS. GHOSH: Just one moment, your Honor.
2 Q.  Mr. Devito, were you also assigned to a case in your
3    laboratory with lab file number 2017-065170?
4 A.  Yes, that's correct.
5 Q.  I am now going to show you what has been marked for
6    identification as Government Exhibit 807.
7         Before we go on to this one, going back to Government
8    Exhibit 10 which you have in front of you in the evidence bag,
9    do you still have that there?
10 A.  Yes, I do.
11 Q.  Just to be clear, when you said that the substance tested
12    positive for heroin, what substance are you referring to in
13    relation to Government Exhibit 10?
14 A.  I am referring to item number 1A, the glassine that I had
15    analyzed here.
16 Q.  Do you now have Government Exhibit 807 in front of you on
17    the screen?
18 A.  Yes, I do.
19 Q.  Do you recognize this?
20 A.  Yes, I do.
21 Q.  What is this?
22 A.  This is a summary of analysis that I performed for this
23    particular case.
24 Q.  Is that the case that I mentioned a moment 2017-065170?
25 A.  Yes, that's correct.

1         MS. GHOSH: The government moves to admit Government
2    Exhibit 807.
3         MR. QUIJANO: No objection.
4         MR. SANTIAGO: No objection.
5         THE COURT: 807 is in evidence.
6         (Government's Exhibit 807 received in evidence)
7         MS. GHOSH: If Mr. Finkel could show the witness
8    Government Exhibit 9, which is already in evidence.
9 BY MS. GHOSH:
10 Q.  Mr. Devito, do you have Exhibit 9 in front of you?
11 A.  Yes, I do.
12 Q.  We were just discussing the analysis that you did in
13    Exhibit 10 a moment ago and what was reflected in Exhibit 808.
14         Was there anything substantively different in the
15    methods you used to analyze the suspected controlled substances
16    in Exhibit 9?
17 A.  No, there was not.
18 Q.  Let me just step back for a moment.  Do you recognize
19    Exhibit 9?
20 A.  Yes, I do.
21 Q.  How do you recognize it?
22 A.  Again, I recognize it as a case that I have previously
23    analyzed, again from my signature here, as well as my
24    initials on outer seals, and then furthermore, on my initials
25    on all the inner seals of the plastic sleeve.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH  CHARLTON

CORRECTED
May 10, 2019

1 Q.  What was your conclusion as to whether the materials in
2   Government Exhibit 9 that you tested contained a controlled
3   substance?
4 A.  So in item number 1A for this case, which was the unit that
5   I had analyzed, I was able to conclude that that item number 1A
6   also contained heroin.
7 Q.  In both Exhibit 9 and Exhibit 10 that we looked at before,
8   after the testing is complete, what do you do with the
9   materials that you tested?
10 A.  After I have completed my analysis, I package my evidence,
11   as you see here.  I wait for the report to be approved and
12   technically reviewed by another analyst.  And once everything
13   is approved, I then take the evidence in this condition back to
14   the evidence control section of the lab where I transfer
15   custody back over to them.
16 Q.  In both Exhibits 9 and 10, did you test the entire
17   substance that you received from the lab?
18 A.  No, I didn't.
19 Q.  What do you do with the substance -- how do you repackage
20   the substance that you did test?
21 A.  The substance that I did test is packaged in a separate
22   glassine envelope.  If you could see that there is
23   another -- the original glassine envelope behind it.  I merely
24   repackage it so that the packaging is more secure.
25 Q.  So for Exhibit 1A, the packaging that that's in is the

1   lab's packaging and not the original packaging, is that right?
2 A.  Just to clarify, 1A contains both the initial packaging of
3   the evidence as well as the glassine envelope that I put the
4   material in after analysis.
5 Q.  Thank you.
6       What, if any, further involvement did you have into
7   the investigations for which these items of evidence, Exhibit 9
8   and Exhibit 10, were collected?
9 A.  Absolutely none at all.
10       MS. GHOSH: Just one moment.
11 Q.  You mentioned that for both of these you didn't test the
12   entire sample but just -- the entire substance that you
13   received, but just a sample of that, is that right?
14 A.  Yes.  In both cases I analyzed one unit.
15 Q.  Is that consistent with standard practice when there is no
16   issue of the weight of the substances?
17 A.  Yes, that's correct.
18 Q.  By issue of weight, I guess I should just ask you, when
19   would you test the entire substance rather than just a sample?
20 A.  In the particular case of narcotics, if a weight threshold
21   was above an eighth of an ounce, I would have to analyze
22   multiple units in order to ensure that I reached that
23   particular weight of sample analyzed.
24 Q.  But that wasn't the case here for you?
25 A.  That's correct.  It was not the case here.

1       MS. GHOSH: At this time, we would request that the
2   limiting instruction previously discussed be read to the jury.
3       THE COURT: All right.
4       The evidence that you just heard concerns a 2012
5   seizure of drugs from Mr. Charlton.  It's been received in
6   evidence for a limited purpose.  The government offers this
7   evidence to demonstrate Mr. Charlton's identity, intent and
8   knowledge, to establish opportunity or the absence of mistake
9   or accident with regard to the offense charged in the
10   indictment, and to demonstrate the background of the narcotics
11   conspiracy charged.  You may not consider this evidence as a
12   substitute for proof that the defendant, Mr. Charlton,
13   committed the crime charged in the indictment.  I will provide
14   more information to you about how you are to consider this
15   evidence concerning the 2012 seizure of drugs from Kenneth
16   Charlton when I instruct you before you deliberate.
17       MS. GHOSH: Thank you, your Honor.
18       Just to make clear for the record, the limiting
19   instruction applies to Government Exhibit 10, the 2012
20   materials, and not Government Exhibit 9.
21       THE COURT: And also applies to 808, doesn't it?
22       MS. GHOSH: That's correct.  808 and Exhibit 10.
23       THE COURT: Thank you.
24       MS. GHOSH: No further questions.
25       MR. QUIJANO: No questions.

1       MR. SANTIAGO: Very briefly, your Honor.
2       THE COURT: Yes, Mr. Santiago.
3   CROSS EXAMINATION
4   BY MR. SANTIAGO:
5 Q.  Good morning, Mr. Devito.
6 A.  Good morning, sir.
7       MR. SANTIAGO: Ms. Dunbar, may you please publish for
8   the jury and for the witness Government Exhibit 808.  And as
9   you publish it, may you please zoom in on the top right-hand
10   corner of the exhibit, focusing on beginning where it says
11   "laboratory report" and ending right above the bar code.
12       Thank you.
13   BY MR. SANTIAGO:
14 Q.  Mr. Devito, the date the testing was assigned to you was
15   April 15, 2019?
16 A.  Yes, that's correct.
17 Q.  You finished your preparation of the testing on April 18,
18   2019, correct?
19 A.  Yes, that's correct.
20 Q.  Can you please read for the jury the date the evidence was
21   submitted?
22 A.  That would be September 5, 2012.
23       MR. SANTIAGO: Thank you, Mr. Devito.  No further
24   questions.
25       MS. GHOSH: No questions, your Honor.

UNITED STATES OF AMERICA, V            CORRECTED
PAUL VAN MANEN and KENNETH CHARLTON        May 10, 2019

1 THE COURT: Mr. Devito, you are excused. Thank you
2 very much.
3 THE WITNESS: Thank you, sir.
4 (Witness excused)
5 MR. FINKEL: The government calls Michael Forster.
6 MICHAEL FORSTER,
7 called as a witness by the government,
8 having been duly sworn, testified as follows:
9 THE DEPUTY CLERK: State your full name and spell your
10 last name for the record.
11 THE WITNESS: Detective Michael Forster,
12 F-O-R-S-T-E-R.
13 DIRECT EXAMINATION
14 BY MR. FINKEL:
15 Q. Good morning.
16 Sir, where are you employed?
17 A. New York City Police Department.
18 Q. For how long have you been employed with the NYPD?
19 A. Seven years.
20 Q. What is your current rank?
21 A. Detective.
22 Q. How long have you been a detective for?
23 A. Approximately six months.
24 Q. Sorry?
25 A. Six months.

1 Q. What was your rank before that?
2 A. Police officer.
3 Q. Are you assigned to a particular unit?
4 A. Yes.
5 Q. What unit is that?
6 A. Overdose task force, which is a part of Staten Island
7 narcotics.
8 Q. Are you from Staten Island originally?
9 A. Yes.
10 Q. Were you involved in an investigation concerning an
11 individual known as Paul Van Manen?
12 A. Yes.
13 Q. What was the scope of your involvement in the investigation
14 of Paul Van Manen?
15 A. I assisted with surveillance.
16 Q. Approximately how many times did you assist with
17 surveillance concerning the investigation of Paul Van Manen?
18 A. Approximately three.
19 Q. Three?
20 A. Three.
21 Q. Were you involved in the daily activities of the
22 investigation of Paul Van Manen?
23 A. No.
24 Q. Detective, what is surveillance?
25 A. Observation on a person or a location.

1 Q. What is its purpose?
2 A. To obtain evidence.
3 Q. Do you take photographs on surveillance?
4 A. Sometimes.
5 Q. Why just sometimes?
6 A. There are times where it's not feasible to take photos.
7 Q. What do you mean by it's not feasible to take photos?
8 A. If we are doing surveillance on foot, or if we are too
9 close and the camera is going to be obvious, it's not feasible
10 to take the picture.
11 Q. What do you mean, if it's too obvious, it makes it
12 unfeasible to take a photograph?
13 A. If the subject of our surveillance or observation is going
14 to notice us, then we don't take pictures.
15 Q. Again, Detective, I just ask you to slow down a bit just so
16 the court reporter can keep up. Thank you, sir.
17 What is a DD-5?
18 A. A report that gets typed into the case.
19 Q. Do you memorialize a DD-5 after performing surveillance?
20 A. Yes.
21 Q. Why do you do that?
22 A. To keep memory, so we know what happened.
23 Q. How long after you perform surveillance do you record a
24 DD-5 about what you observed?
25 A. Usually the same day.

1 Q. Why is it usually the same day?
2 A. Because memory is still fresh in your head.
3 Q. Detective, what, if anything, did you do to prepare for
4 your testimony here today?
5 A. I met with you.
6 Q. Did you review any documents?
7 A. Yes.
8 Q. What documents?
9 A. A DD-5.
10 Q. I want to direct your attention --
11 MR. FINKEL: Well, actually, first, with the Court's
12 permission, we would like to pass out a couple of transcripts
13 for the jury.
14 THE COURT: All right.
15 MR. FINKEL: At this time, with the Court's
16 permission, the government will play what is in evidence as
17 Government Exhibit 301CZ. This is a call from September 11,
18 2017, at approximately 1231 in the afternoon, and it is between
19 the numbers ending in 8865 and 0111.
20 (Audio played)
21 BY MR. FINKEL:
22 Q. Detective, on the date of that call, September 11, 2017,
23 what, if anything, were you doing as part of the Paul Van Manen
24 investigation?
25 A. Observations.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1 Q. Where specifically did you perform
2   observations -- withdrawn.
3      When you say observations, do you also mean
4   surveillance, is that interchangeable?
5 A. Yes.
6 Q. Where, if anywhere, were you performing surveillance on
7   September 11, 2017?
8 A. 225 Malone Avenue.
9 Q. Why were you conducting surveillance at 225 Malone Avenue?
10 A. The detective that was monitoring the wiretap informed us
11   of a drug transaction that was going to take place there.
12 Q. Do you remember the time you first arrived at 225 Malone
13   Avenue?
14 A. I don't recall.
15 Q. Is there anything that would refresh your recollection?
16 A. The DD-5 for that day.
17      MR. FINKEL: Ms. Dunbar, if you can put on the screen
18   for the witness what has been marked as 3507-17, at page 84.
19      You can zoom in in the center.
20 Q. Detective, what are you looking at?
21 A. The DD-5 from that day.
22 Q. Does the DD-5 from that day refresh your recollection as to
23   what time you arrived in the vicinity of 225 Malone on
24   September 11, 2017?
25 A. Yes.

1 Q. What time was that?
2 A. Approximately 1300 hours.
3 Q. 1:00?
4 A. Yes.
5 Q. Where exactly did you station -- by the way, were you alone
6   that day?
7 A. No.
8 Q. Who were you with?
9 A. Detective White.
10      THE COURT: Detective who?
11      THE WITNESS: White.
12 Q. Were you in a car?
13 A. Yes.
14 Q. Where did you and Detective White position your car in the
15   vicinity of 225 Malone?
16 A. In front of 209 Malone.
17 Q. At 1300 hours, what, if anything, did you observe at 225
18   Malone?
19 A. At 1300 hours, nothing.
20      MR. FINKEL: Ms. Dunbar, if we can put up what is in
21   evidence as Government Exhibit 201.
22 Q. Do you know what we are looking at in 201?
23 A. That's 225 Malone.
24 Q. Detective, what, if anything, did you observe over the next
25   hour after 1300 hours, do you remember?

1 A. I'd have to reflect back to the DD-5.
2      MR. FINKEL: Can we put it back up, Ms. Dunbar, for
3   the witness.
4 Q. Let me know if that refreshes your recollection as to what
5   you observed over the next hour on September 11 from 1300 hours
6   to approximately 1400 hours.
7 A. Yeah.
8 Q. What did you observe on September 11, 2017, in the vicinity
9   of 225 Malone, between 1300 hours and 1400 hours?
10 A. Nothing.
11 Q. What did you observe, if anything, approximately 20 minutes
12   later, on September 11, 2017, at 1420 hours?
13 A. I observed a silver Honda CRV pull in front of 225 Malone.
14 Q. From your vantage point where you were on Malone Avenue,
15   were you able to see at that moment who was driving the CRV?
16 A. At that moment, no.
17 Q. What, if anything, did you observe next?
18 A. I observed a male exit 225 Malone, walk to the car and get
19   in on the passenger side, and approximately a minute later exit
20   the vehicle.
21 Q. Again, what time did the car arrive?
22 A. Approximately 1420.
23 Q. What time did the man exit 225 Malone?
24 A. Approximately 1421.
25 Q. A moment later?

1 A. Yes.
2 Q. Then he went back into 225 Malone?
3 A. Correct.
4 Q. What, if anything, did you observe next?
5 A. I observed the silver CRV driving in my direction.
6 Q. It came towards you?
7 A. Yes.
8 Q. As it came towards you, was the distance between the CRV
9   and you and the other detective getting shorter?
10 A. Yes.
11 Q. Were you able to observe who was driving the car?
12 A. Yes.
13 Q. Who was driving the car?
14 A. Paul Van Manen.
15 Q. Detective, do you see Mr. Paul Van Manen in the courtroom
16   here today?
17 A. Yes.
18 Q. Can you point him out, please.
19 A. Right over here.
20      MR. FINKEL: Your Honor, if the record could reflect
21   that the detective identified the defendant, Paul Van Manen.
22      THE COURT: Yes.
23      MR. FINKEL: Ms. Dunbar, if you could put up for the
24   witness what has been marked for identification as Government
25   Exhibit 301B.

1 BY MR. FINKEL:
2 Q. This is a series of text messages from September 11, 2017.
3      Detective, based on what you are seeing on the screen,
4 are these texts between numbers ending in 8865 and 0111?
5 A. Yes.
6 Q. And that's the same numbers that we heard from the call a
7 moment ago?
8 A. Yes.
9      MR. FINKEL: Your Honor, at this time, the government
10 offers 301B.
11      MR. QUIJANO: No objection.
12      MS. O'NEILL: No objection.
13      THE COURT: 301B is in evidence.
14      (Government's Exhibit 301B received in evidence)
15      MR. FINKEL: If we can publish 301B, please.
16      If we can zoom in on the table, please.
17 BY MR. FINKEL:
18 Q. Detective, you can sort of help the jury follow along with
19 this document.
20      The first text at 1312 from the 0111 number to the
21 8865 number, what does it say?
22 A. It says, "OK. So how long you think?"
23 Q. And about 36 minutes later, from the 8865 number to the
24 0111 number, what does that say?
25 A. "What you need."

1 Q. And a moment later, from the 0111 number to the 8865
2 number, what does that say?
3 A. "Half."
4 Q. And at 1418, from the 8865 number to the 0111 number, what
5 does that say?
6 A. "Two min."
7 Q. And a moment later, from the 0111 number to the 8865
8 number, what does that say?
9 A. "OK."
10 Q. Detective, at 1420, what does it say from the 8865 number
11 to the 0111 number?
12 A. "Here."
13 Q. Is that the time that you saw the CRV arrive at 225 Malone?
14 A. Yes.
15      MR. FINKEL: Ms. Dunbar, if we can display for the
16 witness Government Exhibits 240, 241, 242, and 243.
17 Q. Detective, do you recognize those images?
18 A. Yes.
19 Q. What are those?
20 A. Those are the pictures that were taken during the
21 surveillance on September 11.
22 Q. Are those a fair and accurate representation of what you
23 observed that day?
24 A. Yes.
25      MR. FINKEL: The government offers Government Exhibits

1 240 to 243.
2      MR. QUIJANO: No objection.
3      MS. O'NEILL: No objection.
4      THE COURT: 240 to 243 is in evidence.
5      (Government's Exhibits 240, 241, 242, 243 received in
6 evidence)
7 BY MR. FINKEL:
8 Q. What are we looking at here in 240?
9 A. You're looking at what would be 225 Malone from our point
10 of view.
11 Q. If we can go to 241.
12      What are we looking at here?
13 A. That would be the silver CRV turning on to Malone.
14 Q. Now, is that approximately 1420?
15 A. Yes.
16 Q. The same time we saw the "here" text message?
17 A. Yes.
18 Q. If we can go to 242.
19      What are we looking at here?
20 A. The silver CRV in front of 225 Malone.
21 Q. Can you on the screen circle the car you're referring to as
22 the CRV?
23      Thank you, Detective.
24      MR. FINKEL: If the record could reflect that the
25 detective circled the car in the center of the street.

1      THE COURT: Yes.
2      MR. FINKEL: Thank you, your Honor.
3      Ms. Dunbar, if we can go to 243.
4 BY MR. FINKEL:
5 Q. What are we looking at here?
6 A. The silver CRV as it passed the vehicle I was in.
7 Q. Is that an accurate representation of how far away the
8 vehicle was from you and Detective White when the vehicle
9 passed?
10 A. Yes.
11 Q. Thank you, Detective. Nothing further.
12      MR. QUIJANO: No questions.
13      MS. O'NEILL: No questions.
14      THE COURT: Detective, you're excused. Thank you very
15 much.
16      (Witness excused)
17      THE COURT: Next witness.
18      MS. GHOSH: The government calls Brittany Christie.
19 BRITTANY CHRISTIE,
20      called as a witness by the government,
21      having been duly sworn, testified as follows:
22      THE DEPUTY CLERK: State your full name and spell your
23 first and last name for the record.
24      THE WITNESS: My name is Brittany Christie,
25 B-R-I-T-T-A-N-Y, C-H-R-I-S-T-I-E.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH  CHARLTON

**CORRECTED**
**May 10, 2019**

1      MR. QUIJANO: Your Honor, this is not my witness.  May
2  I step out for a moment.
3      THE COURT: Yes.  You are excused.
4  DIRECT EXAMINATION
5  BY MS. GHOSH:
6  Q.  Good morning.
7  A.  Goods morning.
8  Q.  Who do you work for?
9  A.  New York City Police Department police laboratory.
10 Q.  Approximately how long have you worked for the NYPD police
11 laboratory?
12 A.  For approximately three years and eleven months.
13 Q.  What is your current position with the NYPD?
14 A.  I am a criminalist assigned to the controlled substance
15 analysis section, as well as latent print development unit.
16 Q.  How long have you been in those positions?
17 A.  I have been assigned to the controlled substance analysis
18 section for approximately three years and eleven months, and I
19 have been a part of the latent print development unit, it will
20 be one year in June.
21 Q.  What is your educational background?
22 A.  I earned a master's degree and a bachelor's degree in
23 forensic science from Pace University.
24 Q.  Did you complete any internships or work study as part of
25 that educational experience?

1  A.  Yes, I did.
2  Q.  What was that?
3  A.  I completed an internship with the latent print section of
4  One Police Plaza, as well as the fire debris section within the
5  police laboratory.
6  Q.  You mentioned One Police Plaza.  What is located there?
7  A.  One Police Plaza is the NYPD location, the department.
8  Q.  Where did you work before you joined the NYPD?
9  A.  I worked for CVS pharmacy as a pharmacy tech.
10 Q.  What are your duties and responsibilities as a criminalist
11 in the controlled substance analysis section?
12 A.  As a criminalist assigned to the controlled substance
13 analysis section, I analyze evidence for the presence or
14 absence of a controlled substance.
15      THE COURT: Ms. Christie, can you slow down just a
16 little bit?
17      THE WITNESS: Sure.
18 Q.  Ms. Christie, what is a controlled substance?
19 A.  A controlled substance is any substance that is listed
20 under the New York state law and also federal law.
21 Q.  Are drugs like heroin and fentanyl included in that
22 definition?
23 A.  That is correct.
24 Q.  What type of training have you received regarding
25 controlled substance analysis?

1  A.  I completed an eight-month training pertaining to
2  controlled substance analysis, that included question and
3  answer sessions, exercises including known and unknown
4  controlled and noncontrolled substances, as well as written,
5  practical and oral examinations.  I also completed a competency
6  exam, which included both a written and practical component
7  followed by one month of supervised casework.
8  Q.  If I could just ask you to speak a little slower for the
9  sake of the court reporter, I would appreciate it.
10 A.  Sorry.
11 Q.  In your career, approximately how many times have you
12 tested samples for the presence or absence of controlled
13 substances?
14 A.  I have tested approximately 1600 cases, specifically, 3800
15 units of evidence.
16 Q.  Have you testified at trial before as an expert in the
17 analysis of controlled substances?
18 A.  Yes, I have.
19 Q.  How many times?
20 A.  Seven times.
21 Q.  Have you ever been denied expert qualification in the field
22 of analysis of controlled substances?
23 A.  No, I have not.
24      MS. GHOSH: Your Honor, the government asks that Ms.
25 Christie be deemed an expert in the analysis of controlled

1  substances.
2      MS. SIDERIS: No objection.
3      MS. O'NEILL: No objection.
4      THE COURT: Ms. Christie is so recognized.
5  BY MS. GHOSH:
6  Q.  Ms. Christie, were you assigned to a case in your
7  laboratory with lab file number 2017-088009?
8  A.  Yes.
9  Q.  I am going to show you on the screen in front of you what
10 has been marked for identification as Government Exhibits 805
11 and 806.
12      MS. GHOSH: Ms. Dunbar, if you can just flip through
13 those pages so Ms. Christie can take a look at, we will start
14 with Exhibit 805.
15 Q.  Do you recognize these two documents?
16 A.  Yes, I do.
17 Q.  Generally speaking, what are they?
18 A.  Generally speaking, I recognize the laboratory report being
19 a summary of my analysis of a case previously assigned to me,
20 as well as the worksheets in which I documented my results,
21 with my signature on the bottom of both of these pieces of
22 evidence.
23      MS. GHOSH: The government moves to admit Exhibits 805
24 and 806.
25      MS. SIDERIS: No objection.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1    MS. O'NEILL: No objection.
2    THE COURT: 805 and 806 are in evidence.
3    (Government's Exhibits 805 and 806 received in
4    evidence)
5    MS. GHOSH: At this time, I am going to read a portion
6    of the stipulation concerning seized narcotics and laboratory
7    testing which is in evidence as Government Exhibit 507. I am
8    reading paragraphs 10 and 11.
9    Paragraph 10 states: The contents of Government
10   Exhibit 11 were seized from Shaun Sullivan on October 5, 2017
11   and vouchered as 5000126541 by law enforcement officials. The
12   contents of Government Exhibit 11 were tested by analysts
13   employed by a New York City Police Department laboratory. The
14   substance contained within Government Exhibit 11 was in 130
15   glassine envelopes, each containing a substance. The substance
16   tested positive for the presence of heroin and fentanyl, and
17   was determined to weigh approximately 4.9762 grams without
18   packaging. This finding is contained within a lab report
19   that's been marked as Government Exhibit 11A.
20   Paragraph 11 states: The contents of Government
21   Exhibit 12 were seized from Shaun Sullivan on October 5, 2017
22   and vouchered as 5000126505 by law enforcement officials. The
23   items contained in Government Exhibit 12, which consists of two
24   syringes and a quantity of cotton-like material, each
25   containing solid material residue, were tested by analysts

1    employed by a New York City Police Department laboratory. The
2    residue contained within the items in Government Exhibit 12
3    tested positive for the presence of heroin, fentanyl,
4    6-monoacetylmorphine, and methamphetamine. This finding is
5    contained within a lab report that has been marked as
6    Government Exhibit 12A.
7    The government moves to admit Government Exhibits 11
8    and 12.
9    MS. SIDERIS: No objection.
10   MS. O'NEILL: No objection.
11   THE COURT: They are received.
12   (Government's Exhibits 11 and 12 received in evidence)
13   MS. GHOSH: Mr. Finkel, if you can publish those for
14   the jury.
15   BY MS. GHOSH:
16   Q. Ms. Christie, starting with Government Exhibit 11, do you
17   have that one in front of you?
18   A. Yes.
19   Q. Are there gloves up there?
20   A. No.
21   Q. Just a moment.
22   A. Thank you.
23   Q. Do you have Exhibit 11 in front of you?
24   A. Yes.
25   Q. What is this?

1    A. This is a case that was previously assigned to me.
2    Q. Does this Exhibit 11 contain items that you analyzed?
3    A. That is correct.
4    Q. How do you know that you did the analysis on them?
5    A. By my initials on the inner and outer sleeves and heat
6    seals, as well as my signature on the most outer portion of the
7    outer sleeve.
8    Q. How did you actually get these items for testing?
9    A. This case was assigned to me by my supervisor, and I
10   obtained the evidence from the evidence control section within
11   the police laboratory.
12   Q. Can you describe what exactly it is you received for
13   testing?
14   A. For Exhibit 11, I received overall -- can I just -- do you
15   want me to explain how I received it or the actual items?
16   Q. What were the items that you received for testing?
17   A. For Exhibit 11, I received 100 white glassine envelopes
18   containing solid material for item number 1. Item number 2, I
19   received 30 white glassine envelopes containing solid material,
20   as well as item number 3 being one rubber band.
21   Q. Can you describe what things you did to prepare these items
22   for testing?
23   A. The test of analysis that I utilized for these 10 glassine
24   envelopes from item number 1 and item number 2 was known as a color
25   test.

1    Q. Sorry to interrupt. Before you get into the tests that you
2    performed, was there any preparation steps that you took before
3    you began the tests?
4    A. Yes. Before there is any type of analysis, I ensure that I
5    have on a lab coat, nitrile gloves, as well as a mask or
6    respirator. Then I proceed to clean the area with water and
7    soap solution. I verify my balances for any analysis as well
8    as any reagents that I will be using for any color tests that I
9    will conduct during analysis.
10   I proceed to place a piece of bench-top paper on my
11   work area, and then I open both the most outer sleeve and any
12   internal envelopes or evidence envelopes in a manner to not
13   disrupt the original seals or signatures.
14   I then proceed to do an inventory of the items that
15   are in my presence against the invoice that was provided to me.
16   Q. If I could again just remind you to slow down a bit for the
17   court reporter, please.
18   With Government Exhibit 11, did you test the entire
19   exhibit?
20   A. No, I did not.
21   Q. What did you test within the exhibit?
22   A. I tested a total of 10 glassine envelopes from item number
23   1, and 10 glassine envelopes from item number 2, for a total of
24   20 units for testing.
25   Q. How did you choose those samples?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1  A.  Those glassine envelopes were chosen at random.
2  Q.  What tests do you first perform on the samples?
3  A.  I perform a color test.
4  Q.  Is that the Marquis color test?
5  A.  That is correct.
6  Q.  What were the results of that Marquis color test?
7  A.  I observed a purple color reaction.
8  Q.  What does that result mean?
9  A.  That is a characteristic color reaction for opiates.
10  Q.  At this point, were you able to tell which opiate was
11  present in the items?
12  A.  No, I was not.
13  Q.  After the Marquis color test, what did you do next with the
14  sample you were testing from Exhibit 11?
15  A.  I then prepared my samples for a GC-MS analysis.
16  Q.  Before running the GC-MS analysis, what steps do you take
17  to ensure that the instrument is not contaminated?
18  A.  Before running any samples on the GC-MS, I check the
19  parameters of the instrument that was running for that day, and
20  I also ensure that I have a blank in the sample prior to
21  running my sample on that instrument.
22  Q.  What was the result of the GC-MS analysis that you ran on
23  the sample from Government Exhibit 11?
24  A.  I was able to conclude that for the 10 glassine envelopes
25  from item number 1 and 10 glassine envelopes from item number

1  2, that these items contained heroin and fentanyl.
2  Q.  In the first run of the GC-MS analysis, were you able to
3  definitively conclude that both fentanyl and heroin were
4  present?
5  A.  In the first run of the GC-MS analysis, I was not able to
6  identify both heroin and fentanyl.  I was able to identify the
7  presence of heroin with an indication of fentanyl which,
8  according to the standard operating procedures, we would then
9  need to re-prepare the sample at a higher concentration and run
10  it on the GC-MS analysis in order to identify fentanyl.
11  Q.  So can you explain what that means?  Why wasn't the first
12  test you ran able to determine definitively whether fentanyl
13  was present in the sample?
14  A.  The first test is a shorter testing method.  It will give
15  me the indication; however, it is not a method that is approved
16  for the identification of fentanyl.  According to our
17  procedures, in order to identify a substance such as fentanyl,
18  it would require a re-preparation.
19  Q.  So if there had been no indication of fentanyl, you would
20  have been done after the first run?
21  A.  That is correct.
22  Q.  But because it indicated there might be fentanyl, you then
23  have to run another test?
24  A.  That is correct.
25  Q.  What was the next test that you ran?

1  A.  The next test is also GC-MS, just a higher preparation of
2  that sample.
3  Q.  That's a more sensitive test?
4  A.  That is a more sensitive method.
5  Q.  What was the result of that second run of the GC-MS with
6  the more sensitive method?
7  A.  I was able to conclude the identification of fentanyl
8  contained within those items that I tested.
9  Q.  Are you familiar with the term "laced" as it refers to
10  narcotics or controlled substances?
11  A.  Laced?
12  Q.  Yes.  A substance being laced with another substance?
13  A.  Yes.
14  Q.  Is that a smaller amount of a drug added to another amount?
15  A.  That may or may not be the definition of that.
16  Q.  After conducting the tests that you described, the Marquis
17  color test and the two runs of the GC-MS analysis, did you
18  reach a conclusion about whether a controlled substance or
19  substances were contained in the samples you tested from
20  Government Exhibit 11?
21  A.  Yes.
22  Q.  What did you conclude?
23  A.  I concluded from the 10 glassine envelopes from item number
24  1 and the 10 glassine envelopes from item number 2 that they
25  contained the fentanyl and heroin.

1  Q.  So of the 20 glassines that you tested, were the results
2  consistent among those 20?
3  A.  That is correct.
4  Q.  After the testing was complete, what did you do with the
5  samples that you had tested?
6  A.  After this testing was complete, I then proceeded to take a
7  gross weight remaining of my samples.  I then proceeded to
8  package the evidence in a clear plastic sleeve separated by
9  heat seals with my initials as well as the original packaging.
10  I then prepared a report and a case file of my results that
11  were submitted for review, administrative and technical review.
12  Once that laboratory report is approved, the evidence can then
13  be returned to the evidence control section within the
14  laboratory.
15      I just want to just clarify that when the evidence is
16  packaged, before it's approved and that laboratory report is
17  prepared, it is secured within a lockbox that has a personal
18  combination, as well as cabinet that also has a combination.
19  Q.  After you have tested the substance and the items, do you
20  return that to the original glassine that you got it from?
21  A.  No, I do not.
22  Q.  What do you put it in?
23  A.  I place it into a department issued glassine envelope.
24  Q.  Turning now to Government Exhibit 12, do you have that one
25  in front of you?

1  A.  Yes, I do.

2  Q.  This one has the same laboratory number as Government

3     Exhibit 11 that we just looked at?

4  A.  That is correct.

5  Q.  What does that suggest to you?

6  A.  That suggests that these cases are related.

7  Q.  What pieces of evidence are in Exhibit 12?

8  A.  In Exhibit 12, I reviewed two syringes, one containing

9     solid material residue and the other containing solid material

10    residue, as well as a cap containing cotton-like solid material

11    residue.

12 Q.  So just to be clear, you said one contained solid material

13    and one contained -- could you just repeat what the syringes

14    contained?  And speak a little bit slower.

15 A.  One containing solid material residue, and one containing

16    solid material residue, as well as a cap containing cotton-like

17    solid material residue.

18 Q.  Does Government Exhibit 12 contain items that you analyzed?

19 A.  Yes, it does.

20 Q.  How do you know that you did the analysis on those items?

21 A.  By my initials on the inter and outer heat seals as well as

22    my signature on the most outer packaging.

23 Q.  So in Government Exhibit 11, we were looking at glassines

24    with substances in them, and here we are looking at syringes.

25    Can you explain what you did to prepare these items for

1     testing?

2  A.  For syringes I clip the needle portion as a safety

3     precaution before analysis.  Also for the syringes, they were

4     documented to have solid material residue, meaning that it was

5     a very small amount of material.  I would prepare this sample

6     by doing a mechanism known as a wash.  A wash is a small

7     portion of solvent that would be placed into a vial and will be

8     flushed through the syringe.  In the same manner as I am doing

9     the sample preparation for GC-MS, I am preparing a blank in the

10    same manner without the actual sample addition.  For the

11    syringes, I will not perform a color test because of the small

12    amount of material available.

13 Q.  So because it was a residue and not more solid material, is

14    that why you used this wash that you mentioned?

15 A.  That is correct.

16 Q.  What type of material is used to do this wash, what exactly

17    is it?

18 A.  A wash is usually some solvent.  Particular to this case, I

19    used methanol.  Methanol, I would use a small amount of that

20    solvent in any material that was in the syringe or around the

21    needle portion of the syringe to dissolve in that solvent.  I

22    would then flush the solvent through the syringe and vortex it

23    or mix this material, and prepare a blank in the same manner

24    without the actual sample, and prepare for GC-MS analysis.

25         (Continued on next page)

1  Q.  So the wash you use is a liquid that you mix with the

2     material?

3  A.  That's correct.  It's a solvent.

4  Q.  What test did you first perform on the items from

5     Government Exhibit 12 that you were testing?

6  A.  For Government Exhibit 12, I utilized GC-MS analysis.

7  Q.  And just to be clear, why was it that you weren't able to

8     perform the Marquis color test on the items in Exhibit 12?

9  A.  Due to the sample amount.  It was a residue, meaning it

10    wasn't a weighable amount.  There was a small amount of

11    material available for analysis.

12 Q.  Were there any substantive differences between the

13    procedures used for the GC-MS test on Exhibit 12 versus the

14    procedures used on Government Exhibit 11 that we looked at a

15    moment ago?

16 A.  No.  It was the same type of testing.

17 Q.  Let's discuss the results of the GC-MS testing on Exhibit

18    12.  Starting with item 4A, within that exhibit, could you

19    first explain what 4A is?

20 A.  4A is one of the syringes that contains solid material

21    residue.

22 Q.  And what controlled substances, if any, did the GC-MS

23    result shows for item 4A?

24 A.  I was able to conclude the identification of

25    6-monoacetylmorphine and heroin.

1  Q.  What is 6-monoacetylmorphine?

2  A.  6-monoacetylmorphine is a breakdown product or by-product

3     of heroin.

4  Q.  What is your understanding as to why 6-monoacetylmorphine

5     might be present in item 4A?

6  A.  I was able to conclude the identification of

7     6-monoacetylmorphine in heroin within the item.  I cannot

8     attest to why it is there.

9  Q.  And is that also sometimes referred to as 6-MAM?

10 A.  Yes.

11 Q.  Were there any other substances indicated by the testing of

12    item 4A?

13 A.  Yes.

14 Q.  What substances were indicated?

15 A.  I indicated fentanyl in item 6A.

16 Q.  What does it mean that fentanyl was indicated?

17 A.  That means that fentanyl was not identified under the New

18    York City Police Department police laboratory standard

19    operating procedures.  In order to identify a substance, you

20    have to take into consideration the retention time of the

21    compound as well as the unique mass spectrum of the sample

22    compared to a known spectrum.  In this case, fentanyl did not

23    have a complete mass spectrum for me to identify its presence.

24 Q.  Turning to item 4B, again, what was that item?

25 A.  Item number 4B is a syringe containing solid material

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1  residue.
2  Q. What controlled substances, if any, did the GC-MS results
3  show in item 4B within Government Exhibit 12?
4  A. I was able to conclude that item number 4A contained
5  heroin, fentanyl, and 6-monoacetylmorphine.
6  Q. You are referring to 4B, is that correct?
7  A. 4B. Sorry if I misspoke.
8  Q. That's okay.
9       In 4B, was fentanyl confirmed?
10 A. That is correct, fentanyl was identified.
11 Q. Okay. Turning to item 4C, what was this item?
12 A. Item number 4C was a cotton-like material containing solid
13 material residue.
14 Q. What controlled substances, if any, did the GC-MS results
15 show for 4C?
16 A. For 4C I was able to confirm that -- sorry, I was able to
17 identify heroin, fentanyl, and methamphetamine as well as
18 acetyl fentanyl.
19 Q. After testing was complete on the three items in Government
20 Exhibit 12, what did you do with those items?
21 A. I packaged the original GC-MS vials with my evidence as
22 well as the syringes in its original container. I then
23 packaged it in a similar manner in a plastic -- clear plastic
24 sleeve separated by heat seals, the original packaging and my
25 initials. I then proceeded to place this evidence into a

1  lockbox that has a combination lock as well as a cabinet that
2  also has a combination lock. I prepared a laboratory report,
3  submitted my laboratory report for administrative and technical
4  review, and once that report was reviewed and approved, I was
5  able to return that evidence.
6  Q. Thank you. A little slower.
7       MS. Christie were you also assigned to a case in your
8  laboratory with lab file number 2017-106046?
9  A. That is correct.
10 Q. I'm going to show you now what has been marked for
11 identification as Government Exhibit 804. Do you recognize
12 this?
13 A. Yes, I do.
14      MS. GHOSH: And Ms. Dunbar, if you could just flip
15 through the pages so Ms. Christie can see the full exhibit.
16 Thank you.
17 Q. What is this Government Exhibit 804?
18 A. I recognize this to be a summary of analysis of a case that
19 was previously assigned to me.
20      MS. GHOSH: The government moves to admit Government
21 Exhibit 804?
22      MS. O'NEILL: No objection.
23      MS. SIDERIS: No objection.
24      THE COURT: 804 is in evidence.
25      (Government's Exhibit 804 received in evidence)

1       MS. GHOSH: If Mr. Finkel could please hand
2  Ms. Christie what is already in evidence as Government Exhibit
3  18.
4       (Pause)
5  Q. Do you have Government Exhibit 18 in front of you?
6  A. Yes, I do.
7  Q. Have you seen what's contained in Exhibit 18 before?
8  A. Yes, I have.
9  Q. What is that?
10 A. This is a case that was previously assigned to me.
11 Q. And what date were the items in Exhibit 18 originally
12 received by the lab?
13 A. I would have to reference the laboratory report.
14 Q. Do you still have Exhibit 804 on the screen in front of
15 you?
16 A. Yes, I do.
17 Q. Okay. From Exhibit 804 are you able to determine the date
18 that the items were originally received by the lab?
19 A. Yes.
20 Q. And what is that date?
21 A. December 3 of 2017.
22 Q. Did you perform any analysis on the items in Government
23 Exhibit 18?
24 A. Yes, I did.
25 Q. How do you know that you did the analysis?

1  A. I know from the laboratory report, from my signature, as
2  well as my signature on the worksheets and my initials on the
3  heats outer, inner heat sleeves as well as my signature on the
4  most outer packaging of this evidence.
5       MS. GHOSH: Just one moment.
6       (Counsel confer)
7  BY MS. GHOSH:
8  Q. And Ms. Christie, referring you to the invoice number on
9  Government Exhibit 804, do you see that at the top of the
10 laboratory report?
11 A. Yes.
12 Q. What is that invoice number?
13 A. The invoice number is the number -- yes, the invoice number
14 is 5000129742.
15      MS. GHOSH: And if we could put up for the witness
16 Government Exhibit 18B. It is in evidence, actually, 18B.
17 Q. And if you could read the invoice number from the top
18 portion of this document?
19 A. The invoice number is 5000129742.
20 Q. Okay. One moment.
21 A. No problem.
22      (Counsel confer)
23 Q. And Ms. Christie, is that the same as the invoice number
24 that we just looked at a moment ago?
25 A. That is correct.

1         MS. GHOSH: Ms. Dunbar, if you could zoom in on the
2   remarks portion of this.
3   Q. Ms. Christie, if you could --
4         (Counsel confer)
5   BY MS. GHOSH:
6   Q. I will just read in to the record a portion of this
7   document which is in evidence: Which states that on December
8   2, 2017, at approximately 0130 hours, PO Dunn responded to 225
9   Malone Avenue, a walk-through was conducted, who stated the CV
10  was found unconscious on the floor in his bedroom by his
11  girlfriend Fyfe, Jessica, who notified 9-1-1. Upon arrival,
12  the CV was pronounced CV DOA at 2336 hours on 12/1/2017. One
13  hypodermic needle was found on the nightstand next to the bed,
14  packaged and sent to the lab for chemical analysis. Ten white
15  paper bags commingled was found on the bedroom dresser, were
16  packaged and sent to lab for DNA, latent print and chemical
17  analysis.
18        You can take that down, Ms. Dunbar. Thank you.
19  BY MS. GHOSH:
20  Q. Ms. Christie, when you received the items in Exhibit 18
21  that you have in front of you, what form did you receive those
22  items in?
23  A. I received the items as ten white glassine envelopes
24  containing solid material, with solid material residue.
25  Q. Did you test the entire -- the entire ten glassines?

1   A. No, I did not.
2   Q. What did you test within the exhibit?
3   A. Of the exhibit, there are six glassine envelopes containing
4   solid material which I tested one of those and I tested one
5   from the four units that was containing solid material residue.
6   Q. Is testing a sample of the whole consistent with standard
7   operating procedures for the laboratory?
8   A. That is correct.
9   Q. How did you -- you mentioned that one contained solid
10  material. What do you mean by that?
11  A. Solid material is a powder-like or rock-like material that
12  is weighable.
13  Q. And what do you mean by solid material residue?
14  A. Solid material residue pertaining to the amount, residue
15  meaning it is not weighable.
16  Q. It is a small amount?
17  A. It is a small amount, correct.
18  Q. How did you choose those samples to test?
19  A. Those samples were chosen at random.
20  Q. What did you do to prepare the items in Government Exhibit
21  18 for testing?
22  A. I proceeded to do a color test for each unit that I did
23  testing for. I did the Marquis color test.
24  Q. If I could just pause you for one moment. Before you got
25  to the testing, did you take any steps to ensure there was no

1   contamination?
2   A. That is correct.
3   Q. Are those similar to the steps you described before?
4   A. That's correct.
5   Q. Okay. What was the first test that you performed on the
6   samples from Exhibit 18?
7   A. I did a color test. The color test that I used was the
8   Marquis color test, as well as the cobalt thiocyanate stannous
9   chloride color test.
10  Q. Starting with the Marquis color test, what was the result
11  of that test?
12  A. I observed a purple color reaction.
13  Q. And, again, what does a purple reaction indicate?
14  A. That is a characteristical reaction for opiates.
15  Q. You mentioned then performing a second color test.
16  A. That is correct.
17  Q. Why did you perform an additional color test on these
18  items?
19  A. Utilizing the invoice that was provided to me, this item
20  was not alleged any particular substance, therefore it is
21  common lab practice to utilize both color tests.
22  Q. So if the item were alleged to be heroin, you just do the
23  Marquis color test?
24  A. Based on the color reaction that occurs with the Marquis
25  color test, I would perform the Marquis color test alone if it

1   was alleged to be that substance.
2   Q. Okay. But here there was no indication, so you did both
3   tests?
4   A. That is correct.
5   Q. After doing those two color tests, what test did you
6   perform next on Exhibit 18?
7   A. I also performed a GC-MS analysis.
8   Q. What were the results of the GC-MS analysis?
9   A. The results for the GC-MS analysis were heroin and
10  fentanyl.
11  Q. You said that you had performed testing on both solid
12  material and residue. Were the results consistent for both
13  items?
14  A. That is correct.
15  Q. They both contain heroin and fentanyl?
16  A. That is correct.
17  Q. What did you do with the items after your testing was
18  complete?
19  A. After the testing was complete for the item containing
20  solid material, I took a gross weight remaining for the item
21  containing solid material residue. I packaged the evidence in
22  its original container. I then proceeded to package the
23  evidence in a plastic sleeve separated by heat seals as well as
24  the original packaging and I packaged my -- secured my evidence
25  in a lockbox that has a combination lock as well as a cabinet

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1 that has a combination lock. I prepared a laboratory report
2 which went through administrative and technical review and,
3 once approved, the evidence was then returned to the evidence
4 control section within the police laboratory.
5 Q. And did you repackage the materials that you had tested in
6 the same glassine envelopes that they originally came in?
7 A. No. For the solid material I packaged it into a
8 department-issued glassine envelope. For the solid material
9 residue I contain -- it was already in the original packaging
10 and that was contained in its original packaging prior to
11 complete packaging of the evidence.
12 Q. What, if any, further involvement did you have in the
13 investigation for which the items in Government Exhibits 11,
14 12, and 18 were collected?
15 A. I did not have any further involvement.
16      MS. GHOSH: Just one moment.
17      No further questions.
18      THE COURT: All right. Members of the jury, we will
19 take our morning recess and resume in about ten minutes. Thank
20 you.
21      (Continued on next page)
22
23
24
25

1      (Jury not present)
2      THE COURT: Who is doing the cross?
3      MS. SIDERIS: I am, your Honor.
4      THE COURT: Okay. Anything for Mr. Charlton?
5      MS. O'NEILL: No.
6      THE COURT: How many more witnesses do we have at this
7 point?
8      MR. FINKEL: We have --
9      THE COURT: I asked for how many more witnesses.
10      MR. FINKEL: This afternoon the plan is for Anthony
11 Francese.
12      THE COURT: There is no afternoon.
13      MR. FINKEL: After the break Anthony Francese, who is
14 a cooperating witness. We believe, especially with cross, that
15 will take us to the end of the day. And then on Monday we have
16 several relatively quick witnesses, at least from direct's
17 perspective. I can't speak to the cross.
18      THE COURT: All right. Thank you.
19      (Recess)
20      (Jury not present).
21      THE COURT: Is everybody ready?
22      MS. SIDERIS: Yes.
23      THE COURT: Bring in the jury.
24      (Continued on next page)
25

1      (Jury present)
2      THE COURT: Please be seated.
3      All right, Ms. Sideris.
4      MS. SIDERIS: Thank you, your Honor.
5 CROSS-EXAMINATION
6 BY MS. SIDERIS:
7 Q. Good morning, Ms. Christie.
8 A. Good morning.
9      MS. SIDERIS: Ms. Dunbar, can you please display for
10 the witness and the jury Government Exhibit 18B that is in
11 evidence.
12 BY MS. SIDERIS:
13 Q. Ms. Christie, this is a property invoice that you discussed
14 on your direct examination. I would first like to draw your
15 attention to the invoice number. The last four digits read
16 9742, correct?
17 A. That is correct.
18 Q. And the invoice date reads December 2, 2017, correct?
19 A. That is correct.
20 Q. Now, if I could just draw your attention to the remarks?
21      MS. SIDERIS: Ms. Dunbar, if you could please enlarge
22 that, highlight the remarks. Thank you.
23 Q. The sentence starting with hypodermic. Could you READ
24 THAT, please? I think it is seven lines down. It is pretty
25 much in the middle of the paragraph.

1 A. Sure. "One hypodermic needle was found on the nightstand
2 next to bed, packaged and sent to the lab for chemical" --
3 Q. Thank you.
4 A. Okay.
5      MS. SIDERIS: Ms. Dunbar, can you please publish for
6 the witness and the jury what's in evidence as Government
7 Exhibit 804. Ms. Christie, we are looking at Government
8 Exhibit 804. If I could direct your attention to the bottom
9 third of the page, it lists the last four digits, it states
10 from invoice number, and the last four digits are 9742, that's
11 correct?
12 A. That is correct.
13 Q. And if you could look at the top right corner, the
14 laboratory report, the date submitted reads December 3, 2017.
15 Is that correct?
16 A. That is correct.
17 Q. And on this lab report, the results of your examination and
18 an analysis that you went through on your direct examination,
19 there is not hypodermic needle listed, is that correct?
20 A. That is correct.
21 Q. It wasn't tested, is that correct?
22 A. I did not receive a hypodermic needle as part of this case
23 pertaining to this invoice number.
24      MS. SIDERIS: Thank you. No more questions, your
25 Honor.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1  MS. O'NEILL: No questions, your Honor.
2  THE COURT: Okay.
3  MS. GHOSH: No further questions, your Honor.
4  THE COURT: All right, Ms. Christie. You are excused.
5  Thank you very much.
6  THE WITNESS: Thank you.
7  (Witness excused)
8  THE COURT: Call your next witness.
9  MS. GHOSH: The government calls Anthony Francese.
10  ANTHONY JOSEPH FRANCESE,
11  called as a witness by the government,
12  having been duly sworn, testified as follows:
13  THE COURT: All right, Ms. Ghosh, you can proceed.
14  MS. GHOSH: Thank you, your Honor.
15  DIRECT EXAMINATION
16  BY MS. GHOSH:
17  Q. Good morning, Mr. Francese. If you can bring the mic close
18  to you and speak slowly into it for the court reporter.
19  How old are you?
20  A. 49.
21  Q. Where were you born?
22  A. Brooklyn, New York.
23  Q. How far did you go in school?
24  A. To the tenth grade.
25  Q. Where did you grow up?

1  A. In Brooklyn, New York.
2  Q. What part of Brooklyn?
3  A. Bensonhurst, Brooklyn.
4  Q. What has been your primary source of income over the year?
5  A. I have been a plumber since I am 13 years old.
6  Q. Where do you live now?
7  A. Staten Island, New York.
8  Q. Who do you live with?
9  A. My mom.
10  Q. Within the past year, have you pled guilty to any federal
11  crimes?
12  A. Yes, I have.
13  Q. What federal crimes did you plead guilty to?
14  A. To distribute heroin and fentanyl.
15  Q. Why did you plead guilty?
16  A. Because I was guilty.
17  Q. Who were some of the people that you agreed to distribute
18  heroin and fentanyl with?
19  A. Paul, Teddy, Jasmin, Shaun, Diane, and Chris.
20  Q. Are those all of the people that you agreed to distribute
21  heroin with or just some of them?
22  A. Just some of them.
23  Q. Do you see anyone in this courtroom who you committed
24  crimes with?
25  A. Yes.

1  Q. Who?
2  A. Paul.
3  Q. Could you identify him by an article of clothing that he is
4  wearing?
5  A. Red tie, gray suit.
6  MS. GHOSH: Your Honor, could the record reflect that
7  Mr. Francese has pointed out the defendant Paul Van Manen?
8  THE COURT: Yes.
9  BY MS. GHOSH:
10  Q. Mr. Francese, I am showing you now what has been admitted
11  as Government Exhibit 101. It should show up on the screen in
12  front of you.
13  Do you recognize this person?
14  A. Yes.
15  Q. Who is that?
16  A. That's Paul.
17  Q. Did you know his last name?
18  A. Van Madden.
19  Q. Mr. Francese, when did you first become involved in
20  distributing heroin?
21  A. Around the end of 2014.
22  Q. Why did you begin distributing heroin?
23  A. To support my drug habit.
24  Q. You were a user as well?
25  A. Yes.

1  Q. When you first started distributing heroin, how long had
2  you been using heroin yourself?
3  A. Around a year and a half.
4  Q. Who did you work with when you first started distributing
5  heroin?
6  A. Dino.
7  Q. I want to show you what's been admitted as Government
8  Exhibit 102. Do you recognize this person?
9  A. Yes.
10  Q. Who is that?
11  A. That's Dino.
12  Q. Do you know his full name?
13  A. Medin Kosic.
14  Q. How did you first meet Dino?
15  A. Through his cousin Mike.
16  Q. And at that time, what was Dino doing?
17  A. He was distributing heroin for his cousin Mike.
18  Q. I am going to show you what's been admitted as Government
19  Exhibit 106. Do you recognize this person?
20  A. Yes, I do.
21  Q. Who is that?
22  A. That's Mike.
23  Q. And approximately when was it that you first met Dino?
24  A. Around spring, early summer of 2014.
25  Q. And you mentioned when you met Dino he was distributing

J5a2van3          Francese - Direct          Page 853

1  heroin for Mike, is that right?
2  A. Yes.
3  Q. How long did you -- let me just back up for a second.
4      When you started buying heroin, who were you buying it
5  from?
6  A. I was buying it from Mike.
7  Q. How long did you buy heroin from Mike for?
8  A. Around a year.
9  Q. When did that stop?
10 A. That stopped probably around spring, early summer of 2014.
11 Q. Why did it stop then, you buying from Mike?
12 A. It didn't stop. Mike was working for Dino, and Mike got
13 arrested. I mean Dino was working for Mike, and Mike got
14 arrested.
15 Q. Okay. After Mike got arrested, who did you then start
16 buying heroin from?
17 A. From Dino.
18 Q. Did anything change in how you bought the heroin?
19 A. Yes. I got it cheaper.
20 Q. And you said a moment ago that you started distributing
21 heroin with Dino in late 2014, is that right?
22 A. Yes.
23 Q. How did you start working with Dino rather than just buying
24 from him?
25 A. I really couldn't afford it anymore, and we came to an

J5a2van3          Francese - Direct          Page 854

1  agreement for me to help him distribute it.
2  Q. What would you get in exchange?
3  A. I would get bundles of heroin and cash.
4  Q. You mentioned a bundle of heroin. What's that?
5  A. A bundle of heroin is ten glassine packages.
6  Q. Is it also referred to as a bun?
7  A. Yes.
8  Q. Where were you living at this time?
9  A. I was living in Brooklyn.
10 Q. I am going to show you what is in evidence as Government
11 Exhibit 202. Do you recognize that?
12 A. Yes.
13 Q. What is that?
14 A. That was my house in Brooklyn.
15 Q. And where specifically did you live? This is a touch
16 screen, so you are welcome to indicate on the screen where it
17 was that you lived within this.
18 A. I lived around the side in the basement apartment.
19 Q. So you are indicating on -- from our view, looking at the
20 photo, on the left side of the house?
21 A. Yes.
22 Q. How long did you live at that location?
23 A. Approximately 14 years.
24 Q. We will discuss the details later, but can you just
25 describe generally what your role was in distributing heroin

J5a2van3          Francese - Direct          Page 855

1  for Dino?
2  A. Dino would bring the heroin to my house, and I was told who
3  to distribute it to and I would distribute it to those people.
4  Q. What involvement, if any, did you have in collecting money
5  for Dino from the customers who were coming to get it?
6  A. Yes, I also collected money.
7  Q. Did you count the money?
8  A. Hardly ever.
9  Q. What do you know about how much money Dino was getting in
10 drug proceeds?
11 A. I know it was -- it cost $40 a bundle, so it varied on the
12 customers that I saw. I know how much I would, you know, I
13 would give him.
14 Q. But you know he charged these buyers $40 a bundle?
15 A. Yes.
16 Q. In what ways did the buyers pay for the drugs?
17 A. In cash.
18 Q. Did they ever receive them on credit to your knowledge?
19 A. Very rarely. Like just like someone, like $100 or so, but
20 never on credit. But if they were like $100 short, then that
21 would be okay.
22 Q. Did you receive money from the buyers every time they
23 picked up from you?
24 A. No.
25 Q. What was your understanding as to how they paid for it on

J5a2van3          Francese - Direct          Page 856

1  the times when they didn't give you the money directly?
2  A. At those times I would distribute the drugs, and then Dino
3  would meet them beforehand to collect the money or after the
4  fact.
5  Q. I want to step back and just clarify a few things about
6  heroin.
7      When you first started using heroin, how much were you
8  buying?
9  A. Around a bundle and a half a day.
10 Q. And you mentioned a bundle is ten glassines, is that right?
11 A. Yes.
12 Q. What is a glassine or a bag of heroin?
13 A. It is usually a dosage for most people.
14 Q. How was the heroin that you got from Dino packaged?
15 A. It was packaged in white glassine envelopes.
16 Q. And how were those secured together?
17 A. They would be -- they would be folded over once with a
18 rubber band holding them together.
19 Q. Were there any pictures or words or stamps on the glassine
20 bags from Dino?
21 A. No, there wasn't.
22 Q. What about heroin from other dealers that you bought over
23 the years? How was that heroin packaged?
24 A. They would have some stamps, like a stamp on it with like a
25 crazy name sometimes of their product, and the bags would be

1  folded different, they would be folded tightly with plastic
2  tape around them, each glassine bag.
3  Q. During what time period were you using the most heroin?
4  A. During the time I was distributing it.
5  Q. With Dino?
6  A. Yes, with Dino.
7  Q. How much were you using at that point?
8  A. I was up to three bundles a day.
9  Q. How many glassines is that?
10  A. That's 30, 30 glassines.
11  Q. When you used 30 glassines in a day, how were those usual
12  spread out over the course of the day?
13  A. Throughout the day and night.
14  Q. Were there any code words you used when you discussed
15  heroin with others?
16  A. Yes.
17  Q. What are some of the code words that you remember?
18  A. "A half," "a whole," "a big," "a small."
19  Q. Why did you use code words?
20  A. We used code words so to try to throw off the police if
21  they were listening.
22  Q. Now, you said that you began distributing with Dino in late
23  2014. When did you stop distributing with Dino?
24  A. The end of September of 2017.
25  Q. Between 2014 and 2017, was your work for Dino continuous or

1  was it off and on. And there is water there if you need some
2  water.
3  A. It was off and on.
4  Q. Approximately how much of that period were you working with
5  Dino?
6  A. I would say two out of the three years.
7  Q. During the times that you weren't working with Dino, why
8  was that?
9  A. There was a few occasions where we would have a dispute
10  over money or the girlfriends that were living with me at that
11  time.
12  Q. You mentioned a dispute over money. What sort of disputes
13  were there over money with Dino?
14  A. Well, there was -- I'm sorry. There was also a time where
15  I was getting accused of taking bags out of the bundles and
16  giving it to the customers.
17  Q. In that instance that you are recalling, had you taken
18  heroin from the customers?
19  A. No.
20  Q. During the times that you worked with Dino, did you ever
21  take heroin from the bundles that Dino had left you to
22  distribute?
23  A. Yes.
24  Q. How often?
25  A. Whenever I needed to.

1  Q. And can you estimate how frequently that was?
2  A. Frequently.
3  Q. To your knowledge, did Dino always learn about it when you
4  took some of the heroin that he had given to you to distribute?
5  A. He would learn about it after the fact or at times I would
6  tell him, too, also.
7  Q. Were there occasions where he would confront you about
8  stealing heroin?
9  A. Excuse me?
10  Q. Were there occasions where Dino would confront you about
11  stealing heroin?
12  A. Yes.
13  Q. And on those occasions, were you truthful as to whether you
14  had or hadn't stolen heroin on that occasion?
15  A. Yes.
16  Q. What about the money you collected? Were there occasions
17  when you took money that was meant for Dino?
18  A. Yes.
19  Q. How much money did you take from him?
20  A. It depended on -- like if I was meeting somebody at the
21  store with his money, I would take out some money to go
22  shopping or something, or if I needed money, I would take it.
23  Q. Can you give an estimate of approximately how much you
24  took? You said, for example, shopping. What are you referring
25  to for shopping?

1  A. From shopping, just like 20 bucks at the corner store.
2  Then if I needed money, I would take up to, you know, a couple
3  hundred dollars, a few hundred dollars.
4  Q. How often did you take money from Dino?
5  A. Well, if I was doing it four times a week, I would say two
6  times a week.
7  Q. And when you say if you were doing it, what do you mean by
8  that?
9  A. If I was distributing the heroin.
10  Q. On the occasions when you took money from Dino, did he
11  learn about that?
12  A. Yes.
13  Q. To your knowledge, what are some of the ways he found out?
14  A. Well, he would learn after the fact I took it, I would tell
15  him. And sometimes I would just tell him.
16  Q. When he confronted you about taking money, were you
17  truthful with him?
18  A. Yes.
19  Q. I would like to discuss in more detail now how your role in
20  the heroin distribution worked. During the times when you were
21  working with Dino, approximately how many times per week did he
22  give you heroin to distribute to others?
23  A. Three to four times a week.
24  Q. What time of day did he generally bring you the heroin?
25  A. In the evening time.

1 Q. What, if anything, did Dino tell you about where he got the
2  heroin from?
3 A. He never told me. I just knew it was in Brooklyn.
4 Q. Do you recall if he mentioned the name of the person he got
5  it from?
6 A. From Gordo.
7 Q. On average how many bundles of heroin did Dino drop off for
8  you to distribute to people?
9 A. It averaged on how many people I had to see that day, but
10  there is times he dropped off 100 bundles.
11 Q. To your knowledge, what were some of the reasons that there
12  would be fewer people that you would see in the day?
13 A. There is times where he would see the people, you know,
14  first, meet them around like my neighborhood or something, and
15  then there is other times where there just wasn't as many
16  people because they were arrested.
17 Q. How did you know who to distribute this heroin to?
18 A. By Dino. He would come to my house and drop it off and he
19  would let me know, you know, who is waiting, who he saw already
20  that I didn't have to see, and he would call them or I would
21  call them or sometimes they would just be waiting around the
22  neighborhood.
23 Q. And was it a fairly consistent group of people that you
24  distributed heroin to for Dino?
25 A. Yes, there was.

1 Q. Who are the people that you recall distributing heroin to
2  for Dino?
3 A. Teddy, Shaun and his wife Diane, Paul, Jasmin, and Chris.
4 Q. Let's start with Paul. About how many bundles did he pick
5  up from you?
6 A. It varied from 20 to 30 at the most.
7 Q. How many times a week did you see him to distribute the
8  heroin?
9 A. Three to four times a week.
10 Q. Approximately when did you first start distributing Dino's
11  heroin to Paul?
12 A. Late 2014, the end of 2014.
13 Q. From your conversations with Paul or with Dino, do you know
14  what Paul did with the heroin that he bought?
15 A. He would use it for himself and also distribute.
16 Q. So you said that he would distribute some of it. How do
17  you know that?
18 A. From conversations that we had.
19 Q. Did he ever discuss his customers with you?
20 A. No.
21 Q. Did he ever have any conversations with you about whether
22  his customers were satisfied with the heroin from Dino?
23 A. Yes.
24 Q. What do you recall about that?
25 A. You know, sometimes they complained about it.

1 Q. That's what Paul told you?
2 A. Yes.
3 Q. Did Paul pay you for the heroin every time he picked it up
4  from you?
5 A. No.
6 Q. Did he ever pay more or less than the price of the heroin
7  that he was getting?
8 A. Sometimes he would just be short a couple of dollars or
9  something.
10 Q. And were there times when he would pay you more than the
11  amount of heroin that he just picked up?
12 A. Yes.
13 Q. Why was that?
14 A. Because he was paying the money that he, you know, the
15  couple dollars that if he owed a couple of bucks on it.
16 Q. Was there anyone who came with Paul sometimes when he would
17  pick up the heroin?
18 A. Yes, there was.
19 Q. Who is that?
20 A. There was a woman who used to come in and in the beginning
21  there was some kid named Anthony used to come.
22 Q. I want to show you what's been previously admitted as
23  Government Exhibit 111. Do you recognize this person?
24 A. Yes, I do.
25 Q. And who is that?

1 A. That is the woman that was with Paul.
2 Q. Sitting here today, do you recall her name?
3 A. No.
4 Q. Did you ever distribute heroin to this woman seen in
5  Government Exhibit 111?
6 A. Yes.
7 Q. And during the times when you distributed to her, was she
8  with Paul or were there times when you distributed to her when
9  she wasn't with Paul?
10 A. There was times when she wasn't with Paul.
11 Q. How much did you distribute to this woman?
12 A. Well, when she was getting it for Paul, you know, it would
13  kind of be the same as -- 20, mostly 20, sometimes higher than
14  that. And there was times when Paul was arrested or whatever
15  and she was getting it on her own and she wouldn't take as
16  much.
17 Q. So during the times when Paul wasn't arrested, as far as
18  you were aware, your understanding is that she was picking up
19  his portion?
20      MR. QUIJANO: Objection. Leading.
21      THE COURT: Overruled.
22 BY MS. GHOSH:
23 Q. Just to clarify your testimony, Mr. --
24 A. Yes, yes.
25 Q. Okay.

J5a2van3          Francese - Direct          Page 865

1          How often did you see that woman?
2  A.  Well, like I said, when she was with Paul, she would be
3   hanging around Paul a lot, you know, like most of the times
4   when Paul came around.  And then when Paul wasn't around she
5   would come with a girlfriend or something or with that kid
6   Anthony.
7  Q.  And did you ever distribute to Anthony at times when he
8   wasn't with Paul?
9  A.  Yes.
10  Q.  How many bundles did you distribute to him?
11  A.  Probably the same, the same, as I said, 20, you know.
12  Q.  And was it your understanding that you were giving Paul's
13   portion to Anthony on those occasions?
14  A.  Yes.
15  Q.  Do you recall approximately when you first started seeing
16   Anthony?
17  A.  I don't recall that.
18  Q.  Another person you mentioned was Jasmin.  I am showing you
19   what's been admitted as Government Exhibit 103.  Do you
20   recognize this person?
21  A.  Yes.
22  Q.  And who is that?
23  A.  Jasmin.
24  Q.  Did you know him by any other names?
25  A.  Yes.

J5a2van3          Francese - Direct          Page 867

1  A.  Yes, he did.
2          (Continued on next page)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

J5a2van3          Francese - Direct          Page 866

1  Q.  What's that?
2  A.  Min.
3  Q.  Did you know his full name?
4  A.  No.
5  Q.  How many bundles of heroin did you distribute to Jasmin?
6  A.  He averaged 40 bundles.
7  Q.  How many times a week did you see Jasmin?
8  A.  Three times.
9  Q.  Approximately when did you first start distributing to
10   Jasmin?
11  A.  Spring of 2016, around there.
12  Q.  Did you distribute it to Jasmin the whole time that you
13   were working with Dino?
14  A.  No.
15  Q.  Why not?
16  A.  We had a fight.
17  Q.  What was the fight about?
18  A.  He thought I was disrespecting him.
19  Q.  What happened during that fight?
20  A.  Well I came out, out of my house.  He said he had to talk
21   to me, and he slapped me, and then we wound up just having a
22   fistfight.
23  Q.  Did you serve Jasmin again after that fight?
24  A.  No.
25  Q.  Do you know whether Dino continued to serve him heroin?

J5A8VAN4          Francese - Direct          Page 868

1  Q.  How do you know that?
2  A.  Because Dino was by my house and he said he had to go see
3   somebody, and so I was going out for some reason and I saw him
4   in a car with his cousin Jasmin.
5  Q.  You saw Dino with Jasmin in your neighborhood?
6  A.  Yes.
7  Q.  Another person who you mentioned was Teddy.  Showing you
8   what is in evidence as Government Exhibit 109.
9          Do you recognize this person?
10  A.  Yes.
11  Q.  Who is that?
12  A.  That's Teddy.
13  Q.  Do you know his full name?
14  A.  Theodore.
15  Q.  Do you know his last name?
16  A.  No.
17  Q.  How many bundles did you distribute to Teddy?
18  A.  In the beginning, around 10 bundles, and then towards the
19   middle and the end, up to 20 bundles.
20  Q.  How many times a week did you see Teddy?
21  A.  Three to four times a week.
22  Q.  Approximately when did you first start distributing heroin
23   to him?
24  A.  Around the spring of 2015.
25  Q.  You also mentioned someone named Shaun.  I am showing you

1    what is in evidence as Government Exhibit 108.
2      Do you recognize that person?
3 A. Yes.
4 Q. Who is that?
5 A. That's Shaun.
6 Q. Do you know his full name?
7 A. No.
8 Q. How many bundles did you distribute to Shaun?
9 A. 30 bundles.
10 Q. How many times a week did you see him?
11 A. Three to four times a week.
12 Q. Approximately when did you first start dealing to Shaun?
13 A. In the very beginning when I started to distribute, the end
14   of 2014.
15 Q. You mentioned that you also distributed to Shaun's wife
16   Diane?
17 A. Yes.
18 Q. How much did you distribute to her?
19 A. Well, they would come together, or, you know, one would
20   come one day, one would come the other day, and the same, 30
21   bundles.
22 Q. You also mentioned someone named Chris. Do you know his
23   full name?
24 A. No, I don't.
25 Q. Did you know him by any other nicknames?

1 A. Chris the Greek.
2 Q. Chris the Greek.
3      How many bundles did you distribute to him?
4 A. It varied with him all the time. He was more of a user.
5   So anywhere from 5 to 10 to 15.
6 Q. How many times a week did you typically see Chris?
7 A. The same, three to four times a week.
8 Q. Approximately when did you first start dealing to Chris
9   heroin?
10 A. In the very beginning, the end of 2014.
11 Q. When Dino gave you heroin to distribute to these people we
12   were just discussing, where did you keep the heroin before you
13   gave it out?
14 A. I would keep it in my apartment.
15 Q. That's the apartment we looked at a few minutes ago in
16   Exhibit 202?
17 A. Yes.
18 Q. Where in the apartment did you store the drugs?
19 A. Either behind my bar, under the couch.
20 Q. So let's just walk through an example. If Dino wanted to
21   distribute 30 bundles to Paul on a particular day, how would
22   that work, from start to finish?
23 A. Well, he would -- if he would drop it off to me --
24 Q. I am just going to interrupt for a moment. If you could
25   just clarify who you mean by "he"?

1 A. Dino would drop it off to me and tell me who I had to see.
2   And if he said I had to see Paul, I would put the bundles
3   downstairs in my house, and then he would say Paul needs 30,
4   20, whatever. And I would put them in a plastic bag. Then
5   like in a black plastic bag. And then sometimes I started
6   putting it in cigarette packs.
7 Q. What are some of the ways, to your knowledge, Paul would
8   know when to come and pick up that heroin from you?
9 A. Dino would call him, or Dino would tell me to call him, or
10   Paul would just be waiting, you know, around my neighborhood.
11 Q. Where did you typically meet Paul to give him the heroin?
12 A. Right on my block.
13 Q. I am going to show you what is in evidence as Government
14   Exhibit 410.
15      Do you recognize what this shows?
16 A. Yes.
17 Q. What does this map show?
18 A. This is a map of my neighborhood.
19 Q. Could you circle the approximate location of your apartment
20   at the time that you lived in Brooklyn?
21      MS. GHOSH: Let the record reflect that the witness
22   has circled on 72nd Street between 18th and 19th Avenue, close
23   to 19th Avenue.
24      THE COURT: The record will so reflect.
25 Q. So Mr. Francese, that's where your apartment was. Where

1   would you meet people that you were giving heroin to?
2 A. I would meet them either down my block or around the block
3   on 73rd and 18th and 19th. It varied in my neighborhood, just
4   a couple of blocks from my house.
5 Q. Why did you meet people like Paul nearby in your
6   neighborhood?
7 A. Because I felt the safest distributing the heroin in my
8   neighborhood.
9 Q. What do you mean by safest?
10 A. It felt that I was familiar with the neighborhood and I
11   would know if like police were watching or something.
12 Q. Why didn't you generally have Paul come directly to your
13   house?
14 A. There was a couple of occasions he came, but then there was
15   a time where he came by my house, my daughter and my sister
16   told me that she don't want him around my house no more.
17 Q. What did you get in exchange for distributing heroin for
18   Dino?
19 A. I was paid in bundles of heroin and cash.
20 Q. What kind of salary arrangement did you have with Dino?
21 A. The salary varied, like the more people I would see, I
22   would get more bundles and more cash.
23 Q. You said that you saw those people we talked about three or
24   four times a week, is that right?
25 A. Yes, that's right.

UNITED STATES OF AMERICA, V                                                                    **CORRECTED**
PAUL VAN MANEN and KENNETH CHARLTON                                                      **May 10, 2019**

| J5A8VAN4 | Francese - Direct | Page 873 |
| --- | --- | --- |

1  Q. From what Dino told you, what do you know about whether
2    those people got heroin on the days in which you didn't
3    distribute to them?
4  A. I know that Dino would tell me that he would see everybody
5    that night, and that he wasn't coming to bring me anything
6    because he already saw everybody and he was already back home
7    already.
8  Q. When he said that he had seen everybody, was it your
9    understanding he was referring to that group of people we
10   discussed earlier, including Paul?
11 A. Yes.
12 Q. Based on your discussions with Dino, who else provided
13   heroin to those people during the times when you weren't doing
14   so?
15 A. Say it again.
16 Q. Sure. Based on your discussions with Dino, who else did
17   you understand to be distributing heroin to that group of
18   people when you weren't doing so?
19 A. Chris.
20 Q. What was your understanding of what Chris's role was?
21 A. Distributing the heroin for Dino.
22 Q. Did there ever come times when heroin was left over at the
23   end of the day that you hadn't distributed for Dino yet?
24 A. Yes, there was.
25 Q. How often did that happen?

| J5A8VAN4 | Francese - Direct | Page 874 |
| --- | --- | --- |

1  A. It happened frequently.
2  Q. What would happen to that heroin?
3  A. We would save it for the next day, for the next night, and
4    I also would take some of it.
5        MS. GHOSH: I would like to play now what is in
6    evidence as Government Exhibit 305A, and we will hand out some
7    transcripts first.
8        For the record, this is a call from August 27, 2017,
9    approximately 2:01 p.m., between the phone numbers ending in
10   8473 and 5250. And we will play starting at 6 seconds through
11   36 seconds.
12       Ms. Dunbar, if you could start playing.
13       (Audio played)
14 BY MS. GHOSH:
15 Q. Mr. Francese, the person who said "I'm not home," do you
16   recognize that voice?
17 A. Yes.
18 Q. Whose voice is that?
19 A. That's me.
20 Q. What about the other voice who said, "Yeah, pick up," do
21   you recognize that person?
22 A. Yes. That was Dino.
23       MS. GHOSH: Ms. Dunbar if you could keep playing.
24       (Audio played)
25 Q. Mr. Francese, first of all, the phone number 646-571-5250,

| J5A8VAN4 | Francese - Direct | Page 875 |
| --- | --- | --- |

1    do you recognize that phone number?
2  A. Yes. That was my phone number.
3  Q. In this call, at the beginning Dino says "pick up." What
4    did you understand him to be asking you to pick up?
5  A. Pick up my other phone.
6  Q. You then told him, "I got rid of some, 'member?" What were
7    you referring to when you said you had gotten rid of some?
8  A. Oh, that I sold some of the bundles.
9  Q. Some, referring to bundles of heroin?
10 A. Yes.
11 Q. When Dino asked you "10"?, what did you understand him to
12   be asking you?
13 A. He meant 10 bundles of heroin.
14 Q. What did you mean when you replied "I got seven"?
15 A. I meant I had seven bundles of heroin left.
16 Q. How often did you have this type of conversation with Dino
17   where he checked in on how much had been sold?
18 A. Every time that I had his heroin.
19 Q. You mentioned that you would sometimes speak to the buyers
20   on the phone to coordinate them picking up the heroin, is that
21   right?
22 A. Say it again.
23 Q. I think you mentioned earlier that sometimes, if Paul was
24   coming to pick up, you might talk to him on the phone to
25   coordinate that?

| J5A8VAN4 | Francese - Direct | Page 876 |
| --- | --- | --- |

1  A. Yes.
2  Q. How did you know these people's phone numbers in order to
3    communicate with them?
4  A. Dino would store them in my phone, in the phones.
5  Q. What do you mean that Dino would store them in your phone?
6  A. Well, we would get, like, new phones every month or two.
7    And when I got the phone, the new phone, the numbers would be
8    there or we put them in there together.
9  Q. When you say we would put them in there together, who are
10   you referring to?
11 A. To me and Dino.
12 Q. Who were some of the people -- you said that you would get
13   new phones. Who would get new phones from Dino, to your
14   understanding?
15 A. I know of Teddy. In the beginning, Paul, Shaun.
16 Q. Who were some of the people whose numbers Dino put in the
17   phone or told you to put in the phone?
18 A. He would tell me to put whatever numbers that he didn't put
19   in there.
20 Q. Who were some of the people whose numbers those would be
21   though?
22 A. Paul, Teddy, Shaun, Chris, Jasmin.
23 Q. What name or names did you use for Paul in your phone or
24   when talking about him with Dino?
25 A. Poop chuter and homo.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1 Q. Why did you use those words to refer to Paul?
2 A. Regrettably, me and Dino made up nicknames for everybody.
3 Q. Are you homophobic, Mr. Francese?
4 A. Not at all.
5     MS. GHOSH: May I continue, your Honor?
6     THE COURT: Yes, please.
7 Q. How often did Dino give you a new phone?
8 A. The times I was working, from every month to two months.
9 Q. Why was it important to change phones so often?
10 A. Because we thought the police couldn't, like, tap your
11   phones if you got a new phone.
12 Q. Mr. Francese, from your conversations with Paul, what do
13   you know about what he did with the heroin that he picked up
14   from you?
15 A. I know that, you know, he had a drug problem like I had,
16   and also, that he was distributing to his own customers.
17 Q. According to what Paul told you, how much did he charge for
18   a bundle of heroin when he sold to his customers?
19 A. He told me that he used to charge $80 a bundle.
20 Q. How do you know that he sold some heroin to customers?
21 A. Because he would tell me he has his customers waiting for
22   him.
23 Q. What did he tell you about where he sold the heroin?
24 A. In Staten Island.
25 Q. On the occasions when you spoke with Paul on the phone

1   before he came to pick up the heroin from you, how would he let
2   you know how much heroin he was going to pick up?
3 A. Just by numbers.
4 Q. Can you give an example?
5 A. Like 20. If he needed 20, 20; if he needed 25, 25.
6 Q. Did he say 20 or 25 of what?
7 A. Just the number we would use.
8 Q. How were you able to understand what he meant if he just
9   told you a number?
10 A. Because we never really said bundle or heroin; we would
11   just use the number.
12 Q. When you were on the phone with someone who was arranging
13   to pick up heroin, if that person wasn't careful about their
14   language, what would you typically do?
15 A. I would tell them to shut up, and if they kept saying the
16   drug or code for the drug, I would just hang up on them.
17 Q. Mr. Francese, did there come a time when you moved out of
18   Brooklyn?
19 A. Yes. In September of 2017.
20 Q. Why did you leave Brooklyn?
21 A. Because my sister sold the house in Brooklyn.
22 Q. Where did you move to?
23 A. I moved to Staten Island.
24 Q. After you moved to Staten Island, what was your involvement
25   with continuing to distribute heroin for Dino?

1 A. I continued to distribute heroin until the end of September
2   of 2017.
3 Q. Did you continue to distribute for him frequently or
4   occasionally, how often, once you moved to Staten Island?
5 A. Oh, no, just a few times more.
6 Q. What happened on those occasions?
7 A. I was with my mom staying at my aunt's house, and she
8   lived, like, at the end of Staten Island. So Dino would
9   either -- in the beginning he would come and see me and he
10   would leave me some, for myself and also to distribute.
11 Q. What did you do with the heroin that Dino gave you to
12   distribute?
13 A. Well, he told me to see somebody.
14 Q. Do you recall specifically who it was that you gave the
15   heroin to?
16 A. Yes, Paul.
17 Q. Did you give the heroin that Dino had left to Paul?
18 A. Say it again.
19 Q. Did you in fact give that heroin to Paul?
20 A. Yes.
21     MS. GHOSH: I am going to play a call 304A, Exhibit
22   304A, which is already in evidence.
23     This is 304, which for the record is September 14,
24   2017, at approximately 4:28 p.m., and this is between the phone
25   numbers ending in 9918 and 5250.

1     Ms. Dunbar, if you could play that call, please.
2     (Audio played)
3     MS. GHOSH: If you could just start at 13 seconds to
4   avoid the phone ringing.
5     (Audio played)
6 BY MS. GHOSH:
7 Q. Mr. Francese, who is the first voice we heard, the male
8   voice in this call?
9 A. That would be me.
10 Q. Who was the female voice that we heard second?
11 A. That was the woman that -- Paul's friend.
12 Q. That the woman that we looked at earlier in Exhibit 111.
13     Who were you referring to, when you said -- and this
14   is in the transcript at line 3 -- "he didn't come yet," who
15   were you referring to by "he"?
16 A. I was referring to Dino.
17 Q. When the woman told you, "He said to hold him 15 till
18   6:00," what did you understand that to mean?
19 A. To hold 15 bundles.
20 Q. Who was the "he" that you understood her to be referring to
21   when she said "he said to hold him 15?
22 A. Paul.
23 Q. What did you understand would happen at 6:00?
24 A. They assumed that Dino was bringing me the heroin.
25 Q. Why were you telling the woman in the call "I ain't seen

J5A8VAN4          Francese - Direct          Page 881

1  him yet"?
2      First of all, who were you referring to by "him" when
3  you said "I ain't seen him yet"?
4  A. I was referring to Dino.
5  Q. Why were you telling her that Dino hadn't come to see you
6  yet?
7  A. Because she was asking me if he dropped the heroin off yet.
8  Q. Then you said "you got it."  What were you agreeing to do
9  for the woman?
10 A. Hold the 15 bundles if Dino brought it to me.
11 Q. Again, the phone number 5250, whose phone number was that?
12 A. Mine.
13 Q. At this point in September 2017, what, if anything, did
14 Paul tell you about where he was living?
15 A. He told me that he was staying in New Jersey.
16 Q. Did he say where he was in New Jersey?
17 A. In a motel.
18 Q. Did he give you any description of where that motel was in
19 relation to Staten Island?
20 A. Well, he said that it was by the Outerbridge.  That's about
21 all I know.  Because I know it was closer -- my aunt's house
22 was closer to the Outerbridge.
23     MS. GHOSH: I would like to now play Government
24 Exhibit 304B, as in boy, which is next in the packet.  For the
25 record, this call is from September 15, 2017, at approximately

J5A8VAN4          Francese - Direct          Page 882

1  12:23 p.m., between the phone numbers ending in 9918 and 5250.
2  We will play starting at 11 seconds.
3     (Audio played)
4     MS. GHOSH: Ms. Dunbar, pause it for a moment.
5  BY MS. GHOSH:
6  Q. Mr. Francese, who is the speaker who asks "you ready?"
7  A. Paul.
8  Q. Who was the other speaker?
9  A. Myself.
10 Q. Again, the 5250 phone, whose phone was that?
11 A. My phone.
12 Q. And the 9918 phone?
13 A. Paul's phone.
14     MS. GHOSH: Ms. Dunbar, if you can continue playing.
15     (Audio played)
16     MS. GHOSH: Ms. Dunbar, could you pause it for a
17 moment.
18 Q. We just heard a reference to "Shaun, Diane's man."  Do you
19 know who Paul was speaking about there?
20 A. He is talking about Shaun, who I used to distribute heroin
21 to.
22 Q. That's the individual that we looked at a photo of earlier?
23 A. Yes.
24 Q. When you asked, "Where is he?" in line 7, who were you
25 referring to when you said "where is he"?

J5A8VAN4          Francese - Direct          Page 883

1  A. I was referring to where is Dino.
2  Q. OK.
3     MS. GHOSH: Ms. Dunbar, if you could continue playing,
4  please.
5     (Audio played)
6     MS. GHOSH: Ms. Dunbar, could you pause it, please.
7  Q. Mr. Francese, on the first page of the transcript, just to
8  direct you, at line 16 Paul says, "He's out again, yeah."  What
9  did you understand him to mean when he said Shaun was out
10 again?
11 A. He is referring that Shaun is out of jail again.
12 Q. A few lines down, on line 21 you said, "Dino's gonna do
13 business with him."  What do you mean by business?
14 A. I meant that Dino is going to continue to distribute heroin
15 to him.
16 Q. Were you surprised that Dino would continue to distribute
17 heroin to Shaun?
18 A. Yes, I was.
19 Q. Why?
20 A. Because him and his wife got arrested quite a few times,
21 the times I knew them, and, you know, he dealt with them again
22 right after they got out of jail.
23 Q. What was the concern about that, dealing with someone who
24 had just gotten out of jail?
25 A. That they were being watched or something, or maybe an

J5A8VAN4          Francese - Direct          Page 884

1  informant.
2     MS. GHOSH: Ms. Dunbar, if you could continue playing,
3  please.
4     (Audio played)
5     MS. GHOSH: Ms. Dunbar, could you pause it for a
6  moment.
7  Q. Mr. Francese, on the second page of this transcript Paul
8  says, "They're supposed to go to lunch today.  I want my shit
9  before that."  What did you understand him to be referring when
10 he said "I want my shit before that"?
11 A. That he wanted Dino to give Paul his heroin before he went
12 to lunch.
13 Q. Did you understand who was going to lunch with who?
14 A. I understand that Dino was going to lunch with Shaun.
15 Q. You and Paul were then talking about Dino not answering the
16 phone.  What was your understanding of the 2856 number that
17 Paul referenced?
18 A. That was one of Dino's phones.
19 Q. How many phone numbers were you aware of Dino having over
20 the time that you worked with him?
21 A. He always kept his personal number, but like I said, we
22 would change numbers, business phone numbers, every month to
23 two months.
24 Q. What about Paul, do you recall how many different phone
25 numbers you were aware that Paul had over the years?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1  A. I don't recall.
2      MS. GHOSH: Ms. Dunbar, if you could continue playing,
3  please.
4      (Audio played)
5      MS. GHOSH: Ms. Dunbar, could you please pause it
6  there.
7  Q. Mr. Francese, in line 15, when you say "I thought he came
8    to give you something," what were you talking about there?
9  A. I was saying that I thought Dino -- I thought Dino came to
10   drop heroin off to Paul.
11 Q. When you said "keep blowing up the phone, man," in lines 18
12   and 19, what did you mean by that?
13 A. I meant to keep calling him repeatedly.
14 Q. When Paul said, "I'm going crazy, the phones don't stop,"
15   what did you understand him to be saying?
16 A. I understood that to be that people were calling on his
17   other phone to know if he had heroin, if he picked up the
18   heroin or not.
19 Q. Mr. Francese, how much heroin were you using at this point
20   in the fall of 2017?
21 A. I was down to like a bundle, a bundle and a half.
22 Q. While you were living in Staten Island, did you get heroin
23   from anyone besides Dino?
24 A. Yes.
25 Q. Who?

1  A. I got heroin from Paul, and I also had another connection
2    that I knew of in Staten Island.
3  Q. On the times that you got heroin from Paul, based on your
4    discussions with him, where was Paul getting the heroin from?
5  A. He would continue getting it from Dino and also somewhere
6    else.
7  Q. How do you know that he was getting at least some of the
8    heroin from Dino?
9  A. Well, Dino would give him the heroin to bring to me, to
10   drop off to me for my personal use. And Paul would tell me
11   he's going to see Dino.
12 Q. Why weren't you getting the heroin directly from Dino
13   yourself?
14 A. At that time, Dino -- I haven't seen Dino for a while; he
15   hasn't showed face to me for a while. And also, the house I
16   was staying at, my aunt's house with my mom, it was more
17   convenient for Paul to drop it off than for Dino to go all the
18   way out of his way.
19 Q. You said that you previously stored heroin for Dino when
20   you were living in Brooklyn, is that right?
21 A. Yes.
22 Q. What, if anything, did you know about Dino storing drugs in
23   Staten Island around this time in the fall of 2017?
24 A. I actually moved into Dino's father's apartments, and the
25   apartments weren't -- they were all being redone and

1  everything, and they weren't finished yet. So there were times
2  where he stashed the heroin in the apartment, my apartment that
3  my mom and I were moving in that wasn't yet finished.
4  Q. Do you recall when that was, that he was stashing the
5    heroin in the apartment in Staten Island?
6  A. That was probably mid-October, November of 2017.
7  Q. When Paul gave you heroin, did you always pay for it?
8  A. No.
9  Q. Why not?
10 A. There was a time that I lent Paul a couple of dollars and
11   we worked it off with heroin.
12 Q. When you did pay Paul for heroin, how much did you pay him?
13 A. 40 to 50 dollars a bundle.
14 Q. Based on your conversations with Paul, how much did he
15   charge his typical customers for a bundle of heroin?
16 A. That would be $80 a bundle.
17 Q. Who else did you learn that Paul was distributing heroin to
18   at this point?
19 A. I just know of a few occasions he was also distributing to
20   Teddy.
21 Q. How did you learn that?
22 A. From Teddy telling me.
23 Q. What did Paul tell you about whether he had people besides
24   you and Teddy to distribute heroin to?
25 A. Can you say that again?

1  Q. Sure. What did Paul tell you about whether he had people
2    besides you and Teddy that he was distributing heroin to?
3  A. I would know because I would have to wait, Paul told me,
4    until he finished seeing everybody else.
5  Q. What is it that Paul would tell you in those circumstances?
6  A. That he had to go see the other people before he could drop
7    the heroin to me.
8      MS. GHOSH: We are going to play a call, which is 304C
9  already in evidence. This is in the transcript packets as
10 304C-T as an aid to the jury. For the record, this is a call
11 from September 15, 2017, at approximately 3:32 p.m., and the
12 call is between the phone numbers ending in 9918 and 5250.
13     Ms. Dunbar, if you could please play the beginning
14 portion of this call starting at second 14.
15     (Audio played)
16     MS. GHOSH: Ms. Dunbar, if you could pause there.
17 BY MS. GHOSH:
18 Q. First, who said at the beginning, "Yeah, what up?"
19 A. Paul.
20 Q. Who is the other speaker who asked, "You with him?"
21 A. Myself.
22 Q. Who were you referring to when you asked Paul if Paul was
23   with him?
24 A. If he was with Dino.
25 Q. When Paul said, "No, I never got over there," what did you

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1   understand him to mean by "over there"?
2   A. By Dino, wherever he may be at that time.
3   Q. When Paul said, "I got people waiting all day" -- let me
4   back up a moment.
5        On line 6 through 7, you said, "You don't have
6   nothing?" What were you asking Paul if he had?
7   A. If he had heroin.
8   Q. When he says "nothing," and then "I got people waiting all
9   day," what did you understand Paul to mean when he said "I got
10  people waiting all day"?
11  A. I understood that to be that he had customers waiting for
12  him all day.
13       MS. GHOSH: Ms. Dunbar, if you can just back up a few
14  seconds and then keep playing for a moment.
15       (Audio played)
16       MS. GHOSH: Ms. Dunbar, you can stop.
17  Q. When Paul says, "I'm gonna go to his house," what did you
18  understand him to be referring to?
19  A. Going to Dino's house.
20  Q. Did you ever go to Dino's house?
21  A. Yes.
22  Q. When Paul says "there's rush hour and everything," what did
23  you understand him to mean by rush hour?
24  A. What number is that?
25  Q. That's in line 15 of the transcript.

1   A. I don't know what he meant by that. It could have been
2   rush hour traffic or rush hour people calling or something.
3   Q. Were you familiar with rush hour as a term to describe a
4   busy period for heroin sales?
5   A. Yeah, but it did not mean that all the time.
6   Q. You mentioned that you had been to Dino's house. Where was
7   his house?
8   A. In Staten Island.
9   Q. Do you recall the address?
10  A. Yes. 737 Post Avenue.
11  Q. Besides Dino and Paul, you mentioned that there was someone
12  else you got heroin from in Staten Island?
13  A. Yes.
14  Q. Who was that?
15  A. I don't really know a name. I just knew him as a Spanish
16  guy. I met him from Brooklyn. I think he lived in Staten
17  Island.
18  Q. Did you ever obtain heroin from Jasmin?
19  A. Oh, yes.
20  Q. When was that?
21  A. There was one occasion, it was like December of 2017, where
22  I was really sick, and I was asking Dino if he could get me
23  heroin, and he called Jasmin and he got me a bundle of heroin.
24       MS. GHOSH: You can take that call down, Ms. Dunbar.
25  Q. Mr. Francese, we have been talking with the jury about

1   these particular events involving your participation in the
2   heroin and fentanyl conspiracy. I want to talk to you now
3   about some other crimes that you have committed.
4        Before you were arrested in this case, how many times
5   had you sold drugs before?
6   A. Never.
7   Q. Before you were arrested in this case, had you ever sold
8   drugs?
9   A. Oh, yes. Sorry.
10  Q. How often?
11  A. Three to four times a week for three years.
12  Q. Which drugs had you sold?
13  A. I sold heroin, fentanyl. I didn't know it was fentanyl. I
14  also sold some of my opiate pills that I was prescribed, and I
15  traded them.
16  Q. How often did you sell those prescription pills?
17  A. Whenever I needed to.
18  Q. Have you ever been convicted of selling drugs before?
19  A. No, just this case.
20  Q. What about using drugs? What drugs have you used in your
21  life?
22  A. Quite a few of them. Marijuana, cocaine, LSD, PCP,
23  opiates, prescription pills.
24  Q. Have you ever been arrested for using drugs?
25  A. Just this time.

1   Q. What is your understanding of how the government learned
2   about the times that you sold drugs, like the prescription
3   pills, but you didn't get arrested?
4   A. I told them.
5   Q. What is your understanding of how the government learned
6   about the drugs you used where you didn't get arrested?
7   A. I also told them.
8   Q. Did you tell the government about other crimes that you
9   committed that you were never arrested for?
10  A. Yes, I did.
11  Q. For example, did you tell the government about stealing
12  radios from cars when you were a teenager?
13  A. Yes, I did.
14  Q. To your knowledge, how did the government find out about
15  you stealing radios from cars?
16  A. I told them.
17  Q. Now, after you were arrested on this case, were you
18  released on bail or were you kept in jail?
19  A. I was released on bail.
20  Q. When were you arrested in this case?
21  A. I believe it was January 18th of 2018.
22  Q. Did there come a time when you decided to cooperate with
23  the government?
24  A. Yes.
25  Q. When was that?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

**CORRECTED**
**May 10, 2019**

1  A. Around the middle of January of 2019.
2  Q. As part of your decision to begin cooperating with the
3   government, did you begin meeting with the government?
4  A. Yes, I did.
5  Q. Now, after you began meeting with the government, did you
6   violate the terms of your bail?
7  A. Yes, I did.
8  Q. How did you violate your bail?
9  A. I used cocaine.
10 Q. Was there another way in which you violated the terms of
11  your bail?
12 A. Yes. I wasn't honest about it to the government.
13 Q. Why did you use cocaine?
14 A. I used cocaine because I was actually with a girl that I
15  haven't been with for a while, and I gave in and I used
16  cocaine, and I broke over a year of sobriety.
17 Q. Why did you lie about that?
18 A. Because I was embarrassed of it, for being with that girl
19  to begin with, and also for ruining my sobriety.
20 Q. Did the government find out that you had lied?
21 A. Yes, they did.
22 Q. To your knowledge, how did the government find out that you
23  had used cocaine and lied about it?
24 A. From my pretrial, I have to give urine every week.
25 Q. And so there was a positive drug test?

1  A. Yes, there was.
2  Q. I am going to show you now what -- excuse me one moment.
3         MS. GHOSH: I am going to show just for the witness
4   Government Exhibit 1003.
5         Ms. Dunbar, if you could just flip through the pages
6   of this for Mr. Francese.
7  Q. Mr. Francese, do you recognize this document?
8  A. Yes. That's my plea agreement.
9  Q. How do you recognize this as your plea agreement?
10 A. From my signature that you just showed me.
11 Q. After you signed this agreement, were you required to plead
12  guilty to a federal crime?
13 A. Yes.
14 Q. What charges did you plead guilty to?
15 A. I pled guilty to distribute heroin and cocaine -- I mean
16  heroin and fentanyl. I'm sorry.
17 Q. Why did you plead guilty to agreeing to distribute heroin
18  and fentanyl?
19 A. Because I'm guilty.
20        MS. GHOSH: The government offers into evidence
21  Government Exhibit 1003.
22        MS. SIDERIS: No objection.
23        THE COURT: 1003 is in evidence.
24        (Government's Exhibit 1003 received in evidence)
25 Q. Mr. Francese, have you been sentenced for that crime?

1  A. No.
2  Q. What is your understanding of the maximum sentence you face
3   as a result of that crime?
4  A. Maximum sentence is life.
5  Q. What is the mandatory minimum sentence that you face right
6   now for this crime?
7  A. Ten years.
8  Q. Who will sentence you for your crimes?
9  A. The judge.
10 Q. What are your obligations under this agreement?
11 A. My obligations are to be truthful, to report to all
12  meetings asked of me, and to testify.
13        MS. GHOSH: Ms. Dunbar, if we can publish Exhibit 1003
14  for the jury.
15 Q. What obligations, if any, do you have about whether you can
16  commit new crimes?
17 A. I cannot commit any crimes.
18 Q. If you fulfill your duties under the agreement, what is
19  your understanding of what the government has to do under this
20  agreement?
21 A. The government would have to write me a 5K letter.
22 Q. In your understanding, what is a 5K letter?
23 A. A 5K letter is -- it's something that I can get so I
24  wouldn't have to face a minimum of ten years.
25 Q. What is your understanding of what goes into that 5K

1   letter?
2  A. That I have been truthful, that I testified, and I showed
3   up to all meetings.
4  Q. What else goes into the 5K letter?
5         Is it your understanding that information about the
6   crimes you committed goes into that letter?
7  A. Yes. I'm sorry. Yes. And also that I -- you know, I
8   violated my term.
9  Q. You're referring to the fact that you violated your bail,
10  that will go into the 5K letter?
11 A. Yes.
12 Q. And the fact that you lied to the government, that will go
13  into your 5K letter?
14 A. Yes, that will.
15 Q. What is your understanding of the effect that the 5K letter
16  has on the mandatory minimum sentence that you're facing?
17 A. That the mandatory is waived.
18 Q. So the judge isn't required to follow the mandatory minimum
19  sentence, that's your understanding?
20 A. Yes, that's correct.
21 Q. Who does the 5K letter go to?
22 A. It goes to the judge.
23 Q. Will the sentencing judge know about your testimony today?
24 A. Yes, he will.
25 Q. Will he know about all of the crimes you have committed?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

J5A8VAN4          Francese - Direct          Page 897

1 A. Yes, he will.
2 Q. And your violation of bail and your lie about your
3 violation of bail?
4 A. Yes.
5 Q. What do you expect might happen as a result of that
6 information being included in your 5K letter?
7 A. It could hurt me.
8 Q. Without the 5K letter, what is your understanding of the
9 minimum time that you're facing?
10 A. Ten years.
11 Q. And without the letter, what is your understanding of the
12 maximum time that you're facing?
13 A. Say that again.
14 Q. Sure. Without the 5K letter, what is your understanding of
15 the maximum amount of time that you're facing for this crime?
16 A. Life.
17 Q. If you get the 5K letter, what is your understanding of the
18 minimum time that you're facing?
19 A. That there is no minimum.
20 Q. If you get the 5K letter, what is your understanding of the
21 maximum time that you're facing?
22 A. It would still be life.
23 Q. Will the government's 5K letter recommend any particular
24 sentence for you?
25 A. No, it doesn't.

J5A8VAN4          Francese - Direct          Page 898

1 Q. Has anyone told you what sentence you're going to get?
2 A. No, they haven't.
3 Q. What sentence are you hoping to get?
4 A. The least jail time or no jail time.
5 Q. Do you know whether you will actually receive a lower
6 sentence because you cooperated?
7 A. No, I don't know that.
8 Q. Does your sentence depend on the outcome of this trial?
9 A. No, it doesn't.
10 Q. If you lie but someone gets convicted, do you get the 5K?
11 A. No, I don't.
12 Q. If you tell the truth but no one gets convicted, do you get
13 the 5K?
14 A. Yes, I do.
15 Q. If there is a dispute between you and the government over
16 whether you were truthful, who resolves that dispute?
17 A. The judge does.
18 Q. Did the government make any promises about what would
19 happen if you testified today?
20 A. No, they haven't.
21 Q. As you understand it, what will happen if you lie here
22 today?
23 A. I won't get a 5K letter.
24 Q. What is your understanding about whether you can be charged
25 with new crimes for lying here today?

J5A8VAN4          Francese - Direct          Page 899

1 A. I will be charged with new crimes, yes.
2 Q. If you lose your cooperation agreement, will you be allowed
3 to withdraw your guilty plea?
4 A. No.
5         MS. GHOSH: Just a moment.
6 Q. Mr. Francese, if you lie here today, what is your
7 understanding of what happens to your cooperation agreement
8 with the government?
9 A. It gets torn up.
10 Q. Mr. Francese, how did you primarily use heroin?
11 A. I only snorted it.
12 Q. Were you familiar with other ways that people could use
13 heroin?
14 A. Yes.
15 Q. What other ways can people use heroin?
16 A. They could use by shooting up, by smoking it, a couple of
17 ways.
18 Q. Are you familiar with people who shoot up heroin?
19 A. Yes.
20 Q. Have you ever seen someone shoot up heroin?
21 A. Yes.
22 Q. Can you explain how someone prepares heroin when they are
23 sniffing it or the way you used it?
24 A. You just take it out of the glassine bag and you break it
25 up and you snort it.

J5A8VAN4          Francese - Direct          Page 900

1 Q. How much would you use at one time when you are snorting
2 it?
3 A. I was up to sometimes three glassine packets at once.
4 Q. Was that at the time you were using the most?
5 A. Yes.
6 Q. At other times when you first started using it, how much
7 would you sniff at a time?
8 A. Just one packet at a time.
9 Q. And you mentioned that you're familiar with seeing people
10 shoot up heroin. What is the process for preparing the heroin
11 to shoot up?
12 A. They will take the glassine packet -- I don't know exactly
13 how to do it, but just by seeing, you put it in the spoon and
14 have to cook it up to purify it. And then you put like some
15 kind of filter in the spoon and you suck it up with a syringe,
16 you tie your arm, you find a vein, and you put it in your vein.
17 Q. You mentioned some sort of filter. Can you describe what
18 you mean by that?
19 A. I guess the filter soaks up all the -- like the cut,
20 whatever. I'm not really sure. I saw people use -- they use a
21 cigarette filter, a piece of cotton, whatever.
22 Q. What do you mean when you say that they cook it?
23 A. You have to cook it up to make it pure.
24 Q. What do you mean by that?
25 A. To make it stronger. And you have to melt the heroin

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON

CORRECTED
May 10, 2019

1   because it comes in a powder form.
2          THE COURT: If it's subjected to heat, it liquifies,
3   is that it?
4          THE WITNESS: Yes.
5   Q. Was there another way that you mentioned you were familiar
6   with people using heroin?
7   A. People could also smoke it.
8   Q. How does that work?
9   A. I only saw it a couple of times. You put it on tinfoil,
10  the powder on a piece of tinfoil, you heat it up and you inhale
11  it with a straw, the smoke, after heating it up.
12  Q. When you have seen people inject heroin, how much heroin do
13  they put in the spoon when they are heating it?
14  A. Everybody has a different tolerance.
15  Q. What about on the occasions when you have seen people smoke
16  it, do you know how many glassine bags they are using in the
17  tinfoil?
18  A. No. Probably just one glassine bag.
19         MS. GHOSH: Your Honor, would this be a good time for
20  the afternoon break?
21         THE COURT: Well, it's the end of the day. How much
22  more do you have?
23         MS. GHOSH: Not much, your Honor.
24         THE COURT: How much more?
25         MS. GHOSH: Let me just consult with my colleagues.

1   One moment.
2          Your Honor, we have no further questions.
3          THE COURT: Ladies and Mr. Jackson, we are going to
4   take our weekend break now. We will resume on Monday morning
5   at 9:30, promptly at 9:30. Remember my instructions. Don't
6   discuss the case, don't do any independent research, keep open
7   minds. And enjoy the weekend. We will resume on Monday at
8   9:30. We will have breakfast for you at 9:00 when the jury
9   room opens.
10         One further word. The notepads that you're taking
11  notes on, leave them in the jury room.
12         (Jury exits courtroom)
13         THE COURT: Mr. Francese, you're finished with direct
14  examination now. So I don't want you talking to the attorneys.
15  Don't talk to the government. And I am going to instruct the
16  government not to talk to you.
17         You're excused.
18         MS. FENDER: As before, if we could just have the
19  exception of arranging travel, nonsubstantive communications.
20         THE COURT: Yes. I am only talking about the
21  testimony in this case.
22         We will have your jury charge for you later today by
23  e-mail.
24         Anything else to take up?
25         MR. FINKEL: Your Honor, to answer the Court's

1   question before, the government has approximately five
2   witnesses left. Depending on cross, the rest are not
3   particularly long. It's conceivable we will be able to rest on
4   Monday. If not, we feel confident we will be resting on
5   Tuesday.
6          THE COURT: Let's rest on Monday.
7          When do you want to do the jury conference? Would you
8   like to do it Monday afternoon?
9          MR. FINKEL: The government is prepared to do it
10  whenever the Court would like. In some ways it might depend,
11  perhaps, on the case the defendants are going to put on.
12         MR. QUIJANO: We are prepared to proceed Monday
13  afternoon if the government rests.
14         THE COURT: We will proceed Monday afternoon then at
15  the end of the trial day.
16         Everybody have a nice weekend.
17         (Adjourned to May 13, 2019, at 9:30 a.m.)
18
19
20
21
22
23
24
25

1              INDEX OF EXAMINATION
2   Examination of:                          Page
3    JESSICA FYFE
4   Cross By Ms. Sideris . . . . . . . . . . . . . 750
5    BRYAN DUNN
6   Direct By Mr. Finkel . . . . . . . . . . . 767
7   Cross By Mr. Quijano . . . . . . . . . . . 772
8   Redirect By Mr. Finkel . . . . . . . . . . 775
9   Cross By Mr. Quijano . . . . . . . . . . . 778
10   DIMITRI DEVITO
11  Direct By Ms. Ghosh . . . . . . . . . . . . 788
12  Cross By Mr. Santiago . . . . . . . . . . . 808
13   MICHAEL FORSTER
14  Direct By Mr. Finkel . . . . . . . . . . . 809
15   BRITTANY CHRISTIE
16  Direct By Ms. Ghosh . . . . . . . . . . . . 821
17  Cross By Ms. Sideris . . . . . . . . . . . 847
18   ANTHONY JOSEPH FRANCESE
19  Direct By Ms. Ghosh . . . . . . . . . . . . 849
20             GOVERNMENT EXHIBITS
21  Exhibit No.                           Received
22   18   . . . . . . . . . . . . . . . . . . . . 770
23   18B  . . . . . . . . . . . . . . . . . . . . 771
24   17   . . . . . . . . . . . . . . . . . . . . 776
25   17B  . . . . . . . . . . . . . . . . . . . . 777

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 12, 2019

<u>**VIA ECF**</u>

The Honorable Paul A. Crotty
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> **Re:**   *United States v. Paul Van Manen, et al.*, **S4 18 Cr. 30 (PAC)**

Dear Judge Crotty:

The Government respectfully submits this letter in the above-captioned matter in advanced of the charge conference scheduled for May 13, 2019.   As further explained below, the Government requests certain modifications and additional charges be included in the Court's Jury Charge.

**1.   Economic Necessity is Not a Defense to the Charged Crime**

The Government requests that the Court include in its charge the instruction it provided to the jury on May 7, 2019 namely that "[e]conomic necessity is not a defense to the conspiracy charged."  (Tr. at 66-67.)  Such an instruction may follow the instruction concerning the elements of a conspiracy on page 39 of the Court's draft charge.  The Government requests the following language:

> **Economic Necessity is Not a Defense**
>
> When deliberating whether the defendants each unlawfully, knowingly and willfully entered into the conspiracy charged in Count One of the Indictment, I instruct you that a defendant's economic status has no bearing on whether the Government proved that the defendant being considered unlawfully, knowingly and willfully entered into the conspiracy.  That is because economic necessity is not a defense to the crime charged in Count One.  Stated differently, even if you find that one or both of the defendants entered into the conspiracy because they lacked that financial means to purchase controlled substances on their own, that does not negate a defendant's knowledge and willfulness to enter the conspiracy.  In short, if you find beyond a reasonable doubt that a defendant

A-439

Honorable Paul A. Crotty
United States District Judge
May 12, 2019
Page 2

unlawfully, knowingly and willfully joined the conspiracy those elements of the charge are satisfied even if you conclude that a reason, or the only reason, a defendant joined the conspiracy was because of his economic status.[1]

## 2. Charge III.E. - Buyer Seller Relationship

As was raised with the Court on May 7, 2019, the defense has posed questions to lay witnesses concerning whether such witnesses viewed their relationship with other members of the charged conspiracy as that of a "buyer" and a "seller." (*See e.g.*, Tr. 180 ("Q.  Essentially, your involvement with Kosic was the same; your relationship with him was as a buyer to a seller, is that fair?  A.  Yes.").)  It is beyond dispute that a witness's understanding of a  "buyer" or a "seller" relationship in the colloquial sense may be quite different than the legal definition of a buyer/seller relationship as outlined by the Second Circuit.  Indeed, the term "buyer/seller relationship" referenced in the jury charge is *not* the literal meaning of "buyer/seller," but instead a narrow legal exception to conspiracy liability.  *See United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009) ("As a literal matter, when a buyer purchases illegal drugs from a seller, two persons have agreed to a concerted effort to achieve the unlawful transfer of the drugs from the seller to the buyer. According to the customary definition, that would constitute a conspiracy with the alleged objective of a transfer of drugs. Our case law, however, has carved out a narrow exception to the general conspiracy rule for such transactions.").  It is for this reason that the Government requested a limiting instruction after the defendants cross-examined witnesses using the terms "buyer" and "seller" in the colloquial sense.

To counteract the confusion the jury may have about the "buyer seller relationship" they must consider, the Government requests the Court insert the following language after the Buyer Seller Relationship instruction currently found on pages 41-42 of the Court's Jury Charge:

> The legal meaning of a "buyer seller relationship," which I have just explained, is different from the common use of that phrase. During this trial you may have heard witnesses characterize their relationship with another as that of a "buyer/seller."  As I have already instructed you, it is my instructions on the law that must be followed. Witnesses do not have an understanding of the law.  Their role is to provide testimony based on their own perceptions and understanding.  Thus, even if a witness used the terms "buyer" or "seller" they may not have used these terms consistent with the legal meaning of "buyer/seller" that I have just explained.  In other words, regardless of whether a witness defined a relationship

---

[1] *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 490 (2001) ("[I]t is an open question whether federal courts ever have authority to recognize a necessity defense not provided by statute."); *see id.* (declining to recognize the defense of medical necessity to charges under the Controlled Substances Act).

A-440

Honorable Paul A. Crotty
United States District Judge
May 12, 2019
Page 3

between two individuals as "buyer/seller" you must apply the facts as you find them to the law as I have given it to you, and if appropriate you may nevertheless conclude that those two individuals conspired, that is, they agreed to violate the narcotics laws of the United States.

### 3.  Charge III.D. - Multiple Conspiracies.

A multiple conspiracy charge is not required merely because the indictment alleges a conspiracy, nor is it available simply upon request of the defense.  Instead, such a charge is only appropriate "where there is a basis for the defense claim that multiple conspiracies existed."  *See 1 Sand et al., Modern Federal Jury Instructions-Criminal* ¶ 19.01, Instruction 19-5 & cmt. at 19-22 (2009); 2 Fed. Jury Prac. & Instr. § 31:09 (6th ed.), 2 Fed. Jury Prac. & Instr. § 31:09 (6th ed.) ("An instruction describing multiple or single conspiracies should be given only when required by the evidence.").  A defendant seeking a multiple conspiracy charge has the burden to show that "there was evidence of separate networks operating independently of each other."  *United States v. Reid*, 475 F. App'x 385, 386 (2d Cir. 2012) (explaining that reversal of a district court's omission of multiple conspiracy charge requires showing of "substantial prejudice").  Whether there were multiple conspiracies requires an evaluation of several factors, "including the overriding goal of the conspiracy, the core group who led the conspiracy, if the individual operations shared common participants, if the individual schemes were independent, and if the participants used distinctive means and methods common among the individual operations."  *Id.* (affirming denial of multiple conspiracy charge where operations in three cities were led by "a core group of participants (with a [particular individual] as the main supplier").  "[A] single conspiracy is not transformed into multiple conspiracies solely by the fact that it involved two or more phases or spheres of operation, or that it occurred in more than one stage and at different times so long as there was an ongoing connection between transactions."  *Id.* (citations, alterations and quotation marks omitted).  "If only one conspiracy has been alleged and proved a defendant is not entitled to a multiple conspiracies charge."  *Medina*, 944 at 64 (alterations and quotations omitted) (collecting cases).

Here, the defendants have failed to carry their burden to show there were multiple conspiracies.  Rather, the evidence shows a single conspiracy to distribute heroin in Staten Island.  That heroin was primarily acquired from a common supplier, and the core participants remained the same.  That there were occasions when other suppliers were used by the conspiracy participants does not alter this analysis because there still existed cooperation among the members of the conspiracy. Moreover, the defendants have not established that occasional use of other suppliers by some members of the conspiracy transformed that single conspiracy into "separate networks operating independently of each other."  *Medina*, 944 F. App'x at 388.  Given the evidence of record at this time, the Government objects to the inclusion of any such instruction.

However, if the defendants testify and thereby introduce disputed facts from which the Court concludes that a multiple conspiracy charge is appropriate, the Government requests that the following language be used:

Honorable Paul A. Crotty
United States District Judge
May 12, 2019
Page 4

In this case, the Defendants contend that the Government's proof
fails to show the existence of the conspiracy charged in the
Indictment. You must determine if the Government has proven the
existence of that conspiracy, or has instead proven the existence of
several separate and independent conspiracies with various groups
of members.

Whether there existed a single unlawful agreement, or many such
agreements, or indeed, no agreement at all, is a question of fact for
you, the jury, to determine in accordance with the instructions I am
about to give you.   Count One charges a single conspiracy to
distribute or possess with intent to distribute controlled substances.
You may not convict the Defendants of the crime charged in Count
One of the Indictment if you find that they were not a member of
any conspiracy, or if you find that they were a member of a different
conspiracy than the one charged in the Indictment.

You may find that there was a single conspiracy if you find that the
evidence shows that there was a mutual dependence among the
participants in the criminal activity, or that they shared a common
aim or purpose, or that when you examine the nature and scope of
the operations of the criminal activity it is reasonable to infer that
each member of the conspiracy was aware that he or she was playing
a part in a larger venture where others performed roles that were also
important to the success of the venture.

A single conspiracy can exist even though its members and activities
change over time. Accordingly, you may find that there was a single
conspiracy even if there were changes in personnel, the addition or
subtraction of members, shifting emphasis in the location of
operations, or an evolution in the activities undertaken by the
conspirators, so long as you find that some core members of the
conspiracy continued to act for the entire duration of the conspiracy
to accomplish the purposes charged in Count One of the Indictment.

A single conspiracy may exist without each member conspiring
directly with or even knowing every other member of the
conspiracy. A single conspiracy may have two or more objects
because the single conspiracy is the crime, not its diverse objects.
And a single conspiracy can exist even if not all the conspirators
participated in both objects of the conspiracy. Furthermore, a
finding of a master conspiracy with sub-schemes or related sub-
conspiracies involving different groups of individuals does not
constitute a finding of multiple conspiracies.

Honorable Paul A. Crotty
United States District Judge
May 12, 2019
Page 5

> On the other hand, multiple conspiracies exist where the evidence
> shows separate, unlawful agreements operating independently of
> each other to achieve distinct purposes. Proof of several separate and
> independent conspiracies is not proof of the single, overall
> conspiracy charged in the Indictment. If you find that there were
> multiple conspiracies, and that none of the conspiracies was the
> conspiracy charged in Count One, then you must acquit that
> Defendant. Likewise, if you find that a Defendant was a member of
> another conspiracy, not the one charged in the Indictment, then you
> must acquit that Defendant.

> In other words, you must determine whether the conspiracy charged
> in the Indictment existed. If it did, you then must determine the
> nature of the conspiracy and whether one or both of the defendants
> jointed that conspiracy.[2]

### 4.  Charge III.G.  - Death Resulting and Serious Bodily Injury

The Government requests that the Court modify the but-for causation language in its instruction concerning death resulting and serious bodily injury to reflect the Supreme Court's decision in *Burrage v. United States*, 571 U.S. 204 (2014).  In *Burrage*, the Supreme Court analyzed the meaning of but-for causation in the context of the Controlled Substances Act, and specifically what role the substances distributed by the conspiracy must play in causing the death and/or serious bodily injury of a victim.  In that regard, the Supreme Court explained:

> where A shoots B, who is hit and dies, we can say that A [actually]
> caused B's death, since but for A's conduct B would not have died.
> The same conclusion follows if the predicate act combines with
> other factors to produce the result, so long as the other factors alone
> would not have done so—if, so to speak, it was the straw that broke
> the camel's back. Thus, if poison is administered to a man debilitated
> by multiple diseases, it is a but-for cause of his death even if those
> diseases played a part in his demise, so long as, without the
> incremental effect of the poison, he would have lived.

*Id.* at 211 (citation and alterations omitted).  In accord with that precedent the Government believes the following italicized language should be included in the Court's charge.  Especially because, in this trial, as explained by Dr. Cederroth, alprazolam may have also played a role in causing Michael Ogno's death, and the Government believes the jury should be instructed how to consider the evidence of the role that alprazolam played:

---

[2] Adapted from *United States v. Carroll*, S4 17 Cr. 754 (CS) (S.D.N.Y.).

A-443

Honorable Paul A. Crotty
United States District Judge
May 12, 2019
Page 6

I instruct you that, in order to find that the serious injury or death of a particular individual resulted from the use of heroin and/or fentanyl distributed through the conspiracy, you must find that the Government has proven that heroin and/or fentanyl distributed by Mr. Van Manen or a coconspirator was the cause of the alleged victim's serious bodily injury or death. In other words, the Government must prove that the alleged victim would not have suffered a serious bodily injury or died on the date he did, but for the ingestion of the heroin and/or fentanyl distributed by Mr. Van Manen or his co-conspirator.

*To be clear, the Government is not required to show that the heroin and/or fentanyl distributed through the conspiracy was the only factor that brought about the alleged victim's serious bodily injury or death. Indeed, it can be sufficient if heroin and/or fentanyl distributed through the conspiracy caused the alleged victim's serious bodily injury or death in combination with other causes, so long as you find that the Government has proven that the individual in question would not have suffered a serious bodily injury or died on the date he did, absent his ingestion of the heroin and/or fentanyl distributed through the conspiracy. Put another way, you must decide whether the incremental effect of the heroin and/or fentanyl was the straw that broke the camel's back in causing the serious bodily injury or death of the victim or victims.*

## 5. Non-Prosecution Agreement.

One of the Government's witnesses was provided a Non-Prosecution Agreement. Accordingly, the Government requests the following charge be added:

You have heard testimony from a Government witness who testified pursuant to an agreement with the Government that, in exchange for his truthful testimony, the Government agreed not to prosecute that witness for certain specified crimes that he may have committed.

The Government is permitted to enter into these types of understandings, and is entitled to call as witnesses people with whom such agreements are entered. The fact that the Government has agreed not to prosecute a witness does not disqualify him from testifying and does not preclude you from accepting that testimony as true.

As with the cooperating witness testimony, you may want to consider whether a witness who received a non-prosecution agreement would

A-444

Honorable Paul A. Crotty
United States District Judge
May 12, 2019
Page 7

benefit more by lying or by telling the truth.  If you believe the witness was motivated by personal gain, was the motivation one that would cause him to lie or was it one that would cause him to tell the truth?

One final note in this regard.  It is no concern of yours why the Government entered into such an agreement with a witness.  Your sole concern is to decide whether the witness was giving truthful testimony in this case before you.  In sum, you should look to all the evidence in deciding what credence and what weight, if any, you will give to a witness's testimony.[3]

6.  **Additional Requests.**

- Page 20.  The Court noted that the transcripts are not evidence.  Because there were foreign language translations, the parties stipulated to the admission of GX 306E-T and GX 306F-T.

- Pages 33-34.  The Government requests that Court modify "[b]asically, what you are determining is whether the drugs in Mr. Van Manen and Mr. Charlton's possession were for their personal use or for the purpose of distribution" to "[b]asically, what you are determining is whether *at least some of the drugs* in Mr. Van Manen and Mr. Charlton's possession were for their personal use or for the purpose of distribution."  The Government need not prove that all of the drugs the defendants acquired were redistributed or that all were intended for redistribution and indeed the parties agree that at least some of the narcotics possessed by the defendants were used by the defendants.

- Page 36.  The Government requests the additional language be included given the evidence in this case:  "It is not even necessary that Mr. Van Manen and Mr. Charlton knew every other member of the conspiracy, *or indeed that they knew each other*."

- Page 45.  The Government requests the additional language be included given the operative indictment in this case:  "*second*, you will be asked to find whether

---

[3] Adapted from the *Collins* Charge; the Tomasetta Charge; Sand, et al., *Modern Federal Jury Instructions*, Instr. 7-5; the charge in *United States v. Projansky*, 465 F.2d 123, 136-37 fn. 25 (2d Cir.) (specifically approving charge set forth in footnote); *see United States v. Gleason*, 616 F.2d 2, 15 (2d Cir. 1979) ("Where the court points out that testimony of certain types of witnesses may be suspect and should therefore be scrutinized and weighed with care, such as that of accomplices or coconspirators . . . it must also direct the jury's attention to the fact that it may well find these witnesses to be truthful, in whole or in part.") (citations omitted).

Honorable Paul A. Crotty
United States District Judge
May 12, 2019
Page 8

Michael Ogno's use of heroin and/or fentanyl distributed through the conspiracy resulted in his death *or serious bodily injury*."

                                        Respectfully submitted,

                                        GEOFFREY S. BERMAN
                                        United States Attorney

By:   /s/_____
        Catherine E. Ghosh
        Ryan B. Finkel
        Jessica K. Fender
        Assistant United States Attorneys
        (212) 637-1114 / 6612 / 2276

cc:    All counsel (via ECF)

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

―――――――――――――――――――――――――――――

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 12, 2019

**VIA ECF**

The Honorable Paul A. Crotty
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      **Re:**   ***United States v. Paul Van Manen, et al.*, S4 18 Cr. 30 (PAC)**

Dear Judge Crotty:

      The Government writes to renew its motion that Defendant Paul Van Manen's purported toxicology expert be precluded from testifying. (*See* Dkt. 194, at 4; Dkt. 203, at 5.)

      **A.  Background**

      On April 17, 2019, counsel for Van Manen provided a resume and the following disclosure for its proposed expert Dr. Robert Powers:

> Dr. Powers is a forensic toxicologist and his resume is attached. Given the government's April 2, 2019 disclosure and Dr. Kadehjian report, we do not anticipate Dr. Powers' testifying.  To the extent that Dr. Kadehjian's testimony deviates from his report or with accepted science, Dr. Powers would be called as a witness by the defendant, Paul Van Manen. Dr. Powers' testimony would include his opinion regarding the death of Michael Ogno based on his review of the documents from the Office of the Chief Medical examiner, including the Autopsy Report and Forensic Toxicology Laboratory Report and his training and experience. Dr. Powers would testify that the concentration of fentanyl being detected at a fatal concentration is the major contributor to toxicity and the proximate cause of death.

No other information concerning Dr. Powers has been provided.

      During the final pretrial conference in this case, counsel for Van Manen stated that they would only call their experts, including Dr. Powers, "to rebut something that came up that was at odds with either the autopsy findings by Cederroth or [Kadehijan's] findings in his report."

(4/24/19 Tr. at 30.)  When the Court inquired whether there was anything about the Government's expert reports that the defendant intended to challenge, defense counsel responded: "As they exist now?  No."  (*Id.*)  Defense counsel further confirmed that the view of the Government's experts was the same as their purported experts.  (*Id*. at 31.)

On May 10, 2019, the Government confirmed to the defendants that it did not intend to call Dr. Kadehjian, its forensic toxicologist.  That decision was in part because Dr. Cederroth testified that fentanyl was the contributing factor in Michael Ogno's death.  Thus, Dr. Kadehjian's potential testimony would at most echo Dr. Cederroth testimony.  To streamline its case the Government decided not to call Dr. Kadehjian.

On Sunday evening, May 12, 2019, Van Manen's counsel indicated its intent to call Dr. Powers because "the government is no longer calling a toxicology expert."  (Email from A. Sideris to the parties, dated May 12, 2019.)  However, Van Manen has not cured the fundamental issue concerning Dr. Powers—no expert disclosure for him has been provided.  Moreover, no Government expert has testified inconsistently with the reports issued by the Government's experts—the only reason defense counsel told this Court it would call Dr. Powers.

### B.  Applicable Law

Under Rule 702, an expert may testify if his or her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  The party that proffers expert testimony bears the burden of showing that it is admissible.  *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987).  The trial court must also find that the proposed testimony is both relevant and reliable prior to admitting it into evidence.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *see also Kumho Tire Co., Inc. v. Carmichael*, 526 U.S. 137, 141 (1999).  A trial judge's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion.  *See General Elec. Co. v. Joiner*, 522 U.S. 136, 139, 142 (1997).

A defendant must "give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial."  Fed. R. Crim. P. 16(b)(1)(C).  "This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  *Id.*

### C.  Discussion

The meager one paragraph disclosure concerning Dr. Powers' testimony does not satisfy Rule 16.  The disclosure states that "Dr. Powers' testimony would include his opinion regarding the death of Michael Ogno," and adds that fentanyl is the proximate cause of death, but, critically, counsel does not explain the basis for these opinions.  "Merely identifying the general topics about which the expert will testify is insufficient; rather, the summary must reveal the expert's actual opinions."  *United States v. Valle*, No. 12 Cr. 847, 2013 WL 440687, at *5 (S.D.N.Y. Feb. 2, 2013); *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001) ("The Rule requires a summary of the expected testimony, not a list of topics.").

By contrast, the Government's expert toxicologist provided a three-page report with a page and a half of citations that explained *why* he reached the conclusions that he did. The defendant's disclosure provides the Government with no information as to "why" Dr. Powers reached the conclusion he did. The Government instead is left to guess. That is insufficient notice. The Government cannot adequately prepare for Dr. Powers' testimony and cannot discern whether the opinion (or opinions) are based on "reliable principles and methods." *See* Fed. R. Evid. 702. Dr. Powers should therefore be precluded from testifying.

The failure to provide adequate notice at this stage is sufficient cause for preclusion. *See, e.g.*, *Valle*, 2013 WL 440687, at *5; *United States v. Mahaffy*, No. 05 Cr. 613, 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007); *United States v. Ferguson*, No. 06 Cr. 137, 2007 WL 4539646, at *1 (D. Conn. Dec. 14, 2007). The expert disclosure provisions of the Federal Rules exist to allow counsel the opportunity to challenge the admissibility of testimony, adequately prepare for cross-examination, and decide whether to retain and prepare rebuttal witnesses. *See, e.g.*, *United States v. Rajaratnam*, No. 09 Cr. 1184, 2011 WL 723530, at *3 (S.D.N.Y. Feb. 25, 2011) ("[T]he purpose of reciprocal expert disclosures is 'to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.'" (quoting Fed. R. Crim. P. 16 Advisory Committee's Note)); *Valle*, 2013 WL 440687, at *5 (same); *United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008) (same). Indeed, just a day or two before Dr. Powers would take the stand any expert disclosure now provided could not remediate the defendant's failure to provide more information weeks ago.

In any event, the sole reason that Van Manen reserved the right to call Dr. Powers has not come to pass. Van Manen indicated that Dr. Powers was required only if the Government's experts testified contrary to their expert disclosures. That did not happen even after defense counsel cross-examined Dr. Cederroth. Indeed, the Government's toxicologist did not testify at all. And, Van Manen has not identified anything in Dr. Cederroth's testimony that is inconsistent with her expert disclosure or Dr. Kadehijan's disclosure.

\*   \*   \*

The Court should preclude testimony by Dr. Robert Powers.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By:    /s/_____
Catherine E. Ghosh
Ryan B. Finkel
Jessica K. Fender
Assistant United States Attorneys
(212) 637-1114 / 6612 / 2276

cc:    All counsel (via ECF)

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                                    May 13, 2019

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
    UNITED STATES OF AMERICA,              New York, N.Y.
 3
               v.                          18 Cr. 30(PAC)
 4
    PAUL VAN MANEN and KENNETH
 5  CHARLTON,
 6              Defendants.
 7  ------------------------------x        Trial
                                           May 13, 2019
 8                                         9:30 a.m.
 9  Before:
10                 HON. PAUL A. CROTTY,
11                                         District Judge
                                           - and a Jury--
12                  APPEARANCES
13  GEOFFREY S. BERMAN
         United States Attorney for the
14       Southern District of New York
    BY:  JESSICA K. FENDER
15       RYAN B. FINKEL
         CATHERINE E. GHOSH
16       Assistant United States Attorneys
17  QUIJANO & ENNIS, P.C.
         Attorney for Defendant Van Manen
18  BY:  PETER E. QUIJANO
         ANNA N. SIDERIS
19  O'NEILL & HASSEN
         Attorney for Defendant Charlton
20  BY:  GRAINNE E. O'NEILL
21  THE LAW OFFICE OF CARLOS M. SANTIAGO
         Attorney for Defendant Charlton
22  BY:  CARLOS M. SANTIAGO, JR.
23
    ALSO PRESENT:
24
    MADISON DUNBAR, Paralegal, U.S. Attorney's Office
25  WILLIAM COLEMAN, Paralegal, U.S. Attorney's Office
```

1            (Trial resumed; jury not present)

2            THE COURT: We are still missing one juror, but we

3  have a problem with Juror No. 2, Ms. Elsie O'Connor.

4            Ms. Elsie O'Connor, I will ask David Gonzalez, who had

5  a conversation with her, to report, but she has a problem with

6  her dog.

7            MS. FENDER: Her dog?

8            THE COURT: Dog.

9            THE DEPUTY CLERK: Ms. O'Connor needs to take her --

10  her dog suffers from liver and stomach malfunction and the dog

11  is currently having an episode, and when this happens she needs

12  to take him to the vet, and it's like a three to four days that

13  she needs to stay and care for her dog. So she has asked to be

14  excused to care for her dog because she is the only one

15  available.

16            THE COURT: Who has a reaction? The government first.

17  Ms. Ghosh.

18            Ms. O'Connor lives by herself, I am told, and this is

19  her sole companion.

20            MS. GHOSH: Your Honor, it sounds like there is not

21  really anything to be done in this situation. We are certainly

22  sorry for her situation. I think if she is the only caretaker,

23  then she is limited in her options and probably wouldn't be

24  focused on the trial if she were told that she had to remain.

25  So we would consent to her being excused and seating the first

1  alternate juror.

2            THE COURT: Mr. Quijano.

3            MR. QUIJANO: Your Honor, I agree with that

4  assessment. We would consent to having her excused.

5            MS. O'NEILL: We agree with that as well.

6            THE COURT: Should I call Ms. O'Connor out and tell

7  her that she is excused?

8            MS. GHOSH: Yes, your Honor.

9            (Juror No. 2 present)

10            THE COURT: Come on up here, Ms. O'Connor, please.

11  Could you tell us a little bit more about your dog?

12            JUROR: My dog is 15 years old. He does have a

13  chronic condition of stomach ulcer and pancreatis. Late last

14  night from 9 to 1:00 in the morning he had a bout of diarrhea

15  and vomiting continuously. It didn't stop until about 2 in the

16  morning. I gave him some medication. It's very debilitating

17  when he has it. I usually take him to the vet because he knows

18  of his condition. They usually prescribe medication. The

19  medications I have to give to him, it's a pill and sometimes a

20  liquid, two or three times a day. Unfortunately, there is no

21  nobody home to give it to him. Since I am retired now, it

22  works out because my daughter right now, she is in a

23  conference.

24            THE COURT: But you have nobody to take care for the

25  dog?

1            JUROR: No, just me and my daughter. And I called the

2  vet on my way here. I called the vet. I explained I am on

3  jury duty. She said, unfortunately, they cannot prescribe any

4  medication over the phone; they have to see the dog.

5            THE COURT: So you want to be excused from further

6  jury service?

7            JUROR: If possible, yeah. I know how these bouts run

8  with him. He is 15 years old. I left him. He ate a little

9  bit this morning. He was fairly alert.

10            THE COURT: I have consulted with the parties, the

11  government and counsel for the two defendants, and they consent

12  to your being excused. So you will be excused with the thanks

13  of the Court.

14            JUROR: Thank you.

15            THE COURT: Thank you very much.

16            Ms. Salvador, Alternate Juror No. 1, will replace

17  Ms. O'Connor.

18            THE DEPUTY CLERK: Judge, what about her notes?

19            THE COURT: Leave your notes here. Don't talk to the

20  jury anymore. Don't talk about the case either.

21            (Juror No. 2 excused)

22            THE COURT: David, will you check on Juror No. 9?

23            THE DEPUTY CLERK: Not yet. I will give her a call.

24            THE COURT: She is having subway, transportation

25  problems?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

1     THE DEPUTY CLERK: Yes, that's what we said.

2     MS. SIDERIS: Your Honor, while we are waiting, may I

3 be heard on one of the letters that the government filed last

4 night regarding an expert witness?

5     THE COURT: Yes.

6     MS. SIDERIS: The government's expert notice regarding

7 the death of Michael Ogno was two experts in two distinct

8 fields of expertise. So pathology, the medical examiner, and

9 their toxicologist, toxicology expert. Their disclosure and

10 their report from their toxicologist was that the proximate

11 cause of death was fentanyl toxicity. Our expert, we disclose,

12 would come to the same conclusion, that the proximate cause of

13 death was fentanyl toxicity.

14     We found out from the government after our

15 cross-examination had finished of the medical examiner that

16 they were no longer intending on calling the toxicology expert.

17 I did not anticipate when crossing the medical examiner that

18 there would not be a toxicologist expert called. More

19 importantly, the medical examiner, there was no expert notice

20 as far as her testimony that she would be going into that field

21 or that that was her expertise. Accordingly, we notified the

22 government yesterday that now we intend on calling our

23 toxicology expert, Dr. Robert Powers.

24     THE COURT: Yes.

25     MS. SIDERIS: The government filed a motion letter

1 with the Court last night that we should be precluded from

2 doing so.

3     If the Court doesn't have any questions, that's all.

4     THE COURT: I want to hear from the government.

5     MS. FENDER: Your Honor, Mr. Finkel is more familiar

6 with this issue, but since he stepped out, I will do my best.

7     A few things, your Honor. First of all, even putting

8 aside any complaints about Dr. Cederroth's testimony, which I

9 heard none, and, frankly, we inquired last night as to the

10 basis for any renewed interest in calling Dr. Powers, because

11 the representation made to this Court from the defense was that

12 if Dr. Cederroth testified consistent with her report, and if

13 we were to call Dr. Kadehjian, if he were to testify consistent

14 with his report, that there would be no need for the alleged

15 defense expert.

16     So Dr. Cederroth testified entirely consistently with

17 her report, exactly as expected. But I haven't heard anything

18 to suggest otherwise. But even separate and apart from that,

19 your Honor, there is no excuse for the deficient expert notice

20 that has been provided for Dr. Powers. We fully briefed that

21 issue. As your Honor can see in our most recent letter, we

22 again reiterated the incredibly succinct disclosure with

23 respect to Dr. Powers. There is not adequate notice here.

24 They have not cured that inadequate notice. There is no

25 suggestion of what Dr. Powers' actual statement or opinion

1 would be. And we have had no opportunity to address any of

2 that.

3     So for two reasons we think that this is improper.

4 One, Dr. Cederroth testified consistently with her opinion and

5 appropriately. She is an expert in forensic pathology. She

6 rendered an opinion on the cause of death, which included the

7 combined effects of fentanyl, heroin and alprazolam. That's

8 all entirely consistent with her full-fledged report and all of

9 the papers and notes that were provided to the defense. We

10 have nothing of the kind from Dr. Powers. So he should be

11 precluded.

12     THE COURT: Ms. Sideris, do you want to respond?

13     MS. SIDERIS: Your Honor, just to highlight that our

14 response to the government's expert notice was we gave notice

15 of two experts, a pathology expert and a toxicology expert;

16 and, certainly, with regard to our intention of calling the

17 toxicology expert, it was in response to the anticipated

18 testimony of the government's toxicology expert. We told the

19 government our expert, we expect, will agree with what your

20 expert is saying, that their expert report was defining the

21 substances and then concluding that, based on those levels, it

22 was not morphine, it was fentanyl toxicity. And that's exactly

23 what we gave notice of. Unless the government wants to mislead

24 the jury that this was a heroin overdose, I don't see why we

25 would not be allowed to call our witness, our expert witness.

1     THE COURT: For the reasons stated by the government,

2 Dr. Powers' testimony is precluded.

3     Is the juror here yet?

4     THE DEPUTY CLERK: No. I left her a voice mail.

5     MS. GHOSH: Your Honor, while we are waiting for the

6 jurors, there was another letter that we sent over this morning

7 and handed a hard copy to your deputy. I am not sure if this

8 is a good time to address the disputed redactions in one of the

9 text messages involving Kenneth Charlton.

10     THE COURT: If you show me the letter, I will read the

11 letter. I haven't had a chance to read it.

12     MS. GHOSH: I can hand it up. To be clear, we don't

13 expect this to come in before the morning break. So if your

14 Honor would rather consider it and address it at the morning

15 break, we can do that as well.

16     THE COURT: Ms. O'Neill.

17     MS. O'NEILL: Yes, your Honor. So this is from the

18 text messages from Mr. Charlton's phone to Jasmin Cejovic.

19 From our understanding, the government did not elicit any

20 information from Mr. Cejovic about the context of this text.

21 But from our understanding, Mr. Charlton was in the hospital

22 and he was trying to get Jasmin Cejovic, and probably other

23 drug dealers, to bring him drugs while he was in the hospital

24 so he wouldn't go through withdrawal. And this text is Mr.

25 Charlton saying, I'm mad at you because you wouldn't come and

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                                    May 13, 2019

1 front me drugs when I needed you to.  The way the government is
2 trying to create a ransom note out of this, it's just saying,
3 why you didn't work with me, we were doing good, like always,
4 as though they were employed together, instead of what was
5 actually meant by the text, meaning fronting me drugs.
6         Now, Mr. Charlton is going to testify about what this
7 means, what this text means, in the next few days, and it would
8 be extremely difficult for him to explain what it meant if we
9 removed any of the context of the text that is actually within
10 the text.  And the rule of completeness obviously dictates that
11 the context in which statements were made should come in in
12 order to clarify for the jury what statements mean.  Here, what
13 the government is proposing will leave the jury with confusion
14 as to what "work with me" meant.
15         THE COURT: Do you consent to striking the words or
16 redacting the words "pissing my kid off"?
17         MS. O'NEILL: Yes.
18         THE COURT: You object to "when I was sick and out
19 of the hospital"?
20         MS. O'NEILL: Yes.  Mr. Charlton again is going to
21 testify about what this meant, and there would be no way for
22 him to testify about it if he didn't give the context of him
23 being in and out of the hospital.
24         THE COURT: Since you consented, I will redact
25 "pissing my kid off."  I am not going to direct the redaction

1 of "when I was sick and out of the hospital."  That will
2 stay in the text.
3         MS. O'NEILL: Thank you, your Honor.
4         Ms. Miolan is driving in.  She is on the FDR Drive at
5 East 37th Street so it's going to be a while longer.  We will
6 just wait.
7         (Recess)
8         (Continued on next page)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1         (Jury present)
2 ANTHONY JOSEPH FRANCESE, resumed.
3         THE COURT: The record will reflect that Ms. O'Connor
4 has been excused and you are not to speculate as to why.  We
5 have replaced Ms. O'Connor and Juror No. 2 is now Maria
6 Salvador who is sitting in Juror No. 2.
7         All right.  Ms. Sideris.
8         MS. SIDERIS: Thank you, your Honor.
9         THE COURT: I want to remind the witness that he is
10 still under oath.
11 CROSS-EXAMINATION
12 BY MS. SIDERIS:
13 Q.  Good morning, Mr. Francese.
14 A.  Good morning.
15 Q.  Sir, on your direct examination last week you discussed
16   working for Medin Kosic.  Do you remember that?
17 A.  Yes.
18 Q.  You started working for Kosic towards the end of 2014, is
19   that right?
20 A.  Yes.
21 Q.  And that involved Kosic using your home as a pick-up spot
22   for his customers, right?
23 A.  Well, not my home, you know, outside my home.
24 Q.  He would leave his heroin with you?
25 A.  Yes.

1 Q.  And customers would come to pick up his heroin from you?
2 A.  Yes.
3 Q.  Kosic told you who to distribute his heroin to?
4 A.  Yes.
5 Q.  Kosic gave you phones that you were to use while having
6   conversations about distributing his heroin?
7 A.  Yes.
8 Q.  Kosic stored numbers of his customers in your phone?
9 A.  Yes.
10 Q.  By the way, you never personally saw Kosic give Paul a
11   phone, right?
12 A.  No.
13 Q.  Kosic told you to collect money from his customers?
14 A.  Yes.
15 Q.  How much each customer paid, that varied, right?
16 A.  Yes, as many as they took.
17 Q.  And not every customer paid the same amount per bundle,
18   correct?
19 A.  To my knowledge, they paid the same amount.
20 Q.  You weren't aware that some customers paid less per bundle?
21 A.  No.
22 Q.  I will get back to that.
23         Kosic did not discuss with you his business with every
24   one of his customers, correct?
25 A.  That's correct.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                          May 13, 2019

1 Q. He didn't tell you what arrangement he had set up with each
2   customer?
3 A. Only the arrangement he made with me at that time. Only
4   the arrangement for that time I would have to deal with the
5   customer. Besides that I wouldn't know.
6 Q. Sometimes a customer of Kosic's would pick up heroin from
7   you and wouldn't give you money, is that correct?
8 A. Say that again.
9 Q. Sure. There would be times when a customer of Kosic would
10   come pick up heroin and not give you any money, correct?
11 A. That's correct.
12 Q. Some of the reasons were that they had already paid Kosic
13   directly?
14 A. Yes.
15 Q. Or because Kosic was planning to collect the payment on his
16   own?
17 A. Yes.
18 Q. Or because the customer was short money the last time he
19   picked up heroin?
20 A. Well, that's not why -- I don't know that arrangement. I
21   only know what I had to do. I don't know everything that he
22   was thinking that went on.
23 Q. For example, you remember though that Paul was short a
24   couple of dollars once?
25 A. Oh, yes.

1 Q. And he paid back the couple of dollars the next time he
2   picked up?
3 A. Yes.
4 Q. Paul would usually pick up around 20 bundles of heroin at a
5   time, correct?
6 A. Yes.
7 Q. And Jasmin Cejovic, you're aware of Jasmin Cejovic, right?
8 A. Yes.
9 Q. He would usually pick up about 40 bundles of heroin at a
10   time?
11 A. Yes.
12 Q. Shaun Sullivan, you're aware that he would pick up usually
13   around 30 bundles of heroin?
14 A. Yes.
15 Q. Shaun's wife Diane, you know her, right?
16 A. Yes.
17 Q. And her heroin -- she sold heroin, right?
18 A. Yes.
19 Q. And her heroin was also from Kosic?
20 A. Yes.
21 Q. Shaun and Diane called themselves king and queeny, right?
22 A. I don't know them as that.
23 Q. You knew they called themselves that, right?
24 A. No, I didn't.
25 Q. So you would get paid by Kosic in heroin?

1 A. Heroin and cash.
2 Q. He would usually -- when he paid you in heroin, it was
3   usually three to four bundles daily?
4 A. Yes. Well, on the customers I would see, like that. If I
5   only saw one customer, I wouldn't get three bundles; I would
6   get a bundle and cash.
7 Q. At its peak, your habit was three bundles a day?
8 A. Yes.
9 Q. You talked about sometimes you took heroin from Kosic
10   without paying him, right?
11 A. Well, yes.
12 Q. Or sometimes you would keep some of the money from Kosic's
13   customers without him knowing?
14 A. No, he would know, after the fact.
15 Q. So you would take it without asking permission first,
16   right?
17 A. Well, like I said, it was -- if it was $20, if it was more
18   than $20, then I would tell him. He would argue about it.
19 Q. Sometimes he would punish you by withholding heroin when
20   that happened, right?
21 A. No. I don't know if that was what he was thinking but --
22 Q. But that would happen after you told him that you kept some
23   money, he would withhold heroin, right?
24 A. No. I don't -- maybe he wasn't coming around that day or
25   something, but I don't know if it was like getting punished or

1   something.
2 Q. Just one second.
3      Do you remember meeting with the government on this
4   case?
5 A. Yes.
6 Q. Do you remember telling them on January 29 that sometimes
7   Dino would punish you for keeping some of the money from his
8   customers?
9 A. Well, in punishing, he wouldn't come around, you know what
10   I mean. I don't know. I was thinking he was punishing me in
11   that way, by not coming around.
12 Q. Punishment because he knew that if you didn't have heroin,
13   you would get sick, right?
14 A. Yeah, but I would just call someone else to get it.
15 Q. He knew you were an addict, correct?
16 A. Correct.
17 Q. And that you needed heroin?
18 A. Yes.
19 Q. If you didn't have heroin, you would get sick?
20 A. Yes. But, you know, I didn't need him. I would just have
21   to go pay more money for it then if he didn't come. I didn't
22   see him --
23 Q. Thank you. Kosic wasn't an addict like you, right?
24 A. No.
25 Q. You knew Jasmin Cejovic wasn't an addict either, right?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                          May 13, 2019

1  A.  No.
2  Q.  And you knew that Kosic and Cejovic made a lot of money off
3   of selling heroin, right?
4  A.  Yes.
5  Q.  They showed off their money, right?
6  A.  Well --
7  Q.  They partied?
8  A.  I don't know if they showed off.
9  Q.  Well, they partied?  They talked about partying, right?
10  A.  What do you mean by partying?
11  Q.  They went to clubs, they took out girls?
12  A.  Yes.
13  Q.  They bought expensive clothes?
14  A.  Yes.
15  Q.  Expensive jewelry?
16  A.  Yes.
17  Q.  You never knew if any of Kosic's heroin had fentanyl,
18   right?
19  A.  No.
20  Q.  You never discussed fentanyl with Kosic?
21  A.  No.  I told him one time I wasn't feeling right from it.
22  Q.  He never told you that his heroin had fentanyl?
23  A.  No.
24  Q.  You never OD'd from Kosic's heroin?
25  A.  No.

1  Q.  You were aware that some people complained about his heroin
2   being weak, right?
3  A.  Yes.  Sometimes.
4  Q.  Sometimes it was weak?
5  A.  Yes.
6  Q.  Mr. Francese, you're testifying today pursuant to a
7   cooperation agreement that you signed and entered into with the
8   government, right?
9  A.  Yes.
10  Q.  For what you pled guilty, you understand that you face a
11   mandatory minimum of ten years, right?
12  A.  Yes.
13  Q.  You're testifying in hopes that you receive a letter from
14   the government when it's time for you to be sentenced?
15  A.  Yes.
16  Q.  And with this letter, you have the chance, the opportunity,
17   to receive no jail time, right?
18  A.  Well, for the minimum, the minimum would be taken away,
19   that's what I am hoping for.
20  Q.  So the new minimum is zero years, right?
21  A.  Yes.
22  Q.  You're not in jail right now, is that correct?
23  A.  No, I'm not.
24  Q.  In fact, when you learned you were facing federal charges,
25   you turned yourself in, right?

1  A.  Yes.
2  Q.  Before you did so, you did some heroin, right?
3  A.  Yes.
4  Q.  Because you were scared?
5  A.  Yes.
6  Q.  Scared of prison, right?
7  A.  Scared of prison?
8  Q.  Yeah.  You were scared of going to prison?
9  A.  I didn't know I was going to prison when I turned myself
10   in.
11  Q.  Well, you knew that you were facing --
12  A.  I didn't know what I was facing.
13  Q.  You turned yourself in because you knew that you were
14   indicted on federal charges, right?
15  A.  Yes.
16  Q.  And you were ultimately released by a judge, right?
17  A.  Yes.
18  Q.  On bond?
19  A.  Yes.
20  Q.  So you did not have to stay in jail up until your sentence,
21   that's correct, right?
22  A.  That's correct.  But I had to go into a drug program
23   immediately and I still am in a drug program.
24  Q.  Good for you.
25        One of the reasons that you asked to stay out of jail

1   is also because you don't have much of a criminal record, is
2   that true?
3  A.  No.
4  Q.  That's correct you don't have a criminal record?
5  A.  It's correct.
6  Q.  You have no prior felony convictions?
7  A.  No.
8  Q.  So as you sit here today, you have never done any jail
9   time, right?
10  A.  I did one time 30 days in Rikers Island.
11  Q.  You have never been in federal prison?
12  A.  No.
13  Q.  So for pleading guilty in this case, you're facing a
14   mandatory minimum of ten years?
15  A.  Yes.
16  Q.  For conspiracy to distribute heroin and fentanyl, right?
17  A.  Yes.
18  Q.  So with the letter from the government that you're hoping
19   for, you have the possibility of no jail time?
20  A.  Yes.
21  Q.  And that's not a possibility without the letter, right?
22  A.  Yes.  That's correct.
23        MS. SIDERIS: One moment.
24        Thank you, Mr. Francese.  No more questions, your
25   Honor.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                    May 13, 2019

1    THE COURT: Ms. O'Neill.
2    MS. O'NEILL: We have no questions.
3    THE COURT: Ms. Ghosh.
4    (Continued on next page)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  A. I don't recall. 30? It would definitely never be more
2    than that.
3  Q. So 20 to 30 bundles a day?
4  A. Yes.
5  Q. And the other people who picked up, they were also in a
6    similar range?
7  A. It all varied.
8        MS. SIDERIS: Objection.
9  A. They had different numbers.
10  Q. And we discussed those last week?
11  A. Yes.
12  Q. The people who picked up Dino's heroin from you weren't
13    picking UP one or two bundles at a time, correct?
14  A. No, that's correct.
15  Q. And you were asked about Paul owing Dino a couple of
16    dollars at some point and so the price -- the amount he was
17    paying for the heroin changed. How much was it that Paul owed
18    to Dino in your understanding?
19  A. I don't recall. It was never too much.
20  Q. Was it several hundred dollars?
21  A. Oh, I don't know that much. I don't know. But I know a
22    couple hundred dollars here and there, you know what I mean?
23  Q. Okay. You were also asked a few questions about whether
24    there were ever complaints about the heroin being weak. Do you
25    recall those questions?

1    REDIRECT EXAMINATION
2    BY MS. GHOSH:
3  Q. Good morning, Mr. Francese.
4  A. Good morning.
5  Q. You were asked some questions on cross-examination about
6    your role when working for Dino. Do you recall those
7    questions?
8  A. Yes.
9  Q. Mr. Francese, did you ever package heroin for Dino?
10  A. We did it once.
11  Q. Did you often package heroin for Dino?
12  A. No.
13  Q. Did you help get Dino customers?
14  A. No.
15  Q. Did you drive other members of the conspiracy around to
16    pick up or sell heroin?
17  A. No.
18  Q. And you were also asked some questions about the customers
19    who picked up. Are you referring to anyone who picked up from
20    you as a customer of Dino?
21  A. Yes.
22  Q. And the amounts that people picked up, how much did -- did
23    Paul Van Manen pick up on a typical day?
24  A. He averaged like 22 a day, sometimes it would be more.
25  Q. What was the most he picked up?

1  A. Yes.
2  Q. Is it fair to say that the strength of heroin changed over
3    time, it fluctuated?
4  A. Yes, it fluctuated.
5  Q. Sometimes it was strong?
6  A. Yes.
7  Q. Sometimes it was weaker?
8  A. Yes.
9  Q. That's just how heroin is?
10  A. That's how, yeah, that's how it usually goes.
11  Q. And you were also asked some questions about facing the
12    possibilities of no jail time. Mr. Francese, what is your
13    understanding of what you need to do in order to even have the
14    opportunity to face no jail time?
15  A. I need to tell the truth.
16        MS. GHOSH: Thank you.
17        THE COURT: You are excused.
18        THE WITNESS: Thank you.
19        (Witness excused)
20        THE COURT: Government call the next witness.
21        MR. FINKEL: Your Honor, the United States calls Derek
22    Yung.
23    DEREK YUNG,
24        called as a witness by the government,
25        having been duly sworn, testified as follows:

j5d2van2          Yung - Direct          Page 930

1      THE COURT: Please sit down, Mr. Yung. Pull yourself
2   right up to the microphone.
3   DIRECT EXAMINATION
4   BY MR. FINKEL:
5   Q. Good morning, Mr. Yung --
6      THE COURT: Go ahead, Mr. Finkel.
7      MR. FINKEL: Thank you, your Honor.
8   DIRECT EXAMINATION
9   BY MR. FINKEL:
10  Q. Good morning, Mr. Yung.
11  A. Good morning.
12  Q. Where do you reside?
13  A. Staten Island, New York.
14  Q. What neighborhood in Staten Island?
15  A. Oakwood Heights.
16  Q. What's the furthest level of education you have received?
17  A. College.
18  Q. What did you study in college?
19  A. Accounting.
20  Q. Where did you go to high school?
21  A. Monsignor Farrell High School.
22  Q. Where is Monsignor Farrell High School located?
23  A. On Amboy Road.
24  Q. In what borough?
25  A. Staten Island.

j5d2van2          Yung - Direct          Page 931

1   Q. What neighborhood in Staten Island is Monsignor Farrell
2     located in?
3   A. Oakwood Heights, my neighborhood, a block away from where I
4     reside.
5      MR. FINKEL: Mr. Coleman, if we can display for the
6     witness what has been marked for identification as Government
7     Exhibit 408.
8   BY MR. FINKEL:
9   Q. Mr. Yung, what is Government Exhibit 408?
10  A. Repeat.
11  Q. What is the image you are looking at on the screen,
12    Government Exhibit 408?
13  A. A pinpoint of Monsignor Farrell High School.
14  Q. Is that a fair and accurate representation of where
15    Monsignor Farrell is located?
16  A. I believe so.
17     MR. FINKEL: Your Honor, the government offers 408.
18     MS. O'NEILL: No objection.
19     MR. QUIJANO: No objection.
20     THE COURT: 408 is in evidence.
21     (Government's Exhibit 408 received in evidence)
22     MR. FINKEL: If we can publish it.
23  BY MR. FINKEL:
24  Q. Mr. Yung, am I correct that that red pin is where Monsignor
25    Farrell is located?

j5d2van2          Yung - Direct          Page 932

1   A. Yes, sir.
2   Q. That's where you went to high school?
3   A. Yes, sir.
4      MR. FINKEL: Mr. Coleman, if we can display for the
5     witness what's been marked for identification as Government
6     Exhibit 409.
7   BY MR. FINKEL:
8   Q. Do you recognize that?
9   A. It's a closer pinpoint of the high school, yes.
10  Q. The Monsignor Farrell High School?
11  A. Yes.
12     MR. FINKEL: Your Honor, the government offers 409.
13     MR. QUIJANO: No objection.
14     MS. O'NEILL: No objection.
15     THE COURT: 409 is in evidence.
16     (Government's Exhibit 409 received in evidence)
17     MR. FINKEL: If we can publish it, Mr. Coleman.
18  BY MR. FINKEL:
19  Q. Mr. Yung, am I correct that that pinpoint is Monsignor
20    Farrell?
21  A. Yes, sir.
22  Q. To the left, it says Wolverine Street. Do you see that?
23  A. Yes, sir.
24  Q. What do you know about Wolverine Street?
25  A. I reside on that block.

j5d2van2          Yung - Direct          Page 933

1      MR. FINKEL: We can take that down, Mr. Coleman.
2   BY MR. FINKEL:
3   Q. Just to be clear, Mr. Yung, you grew up in Staten Island,
4     is that right?
5   A. Yes.
6   Q. Did you receive a subpoena in this case?
7   A. Yes, sir.
8   Q. Is that from the government?
9   A. Yes.
10  Q. After you received the subpoena, did you go to court?
11  A. Yes, sir.
12  Q. Did you have a lawyer appointed to you?
13  A. Yes, sir.
14  Q. Do you remember approximately when that was?
15  A. April.
16  Q. After you had a lawyer appointed to you, did you and your
17    attorney meet with attorneys from the government?
18  A. Yes, sir.
19  Q. Approximately how many meetings do you think you had?
20  A. I think five.
21  Q. During those meetings, did you disclose prior crimes that
22    you had committed?
23  A. Yes.
24  Q. What were they?
25  A. Possession and selling of narcotics, retail theft.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                          May 13, 2019

1 Q. By retail theft, you mean shoplifting?
2 A. Yes, sir.
3 Q. What are the kind of items you shoplifted?
4 A. Minuscule items, I would say less than $50.
5 Q. And you have also been arrested in the past?
6 A. Yes, sir.
7 Q. What have your arrests been for?
8 A. Possession of narcotics and one DUI.
9 Q. As a result of the meetings that you had with the
10 government, did there come a time, if ever, when you entered
11 into an agreement with the government?
12 A. Yes, sir.
13      MR. FINKEL: Mr. Coleman, if we can display for the
14 witness what's been marked for identification as Government
15 Exhibit 1005. If you can just slowly flip through it so
16 Mr. Yung can see what that document is.
17 BY MR. FINKEL:
18 Q. Mr. Yung, do you recognize what's been marked as 1005?
19 A. Yes, sir.
20 Q. What is it?
21 A. I believe it's a nonprosecution agreement.
22 Q. Nonprosecution agreement that you signed?
23 A. Yes. I see my signature.
24      MR. FINKEL: Your Honor, the government offers 1005.
25      MR. QUIJANO: No objection.

1      MS. O'NEILL: No objection.
2      THE COURT: 1005 is in evidence.
3      (Government's Exhibit 1005 received in evidence)
4      MR. FINKEL: Go back to the first page, please, and if
5 you can publish it.
6 Q. Mr. Yung what is your understanding of the nonprosecution
7 agreement that you have entered into with the government?
8 A. That whatever I said to the government, they will not
9 prosecute me for.
10 Q. And in exchange, what are you required to do?
11 A. To cooperate fully, testify, attend all meetings with the
12 government, and not commit any crimes.
13 Q. When you testify and when you meet with the government,
14 what obligation do you have with respect to your candor?
15 A. Can you say that differently?
16 Q. Sure. Are you required to be truth when you testify?
17 A. Yes.
18 Q. Are you required to be truthful when you meet with the
19 government?
20 A. Yes.
21 Q. Is it your understanding if you are not truthful that you
22 can be charged with a separate crime of perjury?
23 A. Yes, sir.
24 Q. And if you are not truthful what happens to your
25 nonprosecution agreement?

1 A. I believe it gets ripped up and it is null and void.
2 Q. Could you then be charged for the crimes?
3 A. I could.
4 Q. Specifically what crimes has the government promised it
5 won't prosecute you for?
6 A. Possession and sale of heroin, sale of OxyContin --
7 oxycodone, I'm sorry, sale and distribution of Xanax, and
8 possession of personal use of all of the drugs that I have used
9 in my life.
10      MR. FINKEL: Mr. Coleman, we can take that down.
11 BY MR. FINKEL:
12 Q. Mr. Yung, have you ever used heroin?
13 A. Yes.
14 Q. When approximately was the first time that you used heroin?
15 A. I believe around 2013.
16 Q. When was the last time you used heroin?
17 A. Around the time of Mr. Van Manen's incarceration.
18 Q. You are clean now?
19 A. Yes.
20 Q. How long have you been clean for approximately?
21 A. I have been clean from heroin for since about the
22 incarceration, so January, I believe January of '18.
23 Q. What treatments are you undergoing, if any, to help you
24 stay clean?
25 A. Intensive outpatient methadone maintenance treatment

1 program.
2 Q. What is methadone?
3 A. It's a substitute to get off heroin or any other
4 opiate-based narcotics.
5 Q. Does methadone affect your memory?
6 A. No.
7 Q. Does it affect your ability to perceive events?
8 A. I would say so.
9 Q. How would you describe your memory overall?
10 A. Not great. I have done a lot of drugs through the years, a
11 lot of Xanax.
12 Q. Okay. We will get there.
13      Are you on any other medication right now?
14 A. Yes.
15 Q. What medication is that?
16 A. Clonazepam.
17 Q. Does that affect your memory?
18 A. It could, if abused.
19 Q. Did you take the @clonazepam or you were prescribed
20 clonazepam?
21 A. Prescribed.
22 Q. Have you taken clonazepam today?
23 A. No, sir.
24 Q. Have you taken clonazepam within the past week?
25 A. No, sir.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

1 Q. And you are not on clonazepam right now?
2 A. Correct.
3 Q. Just methadone.
4 A. Yes.
5 Q. I think you touched on this before, but just to be clear,
6   where do you get your methadone from?
7 A. Beth Israel Mt. Sinai.
8 Q. And what is at Beth Israel Mt. Sinai?  Is that like a
9   methadone clinic?
10 A. Yes, sir.
11 Q. Why do you -- how often do you go to the clinic to receive
12   your methadone?
13 A. In the beginning, six days a week, Monday through Saturday.
14   Now I go Monday, Wednesday, Friday, only three days.
15 Q. Why do you need to go to the clinic to obtain methadone?
16   Why doesn't the clinic just give you a year-long supply of
17   methadone?
18 A. Because of people's background of abuse, they want the
19   nurses to dispense it at the window so that it will not be
20   abused.  But if I am going from six days to three days from
21   good behavior and clean urines, they give take-homes based on
22   the reports.
23 Q. What do you mean by clean urine?
24 A. Negative urines for negative narcotics.
25 Q. You are drug tested when you go to the clinic?

1 A. Yes, sir.
2 Q. Based on your own personal experience at this methadone
3   clinic, who are some of the kinds of people who also go to the
4   methadone clinic?
5       MR. QUIJANO: Objection.
6       THE COURT: Overruled.
7 Q. You can answer, Mr. Yung.
8 A. Addicts, people like me, trying to get better in recovery,
9   and opiate addicts.
10 Q. Is staying clean easy?
11 A. Absolutely not.
12 Q. The subpoena that you received that we talked about before,
13   did it relate to requiring your testimony at the trial of Paul
14   Van Manen?
15 A. Yes, sir.
16 Q. At a very high level, very generally, can you describe
17   how -- well, do you know Mr. Van Manen?
18 A. Yes.
19 Q. At a very high level, very generally, can you describe what
20   your relationship is with Mr. Van Manen?
21 A. He was my heroin dealer.
22 Q. Do you see Mr. Van Manen here today?
23 A. Yes.
24 Q. Can you point him out and describe an article of his
25   clothing?

1 A. He is wearing a suit and tie, third in the row, in the
2   second row.
3       MR. FINKEL: Your Honor, if the record could reflect
4   that Mr. Yung has identified the defendant Paul Van Manen.
5       THE COURT: Yes.
6       MR. FINKEL: Thank you, your Honor.
7 BY MR. FINKEL:
8 Q. Mr. Yung, do you know who Kenneth Charlton is?
9 A. No.
10 Q. When you used heroin, how did you acquire your heroin?
11 A. Sometimes I would get it through friends.  We call that
12   middlemanning.  And other times I would get it from the dealer.
13 Q. What do you mean by "middlemanning"?  If I can ask you just
14   to talk a little bit into the mic a little closer.
15 A. Middlemanning, so I -- a friend goes to the dealer, that I
16   give the money -- I give the money to the friend.  He goes to
17   the dealer with the money, gets the drugs for himself and for
18   me and comes back with the drugs and divides the drugs up with
19   me and vice versa.
20 Q. When did you first meet Mr. Van Manen?  What year?
21 A. I believe around 2014.
22 Q. How did you meet him?
23 A. Through a mutual friend.
24 Q. Where did you meet Mr. Van Manen that first time you met
25   him?

1 A. On a side street somewhere in the North Shore of Staten
2   Island.
3 Q. Did you meet him inside a building or on the street?  Where
4   exactly did you meet him?
5 A. In the middle of a street in a car.
6 Q. In your car?
7 A. No.
8 Q. In Mr. Van Manen's car?
9 A. I don't know whose car it was.
10 Q. Who was driving?
11 A. I don't recall, but I know Mr. Van Manen was in the car
12   because that's how I met him.
13 Q. What kind of car was it?
14 A. I don't recall.
15 Q. What was the purpose of that first time you met
16   Mr. Van Manen?
17 A. To meet with him directly and exchange phone numbers so
18   that I wouldn't have to keep going through the mutual friend.
19 Q. And did you exchange phone numbers --
20 A. Yes.
21 Q. -- with Mr. Van Manen?
22 A. Yes, sir.
23 Q. What phone number did you call when you wanted to call
24   Mr. Van Manen?
25 A. I don't know the phone number.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

1 Q. Did he always have the same phone number?
2 A. No. He changed them.
3 Q. How many times approximately have you spoken with
4 Mr. Van Manen?
5 A. Couple hundred.
6 Q. Are you familiar with his voice?
7 A. Yes.
8 Q. Just to be clear, Mr. Yung, why did you exchange phone
9 numbers with Mr. Van Manen?
10 A. With the intent on procuring or buying heroin for personal
11 use.
12 Q. Approximately how many times did you purchase heroin from
13 Mr. Van Manen?
14 A. Through the years, I would have to say a couple hundred.
15 Q. What was the typical amount of heroin that you purchased
16 from Mr. Van Manen?
17 A. My typical amount would be one bundle, which would be ten
18 glassine bags, individual bags.
19 Q. How much did Mr. Van Manen charge you for one bundle of
20 heroin?
21 A. 80 at first, but then we became more acquainted and he saw
22 that I was buying with regularity, so he lowered it to 70 a
23 bundle.
24 Q. Based on your experience purchasing heroin, was $80
25 expensive for a bundle?

1 A. Yes, I considered it expensive.
2 Q. You were aware of cheaper prices for a bundle?
3 A. Yes.
4 Q. What did Mr. Van Manen's bundles look like?
5 A. Typically white glassine bags folded in half with a rubber
6 band to keep it together.
7 Q. What do you mean folded in half?
8 A. All the ten bags would be together, folded one time, and
9 procured -- and secured with the rubber band, a small rubber
10 band.
11 Q. Did they have any stamps on them?
12 A. No stamps.
13 Q. Have you seen that when you would purchase heroin from
14 other people where sometimes bundles would have stamps on them?
15 A. I saw stamps before, yes.
16 Q. Sometimes when you purchased a bundle of heroin, were the
17 bags rolled?
18 A. Yes, sometimes.
19 Q. What does that mean that the bags were rolled?
20 A. Instead of folding them in half, they would roll them as
21 tight as they could and then put it in the rubber band for, I
22 guess, extra concealment, to make it smaller.
23 Q. And that's when you would purchase heroin from other
24 dealers other than Mr. Van Manen, is that right?
25 A. Other dealers or from friends that got from other dealers,

1 correct.
2 Q. When you purchased heroin from Mr. Van Manen, did you
3 primarily buy for personal use or to resell?
4 A. Primarily for personal use.
5 Q. Did you ever buy heroin from Mr. Van Manen in order to
6 resell it?
7 A. Yes.
8 Q. Or redistribute it?
9 A. I don't understand the difference.
10 Q. Did you also buy heroin from Mr. Van Manen to redistribute
11 it even if you were weren't selling it for a profit? Did that
12 happen?
13 A. You mean for no profit?
14 Q. Correct.
15 A. Oh, yes, I did that at times.
16 Q. Have you ever sold heroin to Mr. Van Manen?
17 A. No.
18       MR. FINKEL: If we could put up for the witness what's
19 been marked for identification as Government Exhibit 301EI, and
20 I will represent that this is a text message between the phone
21 number ending in 8865 and a phone number ending in 4208.
22 A. Yes.
23 Q. Mr. Yung, do you recall having this text conversation with
24 Mr. Van Manen?
25 A. Not until it was shown -- I didn't recall it until it was

1 shown to me.
2 Q. Do you recall it now?
3 A. Yes.
4       MR. FINKEL: Your Honor, the government offers 301EI.
5       MR. QUIJANO: No objection.
6       MS. O'NEILL: No objection.
7       THE COURT: 308EI is in evidence.
8       (Government's Exhibit 301EI received in evidence)
9       MR. FINKEL: If we can publish it, please.
10 Q. Mr. Yung, the 4208 number, that's you, right?
11 A. Yes, sir.
12 Q. Do you have an understanding who the 8865 number is?
13 A. I believe Mr. Van Manen.
14 Q. So I am just going to read the first four texts from
15 October 5, 2017, around 1742 and 1743. You said: "Shit's been
16 weak lately. I can get grams for 90 fire. Would you be
17 interested? Gram is like 2.5, 3 buns. And if you cut it, at
18 least a brick, 'cause it's way strong. I'm going to get it for
19 myself. I'll show it to you."
20       Mr. Yung, what did you mean? What were you telling
21 Mr. Van Manen in those text messages?
22 A. That someone in my circle of friends that were heroin
23 addicts, they would always tell me what they could get, prices,
24 the quality, and stuff of that nature, and I was telling him
25 that his product was weak lately, the heroin was weak, and that

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                                          May 13, 2019

1  I could get him a gram of heroin for $90. Fire would mean that
2  it would be strong.
3  Q. Why were you telling him that you can get a gram of heroin
4  that was fire? Why were you telling Mr. Van Manen that you
5  could get a gram of heroin that was fire?
6  A. Just mentioning it, seeing if -- I said would you be
7  interested? Never came to fruition, though.
8  Q. Right, but why were you offering this to Mr. Van Manen?
9  What was your purpose in doing that?
10 A. Oh, to maybe -- 'cause he was getting -- 'cause his product
11 was weak and I was saying maybe I could give him a stronger
12 product and for him to resell.
13 Q. In the third text message you use the word "a brick." Do
14 you see that?
15 A. Yes.
16 Q. What does that mean, a brick?
17 A. A brick is a street term for five bundles or 50 glassine
18 bags.
19 Q. And then below the four text messages you sent am I correct
20 that Mr. Van Manen responded "yeah, show it to me so you don't
21 need."?
22 A. Okay.
23 Q. What did you understand Mr. Van Manen to be asking in that
24 text message when he wrote "yeah, show it to me, so you don't
25 need?"

1  A. He said, yeah, so get it and when you get it, show it to
2  me, and then the second part, "so you don't need" was saying,
3  so you don't need from me today, you don't need heroin from me
4  today? He was asking. And I said "I do."
5  Q. What did you mean when you said "I do"?
6  A. I need to meet you for heroin.
7  Q. And why did you need to meet Mr. Van Manen if you had
8  access to the grams that were fire?
9  A. I personally didn't have the access, but like I said
10 previously, someone in my friends of addicts said they could,
11 and I took his word for it.
12 Q. Why were you suggesting to Mr. Van Manen that you had
13 access to the grams that were fire? What was your intent in
14 doing that?
15 A. Intent? To get stronger heroin for myself along with maybe
16 make some money and help out Paul at the same time.
17 Q. Did that come to pass? Did it come to pass where you
18 provided Mr. Van Manen the grams that were fire?
19 A. No, it never came to fruition. I never sold him heroin.
20 Q. If we can continue down in the text message at 1807, from
21 the 4208 number, your number, you say "tell you, man, it's been
22 weak." What did that mean?
23 A. To tell his higher-up, whoever he was getting it from, that
24 the heroin was lower than usual, the quality was lower than
25 norm.

1  Q. And then below that he responds "K," and then after that am
2  I correct that you respond "not complaining, just tell him to
3  step it up." Do you see that?
4  A. Yes.
5  Q. What did you mean "not complaining, just tell him to step
6  it up"?
7  A. I said "not complaining" to not be disrespectful, because I
8  didn't want him to cut me off because he was still my primary
9  dealer that I would meet a lot, and "just tell him to step it
10 up" was just to tell your connect or your dealer to do better
11 with the quality of heroin.
12 Q. You wrote "not complaining." What do you believe would
13 have happened if Mr. Van Manen thought that you were
14 complaining?
15 A. He might have took it as disrespect or as complaining of
16 his product and that I wouldn't want it and maybe he would have
17 cut me off.
18 Q. What does that mean to get cut off?
19 A. Delete my number, block my number, not continue to serve
20 me, and then I would be hung out to dry with no heroin with an
21 addiction.
22 Q. Why would it have been a problem if Mr. Van Manen around
23 that time in October of 2017 cut you off from selling heroin to
24 you?
25 A. Because I was actively using it at the time.

1        MR. FINKEL: If we can go to the next page,
2  Mr. Coleman.
3  BY MR. FINKEL:
4  Q. Working through the rest of these text messages, at 1808
5  you texted "you grab yet?" What did you understand that to
6  mean?
7  A. That is coming from me, asking do you have the heroin on --
8  did you get the heroin.
9  Q. And then below that Mr. Van Manen responds "only to you."
10 What does that mean?
11 A. I'm not quite sure.
12 Q. And then below that you respond?
13 A. "Imma be at Vincent Coverly." What does that mean?
14 A. I was telling him the street corners I was on.
15 Q. And then he responds, "I'm waiting. Should be soon." What
16 did you understand that to mean.
17 A. For face value.
18 Q. Did you have an understanding of who Mr. Van Manen was
19 waiting for?
20 A. Not for a fact.
21 Q. Okay. And then below that you said "KK I'm here waiting,"
22 at 1808?
23 A. Yes.
24 Q. Do you see that?
25 A. Yes.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                                                    May 13, 2019

| j5d2van2 | Yung - Direct | Page 950 |

1 Q. Where were you waiting?
2 A. By Vincent and Coverly.
3 Q. And why were you waiting?
4 A. To meet him, to buy heroin.
5      MR. FINKEL: At this time, your Honor, if we could
6 pass out some transcript packets to the jury.
7      THE COURT: Yes.
8      MR. FINKEL: Your Honor, actually we don't have a
9 transcript for this next one. This is a call between those two
10 numbers 4208 and 8865, on October 5, 2017, at 2015. It's
11 marked for identification as Government Exhibit 301EJ. Your
12 Honor, the government offers GX 301EJ.
13      MR. QUIJANO: No objection.
14      MS. O'NEILL: No objection.
15      THE COURT: It is in evidence.
16      (Government's Exhibit 301EJ received in evidence)
17      MR. FINKEL: If we can play, and just so the members
18 of the jury understand, we don't have a transcript for this
19 one, this is GX 301EJ.
20      (Audio played)
21      MR. FINKEL: Stop right there, please.
22 BY MR. FINKEL:
23 Q. Mr. Yung, did you recognize the voice that said "I'm
24 heading to Chuck E. Cheese"?
25 A. Can you replay it? Because it's the first time I'm hearing

| j5d2van2 | Yung - Direct | Page 951 |

1 this.
2 Q. Sure.
3      (Audio played)
4      MR. FINKEL: Let's pause it right there.
5 BY MR. FINKEL:
6 Q. Mr. Yung, what is that call about?
7 A. Logistics of where we could meet in the middle to meet so
8 that I could buy heroin.
9 Q. And who is the "we" you are referring to?
10 A. Me and Mr. Paul Van Manen.
11 Q. And that call is from October 5, 2017. You would agree
12 that is the same date as the text messages we just looked at?
13 A. I suppose, yes.
14 Q. Mr. Yung, where are some of the places that you would meet
15 Mr. Van Manen to purchase heroin from him?
16 A. He would deliver -- he or others would deliver it to my
17 block, my house. Pretty much anywhere on Staten Island he
18 would deliver it to. I would also go to his residences. So he
19 stayed at motels sometimes, and there was a motel in Jersey
20 that I saw him at a few times.
21      MR. FINKEL: If I could direct the jury's attention to
22 what should be the first transcript in their packet, this is
23 301QT. This is a call from October 10, 2017 at 1659 and it is
24 between the numbers ending in 8865 and 4208, and this is in
25 evidence.

| j5d2van2 | Yung - Direct | Page 952 |

1      Mr. Coleman, if you could play 301Q.
2      (Audio played)
3      MR. FINKEL: Stop right there, please.
4 BY MR. FINKEL:
5 Q. Mr. Yung, did you recognize the voice that said hello?
6 A. Yes.
7 Q. Whose voice was that?
8 A. Mr. Paul Van Manen.
9 Q. And did you recognize the voice that said "you're good"?
10 A. My voice.
11 Q. Your voice. What did you mean when you say "you're good"?
12 A. Do you have heroin?
13 Q. Why didn't you just say: Do you have heroin?
14 A. For law -- for -- barrier for law enforcement not to say it
15 at face value.
16      MR. FINKEL: Okay. We can keep playing.
17      (Audio played)
18 BY MR. FINKEL:
19 Q. Mr. Yung, what did you mean when you said "the usual spot"
20 to Mr. Van Manen?
21 A. I meant where I have met him previously.
22 Q. And is that Chase Bank?
23 A. Chase Bank, correct.
24 Q. Is there any reason why you would meet Mr. Van Manen near
25 Chase Bank?

| j5d2van2 | Yung - Direct | Page 953 |

1 A. Because when I would take the express bus home, it would be
2 across the street from the stop I get off at as well as needing
3 to use the ATM to get money to buy the heroin.
4      MR. FINKEL: All right. If the members of the jury
5 and the court can turn to what should be the next transcript in
6 the packet which is marked as 301R. This is a call from
7 October 10, 2017, 1758, which is about an hour later from the
8 previous call we listened to. This is, again, the calls
9 between 8865 and 4208. This is in evidence. Mr. Coleman, if
10 you can play 301R.
11      (Audio played)
12 BY MR. FINKEL:
13 Q. Mr. Yung, did you recognize the first voice on the call
14 that said "yo, what up?"
15 A. Yes.
16 Q. That was from the 8865 number who said "yo, what up?"
17 A. Mr. Paul.
18 Q. And did you recognize the voice from the 4208 number that
19 said, "Where are you? I'm inside the store."
20 A. Myself.
21 Q. This is on line 7 of your transcript. Mr. Van Manen
22 indicated "white car, back wall, all right?" What was your
23 understanding of why Mr. Van Manen was telling you white car?
24 A. To distinguish his car from the rest and to tell me where
25 he was in the parking lot so I would not be confused.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                          May 13, 2019

1  Q.  You were going to meet him in his car in the parking lot?
2  A.  Yes.
3  Q.  Was Mr. Van Manen always in a white car?
4  A.  No.
5  Q.  What color car was he usual in?
6  A.  I wouldn't say he had a usual car.  He -- I think he used
7  rentals, so he would have different multiple cars throughout
8  the years.
9          MR. FINKEL:  If I can direct the members of the jury
10  and the court to turn to the next transcript in the packet
11  which is marked 301T.  This is a call from October 17, 2017 at
12  approximately 1723, and it is between the numbers ending in
13  8865 and 4208.  This is in evidence.  Mr. Coleman.
14          (Audio played)
15          MR. FINKEL:  Stop right there.
16  BY MR. FINKEL:
17  Q.  Mr. Yung, did you recognize the voice that said "the usual
18  spot" which was from the 4208 number?
19  A.  On the seventh line?
20  Q.  The seventh line of your transcript, but I'm asking if you
21  recognize the voice that said "the usual spot," which is from
22  the 4208 number.
23  A.  Yes.
24  Q.  And whose voice is that?
25  A.  Myself.

1  Q.  And did you recognize the voice from the 8865 number that
2  said, "You got it Chasey Chase by the house or the other one?"
3  A.  Yes.
4  Q.  And whose voice was that?
5  A.  Paul.
6  Q.  What did you understand it to mean when Mr. Van Manen said
7  "Chasey Chase"?
8  A.  Chase Bank.
9  Q.  And why was he mentioning Chase Bank to your understanding?
10  A.  Because that's where we agreed to meet.
11  Q.  Meet for what purpose?
12  A.  Buy heroin.
13          MR. FINKEL:  All right.  You can just play the rest of
14  the call, Mr. Coleman.
15          (Audio played)
16          MR. FINKEL:  Mr. Coleman, if you can display what is
17  in evidence as Government Exhibit 620.
18  BY MR. FINKEL:
19  Q.  Mr. Yung, do you see the image of Government Exhibit 620 on
20  your screen?
21  A.  Yes, sir.
22  Q.  What is that?
23  A.  That is a picture of the Burger King on Hyland and Tysons,
24  and behind that bush on the left would be a fence, and to the
25  left of that fence would be the Chase Bank that I would refer

1  to.
2  Q.  Have you been to that Burger King?
3  A.  Yes.
4  Q.  Just to be clear, that Burger King is in Staten Island?
5  A.  Yes.
6          MR. FINKEL:  If the members of the jury and the
7  court -- if I can direct your attention to the next call in the
8  packet, which is 301Y, and this is a call from October 19,
9  2017, at 1933, and it is between the 8865 number and 4208.
10  Actually, before we play it, this is a call -- as I mentioned,
11  this is a call between 8865 and 4208.  This call is not in
12  evidence.  At this time, your Honor, the government offers
13  301Y.
14          MS. O'NEILL:  No objection.
15          MR. QUIJANO:  No objection.
16          THE COURT:  301Y is in evidence.
17          (Government's Exhibit 301Y received in evidence)
18          (Audio played)
19  BY MR. FINKEL:
20  Q.  Mr. Yung, do you recognize the voice from the 4208 number
21  that said, "No, I'm at Burger King"?
22  A.  Yes, myself.
23  Q.  And did you recognize the voice that said "yo, you're home,
24  right?"
25  A.  Yes.

1  Q.  Whose voice was that?
2  A.  A gentleman named Anthony.
3  Q.  Who is Anthony?
4  A.  A gentleman that lived -- I believe was living with Paul
5  for a long period of time and hung around him and pretty much
6  they were together for most of the time.
7  Q.  And on line 9 of the transcript you say "one."  Do you see
8  that?
9  A.  Yeah.
10  Q.  What did you mean by "one"?
11  A.  One bundle.  My usual purchase.
12  Q.  Just to be clear, what was the purpose of this contact
13  between you and the individual who answered the 8865 phone on
14  that occasion, Anthony?
15  A.  To buy one bundle of heroin.
16  Q.  I think you mentioned this a bit before.  Was there ever an
17  occasion in which you traveled to Mr. Van Manen to pick up
18  heroin?
19  A.  Repeat.  I'm sorry.
20  Q.  Were there ever occasions in which you traveled somewhere
21  to pick up heroin from Mr. Van Manen?
22  A.  Yeah.
23  Q.  I think you mentioned this before, but where are some of
24  the places you traveled to meet Mr. Van Manen?
25  A.  I would meet him on side streets in Staten Island.  I would

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

1  meet him at motels. He had --

2  Q. Where are some of the motels located?

3  A. He stayed at multiple hotel motels on Staten Island and one

4  hotel in, I believe, Port Richmond, New Jersey. Or Perth --

5  I'm sorry, Perth Amboy, New Jersey.

6  Q. And you traveled to the hotel in Perth Amboy?

7  A. Yes.

8  Q. How did you travel to the hotel in Perth Amboy?

9  A. I would drive.

10  Q. What route did you take to travel to the hotel in Perth

11  Amboy from Staten Island?

12  A. I believe I would cross the Outerbridge. It might have

13  been Goethals, but I think it is the Outerbridge.

14       MR. FINKEL: If we can display what is in evidence as

15  Government Exhibit 223.

16  BY MR. FINKEL:

17  Q. Mr. Yung, is there an image on your screen?

18  A. Yes.

19  Q. What is that image?

20  A. Image of the Circle Motor Lodge motel.

21  Q. Have you been there before?

22  A. Yes. That's where Mr. Van Manen was staying in New Jersey.

23  Q. And why did you go to the Circle Motor Lodge?

24  A. To buy heroin.

25       MR. FINKEL: We can take that down.

1  BY MR. FINKEL:

2  Q. Mr. Yung, when you ordered heroin from Mr. Van Manen, was

3  it always Mr. Van Manen who delivered it to you?

4  A. No, sir.

5  Q. Who were some of the people who would deliver it to you

6  after you spoke with Mr. Van Manen to order heroin?

7  A. There were multiple people. I know there is a kid named

8  Shaun, a woman Doreen. I think there was a girl, I think her

9  name was Patricia, for very briefly.

10       MR. FINKEL: Okay. Mr. Coleman, if we can display

11  what is in evidence as Government Exhibit 111.

12  BY MR. FINKEL:

13  Q. Do you recognize that individual in Government Exhibit 111?

14  A. Yes.

15  Q. Who is that?

16  A. Doreen.

17  Q. Is that one of the people you mentioned would sometimes

18  deliver you the heroin after you spoke with Paul?

19  A. Yes.

20       MR. FINKEL: And, Mr. Coleman, if we can display what

21  is in evidence as Government Exhibit 113.

22  Q. Do you recognize that individual, Mr. Yung?

23  A. That is the woman I was referring to as Patricia.

24  Q. And what did Patricia -- what is your understanding of

25  Patricia with respect to ordering heroin?

1  A. You mean who she was?

2  Q. Let me take a step back.

3       So this was another individual who delivered you

4  heroin after you spoke with Mr. Van Manen?

5  A. Yes, at a point in time.

6  Q. Who did Mr. Van Manen get his heroin from?

7       MR. QUIJANO: Objection.

8       THE COURT: Sustained.

9  BY MR. FINKEL:

10  Q. Did you have discussions with Mr. Van Manen about who he

11  received his heroin from?

12  A. Not directly.

13  Q. Did you have discussions with Mr. Van Manen about where --

14  the location he would obtain his heroin from?

15  A. I wouldn't ask him, but I figured it was Brooklyn.

16       MR. QUIJANO: Objection.

17  Q. Did he tell you it was Brooklyn?

18       THE COURT: Overruled.

19  A. He would say, I'm coming over the bridge, kid; or, I'm

20  going to Brooklyn to go get, I'm out; I got to go to Brooklyn,

21  I will be back in two hours; or, I am in Brooklyn, give me

22  about an hour, I got some people to see before you. Things

23  like that.

24  Q. Mr. Yung, did you ever ask -- well, you mentioned that you

25  didn't have discussions with Mr. Van Manen about from whom he

1  received his heroin. Did you ever ask him from whom he

2  received -- from whom Mr. Van Manen received his heroin?

3  A. I didn't ask, but I heard a name in passing.

4  Q. Okay. Why didn't you ask Mr. Van Manen from whom did he

5  receive his heroin?

6       MR. QUIJANO: Objection.

7       THE COURT: Overruled.

8  A. Repeat the question.

9  Q. Why did you not ask Mr. Van Manen who he was receiving the

10  heroin he got from?

11  A. Because I didn't really want to know, and usually that is

12  disrespectful to ask for someone else's dealer because then

13  usually you don't use the person, you like leapfrog and use the

14  other person, the person higher up. And I had no interest in

15  that. I had no interest in buying amounts like that.

16  Q. What do you mean "buying amounts like that"?

17  A. Large quantities of heroin, multiple bundles.

18  Q. Why would it be disrespectful to ask Mr. Van Manen from

19  whom he was buying the large quantities of heroin from?

20       MR. QUIJANO: Objection.

21       THE COURT: Sustained.

22  Q. Why would it be disrespectful to ask Mr. Van Manen from

23  whom he was buying heroin from?

24       MR. QUIJANO: Objection.

25       THE COURT: Sustained.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                                    **May 13, 2019**

1      MR. FINKEL: If we could -- if I could direct the jury
2   and the court's attention to the next transcript in the
3   packet, which is 301O, and this is a call from October 15,
4   2017, at 2229.  This is between the 8865 number and the 4208
5   number.
6      (Audio played)
7      MR. FINKEL: Stop right there.
8   BY MR. FINKEL:
9   Q.  Mr. Yung, do you recognize the voices on that call?
10  A.  Yes, sir.
11  Q.  And whose voices are they?
12  A.  Doreen and I.
13  Q.  Doreen and who?
14  A.  Myself, I.
15  Q.  Thank you.
16      What did you understand it to mean when Doreen said
17  "No, in Jersey"?
18  A.  She is not on Staten Island.  She is in New Jersey at the
19  hotel.
20  Q.  And why did you ask, "So you're done?"
21  A.  Asking if they were done delivering or serving heroin for
22  the day, for the night.
23  Q.  And what did you understand it to mean when Doreen said,
24  "No, we have somebody on the island running around for him"?
25  A.  That there was someone on Staten Island delivering the

1   heroin for Paul.
2      MR. FINKEL: We can take that down.
3   Q.  We talked a bit about Brooklyn before.  Do you remember
4   that?
5   A.  Yes.
6   Q.  Was there ever an occasion when you traveled to Brooklyn
7   with respect to heroin?
8   A.  Yes, one occasion.
9   Q.  Why did you travel to Brooklyn with respect to heroin?
10  A.  Because a gentleman -- the gentleman named Anthony asked me
11  to give him a ride, and he would pay me in drugs.  I believe
12  that was at a time when Mr. Van Manen was incarcerated.
13  Q.  Why did -- did you agree to give Anthony a ride to
14  Brooklyn?
15  A.  Eventually, yes.
16  Q.  Do you recall where you traveled to in Brooklyn?
17  A.  Across the Verrazzano Bridge, we took the Belt Parkway, not
18  the BQE, and we got off in exit -- I don't know the specific
19  exit.
20  Q.  What happened when you got to the location in Brooklyn that
21  you were traveling to with Anthony?
22  A.  He -- somebody came into the car.  He met with the person.
23  Q.  Do you know who the person was who came into the car when
24  you got to Brooklyn?
25  A.  No.  I tried to not -- I tried to look like by my driver's

1   side window, because I'm pretty sure he didn't want me to know
2   who he was and vice versa, I didn't want him to know who I was
3   either.
4   Q.  Do you have an understanding of what happened when that
5   individual got into the car that you were driving with Anthony?
6   A.  I had an understanding that he was buying -- getting
7   heroin.
8   Q.  Who was getting heroin?
9   A.  Anthony.
10  Q.  From the individual who got in the car?
11  A.  Yes.
12  Q.  How did you feel in that moment when you were in Brooklyn
13  driving the car while Anthony was getting heroin from this
14  individual?
15      MR. QUIJANO: Objection.
16      THE COURT: Sustained.
17  Q.  Did you ever do this sort of thing again, drive through
18  Brooklyn to pick up heroin with Anthony?
19  A.  No.
20  Q.  Why not?
21      MR. QUIJANO: Objection.
22      THE COURT: Overruled.
23  A.  It was just a one-time deal, and I was desperate for heroin
24  that day and that that was the only way I could get it.
25      MR. FINKEL: We can display for the witness what's

1   been marked for identification as Government Exhibit 110.
2   BY MR. FINKEL:
3   Q.  Do you see an image on your screen, sir?
4   A.  Yes, sir.
5   Q.  Do you recognize the individual in 110?
6   A.  Yes, sir.
7   Q.  Who is that?
8   A.  Michael Ogno.
9      MR. FINKEL: Your Honor, the government offers 110.
10     MS. O'NEILL: No objection.
11     MR. QUIJANO: No objection.
12     THE COURT: 110 is in evidence.
13     (Government's Exhibit 110 received in evidence)
14     MR. FINKEL: Publish it, please.
15  BY MR. FINKEL:
16  Q.  Mr. Yung, at a very high level, can you describe your
17  relationship, if any, with Michael Ogno.
18  A.  He was my best friend in middle school.  I met him in sixth
19  grade.  We went to the same high school, Monsignor Farrell High
20  School.
21     (Continued on next page)
22
23
24
25

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                          May 13, 2019

1 Q. What was your relationship with Mr. Ogno like when you were
2 both at Monsignor Farrell High School?
3 A. We were adolescents turning into men. So he was a little
4 ahead of me of the curve, like he was into girls before I was,
5 so he would like to introduce me to girls. And then we were
6 introduced to weed, and then introduced to Xanax and
7 painkillers. And we were also gym buddies; we would go to the
8 gym, usually after school with some regularity.
9          MR. FINKEL: Mr. Coleman, if you could display what is
10 in evidence as Government Exhibit 201.
11 Q. Mr. Yung, do you recognize what is marked as Government
12 Exhibit 201?
13 A. Yes.
14 Q. What is it?
15 A. The house on the left, with no car in the driveway, is
16 where Michael Ogno lived, his mother's house.
17 Q. You mentioned this a bit before. What are the drugs that
18 you and Mr. Ogno took together?
19 A. Marijuana, Xanax, oxycodone, heroin.
20 Q. Based on what you saw, how often did Mr. Ogno -- well,
21 directing your attention to when you were in high school, and
22 maybe a year or so after, based on what you saw, how often was
23 Mr. Ogno taking Xanax, if at all?
24 A. Whenever he could get his hands on it.
25 Q. Do you know at that time, high school or a year a two

1 after, do you know where Mr. Ogno was getting his Xanax from?
2 A. I know he got Xanax from a pain management doctor. He
3 introduced me to that pain management doctor that he was going
4 to, and he was being prescribed oxycodone and Xanax.
5 Q. Based on what you saw at first, how did Mr. Ogno get
6 heroin?
7 A. Through other people, sometimes through -- he would ask me,
8 and I would middleman for him.
9 Q. Who were you with -- well, how do you take -- withdrawn.
10       Who were you with the first time you injected heroin?
11 A. The first time I injected heroin Mr. Ogno did it for me,
12 showed me the process, and he put the needle in my arm and did
13 it for me. I didn't do it myself the first time.
14 Q. What do you mean Mr. Ogno showed you the process for heroin
15 injection?
16 A. The steps it took to put the powdered heroin into liquid
17 form and to put it into the syringe and to find the vein and to
18 get it into the system.
19 Q. Can you explain how that works, turning it from powdered
20 form into liquid form?
21 A. You get -- he would get a metal spoon, put the powdered
22 heroin into the spoon, take the syringe, draw water from a cup
23 like this, squeeze it into the spoon, mix it up, and sometimes
24 cook it, which is put fire underneath to get rid of any
25 impurities, but most of the time didn't do that, just mixed it

1 up. And then you get a piece of cotton from a Q-Tip and you
2 put the cotton in a rolled-up ball on the tip of the syringe
3 and you put it in the liquid and squeeze -- to get the liquid
4 into the syringe.
5 Q. Then once the liquid is in the syringe, what would happen
6 next?
7 A. Just find a vein and put the syringe in the vein and shoot
8 the heroin into the vein.
9 Q. Based on what you know, when did Mr. Ogno start using
10 heroin?
11 A. I'm not sure.
12 Q. You mentioned that there were occasions when you
13 middlemanned heroin for Mr. Ogno. On those occasions, from
14 whom were you getting the heroin that you then gave to Mr.
15 Ogno?
16 A. I would get it from Mr. Van Manen, others.
17 Q. Did there come a time, if ever, when you introduced Mr. Van
18 Manen to Mr. Ogno?
19 A. Yes.
20 Q. When approximately was that?
21 A. I think 2017, maybe early 2016, probably 2017. I mean late
22 2016, probably 2017.
23 Q. Why did you introduce Mr. Van Manen to Mr. Ogno?
24 A. Because I was trying to clean up my act, trying to get
25 clean. I was wasting a lot of money, and I told him -- I don't

1 remember if I told him, but --
2 Q. Told who?
3 A. Mr. Ogno. But I was wanting to get clean, and I made him
4 aware of that. Which in hindsight failed because I continued
5 to use afterwards, but --
6          MR. QUIJANO: Objection.
7          THE COURT: Overruled.
8 A. -- I was trying to get clean. So he said, well, since
9 you're going to get clean, why don't you give me your dealer.
10 Q. Mr. Ogno said that?
11 A. And do me the favor. Yes.
12 Q. So how did you arrange so that Mr. Ogno and Mr. Van Manen
13 can be in contact without you?
14 A. I called or texted Mr. Van Manen, told him the nature of my
15 relationship with Mr. Ogno, vouching for him, and he OK'd it.
16 And by OK'ing it, I gave him his number so they could exchange
17 numbers.
18 Q. What do you mean that you vouched for Mr. Ogno when you
19 spoke with Mr. Van Manen?
20 A. Vouching would be like saying he's not a cop or he's like
21 the same as me.
22 Q. What do you mean the same as you?
23 A. Just a customer that wouldn't give you problems.
24 Q. How many times do you believe you have spoken to Mr. Ogno
25 when he was alive?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                    May 13, 2019

1   A. Many times. I knew him since sixth grade.
2   Q. Are you familiar with his voice?
3   A. Yes.
4       MR. FINKEL: If the jury and the Court could turn to
5   the next transcript in the packet, which is 301J. This is call
6   from October 21, 2017, at approximately 1928, and it's between
7   the numbers ending in 8865 and 0111. This call is in evidence.
8   Mr. Coleman, if you could play it, please.
9       (Audio played)
10      MR. FINKEL: Top it right there.
11  BY MR. FINKEL:
12  Q. Mr. Yung, do you recognize the voice that said, from the
13  8865 number that said, "Yeah, I'm coming in about another
14  seven, eight minutes, what do you need again?"
15  A. Yes.
16  Q. Whose voice is that?
17  A. Mr. Van Manen.
18  Q. Did you recognize the voice that said, from the 0111
19  number, "I have 20 and I was going to see if you would give me
20  a half and I will owe you 20."
21  A. Yes.
22  Q. Whose voice was that?
23  A. Mr. Ogno.
24      MR. FINKEL: Mr. Coleman, if you would roll it back a
25  couple of seconds and then play it.

1       (Audio played)
2       MR. FINKEL: If I could turn to the next transcript in
3   the packet, which is marked in evidence as Government Exhibit
4   301M, as in Mary, and it's between -- I believe one of the
5   jurors needs to go to the rest room.
6       JUROR: Can I use the rest room?
7       THE COURT: Why don't we just take a morning recess.
8   We will resume in 15 minutes.
9       MR. FINKEL: Please leave your packets on your seat.
10      (Jury exits courtroom)
11      THE COURT: Mr. Yung, you can step down.
12  We will take our morning recess.
13      (Recess)
14      MR. FINKEL: Your Honor, the witness is in the
15  bathroom.
16      While we are waiting, can I just put on the record one
17  of the jurors during the recess came into that door and went
18  out. It was just counsel in here. But the parties would just
19  request that your Honor remind the jury to use the entrance in
20  the jury room rather than to come into the courtroom.
21      THE COURT: Yes.
22  How much more do you have, Mr. Finkel?
23      MR. FINKEL: Maybe 10 minutes, 15 minutes.
24      THE COURT: 15 or 50.
25      MR. FINKEL: Around 15.

1       (Jury present)
2       THE COURT: Is somebody getting Mr. Yung?
3       MR. FINKEL: Yes. He is in the bathroom and should be
4   back here in a moment. I apologize to your Honor and to the
5   members of the jury.
6   DEREK YUNG, resumed.
7       THE COURT: Mr. Finkel.
8       MR. FINKEL: Thank you, your Honor.
9   BY MR. FINKEL:
10  Q. Mr. Yung, you're still under oath. OK?
11  A. Yes, sir.
12  Q. Mr. Yung, when was the last time you saw Mr. Ogno?
13  A. The last time I saw him was at his girlfriend's block
14  party.
15  Q. Where was that block party?
16  A. I'm not sure the name of the block, but I could give you
17  the logistics of where it's near.
18  Q. What neighborhood was it?
19  A. I believe it's Eltingville, but it's off Arthur Kill Road
20  so it's a little off.
21  Q. By the way, which street did Mr. Ogno live on?
22  A. Malone Avenue.
23  Q. What was Mr. Ogno's girlfriend's name?
24  A. I don't recall.
25  Q. How long were you at the block party with Mr. Ogno and his

1   girlfriend for?
2   A. Two, three hours.
3   Q. Did you ever see Mr. Ogno alive after that day again?
4   A. I don't believe so.
5   Q. How did you learn that Mr. Ogno passed away?
6   A. From Facebook posts.
7   Q. Did you go to his funeral?
8   A. Yes.
9   Q. Who spoke at the funeral?
10  A. The priest and his girlfriend.
11  Q. The girlfriend from the block party?
12  A. Yes, sir.
13  Q. Where did you go after Mr. Ogno's funeral?
14  A. I went to the Circle Motor Lodge to see Paul.
15  Q. Why did you want to see Mr. Van Manen after Mr. Ogno's
16  funeral?
17  A. Because I was hurt, I was mourning, sad, angry. I just
18  wanted to get high and dull the pain.
19      MR. FINKEL: Mr. Coleman, if you can display for the
20  witness what has been marked for identification as Government
21  Exhibit 403.
22  Q. Mr. Yung, you see that red pin in the lower left of the
23  document?
24  A. Yes, sir.
25  Q. What location does that pin represent?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                                    May 13, 2019

1  A.  The motel in New Jersey, the Circle Motor Lodge.
2      MR. FINKEL: The government offers 403.
3      MR. QUIJANO: No objection.
4      MS. O'NEILL: No objection.
5      THE COURT: 403 is in evidence.
6      (Government's Exhibit 403 received in evidence)
7      MR. FINKEL: Can we publish it, please.
8  BY MR. FINKEL:
9  Q.  Now that it's published for the jury, what does that red
10     pin in the lower left of 403 represent?
11 A.  The same motel, Circle Motor Lodge.
12 Q.  That's where you travelled to after Mr. Ogno's funeral?
13 A.  Yes.
14     MR. FINKEL: Put up 223, which is in evidence.
15 Q.  Mr. Yung, when you arrived at the Circle Motor Lodge after
16     Mr. Ogno's funeral, did you meet with Mr. Van Manen?
17 A.  Yes, sir.
18 Q.  What were you wearing when you met with Mr. Van Manen the
19     day of Mr. Ogno's funeral at the Circle Motor Lodge?
20 A.  The suit I was wearing at the funeral.
21 Q.  Was it usual for you to wear a suit when you met with Mr.
22     Van Manen?
23 A.  No, not usual.
24 Q.  What, if anything, did Mr. Van Manen tell you about what
25     you were wearing on the day of Mr. Ogno's funeral?

1  A.  He gave me a positive comment on my attire, on my suit, a
2      remark.
3  Q.  Did he ask you why you were wearing a suit?
4  A.  No, I told him.
5  Q.  What did you tell him?
6  A.  I said I just came from Mike's funeral.
7  Q.  Can you please speak into the mic?
8  A.  I said I just came from Mike's funeral.
9  Q.  What did he say after you told him you came from Mike's
10     funeral?
11 A.  He said, Mike who?
12 Q.  What did you respond?
13 A.  I said Mike Mike.  He said, Our Mike, Mike Malone?  And I
14     said yeah.
15 Q.  What do you mean Mike Malone?
16 A.  The street he lived on.  I don't know if he knew his last
17     name.  That might have been why.
18 Q.  Did you tell Mr. Van Manen that Michael Ogno had died?
19 A.  Yes.
20 Q.  After you told him that, after you told Mr. Van Manen that
21     Michael Ogno had died, what, if anything, happened next?
22 A.  He looked shocked and appalled and took a step back,
23     nervous, pacing to the bathroom and back, asking questions and
24     stuff like that.  And he said, the last time I seen him I only
25     gave him two bags.

1  Q.  What did you understand it to mean, Mr. Yung, when Mr. Van
2      Manen told you, after learning that Mr. Ogno had died, that the
3      last time he saw Mr. Ogno he had only given him two bags?
4  A.  That he only gave him two bags of heroin and he thought it
5      was a miniscule amount.
6  Q.  When you say bags in this context, is that the same thing
7      as a bundle?
8  A.  Two bags of a bundle, yes.  Out of the bundle, you take two
9      bags out, yes.
10 Q.  So less than a bundle?
11 A.  Yes.
12 Q.  What, if anything, did Mr. Van Manen say about how long ago
13     he had seen Mr. Ogno when he gave him what he said were two
14     bags?
15 A.  He was trying to remember.  I don't recall the exact date
16     of when he said he saw him.
17 Q.  Did you buy heroin from Mr. Van Manen that day?
18 A.  Yes, sir.
19 Q.  How much?
20 A.  I believe one bundle.
21 Q.  Why are the details of that day so clear in your mind, the
22     day that Mr. Ogno passed?
23 A.  Because it was a devastating day.  It's seared into my
24     brain.  That was my best friend at one point in time, in
25     another time in life, and that was the day of his funeral.  A

1      lot of emotions that day.
2      MR. FINKEL: One moment, your Honor.
3  Q.  Mr. Yung, you mentioned in the beginning of your testimony,
4      I believe, that you have been clean for about a year, is that
5      right?
6  A.  I have been clean from heroin, yes, for about a year.
7  Q.  What are the factors that caused you to try -- withdrawn.
8      What are the factors that led you to be able to get
9      clean when you decided to get clean about a year ago?
10     MR. QUIJANO: Objection.  Relevance.
11     THE COURT: Sustained.
12     MR. FINKEL: Can I have a moment with defense counsel?
13     THE COURT: Yes.
14     MR. FINKEL: I think we need a brief sidebar on this.
15     THE COURT: No.  No sidebar.  Next question.
16 BY MR. FINKEL:
17 Q.  In early 2018, late 2017, from whom were you purchasing
18     heroin?
19 A.  I don't think I was purchasing heroin late 2018.
20 Q.  In late 2017, early 2018, from whom were you purchasing
21     heroin?
22 A.  Mr. Van Manen.
23 Q.  After that time period in early 2018, from whom were you
24     purchasing heroin?
25 A.  Repeat.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                          May 13, 2019

1 Q. After early 2018 -- let me direct your attention to the
2 middle of 2018, so June, July 2018. From whom, if anyone, were
3 you purchasing heroin?
4 A. I don't recall the middle of 2018 purchasing heroin, I
5 don't believe.
6 Q. Did there come a time when you stopped purchasing heroin
7 from Mr. Van Manen?
8 A. Yes.
9 Q. Why?
10 A. He was in --
11      MR. QUIJANO: Objection.
12      THE COURT: Overruled.
13 A. He was incarcerated.
14      MR. FINKEL: Nothing further. Thank you.
15      THE COURT: Mr. Quijano.
16      MR. QUIJANO: Thank you, your Honor.
17 CROSS-EXAMINATION
18 BY MR. QUIJANO:
19 Q. Good afternoon, Mr. Yung.
20      I am going to ask you some questions. If you can
21 answer them with a yes or no, I will ask you to do so. If you
22 don't understand my question, simply tell me and I will try to
23 rephrase it. OK?
24 A. Yes, sir.
25 Q. A few minutes ago you said when you went to the motel and

1 spoke to Paul after the funeral, you said he told you that he
2 had only given him two bags. Do you remember that part of your
3 testimony?
4 A. Yes.
5 Q. And you said, in fact, you thought that two bags would not
6 even be enough to get Michael high, right?
7      Did you say that?
8 A. That wasn't my opinion.
9 Q. You recall talking to the government before you testified,
10 right?
11 A. Yes, sir.
12 Q. You recall on April 18 when you were talking to them?
13 A. Can you repeat?
14 Q. Do you recall telling them that you were surprised because
15 two bags was not enough to get someone high? Do you remember
16 telling the government that in relationship to the two bags
17 that Paul said he had given him last?
18 A. I could only recall for myself, two bags --
19 Q. I am asking you something different. Do you recall in
20 April, April 18, when you were speaking with the government
21 about this exchange of Paul telling you that he only had given
22 Michael two bags, do you recall telling the government that you
23 were surprised because two bags was not enough for him to get
24 high? The question simply is, do you remember telling the
25 government that then?

1 A. Yes.
2 Q. You used the term middleman several times in your
3 testimony, correct?
4 A. Yes, sir.
5 Q. By middleman, you're referring to instances where you would
6 give someone heroin and that person would give you some money,
7 correct?
8 A. Correct.
9 Q. That's selling heroin, correct?
10 A. Correct.
11 Q. The first contact you had with the federal government, with
12 these prosecutors, was that around the time of you receiving a
13 subpoena?
14 A. A little bit after.
15 Q. And you received a subpoena when, approximately?
16 A. I think early to mid-April.
17 Q. A month ago or so, sound right?
18 A. Yes, sir.
19 Q. After December 1st, did you have any contact with any New
20 York Police Department officials, perhaps Detective Slevin,
21 Detective Truscelli --
22      MR. FINKEL: Objection. What year are we talking
23 about?
24 Q. Any time after December 1st of 2017. That's the day that
25 your best friend OD'd, right?

1 A. Yes, sir.
2 Q. Any time after December 1st until today, have you ever been
3 interviewed or had any contact with New York police about what
4 happened to Michael on December 1st, any contact?
5 A. No, not referring to Michael.
6 Q. Well, about what happened?
7 A. No.
8 Q. New York police never spoke to you, right?
9 A. Correct.
10 Q. You mentioned Anthony several times, a person named Anthony
11 several times on direct examination, correct?
12 A. Correct.
13 Q. You know Anthony's last name, don't you?
14 A. I think it starts with a "P," it's Spanish. I think it's
15 Perez.
16 Q. He was your friend, right?
17 A. Yes.
18 Q. You know his last name was Perez, right?
19 A. Not until I saw documents.
20 Q. You met Anthony around 2014, does that sound right?
21      Does that sound right?
22 A. Correct. Around the same time I met Mr. Van Manen, I met
23 them together.
24 Q. Right. Anthony was Paul's lover, correct? His companion,
25 correct?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

1 A. I don't know for sure, but --
2 Q. They were living together when you met them?
3 A. Yes.
4 Q. Indeed, you became his friend, you played video games with
5    Anthony, right?
6 A. Yes.
7 Q. You hung around with them a lot, right?
8 A. I didn't hang around with them, but I did play video games
9    with Anthony.
10 Q. Paul never sold you heroin during that period when you
11   first met Anthony in 2014, right? Right?
12 A. He did.
13 Q. He did? OK.
14        MR. QUIJANO: Would you please put up Government
15 Exhibit 301EI. It should be the intercepted text messages from
16 October 5.
17 Q. Now, if I understood you correctly on direct examination,
18   this is a series of texts that you sent to Paul on October 5th
19   of 2017, right? Right?
20 A. Correct.
21       MR. FINKEL: I just ask that Mr. Quijano give Mr. Yung
22   a chance to answer the question. He keeps saying right,
23   correct. Mr. Yung should have an opportunity to think about an
24   answer before answering.
25       THE COURT: Your observation is noted.

1   weight and sell it for the same price, correct?
2 A. Correct.
3 Q. And when you were doing heroin, and specifically around
4   2017, you would get heroin from other sources, not just Paul,
5   right? Right?
6 A. I don't believe so.
7 Q. You're saying in 2017 your only source of heroin was Paul
8   Van Manen?
9 A. He was my main source, unless he was incarcerated, I
10   believe so.
11 Q. So when he -- you had other sources. You call him the main
12   source. You had other sources for heroin in 2017, right?
13 A. Yes.
14 Q. One of those was CK, right? Right?
15 A. That was a name that a friend -- that was one of my
16   friend's dealers that he would do the middlemanning for me.
17 Q. There is that term again middleman. If I understand you
18   correctly, the way you're using it is that he would give your
19   friend money, presumably that friend would then purchase from
20   CK, and give him the drugs and eventually get back to you,
21   right?
22 A. Yes.
23 Q. And you understood that the source of the heroin you were
24   buying then was not your friend, it was actually coming from
25   CK, a dealer, correct?

1       MR. QUIJANO: Thank you.
2 Q. OK. So the second attribution there, after you say "shits
3   been weak lately, I can get grams for 90 fire." Actually,
4   let's start with that one.
5       Fire refers to the strength of the heroin, correct?
6 A. It's a term for strong, yes.
7 Q. Well, you sent this text, right?
8 A. Correct.
9 Q. And you used fire to be referring to the strength of the
10   heroin, correct?
11 A. Correct.
12 Q. And then you ask, Would you be interested? What you're
13   talking about is, if he was interested, you would sell him
14   some, right?
15 A. Correct.
16 Q. The third attribution, "Gram is like 2.5 3 buns, and if you
17   cut it, at least a brick, cuz it's way strong."
18     Now, what you're referring to is that the heroin
19   you're talking about was so strong that you could mix it, you
20   could cut two and a half bundles and essentially double it in
21   weight. Is that what you meant by this?
22 A. Correct.
23 Q. Thereby being able to even maximize one's profit, you would
24   be able to maximize your profit by having even less heroin that
25   you're selling, but because it's so strong you can double its

1 A. Correct.
2 Q. OK. CK in fact was an African American who basically
3   worked underneath a bridge, isn't that right?
4 A. I don't know anything about the individual.
5 Q. You never dealt directly with CK?
6 A. No.
7 Q. Is that a no?
8       THE COURT: He said no.
9       MR. QUIJANO: You can take that down, please.
10 Q. So Michael Ogno, when he died, he was your best friend,
11   right?
12 A. At that time we were both addicts. So friends, it was not
13   the same meaning as before.
14 Q. You had known him since sixth grade, was it?
15 A. Correct.
16 Q. By high school, the two of you were doing oxy and Xanax,
17   right?
18 A. We were introduced to it, yes.
19 Q. Does that mean the two of you were using oxy and Xanax?
20 A. Correct.
21 Q. Were you obtaining the pills or was Michael?
22 A. Both.
23 Q. Both?
24 A. Correct.
25 Q. Using bogus prescriptions from shady doctors, right?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                    May 13, 2019

1  A. That was after high school, I believe.
2  Q. Is that Dr. Rothenberg?
3  A. I believe so.
4  Q. You know so, right?
5  A. I don't know if that's the pronunciation.
6  Q. How do you pronounce it?
7  A. That's what I am saying, I don't know if that's the correct
8  pronunciation, but it sounds right, it's a Jewish last name.
9  Q. A doctor, or at least had the title of a doctor, would give
10  you prescriptions to be able to get the oxy and the Xanax,
11  right?  Right?
12  A. Correct.
13  Q. High school you were also, both of you, using marijuana?
14  A. Correct.
15  Q. And you got into steroids?
16  A. Repeat.
17  Q. You got into steroids?
18  A. Me?
19  Q. You and Michael.
20  A. I did not.  Michael did.
21  Q. Michael got heavily into steroids, right?
22  A. I believe so.
23  Q. When you heard he died, you initially thought he died of a
24  heart attack because of steroids?
25  A. I thought it could be a possibility.  I didn't know for a

1  fact what was the cause of death.
2  Q. So you never used steroids, is that right?
3  A. Under a doctor, TRT, testosterone replacement treatment,
4  and endocrinologist because my testosterone level was very low
5  from drug use, inactivity, and being on methadone.
6  Q. You were around Michael when he would use steroids, you had
7  seen him use steroids?
8  A. No.
9  Q. But you know how he took steroids?
10  MR. FINKEL: Objection.  Foundation.
11  THE COURT: Overruled.
12  Q. Based on your relationship with Michael, did you know
13  whether Michael injected steroids or took them in some other
14  form?
15  A. Yes.
16  Q. He injected them, right?
17  A. Yes.
18  Q. When you were using heroin, you injected, correct?
19  A. Yes.
20  Q. You would tie your arm up, right?
21  A. Correct.
22  Q. And the needle you would use, am I correct the actual
23  needle is relatively small, short, a half inch, a quarter inch
24  in length, does that sound right?
25  A. Yes, sir.

1  Q. I don't know the technical term, but the body or the
2  cylinder is also relatively short or small in diameter; is that
3  a fair description?
4  A. Yes, sir.
5  MR. QUIJANO: Can I have Government Exhibit 17?  Is
6  that handy?
7  Q. Don't touch this.  I am going to show you what is in
8  evidence as Government Exhibit 17.  Can you see that?
9  A. Yeah.  That's a needle.  Can you put it a little further --
10  Q. It's a big needle, right?
11  A. Yeah.
12  Q. It's not a needle, from your knowledge, that would ever be
13  used to inject heroin intravenously?
14  A. It could be.
15  Q. Did you ever use a needle that big?
16  A. I have not.
17  Q. Isn't this what is used to inject something into a muscle,
18  like steroids?
19  MR. FINKEL: Objection.  Foundation.
20  THE COURT: Sustained.
21  Q. From your relationship with Michael and his use of
22  steroids, didn't he use a needle such as this to inject
23  steroids into the muscle?
24  MR. FINKEL: Objection.  Foundation.
25  THE COURT: Sustained.

1  Q. Did you ever use a needle like this to inject heroin, this
2  big?
3  A. No.
4  Q. Michael was really into steroids, right?  Right?
5  A. I guess.
6  Q. You guess.  You know, don't you?  He was your best friend,
7  right?
8  A. I said he was my best friend in middle school.
9  Q. Michael was really into weightlifting, right, when he died?
10  A. I think so.
11  Q. Were you?
12  A. No.
13  Q. You know that Michael went to a place called the Retro gym,
14  right?
15  A. Yeah.  I believe he told me that was the gym he went to.
16  Q. You knew somebody named Angel who also came from the Retro
17  gym who was a heroin dealer, correct?
18  A. What was his name?
19  Q. Angel.  Angel from Retro gym.
20  A. I don't know that name so I would have to say no.
21  Q. You never heard that name before?
22  MR. FINKEL: Objection.  Asked and answered.
23  THE COURT: Overruled.
24  Q. You never heard a reference to an Angel as someone who sold
25  drugs to Michael and you?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                                      May 13, 2019

1          Let's just stay with Michael.
2   A. Not under -- well, I don't know about Michael's abuse with
3     the person named Angel.
4   Q. If he wasn't your best friend, you were still in close
5     contact with Michael around the time he died in 2017, right?
6   A. By that time we only called each other when we needed
7     something from each other.
8   Q. Like drugs, right?
9   A. Correct.
10  Q. And you understood that Michael had several suppliers,
11    several sources of heroin for him, right?
12  A. Yes.
13  Q. In fact, around 2017 -- withdrawn.
14         You're still on heroin in 2017, right?
15  A. Correct.
16  Q. Specifically, around December 1st, you're still using,
17    you're still an addict, correct?
18  A. Yes.
19  Q. That meant that you had to use heroin every day, correct?
20  A. No.
21  Q. You didn't use heroin every day when you were addicted to
22    it?
23  A. I was on methadone as well.
24  Q. When did you get on methadone in relationship to December
25    1st of 2017, if you recall?

1   A. I don't recall exactly.
2   Q. Well, was it a week before, a year before, a few months
3     before, do you have any recollection?
4   A. Over a year.
5   Q. That you had been on methadone?
6   A. Yes.
7   Q. In fact, you acknowledge you have a horrible memory, right?
8   A. Well, from the drug use, it's not perfect.
9   Q. Well, in fact, in talking to the government, you told them
10    several times, I have got a really bad memory, right? You told
11    them that, or did you forget?
12         MR. FINKEL: Objection.
13  A. I told them.
14         THE COURT: Overruled.
15  Q. You told them that, right?
16  A. Yes. I told them exactly what I just said to you.
17  Q. So when you weren't on methadone, I am correct that your
18    heroin habit required that you take heroin every day, right?
19  A. That is correct.
20  Q. When you weren't on methadone, your heroin habit required
21    that you ingest -- withdrawn.
22         How did you ingest it, were you shooting the entire
23    time?
24  A. I didn't start like that.
25  Q. By 2016, '17, you're shooting, correct?

1   A. Correct.
2   Q. So in that time period, when you're addicted to heroin, is
3     it true that you would have to inject yourself approximately
4     every four or five hours, correct?
5   A. Minimum once a day.
6   Q. I'm sorry?
7   A. Minimum once a day.
8   Q. I didn't ask you minimum. Your normal routine. Wouldn't
9     you have to inject yourself about every four or five hours when
10    you were addicted to heroin?
11  A. No.
12  Q. If you did not keep giving yourself heroin, you would get
13    sick, one would get sick, correct?
14  A. Correct.
15  Q. You had that happen to you, correct?
16  A. Correct.
17  Q. That's really bad, right?
18  A. It's very bad, yes.
19  Q. In fact, the fear of having or going into the sickness,
20    going into withdrawal, is what prompts an addict, such as
21    yourself, to keep using the heroin as is required, correct?
22  A. Yes, sir.
23  Q. And in most circumstances, if you're addicted -- withdrawn.
24         There is no, like, I'm almost addicted, I am kind of,
25    you're either addicted or you're not with heroin; as you

1     understand it, there is no real middle ground?
2   A. There is a mental addiction and a physical addiction.
3   Q. Let's talk about both. You either are addicted to heroin
4     or you are not?
5          MR. FINKEL: Objection as to form.
6          THE COURT: Overruled.
7   Q. Right?
8   A. Repeat.
9   Q. Let me put it this way. When you're addicted to heroin, to
10    fight off the sickness, to know you're not going to get sick,
11    you have to regularly keep ingesting heroin over the course of
12    the day, depending on what your tolerance is and how soon that
13    heroin will wear off, is that correct?
14  A. Yes.
15  Q. You indicated on direct examination, if I heard you
16    correctly, that you would normally purchase a bundle for about
17    80 or $70, right? Is that what you said?
18  A. From Mr. Van Manen, yes.
19  Q. Did the price vary from some of the other suppliers?
20  A. Yes.
21  Q. How did it vary and tell me who was supplying you, what
22    were their rates?
23  A. I don't recall. They usually didn't use names.
24  Q. Do you recall how much you paid?
25  A. $50, $40 I believe was the cheapest I think I ever got for

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

1  one bundle.
2  Q. With some of the heroin you purchased from Mr. Van Manen,
3  you would turn around and sell that or middle it to Michael
4  Ogno, right?  Right?
5  A. At times, yes.
6  Q. And you would charge him 120, right?
7  A. I don't recall.
8  Q. You charged him more than you paid for it, right, you
9  remember that?
10  A. Yes.
11  Q. Don't you?
12  A. Yes, sir.
13  Q. In fact, you delayed introducing Michael to Paul because
14  you didn't want to be cut out to selling to your best friend
15  and making the money that you were making from him so you could
16  keep buying drugs; isn't that why you delayed, Mr. Yung?
17  A. No.
18  Q. I may have asked you this.  I apologize if I have.  It was
19  Michael who actually introduced you to heroin back when you
20  started, right?  Or did you turn him on?
21  A. He introduced me to shoot -- to IV'ing heroin.
22  Q. So you already were using heroin when that happened?
23  A. I think so.  I was mostly trying to use prescription pills,
24  but when they were not available and I was sick, I would turn
25  to the alternative, yes.

1        THE COURT:  The alternative being heroin?
2        THE WITNESS:  Yes.  Correct.
3  Q. You remember telling the government, I believe the first
4  time you met them on April 18, that Michael introduced you to
5  heroin?  Do you remember telling them that, these guys?
6  A. I suppose.
7  Q. There were a couple of occasions when you did heroin with
8  Paul, right?
9  A. Correct.
10  Q. And Anthony?
11  A. Correct.
12  Q. In fact, you thought of Paul as your friend also, didn't
13  you?
14  A. Mainly dealer.  But I guess if there was a middle ground
15  between dealer and friends, yes.
16  Q. There were times when you would just hang with him and talk
17  and not just be selling or buying heroin, right?
18  A. With whom?
19  Q. With Paul.
20  A. No.  He would never call me to hang out.
21  Q. Well, certainly around the time you first met Paul and
22  Anthony, that's all you were doing, you would hang out with
23  them sometimes, right, back in 2014 I guess it was?
24  A. Not really.
25  Q. You know Paul couldn't inject himself, you had those

1  discussions, or you saw that, right?
2  A. I don't recall.
3  Q. Didn't you at least a couple of times inject Paul?  Do you
4  remember that or did you forget that too?
5  A. I never did that.
6  Q. Doing heroin with Paul or heroin that Paul had sold you,
7  you felt safe with that heroin, right?
8  A. To a degree, yes.
9  Q. You felt he certainly is not selling you rat poison, right,
10  your words?
11  A. Correct.
12  Q. In fact, once you asked him if his heroin was ever laced
13  with fentanyl and he said no, right?  Right?
14  A. I don't recall, but I don't think he was aware of what was
15  even in his own drugs.
16  Q. OK.  Do you remember -- again, I think it's your first
17  meeting with them, April 18, a few weeks ago -- do you remember
18  telling the government that being with Paul Van Manen and doing
19  drugs with him made you feel safe, he wasn't selling rat
20  poison?  Do you remember telling them that a few weeks ago?
21  A. Yes.
22  Q. In fact, when you asked, he told you no one has ever died
23  or had a fentanyl reaction from heroin that I know I sold,
24  right?
25  A. Can you repeat that?

1  Q. That no one had ever died or had a fentanyl reaction from
2  his heroin.
3        MR. FINKEL:  Objection.
4        THE COURT:  Overruled.
5  Q. Did he tell you that?
6  A. Did he tell me that?  No.
7  Q. Do you remember telling the government -- again, this is
8  your first meeting a few weeks ago -- that Paul Van Manen said,
9  No fentanyl, no one has ever died from heroin that he
10  sold?  Do you remember telling them that, sir?
11  A. Can you repeat?
12  Q. Sure.  Do you remember telling the government on, I think
13  it's April 18, that Paul Van Manen said, No fentanyl, said no
14  one has ever died from heroin he had sold?  Do you remember
15  telling the government that?
16  A. I remember telling the government that I don't think that
17  Paul knew there was fentanyl in his drugs.
18  Q. OK.  I appreciate that.  Do you remember also telling them
19  what I just read to you?
20        MR. FINKEL:  Objection.  Asked and answered.
21        THE COURT:  I will allow it one more time.  Overruled.
22  Q. Let me ask it again just so I am clear.  I am only going to
23  ask --
24        THE COURT:  Just ask the question.
25  Q. Do you remember telling the government, among other things,

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

1 that Paul Van Manen said, No fentanyl, said no one has ever
2 died from the heroin that he sold? Do you remember telling the
3 government that about three weeks ago?
4 A. I don't know if that's the correct words. How could I know
5 that for a fact?
6 Q. I am only asking if you remember telling the government
7 that. If you don't remember --
8     THE COURT: He said that several times, he does
9 not remember.
10     MR. QUIJANO: I will move on, your Honor.
11 Q. Did you ever knowingly do fentanyl?
12 A. No.
13 Q. Are you familiar with fentanyl patches?
14 A. Yes.
15 Q. Do you know if Michael was familiar with fentanyl patches?
16 A. I believe he was, not to a certainty.
17 Q. I am correct that fentanyl patches can be used by opening
18 them and smoking them, is that correct, instead of just wearing
19 them?
20 A. I'm not sure. I don't know.
21 Q. Do you know if Michael has ever used a fentanyl patch to
22 get high?
23     MR. FINKEL: Objection. Foundation.
24     MR. QUIJANO: If he knows.
25     THE COURT: Overruled.

1 Q. Do you know?
2 A. No.
3 Q. You don't know or he didn't?
4     THE COURT: The answer to your question was no.
5 Q. Have you ever heard the terms magees in reference to
6 fentanyl patches?
7 A. No.
8 Q. Were you familiar -- withdrawn.
9     You were familiar with Michael's addiction around the
10 time he died, correct, in 2017, the fall of 2017?
11 A. I knew that we both IV'd heroin.
12 Q. Do you know, from your knowledge of Michael and being
13 around Michael, that he would use approximately two to three
14 bundles a day? Does that sound right?
15 A. I don't know. I don't know.
16 Q. When you were shooting heroin around that time, would you
17 use two to three bundles a day?
18 A. It would have to depend on the potency. If it was really
19 bad, then that would be the maximum that I would have used.
20     MR. QUIJANO: Your Honor, is this -- one moment.
21     THE COURT: It's a convenient time if you have one
22 more question.
23     MR. QUIJANO: One more question.
24     Actually, why don't we break.
25     THE COURT: We will take our luncheon recess now. I

1 remind you when you're coming and going, don't come into the
2 courtroom. Walk out from the jury exit, and when you enter go
3 into the jury entrance. Don't come into the courtroom.
4     Thank you. We will resume at 2:00.
5     (Jury exits courtroom)
6     THE COURT: You're on cross-examination Mr. Yung, so
7 don't talk to the government. Do you understand?
8     THE WITNESS: Understood.
9     THE COURT: Thank you. You can step down.
10     MR. FINKEL: Your Honor, certainly no one from the
11 government will talk to him about his testimony, but in terms
12 of the logistics, if one of the agents just tells him where to
13 go and what time, is that all right with your Honor?
14     THE COURT: Don't talk to him at all. Come back here
15 at 10 to.
16     THE WITNESS: Ten to 2:00?
17     THE COURT: Yes.
18     THE WITNESS: I don't have a phone or watch, but I'll
19 ask.
20     THE COURT: OK.
21     Anything else?
22     MR. FINKEL: No.
23     Your Honor, there may be some issues we would wish to
24 discuss about cross of the defendants in their case. There is
25 a possibility that we are going to rest this afternoon with

1 some time still left in the day. Is our understanding correct
2 that the defense would then be required, if they choose to put
3 on a case, would be required to put on a case at that time?
4     THE COURT: Yes. The play is continuous. The
5 government rests. The defendant then takes the stand, if they
6 take the stand.
7     MR. FINKEL: As we have done for the government's
8 witnesses, it would be helpful to know from the defendants who
9 they intend to call first.
10     MS. O'NEILL: Mr. Charlton will be first.
11     THE COURT: Mr. Charlton will be first.
12     MR. FINKEL: Last piece, your Honor. Mr. Charlton's
13 team has now notified us of another individual that they may
14 call. We don't really know the purpose of why they are
15 intending to call another possible individual. It does seem
16 like they have known about this possibility with this
17 individual for quite some time. The only thing the government
18 wants to point out is to prevent delays to the trial --
19     THE COURT: If you want to prevent delays to the
20 trial, I would speed up my examination. It's really the
21 government that has been at this now for six days.
22     MR. FINKEL: I apologize for that.
23     Anyway, the people that the defendant may call, it
24 seems that they have exposure for either selling or possessing
25 drugs. We just want to make sure that there is some

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                    May 13, 2019

1  arrangement -- defense counsel hasn't even indicated whether or
2  not they are going to call these people, but there is some
3  arrangement so that those individuals can consult with counsel
4  before they take the stand and are in a position where they
5  might have to waive their Fifth Amendment rights for example.
6       THE COURT: Ms. O'Neill.
7       MS. O'NEILL: Just to speak about the person who we
8  notified the government about this morning, we have not
9  subpoenaed her. I have never spoken with her. Mr. Santiago
10  has never been trying to do that, and
11  once we spoke with her, we would of course have told them about
12  her earlier if we could have. We are not sure whether we are
13  going to be able to get her, but I don't think she has any
14  exposure for selling heroin. That is not what we would ask her
15  about or what she would testify to.
16       THE COURT: See you at 2:00.
17       (Luncheon recess)
18
19
20
21
22
23
24
25

1        A F T E R N O O N   S E S S I O N
2                    2:00 p.m.
3       (Jury not present)
4       MR. QUIJANO: Your Honor, may I have a moment? I need
5  the reporter to find a section.
6       THE COURT: Sure. Go ahead.
7       (Pause)
8       MS. O'NEILL: Judge, logistically, if Mr. Charlton
9  testifies today, we just want to make sure that we can take a
10  break first so the marshals can accommodate their security
11  needs and his testimony.
12       THE COURT: Okay.
13       (Pause)
14       (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

1       (Jury present)
2       THE COURT: Good afternoon. Please be seated.
3  Mr. Quijano.
4       MR. QUIJANO: Thank you, your Honor.
5       Your Honor, with the court's permission may I have the
6  court reporter read back a question and answer from this
7  morning?
8       THE COURT: Yes.
9       (The following portion of the record read:
10       Q. You never heard a reference to an Angel as
11            someone who sold drugs to Michael and you?
12            Let's just stay with Michael.
13       A. Not under -- well, I don't know about
14            Michael's abuse with the person named Angel.)
15  BY MR. QUIJANO:
16  Q. I understand you are not familiar with Michael's abuse with
17  a person named Angel, but you know that Michael got drugs from
18  someone named Angel, right?
19  A. No. I'm ignorant to that.
20  Q. Angel from the gym.
21  A. Yeah, I didn't go to his gym.
22  Q. I'm sorry?
23  A. I didn't go to that gym, so I don't know who he associates
24  with at that gym.
25  Q. My question is, don't you know that Michael got heroin from

1  Angel from the gym?
2  A. No.
3  Q. Do you have experience of having been with Michael when he
4  was sick, going through withdrawal, and in the need of getting
5  heroin and what his pattern of calling sources would be? Do
6  you understand my question?
7  A. Not exactly.
8  Q. Okay. Let me withdraw it and rephrase it.
9       When Michael was looking for heroin to buy, in
10  particular if he was becoming sick, wouldn't he tend to call
11  the same supplier, the same source, over and over and over
12  again over a very short period of time, six, seven calls in
13  five minutes?
14       MR. FINKEL: Objection: Foundation.
15       THE COURT: Overruled.
16       MR. QUIJANO: In his experience.
17       THE COURT: Overruled.
18  BY MR. QUIJANO:
19  Q. Isn't that true? Isn't that what he would do?
20  A. I don't know -- I don't know who he would call or any --
21  no.
22  Q. You were never with him when he was trying to find a source
23  for heroin, especially if he was becoming sick?
24  A. No, not really.
25  Q. His mother was complicit in his drug use, right?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                    May 13, 2019

1 A. Yes.
2 Q. In fact, she even once asked you for heroin, didn't she?
3 A. Yes.
4 Q. Now, did you use Xanax or was that just Michael?
5 A. I used Xanax.
6 Q. Michael used a lot of Xanax, right, going back to high
7   school days, is that right?
8       MR. FINKEL: Objection.
9       THE COURT: Overruled.
10 Q. Is that right?
11 A. Relative to a lot --
12 Q. What you would consider a lot.
13 A. Yes.
14 Q. He would oftentimes, in fact, mix the Xanax or take the
15   Xanax at the same time as using heroin, drinking alcohol, and
16   steroids, isn't that right?
17 A. I don't know for a fact.
18 Q. He would refer to Xanax as hockey sticks. Does that sound
19   right?
20 A. It's a familiar term, yes.
21 Q. In fact, you use that term, right?
22 A. It would be in my vocabulary.
23 Q. It would?
24 A. Yes, it's in my vocabulary.
25 Q. In fact, for a while, you sold Xanax that you bought from

1   other drug users, right?
2 A. Yes.
3 Q. And you are aware of Michael using heroin and Xanax at the
4   same time, right? Right?
5 A. I don't know for a fact, like I said earlier.
6 Q. Well, you warned Michael about using Xanax, especially if
7   he took it with methadone or heroin, right? You warned him
8   about that.
9 A. I don't recall.
10 Q. Isn't it true that Michael would use the heroin in
11   particular when he thought he had weak heroin?
12 A. Can you repeat? I don't understand.
13 Q. Isn't it true that he would use the Xanax, especially when
14   he thought he had weak heroin?
15       MR. FINKEL: Objection as to foundation.
16       THE COURT: Overruled.
17 A. I don't know.
18       MR. QUIJANO: If I could ask the reporter to read that
19   other section, please, question and answer from this morning.
20       (The following portion of the record read:
21       Q. So when he -- you had other sources. You call
22       him the main source. You had other sources for
23       heroin in 2017, right?
24       A. Yes.)
25       MR. QUIJANO: Could you keep reading, from that point,

1   the next question and answer?
2       (The following portion of the record read:
3       Q. One of those was CK, right? Right?
4       A. That was a name that a friend -- that was
5           one of my friend's dealers that he would do
6           the middlemanning for me.)
7 BY MR. QUIJANO:
8 Q. So CK was one of these examples you gave earlier where
9   somebody would give you money or -- yeah, someone would give
10   you money, you give the money to a dealer, the dealer would
11   give you drugs and then you would give the drugs to your
12   friend, right? That's the way you are using "middleman,"
13   right?
14 A. Correct.
15 Q. So in terms of this last question and answer, so CK is one
16   of these dealers. Who was the middleman in that situation?
17   Was it Michael?
18 A. No.
19 Q. Who was it?
20 A. Our friend from the neighborhood.
21 Q. Do you know his name?
22 A. Mark.
23 Q. You would buy heroin from Mark sometimes, right?
24 A. Yes.
25 Q. You would also buy heroin from Steve, right?

1 A. Maybe once or twice before he introduced me to
2   Mr. Van Manen.
3 Q. I'm sorry. I didn't hear you. Maybe once or twice --
4       THE COURT: Before he introduced --
5 A. Before he introduced me to Mr. Van Manen.
6 Q. You also bought heroin from Danny, right?
7 A. Who?
8 Q. A Danny? Danny?
9 A. You have to be more specific.
10 Q. I only have that name. Did you buy heroin from Danny
11   during that time period?
12 A. I don't recall.
13 Q. You testified this morning about how, after the funeral,
14   you went to see Paul and Doreen at the hotel, right?
15 A. Yes.
16 Q. You were feeling -- if I heard you correctly this morning,
17   you were feeling bad. You wanted some heroin because of how
18   you felt about your friend dying, right?
19 A. Yes.
20 Q. And you bought heroin from Paul that day at the hotel?
21 A. Yes.
22 Q. Did you use it?
23 A. Yes.
24 Q. Immediately?
25 A. When I got home, yes.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,             **May 13, 2019**

1 Q. Michael had a brother named Anthony, is that correct?
2   Anthony.
3 A. Yes.
4 Q. You knew him, right?
5 A. He was much older.
6 Q. You knew him, right?
7 A. Yes.
8 Q. He used a lot of pills, right?
9 A. I don't know.
10 Q. You don't know anything about his drug use. You have to
11   answer?
12 A. No.
13 Q. Did you meet his wife or his ex-wife Melissa? Do you know
14   her?
15 A. I think I met her once when we were kids in middle school.
16   The parents took us to their house.
17 Q. What about Melissa's cousin, the heroin dealer? Do you
18   know her?
19 A. No.
20 Q. So you agreed -- withdrawn.
21     You are testifying today pursuant to a nonprosecution
22   agreement you signed with the government, right?
23 A. Yes.
24 Q. And in that agreement, you agreed to tell them about all
25   your crimes, right?

1 A. Yes, sir.
2 Q. So you told them about selling heroin between 2014 and '18,
3   right?
4 A. Yes.
5 Q. You told them about selling oxycodone from at least 2012 to
6   2013?
7 A. Yes.
8 Q. You didn't keep selling oxy after 2013? Every once in a
9   while? You don't remember that either?
10 A. I think I already made the transition to --
11 Q. To heroin?
12 A. Yes, sir.
13 Q. You sold Xanax at least from 2012 to 2018, right?
14 A. Repeat.
15 Q. Xanax between 2012 and 2018, you sold it.
16 A. Yes.
17 Q. A lot of that was to Michael, right? Right?
18 A. No, not a lot.
19 Q. You admitted to the government possessing a long list of
20   different types of drugs, right, that you possessed in your
21   life?
22 A. Yes. They asked me --
23 Q. Is it heroin?
24 A. -- for every drug I ever did in my life.
25 Q. Heroin, yes?

1 A. Correct.
2 Q. Pills?
3 A. Correct.
4 Q. Marijuana?
5 A. Correct.
6 Q. Cocaine?
7 A. Correct.
8 Q. Ecstasy and K2, right?
9 A. Correct.
10 Q. And the deal that you have is, in return for testifying
11   today, in cooperating with them, they are not going to
12   prosecute you for anything, right? Nothing.
13 A. They --
14 Q. Right?
15 A. They won't prosecute me for what I told them with the
16   nonprosecution agreement.
17 Q. Which means they will not prosecute you for anything. You
18   are not expecting any prosecution to come from them in return
19   for testifying, right?
20 A. I hope not.
21 Q. Well, that's -- well, what's your understanding of this
22   agreement? Isn't it that if you cooperate and if you testify
23   the way you have been doing today, that in return for that,
24   they will not charge you with any crime whatsoever. Is that
25   right?

1 A. That is one of the factors.
2 Q. And that's why you are testifying today, right?
3 A. Yes.
4     MR. QUIJANO: May I have a moment, your Honor.
5     THE COURT: Yes, you may.
6     (Counsel confer)
7     MR. QUIJANO: Thank you, Mr. Yung. Thank you, your
8   Honor.
9     THE COURT: Ms. O'Neill.
10     MS. O'NEILL: We have no questions.
11     THE COURT: Mr. Finkel.
12     MR. FINKEL: Thank you, your Honor.
13 REDIRECT EXAMINATION
14 BY MR. FINKEL:
15 Q. Mr. Yung, on cross-examination, counsel asked you about
16   your sale of heroin. Did you sell heroin every day between
17   2014 and 2018?
18 A. No.
19 Q. There are some questions that were asked on cross about
20   that text message we looked at before, remember, with the fire?
21 A. Yes.
22 Q. Did you have direct access to that heroin or was that
23   through a friend?
24 A. It was through a friend.
25 Q. And did you ever come into possession of that fire heroin

1  that you described?

2  A.  No, that never came to fruition.

3  Q.  You were asked some questions on cross about what it feels

4  like when you are going through withdrawals and having cravings

5  for heroin.  Do you remember those questions?

6  A.  Yes.

7  Q.  Your answers to those questions, were those based on your

8  owner personal experience?

9  A.  I believe he was asking about Mr. Ogno's -- the question

10  was based on Mr. Ogno's.  He wasn't asking me about my own.

11  That's what I took the question for.

12  Q.  Understood.

13      After you provided Mr. Van Manen -- withdrawn.

14      After you gave Mr. Ogno Mr. Van Manen's phone number

15  and you introduced Mr. Van Manen to Mr. Ogno, how often, if

16  ever, did you middle between Mr. Van Manen and Mr. Ogno?

17  A.  After that?  I think that was -- never.

18  Q.  Why was that?

19  A.  Because I had already given him the dealer, direct contact

20  to the dealer.

21  Q.  You were asked some questions on cross about whether or not

22  you had used heroin in front of Mr. Van Manen, is that right?

23  A.  Yes.

24  Q.  I believe you said there were times when you did.

25  A.  Correct.

1  Q.  Did there come a time, if ever, when Mr. Van Manen asked

2  you to stop using heroin in front of him?

3  A.  You mean logistically or --

4  Q.  Did Mr. Van Manen --

5  A.  -- to stop using it in general?

6  Q.  I meant more logistically.  Let me withdraw that and back

7  it up.  I appreciate the clarification.

8      Did there come a time, if ever, when Mr. Van Manen

9  asked you not to use heroin in his presence?

10  A.  Yes.

11  Q.  To your understanding, why did Mr. Van Manen ask you not to

12  use heroin in his presence?

13      MR. QUIJANO: Objection.

14      THE COURT: Overruled.

15  A.  He didn't want the consequences.

16  Q.  What do you mean by the consequences?

17  A.  He didn't want an OD, me to OD or, I don't know, any

18  consequences that come with doing drugs and then getting in a

19  car or dying, perhaps, things like that nature.

20  Q.  Mr. Yung, you were asked some questions about the

21  conversation that you had on the day of Michael Ogno's funeral

22  in the hotel room with Mr. Van Manen.  Do you remember that?

23  A.  Yes.

24  Q.  I believe you said on direct and on cross that

25  Mr. Van Manen was pacing and stuttering in the room when you

1  told him that Mr. Ogno had passed, is that right?

2  A.  Yes.

3  Q.  During that conversation, what did Mr. Van Manen say about

4  how long ago he had last seen Mr. Ogno to provide him those two

5  bags?  Do you remember?

6  A.  I don't recall the exact amount of days, but it was a short

7  period of time.

8      MS. O'NEILL: Mr. Coleman, if we could put up for the

9  witness 3514-01, at page 6.

10  BY MS. O'NEILL:

11  Q.  Mr. Yung, I'm going to show you this document.  Don't read

12  it out loud.  I want to know if this refreshes your

13  recollection about to how long Mr. Van Manen had last seen --

14      MR. QUIJANO: Objection, your Honor.  This was covered

15  on direct.  This wasn't brought out on cross.

16      THE COURT: Sustained.

17  BY MR. FINKEL:

18  Q.  You were asked some questions about your nonprosecution

19  agreement.  Do you remember that?

20  A.  Yes.

21  Q.  If you lie here today, what happens to your nonprosecution

22  agreement?

23  A.  I believe it is no good.

24  Q.  And can the government charge you for the crimes you have

25  committed at that time?

1  A.  I believe they can.

2      MR. FINKEL: Thank you, Mr. Yung.

3      THE WITNESS: Thank you.

4      THE COURT: You are excused, Mr. Yung.  Thank you.

5  (Witness excused)

6      THE COURT: Call your next witness.

7      MR. FINKEL: Your Honor, the government calls Stephen

8  Napolitano.

9  STEPHEN NAPOLITANO,

10      called as a witness by the government,

11      having been duly sworn, testified as follows:

12      THE WITNESS: Thank you.

13      THE COURT: Please sit down, Mr. Napolitano.  Make

14  yourself comfortable.  Speak right into the microphone.

15  Okay, Mr. Finkel.

16      MR. FINKEL: Thank you, your Honor.

17  DIRECT EXAMINATION

18  BY MR. FINKEL:

19  Q.  Good afternoon, sir.

20  A.  Good afternoon.

21  Q.  Are you employed?

22  A.  Yes.

23  Q.  Where are you employed?

24  A.  New York City Police Department.

25  Q.  How long have you been with the NYPD?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                     May 13, 2019

1   A. Just over ten years.
2   Q. What is your current rank?
3   A. Detective.
4   Q. How long have you been a detective?
5   A. Approximately five months, six months.
6   Q. Where are you from originally?
7   A. Staten Island.
8   Q. You grew up there?
9   A. I'm sorry?
10  Q. You grew up there?
11  A. Yes.
12  Q. Are you familiar with it?
13  A. Yes.
14       MR. FINKEL: Mr. Coleman, if we can display for the
15  witness what's been marked for identification as Government
16  Exhibit 414.
17  BY MR. FINKEL:
18  Q. Detective Napolitano, do you recognize these locations or
19  this general area of the map, I should say?
20  A. Yes.
21  Q. Where is it?
22  A. It is Staten Island on the south shore.
23       MR. FINKEL: Government offers 414?
24       MS. O'NEILL: No objection.
25       MR. QUIJANO: No objection.

1        THE COURT: 414 is in evidence.
2        (Government's Exhibit 414 received in evidence)
3        MR. FINKEL: And if we may publish it?
4        THE COURT: Yes, you may.
5   BY MR. FINKEL:
6   Q. Detective, based upon your experience in Staten Island,
7   your experience as a detective, approximately how long does it
8   take one to travel on a weekday morning between 14 Giffords
9   Lane and 225 Malone Avenue?
10  A. Anywhere between six to eight minutes. Not long.
11       MR. FINKEL: Thank you. We can take that down.
12  BY MR. FINKEL:
13  Q. Detective, do you work for a particular unit in the NYPD?
14  A. I do. Staten Island overdose tax force, and it is a branch
15  out of narcotics.
16  Q. How long have you been with the Staten Island overdose task
17  force?
18  A. A little over two years.
19  Q. Were you involved at all in the investigation of Paul
20  Van Manen?
21  A. I was.
22  Q. What was the scope of your involvement in the investigation
23  of Paul Van Manen?
24  A. To conduct any surveillance, observations via the wire that
25  we had up and running.

1   Q. How many times did you conduct surveillance in the
2   Van Manen investigation?
3   A. Approximately five times.
4   Q. Did you have any other involvement in the investigation?
5   A. I had -- I was involved in one arrest --
6   Q. Okay.
7   A. -- as well.
8   Q. Were you involved in the day-to-day comings and goings of
9   the Paul Van Manen investigation?
10  A. No.
11  Q. What is surveillance?
12  A. Surveillance is where we would park, stand in the area to
13  observe what would be a narcotics transaction or to see any
14  narcotics activity in the location.
15  Q. Have you heard of the term a DD-5?
16  A. Yes.
17  Q. What is a DD-5?
18  A. A DD-5 is pretty much a note that we would take and put it
19  into our case via computer.
20  Q. And would you write a DD-5 after performing surveillance?
21  A. When feasible, yes, we try to get it in right away.
22  Q. Why?
23  A. Just so you don't forget anything and just pretty much
24  usually when you do observations like that we would want it to
25  get in as soon as possible.

1   Q. Detective, what have you done, if anything, to prepare for
2   your testimony here today?
3   A. I have met with you.
4   Q. Did you review any documents?
5   A. Yes.
6   Q. What kind of documents?
7   A. My DD-5.
8   Q. Do you recall what you did as part of the Paul Van Manen
9   investigation on September 8, 2017?
10  A. I do.
11  Q. What did you do?
12  A. I conducted a surveillance at 225 Malone Avenue.
13  Q. What time did you -- were you parked right in front of 225
14  Malone?
15  A. No.
16  Q. Were you in a car?
17  A. Yes, a van.
18  Q. A van. Where was the van parked with respect to 225
19  Malone?
20  A. I believe I was in front of 218 Malone.
21  Q. A few houses down.
22  A. Yes.
23  Q. What time did you arrive in the vicinity of 225 Malone on
24  September 8, 2017?
25  A. I'm not too sure about the time frame.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                    May 13, 2019

1  Q. Do you remember?  Do you remember?
2  A. No.
3          MR. FINKEL: Your Honor, may I approach?
4          THE COURT: Yes, you may.
5  BY MR. FINKEL:
6  Q. Detective, if you can turn in your binder to a tab that's
7  marked 3507-17.  Do you see that?  And if you can turn to page
8  57 and let me know if that refreshes your recollection as to
9  the time at which you arrived in the vicinity of 225 Malone.
10 A. 1720 hours.
11 Q. That's the time -- I'm sorry, that's the time you arrived
12 or --
13 A. I -- I'm sorry, 1745.  I have it indicated here.
14 Q. And why were you in the vicinity of 225 Malone on September
15 8, 2017?
16 A. It came over via the wire that there was going to be a
17 narcotics transaction at the location.
18         MR. FINKEL: Mr. Coleman, if we can display for the
19 witness what's been marked for identification as Government
20 Exhibit 301A.
21 BY MR. FINKEL:
22 Q. And these are a series of text messages between phone
23 numbers ending in 8865 and 0111.  Do you see that, Detective?
24 A. Yes.
25 Q. The date of these text messages is September 8, 2017.  Do

1  you see that?
2  A. Yes.
3          MR. FINKEL: Your Honor, the government offers 301A.
4          MR. QUIJANO: No objection.
5          MS. O'NEILL: No objection.
6          THE COURT: It is in evidence.
7          (Government's Exhibit 301A received in evidence)
8          MR. FINKEL: If you can publish it, please.
9  BY MR. FINKEL:
10 Q. Detective, if I can just ask you to read the text that's at
11 1816, which is from 8865 to 0111.
12 A. At 1816, a text message was "4 minutes, what do you need?"
13 Q. "4 min what ya need," right?
14 A. Yeah.
15 Q. A moment later, from 0111 to 8865, what was send?
16 A. At 1816 a text was sent "half."
17 Q. Then from 8865 to 0111 at 1820, what was the text that was
18 sent?
19 A. "Here."
20 Q. Detective, when you arrived in the vicinity of 225 Malone
21 at 1745 what, if anything, did you see?
22 A. The address that we were targeting.
23 Q. Did you -- at 1745 did you see any other activity?
24 A. No.
25 Q. What, if anything, did you see at 1820?

1  A. I don't know offhand.  Can I check?
2  Q. Do you remember?
3  A. At 1820?  I believe that that's when the target showed up
4  to the location.
5  Q. And what do you mean by when the target showed up to the
6  location?
7  A. Well, I observed the vehicle make a left on to Malone
8  Avenue from Grayson and stop in front of 225 Malone.
9  Q. Do you remember what kind of vehicle it was?
10 A. I believe it was a CRV, a Honda CRV.
11 Q. And what did you observe at around 1820 when the CRV pulled
12 in front of 225 Malone?
13 A. I observed a male white exit 225 Malone, went right up to
14 the passenger door.  The window was open.  That male white put
15 his hands in the car, met up with the person that was sitting
16 in the passenger, like a hand-to-hand, and then, immediately
17 after, said male put something in his pocket and went right
18 back inside.
19 Q. Were you able to -- how many individuals were in the Honda
20 CRV?
21 A. In the car?
22 Q. Yes.
23 A. Two.
24 Q. Were you able to observe them?
25 A. I was.

1  Q. Were you able to identify them?
2  A. Yes.
3  Q. Who were they?
4  A. Driving was Doreen Spinelli and in the passenger seat was
5  Paul Van Manen.
6  Q. Detective, do you see Paul Van Manen here in the courtroom
7  today?
8  A. I do.
9  Q. Can you point him out and describe him by an article of
10 clothing?
11 A. Blue suit, blue tie, white shirt.
12         MR. FINKEL: Your Honor, if the record could reflect
13 that the witness identified --
14         THE COURT: Yes.
15         MR. FINKEL: -- the defendant?
16         Thank you, your Honor.
17         Mr. Coleman, if you can put up 111, which is in
18 evidence.
19 BY MR. FINKEL:
20 Q. Do you recognize that individual?
21 A. Yes.
22 Q. Who is the individual depicted in 111?
23 A. Doreen Spinelli.
24 Q. That's who you saw that day on September 8?
25 A. Driving, yes.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

J5d2van4      Napolitano - Direct      Page 1026

1      MR. FINKEL: Mr. Coleman, if you can display for the
2 witness what's been marked for identification as Government
3 Exhibit 234.
4      If you can go to 235.
5      You can go to 236.
6      237.
7      238.
8      239.
9 BY MR. FINKEL:
10 Q. Detective, do you recognize the images in Government
11 Exhibits 234 to 239?
12 A. Yes.
13 Q. What are they?
14 A. These are pictures that I had taken.
15 Q. On September 8?
16 A. Yes.
17 Q. Are they a fair and accurate representation of what you
18 observed that day?
19 A. Yes.
20      MR. FINKEL: Your Honor, the government offers 234 to
21 239.
22      MR. QUIJANO: No objection.
23      MS. O'NEILL: No objection.
24      THE COURT: They are received in evidence.
25      (Government's Exhibits 234 to 239 received in

J5d2van4      Napolitano - Direct      Page 1027

1 evidence)
2      MR. FINKEL: If we can publish 234 for the jury,
3 please.
4 Q. Detective, what are we looking at in Government Exhibit
5 234?
6 A. We are looking at the Honda CRV pulling up to 225 Malone
7 Avenue.
8 Q. Was that at approximately 1820?
9 A. Yes.
10      MR. FINKEL: If we can go to 235.
11 Q. This is another image of the same moment?
12 A. Yes.
13      MR. FINKEL: If we can go to 236, to 237, and 238.
14 BY MR. FINKEL:
15 Q. Detective, what are we looking at in Government Exhibit
16 237?
17 A. We are looking at the male that I said before approaching
18 the Honda CRV.
19      MR. FINKEL: Thanks. We can take that down.
20      If you can -- Mr. Coleman, if you can put up for the
21 witness what's been marked for identification as Government
22 Exhibit 301G.
23 BY MR. FINKEL:
24 Q. Detective, do you see this is another text message? Do you
25 agree that is between numbers ending 0111 and 8865?

J5d2van4      Napolitano - Direct      Page 1028

1 A. Yes.
2 Q. It is from October 19, 2017.
3      MR. FINKEL: Your Honor, the government offers 301G.
4      MR. QUIJANO: No objection.
5      MS. O'NEILL: No objection.
6      THE COURT: 301G is in evidence.
7      (Government's Exhibit 301G received in evidence)
8      MR. FINKEL: If we can publish it, please.
9 BY MR. FINKEL:
10 Q. Detective, if you can just read the text that was sent from
11 the 0111 number to 8865?
12 A. Yes. At 2323 hours, "Hey yo Pauley, my man, what time you
13 gonna be around tm?" "tomorrow."
14      MR. FINKEL: Thanks. We can take that down.
15      Mr. Coleman, if you can display for the witness what's
16 been marked for identification as Government Exhibit 301I.
17 BY MR. FINKEL:
18 Q. And this is a text message from October 19, 2017, between
19 numbers ending in 0111 and 8865. Do you see that?
20 A. Yes.
21      MR. FINKEL: Your Honor the government offers 301I?
22      MR. QUIJANO: No objection.
23      MS. O'NEILL: No objection.
24      THE COURT: 301I is in evidence.
25      MR. FINKEL: If we can publish it?

J5d2van4      Napolitano - Direct      Page 1029

1      THE COURT: Yes.
2      (Government's Exhibit 301I received in evidence)
3 BY MR. FINKEL:
4 Q. If you can just read that text message?
5 A. Sure. "1954, yo, Pauley Paul, what's up?"
6      MR. FINKEL: If we can put up 301K for the witness.
7 BY MR. FINKEL:
8 Q. And, Detective, these are a series of text messages between
9 the 8865 and the 0111 number. Do you see that?
10 A. Yes.
11 Q. This is from October 21, 2017?
12 A. Um-hmm.
13 Q. Right?
14 A. Yes.
15      MR. FINKEL: Your Honor, the government offers 301K.
16      MS. O'NEILL: No objection.
17      MR. QUIJANO: No objection.
18      THE COURT: It is in evidence.
19      (Government's Exhibit 301K received in evidence)
20      MR. FINKEL: If we can publish it, please.
21 BY MR. FINKEL:
22 Q. Detective, if you can read the text message at 1939 from
23 8865 to 0111?
24 A. Sure. "1939, I'm here," or "herr."
25 Q. Then at 1940, what does it say from -- that was sent from

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                    **May 13, 2019**

1  8865 to 0111?
2  A. "Here."
3        MR. FINKEL: Mr. Coleman, if we can display for the
4  witness what's been marked for identification Government
5  Exhibit 301EH.
6  BY MR. FINKEL:
7  Q. Detective, these are a series of text messages from the
8  8865 number, right?
9  A. Yes.
10       MR. FINKEL: And if you can go to the next page,
11  please.
12  Q. There is one at 1950 between 8865 and 0111. Do you see
13  that?
14  A. Yes.
15       MR. FINKEL: Go back to the first page, please. Your
16  Honor, the government offers 301EH.
17       MS. O'NEILL: No objection.
18       MR. QUIJANO: No objection.
19       THE COURT: 301EH is in evidence.
20       (Government's Exhibit 301EH received in evidence)
21  BY MR. FINKEL:
22  Q. Detective, the first text on this page from 1933 sent from
23  8865 to a number ending in 0140, can you read that text?
24  A. Sure. "It's Paul. It's going to be an early night. I'm
25  giving notice so nobody gets stuck. I've been having car

1  issues, and my ride is leaving in an hour."
2  Q. And the text below it, between 8865 and the number ending
3  in 6855, can you read that one?
4  A. Sure. "It's Paul. It's going to be an early night. I'm
5  giving notice so nobody gets stuck. I've been having car
6  issues, and my ride is leaving in an hour."
7  Q. Appear to be the same message in both texts?
8  A. Yes.
9  Q. What about below that? Does that appear to be the same
10  message sent from 8865 to 7841 at 1934?
11  A. Yes.
12  Q. And below that between 8865 and 1749 at the bottom of the
13  first page?
14  A. Yes.
15  Q. Okay. Now, moving on to page 2, 301EH, 1935, between 8865
16  and 2531, is that the same message?
17  A. Yes.
18  Q. Then below that between 8865 and 1162, is that the same
19  message?
20  A. Yes.
21  Q. And 1950, between 8865 and 0111, can you read that text?
22  A. "It's Paul. It's going to be an early night. I'm giving
23  notice so nobody gets stuck. I've been having car issues, and
24  my ride is leaving in an hour."
25       MR. FINKEL: Mr. Coleman, if you could flip to the

1  third page.
2  BY MR. FINKEL:
3  Q. Detective, do the rest of the text messages appear to be
4  the same as the one you just read?
5  A. Yes.
6  Q. To different numbers?
7  A. Yes.
8        MR. FINKEL: Okay. Let me take that down. Thank you,
9  Mr. Coleman.
10  BY MR. FINKEL:
11  Q. Detective, do you recall what you were doing as part of the
12  Paul Van Manen investigation on October 13, 2017?
13  A. Yes. I do.
14  Q. What were you doing?
15  A. Pretty much the same as before, responding to areas where a
16  possible drug transaction is about to occur.
17  Q. And let me direct your attention to approximately 1730
18  hours on October 13, 2017. What, if anything, happened at that
19  time?
20  A. I remember we did effect an arrest of a Denise Belfield. I
21  remember recovering drugs and vouchering them. I don't know
22  much more than that.
23  Q. Why was Denise Belfield arrested on that day to your
24  knowledge?
25  A. She was arrested because we were given ample time to --

1  when Mr. Van Manen left the location to effect an arrest.
2  Q. What do you mean you were given ample time when
3  Mr. Van Manen left the location to effect an arrest on Denise
4  Belfield?
5  A. There was a gap from when the drug transaction happened to
6  her getting to her home, so when she was walking home, we
7  effected an arrest.
8  Q. Why did you not -- were you alone that day?
9  A. No.
10  Q. Why did you not arrest Denise Belfield in front of
11  Mr. Van Manen?
12  A. Because we wouldn't want to raise any suspicion or anything
13  like that and have anything compromised regarding the case.
14  Q. You said you vouchered the drugs that were secured from
15  Denise Belfield. What do you mean by that?
16  A. It is a process where we take the drugs and we safeguard
17  the drugs. We process it where it gets a unique number, and it
18  gets secured and sent to the lab for further analysis.
19  Q. Do you remember what the voucher number was?
20  A. I don't. No.
21  Q. Just to be clear, this arrest happened after the
22  transaction between Denise Belfield, is that correct?
23  A. Yes, yes.
24  Q. Is there anything that would refresh your recollection as
25  to what the voucher number was of the drugs that you secured?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                    May 13, 2019

1  A. Yes.
2  Q. What is that?
3  A. It could be in multiple things, a DD-5, the invoice number.
4  Q. If you can turn in your binder to tab -- actually . . .
5       MR. FINKEL: Your Honor, may I approach.
6       THE COURT: Yes, you may.
7  BY MR. FINKEL:
8  Q. Detective, let me know if that refreshes your recollection
9  as to what the voucher number is for the drugs secured from
10 Denise Belfield.
11 A. Yes.
12 Q. What is the voucher number?
13 A. It is 5000127014.
14 Q. Okay.
15      MR. FINKEL: At this time the government would read
16 from a stipulation, with your Honor's permission. This is from
17 Government Exhibit 509.
18      THE COURT: Yes. Go ahead.
19      MR. FINKEL: "The contents of Exhibit 15 were seized
20 from Denise Belfield on October 13, 2017 and vouchered as
21 5000127014 by law enforcement officials. The contents of
22 Government Exhibit 15 were tested by analysts employed by a New
23 York City Department" -- "police department laboratory. The
24 substance contained within Government Exhibit 15 was in five
25 glassine envelopes each containing a substance. The substance

1  tested positive for the presence of heroin and fentanyl and was
2  determined to weigh approximately .224 grams without packaging.
3  This finding is contained within a lab report that's been
4  marked as Government Exhibit 15A."
5       Your Honor, the government offers 15 and 15A.
6       MS. O'NEILL: No objection.
7       MR. QUIJANO: No objection.
8       THE COURT: 15 and 15A are received in evidence.
9       (Government's Exhibits 15 and 15A received in
10 evidence)
11      MR. FINKEL: May we publish?
12      THE COURT: Yes, you may.
13      MR. FINKEL: Thank you.
14      Mr. Coleman, if we can publish for the jury Exhibit
15 15A.
16 BY MR. FINKEL:
17 Q. And Detective, if you can just read where I am circling in
18 the middle of the page, where it says substance identified.
19 A. "Fentanyl," which is item number one, "0.224 grams
20 aggregated weight."
21 Q. And below that?
22 A. "Heroin, item 1, 0.224 grams aggregated weight."
23 Q. And what is the invoice number associated with this
24 laboratory report?
25 A. 5000127014.

1       MR. FINKEL: Your Honor, at this time if we could pass
2  out some transcripts to the members of the jury?
3       THE COURT: Yes.
4       MR. FINKEL: Thank you.
5  BY MR. FINKEL:
6  Q. Detective, your arrest of Denise Belfield of the heroin and
7  fentanyl, that happened on October 13, right?
8  A. Yes.
9       MR. FINKEL: Your Honor, at this time the government
10 would like to play a recording that's in evidence as Government
11 Exhibit 301CI. This is between numbers ending in 8865 and
12 2856, and it is from October 14, the next day, at approximately
13 1746.
14      THE COURT: Okay. Go ahead.
15      MR. FINKEL: Thank you, your Honor.
16      (Audio played)
17      MR. FINKEL: Thank you, Detective. No further
18 questions.
19 CROSS-EXAMINATION
20 BY MR. QUIJANO:
21 Q. Good afternoon, Detective Napolitano.
22 A. Good afternoon.
23 Q. You just got promoted five months ago?
24 A. Yes.
25 Q. Congratulations.

1  A. Thank you.
2  Q. Detective Slevin is in your same precinct, is that correct?
3  A. Yes, same office.
4  Q. You know him, right?
5  A. I do.
6  Q. He was part of this investigation, right?
7  A. I know he was part of an overdose, not the actual
8  investigation.
9  Q. You mean the surveillance points, he wasn't involved in
10 that as far as you know?
11 A. I'm not too sure about his involvement with that.
12 Q. In fact, he was promoted to detective about five months ago
13 also, wasn't he?
14 A. Yes.
15 Q. Now, if I understood your testimony correctly, you were
16 part of the original overdose task force investigation that was
17 being conducted, correct?
18 A. No. I got -- I got to that office in May of 2017. That
19 unit has been ongoing.
20 Q. I am talking about the Van Manen investigation.
21 A. Oh, yes.
22 Q. You were part of that from the beginning, correct?
23 A. From when it started, I was there, yes. I don't know about
24 being part of it, but . . .
25 Q. Okay, but you were involved in the investigation?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

1 A. Somewhat, yes.
2 Q. And Detective Truscelli was involved in that investigation,
3    is that correct?
4 A. It was his case.
5 Q. You know him obviously?
6 A. Yes.
7 Q. In fact, you were working under him during that
8    investigation, is that correct?
9 A. No.
10 Q. No?
11 A. No. He is not my supervisor.
12 Q. But with regard to the investigation, Van Manen
13    investigation, wasn't he running that investigation?
14      MR. FINKEL: Objection. It is beyond the scope.
15      THE COURT: Sustained.
16    BY MR. QUIJANO:
17 Q. Now, you testified about, I believe, one of the
18    surveillances was around 225 Malone, is that correct?
19 A. Yes.
20 Q. In connection with your involvement in the investigation,
21    was there an investigation of an overdose there that happened
22    earlier that year at that location?
23      MR. FINKEL: Objection. Same objection as to scope.
24      THE COURT: Overruled.
25 Q. Were you?

1 A. Prior to me being there?
2 Q. No, prior to the events you have testified to, which I
3    think are September and October mostly --
4 A. Right.
5 Q. -- were you aware that there was an overdose at 225 Malone
6    on December 1? You are aware of that, right?
7 A. Of what year?
8 Q. Of 2017, the Michael Ogno overdose.
9 A. So I'm getting confused with what you are asking me,
10    so. . .
11 Q. Sure. Let me go ahead and rephrase it.
12 A. Go ahead.
13 Q. You are aware that Michael Ogno -- there was an overdose of
14    Michael Ogno on December 1 at 225 Malone?
15 A. I know that there was an overdose at that location, yes.
16 Q. What I am asking you is if you were aware also that earlier
17    in 2017 there was another overdose at 225 Malone.
18 A. I'm not aware of that.
19      MR. QUIJANO: Thank you, your Honor. No further
20    questions.
21      THE COURT: Ms. O'Neill?
22      MS. O'NEILL: We have no questions.
23      THE COURT: Mr. Finkel.
24      MR. FINKEL: Nothing, your Honor.
25      Thank you, Detective.

1      THE COURT: Detective, thank you.
2      THE WITNESS: Thank you.
3      (Witness excused)
4      THE COURT: Next witness.
5      MS. GHOSH: Your Honor, the government calls Detective
6    Nicholas Velez.
7    NICHOLAS VELEZ,
8      called as a witness by the government,
9      having been duly sworn, testified as follows:
10      THE COURT: Sit down, please, Detective, get yourself
11    comfortable.
12      THE WITNESS: Thank you, your Honor.
13      THE COURT: Okay, Ms. Ghosh.
14      MS. GHOSH: Thank you, your Honor.
15    DIRECT EXAMINATION
16    BY MS. GHOSH:
17 Q. Good afternoon, sir. Where do you work?
18 A. I work with the NYPD Emergency Services K-9 unit.
19 Q. Could I ask you to move the microphone?
20 A. I'm sorry.
21 Q. That's okay.
22      You said you work with the K-9 unit, is that right?
23 A. Emergency Service K-9 unit, yes, that's correct.
24 Q. What does that unit do?
25 A. My partner is a dog. We have -- we use the dogs for patrol

1    services, explosion detection, and narcotics detection.
2 Q. How long have you been with the NYPD?
3 A. Approximately 16 years.
4 Q. And what is your current job title?
5 A. Detective.
6 Q. How long have you been a detective?
7 A. Approximately six years.
8 Q. Going back to the spring of 2014, what bureau were you in
9    at that time?
10 A. I was in the narcotics bureau.
11 Q. What types of cases did you work while you were in the
12    narcotics bureau?
13 A. Narcotic-related cases.
14 Q. Was there a certain geographic area that you covered?
15 A. I covered Staten Island.
16 Q. Did your work include investigations into overdoses?
17 A. No, they did not.
18 Q. When did you leave the narcotics bureau?
19 A. I left the narcotics bureau in approximately 2015.
20 Q. Detective, are you familiar with an individual named Paul
21    Van Manen?
22 A. I am.
23 Q. Directing your attention to April 11, 2014, were you
24    working that day?
25 A. I was.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

J5d2van4     Velez - Direct     Page 1042

1  Q. What investigative steps, if any, did you take with respect
2  to Paul Van Manen on that day?
3  A. I executed a search warrant at Paul Van Manen's residence
4  at 37 Victory Boulevard.
5  Q. And let's just step back for a moment. Why did you believe
6  that Van Manen was associated with that address?
7  A. I got information from a confidential informant that the
8  defendant was living at the residence and dealing drugs from
9  the residence.
10  Q. What steps did you take to verify that Mr. Van Manen was in
11  fact living at that residence and selling drugs out of it?
12  A. I made confidential informant buys at the location with
13  drugs.
14  Q. Approximately how many confidential informant buys were
15  made?
16  A. Approximately two.
17  Q. Going back to April 11, 2014, did you personally take part
18  in the search of the residence?
19  A. I did.
20  Q. What, if anything, did you find?
21  A. A quantity of narcotics in the residence.
22  Q. Where exactly were the narcotics located?
23  A. There was drugs located in various locations. The one that
24  I do remember is in the bedroom closet, in a lockbox, and on
25  the defendant's person.

J5d2van4     Velez - Direct     Page 1043

1       MS. GHOSH: Your Honor, at this time I would like to
2  read a portion of a stipulation which is in evidence as
3  Government Exhibit 507.
4       THE COURT: Yes.
5       MS. GHOSH: This is paragraph 5: "The parties
6  stipulate that the contents of Government Exhibit 6 were seized
7  from Paul Van Manen on April 11, 2014, and vouchered at
8  5000054088 by law enforcement officials. The contents of
9  Government Exhibit 6 were tested by analysts employed by New
10  York City Police Department laboratory. The substance
11  contained within Government Exhibit 6 was in 267 glassine
12  envelopes, each containing a substance. The substance tested
13  positive for the presence of heroin and was determined to weigh
14  approximately 9.053 grams without packaging. This finding is
15  contained within a lab report that has been marked as
16  Government Exhibit 65."
17       At this time the government moves to admit Government
18  Exhibit 6A and 6.
19       MR. QUIJANO: No objection.
20       MS. O'NEILL: No objection.
21       THE COURT: 6A and 6 received in evidence.
22       (Government's Exhibits 6A and 6 received in evidence)
23       MS. GHOSH: May Ms. Fender publish to the jury, and if
24  I can ask Mr. Coleman to put up Government Exhibit 6A on the
25  screen.

J5d2van4     Velez - Direct     Page 1044

1  BY MS. GHOSH:
2  Q. Detective, did you recover any nondrug evidence that day
3  during the search at 37 Victory Boulevard?
4  A. I did. U.S. currency and a leasing agreement.
5       MS. GHOSH: Your Honor, may I approach the witness?
6       THE COURT: Yes, you may.
7  BY MS. GHOSH:
8  Q. Detective, I have handed you what's been marked as
9  Government Exhibit 60. Do you recognize that?
10  A. Yes. This is the leasing agreement that I vouchered.
11       MS. GHOSH: Government moves to admit Exhibit 60?
12       MR. QUIJANO: No objection.
13       MS. O'NEILL: No objection.
14       THE COURT: 60 is in evidence.
15       (Government's Exhibit 60 received in evidence)
16       MS. GHOSH: Mr. Coleman, do we have the electronic
17  versing to publish?
18  BY MS. GHOSH:
19  Q. Detective, can you explain what this document is, Exhibit
20  60?
21  A. This is the rental purchase agreement with Paul Van Manen's
22  name on for 37 Victory Boulevard, Apartment 3F.
23  Q. And where are you seeing Mr. Van Manen's name?
24  A. On the top right.
25  Q. What, if anything, occurred as a result of this search

J5d2van4     Velez - Cross     Page 1045

1  executed at 37 Victory Boulevard that day?
2  A. Paul Van Manen was placed under arrest.
3  Q. Were there any other individuals in the house at the time
4  of the search?
5  A. Two other, yes.
6  Q. Did you have any further involvement in that case involving
7  Mr. Van Manen?
8  A. No, I did not.
9  Q. Did you have any involvement in any investigations into
10  Mr. Van Manen since that date?
11  A. I did not, no.
12       MS. GHOSH: No further questions.
13  CROSS-EXAMINATION
14  BY MR. QUIJANO:
15  Q. Good afternoon, Detective.
16  A. Good afternoon, sir.
17  Q. So this was an execution of a warrant on April 11, 2014?
18  A. Yes, sir, a search warrant.
19  Q. Search warrant.
20       Detective Truscelli led that that night?
21  A. No. That was my search warrant.
22  Q. Was Detective Truscelli present when you executed the
23  warrant?
24  A. Yes, he was.
25  Q. And present in the house was Paul Van Manen?

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

1  A. That's correct.
2  Q. As well as two other people?
3  A. That's correct.
4  Q. Taylor and Remy? Does that sound right?
5  A. I believe that's their names.
6  Q. And this is 2014, correct?
7  A. That's correct, yes.
8  Q. Now, Mr. Van Manen was actually arrested I believe two
9   other times within a three-week period of April 11, 2014?
10     MS. GHOSH: Objection, your Honor. Foundation.
11  Q. If you know.
12  A. I'm not -- I can't recollect. I'm not familiar.
13  Q. Do you recall he was arrested multiple times in around
14   April 11, 2014?
15  A. I don't remember, to be honest with you.
16  Q. Do you remember Detective Truscelli hitting Paul Van Manen
17   that night and giving him two black eyes?
18     MS. GHOSH: Objection, your Honor.
19     THE COURT: Sustained.
20     MR. QUIJANO: Nothing further.
21     MS. O'NEILL: No questions.
22     THE COURT: You are excused, Detective. Thank you
23  very much.
24     THE WITNESS: Thank you, your Honor.
25     (Witness excused)

1     MS. GHOSH: Your Honor, would this be a good time for
2  the afternoon break?
3     THE COURT: No.
4     MS. GHOSH: The government calls Enrique Santos.
5  ENRIQUE SANTOS,
6   called as a witness by the government,
7   having been duly sworn, testified as follows:
8     THE COURT: Sit down, Santos. Make yourself
9  comfortable. Are you all set?
10     THE WITNESS: Yes.
11     THE COURT: All right, Ms. Ghosh.
12     MS. GHOSH: Thank you, your Honor.
13  DIRECT EXAMINATION
14  BY MS. GHOSH:
15  Q. Good afternoon, Mr. Santos.
16  A. Good afternoon.
17  Q. Where do you work?
18  A. The U.S. Attorney's office.
19     (Continued on next page)
20
21
22
23
24
25

1  Q. How long have you been employed at the U.S. Attorney's
2   Office?
3  A. 11 years.
4  Q. What is your job title?
5  A. Investigative analyst.
6  Q. What are your duties and responsibilities as an
7   investigative analyst?
8  A. I perform forensic examinations of mobile devices, such as
9   cell phones, computer tablets, and GPS devices, and I also
10   operate and maintain an evidence vault.
11  Q. What is a forensic examination?
12  A. A forensic examination is basically when we are able to
13   download data off of a cell phone and examine it and parse the
14   data out for an investigation.
15  Q. Can you please walk us through your educational background?
16  A. I have a bachelor's degree in political science from SUNY
17   Purchase and a master's in criminal justice from the John Jay
18   College of Criminal Justice.
19  Q. Have you received training in the analysis of electronic
20   evidence and forensic examinations?
21  A. Yes.
22  Q. Does that training include the analysis of cell phones?
23  A. Yes.
24  Q. Can you briefly describe some of that training?
25  A. I currently have about 160 hours of formal classroom

1   training for the examination of forensic devices. I have
2   received certifications for each of the forensic tools that I
3   use to examine these devices. And I also regularly attend
4   forensics-related workshops and conferences.
5  Q. You mentioned certain forensic tools that you use. What
6   are those tools?
7  A. Specifically, the one that we use the most in our office --
8   I will just name two of them -- is Cellebrite, and XRY is
9   another one we use.
10  Q. During your time at the U.S. Attorney's Office, have you
11   completed cell phone extractions?
12  A. Yes.
13  Q. Approximately how many?
14  A. Over 1500 at this point.
15  Q. Have you analyzed cell phone extractions that others have
16   completed?
17  A. Yes.
18  Q. Approximately how many?
19  A. Closer to 50.
20  Q. Generally speaking, how would you conduct a phone
21   extraction?
22  A. Usually, when we receive a phone, we will receive some sort
23   of search authorization along with the phone, usually in the
24   form of a search warrant or a search consent form. We will
25   review those to make sure that we are authorized to search that

1  phone. Once we are content that the authorization is valid, we
2  will move to isolate the phone from receiving any wireless
3  signals that could potentially carry a wipe command, or either
4  put the phone in airplane mode or remove the SIM card from the
5  phone. We will then try to write down any identifying
6  information about the phone, usually it's like the phone make
7  and model, any unique identifying numbers of the phone, such as
8  the serial number or an IMEI number. Then if the phone is
9  locked, we will try to unlock it. Then we download the data
10  onto a hard drive. And then that data gets loaded into another
11  program that then parses out the data, and then we create a
12  report and produce that to either the agents or the prosecutors
13  on the case.
14  Q. Are you familiar with the term forensic image of a phone?
15  A. Yes.
16  Q. Who is a forensic image?
17  A. A forensic image is basically a capture of the data on a
18  device in as an original state as possible from when the phone
19  is seized.
20  Q. Can a forensic image be altered once it's taken?
21  A. No.
22  Q. Mr. Santos, I am going to show you what has been marked for
23  identification as Government Exhibit 704.
24      Mr. Santos, do you recognize Government Exhibit 704?
25  A. I do.

1  Q. What is that?
2  A. This is a Samsung phone that I examined for this case.
3  Q. What was the legal basis for your examination of it?
4  A. We had a search warrant for this phone.
5      MS. GHOSH: I am now going to read paragraph 3 from
6  Government Exhibit 506, which is a stipulation between the
7  parties.
8      This paragraph states that: Government Exhibit 704 is
9  a Samsung cellular telephone, with phone number 347-636-5083,
10  that was lawfully recovered on January 17, 2018 from Kenneth
11  Charlton, by deputy United States marshals, called "the
12  Charlton cell phone" in the stipulation. The Charlton cell
13  phone has been in the continual custody of law enforcement
14  officers and is in substantially the same condition today as
15  when it was obtained by deputy United States marshals on
16  January 17, 2018. Government Exhibit 704A is a true and
17  accurate report reflecting certain contents of the Charlton
18  cell phone.
19      The government offers stipulation 506 into evidence.
20      MR. QUIJANO: No objection.
21      MS. O'NEILL: No objection.
22      THE COURT: 506 is in evidence.
23      (Government's Exhibit 506 received in evidence)
24  BY MS. GHOSH:
25  Q. Mr. Santos, can you describe how you examined the phone

1  that is marked for identification as Government Exhibit 704?
2  A. So I received the phone. I reviewed a search warrant that
3  came along with the phone and made sure that it was the same
4  device I was looking at. And once I was content with it being
5  correct, I connected the phone to a computer. I was able to
6  unlock and download the data from the phone. I created a
7  report that contained all the data that we were able to
8  download, and I turned that over to the agents.
9      MS. GHOSH: Mr. Coleman, if you can put up for the
10  witness documents marked for identification as Government
11  Exhibits 704A-1 through 704A-4.
12      If you could just flip through these so the witness
13  can see Government Exhibits 704A-1, A-2, A-3 and A-4.
14      THE COURT: Do you have a question?
15      MS. GHOSH: I am just waiting for the witness to
16  review the documents that have been marked for identification,
17  your Honor. There is just one more, 704A-4, if we can show
18  that just to the witness.
19  BY MS. GHOSH:
20  Q. Mr. Santos, do you recognize these documents that you have
21  been shown?
22  A. I do.
23  Q. What are they?
24  A. These are excerpts from the PDF report that I created for
25  Government Exhibit 704.

1  Q. Do these excerpts fairly and accurately depict some of the
2  data that you extracted from the phone that was marked for
3  identification as 704?
4  A. Yes.
5      MS. GHOSH: The government offers Exhibits 704A-1
6  through 704A-4 into evidence.
7      MR. QUIJANO: No objection.
8      MS. O'NEILL: No objection.
9      THE COURT: 704A-1 through 704A-4 are admitted in
10  evidence.
11      (Government's Exhibits 704A-1, 704A-2, 704A-3 and
12  704A-4 received in evidence)
13      MS. GHOSH: Mr. Coleman, can we publish 704A-1 to the
14  jury.
15  BY MS. GHOSH:
16  Q. Mr. Santos, what is this document?
17  A. This is the front page of the PDF report for this phone.
18  It basically just lists information about the case that this
19  phone belongs to, including the evidence number. It also
20  includes data about when the extraction was started and when it
21  ended, and just what type of extraction I performed on this
22  phone.
23  Q. If we look first at the top portion, the summary, can you
24  just explain what this information is?
25  A. Of the entire report, this is the only user entered part.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                    May 13, 2019

1    This is the only part where I can enter information on the
2    report.  So here I have my name, the office that I work for,
3    the case number that's associated, and any names that are
4    associated with the phone.  It also lists the time that the
5    report was created.
6            MS. GHOSH: If we can turn to page 2 of 704A-1.
7            Mr. Coleman, if you can zoom in on the first half of
8    the device information section through the end of physical, if
9    you could, please.
10   BY MS. GHOSH:
11   Q.  Mr. Santos, generally speaking, what information is
12   contained in this section device information?
13   A.  Generally, it's identifying information about the phone and
14   the SIM card that was contained in the phone.  It contains
15   specifically the IMEI number, which is unique identifying
16   number for that phone, and it contains a phone number
17   associated with that SIM card.
18   Q.  You mentioned a phone number.  Using the touchscreen in
19   front of you, could you circle where this indicates the phone
20   number of the phone.
21           What is the phone number for this phone?
22   A.  It's area code (346) 636-5083.
23   Q.  That information is next to something that says MSISDN.
24   What is that?
25   A.  It's an industry acronym for mobile station international

1    subscriber directory number.  It's just the device's phone
2    number.
3            MS. GHOSH: Mr. Coleman, if we can turn to page 3 of
4    704A-1, please.
5            If you could just zoom in on the information there,
6    please.
7    Q.  Mr. Santos, what does this page tell us, generally
8    speaking?
9    A.  It's just a summary of the types of data that the
10   extraction was able to pull out of the phone.  So it's just a
11   summary of all the different data that was parsed.
12   Q.  In looking at the two columns on the right, the middle
13   column and the right column, there is certain text in red that
14   says deleted.  Can you explain what that means?
15   A.  It means that either the phone's operating system or the
16   phone's user deleted some information, but the extraction was
17   able to recover some of that deleted information.
18           MS. GHOSH: Mr. Coleman, if you can put up 704A-2 for
19   the jury, please.
20   Q.  Before we turn the page, can you explain where the
21   information in this part of the exhibit comes from?
22   A.  This is from the chat section of the report.
23           MS. GHOSH: If we can go to the next page, please.
24           If you could just zoom in on the bottom portion where
25   there is text.  Thank you.

1    Q.  Mr. Santos, can you, based on this document, tell us who
2    the participants in this chat are?
3    A.  Yes.  The participants --
4            MS. O'NEILL: Objection.
5            THE COURT: Overruled.
6    A.  The participants here are Diane Nicole Scadutto and Kenneth
7    Charlton.
8    Q.  Could you just read into the record the first message from
9    Diane Nicole Scadutto from May 8, 2015?
10   A.  Sure.  "What's up.  It's Shaun.  I'm home."
11   Q.  What does the second message say, also from the same
12   person?
13   A.  It's a phone number.  It's area code (347) 299-7845.
14   Q.  Just to be clear, is it your understanding that Diane
15   Nicole Scadutto and Kenneth Charlton are user names used in the
16   Facebook Messenger platform?
17   A.  Yes.
18   Q.  Do you have any understanding of who was actually sending
19   these messages?
20   A.  Yes.
21   Q.  Do you have any understanding of who was actually sending
22   these messages?
23   A.  Just what is listed on the report.
24   Q.  After the message with the phone number, can you please
25   read the response sent on May 8, 2015 from the user listed as

1    Kenneth Charlton?
2    A.  It says, "What up.  Glad to hear it."
3            MS. GHOSH: Mr. Coleman, if we can go to the next
4    page, please.
5    Q.  Mr. Santos, if you could just read the response from the
6    user listed as Diane Nicole Scadutto, please?
7    A.  It says, "Not much, same shit, diff day, everything is back
8    to normal."
9            MS. GHOSH: Mr. Coleman, if we can now bring up 704A-3
10   for the jury.
11   Q.  Where is the information in 704A-3 taken from in this
12   phone?
13   A.  The contact section.
14           MS. GHOSH: Can we please go to page 2.  If you could
15   zoom in on the one entry there.
16   Q.  What is the name listed for this contact in the phone
17   number?
18   A.  It's a contact labeled as Ameriken, spelled
19   A-M-E-R-I-K-E-N.  And the phone number listed is area code
20   (347) 636-5083.
21   Q.  How does that number compare to the phone number of the
22   phone that you extracted?
23   A.  Can I see that first page of the report to refresh my
24   recollection?
25   Q.  Yes, absolutely.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

1      MS. GHOSH: If we go back to 704A-1, the second page.
2      If we just zoom in on the MSISDN section.
3 A. It's the same number.
4      MS. GHOSH: Mr. Coleman, if we can go back to 704A-3
5  and go to page 4, please.
6 Q. Could you please read the name listed in row 494?
7 A. The name is Frank Chopper.
8      MS. GHOSH: If we go to the next page.
9 Q. Without going into detail, do you see the two names listed
10  on this page?
11 A. Yes.
12 Q. Who are those names?
13 A. Frank Chopper.
14      MS. GHOSH: If we can go to page 6, please.
15      If you can just zoom in on the top portion of that.
16  Thank you.
17 Q. What name is listed here in row 971?
18 A. Michael Shearer.
19      MS. GHOSH: Mr. Coleman, if you can just flip to the
20  next page.
21 Q. Do you see which name is listed here as another contact?
22 A. Michael Shearer.
23      MS. GHOSH: If we could go to page 9 and zoom in on
24  those.
25 Q. Can you please read the name and the contact phone numbers

1  that appear in rows 1026 through 1030 on this page?
2 A. Sure.
3      1026, the name is listed as Min.
4      1027, it's Min Joe.
5      1028 is Min Min.
6      1029 is Minn with two Ns.
7      1030 is Mins Boy Midland.
8      The phone number for 1026, it's area code (347)
9  337-8306.
10      1027 the phone number is 646-972-8360.
11      1028 the phone number is 929-348-6189.
12      1029 the phone number is area code (551) 275-3113.
13      And 1030 the phone number is 917-930-3936.
14      MS. GHOSH: Mr. Coleman, if we could go to the second
15  group of contacts on this page, page 9.
16 Q. What are the two names listed here?
17 A. Line 1034 is Mymin, spelled M-Y-M-I-N. And 1035 is the
18  same. And there is one phone number. It's 626-972-6785.
19      MS. GHOSH: If we could go to page 10, please.
20 Q. What is the name of the person listed on this contact?
21 A. Shaun M. Sullivan.
22      MS. GHOSH: If we could go to the next page, please.
23 Q. Is this the same name?
24 A. Yes.
25 Q. Looking at the bottom portion of row 1282, do you see a

1  phone number listed there?
2 A. Yes.
3 Q. Which phone number is that?
4 A. It's area code (347) 299-7845.
5      MS. GHOSH: Mr. Coleman, if we can bring up 704A-4,
6  please.
7 Q. Mr. Santos, where is the data coming from in 704A-4?
8 A. From the timeline section.
9 Q. Can you explain what the timeline section of the phone
10  extraction is?
11 A. The timeline section just pulls data from all the other
12  sections of the report and lists them in chronological order.
13 Q. What are some of the sections it pulls from?
14 A. Text messages, calls, chats, MMS.
15      MS. GHOSH: If we can go to page 2, please, and zoom
16  in on that.
17 Q. Mr. Santos, could you read the message that was sent on
18  January 7, 2018 that was sent to someone with the phone number
19  ending in 7744 who is labeled as Big Fat John?
20 A. The message says, "Oh, yeah, Billy was telling me Min's new
21  guy after me just got pinched Thursday or Friday. It's on
22  SILive with 160 bags, pins, subs, he got pulled over smoking a
23  joint while in cell phone, lol, jackass."
24      MS. GHOSH: If we can go to page 3 and zoom in on the
25  entry at the top, please.

1 Q. This is in row 8642.
2      First of all, the second column says "Web history."
3  Can you explain where this information is pulled from in the
4  phone?
5 A. There is a section in the phone report called Web history,
6  it just lists some of the pages you have visited on your phone.
7 Q. What is the title of the page visited on January 7, 2018 at
8  approximately 9:43 p.m.?
9 A. This is a link to a news article and the heading of the
10  article is Traffic Stop Leads to Arrest, 160 bags of heroin,
11  police allege. And it's from a Web site SILive.com.
12      MS. GHOSH: If we can zoom in on the bottom message,
13  8658, please.
14 Q. Could you please read the outgoing SMS message sent on
15  January 7, 2018 to someone with the name saved as Damian, phone
16  number ending in 7660?
17 A. "Min's new guy after me. Billy just told me about it. The
18  kid was smoking pot in on the cell phone when he got pulled
19  over and that's everything you got pulled over with, lol."
20      MS. GHOSH: Moving to page 4, please, Mr. Coleman.
21  Zoom in on this.
22 Q. This is an incoming SMS message in row 8832, on January 7,
23  2018, from Big Fat John, with the phone number ending in 7744.
24  What did he write?
25 A. "Yeah, Frank, I know Min told me."

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

1     MS. GHOSH: Go to the next page, please.
2 Q. This message is from -- by the way, the ones we were just
3   looking at --
4     MS. GHOSH: If we can just go back to the one we were
5   looking at for a moment.
6 Q. Just to be clear, what does incoming message mean versus
7   outgoing message?
8 A. This is from the phone's perspective, the phone that I
9   examined. So an incoming call would indicate that it's coming
10  from someone else's phone into this device, and an outgoing
11  call or message would be a message going out from that phone to
12  another phone.
13 Q. Thank you.
14     Going to the next page, which is page 5, row 10916,
15  this is from January 10, 2018, an outgoing message to a number
16  ending in 4957. What is that message?
17 A. "Who's this?"
18     MS. GHOSH: Go to page 6, please.
19 Q. What is the response in row 10935, on January 10, 2018,
20  from the number ending in 4957?
21 A. "It's Min dick."
22     MS. GHOSH: If we can go to page 7, please, and zoom
23  in there.
24 Q. The first message, row 11054, incoming on January 10, 2018,
25  from 4957, what does that message say?

1 A. "You still got people."
2 Q. What about the message just after that from the same
3   number?
4 A. "That hit you up."
5 Q. If we can go to the third message on this page, row 11059,
6   outgoing to the 4957 number, what is the response?
7 A. "Of course, and I'm finally clean."
8     MS. GHOSH: Page 8, please, Mr. Coleman.
9 Q. Starting at the very top. This is an incoming message in
10  row 11064 from the 4957 number. What does that message state
11  on January 10, 2018?
12 A. "Hit people up now."
13 Q. The response on January 10, 2018 to the 4957 number?
14 A. "Working on it."
15     MS. GHOSH: If you can zoom in on the next section,
16  please.
17 Q. Incoming message from 4957 on the same date?
18 A. "No more credit though."
19     MS. GHOSH: If we could just zoom in on the rest of
20  the page there. Thank you.
21 Q. What is the next incoming message to this phone from 4957?
22 A. "I'm not in a position."
23 Q. The message after that?
24 A. "To do that."
25 Q. Looking at the outgoing message on January 10, 2018 to the

1   4957 number, could you read that, please?
2 A. "Neither am I and I'm not in a position to have people come
3   and no one's here or waiting around, don't know why you just
4   didn't work with me when I was sick in out of hospital. We
5   were doing good like -- sorry, there is a redacted area -- get
6   pinched. I don't drive around getting stoned on my phone
7   losing product."
8     MS. O'NEILL: Objection.
9     MS. GHOSH: We will correct that.
10     THE COURT: We are going to take our afternoon break
11  now. We will resume in 10 minutes.
12     (Jury exits courtroom)
13     (Recess)
14     (Jury present)
15     THE COURT: Ms. Ghosh.
16     MS. GHOSH: Thank you, your Honor.
17     To expedite things, with your Honor's permission, I am
18  going to hand up some paper copies to the witness.
19 BY MS. GHOSH:
20 Q. Before the break, we were looking in 704A-4 at page 8.
21     MS. GHOSH: If we could pull that back up for
22  everyone, please, Mr. Coleman.
23     If you could zoom in on the bottom text.
24 Q. Mr. Santos, could you please read this corrected version
25  into the record of the message sent from the phone to the phone

1   ending in 4957 on January 10, 2018?
2 A. I am looking for the message on the paper version.
3 Q. This one is up on the screen in front of you.
4 A. "Neither am I and I'm not in a position to have people come
5   and no one's here or waiting around. Don't know why you just
6   didn't work with me when I was sick. We were doing good like
7   always and -- "
8     MS. O'NEILL: Objection.
9     THE COURT: What is the objection?
10     MS. O'NEILL: We discussed this earlier. The Court
11  ruled on this.
12     MS. GHOSH: We will fix this.
13     We can take this down for now.
14     If you could please go to page 9 of 704A-4.
15 BY MS. GHOSH:
16 Q. Could you please read this incoming message from the 4957
17  phone on January 10, 2018?
18 A. It says, "LMK get people ready."
19     MS. GHOSH: I am now going to read from stipulation
20  506, which is in evidence, paragraph 2, which states that:
21     Government Exhibit 702 is an Apple cellular telephone
22  with phone number 941-268-9918, called in the stipulation "the
23  Van Manen iPhone." Government Exhibit 703 is an LG cellular
24  telephone with phone number 646-698-3070, called "the Van Manen
25  LG cell phone." The Van Manen iPhone and the Van Manen LG cell

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

May 13, 2019

1 phone were lawfully recovered on January 16, 2018 from Paul Van
2 by NYPD officers, and are in substantially the same condition
3 today as when they were obtained by the NYPD on January 16,
4 2018. Government Exhibit 702A is a true and accurate report
5 reflecting certain contents of the Van Manen iPhone.
6 Government Exhibit 703A is a true and accurate report
7 reflecting certain contents of the Van Manen LG cell phone.
8 BY MS. GHOSH:
9 Q. Mr. Santos, do you have in front of you documents marked
10 for identification as Government Exhibit 702A-1 through A-8 and
11 703A-1 through A-4?
12 A. I do.
13 Q. Did you perform extractions on the phones with the numbers
14 ending in 9918 and 3070 which were described in that
15 stipulation I just read?
16 A. Yes.
17 Q. Do the excerpts that you have in front of you fairly and
18 accurately depict some of the data that you extracted from
19 those phones?
20 A. Yes.
21 MS. GHOSH: The government offers Exhibits 702A-1
22 through 702A-8 and 703A-1 through 703A-4 into evidence.
23 MR. QUIJANO: No objection.
24 MS. O'NEILL: No objection.
25 THE COURT: They are received in evidence.

1 (Government's Exhibits 702A-1 through 702A-8, 703A-1
2 through 703A-4 received in evidence)
3 MS. GHOSH: Mr. Coleman, can we please publish 702A-1
4 to the jury. Thank you.
5 BY MS. GHOSH:
6 Q. Going to page 2, Mr. Santos, do you see the phone number
7 for this phone in the device information section?
8 A. Yes.
9 Q. Where are you looking for that, you want to just circle it?
10 A. Toward the middle of the report, right next to where it
11 says MSISDN, there is a 941 phone number.
12 Q. And that's the phone number ending in 9918?
13 A. Yes.
14 MS. GHOSH: Mr. Coleman, if we could go to page 3,
15 please, and just zoom in on the section that says, in the
16 middle of the page, SMS messages and MMS messages and chats.
17 If you can just zoom in on that section from chats down.
18 A little bit higher, please.
19 Q. Mr. Santos, how many chats were on this phone originally?
20 A. 995.
21 Q. How many of those were deleted?
22 A. 572.
23 Q. What about SMS messages, how many were deleted out of how
24 many in total?
25 A. Originally there were 1,119 and 799 were deleted.

1 Q. What about MMS messages?
2 A. 72 originally, 51 deleted.
3 Q. What is the difference between an MMS message and SMS
4 message?
5 A. An MMS is just an SMS with some sort of multimedia attached
6 to it, usually a photo or an audio message, something like
7 that.
8 Q. What is an SMS message?
9 A. It's just a text message.
10 MS. GHOSH: Mr. Coleman, if we could please go to
11 702A-2.
12 Q. Mr. Santos, what section of the phone is this from?
13 A. The user accounts.
14 MS. GHOSH: If we could zoom in on row 9, please.
15 Q. What is the user name associated with this item in row 9?
16 A. Paul C. Van Manen.
17 Q. Thank you.
18 MS. GHOSH: If we could go to 702A-3.
19 Q. Which section is this?
20 A. Contacts.
21 MS. GHOSH: If we can go to the second page, please.
22 Q. Looking at rows 138 through 140, what names do you see
23 there?
24 A. 138 is Anthony Bonesky; 139 is also Anthony Bonesky; and
25 140 is also Anthony Bonesky.

1 Q. Looking at row 138, what are the last four digits of the
2 first number listed there?
3 A. 5250.
4 MS. GHOSH: We can zoom out of that and go to the next
5 page, please. And zoom in on row 194.
6 Q. Which name is listed here?
7 A. Biggs.
8 Q. What are the last four digits of the phone number
9 associated with Biggs?
10 A. 8473.
11 MS. GHOSH: If we can zoom out of that and go to the
12 next page, please.
13 If you could zoom in here.
14 Q. What name is listed in rows 407 and 408?
15 A. Derrick Wolverine for both.
16 Q. What are the last four digits of the phone number
17 associated here with Derrick Wolverine?
18 A. 4208.
19 MS. GHOSH: If we can go to the next page, and zoom in
20 on this whole section.
21 Q. Could you read the names associated with these rows 424
22 through 428?
23 A. 424 is Dino; 425 is Dino Crazy; 426 is Dino Crazy; 427 is
24 Dino K; 428 is Dino K.
25 MS. GHOSH: We will go on to the next page.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                    May 13, 2019

1          If we can zoom in on the three entries on this page.
2 Q.  What is the entry in row 826, which name?
3 A.  Mike OO.
4 Q.  The phone number listed for Mike OO, could you please read
5    that?
6 A.  Area code (917) 525-6275.
7 Q.  How about row 831 at the bottom of this page?
8 A.  That's a contact Mike Malone, phone number area code (347)
9    681-0111.
10          MS. GHOSH: If we can go to the next page.
11 Q.  What is the user name for these two contacts?
12 A.  Min.
13 Q.  These are both phone numbers ending in 4957?
14 A.  Yes.
15          MS. GHOSH: Go to the next page, please.
16 Q.  What is the phone number listed for New Num?
17 A.  646-966-8865.
18          MS. GHOSH: Go to the next page.
19 Q.  What is the name on this one?
20 A.  Paul.
21 Q.  And a phone number ending in 8685?
22 A.  347-446-8685.
23          MS. GHOSH: The next page, please.
24 Q.  Who is the individual in these contacts?
25 A.  Shaun Sullivan.

1          MS. GHOSH: If we can go to the next page.
2 Q.  Who is the individual listed here?
3 A.  Teddy.
4 Q.  This is for a phone number ending in 5073 in the first two
5    rows?
6 A.  Yes.
7          MS. GHOSH: If we could go to the last page of this
8    document, please.
9          One more page, please.
10 Q.  Who is listed here?
11 A.  Yung Derek.
12          MS. GHOSH: Mr. Coleman, if we could go to 702A-5,
13    please.
14 Q.  Which section of the phone is this?
15 A.  The images section.
16          MS. GHOSH: If we could go to the second page, please,
17    and zoom in on that.
18 Q.  Can you explain what this information is showing?
19 A.  This is -- it's showing an image that was found on the
20    phone, and there is some metadata associated with that image.
21 Q.  What is the date of the image?
22 A.  November 28, 2017.
23          MS. GHOSH: If we could go -- let's go to the next
24    page right now.
25 Q.  Is this also an image that was recovered from the phone

1    from November 28 --
2 A.  Yes.
3 Q.  -- 2017?
4 A.  Yes.
5          MS. GHOSH: Mr. Coleman, if you could bring up
6    702A-5A, please.
7 Q.  Mr. Santos, have you confirmed that this is the image we
8    just saw in the thumbnail version in row 165?
9 A.  Yes.
10          MS. GHOSH: If we can pull up 702A-5B, please.
11 Q.  Is this the image that was in the phone in row 200 that we
12    just saw?
13 A.  Yes.
14          MS. GHOSH: Mr. Coleman, if you could, please, bring
15    up 702A-6, and go to the next page and zoom in there.
16 Q.  Is this an image taken from January 12, 2018?
17 A.  Yes.
18 Q.  If we turn to the next page of this, is this a larger image
19    of that thumbnail?
20 A.  Yes.
21 Q.  Could you read what it says at the top of this image?
22 A.  It says, "Welcome to 120 Worth Street, New York, New York
23    10013."
24          MS. GHOSH: If we can look at 702A-7.
25          The next page, please.

1 Q.  Is this an image that was taken from the phone as well?
2 A.  Yes.
3          MS. GHOSH: If we could turn to the next page.
4 Q.  This is a larger version of that image?
5 A.  Yes.
6          MS. GHOSH: Mr. Coleman, can you please bring up
7    702A-8.
8          If you could go to the second page, please.
9 Q.  This is an incoming message from August 10, 2017. It
10    appears that there is no phone number listed. Can you explain
11    why that would be?
12 A.  So this message indicates that it's a recovered deleted
13    message. When we recover deleted messages, usually those items
14    are in some state of decomposition. So the longer ago the
15    message was deleted, the less material you are sometimes able
16    to recover. So it looks like in this specific case we lost the
17    to or from data.
18 Q.  Could you please read this message?
19 A.  It says, "If I give Doreen the $20 I have on me, can I grab
20    another half? Would mean I owe you 75 prob. Won't have it
21    till Sat though."
22          MS. GHOSH: If we can go to the next page and zoom in
23    on the bottom.
24 Q.  Again, is this the same issue where it was deleted so we
25    don't have information about the person who was receiving this

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                                          **May 13, 2019**

1 message?
2 A. Correct.
3 Q. Could you read this message, please?
4 A. "He's got only seven. That's 280. Hold that 120 till I
5 see you."
6         MS. GHOSH: If we could skip ahead a few pages to the
7 page with 865 at the bottom.
8         Can you zoom in on the top message, please.
9 Q. This is an outgoing message from the 9918 number on
10 November 27, 2017?
11 A. Yes.
12 Q. What does this message say?
13 A. "Didn't go to Brooklyn yet. I'm working on that now."
14         MS. GHOSH: Could you please, Mr. Coleman, go to the
15 page ending in 903 at the bottom, a few more pages in.
16         If you could zoom in on the messages there.
17 Q. Mr. Santos, are these a series of messages to and from the
18 9918 number, but we don't have information about who they are
19 being sent to?
20 A. That's correct.
21 Q. OK. What is the date of these messages?
22 A. December 28, 2017.
23         MS. GHOSH: If we can turn to the page ending with 973
24 on the bottom. Just zoom in on this section.
25 Q. Again, were all of these messages deleted?

1 A. Yes.
2 Q. In row 5498, there is an outgoing message on January 12,
3 2018. Can you read that message, please?
4 A. "What you need?"
5 Q. What is the response?
6 A. "A whole one."
7 Q. What does the next line 5500 say?
8 A. "OK. ASAP around five in Manhattan right now."
9         MS. GHOSH: Now I would like to read Government
10 Exhibit 510, which is a stipulation concerning cell phone
11 records. This stipulation between the parties states that:
12         Government Exhibits 611A and 611B are true and correct
13 business records of the cellular phone service provider Sprint,
14 obtained pursuant to a court order, and which were created,
15 kept and maintained by Sprint in the course of its regularly
16 conducted business activity. Government Exhibit 611A consists
17 of call detail records for cellular telephone number
18 941-268-9918. 611B consists of subscriber records for cellular
19 phone number 941-268-9918.
20         Paragraph 2 says that: Government Exhibits 612A and
21 612B are true and correct business records of the cellular
22 phone service provider AT&T, obtained pursuant to a court
23 order, and which were created, kept and maintained by AT&T in
24 the course of its regularly conducted business activity.
25 Government Exhibit 612B consists of subscriber records for

1 cellular telephone number 347-446-8685.
2         The government moves to admit Government Exhibits 510,
3 611A, 611B and 612B.
4         MS. O'NEILL: No objection.
5         MR. QUIJANO: No objection.
6         THE COURT: They are received in evidence.
7         (Government's Exhibits 510, 611A and 611B received in
8 evidence)
9         MS. GHOSH: If we could put up 611B, please.
10 BY MS. GHOSH:
11 Q. Mr. Santos, generally speaking, what is this document?
12 A. This is subscriber information from Sprint for a cell phone
13 user.
14 Q. This is for the phone number ending in 9918?
15 A. Yes.
16 Q. Is that the same phone number that we were just looking at
17 Government Exhibit 702A?
18 A. Yes.
19 Q. What name is listed as the subscriber?
20 A. Alexandrea Van Manen.
21         MS. GHOSH: If we could pull up 612B.
22 Q. What is this?
23 A. Subscriber information from AT&T.
24 Q. If we could look down to the MSISDN number. This is for
25 the phone number ending in 8685?

1 A. Yes.
2 Q. Who is listed as the subscriber for this phone?
3 A. Paul Van Manen.
4         MS. GHOSH: We can take that down.
5         For the record, we are putting in a corrected copy of
6 704A-4 page 8.
7 BY MS. GHOSH:
8 Q. Mr. Santos, could you please read this message now?
9 A. "Neither am I and I'm not in a position to have people come
10 and no one's here or waiting around, don't know why you just
11 didn't work with me when I was sick in out of hospital. We
12 were doing good like always and I don't get pinched. I don't
13 drive around getting stoned on my phone losing product."
14 Q. Thank you. Just to be clear, that was from the first phone
15 we looked at that was seized from Kenneth Charlton?
16 A. Yes.
17 Q. Thank you.
18         So let's turn to the second Van Manen phone 703A-1.
19         MS. GHOSH: If we could put that up for the jury,
20 please.
21         If we could go to page 2, please.
22 Q. Mr. Santos, does this data reflect the phone number for the
23 phone in 703A-1?
24 A. This extraction would be in a different part of the report,
25 but no.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                                    May 13, 2019

1      MS. GHOSH: Could we bring up 703A-4, please.
2      If you can zoom in on the top part.
3  Q. What does the SIM data section mean?
4  A. This is the data that was extracted from the SIM card that
5      came with the phone, and here we were able to find the phone
6      number associated with that phone.
7  Q. So why in this example is the phone number taken here from
8      the SIM data and not in the earlier section that we saw with
9      the other examples?
10 A. With the previous phone, I performed what's called a
11     physical extraction. It's just a more thorough type of
12     extraction. That specific model allowed us to be able to
13     perform that kind of extraction. With this phone I performed
14     what's called a logical extraction, which it grabs basically
15     data that's live, but unfortunately not the phone number
16     directly from the device, although I was able to capture that
17     information from the SIM card.
18 Q. With this type of extraction, the logical and file
19     extraction, what effect does that have on the amount of data
20     that you can recover from the phone?
21 A. It's usually less information than the physical extraction.
22     MS. GHOSH: If we could go to 703A-3, please.
23 Q. This is the timeline section of the phone?
24 A. Yes.
25     MS. GHOSH: If you could turn to the second page,

1  please, Mr. Coleman.
2      If you could zoom in on those messages from January
3      15, 2018.
4  Q. Mr. Santos, could you read the first message, which was an
5      incoming message from a number ending in 9900?
6  A. "Give her the whole and I'll take a half."
7  Q. Could you please read the bottom two messages which are
8      also incoming from the same number?
9  A. "But when are you coming to me? I'm OK till later so don't
10     worry about me. Give her the whole one."
11     MS. GHOSH: If you could, Mr. Coleman, please turn to
12     the page ending with 42 at the very bottom of it. It's a few
13     pages in. And if you can zoom in on that bottom portion.
14 Q. Mr. Santos, could you please read the first and second
15     messages here, which are first to someone ending in 0148 and
16     then from that individual?
17 A. "What you getting?"
18     "Half."
19 Q. And row 329, at the bottom, there is an outgoing message.
20     Could you read that one sent to Jack with 9043 as his phone
21     number?
22 A. "On our way."
23     MS. GHOSH: At this time, I would like to read into
24     the record a stipulation between the parties, which is marked
25     for identification as Government Exhibit 513. This is a second

1  stipulation concerning cell phone records. It states that:
2      Exhibits 610A and 610B are true and correct business
3  records of cellular phone service provider T-Mobile, obtained
4  pursuant to a court order, and which were created, kept and
5  maintained by T-Mobile in the course of its regularly conducted
6  business activity. Government Exhibit 610A consists of call
7  detail records for the cellular telephone number 646-966-8865
8  and 610B consists of call detail records for the phone number
9  ending in 3070.
10     The government moves to admit Government Exhibits 513,
11     610A and 610B.
12     MR. QUIJANO: No objection.
13     MS. O'NEILL: No objection.
14     THE COURT: They are in evidence.
15     (Government's Exhibits 513, 610A and 610B received in
16     evidence)
17     MS. GHOSH: I am going to read now from another
18     stipulation, which is marked for identification as Government
19     Exhibit 511. This says that:
20     Government Exhibit 705 is an Apple cellular telephone
21     with phone number 646-705-8473, described in the stipulation as
22     the Kosic iPhone. Exhibit 706 is an LG cellular telephone with
23     phone number 646-905-7291, the Kosic LG cell phone. The Kosic
24     iPhone and the Kosic LG cell phone were recovered on January
25     17, 2018, from 737 Post Avenue, Staten Island, New York by Drug

1  Enforcement Administration agents during the arrest of Medin
2  Kosic. The Kosic iPhone and Kosic LG cell phone have been in
3  the continual custody of law enforcement officers and are in
4  substantially the same condition today as when they were
5  obtained by the DEA on January 17, 2018.
6      The government offers the stipulation, Exhibit 511
7  into evidence.
8      MR. QUIJANO: No objection.
9      MS. O'NEILL: No objection.
10     THE COURT: 511 is in evidence.
11     (Government's Exhibit 511 received in evidence)
12     (Continued on next page)

J5d2van6      Santos - Direct      Page 1082

1   BY MS. GHOSH:
2   Q. Mr. Santos, did you perform extractions on the phones
3   ending in number 8473 and 7291 described in the stipulation I
4   just read?
5   A. Yes.
6   Q. You have in front of you documents marked for
7   identification as Government Exhibits 705A and 706A1 through
8   A4. If you could just flip through those and then let me know
9   if you recognize them.
10   A. Yes I recognize these.
11   Q. What are they?
12   A. One is a report for a SIM card and the other is a report
13   for a cell phone.
14   Q. Do those excerpts fairly and accurately depict some of the
15   data you extracted from the phones in 705 and 706?
16   A. Yes.
17      MS. GHOSH: The government offers 705A and 706A1
18   through A4.
19      MS. O'NEILL: No objection.
20      MR. QUIJANO: No objection.
21      THE COURT: They are received in evidence.
22      (Government's Exhibits 705A and 706A1 through
23   A4 received in evidence)
24      MS. GHOSH: Mr. Coleman, can we publish?
25   Q. Mr. Santos, what does this report show?

---

J5d2van6      Santos - Direct      Page 1083

1   A. This is a report for a SIM card, and here we have
2   information such as the cell phone number associated with that
3   SIM card and information that would be pertinent to the network
4   carrier, so such as the IMSI number and the ICCID number.
5   Q. Were the contents of this phone able to be extracted?
6   A. No.
7   Q. Why not?
8   A. The phone was locked.
9      MS. GHOSH: Mr. Coleman, can we publish Exhibit 706A1
10   to the jury. Actually, 706A2. Thank you.
11   BY MS. GHOSH:
12   Q. In the SIM data section what is the phone number for this
13   phone in 706A2?
14   A. It is area code 646-905-7291.
15   Q. Again, is this one of the phones where you were not able to
16   extract as much data as you might -- you had to do it in a
17   different way?
18   A. Correct.
19      MS. GHOSH: If we could go to 706A3, please. And if
20   you could go to --
21   BY MS. GHOSH:
22   Q. Again, Mr. Santos, what section is this?
23   A. The timeline section.
24      MS. GHOSH: If we could go to the next page and just
25   zoom in on the messages that are visible there. Thank you.

---

J5d2van6      Santos - Direct      Page 1084

1   BY MS. GHOSH:
2   Q. So these are four messages from January 16, 2018. Is that
3   correct?
4   A. Yes.
5   Q. And can you read the first one, which is an incoming
6   message from the phone ending in 9688?
7   A. "Hi. Who is this?"
8   Q. And what is the response to this?
9   A. "Doreen, answer the phone. It is big daddy."
10   Q. And the next message?
11   A. "Who is big daddy?"
12   Q. And the final message?
13   A. "Dino."
14   Q. Thank you.
15      MS. GHOSH: Okay. I will read from Government Exhibit
16   511:
17      "Government Exhibit 707 is a Samsung cellular
18   telephone with phone number 646-818-5073. ('the Banasky cell
19   phone'). The Banasky cell phone was lawfully recovered on
20   January 17, 2018, from 737 Post Avenue, Staten Island, New
21   York, by DEA agents during the arrest of Theodore Banasky and
22   is in substantially the same condition today as when it was
23   obtained by the DEA on January 17, 2018. The Banasky cell
24   phone has been in the continuous custody of law enforcement
25   officers and is in substantially the same condition today as

---

J5d2van6      Santos - Direct      Page 1085

1   when it was obtained by DEA on January 17, 2018."
2   BY MS. GHOSH:
3   Q. Mr. Santos did you perform extractions on the phone with
4   the number ending in 5073 that I just described?
5   A. Yes.
6   Q. And do you have in front of you what's marked for
7   identification as 707A1 and A2?
8   A. Yes.
9   Q. And did those excerpts fairly and accurately depict some of
10   the data that you extracted from that phone?
11   A. Yes.
12      MS. GHOSH: The government offers 707A1 and 707A2.
13      MR. QUIJANO: No objection.
14      MS. O'NEILL: No objection.
15      THE COURT: They are received in evidence.
16      (Government's Exhibits 707A1 and 707A2 received in
17   evidence)
18      MS. GHOSH: If we could put up 707A2, please, and just
19   zoom in on the bottom portion of that from the SIM data
20   section.
21   BY MS. GHOSH:
22   Q. And, again, what is the phone number for this phone,
23   Mr. Santos?
24   A. Area code 646-818-5073.
25      MS. GHOSH: You can take that down, Mr. Coleman.

---

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                     May 13, 2019

1  BY MS. GHOSH:
2  Q. Mr. Santos, in addition to extracting data from certain
3  cell phones yourself, did you analyze the extraction from a
4  cell phone that another agency had extracted?
5  A. Yes.
6  Q. What were you asked to do?
7  A. I was just asked to look at the report that was created by
8  another examiner and just authenticate the data.
9       MS. GHOSH: I am going to read now from Exhibit 506
10  which is a stipulation. This states that:
11       "Exhibit 701 is a Samsung cellular cell phone with
12  phone number 917-525-6275 that was lawfully recovered on
13  December 2, 2017, from Michael Ogno's bedroom by New York City
14  Police Department officers," called "the Ogno cell phone" in
15  the stipulation. "The Ogno cell phone has been in the
16  continual custody of law enforcement officers and is in
17  substantially the same condition today as when it was obtained
18  by the NYPD.
19       "Government Exhibit 701A is a true and accurate report
20  reflecting certain contents of the Ogno cell phone.
21       "Government Exhibit 701B and C are true and accurate
22  copies of certain images extracted from the Ogno cell phone."
23       The government moves to admit 701A, 701B and 701C.
24       MR. QUIJANO: No objection.
25       MS. O'NEILL: No objection.

1       THE COURT: 701A, B, and C are received in evidence.
2       (Government's Exhibits 701A, 701B and 701C received in
3  evidence)
4  BY MS. GHOSH:
5  Q. Mr. Santos, do you have 701A in front of you?
6  A. Yes.
7  Q. And just to be clear, is this the complete extraction that
8  you received or just excerpts?
9  A. Just excerpts.
10       MS. GHOSH: If we could publish 701A for the jury.
11  BY MS. GHOSH:
12  Q. What did you do with Government Exhibit 701A, Mr. Santos?
13  A. I just read through the report and just tried to recognize
14  it as if I were -- if I had done this report, so just go
15  through all the sections and just make sure that all of the
16  data is where it would usually appear if I had done the report.
17  Q. And did you find that it was?
18  A. Yes.
19  Q. And this is a Cellebrite report, is that correct?
20  A. Yes.
21  Q. Are you familiar with Cellebrite reports and what they
22  typically look like?
23  A. Yes.
24  Q. With 701A, are you able to determine what this phone's
25  phone number is?

1  A. Yes.
2  Q. And where do you see that listed?
3  A. Where it says "device information," there is a section that
4  says MSISDN, and then there is a 917 phone number listed in
5  that box.
6       THE COURT: What page is that on?
7       THE WITNESS: Page 1, your Honor.
8       THE COURT: Thank you.
9       MS. GHOSH: I believe it is page 1, your Honor.
10       THE COURT: Thank you.
11       MS. GHOSH: If we could turn to page 3, please, in the
12  contact section. Mr. Coleman if you could zoom in on row 6,
13  please.
14  BY MS. GHOSH:
15  Q. What information is listed in the Ogno cell phone under the
16  contact name D Paul?
17  A. Under D Paul there are three different phone numbers listed
18  here.
19  Q. And are those the phone numbers ending in 3070, 9918, and
20  8865?
21  A. Yes.
22       MS. GHOSH: Mr. Coleman, if we could go to the next
23  page and zoom in on the last contact name.
24  BY MS. GHOSH:
25  Q. What is the name saved in the last contact listed here, row

1  20?
2  A. It is contact section, it is Baby Love.
3  Q. And what's the phone number for Baby Love?
4  A. 347-552-4911.
5       MS. GHOSH: If we could go to page 5 of this exhibit,
6  Mr. Coleman? Thank you.
7  BY MS. GHOSH:
8  Q. And this is the timeline?
9  A. Yes.
10       MS. GHOSH: If we could turn to row 49, which is on
11  page 7.
12  Q. And what is listed in row 49?
13  A. It is a deleted e-mail.
14  Q. And is this from November 29, 2017?
15  A. Yes.
16  Q. Who is the e-mail from?
17  A. Western Union.
18  Q. And what is the subject line of the e-mail?
19  A. It is "Western Union - Your transaction's being reviewed."
20       MS. GHOSH: If we could turn to the next page, please,
21  and look at rows 104 and 105. Excuse me. One more page.
22  BY MS. GHOSH:
23  Q. And what is the date of these two outgoing MMS messages
24  from the Ogno phone on December 1, 2017?
25  A. The date is December 1, 2017.

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                    May 13, 2019

J5d2van6          Santos - Direct          Page 1090

1  Q. Thank you.
2       And who were they sent to?
3  A. D Paul.
4       MS. GHOSH: If we could turn to 701B for a moment,
5  please, Mr. Coleman.
6  Q. Is this one of the images that we were just looking at in
7  the timeline?
8  A. Yes.
9       MS. GHOSH: If we could go to 701C, please. If we
10 could zoom in on that a bit, the bottom portion where it says
11 "transaction receipt."
12 BY MS. GHOSH:
13 Q. Does this appear to be a transaction receipt from Moneygram
14 with the sender name Michael Ogno and the receiver name Paul
15 Van Manen?
16 A. Yes.
17 Q. Thank you.
18      MS. GHOSH: If we could go back to 701A, the timeline,
19 and if we could go to rows 106 through 108.
20 BY MS. GHOSH:
21 Q. What happened at 10:48 a.m.?
22 A. There was an outgoing message to a contact D Paul.
23 Q. What does the message say?
24 A. "Lmk when you get it."
25 Q. What was the response at 10:51?

J5d2van6          Santos - Direct          Page 1091

1  A. "Will do."
2  Q. And the next outgoing message at 11:03?
3  A. "You're coming to me, right?"
4       MS. GHOSH: Mr. Coleman, could you zoom out and zoom
5  in on rows 109 through 112, please.
6  BY MS. GHOSH:
7  Q. What happened after that message we just looked at in row
8  109?
9  A. A couple outgoing calls and an e-mail.
10 Q. There is an outgoing call at 11:04 a.m. to D Paul, is that
11 correct?
12 A. Yes.
13 Q. And then skipping to row 111?
14 A. Two more outgoing calls to the same person.
15 Q. At 11:18 and 11:19?
16 A. Yes.
17      MS. GHOSH: If we could now zoom in on rows 113
18 through 120, please.
19 BY MS. GHOSH:
20 Q. Is this a series of messages going to and coming from the
21 3070 number stated as D Paul?
22 A. Yes.
23 Q. All on December 1, 2017?
24 A. Yes.
25 Q. Between 11:23 and 11:34 a.m.?

J5d2van6          Santos - Direct          Page 1092

1  A. Yes.
2  Q. Could you read through these messages, please.
3  A. Starting with line 113 it says: "I'm getting your
4  Moneygram and then I'm coming to dinner."
5       And then the response is: "Okay. We're having
6  turkey."
7       Response: "On my way now. About ten minutes."
8       Response: "Okay. So you wanna gimme the bunny. I'll
9  owe it to you Sunday."
10      Response: "That's what we said we were doing, right?"
11      Response: "Yes, sir."
12      And response: "Here."
13 Q. Mr. Santos, if you -- it may be easier with the paper copy
14 in front of you, but can you look through and let me know did
15 this phone send any messages after the one in row 119 that says
16 "yes, sir"? Are there any outgoing messages after that?
17 A. No.
18      MS. GHOSH: Mr. Coleman, could you please bring up row
19 126 through 133 on the next page. I'm sorry, one more.
20 BY MS. GHOSH:
21 Q. And these are a series of incoming messages from the phone
22 number saved as Baby Love?
23 A. Yes.
24 Q. All on December 1, 2017?
25 A. Yes.

J5d2van6          Santos - Direct          Page 1093

1  Q. Can you read these messages, please?
2  A. Starting with line 126: "Baby?"
3       Then "Mike."
4       "Why aren't you talking to me?"
5       And then a series of calls.
6       And then one last text message that says: "Babe?"
7  Q. That series of calls, did any of those go through?
8  A. No. They are all listed as zero for call duration.
9  Q. And you said a few minutes ago that the Exhibit 701A is
10 just excerpts from the extraction report, not the full report.
11 A. Correct.
12 Q. If I could direct your attention to page 5, the first page
13 of the timeline, does this indicate how many messages are in
14 the full timeline?
15 A. No.
16 Q. What does the 136 next to timeline indicate?
17 A. Just how many items are listed on this list. So I am
18 seeing that it is a combination of calendar events, installed
19 applications, and then, if you continue on, I believe there
20 were text messages and calls.
21 Q. And some of the -- did you have any -- withdrawn.
22      Did you have any other involvement in this
23 investigation beyond analyzing the extraction from this device?
24 A. No.
25 Q. Did you have any involvement in deciding which phones to

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,                    May 13, 2019

1    perform extractions on?
2    A.  No.
3    Q.  Did you have any involvement in choosing which excerpts
4    from the extractions were included in Exhibits 701 through 707?
5    A.  No.
6         MS. GHOSH:  Just one moment.
7         (Counsel confer)
8    BY MS. GHOSH:
9    Q.  Referring back to the timeline that we were just looking
10   at, I believe you said that there were no further messages
11   after the outgoing message that said "yes, sir."  Were there
12   any outgoing calls made after that message?
13   A.  No.
14   Q.  And the time stamp listed here gives a time, a certain time
15   a.m. or p.m. and then it says UTC minus five, it looks like, on
16   most of these.  Can you just explain what UTC is?
17   A.  UTC is an acronym for universal coordinated time.  It is
18   basically the referenced time by which the rest of the world
19   sets its clocks to, so minus five when adjusting the clock
20   adjusting that UTC time to reflect New York eastern -- I
21   believe it is daylight time, so we are just adjusting the clock
22   to show that it is New York daylight time -- excuse me,
23   standard time.
24        MS. GHOSH:  No further questions.
25        THE COURT:  All right, ladies and gentleman I keep

1    saying, Mr. Jackson.  We will break now for the evening.  We
2    will resume tomorrow at 9:30.  Try to be in on time.  It's
3    going to be stormy tonight, tomorrow morning, as well.  Keep an
4    open mind.  Don't discuss the case.  Have a safe ride home
5    tonight.  See you tomorrow morning at 9:30.
6         (Continued on next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1         (Jury not present)
2         THE COURT:  You can step down, Mr. Santos.
3         (Witness not present)
4         THE COURT:  Please be seated.
5         Is that your last witness?
6         MS. GHOSH:  Your Honor we have one additional witness,
7    Mr. Coleman, who will just be putting in some summary charts,
8    so that will be approximately ten minutes, and there are a few
9    additional calls that we will be playing.  Other than that, the
10   government will be finished tomorrow morning quite quickly.
11        THE COURT:  For the defendants, who is going to go
12   first?
13        MS. O'NEILL:  Mr. Charlton will be going first.  We
14   might have our witness that we mentioned earlier, though,
15   before him, but we will be doing our case tomorrow.
16        THE COURT:  How long do you think you will be?
17        MS. O'NEILL:  A couple of hours probably.
18        THE COURT:  And Mr. Quijano?
19        MR. QUIJANO:  Three to four hours, your Honor.
20        THE COURT:  So Tuesday that will be defendants' day,
21   right?
22        MR. QUIJANO:  I'm sorry, your Honor?
23        THE COURT:  Most of tomorrow will be taken up with the
24   defendants' presentation of their case.
25        MR. QUIJANO:  I believe so, yes.

1         MS. O'NEILL:  Yes.
2         THE COURT:  So we will have summations on Wednesday,
3    jury charge on Wednesday?
4         MR. QUIJANO:  Hopefully.
5         MS. O'NEILL:  That's what we would anticipate.
6         THE COURT:  Okay.  How long do you think your
7    summations are going to be?
8         MR. QUIJANO:  Normally I can answer that question, but
9    I haven't even begun to start to draft it.  I would assume it
10   would never be more than 90 minutes.  Probably an hour and
11   fifteen minutes, something of that nature.
12        MS. O'NEILL:  I believe mine will be much shorter than
13   that.
14        THE COURT:  And for the government?
15        MS. GHOSH:  Your Honor, I imagine our closing will
16   probably be approximately an hour and a half.
17        THE COURT:  Do you want to take a little break and
18   then we will start with the jury charge?
19        MR. QUIJANO:  Yes, your Honor, but I do have one
20   application.
21        THE COURT:  Okay.
22        MR. QUIJANO:  Mr. Van Manen is prepared to be excused
23   with the court's permission at around 5:00.  I would ask to do
24   that only because it is as soon as we can get him transferred
25   from here to the MCC.  We do need to meet with him as quickly

UNITED STATES OF AMERICA, V
PAUL VAN MANEN and KENNETH CHARLTON,

**May 13, 2019**

1 as possible when we break tonight in order to continue our
2 preparation for his direct examination.
3     THE COURT: Listen, there is nothing magical about
4 reviewing the jury charge tonight. Do you want to do it
5 tomorrow night?
6     MR. QUIJANO: That would be really appreciated.
7     MS. O'NEILL: Yes, we would appreciate that.
8     MR. QUIJANO: You will be our favorite judge forever.
9     THE COURT: I doubt that. Forever is a long time.
10     MR. QUIJANO: I would request that.
11     THE COURT: Does the government have a position? Do
12 you care, Mr. Finkel?
13     MR. FINKEL: That's fine with the government, and you
14 are our favorite Judge Forever, as well, I would say. That's
15 certainly fine. Whenever the court wants to schedule the
16 charging conference, the government will be ready.
17     THE COURT: Okay.
18     MR. QUIJANO: Thank you, your Honor.
19     MR. FINKEL: Just one additional point, your Honor.
20 The government would like to reserve the right to call a single
21 rebuttal witness. That would be the special agent who was
22 present during the proffer meeting with Mr. Van Manen. That
23 depends on exactly what Mr. Van Manen testifies to. But if he
24 testifies inconsistently with what he told the government, then
25 we would introduce special agent Mikhail Vinopol to testify

1 about that meeting, and it would be short.
2     THE COURT: All right. We will see you tomorrow
3 morning at 9:00.
4     COUNSEL: Thank you, your Honor.
5     MS. FENDER: Just to clarify, your Honor, at 9 not at
6 9:30, correct?
7     THE COURT: I thought maybe you wanted tea and coffee
8 with the jury.
9     MS. FENDER: Sure. I'm always down for free food.
10     THE COURT: I will be here at 9:00 if you need
11 anything. We will start at 9:30.
12     COUNSEL: Thank you.
13     (Adjourned to Tuesday, May 14, 2019 at 9:30 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

1              INDEX OF EXAMINATION
2 Examination of:                    Page
3 ANTHONY JOSEPH FRANCESE
4 Cross By Ms. Sideris . . . . . . . . . . . . 916
5 Redirect By Ms. Ghosh . . . . . . . . . . . 927
6
7   DEREK YUNG
8 Direct By Mr. Finkel . . . . . . . . . . . . 930
9 Cross By Mr. Quijano . . . . . . . . . . . . 978
10 Redirect By Mr. Finkel . . . . . . . . . . .1013
11
12   STEPHEN NAPOLITANO
13 Direct By Mr. Finkel . . . . . . . . . . . .1017
14 Cross By Mr. Quijano . . . . . . . . . . . .1036
15
16   NICHOLAS VELEZ
17 Direct By Ms. Ghosh . . . . . . . . . . . .1040
18 Cross By Mr. Quijano . . . . . . . . . . . .1045
19
20   ENRIQUE SANTOS
21 Direct By Ms. Ghosh . . . . . . . . . . . .1047
22
23
24
25

1            GOVERNMENT EXHIBITS
2 Exhibit No.                  Received
3 408   . . . . . . . . . . . . . . . . . . 931
4 409   . . . . . . . . . . . . . . . . . . 932
5 1005   . . . . . . . . . . . . . . . . . 935
6 301EI   . . . . . . . . . . . . . . . . . 945
7 301EJ   . . . . . . . . . . . . . . . . . 950
8 301Y   . . . . . . . . . . . . . . . . . 956
9 110   . . . . . . . . . . . . . . . . . . 965
10 403   . . . . . . . . . . . . . . . . . . 974
11 414   . . . . . . . . . . . . . . . . . .1019
12 301A   . . . . . . . . . . . . . . . . . .1023
13 234 to 239 . . . . . . . . . . . . . . . .1026
14 301G   . . . . . . . . . . . . . . . . . .1028
15 301I   . . . . . . . . . . . . . . . . . .1029
16 301K   . . . . . . . . . . . . . . . . . .1029
17 301EH   . . . . . . . . . . . . . . . . .1030
18 15 and 15A . . . . . . . . . . . . . . . .1035
19 6A and 6 . . . . . . . . . . . . . . . . .1043
20 60   . . . . . . . . . . . . . . . . . . .1044
21 506   . . . . . . . . . . . . . . . . . .1051
22 704A-1, 704A-2, 704A-3 and 704A-4   . . . .1053
23 702A-1 through 702A-8, 703A-1 through . . .1067
24         703A-4
25 510, 611A and 611B . . . . . . . . . . . .1076

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA,            New York, N.Y.
 3
             v.                           18 Cr. 30(PAC)
 4
     PAUL VAN MANEN and KENNETH
 5   CHARLTON,
 6               Defendants.
     ------------------------------x      Trial
 7
                                          May 14, 2019
 8                                        9:40 a.m.
     Before:
 9
                     HON. PAUL A. CROTTY
10
                                          District Judge
11                                        - and a Jury-
12                    APPEARANCES
13   GEOFFREY S. BERMAN
             United States Attorney for the
14           Southern District of New York
     BY:     JESSICA K. FENDER
15           RYAN B. FINKEL
             CATHERINE E. GHOSH
16           Assistant United States Attorneys
17   QUIJANO & ENNIS, P.C.
             Attorney for Defendant Van Manen
18   BY:     PETER E. QUIJANO
             ANNA N. SIDERIS
19   O'NEILL & HASSEN
             Attorney for Defendant Charlton
20   BY:     GRAINNE E. O'NEILL
21   THE LAW OFFICE OF CARLOS M. SANTIAGO
             Attorney for Defendant Charlton
22   BY:     CARLOS M. SANTIAGO, JR.
23
     ALSO PRESENT:
24
     HANNAH HARNEY, Paralegal, U.S. Attorney's Office
25   WILLIAM COLEMAN, Paralegal, U.S. Attorney's Office
```

1      (Trial resumed; jury not present)

2      THE COURT: Good morning. Please be seated.

3      Do you want to raise something, Mr. Finkel.

4      MR. FINKEL: Yes, your Honor, a few points.

5      We sent a letter last night regarding the potential

6 scope of testimony from nondefendant witnesses from the

7 Charlton team.

8      THE COURT: Yes.

9      MR. FINKEL: We were notified by the Charlton team

10 that they believe that Nicole Ferrara will testify today.

11 Again, the government doesn't know the scope of her proposed

12 testimony, but what we do know is -- well, we believe that she

13 is going to testify about interactions she may or may not have

14 had with Kenneth Charlton or others regarding drug sales, which

15 means she is going to be speaking and testifying about criminal

16 exposure, and we ask that she be advised of her rights and, if

17 necessary, have a lawyer appointed to her.

18      What the government's real concern here is that

19 Kenneth Charlton's team will be able to elicit the testimony

20 they want to elicit on direct, and then when we have the

21 opportunity to confront her statements and test the reliability

22 of her statements, she will then take the Fifth and that

23 obviously would severely prejudice the government and its

24 ability to cross-examine a witness in this case. So we don't

25 know exactly what her testimony will be, but we do believe she

1 has exposure. Of course she has rights and she should be

2 advised of those rights outside the presence of the jury.

3      THE COURT: Ms. O'Neill.

4      MS. O'NEILL: I do not believe she has any exposure,

5 that we will be eliciting anything about her purchasing of

6 drugs or selling of drugs or anything like that.

7      MR. FINKEL: The problem with that, your Honor, is the

8 government has a right to do that. This is going to go

9 directly to her involvement in heroin sales. So we have a

10 right to cross-examine a witness that's put forth by the

11 defendants about their knowledge, about their involvement,

12 about their ability to make the statements that they are going

13 to make on direct. Even if Ms. O'Neill doesn't intend to ask

14 questions about what crimes Ms. Ferrara may or may not have

15 committed, that may come up on the government's cross. And

16 what Ms. O'Neill just said is exactly the concern the

17 government has, that the direct will be carefully crafted to

18 avoid any sense that she has exposure, but on cross we will be

19 handicapped and handcuffed from asking the kinds of questions

20 that will be appropriate cross-examination.

21      MS. O'NEILL: Your Honor, Nicole Ferrara is the Nicole

22 Ferrara that the government has put into this trial. She

23 sent -- Mr. Charlton sent a text message to the cooperator

24 saying, here, I got this customer Nicole. I gave her your

25 number. That never happened, and Nicole Ferrara is just going

1 to say that that never happened and provide the context in

2 which she knew Mr. Charlton, and that he never -- he never gave

3 her a drug dealer's number. I don't think anyone has ever

4 alleged --

5      THE COURT: What's wrong with that, Mr. Finkel?

6      MR. FINKEL: Your Honor, I guess --

7      THE COURT: She contradicts apparently something

8 that's been said --

9      MR. FINKEL: About a heroin sale, so the government

10 would have the opportunity to cross her about her knowledge of

11 heroin sales, her knowledge of asking Mr. Charlton for drug

12 dealers' numbers.

13      THE COURT: What if she were to take the Fifth.

14      MR. FINKEL: If she were to take the Fifth on cross

15 and not on direct, I think that would severely prejudice the

16 government.

17      What I would ask for your Honor is, I don't see any

18 harm in getting Ms. Ferrara an attorney who can speak with her,

19 talk with her about her rights, so she can make an informed

20 decision, with the advice of counsel, about what may or may not

21 happen if she decides to testify.

22      MS. O'NEILL: Your Honor, here --

23      MR. FINKEL: I don't see any prejudice from that.

24      MS. O'NEILL: Your Honor, here is the issue. We have

25 no evidence that she has ever been involved in any way in

1 selling heroin. I don't know that the government has any
2 evidence about her because they neglected to contact this key
3 person in their case. They had her phone number. They had her
4 name. They never bothered to call her to see if she ever
5 received this information from Mr. Charlton. She in fact did
6 not. That's all we are going to solicit from her. I don't
7 think she needs an attorney to say I did not get this
8 information. I don't think the government knows anything about
9 her because if they did, they probably would have interviewed
10 her before. But if Mr. Finkel is saying she is in some way
11 involved in heroin sales, which, again, it does not seem to be
12 the case at all from my information, she has been clean since
13 2017, and that's all I really know about her.
14       So I don't knowing what this is. It is just an
15 attempt to preclude us from calling a witness when she has
16 material evidence that they put forward in their case in chief.
17       MR. FINKEL: Your Honor, Ms. Ferrara has rights under
18 the Constitution of the United States. She might not be
19 familiar with her legal rights that she has. What the
20 government is requesting is that she be provided with counsel.
21 I do not understand and have not heard Ms. O'Neill articulate a
22 reason why it prejudices them if Ms. Ferrara would be appointed
23 an attorney to discuss with her her rights so she can be
24 advised of the potential exposure she faces. These text
25 messages are about drug sales.

1       THE COURT: Where is Ms. Ferrara now?
2       MS. O'NEILL: She is with my investigator in the car
3 coming here. She should be here soon.
4       THE COURT: I am going to appoint CJA counsel for
5 Ms. Ferrara. We will do that now.
6       David, bring the jury in. Get the witness on the
7 stand.
8       MR. FINKEL: Your Honor, just one quick thing before
9 the jury comes in.
10       The government would request that the defendants be
11 allocuted on their rights to or not to testify if they choose.
12       THE COURT: Do you have a response to that,
13 Mr. Quijano?
14       MR. QUIJANO: I'm not sure -- inquiring as to whether
15 they are going to testify? Is that what he means?
16       MR. FINKEL: No, simply that your Honor advise the
17 defendants that they have a right to testify if they want and a
18 right not to testify if they want. That's all.
19       THE COURT: I think that they understand that. Is it
20 clear that you have advised them, Mr. Quijano and Ms. O'Neill?
21       MR. QUIJANO: Of course, your Honor.
22       THE COURT: That you have advised their clients that
23 they can testify if they wish to do so and they also have the
24 right not to testify.
25       MR. QUIJANO: We have covered it very thoroughly.

1       MS. O'NEILL: Yes.
2       MR. QUIJANO: We anticipate there will be a question
3 at the end of the government's case as to whether they will
4 testify, and he will answer affirmatively.
5       MR. FINKEL: That's fine with the government. Thank
6 you, your Honor.
7       THE COURT: Okay. Bring the jury in.
8       (Continued on next page)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1       (Jury present)
2 ENRIQUE SANTOS, resumed.
3       THE COURT: Mr. Santos, you are still under oath.
4       THE WITNESS: Yes, your Honor.
5       THE COURT: Ms. Ghosh.
6       MS. GHOSH: The government has no further questions
7 for Mr. Santos.
8       MR. QUIJANO: No questions, your Honor.
9       MS. O'NEILL: No questions.
10       THE COURT: You are excused, Mr. Santos.
11       THE WITNESS: Thank you.
12       (Witness excused)
13       MS. GHOSH: Your Honor, at this time the government
14 would like to enter a few additional calls into evidence.
15 These calls are Government Exhibits 301EA through EG. It is a
16 series of five calls, excuse me, six calls and one text
17 message. Two are from the 8865 number on October 15, 2017.
18 The government offers 301EA through EG.
19       MR. QUIJANO: No objection.
20       MS. O'NEILL: No objection.
21       THE COURT: They are in evidence.
22       (Government's Exhibits 301EA through EG received in
23 evidence)
24       MS. GHOSH: Mr. Coleman, if you could please play
25 301EA. And for the court's and jury's information, we don't

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1 have transcripts for these calls, so we will just listen to the
2 audio.
3         For the record, this first call, 301EA, is an incoming
4 call from a number ending in 6464 to the 8865 number on October
5 15, 2017, at approximately 12:56.
6         (Audio played)
7         MS. GHOSH: If we could now publish for the jury
8 301EB, which is a text message from the 8865 number to the 6464
9 number on October 15, 2017, at approximately 12:59.
10 Mr. Coleman if we can now play Government Exhibit
11 301EC, which is an incoming call from the number ending in 6464
12 to 8865, on October 15, 2017, at approximately 1:02 p.m.
13         (Audio played)
14         MS. GHOSH: If we could now play Government Exhibit
15 301ED, which is an outgoing call from 8865 to a number ending
16 in 1936 on October 15, 2017, at approximately 3:08 p.m.
17         (Audio played)
18         MS. GHOSH: If we could now play 301EE, which is an
19 outgoing call from 8865 to the number ending in 1936 on October
20 15, 2017, at 4:16 p.m.
21         (Audio played)
22         MS. GHOSH: If we could now play 301EF, which is an
23 incoming call from 1936 to 8865 on October 15, 2017, at 4:55.
24         (Audio played)
25         MS. GHOSH: And if we could now play 301EG, which is

1 an incoming call from 1936 to 8865 on October 15.
2         (Audio played)
3         MS. GHOSH: And for the record, that last call was at
4 approximately 5:30 p.m.
5         The government now offers into evidence a series of
6 text messages. This is Government Exhibit 301L, text messages
7 between the 8865 number and the 0111 number, on October 22,
8 2017. The government offers 301L.
9         MR. QUIJANO: No objection.
10         MS. O'NEILL: No objection.
11         THE COURT: 301L is in evidence.
12         (Government's Exhibit 301L received in evidence)
13         MS. GHOSH: Mr. Coleman, if you could please publish
14 301L to the jury.
15         Thanks. You can take that down.
16         At this time the government offers some additional
17 exhibits from a stipulation which is in evidence as Government
18 Exhibit 507, which is a stipulation concerning seized narcotics
19 and laboratory testing:
20         The contents of Government Exhibit 2 were purchased
21 from Paul Van Manen on May 4, 2017, and vouchered as 5000117168
22 by law enforcement officials. The contents of Government
23 Exhibit 2 were tested by analysts employed by New York City
24 Police Department laboratory. The substance contained within
25 Government Exhibit 2 was in 10 glassine envelopes, each

1 containing a substance. The substance tested positive for the
2 presence of heroin and was determined to weigh approximately
3 .41 grams without packaging. This finding is contained within
4 a lab report that has been marked as Government Exhibit 2A.
5         The government moves to admit Exhibits 2 and 2A.
6         MR. QUIJANO: No objection.
7         MS. O'NEILL: No objection.
8         THE COURT: 2 and 2A are in evidence.
9         (Government's Exhibits 2 and 2A received in evidence)
10         MS. GHOSH: Ms. Fender, if you could please publish to
11 the jury. Thank you.
12         The contents of Government Exhibit 3 were purchased
13 from Paul Van Manen on May 10, 2017 and vouchered as 5000117572
14 by law enforcement officials. The contents of Government
15 Exhibit 3 were tested by analysts. The substance contained
16 within Government Exhibit 3 was in ten glassine envelopes, each
17 containing a substance. The substance tested positive for the
18 presence of heroin. It was determined to weigh approximately
19 0.0836 grams without packaging. This finding was contained
20 within a lab report that's marked as Government Exhibit 3A.
21         Government moves to admit Government Exhibit 3 and 3A.
22         MR. QUIJANO: No objection.
23         MS. O'NEILL: No objection.
24         THE COURT: 3 and 3A are in evidence.
25         (Government's Exhibits 3 and 3A received in evidence)

1         MS. GHOSH: If you could publish. Thank you.
2         The contents of Government Exhibit 5 were seized from
3 Paul Van Manen on April 5, 2013 and vouchered as 5000033316 by
4 law enforcement officials. The content of Government Exhibit 5
5 were tested by analysts employed by an NYPD laboratory. The
6 substance contained within Exhibit 5 was in 18 glassine
7 envelopes each containing a substance. The substance tested
8 positive for the presence of heroin and was determined to weigh
9 approximately 0.58 grams without packaging. This finding is
10 contained within a lab report that's been marked as Government
11 Exhibit 5A.
12         The government moves to admit 5 and 5A.
13         MS. O'NEILL: No objection.
14         MR. QUIJANO: No objection.
15         THE COURT: 5 and 5A are in evidence.
16         (Government's Exhibits 5 and 5A received in evidence)
17         MS. GHOSH: And finally the government -- the contents
18 of Government Exhibit 8 were purchased from Paul Van Manen on
19 August 30, 2017, and vouchered as 5000124301 by law enforcement
20 officials. The contents of Government Exhibit 8 were tested by
21 analysts employed by an NYPD lab. The substance contained
22 within Exhibit 8 was in 10 glassine envelopes, each containing
23 a substance. The substance tested positive for the presence of
24 heroin and was determine to way approximately 0.29 grams
25 without packaging. This finding is contained within a lab

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1 report that's been marked as Government Exhibit 8A.
2 　　　The government moves to admit 8 and 8A.
3 　　　MR. QUIJANO: No objection.
4 　　　MS. O'NEILL: No objection.
5 　　　THE COURT: 8 and 8A are in evidence.
6 　　　(Government's Exhibits 8 and 8A received in evidence)
7 　　　MS. GHOSH: The government now calls William Coleman.
8 WILLIAM COLEMAN,
9 　　called as a witness by the government,
10 　　having been duly sworn, testified as follows:
11 　　　THE COURT: Please sit down, Mr. Coleman. Make
12 yourself comfortable.
13 　　　All right Ms. Ghosh.
14 　　　MS. GHOSH: Thank you.
15 DIRECT EXAMINATION
16 BY MS. GHOSH:
17 Q. Good morning, Mr. Coleman.
18 A. Good morning.
19 Q. What organization do you work for?
20 A. I work for the United States Attorney's office.
21 Q. How long have you worked for the U.S. Attorney's office?
22 A. A little over two months.
23 Q. What position do you hold there?
24 A. Paralegal specialist.
25 Q. What are your duties and responsibilities as a paralegal

1 　　　MS. GHOSH: Thank you. If we could please show the
2 witness 1100, please.
3 BY MS. GHOSH:
4 Q. Do you recognize this document, Mr. Coleman?
5 A. Yes, I do.
6 Q. Generally speaking, what is it?
7 A. It is a calendar of the days that Mr. Paul Van Manen
8 occupied rooms at the Circle Motor Lodge between May 29, 2017
9 and January 16, 2018.
10 　　　MS. GHOSH: The government offers Exhibit 1100.
11 　　　MS. SIDERIS: No objection.
12 　　　MS. O'NEILL: No objection.
13 　　　THE COURT: 1100 is in evidence.
14 　　　(Government's Exhibit 1100 received in evidence)
15 　　　MS. GHOSH: Thank you. If we could publish that for
16 the jury.
17 BY MS. GHOSH:
18 Q. Mr. Coleman, now that the jury can read this chart, can you
19 　explain again what we are looking at here?
20 A. Yes. We are looking at a number of rooms that were
21 color-coded between the dates of May 29, 2017 to January 16,
22 2018. Room number 141 is color-coded in red, room number 149
23 is color-coded in blue, room number 143 is color-coded in
24 orange, and room number 119 is color-coded in green.
25 Q. Is this a chart that you created?

1 　specialist at the U.S. Attorney's office?
2 A. I assist attorneys in preparing for trial and assist
3 　attorneys during and after trial.
4 Q. Directing your attention to April and May 2019, what, if
5 　anything, were you asked to do in connection with this case
6 　regarding certain records?
7 A. I was asked to create a number of summary charts from the
8 　evidence in the trial.
9 　　　MS. GHOSH: At this time the government will read from
10 a stipulation concerning Circle Motor Lodge, which is marked
11 for identification as Government Exhibit 505:
12 　　　The parties agree that Government Exhibit 620 is a
13 true and correct copy of records from the Circle Motor Lodge
14 located at One Victory Plaza, South Amboy, New Jersey 08879,
15 that were made at or near the time of their creation by or from
16 information transmitted by a person with knowledge of the
17 matters set forth in the records and that were kept in the
18 course of a regularly conducted activity of the Circle Motor
19 Lodge as a regular practice of that activity.
20 　　　The government moves to admit Government Exhibit 505
21 and 620.
22 　　　MS. SIDERIS: No objection.
23 　　　THE COURT: 505 and 620 are in evidence.
24 　　　(Government's Exhibits 505 and 620 received in
25 evidence)

1 A. Yes.
2 Q. Where did you get the information contained in this chart?
3 A. The data for this chart is in Government Exhibit 620.
4 Q. And, generally speaking, what was contained in Government
5 　Exhibit 620?
6 A. It's a number of receipts and registrations for a hotel,
7 　Circle Motor Lodge.
8 Q. To be clear, the information in your chart is based on
9 　those records produced by the Circle Motor Lodge?
10 A. That's correct.
11 Q. You indicated that the different colors on this equate to
12 　the different room numbers?
13 A. Yes.
14 Q. So, for example, what are the dates that, according to the
15 　records, Mr. Van Manen was registered in room 119?
16 A. Mr. Van Manen was registered in room 119 starting September
17 14, 2017, continuing into January 2018 -- January 16 of 2018,
18 excluding the days of the 13th and the 14th of October.
19 Q. I would like to show you now what's been marked for
20 　identification as Exhibit 1101. Do you recognize this?
21 A. Yes, I do.
22 Q. And, generally speaking, what is it?
23 A. It is a chart laying out all of the drugs that are in
24 　evidence with their averages.
25 　　　MS. GHOSH: The government moves to admit Exhibit

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,
May 14, 2019

1  1101.
2      MS. SIDERIS: No objection.
3      MS. O'NEILL: No objection.
4      THE COURT: 1101 is in evidence.
5      (Government's Exhibit 1101 received in evidence)
6      MS. GHOSH: Thank you.  Can we publish that for the
7  jury.
8  BY MS. GHOSH:
9  Q.  Mr. Coleman, first of all, where is the information
10  contained in this chart taken from?
11  A.  The information for this chart is taken from government
12  exhibits listed in the far left column.
13  Q.  And what does this chart show?
14  A.  This chart, going from left to right, the second column, is
15  the number of glassines that were in the lab report for
16  government exhibits.  The third column is the controlled
17  substances detected that was in the lab report which is already
18  in evidence.  And the fourth column is the average weight of
19  one glassine in grams from the lab reports in evidence.
20  Q.  And just to be clear, all of this information is taken from
21  the lab reports listed in the first column?
22  A.  Yes, ma'am.
23  Q.  According to the data contained in those lab reports that
24  are in evidence, what is the average weight of one bundle of
25  heroin?

1  A.  The average weight of one bundle is .37 grams.
2  Q.  And, again, according to this data from the lab reports in
3  evidence, approximately how many bundles are there in 100
4  grams?
5  A.  In 100 grams, there is approximately 270.3.
6  Q.  And how many bundles approximately in one kilogram
7  according to the figures in the government exhibits listed
8  here?
9  A.  For one kilogram, the number of bundles on average is
10  2,702.7.
11  Q.  I would like to show you now what's been marked for
12  identification as Government Exhibit 1102.  Do you recognize
13  this?
14  A.  Yes, I do.
15  Q.  Generally speaking, what is it?
16  A.  It is a display of Western Union transactions between
17  Mr. Michael Ogno and Mr. Paul Van Manen.
18      MS. GHOSH: The government offers 1102.
19      MS. SIDERIS: No objection.
20      MS. O'NEILL: No objection.
21      THE COURT: 1102 is in evidence.
22      (Government's Exhibit 1102 received in evidence).
23      MS. GHOSH: If we could publish that for the jury
24  please.
25  BY MS. GHOSH:

1  Q.  Mr. Coleman, where does the data in Exhibit 1101 come from?
2  A.  The data comes from Government Exhibit 602.
3  Q.  What data was contained in 602?
4  A.  The data contained in 602 were a number of transactions
5  from Western Union between parties.
6  Q.  And can you explain again what information was pulled into
7  this exhibit 1102?
8  A.  The information from 602 that was pulled in to 1102 is all
9  the transactions from Michael Ogno.
10  Q.  From Michael Ogno according to the records in 602?
11  A.  That's correct.
12  Q.  Showing you now what's been marked for identification as
13  1103.  Do you recognize this?
14  A.  Yes, I do.
15  Q.  Generally speaking, what is this document?
16  A.  This document is a chart of communications between a number
17  of phone numbers and chart of communications on phone numbers
18  on certain dates.
19      MS. GHOSH: The government offers 1103.
20      MS. SIDERIS: No objection.
21      MS. O'NEILL: No objection.
22      THE COURT: 1103 is in evidence.
23      (Government's Exhibit 1103 received in evidence).
24      MS. GHOSH: If we could please publish that.
25  BY MS. GHOSH:

1  Q.  Mr. Coleman, looking at this first page of 1103 with the
2  blue heading, can you explain what's shown on this page?
3  A.  Yes.  What is shown on this page is communications in
4  evidence between phone numbers 646-972-2856 and 646-966-8865.
5  Q.  And where does the information about these calls come from?
6  A.  The information for these calls comes from all the
7  government exhibits listed in the far right column.
8      MS. GHOSH: If we could turn to the second page.
9  Q.  And what does this page with the yellow heading show?
10  A.  This page shows the chart of communications in evidence
11  from October 4 and 5 of 2017.
12  Q.  And, again, if the jury wanted to listen to these calls,
13  where would they go for that?
14  A.  Again, in the far right column underneath the government
15  exhibits.
16  Q.  If we could turn to the third page, please, with the red
17  heading, what does this page show?
18  A.  This page shows communications in evidence from the date of
19  November 28, 2017.
20  Q.  And what does this page, please.  What does this page with the
21  green heading show?
22  A.  This page shows the communications in evidence between
23  phone numbers 929-348-6198 and phone number 347-636-5083.
24  Q.  And the fifth page with the orange heading, what does this
25  page show?

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1  A. This shows communications in evidence between phone numbers
2  347-681-0111 and 646-966-8865.
3  Q. I would like to show you now what's been marked for
4  identification as Government Exhibit 1104. Do you recognize
5  this?
6  A. Yes, I do.
7  Q. And generally speaking, what is it?
8  A. This is a bar graph showing the calls of phones from
9  Mr. Michael Ogno to Mr. Paul Van Manen between multiple phones.
10        MS. GHOSH: Government offers 1104.
11        MS. SIDERIS: No objection.
12        MS. O'NEILL: No objection.
13        THE COURT: 1104 is in evidence.
14        (Government's Exhibit 1104 received in evidence)
15        MS. GHOSH: If we could publish that for the jury.
16  BY MS. GHOSH:
17  Q. Mr. Coleman where does the data contained in 1104 come
18  from?
19  A. The data contained in 1104 comes from Government Exhibit
20  611A, Government Exhibit 610A, and Government Exhibit 610B.
21  Q. And what does this chart show?
22  A. This chart shows with the blue bars showing Mr. Ogno's
23  phone 346-618-0111 in communication with Mr. Van Manen's phone
24  listed to the right on the key and the red bar shows Mr. Ogno's
25  phone 917 -- I'm having trouble reading. Can we zoom in on

1  that, please? 525-6275 with Mr. Van Manen's phones in the key
2  to the right.
3  Q. So just to be clear, the two colors, the blue and the red,
4  those are for the 0111 and the 6275 phones?
5  A. That's correct.
6  Q. And it shows the number of communications with all three of
7  the funds listed below 8865, 9918, and 3070?
8  A. That's correct.
9  Q. Showing you now what's been marked for identification as
10  1105.
11        (Pause)
12  Q. Do you see that in front of you, Mr. Coleman?
13  A. Yes, I do.
14  Q. Do you recognize this?
15  A. Yes, I do.
16  Q. Generally speaking, what is this?
17  A. This is a list of phone numbers associated with certain
18  individuals from government evidence.
19        MS. GHOSH: The government offers 1105.
20        MS. SIDERIS: No objection.
21        MS. O'NEILL: No objection.
22        THE COURT: 1105 is in evidence.
23        (Government's Exhibit 1105 received in evidence)
24  BY MS. GHOSH:
25  Q. Mr. Coleman, where did the information contained in 1105

1  come from?
2        MS. GHOSH: Excuse me. If we could publish that for
3  the jury thank you.
4  Q. Where does the information in Exhibit 1105 come from?
5  A. It comes from the right column, the government exhibits are
6  listed.
7  Q. And what types of exhibits are listed in the right column?
8  A. In the right column different exhibits include
9  stipulations, as well as phone number records that are already
10  in evidence, as well as Government Exhibit 1102, which is a
11  Western Union transaction, as well as Moneygram transactions.
12  Q. Just to be clear, does this include as a source of
13  information any of the wiretap calls or text messages in the
14  Government Exhibit 300 series?
15  A. No, it does not.
16  Q. And, Mr. Coleman, just to be clear, the exhibits that you
17  have prepared in Government Exhibits 1100 through 1105, is any
18  of that based on your personal knowledge?
19  A. No, it is not.
20        MS. GHOSH: No further questions.
21        THE COURT: Any questions?
22        MS. SIDERIS: No questions, your Honor.
23        MS. O'NEILL: No questions.
24        THE COURT: You are excused, Mr. Coleman. You can go
25  back to work.

1        (Witness excused)
2        MS. GHOSH: Your Honor, at this time the government
3  rests.
4        THE COURT: All right. We will take a short recess,
5  ladies and gentlemen.
6        (Continued on next page)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    (Jury not present)
2    THE COURT: Please be seated. Do you want to make
3  your motions?
4    MR. QUIJANO: Yes, your Honor.
5    At this time Mr. Van Manen moves for dismissal
6  pursuant to Rule 29. The government has not put in a prima
7  facie case establishing he is a member of the charged
8  conspiracy.
9    MS. O'NEILL: Mr. Charlton also puts in a Rule 29
10 motion to dismiss. The government has not made a prima facie
11 case that he is a member of the charged conspiracy nor have
12 they made a prima facie case that he is responsible for the
13 (b)(1)(B) drug weight of 100 grams.
14   THE COURT: I will reserve.
15   Who is going first?
16   MS. O'NEILL: Mr. Charlton -- or Ms. Ferrara was going
17 to, but is not. We will have to wait for her.
18   THE COURT: Is Ms. Ferrara here?
19   MS. O'NEILL: Yes. She is outside the building, I
20 think.
21   THE COURT: Where is the CJA counsel?
22   THE DEPUTY CLERK: 20 minutes ago she said she was
23 about 20 minutes -- on her way on the train, waiting for the 4
24 train. I'm going to call her right now.
25   MS. O'NEILL: Mr. Charlton would like to use the

1  restroom. Is that all right?
2    THE COURT: Yes.
3    MR. FINKEL: Your Honor, while we have an
4  opportunity -- your Honor, this relates with respect to
5  Mr. Van Manen's testimony, so I believe I can put this on the
6  record even though Mr. Charlton is not in the courtroom.
7    As your Honor knows, and as has been briefed,
8  Mr. Van Manen's proffered with the government and entered into
9  a proffer agreement. Pursuant to that proffer agreement, the
10 government is allowed to impeach Mr. Van Manen on the
11 statements that he made during the proffer agreement. I note
12 that now and just put that on the record just to avoid delays
13 later on when Mr. Van Manen takes the stand.
14   THE COURT: You made that same observation at the time
15 we were considering the in limine motions.
16   MR. FINKEL: That's correct, your Honor.
17   THE COURT: Okay.
18   MS. FENDER: May we also go to the restroom, your
19 Honor, or do you want us to sit tight?
20   THE COURT: If you have to, yes. It would be
21 embarrassing.
22   MR. FINKEL: Thank you, your Honor.
23   (Recess)
24   THE COURT: Okay, are we ready to go?
25   MR. FINKEL: The government is ready.

1    THE COURT: Ms. O'Neill, are you ready?
2    MS. O'NEILL: I guess we will just begin with
3  Mr. Charlton, unfortunately.
4    THE COURT: I guess so.
5    Where is Mr. Quijano?
6    MS. SIDERIS: He should be here any minute, your
7  Honor, any moment. I believe he was using the restroom.
8    (Pause)
9    THE COURT: We are all here, bring in the jury,
10 please.
11   (Continued on next page)

1    (Jury present)
2    THE COURT: Please be seated. The government has
3  finished its presentation of the evidence. The defendant will
4  now start its case.
5    Ms. O'Neill, do you want to call your first witness?
6    MS. O'NEILL: Yes. We call the defendant, Kenneth
7  Charlton.
8    THE COURT: Mr. Charlton.
9    KENNETH CHARLTON,
10   the defendant, having been duly sworn, testified
11   as follows:
12   THE COURT: Please sit down, Mr. Charlton. Pull
13 yourself right up to the microphone.
14   You may proceed, Ms. O'Neill.
15 DIRECT EXAMINATION
16 BY MS. O'NEILL:
17 Q. Good morning.
18 A. Good morning.
19 Q. What is your full name?
20 A. Kenneth Douglas Charlton.
21 Q. Do you have any nicknames?
22 A. Yes.
23 Q. What are they?
24 A. Ameriken, K-E-N.
25 Q. How are you feeling this morning?

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1  A.  Considering the circumstances, I'm good.  Thank you.
2  Q.  How old are you?
3  A.  47.
4  Q.  And do you have any children?
5  A.  Yes, I do, two beautiful children -- a daughter 28 and a
6     son 26.
7  Q.  And where do they live?
8  A.  My daughter is in Staten Island.  My son is in Toms River.
9  Q.  And where did you grow up, Mr. Charlton?
10  A.  Staten Island.
11  Q.  Have you always lived in Staten Island?
12  A.  No.  I lived in California as well.
13  Q.  What do you do for work?
14  A.  Union carpenter.
15  Q.  How did you become a carpenter?
16  A.  I moved to California.  They were building a dam by the
17     house I was living in, and I wanted to get on that job because
18     prior to that I was just doing fencing and menial little
19     things, asbestos removal.  So I went down to the reservoir to
20     shape the lake, and they said I had to go to the unemployment
21     office, and the unemployment office sent me to a local hiring
22     hall, the union hall, and they sent me to California Speedway
23     and that was my first union job.
24  Q.  I want to back up a little bit.  You mentioned the word
25     "shape."  What does shaping mean?

1  A.  You solicit work.  You go and you show up on a job with
2     your tools, say, I am ready, willing, and able to work.
3  Q.  So when you first became a union carpenter, you approached
4     the union to do the work?
5  A.  Yes, or the job sites.
6          MS. GHOSH: Objection.
7          THE COURT: It is overruled.
8  Q.  When you first -- in your first work as a union carpenter,
9     what did you do?
10  A.  Metal set and drywall.
11  Q.  What kinds of projects did you work on?
12  A.  In California?
13  Q.  Yes.
14  A.  California Speedway, I built the Honey we Shrunk the
15     Audience in Disneyland, Ontario Mills Mall, mostly schools and
16     hospitals, movie theaters, a lot of movie theaters.
17  Q.  Do you like being a carpenter?
18  A.  I love it.  It's all I know.
19  Q.  What do you like about it?
20          MS. GHOSH: Objection, your Honor.
21          THE COURT: Can we get to something relevant now,
22  Ms. O'Neill.
23          MS. O'NEILL: Yes.  We are getting there.
24          THE COURT: Get there a little more quickly.
25          MS. O'NEILL: Okay.

1  BY MS. O'NEILL:
2  Q.  Did there come a time that you moved back to New York?
3  A.  Yes.
4  Q.  When did you move back to New York?
5  A.  2008.
6  Q.  Why?
7  A.  To be with my children.
8  Q.  And did you work as a carpenter in New York?
9  A.  Yes, I did.
10  Q.  How did you work as a carpenter in New York?
11          MS. GHOSH: Objection, your Honor.  Relevance.
12          THE COURT: Overruled.  I will allow it.
13  A.  How did I work as a carpenter?
14  Q.  Yes.  Let me rephrase.
15  A.  Please.
16  Q.  How did you find work as a carpenter in New York?
17  A.  Through the local, or I solicited, shaped.
18  Q.  What is the local?
19  A.  Local is -- the unions are broke out into several locals
20     for territory, and I was in 608, the Irish local, on the West
21     Side.
22  Q.  Are there any particular projects that you worked on in New
23     York that stand out to you?
24  A.  Yes.
25          MS. GHOSH: Objection, your Honor.  Relevance.

1          THE COURT: Ms. O'Neill, this is not about the
2     carpentry industry and it is not about construction.  It is
3     about a narcotics conspiracy.
4          MS. O'NEILL: Yes.  We are getting there.
5          THE COURT: Let's get there, please.
6          MS. O'NEILL: Okay.
7  BY MS. O'NEILL:
8  Q.  Was there a project that you were on where you were injured
9     on the job?
10  A.  Yes, Mott Haven in the Bronx.  It's a school.
11  Q.  What happened at Mott Haven?
12  A.  I was on top of a stainless steel duct.  I got shocked.  I
13     fell off the duct, and I was sent to Lincoln Memorial Hospital
14     to give me an EKG because they said I could die in the middle
15     of the night.  So I had the EKG done and they sent me home.
16  Q.  Mr. Charlton, if you could try to slow down and speak
17     directly into the microphone.
18  A.  Sure.  Sorry.
19  Q.  So after you went home, what happened then?
20  A.  The next morning I woke up I was in pain.  I went to a
21     chiropractor.
22  Q.  What happened at the chiropractor?
23  A.  He could only do so much for me with his degree level, so
24     he had a neurologist on site that was above his degree level
25     that could write prescriptions.  So after a couple of

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1   adjustments didn't work, they prescribed me oxys.
2 Q. What was your prescription?
3 A. Roxies, the oxycodone 30 milligram.
4 Q. And how many of them were you prescribed to take per day?
5 A. 180 -- oh, six a day, 180 a month, the script was.
6 Q. How long did you take this medication for?
7      MS. GHOSH: Objection, your Honor, relevance.
8      THE COURT: Overruled.
9 A. Almost a year.
10 Q. Did you take the medication as prescribed?
11 A. Initially, at first, and then as needed after.
12 Q. What does that mean by "as needed"?
13 A. My tolerance built up and I started taking more than six a
14   day.
15 Q. So were you able to -- what happened when you took more
16   than six a day?
17 A. My script would run early.
18 Q. And what would you do when your prescription ran out early.
19 A. Borrowed pills from friends.
20      THE COURT: Borrowed pills from who?
21      THE WITNESS: Friends.
22 Q. What does that mean to borrow pills from friends?
23 A. Most of my friends were blue collar guys like me, union
24   guys. Almost everyone I knew had a script.
25 Q. Why did your friends have a script?

1      MS. GHOSH: Objection, your Honor.
2 Q. If you know?
3 A. They had injuries, as well.
4      MS. GHOSH: Objection.
5      THE COURT: Overruled.
6 A. They had injuries as well.
7 Q. So were you working during the time after your injury?
8 A. No, I was not.
9 Q. Why not?
10 A. I applied for compensation for that job. I didn't get it.
11   I was fighting it. So I ended up getting unemployment.
12 Q. What time period are we talking right now?
13 A. This was 2010 to '11.
14 Q. Did there come a time when your prescription ran out?
15 A. Yes, it did.
16 Q. And what did you do after your prescription ran out?
17 A. A friend of mine owned a landscaping company, and he used
18   to buy more scrips and he got scrips as well, and I used to
19   work for him for pills and room and board.
20 Q. What does that mean to work for someone for pills?
21 A. He would supply me with what I needed to not get sick and
22   take care of the pain, and I would push lawn mowers.
23 Q. You mentioned getting sick. What does that mean?
24 A. To me, hell. I didn't know what sickness was. I
25   thought -- the first time I ran out of pills, I called up my

1   friend. I'm like, I'm running out. I'm starting to get sick,
2   sniffles and sneezing. He goes, you are dope sick. I'm not
3   doing heroin. How am I dope sick? How is it possible? He
4   said, You are having opium withdrawal. It is the same thing as
5   being dope sick.
6      The first 12 hours, you start sneezing. You feel like
7   you have a regular cold. Within 18 to 20 hours, you are
8   throwing up all over yourself, diarrhea uncontrollable. By the
9   20th hour, 24th hour, it's hell. You are just waiting for
10   somebody to wake up, for your doctor to wake up to get you a
11   script, somebody to wake up to get you a pill, anything, cold
12   sweats. It is hard as hell. It is tough.
13 Q. So when you would go through this sickness, what would you
14   do?
15 A. I would reach out to friends to try to get some pills.
16 Q. And during this time period, you mentioned that your friend
17   was paying you in pills and room. What does that mean?
18 A. I was staying -- by that time, I was slowly starting to
19   lose everything. I was staying in a place called Midland
20   Motel, and that was like a junkie welfare hotel kind of place.
21   It was disgusting, but it was a roof over my head. He would
22   give me that and money for food and give me pills.
23 Q. Again, what is the time period of this?
24 A. 2011 to 2012.
25 Q. So did there come a time that you started using heroin?

1 A. Yes, there was.
2 Q. When was that?
3 A. When my friend died that had the landscaping company. He
4   overdosed. I had no longer --
5 Q. Could you take a step back? Which is the friend that you
6   were talking about?
7 A. The one who had landscaping company, a friend of mine, Jay.
8 Q. What was your relationship like with him?
9      MS. GHOSH: Objection, your Honor. Relevance.
10      THE COURT: Sustained.
11      (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                    **May 14, 2019**

1 Q. So when you started to use heroin, where were you living?
2 A. In the Midland Motel.
3 Q. What happened when you first used heroin?
4 A. I overdosed.
5 Q. What happened after that?
6 A. They brought me to the hospital and when I came out of the
7   hospital, I was looking not to be sick again, and I found more
8   heroin.
9 Q. Did you stop using heroin then?
10 A. No.
11 Q. Why?
12 A. I tried. I didn't want to go through the pain and the
13   sickness. I know it sounds weak. And now I look back, I was
14   weak, yes. But it was hell.
15 Q. Did there come a time when you left the Midland Motel?
16 A. Yes. 2012.
17 Q. Where did you go?
18 A. I lived with a friend of mine Will in New Dorp Beach.
19 Q. Did you stay with Will in New Dorp Beach?
20 A. As long as I could. I was working on his house doing some
21   work and then until Hurricane Sandy came.
22 Q. What happened with Hurricane Sandy?
23        MS. GHOSH: Objection, your Honor. Relevance.
24        THE COURT: Sustained.
25 Q. Did there come a time when you moved into the Hurricane

1   Sandy evacuation center?
2        MS. GHOSH: Objection, your Honor. Relevance.
3        THE COURT: Sustained.
4 Q. Did you meet anyone at the hurricane evacuation center in
5   this case?
6        MS. GHOSH: Objection, your Honor. Relevance.
7        THE COURT: Sustained.
8 Q. In 2012, in early -- in 2013, how much heroin were you
9   using?
10 A. 2013, about a half a bundle a day, just not to be sick.
11 Q. When you first started using heroin, how much heroin were
12   you using?
13 A. Initially?
14 Q. Yes.
15 A. 2012, two bags a day.
16 Q. How do you use heroin?
17 A. I inject it.
18 Q. Now, in early 2014, where were you living?
19 A. 2014, I was in an apartment, it was a bungalow that I had
20   traded -- I was going to do work on the house, fix it up, and I
21   was going to stay there until the house was fixed up.
22 Q. How much heroin were you using in 2014?
23 A. A bundle a day.
24 Q. Were you working?
25 A. Odd jobs, off and on.

1 Q. What does odd jobs mean?
2 A. You work on the house, anything, anything I can put my
3   hands on.
4 Q. I just want to let you know to try to slow down a little
5   bit and to speak into the mic. OK?
6        So were you convicted of a felony in March 2003?
7 A. Yes, I was.
8 Q. Did that felony require you to let the government know
9   where you were living?
10 A. Yes, it did.
11 Q. Did you fail to do that?
12 A. A couple of times.
13 Q. Were you arrested for that?
14 A. Yes, I was.
15 Q. Were you convicted of anything else?
16 A. Yes.
17 Q. What?
18 A. Drug possession.
19 Q. When?
20 A. Three bags of heroin in 2012.
21 Q. What were the circumstances of that?
22 A. I was buying three bags to do, and I got pulled over. I
23   was on a bicycle.
24 Q. We have talked a little bit about your heroin use in 2014.
25   How did your heroin use progress into 2015?

1 A. 2015, still a bundle not to get sick. If I had anything
2   over to feel alive, I would have a little more.
3 Q. What does that mean to feel alive?
4 A. 2015 it actually declined a little bit. I had another
5   doctor. I had a prescription for a year.
6 Q. You had a prescription for what?
7 A. For oxycodone and methadone pills, 180 each.
8 Q. How did you get that prescription?
9 A. From pain management.
10 Q. Why were you going to a pain management doctor?
11 A. Another injury.
12        MS. GHOSH: Objection, your Honor. Relevance.
13        THE COURT: Sustained.
14 Q. Did there come a time where your prescription from the pain
15   management doctor ran out?
16        MS. GHOSH: Objection, your Honor. Relevance.
17        THE COURT: Sustained.
18 Q. How much heroin were you using in 2016?
19 A. Two bundles a day.
20 Q. How did your heroin use progress?
21 A. By a bundle.
22 Q. How did you find money to get heroin?
23 A. Again, odd jobs or usually -- if I can explain a little
24   bit. Usually, when you get that low, all your friends are
25   heroin addicts. You start with regular friends and slowly

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1  decline. Then you have friends who do drugs sometimes. Now
2  you have nothing and all your friends are heroin addicts. It's
3  like a camaraderie. It's where you don't let another person
4  get sick. So if he doesn't have, we will all put our money
5  together and chip in for that one person that didn't have
6  money. It's sad, I don't want to talk bad about anybody, but
7  that's all we had; we had only each other.
8  Q. What about your heroin use in 2017?
9  A. It was bad.
10  Q. What does that mean, it was bad?
11  A. Well, it was still bad. I was doing a bundle a day, but I
12  was also on methadone. I had to do 100 milligrams of methadone
13  a day and a bundle every day.
14  Q. How were you getting money then?
15  A. I was panhandling; very ashamed to say, but I was
16  panhandling.
17  Q. Did you ever try to quick heroin?
18  A. All the time. From the first day I tried.
19  Q. Did you ever go through detox?
20  A. Three times.
21      MS. GHOSH: Objection, your Honor. Relevance.
22      THE COURT: Overruled.
23  A. Three times.
24  Q. Where did you detox?
25  A. Seguine detox, Staten Island Hospital.

1  Q. Did you ever detox on your own?
2  A. A couple of times. I made it ten days once.
3  Q. Why would you go back to heroin?
4      MS. GHOSH: Objection, your Honor. Relevance.
5      THE COURT: Overruled.
6  A. I ask myself that every day. When you leave a detox
7  center, it's only three days, even seven days, it's not enough
8  to detox. It may be out of your system, but there is still
9  post-withdrawals. You're tired, you don't feel right, you
10  still can't sleep. You do that one bag or that one pill,
11  you're a brand-new person again. If you say, I'll survive
12  today and tomorrow I'll be fine, it's not true; you're right
13  back into it again.
14  Q. How did heroin affect your relationships with your family?
15      MS. GHOSH: Objection, your Honor. Relevance.
16      THE COURT: Sustained.
17  Q. Can you talk about the process for buying heroin?
18  A. It's a process, right. You call a dealer. Usually, like I
19  said, if you're at that point where there's a bunch of us
20  together, we don't all have the money up front to get it.
21  He'll have ten dollars. I'll have ten dollars. We will try to
22  chip in and we get what we can. Usually the more you get the
23  cheaper it is.
24  Q. Do you have more than one dealer?
25  A. Always. You have to.

1  Q. How many dealers would you say you would have at one time?
2  A. At any given time, I would call three or four, but I had
3  anywhere between eight to twelve over the course of two years.
4  Q. Did you always use the same dealer?
5  A. No.
6  Q. Why not?
7  A. I would end up owing them money or they wouldn't always be
8  around, or I could find something cheaper, something better, or
9  they would go to jail.
10  Q. How often would you and your friends chip in money for
11  heroin?
12  A. Almost every day, whenever we could.
13  Q. How common is it?
14  A. Very. Very, very common.
15  Q. How would you find a dealer?
16  A. Through other friends. It's not that hard now. It used to
17  be. It's not that hard now.
18  Q. What does that mean?
19  A. There's a lot of heroin dealers now.
20  Q. Now, I want to talk about one particular dealer, the dealer
21  we have been talking about in this case, Jasmin Cejovic. How
22  did you meet Mr. Cejovic?
23  A. I met him at a friend's house, another addict. She
24  approached me and said, this is the guy with the $60 bundles.
25  He gave me his number and that was it.

1  Q. Why would $60 bundles stand out to you?
2  A. Because the average was between 70 and 80. In the
3  beginning it was more expensive and there was a firm price, 80.
4  Then as time went on the price went down. But back then, the
5  end of 2015, $60 was a good deal.
6  Q. Did there come a time when you called Min? Is that how you
7  know Mr. Cejovic?
8  A. Eventually, not at first because I had a couple of regular
9  people. I called him probably at the beginning 2016, January,
10  February I called him.
11  Q. Why did you call him, do you remember?
12  A. Because my friend had overdosed and it turned out my
13  regular dealer is the one who sold him the heroin. So I guess
14  he stopped selling and I had nowhere else. There was some bad
15  stuff going around, and I think he hid or went to jail. So my
16  regular dealer was not available so I called him as a backup.
17  Q. How did your relationship develop?
18      Let me back up. Did your relationship develop?
19  A. Not much. Gradually I would buy a half bundle, then
20  eventually a bundle. And then if there was a time I needed and
21  didn't have money, he would front me a bundle here and there.
22  Q. Why did you think he fronted you heroin?
23  A. I told him I would pay him back, and I usually always did,
24  in the beginning.
25  Q. You said you usually always did. Were there times when you

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1 didn't pay him back?
2 A. Yeah, a couple of times. I still owe him money, as a
3 matter of fact.
4 Q. Why would you not pay him back?
5 A. Because usually he would give me a line -- he would front
6 me enough just to last me if I had a union job. He knew I was
7 a union carpenter. So when I did go to work, I get paid on
8 Thursdays. When I get paid, I promised to pay him. The first
9 week maybe I would. The second week would go by and it was
10 either pay him or not pay him and buy heroin over here and put
11 money in my pocket. So I always went this route where I didn't
12 have to pay him. I did that a couple of times.
13 Q. Did you work for Min?
14 A. No.
15 Q. Did you resell his heroin?
16 A. No, I did not.
17 Q. Did you send him customers?
18 A. No.
19 Q. Were you his guy?
20 A. No, I was not.
21      MS. O'NEILL: Can I show the parties and the witness
22 and the jury what is in evidence as Government Exhibit 704A-4.
23      THE COURT: Yes, you may.
24      MS. O'NEILL: Page 2.
25 Q. This is an SMS message from your phone. It's number 8624,

1 an outgoing message on January 7. It's to a person named Big
2 Fat John. Who is Big Fat John?
3 A. Big Fat John was one of my heroin dealers that got
4 arrested. He had a warrant for a pill ring in Pennsylvania,
5 and he was arrested three years back. He was living with a
6 girl named Gloria and a guy named Damian, and they ended up
7 having his phone when he got arrested.
8      MS. GHOSH: Objection. Foundation.
9      THE COURT: Overruled.
10 Q. So was this text message after Big Fat John got arrested?
11 A. Yes.
12 Q. Was someone else using his phone?
13 A. Yes.
14      MS. GHOSH: Objection, your Honor. Foundation.
15      THE COURT: Sustained.
16 Q. When you were texting this Big Fat John, who did you think
17 you were texting?
18 A. Gloria, the lady I was renting the room from in an
19 abandoned house.
20 Q. Now, I am going to draw your attention to another text from
21 your phone that's in evidence. This is a message sent the same
22 day. It's number 8658. It's from 704A-4. And this is a
23 message to Damian. Who is Damian?
24 A. Damian was another -- we used to get high together. He
25 rented the room to me as well as Gloria. It was Gloria's

1 boyfriend.
2 Q. When you say rent a room, what do you mean?
3 A. They squatted in this house, an abandoned house after
4 Sandy, and I rented a room from them.
5 Q. When you were texting Big Fat John and Damian, you were
6 texting Gloria and Damian who were your landlords, is that
7 correct?
8 A. Yes.
9 Q. And you were living in a squat?
10 A. Yes.
11 Q. So you see what you're saying to them, right? You're
12 saying, "Min's new guy after me Billy." What do you mean by
13 that?
14 A. Nothing. They were on the verge of throwing me out because
15 they only had me there if they needed. In between her check
16 and his check, they would need heroin. So an extra hundred
17 dollars, they would either have me pay in cash or go pick them
18 up heroin. So in the process, I guess her money was coming in
19 regularly --
20      MS. GHOSH: Objection, your Honor. Speculation.
21      THE COURT: Sustained.
22 Q. When you were texting them, why did you text them this?
23 A. Because I thought if they figured I had a plug-in with a
24 dealer, and I was able to get heroin on call, when they needed
25 it, instantly, that I would have still have a roof over my

1 head.
2 Q. Why would this text have made them think that you had a
3 dealer?
4      MS. GHOSH: Objection, your Honor. Speculation.
5      THE COURT: No. It deals with his motivation.
6 Overruled.
7 A. The question again. I'm sorry.
8 Q. Why did you think that sending a text like this would have
9 made Damian and Gloria think that you had a good connection
10 with the dealer?
11 A. Because if they think I could always have heroin on call, a
12 demand like that, they weren't going to throw me out. And
13 that's pretty much what happened. I was there all the way to
14 my arrest.
15      THE COURT: Listen to the question and answer the
16 question. Don't volunteer information.
17      THE WITNESS: Sorry. All right.
18 Q. Showing you some text messages that are from the same
19 exhibit 704A-4. This is page 2952. It's message 10916. It's
20 to a phone number 347-455-4957. It says, "Who's this?" It
21 appears to be an outgoing message from you.
22      And there is -- I am showing you message 10935. It's
23 an incoming message from the same number. And it says, "It's
24 Min dick."
25      Then there is some more messages, 11054, 11055, 11059,

1  that are incoming messages that say, "You still got people that
2  hit you up," from the same number.
3       Then there's an outgoing message, which is from you,
4  that says, "Of course, and I'm finally clean."
5       Then there is another incoming message from this phone
6  number, the same phone number, that says, "Hit people up now."
7       And then there is an outgoing message from you that
8  says, "Working on it."
9       Then an incoming message that says, "No more credit
10  though."
11       Then another incoming message from the same number
12  that says, "I'm not in a position to do that."
13       Then there's an outgoing message that says, "Neither
14  am I, and I'm not in a position to have people come and no one
15  is here or waiting around.  I don't know why you didn't just
16  work with me when I was sick in and out of hospital.  We were
17  doing good like always.  I don't get pinched.  I don't drive
18  around getting stoned on my phone losing product."
19       What I want to do is talk to you about what these
20  messages mean.  OK?
21  A.  Sure.
22  Q.  I want to start with, when he was saying, "You still got
23  people that hit you up," what did you think he meant by that?
24  A.  When we put money together, people still calling me.  He
25  knows people used to call me and we would call him

1  collectively, and I would gather money.
2  Q.  When you say that you would gather money, would other
3  people also gather money?
4  A.  Yeah, of course.
5  Q.  And contact Min?
6       MS. GHOSH:  Objection, your Honor.  Foundation.
7       THE COURT:  Sustained.
8  Q.  Do you know if other people contacted Min once they
9  gathered money up?
10  A.  Yes, I do.  I know a couple of people that would.  The
11  person that I met him with, Gloria, a lot of people called him
12  when they got the money together.
13  Q.  When you say, "Of course, and I'm finally clean, what did
14  you mean by that?  Why did you say that to him?
15  A.  So he would think that I was a little more levelheaded.
16  Every time he came by I was always high, bad, owing him money.
17  So maybe he would trust me.
18  Q.  Were you clean?
19  A.  No.
20  Q.  When he said, "Hit people up now," what did you think he
21  meant by that?
22  A.  Customers.
23  Q.  When you said "working on it," what did you mean?
24  A.  I was going to try to get customers together.
25  Q.  Were you?

1  A.  No.
2  Q.  Why did you tell him that you were going to do that?
3  A.  I don't know.  I really have no idea.  Just to appease him,
4  I don't know.
5  Q.  Did you owe him money at that time?
6  A.  Yes.  I owed him $500.  I still do.
7  Q.  When you said, "Neither am I, and I'm not in a position to
8  have people come and no one is here when I was sick in and out
9  of the hospital," what did you mean by that?
10  A.  There were times we put money together and we'd sit and
11  wait for him and he would never show up.  And that happened a
12  couple of times, and I look like the bad guy.
13  Q.  What did you mean when you said, "I don't know why you
14  didn't just work with me when I was sick in and out of the
15  hospital."
16  A.  I was in the hospital a lot with my stomach.  They were
17  doing biopsies.  I was there like 12 days getting tests done
18  and I was getting sick in the hospital.  They didn't want to
19  give me painkillers because of my stomach.  I was in the
20  hospital sick.  I was trying to getting ahold of him and
21  saying, please bring me a bundle, and he just left me there
22  dying.
23  Q.  When you were asking him to come, were you asking him to
24  give you a bundle for free?
25  A.  Not free, but fronting.

1  Q.  What does fronting mean?
2  A.  It means, as I explained earlier, if I didn't have money,
3  he would give me a bundle or couple of bundles until I got paid
4  or until I had money.  But he knew I was in the hospital and
5  wasn't working so how was I going to get paid.  I could see
6  that now, but I didn't see that then.
7  Q.  Did you have a car?
8  A.  No, not in a few years.
9  Q.  Were you Min's guy?
10  A.  No, I was not.
11  Q.  Did you ever contact him after you sent these messages?
12  A.  No.  His number was even deleted.
13  Q.  I am going to show you another text that has been entered
14  into evidence as Government Exhibit 303K.
15       This is a message that you sent to Min.  This is your
16  phone number 347-636-5083, right?
17  A.  Yes.
18  Q.  And then this is one of Min's numbers 6189, right?
19  A.  I guess, yeah.
20  Q.  OK.  So the text says, "I have one of my old customers who
21  gets every day, I told her 50, her name is Nicole, she's going
22  to be calling you from 929-423-6056."
23       So did you give Min Nicole's number?
24  A.  Right there I did, yeah.
25  Q.  Did you ever give Nicole Min's number?

1  A.  No.
2  Q.  Why did you tell him that you did?
3  A.  Because I was sick and I was trying to have him come for
4  like two days.  He told me, you still owe me bread.  I said,
5  I'm still trying to get you customers.  He was, like, who?  At
6  the spur of the moment I went through my contacts and I pulled
7  her contact out.  I don't know why I did it.  I was sick and I
8  can't even justify that now, but I did it.
9        MS. O'NEILL: Mr. Coleman, I was wondering if you can
10  play a call.  It's call 303H that is in evidence.  It's from
11  August 31, 2017.
12  Q.  This is a call that's been played before for the jury.  It
13  is a call from you to Min.
14        THE COURT: What are we waiting for?
15        MS. O'NEILL: We are waiting for a call to be played.
16  I'm sorry for the delay.
17        (Audio played)
18        MS. O'NEILL: This is the wrong call.  Sorry.  We will
19  get back to this call.
20  Q.  What I am wondering is, who is Billy?
21  A.  A neighbor of mine in New Dorp.
22  Q.  Did Billy use heroin?
23  A.  Yes.
24  Q.  Now, do you owe other drug dealers money?
25  A.  Yeah.  Yes.

1  Q.  How many?
2  A.  Two.  With Min, three.
3  Q.  Who do you owe money to?
4        MS. GHOSH: Objection, your Honor.  Relevance.
5        THE COURT: Overruled.
6  A.  A Spanish gentleman who is in Rikers right now.  He is
7  probably upstate now, doing eight years, a drug dealer.  And
8  another gentleman and Min.
9  Q.  Why do you owe them money?
10  A.  Same thing, they would front me and I wouldn't pay back.
11  Q.  Now, did you know that Min had a connect?
12  A.  Of course.
13  Q.  Why do you say of course?
14  A.  Because he doesn't have poppy plants in his backyard.
15  Q.  What do you mean by that?
16  A.  Heroin -- you don't grow heroin in your house.  It has to
17  come from somewhere.
18  Q.  Did you know who the connect was?
19  A.  No, I did not.
20  Q.  Did you know where his drugs were stashed?
21  A.  No, I did not.
22  Q.  Did you know Paul Van Manen before you were indicted?
23  A.  No, I did not.
24  Q.  Did you know Anthony Francese before you indicted?
25  A.  No.

1  Q.  Did you know Doreen Spinelli before you were indicted?
2  A.  No.
3  Q.  Did you know Mirsad Bogdanovic before you were indicted?
4  A.  No.
5  Q.  Did you know Shaun Sullivan?
6  A.  Yes.
7  Q.  How did you know Shaun Sullivan?
8  A.  I met him at the evacuation shelter after Sandy.
9        MS. GHOSH: Objection, your Honor.
10        THE COURT: Overruled.
11  Q.  What was your relationship with him like after that, if
12  any?
13  A.  I rented a room from him once for a month.
14  Q.  Did you ever buy heroin from him?
15  A.  Never.
16  Q.  Did you know that he sold heroin?
17  A.  Yes, I did.
18  Q.  Why did you not buy heroin from him?
19  A.  Because he wouldn't work with me, he wouldn't front me if I
20  needed, and it was always $80.  He never went down.  He was too
21  expensive.
22  Q.  Did you buy heroin from family members of his?
23  A.  Yes.  Yes, I did.
24  Q.  Did you buy heroin from his brother?
25  A.  Yes.

1  Q.  Did you buy heroin from his wife?
2  A.  Not directly, but yes.
3  Q.  What do you mean by not directly?
4  A.  She sent somebody out with it.
5  Q.  Did you know Theodore Banasky?
6  A.  No.
7  Q.  Before you were indicted, did you know him?
8  A.  No.
9  Q.  Did you Alexander Bucci?
10  A.  Yes, I met him once in the neighborhood.
11  Q.  Did you know Joe Cucciniello?
12  A.  He's my neighbor.
13  Q.  Did you buy heroin from him?
14  A.  No.
15  Q.  Did you know Jennifer Bogdanovic?
16  A.  No.
17  Q.  Did you know Michael Nunez?
18  A.  No.
19  Q.  Did you know Denise Belfield?
20  A.  No.
21  Q.  Did you know Derek Yung?
22  A.  No.
23  Q.  Did you know Jasmin Cejovic?
24  A.  Min, yes.
25  Q.  How did you know him?

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1 A. My dealer.
2 Q. Did you know where his drugs were coming from?
3 A. No. Afghanistan I figured.
4      MS. GHOSH: Objection, your Honor. Speculation.
5      MS. O'NEILL: That's fine. We will withdraw it.
6      THE COURT: It's withdrawn.
7 Q. When you were arrested, where were you living?
8 A. With Gloria and Damian in New Dorp Beach.
9 Q. I am going to show you something that was in evidence.
10     Were you always living with Gloria and Damian?
11 A. I lived there for about three weeks before I got arrested.
12     MS. O'NEILL: If we could publish to the jury what is
13 in evidence as Government Exhibit 260.
14 Q. Where did you live before you moved in with Gloria and
15 Damian?
16     MS. O'NEILL: Hang on. This is Government Exhibit
17 260.
18 Q. Where were you living before you were living with Gloria
19 and Damian?
20     MS. GHOSH: Objection, your Honor. Relevance.
21     THE COURT: Overruled.
22 A. Me and my dog were living right behind there at Stop & Shop
23 under a table. It's right behind Burger King there. Sorry.
24 Sorry.
25 Q. It's OK. Where are you living now?

1 A. MCC. It hurts. I'm sorry.
2      THE COURT: There is some water there if you want
3 water.
4 A. I'm sorry.
5 Q. It's OK.
6      When you were arrested, were you clean from heroin?
7 A. I was trying, but no.
8 Q. Were you going through withdrawal in jail?
9 A. Yes, I did.
10 Q. Are you clean now?
11 A. 16 months.
12 Q. What has prison been like for you?
13     MS. GHOSH: Objection, your Honor. Relevance.
14     THE COURT: Sustained.
15 Q. Have you had any disciplinary infractions?
16 A. No.
17     MS. GHOSH: Objection, your Honor.
18     THE COURT: Sustained. Strike the answer.
19 Q. Were you part of Medin Kosic's drug conspiracy?
20 A. No.
21 Q. Are you guilty of the crimes that you are charged with
22 here?
23     MS. GHOSH: Objection, your Honor.
24     THE COURT: Sustained.
25 Q. Did you work for Jasmin Cejovic selling heroin?

1 A. No, I did not.
2 Q. Did you recruit customers for Jasmin Cejovic?
3 A. No.
4 Q. Why are you here today?
5 A. To prove my innocence.
6      MS. O'NEILL: Could you try again to play 303H, which
7 I think was the wrong call last time.
8      I'm sorry.
9      We have no further questions.
10     THE COURT: Ms. Ghosh.
11 CROSS-EXAMINATION
12 BY MS. GHOSH:
13 Q. Mr. Charlton, Min was a heroin dealer, right?
14 A. Yes.
15 Q. A pretty big one in your book?
16 A. In my book, not big; he just went to local customers.
17 Q. Could you speak closer to the microphone?
18 A. I didn't consider him a big dealer, no.
19 Q. He worked with all kinds of people to sell heroin, right?
20 A. I knew a couple.
21 Q. He had a supplier, you said, you assumed, someone above
22 him?
23 A. Of course.
24 Q. And Min had people who drove for him?
25 A. Someone would drive him around.

1 Q. And he had people to drive and make deliveries for him,
2 right?
3 A. A couple of times, yes.
4 Q. And he had people besides you, people who would bring him
5 customers, right?
6 A. Yes.
7 Q. He sold a lot of heroin over the years, right?
8 A. I would imagine.
9 Q. Some of that heroin he sold to you?
10 A. Yes.
11 Q. You bought heroin from Min, right?
12 A. Yes, I did.
13 Q. Multiple occasions?
14 A. Yes.
15 Q. Hundreds of times?
16 A. No.
17 Q. You didn't buy from him hundreds of times over the years
18 that you worked for him?
19 A. Definitely not.
20 Q. And over the years you learned where he lived?
21 A. Never.
22 Q. You knew his phone number?
23 A. Yes.
24 Q. You knew that he changed phone numbers, right?
25 A. Yes.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                        May 14, 2019

1 Q. And when he changed it, he would give you the new phone
2    number?
3 A. Yes, or I would get it from another friend who he gave it
4    to.
5 Q. And he would give you the phone number as well himself
6    sometimes, right?
7 A. Not all the time.
8 Q. Sometimes he would give you the number when he changed
9    numbers?
10 A. Once or twice, yes.
11 Q. You knew exactly how to reach him if you needed to?
12 A. Not all the times.  There have been times I had a hard time
13    getting ahold of him.
14 Q. You had multiple contact numbers for him in your phone,
15    right?
16 A. Yes, I did.
17 Q. And you knew how to avoid him if you needed to?
18 A. Yeah.
19 Q. He charged you for the heroin that he sold you, right?
20 A. Yes, he did.
21 Q. It wasn't free?
22 A. No.
23 Q. But he charged you a fair price?
24 A. What he charged everybody.
25 Q. He charged you 45 or 50 dollars a bundle, right?

1 A. Yes.
2 Q. You said earlier that you knew he was charging other people
3    $60, right?
4 A. If you buy bundle, it's 60.  If you buy more than one, it's
5    45, 50.
6 Q. But you knew that he was charging some people $60, right?
7 A. Yeah.  Me as well.
8 Q. OK.  Then he also charged you 45 or 50 dollars a bundle?
9 A. If I bought more than one bundle, yes.
10 Q. That's a lot less than the $80 a bundle that you heard
11    testimony about in this trial, right?
12 A. Yes.
13 Q. The $45 a bundle was a discount for you, right?
14 A. No.  It's a discount for everybody who bought more than
15    two, three, five.
16      MS. GHOSH: Can we pull up Government Exhibit 303E.
17      (Audio played)
18 Q. So, Mr. Charlton, you knew that the $45 a bundle was not a
19    price that everyone got, right?
20 A. Billy paid 50, that I do know.
21 Q. So the price you were being given $45 was not a price that
22    everyone got, right?
23 A. Not everyone, no.
24 Q. And to be clear though, the voice we just heard on the 5083
25    number, that is your voice, right?

1 A. Yes.
2 Q. That was your phone?
3 A. Yes, it was.
4 Q. That was a Samsung Galaxy phone?
5 A. I imagine, yes.
6 Q. Do you recall what your phone was?
7 A. I had a couple of Galaxies and iPhone.
8 Q. Sometimes you paid Min on the spot in cash for the heroin,
9    right?
10 A. Most of the time, yes.
11 Q. Sometimes you didn't actually have in hand all the money
12    you owed him for the heroin you got, right?
13 A. No, I did not.
14 Q. In fact, you said you still owe him $500 today?
15 A. Yes, I do.
16 Q. $500 for heroin?
17 A. Yes, I do.  Yes.
18 Q. So at $50 a bundle, that's ten bundles of heroin you owe
19    him for?
20 A. Yeah.
21 Q. When you didn't have the money, Min would sometimes let you
22    pay him back in other ways, right?
23 A. Once.
24 Q. When you didn't have the money, Min would sometimes let you
25    pay him back in other ways, right?

1 A. No, once.  I gave him my cell phone.  I had a brand-new S7.
2    I gave him that for payment.
3 Q. So your testimony is that the only way you paid Min back in
4    other ways was by giving him your cell phone?
5 A. Yes.  It's my testimony and it's the truth.
6 Q. You knew that if you brought Min customers, he would
7    decrease the amount you owed him, right?
8 A. No, never.
9 Q. He never promised to do that?
10 A. For a discount, no.  He never promised that, no.
11 Q. When you brought him a customer, he would knock off some of
12    what you owed him?
13 A. Never.
14 Q. Never?
15 A. Never, not once.
16 Q. You told Min that you had people ready to buy heroin,
17    right?
18 A. Yeah.  Numerous occasions.
19      MS. GHOSH: If we could put up for the witness what is
20    not in evidence, marked for identification Government Exhibit
21    1010.
22 Q. Do you see this is a message between you and Min?
23 A. Yes, I do.
24      MS. GHOSH: The government moves to admit Exhibit
25    1010.

1    MS. O'NEILL: No objection.
2    THE COURT: 1010 is in evidence.
3    (Government's Exhibit 1010 received in evidence)
4    MS. GHOSH: If we could publish that for the jury.
5 Q. In this message you wrote to Min, "Bro, please call me, we
6    need to bed a lot of people, a lot. I mean I can probably get
7    rid of ten right now."
8    By "bed," you meant sell heroin to, right?
9 A. No. By bed, it means get. I can get a lot of people right
10   now. Bed doesn't make any sense.
11 Q. You meant that you could get a lot of people to sell heroin
12   to?
13 A. We get a lot of people collectively, yes, like we always
14   do.
15 Q. By get rid of ten, you meant sell ten bundles, right?
16 A. Yes.
17 Q. Over the years you knew a lot of people who used heroin,
18   right?
19 A. Yes.
20 Q. You helped some of them get heroin?
21 A. Yes.
22 Q. You sold heroin to them?
23 A. Never.
24 Q. You gave heroin away for free?
25 A. For free?

1 Q. Yes.
2 A. It's not my heroin to give away.
3 Q. You never sold heroin to anyone?
4 A. No.
5 Q. That's your testimony today?
6 A. Yes, it is my testimony.
7 Q. So it's your testimony that you never sold heroin to a
8    woman named Nicole?
9 A. Yes, it is. Never.
10 Q. Did you know Nicole?
11 A. Yes, from the program.
12 Q. From the methadone clinic?
13 A. Yes.
14 Q. A methadone clinic is where addicts go to try and get
15   clean?
16 A. Yeah, like myself.
17 Q. And you knew someone named Mike Shearer, right?
18 A. I lived with him.
19 Q. If you could just answer my questions yes or no, please.
20   You knew Mike Shearer. He is someone we heard about
21   as Mike the carpenter?
22 A. Yes.
23 Q. You sold heroin to him?
24 A. No.
25 Q. Your testimony is that you never sold heroin to Mike

1    Shearer?
2 A. Yes, it is.
3 Q. You knew that Mike sold heroin to other people, right?
4 A. I don't know that either.
5 Q. You didn't know that he got heroin for groups of people?
6 A. We did together, but he didn't sell it. We could call a
7    dealer, the dealer would come, and we would do an exchange.
8 Q. So you and Mike worked together to distribute heroin
9    amongst a group of people?
10 A. If that's the technical term for it, then yes.
11 Q. Some of the heroin that you and Mike distributed together
12   was heroin you got from Min, right?
13 A. Sometimes.
14 Q. You know Nicky Knives?
15 A. Yes, I do.
16 Q. He's a friend of yours?
17 A. Yes.
18 Q. A fellow addict?
19 A. Yes.
20 Q. Violent guy?
21 A. I wouldn't know.
22 Q. You wouldn't know? Do you know where he got the nickname?
23 A. No, I do not, actually.
24 Q. You have known him a long time?
25 A. Since 2012.

1 Q. Sometimes you and Nicky Knives distributed heroin together?
2 A. No.
3 Q. Pulled your resources and got heroin together?
4 A. Yes.
5 Q. That you shared with each other?
6 A. Yes.
7 Q. Some of that was from Min, that heroin?
8 A. Never.
9 Q. You know Scotty Thumbs?
10 A. Yes.
11 Q. A friend of yours?
12 A. Yes.
13 Q. You have known him a long time?
14 A. Around the same time, 2012.
15 Q. He was another person you dealt with?
16 A. Yes, ma'am.
17 Q. Sold him heroin?
18 A. Never.
19 Q. Worked with him to get heroin to distribute to a group of
20   people?
21 A. Just me and him.
22 Q. You knew a guy named Frankie?
23 A. There are a couple of Frankies.
24 Q. Which Frankie did you know?
25 A. There's two Frankies on this indictment that we are

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,              **May 14, 2019**

1 referring to. So it was either Frank Chopper or short Frank.
2 I don't know which one you mean.
3 Q. So which was the Frank that you were going to hook up with
4 Min?
5 A. I guess that's the one Min referred to as short Frankie.
6 Q. You knew that he bought heroin, right, short Frankie?
7 A. He sold heroin. I called him to sell me heroin.
8 Q. And you knew that he -- so you knew that he bought heroin
9 to sell?
10 A. He had to get it from somewhere, yes.
11 Q. And you knew he wanted to buy 10 or 15 bundles a day,
12 right?
13 A. He told me five, but he said he would eventually get 10 or
14 15, yes.
15 Q. So he said that he wanted to buy 10 to 15 bundles a day,
16 right?
17 A. That's what he says he buys.
18 Q. That's what he said he wanted to do?
19 A. That's what he said he does do.
20 Q. OK. And you knew that he bought heroin regularly, right?
21 A. No, I didn't know that. I didn't know if he was lying or
22 not. I just met the guy.
23 Q. He told you that he bought heroin regularly?
24 A. He told me that, yes.
25 Q. You tried to refer him to Min, right?

1 A. After I knew he was working with Min, yes.
2 Q. You tried to refer him to Min before you knew he was
3 already working with Min?
4 A. No. It's in the evidence. He already told me he knew Min
5 when I said that.
6      MS. GHOSH: Can we pull up Government Exhibit 303I.
7 Q. 303I is the text message that you sent to Min on August 16
8 at 4:19 p.m. And you wrote, "Bro, call me ASAP. I got someone
9 who needs five full now, and if it's good love you, 10:15 every
10 day, but you got to get ahold of him now before his regular guy
11 comes." Do you see that?
12 A. Yes, I do.
13 Q. So at this point you were trying to refer short Frankie to
14 Min, correct?
15 A. That was after I already knew that he went to Min.
16 Q. Sir, it's a yes or no question. At this point, were you
17 trying to refer short Frankie to Min?
18 A. At that point, yes.
19 Q. OK. And then after you sent this message to Min, you
20 learned that Frankie was already buying from Min, right?
21 A. No, before that message. That's in evidence too.
22 Q. At the time you sent this message, you already knew that
23 Frankie was buying heroin from Min?
24 A. Repeat the question.
25 Q. At the time you sent this message, you did not yet know

1 that Frankie was buying heroin from Min?
2 A. I did know.
3 Q. So this message is a lie?
4 A. Yes, it is.
5      MS. GHOSH: Can we then go to 303B, please, and play
6 that call.
7      (Audio played)
8 Q. So your testimony is that this conversation with Min, where
9 you expressed surprise that you had just learned Frankie was
10 already seeing him, all of that was a lie, correct?
11 A. I called Frankie to come sell me heroin.
12 Q. Excuse me. All of that conversation we just heard was a
13 lie, is that your testimony?
14 A. Yes, it is. He was already Min's customer.
15 Q. Excuse me. You have answered the question.
16 A. Sorry. Go ahead.
17      THE COURT: Would this be a convenient place to take
18 our morning break?
19      MS. GHOSH: Sure, your Honor.
20      THE COURT: We will break for 15 minutes.
21      (Jury exits courtroom)
22      (Continued on next page)
23
24
25

1      THE COURT: Mr. Charlton, don't talk to your defense
2 counsel now. You're on cross-examination.
3      See you in 15 minutes.
4      MS. FENDER: Before Mr. Charlton steps away, your
5 Honor, obviously, as we have had witnesses who have been on
6 cross-examination, they have been admonished not to speak with
7 their counsel. Our understanding with a defendant is that -- I
8 spoke with Mr. Finkel briefly. We are aware of some Second
9 Circuit precedent that indicates that actually the right to
10 counsel for a defendant trumps sort of that consideration. So
11 we note for the record we have no objection if Mr. Charlton
12 needs to speak with his lawyer despite the fact that he is on
13 cross-examination.
14      MS. O'NEILL: Thank you, government.
15      MS. FENDER: Thank you, your Honor.
16      THE COURT: What was the Second Circuit decision?
17      MS. FENDER: We will get that citation to you during
18 the break, your Honor. Thank you.
19      (Recess)
20      MR. FINKEL: Your Honor, the case that I think stands
21 for the proposition that the Court asked the government about
22 is Geders v. United States, which is a 96 S.Ct. 1330.
23      THE COURT: It's not a Second Circuit case, it's a
24 Supreme Court case.
25      MR. FINKEL: It appears to be. That case from 1976

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                                May 14, 2019

1  stands for the proposition that it was reversible error when a
2  district court declined the defendant a right to consult with
3  his attorney overnight because the court at that point was
4  concerned that there would be unethical conduct between the
5  attorney and the defendant.
6      In an abundance of caution, the government does not
7  object to defendants being able to consult with their attorney
8  during --
9          THE COURT: That's consulting overnight?
10         MR. FINKEL: That's the facts of that case, your
11 Honor. In an abundance of caution, the government does not
12 object to the defendant consulting with his counsel.
13         (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25

1          (Jury present)
2          THE COURT: Ms. Ghosh.
3          MS. GHOSH: Thank you, your Honor.
4      Mr. Coleman, if we could bring up 704A-4, please.
5  BY MS. GHOSH:
6  Q. Mr. Charlton, I am showing you what is in evidence as
7  Government Exhibit 704A-4. And you discussed this on your
8  direct examination, right?
9  A. Yes.
10 Q. By the way, without going into the details of what was
11 said, you had an opportunity to consult with your lawyers over
12 the break?
13 A. Yes.
14 Q. So in this text message you're talking about someone named
15 Frank. Which Frank is this one?
16     Just to be clear, this text message itself doesn't
17 mention Frank. I will get to those. But do you recall?
18 A. No, I don't.
19 Q. Do you recall which Frank this is?
20     I will put up a different page then. This is the one
21 that mentions Frank.
22     So which Frank is this talking about? You mentioned
23 short Frank and Frank Chopper.
24 A. That's from Big Fat John. That's not from me. I think
25 he's trying to say, yeah, thanks, I know, Min told me.

1  Q. Oh, so "frank" means "thanks," you think?
2  A. That's what I think, yeah.
3  Q. Okay.
4  A. That's from her to me.
5  Q. So we will go back to this first one. "So Billy was
6  telling me Min's new guy after me just got pinched." So who is
7  Min's new guy, then?
8  A. I have no idea.
9  Q. Okay. Billy told you that, though, right?
10 A. Yes, he did.
11 Q. And "got pinched" means got arrested?
12 A. Yes.
13 Q. And this arrest was reported in the news, right?
14 A. SI Live, yes.
15 Q. And you saw that news article?
16 A. Yes, I did.
17         MS. GHOSH: If we could put up just for the witness.
18 It is not in evidence. I have marked it as Government Exhibit
19 80.
20 BY MS. GHOSH:
21 Q. Do you see this in front of you, Mr. Charlton?
22 A. Yes, I do.
23 Q. And is this the article that you looked at?
24 A. Yes, it is.
25         MS. GHOSH: Government moves to admit Government

1  Exhibit 80.
2          MS. O'NEILL: No objection.
3          THE COURT: 80 is in evidence.
4          (Government's Exhibit 80 received in evidence)
5          MS. GHOSH: Thank you, your Honor. If we could
6  publish that for the jury.
7  BY MS. GHOSH:
8  Q. Mr. Charlton, do you see that this article mentions that a
9  Frank Ammirato of Slater Boulevard was arrested for having 168
10 glassine bags of heroin in his possession?
11 A. That text makes sense now. Thanks for showing me that.
12 That makes sense, yeah. When she said, "yeah, frank" I was
13 unaware of that.
14 Q. So you do know this Frank, right?
15 A. No, I do not.
16 Q. You don't know Frank Ammirato?
17 A. No, I do not. Never met him or heard of him.
18 Q. But you knew this was Min's new guy.
19 A. That's what Billy said.
20 Q. And you learned that this new guy had been arrested, Min's
21 new guy had been arrested with 160 bags, as you wrote in this
22 message, right?
23 A. Yes.
24 Q. That's 160 bags of heroin?
25 A. Yes.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                                May 14, 2019

1 Q. And "subs," that's Suboxone?
2 A. Yes.
3 Q. "Pins," that's syringes?
4 A. Yes, it is.
5 Q. And you told Damian about this, right?
6 A. Yes, I did.
7 Q. And you told Gloria, who was using the Fat John phone,
8    according to you?
9 A. Yes.
10 Q. Because you thought it was pretty funny, right?
11 A. Yeah, karma, maybe, yeah, a little bit.
12 Q. It was funny that Min's new guy after you had gotten
13    arrested.
14 A. Min's guy got arrest, yes.
15 Q. He was being stupid, right?
16 A. Yes.
17 Q. Smoking weed, not being careful.
18 A. Yes.
19 Q. You knew Shaun Sullivan, correct?
20 A. Yes.
21 Q. He was a drug dealer?
22 A. Yes, he was.
23 Q. His wife was a drug dealer.
24 A. Yes, yes.
25 Q. You used to buy heroin from Shaun?

1 A. Never.
2 Q. Never.
3         MS. GHOSH: If we could put up 704A2, please, and go
4    to the second page: If you could just zoom in on the text
5    portion. Thank you.
6 BY MS. GHOSH:
7 Q. So in this exhibit you see that someone using the Diane
8    Scadutto Facebook writes to you, "What's up? Its Shaun. I'm
9    home"?
10 A. Yes.
11 Q. And then provides a phone number?
12 A. Yes.
13 Q. And he was reaching out once he got out of jail, right?
14 A. Yes. I was in jail with him.
15 Q. Shaun was in jail a lot, right?
16 A. Yes.
17 Q. And he reached out when he got out of jail to you in order
18    to hook back up with you, right?
19 A. Yes, as friends.
20 Q. You were friends with Shaun.
21 A. Acquaintances, but we kept in contact. I rented a room
22    from him, so, yeah.
23 Q. But you never got heroin from him?
24 A. Never.
25 Q. You said it was too expensive?

1 A. Yes, he was.
2 Q. $80?
3 A. Yes.
4 Q. But you got it from his wife, right?
5 A. Not directly but yes.
6 Q. In September 2017, you weren't buying from Shaun, correct?
7 A. Correct.
8 Q. You had a different source?
9 A. He wasn't my source to begin with.
10 Q. In December 2017, you had a source other than Shaun, right?
11 A. Of course, yes.
12 Q. And you had access to pretty good heroin?
13 A. '17, yes, I did actually.
14         MS. GHOSH: You can take that down, Mr. Coleman.
15 Q. You told Shaun that you had access to good heroin, right?
16 A. No, I did not.
17 Q. You didn't have a conversation in which you told him you
18    had the best heroin in Staten Island?
19 A. Never.
20 Q. You had fire?
21 A. That's not my terminology. I have never used the word
22    "fire."
23 Q. Do you know what fire means?
24 A. Now I do, yes.
25 Q. When did you learn what fire means?

1 A. Here in jail.
2 Q. You never heard the term "fire" before that?
3 A. No.
4 Q. And you have been using heroin how long?
5 A. Quite a few years, seven years.
6 Q. You mentioned Damian. He was a heroin user, right?
7 A. Yes, he was.
8 Q. Min knew about Damian, right?
9 A. Yes, he did.
10 Q. You told Min about Damian?
11 A. No.
12 Q. No?
13 A. Nope.
14         MS. GHOSH: If we could put up 303A, please.
15         (Audio played)
16         MS. GHOSH: You can skip ahead.
17         (Audio played)
18         MS. GHOSH: Thank you.
19 BY MS. GHOSH:
20 Q. So you said you would hang up with Min and call Damian
21    right now to see what he is doing, right?
22 A. Yes.
23 Q. "See what he is doing" meant you were going to see how much
24    heroin he want, right?
25 A. No. He wanted -- Damian wanted to hook back up with Min

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                                    May 14, 2019

1   because he lost his number.
2   Q. So you were going to put Damian in touch with Min, right?
3   A. Back in touch with him, yes.
4   Q. And you then gave Damian Min's number, right?
5   A. Yes, I -- I gave -- no, gave -- I requested him if I could
6    do that, if he could have his number again.  He said yes, so I
7    gave Damian Min's number, yes.
8   Q. So you gave Min -- excuse me, you gave Damian Min's number,
9    correct?
10  A. Yes, I did.
11  Q. So that Damian could buy heroin from Min.
12  A. Yes.
13  Q. And I believe you testified on direct that you were aware
14   of other people who called Min as well, right?
15  A. A few people, yes.
16  Q. You knew that because -- you knew that other people called
17   Min because you gave other people Min's number, right?
18  A. No, not true.
19  Q. You have several prior convictions, right, Mr. Charlton?
20  A. A few, yes.
21  Q. Some of them involve narcotics?
22  A. Yes.
23  Q. Some of them don't.
24  A. Yes.
25  Q. And as a result of one of those convictions, you were

1   required by law to update the government on where you were
2    living, right?
3   A. Yes.
4   Q. You knew you had to do that.
5   A. Yes, I did.
6   Q. You promised you would do that.  It was one of terms of
7    your sentence.
8   A. Yes, I did.
9   Q. But you didn't do that, right?
10  A. No, I didn't, twice.
11  Q. And you knew that was a whole separate crime, right?
12  A. Yes, I did.
13  Q. And you were charged with that crime.
14  A. At first I didn't know it was a separate crime, otherwise I
15   wouldn't have did it, but, yeah, I did.
16  Q. And you were charged with that crime?
17  A. Yes, I was.
18  Q. Let's talk about drug dealing in general for a moment.
19   It's fair to say that the way drug dealers make money is by
20   selling heroin to customers, right?
21  A. Yes.
22  Q. The more customers they have, the more money they can make,
23   right?
24  A. I would assume it would be more dangerous, but yes.
25  Q. If a dealer doesn't have any customers, he can't make

1   money.
2   A. True.
3   Q. Can't sell heroin if you don't have customers, right?
4   A. True.
5   Q. Min wasn't an addict, was he?
6   A. No, not that I know of, no.
7   Q. He needed help finding more customers, right?
8   A. I wouldn't know.
9       MS. GHOSH: I would like to bring up 704A4 again,
10   please.
11  Q. So these are the messages from January 2018 between you and
12   Min, right?
13  A. Yes.
14  Q. And Min reaches out to you from a number that you hadn't
15   known about before and he says "it's Min," right?
16  A. Yes.
17  Q. And he says, "You still got people that hit you up,"
18   correct?
19  A. Yes.
20  Q. You agreed, right?
21  A. Yes.
22  Q. You said "of course."
23  A. Yes.
24  Q. You said, "I'm finally clean."
25  A. Yes.

1   Q. That meant that you weren't using heroin?
2   A. Yes.
3   Q. But your testimony is that that was a lie, right?
4   A. Yes.
5   Q. And you told him that you could get him more customers,
6    right?
7   A. I don't -- I don't recall saying that, but . . .
8   Q. You wrote "working on it."
9   A. Yes.
10  Q. Working on getting more customers for him.
11  A. Okay.
12  Q. Is that what you wrote?
13  A. That's what I wrote, yes.
14  Q. But I believe you said earlier today your testimony is that
15   you don't know why you said that to him, is that correct?
16  A. I know why I said it.
17  Q. You know why you told --
18  A. Because I knew I was still getting high.  I needed to get
19   money together and get people.  That's exactly why I said it.
20  Q. So contrary to what you testified to earlier, you know now
21   why you wrote "working on it."
22  A. I never said I didn't know why I wrote "working on it."
23  Q. And "working on it," getting him new customers, was a lie,
24   right?
25  A. No.

UNITED STATES OF AMERICA,  v.
PAUL VAN MANEN ET AL.,                                              **May 14, 2019**

1  Q.  That's your testimony today?
2  A.  I never went through with it.  Yeah.
3  Q.  So "working on it," working on getting him new customers,
4     when you wrote that to him, was not a lie.  Is that your
5     testimony?
6  A.  "Working on it" is a lie.
7  Q.  Okay.  That's a lie.
8  A.  Yes.
9  Q.  Okay.
10      And then Min told you that he is not in a position to
11   give you drugs on credit anymore, right?
12 A.  Yes.
13 Q.  No more heroin on credit.
14 A.  Yes.
15 Q.  You would have to pay for everything up front?
16 A.  Yes.
17 Q.  And you told Min that you didn't want people coming to you
18   when the heroin wasn't ready, right?
19 A.  Yes.
20 Q.  Because sometimes it took Min a while to bring the heroin
21   to you.
22 A.  Sometimes he would never come.
23 Q.  Sometimes it took him a while to bring the heroin to you,
24   correct?
25 A.  Sometimes, yeah.

1  Q.  He was late.
2  A.  Or he never showed, yes.
3  Q.  And then you had people waiting around for this heroin that
4     never came, right?
5  A.  Yes.
6  Q.  And you told him that you had been doing good together,
7     right?
8  A.  Yes.
9  Q.  Because you don't get arrested.
10 A.  True, yes.
11 Q.  "I don't get pinched," right?  That's what you meant?
12 A.  Yes.  That's exactly what I meant.
13 Q.  And you didn't lose Min's heroin like this other guy did,
14   right?
15 A.  That's right.
16 Q.  The guy that came before you?
17 A.  Yes.
18 Q.  And he asked you to get people ready, right?
19 A.  Yes, he did.
20 Q.  By "people," he meant customers, right?
21 A.  Yes.
22 Q.  Now, you said that you never contacted Min after these
23   messages, right?
24 A.  Right.
25 Q.  These messages from January 10, 2018.

1  A.  Yes.
2  Q.  And you were arrested on January 17, 2019, right?
3  A.  Yes.
4  Q.  Excuse me, 2018.  Correct?
5  A.  Yes.
6  Q.  And your phone was seized at the time of your arrest?
7  A.  I brought my phone with me.  I voluntarily brought the
8     phone, yes.
9  Q.  And it was seized by law enforcement at --
10 A.  Yes.
11 Q.  -- that --
12 A.  Yes.
13 Q.  -- time, correct?
14 A.  Yes.
15 Q.  You were arrested on, as you said, January 17, 2018, right,
16   in this case; and after you got arrested, you got discovery in
17   the case, right?
18 A.  Yes.
19 Q.  And discovery is the government's evidence in the case,
20   right?
21 A.  Yes.
22 Q.  It includes search warrants, is that fair to say?
23 A.  Yes.
24 Q.  Reports written by the agents?
25 A.  Yes.

1  Q.  And it included the wiretap calls, right?
2  A.  Yes, it did.
3  Q.  Calls that you were recorded on?
4  A.  Yes.
5  Q.  Texts that you wrote and received?
6  A.  Yes.
7  Q.  All the recordings that we saw at trial this week?
8  A.  Yes.
9  Q.  And you reviewed that material, right?
10 A.  Yes, I did.
11 Q.  You also got additional materials before this trial, right?
12 A.  Yes, I did.
13 Q.  You prepared for this trial.
14 A.  Not much.
15 Q.  Did you review the materials that you received?
16 A.  Yes, I did.
17 Q.  You got to see notes from all the government meetings with
18   the witnesses who testified?
19 A.  Yes, I did.
20 Q.  And now you sat through this trial, right?
21 A.  Yes, I did.
22 Q.  You heard all the government witnesses testify.
23 A.  Yeah.  Testify?  Yeah.  Yes, I did.
24 Q.  And you have seen all of the evidence that the government
25   put in at the trial?

A-520

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                          May 14, 2019

J5e2van3          Charlton - Cross          Page 1191

1  A. Yes, I did.
2  Q. You want the jury to believe that you were a liar in all
3  that evidence, right?
4  A. Some of it, yes.
5  Q. But only then in those recorded calls and texts were you
6  lying, right?
7  A. To my dealer, yes.
8  Q. In the messages on your phone, you were lying, right?
9  A. To my dealer, yes. About a dealer, yes, I was, some --
10  most times, yes.
11  Q. So in all of the recordings, text messages, and evidence
12  from your phone about working with people and getting drugs,
13  those were lies, right?
14  A. Yes.
15  Q. But your testimony today is the truth.
16  A. Or out of context. Today, yes. I'm sober today.
17  Q. Excuse me. There was no question.
18  A. Oh, sorry. Thank you.
19        MS. GHOSH: Nothing further, your Honor.
20        THE COURT: Ms. O'Neill.
21        MS. GHOSH: And the government moves to strike
22  Mr. Charlton's last comment.
23        THE COURT: Stricken.
24        MS. O'NEILL: Could we play the call 303B that's in
25  evidence?

J5e2van3          Charlton - Redirect          Page 1192

1        (Audio played)
2     REDIRECT EXAMINATION
3  BY MS. O'NEILL:
4  Q. So why did you call Short Frankie that day?
5  A. I haven't heard the rest of that phone call in a while.
6  I'm just thinking about it now.
7        I'm sorry. The question?
8  Q. Why did you call Short Frankie that day?
9  A. Because I needed heroin. I called three, four people that
10  day.
11  Q. And what were you looking for from Short Frankie?
12  A. A bundle.
13  Q. How did you meet Short Frankie?
14        MS. GHOSH: Objection, your Honor. This is beyond the
15  scope of cross.
16        THE COURT: Sustained.
17  BY MS. O'NEILL:
18  Q. When you were telling Min about Short Frankie, why were you
19  telling him that you were trying to hook Min up with Short
20  Frankie?
21  A. Because I couldn't get it that quick.
22  Q. Why had you actually communicated with Short Frankie?
23  A. To get heroin.
24  Q. When did you contact Short Frankie to get heroin?
25  A. Probably an hour before that.

J5e2van3          Charlton - Redirect          Page 1193

1  Q. And why -- and why were you -- did you tell -- did you try
2  to hook Min up -- Short Frankie up with Min?
3  A. Not directly.
4  Q. What does that mean, "not directly"?
5  A. Well, I told Min, after I knew that he was his customer, so
6  it looked like I was -- you know, if he didn't come the next
7  time, then he missed out, at least I told that to all my
8  dealers.
9  Q. What did that mean that he missed out?
10  A. Because a lot of times they have wouldn't show up. They
11  hated coming out for a bundle. They wanted you to get more,
12  wanted you to get more. After they asked for $70, if I didn't
13  have any money, they wouldn't show up. They -- I was like, I
14  could have hooked you up on a couple of customers, I could have
15  hooked you said up if -- thinking, my mentality back then, you
16  would show up next time.
17  Q. I want to break that down. So you would sometimes ask your
18  dealer if -- you would sometimes lie to your dealer to -- I'm
19  trying to do this in a nonleading way. When you were calling
20  your dealers and telling them that you had people around, why
21  were you doing that?
22  A. Sometimes I did have people, but not all the time.
23  Q. When you didn't have people, why were you telling them
24  that?
25  A. To have them come.

J5e2van3          Charlton - Redirect          Page 1194

1  Q. Why would they come if you had people?
2  A. So they would think that they would have more business.
3  Q. And --
4  A. Or I definitely had money on me.
5  Q. And did you want your dealers to think a certain way about
6  you?
7  A. Yeah, that I wasn't some -- I didn't want them to think of
8  me the way I was at that time. I didn't think of myself the
9  way I was at that time, just a junkie.
10  Q. And I mean, you let Min believe that you were pawning
11  tools, though.
12        MS. GHOSH: Objection, your Honor.
13        THE COURT: Overruled.
14  A. I was pawning tools.
15  Q. So you --
16  A. I pawned all my tools.
17  Q. You didn't mind Min knowing you were pawning tools.
18  A. That was because -- so he knew I had money on me.
19  Q. What does that mean?
20  A. So he would come.
21  Q. Why would you have money?
22  A. Because I just pawned my tools.
23  Q. What tools are you talking about?
24        MS. GHOSH: Objection, your Honor. Relevance.
25        THE COURT: Sustained.

Min-U-Script®          Southern District Court Reporters          (23) Pages 1191 - 1194

1   BY MS. O'NEILL:
2   Q.  Now, the government asked you on cross about the Samsung
3   Galaxy phones that you had.  Why did you have those phones?
4   A.  I bought one for me, one for my son, and I would want to
5   see Charlie.  I had a lawsuit settlement at the end of 2015 --
6          MS. GHOSH: Objection, your Honor.  Relevance.
7          THE COURT: Sustained.
8   BY MS. O'NEILL:
9   Q.  Did you get the money for those phones from drug dealing?
10  A.  No.  A lawsuit.
11  Q.  Did you -- were there any other ways you got money to buy
12  phones?
13         MS. GHOSH: Objection, your Honor.  Relevance.
14         THE COURT: Overruled.
15  A.  Just work.
16  Q.  Did there come a time when you sold one of your phones to
17  Min?
18  A.  Yes.
19  Q.  What phone did you sell Min?
20         MS. GHOSH: Objection, your Honor.  Relevance.
21         THE COURT: Overruled.
22  A.  The S7 Galaxy when it first came out.
23  Q.  And how much did you sell Min that phone for?
24  A.  I think I got three or four bundles of heroin and $100 in
25  cash.

1   Q.  Why would you tell Min that he could have gotten rid of ten
2   bundles?
3   A.  So he would come, because he would think, you know -- just
4   so he would come.
5   Q.  Why did you get -- did you get ten bundles?
6   A.  He has actually came before when I said that, and there
7   would be no one there and I would have no money and I would try
8   to con him to getting a bundle out of him.  That's why I had a
9   lot of problems.  But he has came before and there would be no
10  one there.  I told him, You just missed them.
11  Q.  Why would you tell him, You just missed them?  Would you
12  give Min a reason these people were gone?
13  A.  I told him they were sick of waiting.  That did happen once
14  or twice, yes.
15  Q.  How do you know Scotty Thumbs?
16  A.  We were -- we used to panhandle together.  We used to share
17  the front of -- it used to be called Hess.  Now it is -- what
18  is the name of it now?  Speedway, Speedway gas station.  We
19  used to take turns panhandling in front of there.
20  Q.  And you mentioned that -- did Scotty Thumbs buy heroin
21  sometimes from Shaun Sullivan?
22  A.  I think so.  I know he went to --
23         MS. GHOSH: Objection, your Honor.  Speculation.
24         THE COURT: Yes.  Strike the answer.
25  BY MS. O'NEILL:

1   Q.  Do you know if Scotty Thumbs bought heroin from Shaun
2   Sullivan?
3   A.  He said he had, yes.
4          MS. GHOSH: Objection, your Honor.  It is hearsay.
5   A.  Yes.
6          THE COURT: It is hearsay.  Strike the answer.
7   BY MS. O'NEILL:
8   Q.  Did you sell drugs to a woman named Nicole?
9   A.  No, I did not.
10  Q.  Did you refer her to a drug dealer?
11  A.  Her personally?  No.
12  Q.  After you received those Facebook messages from Shaun, did
13  you call him?
14  A.  No.
15  Q.  Did you try to connect with him?
16  A.  No.
17  Q.  Did you buy drugs from him?
18  A.  No.
19  Q.  How many times did you buy drugs from Shaun's wife?
20  A.  Indirectly, two or three times.
21  Q.  What does that mean, "indirectly"?
22  A.  She had a kid that was working with her that she would send
23  out to meet me.
24  Q.  Now, the government has played on your cross-examination a
25  call where you mention Damian.  It's a call between you and

1   Min.
2   A.  Okay.
3   Q.  And then they showed a text message of you sending --
4          MS. O'NEILL: Could we -- I'm sorry.  I want to
5   publish to the jury Government Exhibit 303J, which is already
6   in evidence.  It's on my Elmo.
7   Q.  So the message says -- it's cut off, but the end part of
8   the message said, "Now, anyway, Damian just texted me.  He
9   wants your number again."
10         What had transpired before this?
11  A.  Damian had lost either Min's number or he didn't have his
12  new number, so he was asking --
13         MS. GHOSH: Objection, your Honor.  Hearsay and
14  speculation.
15         THE COURT: Overruled.
16  A.  He was asking me if I can get ahold of Min, and I then
17  turned and called Min and said, Damian is trying to get ahold
18  of you again.  Can he have your number?  He told me yeah, and I
19  gave it to him.  It's right there.  "Give him my number."  I
20  did.
21  Q.  When did you meet Nicole who we have been talking about at
22  this trial?
23  A.  How did I meet her?
24  Q.  Yeah.
25  A.  I met her at the methadone program, methadone clinic I used

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1  to go to.
2          MS. O'NEILL: No further questions.
3          THE COURT: Okay.
4          MS. GHOSH: Your Honor, may I have one question?
5          THE COURT: One question.
6  RECROSS EXAMINATION
7  BY MS. GHOSH:
8  Q. Mr. Charlton, you testified today that you lied repeatedly
9  to Min about getting him customers?
10  A. Yes.
11  Q. But he kept selling you heroin, right?
12  A. Off and on, yes.
13          MS. GHOSH: Thank you.
14          THE COURT: You are excused, Mr. Charlton.
15          THE WITNESS: Thank you.
16          (Witness excused)
17          THE COURT: Do you have another witness?
18          MS. O'NEILL: I am just checking on that.  I believe
19  we will call Nicole Ferrara.
20  NICOLE FERRARA,
21     called as a witness by Defendant Charlton,
22     having been duly sworn, testified as follows:
23          THE COURT: Sit down, Ms. Ferrara.  Make yourself
24  comfortable.  Pull yourself right up to the microphone.  All
25  set?

1          THE WITNESS: Yeah.
2  DIRECT EXAMINATION
3  BY MS. O'NEILL:
4  Q. Good afternoon, Ms. Ferrara.
5  A. How are you?
6  Q. Good.  If you can just make sure you speak into the
7  microphone when you are speaking.
8  A. Yes.
9  Q. Have we ever met before?
10  A. No.
11  Q. What's your full name?
12  A. Nicole Ferrara.
13  Q. And what borough do you live in?
14  A. Staten Island.
15  Q. And what is your phone number?  I'm sorry to do this to
16  you.
17  A. 929-423-6056, I believe.
18  Q. And how long have you had that number?
19  A. Three years.
20  Q. Now, do you know a guy named Kenny?
21  A. I know of him.
22  Q. You know of him.  Have you seen him before?
23  A. Yes.
24  Q. Where did you see him?
25  A. The methadone program, by Starbucks, the Hyland Plaza.

1  Q. Do you see him all around the neighborhood?
2  A. I used to, yes, I used to see him with his dog.
3  Q. Did you -- you mentioned the methadone program.  Are you a
4  patient at the methadone program?
5  A. Yes.
6  Q. How long have you been a patient there?
7  A. Three years.
8  Q. And do you know where you first saw Kenny or met him?
9  A. I'm not sure.
10  Q. Did Kenny ever sell drugs to you?
11  A. No.
12  Q. Did he ever give you the name of a drug dealer?
13  A. No.
14  Q. Did he ever give you a phone number for a drug dealer?
15  A. Nope.
16  Q. Did you ever see him passing out a drug dealer's name?
17  A. No.
18  Q. Did you ever see him selling drugs?
19  A. No.
20          MR. FINKEL: Objection.
21          THE COURT: Overruled.
22  Q. Did you ever see him recruiting customers for a dealer?
23  A. No.
24  Q. Now, has the government ever contacted you to ask you these
25  questions?

1  A. No.
2  Q. Have they contacted you at all about this case?
3  A. No.
4          MS. O'NEILL: I have no further questions.
5          THE COURT: Mr. Finkel.
6  CROSS-EXAMINATION
7  BY MR. FINKEL:
8  Q. Good morning.
9  A. Good morning.
10  Q. You met with. . .
11          (Counsel confer)
12  Q. Philip Primason, right?
13  A. Yes.
14  Q. He is the investigator that works for Ms. O'Neill, right?
15  A. Yes.
16  Q. You spoke with him, right?
17  A. Um-hmm.
18  Q. He had an opportunity to interview you, right?
19  A. Yes.
20  Q. And he took notes during that interview, right?
21  A. I have -- I don't know.
22  Q. You didn't see him writing things down?
23  A. No.  It was over the phone.
24  Q. It was over the phone?
25  A. (Nods).

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                May 14, 2019

1  Q. Did he say, Wait. Give me a second. I need to write that
2  down?
3          MS. O'NEILL: Objection.
4          THE COURT: Sustained.
5  Q. You spoke with him more than once?
6  A. Yes.
7  Q. Couple times?
8  A. Yes.
9  Q. You said you know of a Kenny, right?
10 A. Um-hmm.
11 Q. Your testimony is you don't know Kenny, right?
12 A. Yes.
13 Q. So you have no idea how Kenny has your phone number in his
14 phone, right?
15 A. No.
16 Q. He must have learned it somehow, right?
17 A. Obviously.
18 Q. There must have been some interaction between you and Kenny
19 in order for Kenny to get your phone number, right?
20 A. I have never talked to him.
21 Q. But he got your phone number, right?
22 A. Yes.
23 Q. You haven't heard the Title III recordings in this case,
24 have you?
25 A. No.

1  Q. You haven't seen the text messages that Kenny sent to
2  people about you, right?
3  A. No.
4  Q. You don't know anything about that.
5  A. No.
6          MR. FINKEL: Thank you.
7          MS. O'NEILL: No questions.
8          THE COURT: Okay, Ms. Ferrara. You are excused.
9          THE WITNESS: Thank you.
10 (Witness excused)
11         THE COURT: Do you have another witness, Ms. O'Neill?
12         MS. O'NEILL: No. We have no other witnesses.
13         THE COURT: You rest?
14         MS. O'NEILL: We rest.
15         MR. QUIJANO: Paul Van Manen to the stand, please.
16 PAUL VAN MANEN,
17 the defendant, having been duly sworn, testified
18 as follows:
19         THE COURT: Please sit down, Mr. Van Manen.
20 DIRECT EXAMINATION
21 BY MR. QUIJANO:
22 Q. Good afternoon, Paul.
23 A. Good afternoon.
24 Q. How old are you, sir?
25 A. 51.

1  Q. Where were you born?
2  A. Staten Island, New York.
3  Q. Parents alive?
4  A. My father, 85. My mother passed away when she was 67.
5  Q. Brothers and sisters?
6  A. Yeah. I got eight brothers -- well, 7 living. One passed.
7  Stevie, Jimmy, Gary, Johnny, Randy, me, and Henry, Kevin and
8  Brian, two little ones.
9  Q. What do they do for a living?
10         MR. FINKEL: Objection.
11         MR. QUIJANO: Withdrawn.
12 Q. Where did you grow up?
13 A. Thompkinsville, Staten Island.
14 Q. How far did you get in school?
15 A. Sixth grade.
16 Q. You dropped out?
17 A. Yes.
18 Q. When you dropped out, how were you doing in school?
19 A. I was good. I was good.
20 Q. Any tests?
21 A. Yeah, regents. I would go in to take the regents.
22 Q. How were you doing on those?
23         MR. FINKEL: Objection.
24         THE COURT: Overruled.
25 A. Tenth grade reading and college level math.

1  Q. Why did you drop out?
2  A. Poverty, home was tough, no electric, no heat, eventually
3  foreclosure.
4  Q. Started working?
5  A. Yeah, odd jobs.
6  Q. Where and give me ages.
7  A. Started at 14, Esposito's Deli, 1270 Bay Street, Staten
8  Island, New York. Then I was an electrician. Then I worked
9  for a 24-hour mini mart, along with a gas station. Always held
10 two jobs.
11         Eventually, by the time I was 20, I got married and I
12 was working with my father-in-law. We had a wholesale novelty
13 sale in Brooklyn and eventually opened up a store on 72nd, West
14 72nd in Manhattan. It was called Stationery and Toy World. It
15 is still there today. My sister-in-law has it now.
16         After that place --
17 Q. Let me stop you there. When you had Stationery Toy World
18 and Close to Home, what year are we talking about?
19 A. Stationery and Toy World started in '87.
20 Q. Did you own this with your --
21 A. It was me and my sister-in-law at first.
22         MR. FINKEL: Objection.
23         THE COURT: Can we get to the focus of the questions,
24 please?
25         MR. QUIJANO: Of course.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                          May 14, 2019

1   BY MR. QUIJANO:
2   Q. How many employees did you have then?
3   A. Stationery --
4         THE COURT: '87 is pretty remote now, Mr. Quijano.
5         MR. FINKEL: Objection.
6         MR. QUIJANO: I'm sorry?
7         THE COURT: 1987 is very remote.
8         MR. QUIJANO: Okay.
9         THE COURT: Why don't you get us into this century?
10  BY MR. QUIJANO:
11  Q. Did there come a time when you opened further businesses,
12  including the Close to Home, video, and that nature?
13  A. It was '97 I opened Close to Home Deli, 1270 Bay Street,
14  Staten Island, New York.
15  Q. And you opened -- did you open that yourself?
16  A. Yes. Me and my wife, my ex-wife.
17        MR. QUIJANO: Let me show, if I could, just to the
18  witness something that's marked Defendant's Exhibit PV6.
19  Q. Can you see that?
20  A. Parts of it, piece of it.
21  Q. One second.
22        What is that?
23  A. That is a picture of the building, two buildings I used to
24  own and a deli and a luncheonette nextdoor to it that I owned
25  also.

1         MR. QUIJANO: We offer it?
2         MR. FINKEL: No objection.
3         THE COURT: PCV6.
4         MR. QUIJANO: Publish it?
5   PV6.
6         THE COURT: It is in evidence.
7         (Defendant's Exhibit PV6 received in evidence)
8         THE COURT: You can publish it.
9         MR. QUIJANO: May I publish it, please? Oh, it is
10  published? Thank you.
11  BY MR. QUIJANO:
12  Q. At this point you have only had one piece of property or
13  were there other properties that you had bought?
14  A. Well, this is actually on four lots, and I had property --
15  when I had this, I had property in Florida, I had a block, and
16  also --
17  Q. Let's stay in Staten Island for now.
18  A. Okay. I had another house. It was Close to Home Deli. It
19  was about a half a mile away.
20  Q. What kind of building was that?
21        MR. FINKEL: Objection.
22        THE COURT: Sustained.
23  A. It was a two-family house.
24        MR. FINKEL: Move to strike.
25        THE COURT: Can we get into the 21st century, please?

1   It is not a case about real estate holdings either.
2         MR. QUIJANO: No, but a lot of these came up in our
3   case. These locations.
4         May I proceed?
5         THE COURT: Yes.
6   BY MR. QUIJANO:
7   Q. You heard testimony in this case about various locations in
8   other delis, is that correct?
9   A. Yes.
10  Q. What were some of those?
11  A. That was 1270 and the 1272 Bay Street.
12  Q. And what was the name of that?
13  A. That's this one. And there was the other one, 1190 Bay
14  street.
15  Q. And what business was there?
16  A. That was Bada Bing deli.
17  Q. Let me show the witness what is marked PV5. What is that?
18  A. That's a picture of a deli I used to own, another one.
19  Q. Which deli?
20  A. That was the Bada Bing deli.
21        MR. QUIJANO: We offer it.
22        THE COURT: Any objection, Mr. Finkel?
23        MR. FINKEL: No objection.
24        THE COURT: PV5 is in evidence.
25        MR. QUIJANO: Publish it, please?

1         THE COURT: Yes, you may.
2         (Defendant's Exhibit PV5 received in evidence)
3   BY MR. QUIJANO:
4   Q. And was there another commercial business that's come up in
5   this case that you owned?
6   A. No. That's the only two that came up.
7   Q. So at this point it is about 2008?
8   A. No. This one here is 2009 through 2012 going to '13.
9   Q. Approximately how much were you making a year at this
10  point?
11        MR. FINKEL: Objection.
12        THE COURT: Sustained.
13  BY MR. QUIJANO:
14  Q. You still own them?
15  A. No. I lost everything.
16  Q. When did you lose everything?
17        MR. FINKEL: Objection.
18        THE COURT: Sustained.
19  A. Everything was gone --
20        THE COURT: Sustained.
21        MR. FINKEL: Objection. Move to strike.
22        THE COURT: Strike it out.
23  BY MR. QUIJANO:
24  Q. When did you become addicted to heroin?
25  A. The end of 2012.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1 Q. Actually, before you got addicted to heroin, did you suffer
2   any injuries?
3 A. Yes.
4 Q. Tell me about that.
5 A. I was doing a renovation in the first building.
6 Q. Which location?
7 A. 1270 Bay Street, the third floor.  And at the end of the
8   night I fell down the stairs, 22 steps straight.
9 Q. What happened?
10       MR. FINKEL: Objection.
11       THE COURT: Overruled.
12 Q. As a result of your injury, what happened?
13 A. I had to start -- I went to a doctor to get checked because
14   my knees were burning.  I didn't understand it.  I couldn't
15   stand up.  And they told me that I store my meniscus in both my
16   knees, and they prescribed me steroids and told me to stay off
17   my feet for two weeks.  That was impossible.  But after a few
18   days, the knees were all right.
19       Later on, I started having issues with my neck, and my
20   neck would lock and I couldn't turn my neck.  It would bug me
21   out.  So I started going to a chiropractor.  I did that for
22   over a year.  That didn't work.
23       Then I seeked pain management.  The first script was
24   360 M30s.
25 Q. Of what?

1   water retention.  It was congestive heart failure.  That was
2   early 2012.  They couldn't figure it out.  I didn't even figure
3   it out.  It was the medication.
4 Q. What happened next?
5 A. Next I stopped the fentanyl patches and I stopped the
6   morphine.  I just kept going.  I was balancing.  I was okay.  I
7   couldn't concentrate.  I was always out of it, sleeping.  It
8   was not me.
9 Q. What ultimately happens?
10 A. Ultimately what happened, I was at the doctor's office and
11   I didn't receive a script on a Friday and I didn't know I
12   wasn't receiving a script because they were closing the office
13   and I was the last one sitting there.  I didn't understand.
14   She said my insurance didn't go through.  I said, well, I'll
15   pay cash, whatever I need to do.
16 Q. Script for what?
17 A. For my prescription for the oxycodone.  And she said it was
18   too late, to come back Tuesday.  I didn't think too much of it.
19   I was a little nervous.  By the time the night came, I was
20   done.
21 Q. What do you mean, "done"?
22 A. I was throwing up.  Diarrhea, throwing up at the same time.
23   I couldn't breathe.  I went into panic.
24 Q. What happens?
25 A. The kid that was living with me, Anthony, he was with me

1 A. It was M30s roxies, roxicodone.
2 Q. Okay.
3 A. That was too much.
4 Q. How much were you supposed to take a day?
5 A. 12 a day.  According to her, 12 a day.
6 Q. How many did you take?
7 A. I couldn't handle more than two.  I would break them in
8   half.
9 Q. What happened if you took more than two?
10 A. Projectile vomiting, couldn't focus, couldn't do anything.
11 Q. What happened next?
12 A. I seeked another pain management, somebody more reputable,
13   came up with Dr. Kreizman, and I told him my situation and they
14   broke the prescription down.  They gave me 120 15-milligram
15   oxycodone, they gave me fentanyl patches, and 120 morphine 100
16   milligram time release.
17       I was still having issues.  I ended up in the
18   hospital.
19 Q. Issues with taking the medication?
20 A. Yes.
21       MR. FINKEL: Objection.  402, 401.  Objection to this
22   line of questioning.
23       THE COURT: It is overruled.
24 Q. Issues with the medication?
25 A. Yes, I ended up in the emergency room because I was having

1   back in the day.  We was lovers.  He went downstairs to the
2   store to get some underneath there, because I lived in that
3   building also.  I had an apartment there at that time.  And he
4   went to get cigarettes at the store.  By then I didn't have any
5   store.  I sold everything.  I wanted to leave.
6 Q. What did he do?
7 A. He bumped into one of the tenants that lived in the
8   basement apartment, and they asked where was the big guy?
9       MR. FINKEL: Objection as to foundation.  He seems to
10   be testifying about someone else who did something.
11       MR. QUIJANO: I will withdraw that question.
12       MR. FINKEL: Move to strike.
13 BY MR. QUIJANO:
14 Q. As a result of Anthony leaving, eventually what happens?
15 A. Anthony came back upstairs with a bag of what I learned to
16   be heroin.  It was a little, tiny -- a little glassine, and he
17   said to sniff this, I would feel better and it made me feel
18   better.  I didn't like the taste.  I didn't like anything on my
19   nose.  But it worked.  And that -- I ended up using heroin from
20   that Friday night until I can get a script on Tuesday, the
21   following Tuesday, when the doctor was back in the office.  I
22   got the script on the Tuesday, trying to take the script, go
23   back to normal.  It's not holding me.  So I'm supplementing
24   heroin and pills.
25 Q. What year is this?

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                                    **May 14, 2019**

1　A. This is going into 2013?  No, 2012, the end of '12.
2　Q. So after --
3　A. It's October, October '12.
4　Q. After trying to supplement it, the following week --
5　A. Yeah, the following week, trying to supplement it, it
6　wasn't working out.  I couldn't breathe because my sinus was
7　getting affected by sniffing that stuff.  So the only other
8　option was the needle.  That was the hardest part of it all.
9　Q. Did you shoot --
10　A. I could never stick a needle in my arm.
11　Q. Did somebody shoot you up during that --
12　A. Yes.  That's another thing.  Now I became dependent on
13　somebody being there to help me for medication time.
14　Q. This is still the first week after, without getting --
15　A. No, we are going into about two weeks now, two weeks.
16　Q. From that point, did you become addicted to heroin?
17　A. Yes.
18　Q. How long did that take after that first injection?
19　A. I was addicted by the Tuesday after I didn't get the
20　script.
21　Q. As you moved on from that point, were you able to work?
22　A. No.
23　Q. Why?
24　A. I couldn't do anything.  I couldn't pay attention to
25　anything.

1　Q. Why?
2　A. From the pain.
3　Q. Why?
4　A. Because I was always --
5　　　　MR. FINKEL: Objection.
6　A. At the heroin stage, my life became consumed.
7　　　　MR. FINKEL: Your Honor.
8　　　　THE COURT: The objection is sustained and the answer
9　will be stricken out.
10　　　　MR. FINKEL: And, your Honor, I would just ask if you
11　can instruct the witness that while an objection is pending he
12　should not answer the question until your Honor rules on it.
13　　　　THE WITNESS: Sorry.
14　　　　THE COURT: That's right.  Listen to the question.
15　See if there is an objection.  If there is an objection, don't
16　answer right away until I rule on it.
17　　　　THE WITNESS: Okay.
18　　　　THE COURT: And listen to the question and answer that
19　question.  Don't volunteer information.
20　　　　THE WITNESS: Okay.
21　BY MR. QUIJANO:
22　Q. Once you got addicted to heroin, were you able to continue
23　working in any capacity?
24　A. No.
25　　　　MR. FINKEL: Objection.

1　　　　THE COURT: Overruled.
2　A. Not at all.  I couldn't pay attention to anything.  My days
3　were wrapped around the next dose.
4　　　　THE COURT: The answer is no.
5　　　　THE WITNESS: Oh, sorry.
6　Q. How long did you stay addicted at that point, then?
7　A. Until about November that year.  I flew down to Tampa.  I
8　gave up my apartment.  I separated from Anthony, and I tried to
9　get help down there.
10　　　　MR. FINKEL: Objection.  It's not responsive to the
11　question that was posed.
12　　　　THE COURT: The objection is sustained.  Strike out
13　the answer.  Listen to the question and answer it, will you?
14　　　　THE WITNESS: All right.  Sorry.
15　BY MR. QUIJANO:
16　Q. After you first got addicted to heroin in 2012, does there
17　come a point where you stop?
18　A. Yes.
19　Q. When?
20　A. It was when my daughter got into a car accident in July.
21　Q. I would like a time frame first?
22　A. July 20 -- 2015, July 12.
23　Q. So from 2012 to 2015, you were addicted?
24　A. On and off, yes.
25　Q. By July 2015, when your daughter has this accident, do you

1　have any assets, any property whatsoever?
2　　　　MR. FINKEL: Objection.
3　　　　THE COURT: Sustained.
4　BY MR. QUIJANO:
5　Q. After the accident, what happens?  Do you leave?
6　A. I leave to go to Florida to my daughter.  She was on life
7　support down in Florida.  I had methanol pills from back in
8　pain management --
9　　　　THE COURT: Would you read the question back, please.
10　　　　(Record read)
11　　　　THE COURT: Answer yes or no.
12　　　　THE WITNESS: Yes.  Okay.  Sorry.
13　BY MR. QUIJANO:
14　Q. Did you manage to get clean while you were down in Florida
15　in 2015?
16　A. Yes.
17　Q. How long did you stay in Florida?
18　A. I stayed a couple of days.  I had to come back.
19　Q. Did you slip again when you came back?
20　A. No.
21　Q. Did you -- how long did you manage to stay clean from 2015
22　when you stopped until you resumed again?
23　A. About 21 months, 22 months.
24　Q. Where were you living for the majority of that time?
25　A. Between New York and Florida.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                    May 14, 2019

1  Q. When you started again in 2012, about how much heroin were
2     you using until you stopped in '15?
3  A. 2012 --
4        MR. FINKEL: Objection, your Honor.
5        THE COURT: Overruled.
6  A. Regularly. Every two days, between me and Anthony, it was
7     three, four to five bundles.
8        THE COURT: Four to five bundles every two or three
9     days?
10       THE WITNESS: Every two or three days, yes.
11 BY MR. QUIJANO:
12 Q. And you did -- someone would inject you, correct?
13 A. Yes.
14 Q. You could not do that yourself?
15 A. Never.
16 Q. Could you describe the kind of needle that was used to
17    inject you?
18 A. It was known as an insulin needle. It was thin and it had
19    a short tip, quarter inch.
20 Q. Could you give the jury an idea of how long the tip or the
21    needle part was?
22 A. No more than a quarter of an inch.
23 Q. And the body of the syringe, can you describe that?
24 A. It was skinnier than a Bic pen.
25       THE COURT: How long was it?

1        THE WITNESS: It was about five inches.
2  BY MR. QUIJANO:
3  Q. You have seen Government Exhibit 17, the syringe that was
4     recovered in Michael Ogno's bedroom?
5  A. Yes.
6        (Pause)
7        THE COURT: Mr. Quijano, do you have a another line of
8     questioning while we are looking for Exhibit 17?
9        (Pause)
10 BY MR. QUIJANO:
11 Q. You have seen Government Exhibit 17, correct?
12 A. Yes.
13 Q. Is that -- how does that compare to the kind of needles you
14    have been describing that were used to inject heroin into your
15    veins?
16       MR. FINKEL: Objection.
17 A. Never --
18       THE COURT: Overruled.
19 A. Never seen something like that.
20 Q. What's the difference?
21 A. That's for steroids.
22 Q. What's the difference in needles?
23 A. The length, five times, four, five times. It's a whole --
24    it's --
25 Q. And the -- I'll call it the body of the syringe, how does

1     that compare?
2  A. It's three times the width.
3  Q. Have you seen these kinds of needles before, that is
4     Government Exhibit 17?
5  A. Never.
6  Q. This type of needle?
7  A. No. I've never seen it.
8  Q. What's your understanding -- do you have an understanding
9     of what these needles are used for?
10 A. Yes.
11       MR. FINKEL: Objection. There is no foundation if the
12    witness doesn't know anything about needles.
13       THE COURT: Sustained, sustained.
14 BY MR. QUIJANO:
15 Q. You eventually resumed using heroin, is that correct?
16 A. Yes.
17 Q. You told us you stopped in 2015. When did you resume using
18    heroin?
19       MR. FINKEL: Objection.
20       THE COURT: Overruled.
21 A. It was late April, early May.
22 Q. Of what year?
23 A. It was 2017.
24 Q. Where had you been living prior to that?
25 A. In Florida.

1  Q. Did you -- did you move?
2  A. It was where I lived. I would come up here and --
3  Q. In May of 2017, where were you?
4  A. I was at Diane's house.
5  Q. Diane Scadutto --
6  A. Yes.
7  Q. -- who has been talked about in this case?
8  A. Yes.
9  Q. Married to Shaun Sullivan, correct?
10 A. Yes.
11 Q. In Staten Island?
12 A. Yes.
13 Q. What were the circumstances of how you ended up living in
14    her house in May of 2017?
15 A. Diane -- I had given Diane an apartment back in the day, so
16    automatically if I needed somewhere to stay, she allowed me to
17    stay.
18 Q. Why were you even in Staten Island?
19 A. I was here for medical, see my family, and I needed car
20    title for a car that was stuck in my driveway at home.
21 Q. You came up to take care of those things?
22 A. Yes.
23       MR. FINKEL: Objection.
24       THE COURT: Sustained.
25 BY MR. QUIJANO:

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                                May 14, 2019

1  Q. Did you have any intention of remaining in Staten Island
2  when you came up in May of 20 --
3          MR. FINKEL: Same objection.
4          THE COURT: Sustained.
5  A. No.
6          THE COURT: Strike the answer.
7          MR. FINKEL: Thank you, your Honor.
8  BY MR. QUIJANO:
9  Q. Once you started living with Diane, did you resume using
10  heroin?
11  A. Yes.
12  Q. How soon?
13  A. Within days.
14  Q. Did you become addicted?
15  A. Yes.
16  Q. How soon?
17  A. Three or four days.
18  Q. By the summer of 2017, how much heroin were you using on a
19  daily basis?
20  A. It wasn't much at all, maybe a bundle, bundle and a half.
21  Q. And as a result, how often would you have to ingest heroin
22  on a daily basis?
23          MR. FINKEL: Objection.
24  A. Every four hours.
25  Q. Four hours?

1  A. Um-hmm.
2  Q. What would happen if you didn't get the heroin?
3  A. I would start withdrawing, getting sick.
4  Q. Describe what withdrawing and feeling sick is.
5          MR. FINKEL: Objection, your Honor.
6          THE COURT: Sustained. He has already described it
7  several times.
8  BY MR. QUIJANO:
9  Q. Once you became addicted in the summer of 2017, what was
10  the most important thing in your life?
11  A. Heroin.
12          MR. FINKEL: Objection.
13          THE COURT: Overruled.
14  Q. By "heroin," you mean the need to get the heroin, right?
15  A. Need to get it, always worried about the next dose, don't
16  want to be without it, the cycle had begun.
17  Q. So when you are living in Diane Scadutto's apartment, is
18  there other residents in that apartment -- in that building, is
19  that correct?
20  A. It was two-family side by side.
21  Q. This is your old building, right?
22  A. No, no.
23          MR. FINKEL: Objection as to leading.
24          THE COURT: Overruled.
25  BY MR. QUIJANO:

1  Q. And were the people you were living with, were they all
2  addicts?
3  A. Back in --
4          MR. FINKEL: Objection.
5  A. -- that building? Back in the day in the building, yes.
6          THE COURT: Overruled. Back in the day?
7  Q. No, we are talking about Scadutto.
8  A. Oh, Scadutto.
9  Q. May 2017.
10  A. 2017, no, she had people come by.
11  Q. What people?
12  A. Customers of hers.
13  Q. And they would use heroin?
14  A. Yes.
15  Q. In 2012, just to be clear, when you went -- I'm sorry. In
16  2015, when you went back to your -- to Florida, were you around
17  addicts?
18  A. No.
19  Q. Up until 2017, how were you paying for your heroin, up
20  until you get addicted again?
21          MR. FINKEL: Objection.
22          THE COURT: Sustained.
23  BY MR. QUIJANO:
24  Q. When did you start selling heroin?
25  A. I did it as a favor for Diane a couple times.

1  Q. When did you start selling heroin.
2  A. First time I ever sold was amongst -- I would say 2013 was
3  the first time.
4  Q. And how often were you selling then?
5  A. Once in a while. Somebody would come by from downstairs or
6  upstairs once or twice.
7  Q. Did you still have income or did you have to sell to get --
8  be able to pay for heroin?
9          MR. FINKEL: Objection, your Honor.
10          THE COURT: Overruled.
11  Q. Back then, did you still have income or assets or did you
12  have to sell in order to get your heroin?
13  A. I had income from the two delis I had sold.
14  Q. When did that stop to the point that you now had no income
15  and had to sell heroin to get money to buy heroin?
16          MR. FINKEL: Objection. Your Honor has ruled on this
17  issue.
18          THE COURT: Overruled.
19  Q. Do you understand my question?
20  A. Yes.
21  Q. When did it stop, that you no longer had income and you had
22  to sell heroin to get money to buy heroin? When did that --
23  A. 2017 is when I had to sell to buy heroin.
24  Q. So how did that start? Who did you first -- how did you
25  get your customers initially in 2017 and where were you getting

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                                                May 14, 2019

1  the heroin from?
2        MR. FINKEL: Objection as to form.
3        THE COURT: Overruled.
4  A. It was at Diane's house. It was -- Diane was visiting her
5    husband, and she asked me to see a few people.
6  Q. And her husband is Shaun Sullivan, right?
7  A. Shaun Sullivan.
8  Q. Who was in jail when you got there in May of 2017.
9  A. Yes.
10 Q. And so you what?
11 A. So I seen a few people while she was visiting Shaun.
12 Q. Her former customers?
13 A. Yeah, her customers.
14       MR. FINKEL: Objection.
15       THE COURT: Yeah, sustained.
16 BY MR. QUIJANO:
17 Q. Who are these people you were seeing?
18 A. They were people that I had met at the house that came to
19   her house and purchased heroin off of her.
20 Q. Okay. And where were you getting the heroin you were
21   selling at that point?
22 A. Where I was getting it, from Diane.
23 Q. Okay. After Diane goes to jail.
24 A. After Diane goes to jail.
25 Q. Which is when, exactly?

1  A. May 18, 2017.
2  Q. Okay.
3  A. It started off some kid Tru that we knew.
4  Q. Tru?
5  A. Yeah, Tru.
6  Q. Um-hmm?
7  A. Then it went to Jigger.
8  Q. I'm sorry?
9  A. A guy named Jigger.
10 Q. Yes?
11 A. They got arrested at the end of May that year.
12 Q. As far as you know, did they have any relationship with
13   Kosic --
14 A. No, not at all.
15 Q. -- and his conspiracy?
16 A. No.
17 Q. Who else were you getting from initially when you start
18   selling again in 2017 in the summer?
19 A. I would go through Cesar.
20 Q. Cesar?
21 A. Cesar, yeah.
22 Q. Anybody else?
23 A. I met up with Supreme.
24 Q. Supreme?
25 A. Yes.

1  Q. What was the arrangement you had with these various
2    suppliers in terms of financial?
3  A. Cash and carry, cash and carry.
4  Q. What does that mean?
5  A. They want you to buy at least ten bundles or else they
6    don't want to bother seeing you. That's how you get a
7    discounted price so you can resell to support yourself.
8  Q. Did you get credit?
9  A. No.
10 Q. And approximately how many times were you buying from these
11   various suppliers? Let's stay in that May to June period.
12 A. Five to ten bundles every two days.
13 Q. You had customers at that point, right?
14 A. Yeah, a couple of Diane's.
15 Q. For the average week, about how many bundles would you
16   first purchase and sell? Give us an idea.
17 A. Purchase to sell and use?
18 Q. No, let's just get what you purchased from your suppliers
19   first, the total?
20 A. 35.
21 Q. Of the 35, did you use any of those bundles?
22 A. Yes.
23 Q. With anyone else?
24 A. First was Francesca.
25 Q. Okay. And approximately what percentage of the 35 bundles

1  you would get a week would you use.
2  A. Half. Half.
3  Q. That's between you and Francesca.
4        How long did you continue selling at least in Staten
5    Island after you started in May of 2017?
6  A. I left, went home. A couple of weeks later I left and got
7    out of here.
8  Q. What month are we in?
9  A. Three -- June.
10 Q. Up to that point, had you had any contact with Dino Kosic?
11 A. Yes, we did get contact with him.
12 Q. After you started buying heroin --
13 A. Yes.
14 Q. -- up here.
15       Describe that. Again we are talking about the May to
16   June period in 2017, correct?
17 A. Yes.
18 Q. What's the contact you had with Kosic?
19 A. Contact started off, whenever he would try to find Diane,
20   he knew me and Diane were close because I had lived at Diane's
21   house prior. He would call me through Facebook. He didn't
22   have my number.
23 Q. Did you have an understanding of the relationship Kosic had
24   with Diane?
25 A. Yeah, they were intimate.

**UNITED STATES OF AMERICA, v.**
**PAUL VAN MANEN ET AL.,**                                        **May 14, 2019**

1  Q. They were lovers?
2  A. Yes.
3  Q. Continue.
4  A. So he would sell me five bundles, start off at five.
5  Figured it would build up to what Diane had. It never did. He
6  always complained because all I would buy is five or ten. And
7  then when I would go to 15 for a little while, he still
8  complained.
9  Q. We are still talking about until you leave Staten Island?
10 A. Yeah, five or ten.
11 Q. What were the terms during that time period of buying
12 heroin from Kosic?
13 A. Cash.
14 Q. Credit?
15 A. No credit.
16 Q. Is it your understanding that Kosic knew you were selling
17 some of that heroin?
18 A. Yes.
19 Q. Were there any restrictions that Kosic placed on you as to
20 where you could sell the heroin?
21 A. No.
22 Q. Were there any restrictions that Kosic placed on you as to
23 who you could sell that heroin?
24 A. No.
25 Q. Did you ever purchase larger quantities than you have

1  described now, the ten or 15 bundles?
2  A. In May/June, no.
3        THE COURT: Mr. Quijano --
4        MR. QUIJANO: Is this a good time to take break, your
5  Honor?
6        THE COURT: I was just going to ask you that.
7        MR. QUIJANO: See? I'm learning.
8        THE COURT: We will resume at 2:00.
9        (Continued on next page)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1        (Jury not present)
2        THE COURT: See you at 2:00.
3        MR. FINKEL: Your Honor, if we could briefly,
4  hopefully Mr. Quijano is past this point already, but the
5  government's position is that Mr. Van Manen's economic
6  situation, as your Honor previously instructed the jury, has
7  nothing to do with this case. Similarly, whether he is
8  addicted to heroin has nothing to do with this case. So, your
9  Honor, the government notes its continuing objection to those
10 lines of questioning.
11       THE COURT: Okay. You might be thinking about the
12 appropriate charge I can give on this.
13       MR. FINKEL: Yes, your Honor.
14       (Luncheon recess)
15
16
17
18
19
20
21
22
23
24
25

1              AFTERNOON SESSION
2                  2:00 p.m.
3        (Jury present)
4  PAUL VAN MANEN, resumed.
5        THE COURT: Mr. Quijano.
6        MR. QUIJANO: Thank you, your Honor.
7  BY MR. QUIJANO:
8  Q. You mentioned that prior to 2017, there was an occasion
9  where you lived with Diane Scadutto, correct?
10 A. Yes.
11 Q. When and where was that?
12 A. One of the times I returned from Florida. It was June
13 2013.
14 Q. Where?
15 A. 1270 Bay Street, second floor.
16 Q. Who else was living at the building at the time?
17 A. It was Diane and her husband Shaun, Al Gregory and Deanna
18 Gregory, and Anthony.
19 Q. All those are people whose names have come up in this case,
20 correct?
21 A. Yes.
22 Q. At that point, in 2013, when you were living in the
23 building, were you selling heroin to them?
24 A. Yes. If I had, I'd sell it to them. They would sell back
25 and forth to me. Just at cost.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                May 14, 2019

1  Q.  Why?
2  A.  Keep us from getting sick.  Nobody wants to see the next
3    guy suffer.
4  Q.  You mentioned Bogdanovic earlier today.  What period of
5    time were you getting heroin from him?
6  A.  I was getting in 2012 through Deanna and Al.  But from me
7    to him, early '13.
8  Q.  Were you selling that heroin?
9  A.  No.
10 Q.  But did you sell some heroin in 2013?
11 A.  If somebody else in the building, either Shaun or Diane or
12   Al or Deanna, they ran out and I had it, because I had more
13   than they had.
14 Q.  In 2013, when you were dealing with Bogdanovic, did you
15   have an understanding that he was involved with Kosic in any
16   way?
17 A.  Not at all.
18 Q.  And approximately how much were you buying from Bogdanovic
19   during that time period?
20 A.  It was a brick, which is five bundles, every two days, and
21   they were skinny so it was like a gram.
22 Q.  Prior to getting addicted in 2013, had you ever been
23   arrested or convicted of a crime?
24 A.  In 2007 I was arrested for an improper tax stamp in the
25   deli I owned.

1  Q.  What happened with that case?
2  A.  Pled out to a misdemeanor and $300 fine.
3  Q.  Could you get a little closer to the mic.
4         After 2013, were you arrested?
5  A.  Endlessly.
6  Q.  Why don't we talk about that.
7  A.  We can go to --
8  Q.  Why don't we start with 2013.
9  A.  OK.  2013, February 21st, February 26th, March 8th.
10 Q.  Those are three separate arrests?
11 A.  Yes.
12 Q.  Within about a three-week period?
13 A.  16 days to be exact.
14 Q.  Do you know who you were arrested by, which group?
15 A.  It was the Staten Island gang squad at the time.
16 Q.  Who apparently was leading that gang squad when they
17   arrested you those three times?
18         MR. FINKEL: Objection.  Foundation.
19 Q.  If you know.  You know who arrested you, right?
20         MR. FINKEL: I don't know if he knows the NYPD's
21   rankings.
22 A.  Detective Truscelli.
23 Q.  Dectective Truscelli?
24 A.  Yes.
25 Q.  From this trial?

1  A.  Yes.
2  Q.  The first contact you had with him is February 26, 2013?
3  A.  Yes.
4  Q.  Tell me about that arrest.
5  A.  That arrest, we went to -- me and Anthony were going to
6    pick up something.  It was from Bogdanovic.  And we got pulled
7    over.  Anthony had two bags on him from earlier.
8  Q.  How much weight was that?
9  A.  .002.
10 Q.  OK.  Prior to that was the first arrest on February 21st?
11 A.  Yes.
12 Q.  What was that case about?
13 A.  That case, I went to go pick up something for myself, a kid
14   was with me, and he had a bundle on him.
15 Q.  Were you stopped and arrested?
16 A.  I was stopped and arrested and it was DAT.
17 Q.  How much all together?
18 A.  He had one bundle so it was .02.  It was light.
19 Q.  And that third arrest in this three-week period, I think
20   you said March 8th of 2013, what were the circumstances of that
21   arrest?
22 A.  Again, we were headed toward the building, same vehicle,
23   and me and Taylor Tijon got pulled over.
24 Q.  How much weight?
25 A.  I don't know, maybe three bundles.

1  Q.  Same group of cops?
2  A.  Same gang.
3  Q.  About a month or so later, were there additional arrests?
4  A.  Yes.
5  Q.  When is the next arrest?
6  A.  April 5, 2013.
7  Q.  Arrested by whom?
8  A.  Gang squad again.
9  Q.  Circumstances of that case.
10 A.  It was a raid, a raid at 486 Jersey Street, Staten Island,
11   New York.
12 Q.  Were you living there?
13 A.  Yeah, I was living there.
14 Q.  Who else was there when the raid took place?
15 A.  Two girls.  Lynn Taylor and Nicole Grossman.
16 Q.  How much weight is found there, if you know or remember?
17 A.  Between all three of us, I think five bags.
18 Q.  Half a bundle?
19 A.  Two tenths of a gram.
20 Q.  Half a bundle?
21 A.  Half a bundle between all of us.
22 Q.  What happened to those four cases, those four arrests?
23 A.  I pled guilty to all four April 29, and I was sentenced to
24   30 days.
25 Q.  Do you know if you pled to a misdemeanor or a felony?

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL., May 14, 2019

1 A. It was two attempted -- all misdemeanor, two attempted and
2 two possession, in the seventh degree, the lowest.
3 Q. Let's move to 2014. Tell me about your next series of
4 arrests.
5 A. Started again April 11, 2014.
6 Q. What were the circumstances there?
7 A. I was living on Bay and Victory and my apartment was
8 raided.
9 Q. Was it an execution of a search warrant?
10 A. Yes.
11 Q. Who led that search warrant?
12 A. That one was Truscelli.
13 Q. First one through the door?
14 A. Yes.
15 Q. Describe what happened.
16 A. I had a hoody on. He pulled it over my head, kneed me in
17 the face, and I slid across the hardwood floor and hit the
18 wall. He said, You're a fucking junkie fag. Why don't you
19 just kill yourself already?
20 Q. Any result from that knee in the face?
21 A. When I got to Rikers, I had two black eyes.
22 Q. Were you arrested subsequent to that, the April 11 arrest?
23 A. I was in the police station. Every few hours I was ran
24 through for other dates that he would say.
25 Q. Let me stop you. You're talking about being in the police

1 station as a result of the April 11 arrest?
2 A. Yes.
3 Q. What happened?
4 A. Every couple of hours he was laughing and he kept running
5 my name.
6 Q. Who is "he"?
7 A. Truscelli.
8     Here's another one for you, here's another one for
9 you.
10 Q. Another what?
11 A. Another arrest.
12 Q. As a result, were you charged with another case on that
13 night?
14 A. Yeah. It was supposedly serving Lynn and Nicky who I lived
15 with.
16 Q. From what date?
17 A. January 20 -- I just learned that now.
18 Q. Would January 25 refresh your recollection?
19 A. January 25, 2014.
20 Q. So now we have the April 11 and the January 25. Is there a
21 subsequent arrest and case?
22 A. I got out 60 days later. In the same apartment, me and
23 Anthony, another raid.
24 Q. Do you remember the date?
25 A. That was June -- July 10.

1 Q. Again, another execution of a warrant?
2 A. Another warrant.
3 Q. Through the door?
4 A. Through the door.
5 Q. Who led that one?
6 A. That one, it was two other guys. The same gang squad, but
7 two other guys.
8 Q. How much was recovered during that raid and arrest?
9 A. We had three bags.
10 Q. Three bundles or three bags?
11 A. Three bags.
12 Q. Is there a subsequent arrest in 2014?
13 A. August 29, I got a ride from some girl, and I was picking
14 up two bundles from this guy Frank, and I got arrested near his
15 house with two bundles.
16 Q. Same group of cops?
17 A. Same cops.
18 Q. Was Truscelli personally involved in that arrest, if you
19 remember?
20 A. No, it wasn't him.
21 Q. As a result of acquiring these four cases, what did you
22 eventually do?
23 A. The first -- they pled it out to one felony with probation.
24 Q. The others?
25 A. The other one -- oh, misdemeanor and a conditional

1 discharge.
2 Q. So you pled to all four?
3 A. Yeah, one and one.
4 Q. Let's move to 2015. Did your relationship with the gang
5 squad continue?
6 A. Yes, apparently.
7 Q. What happened?
8 A. I was -- I went to my apartment in New Dorp.
9 Q. Can you give me a date?
10 A. August 24th. I went by the apartment because I was headed
11 home to Florida, so I wanted to grab some clothes and a steam
12 machine, because my daughter was about to come out of the
13 hospital. I was pulled over a couple blocks away, and they
14 searched me, and I had a pain medication bottle. They peeled
15 the label off and arrested me.
16 Q. These were pills?
17 A. Methadone pills.
18 Q. Was there a subsequent arrest after the August 24 arrest?
19 A. While I was on the floor in the cell, they picked me up,
20 took me upstairs, and they arrested me for a raid at the
21 apartment where Doreen and Anthony were.
22 Q. That was?
23 A. August 25, the day after.
24 Q. One moment. You mentioned earlier about being pulled over
25 and the pill bottle?

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1 A. Yes.
2 Q. I believe you said that --
3 A. Peeled the label off.
4 Q. Who did that?
5 A. It was a bunch of them. It was a young cop, yeah.
6 Q. So we left off now with these two arrests from incidents on
7   August 25 and the 24th. What happened to those cases?
8 A. I was locked up and I was on probation because I had a
9   probation hold. I was sitting as I was going to court fighting
10   the case, and in the end I bailed out and I took the violation
11   of probation for a suspended license for earlier that year.
12   Then in the end they said it was -- I could plead out to
13   attempted possession, why would I fight it, I already did the
14   time. So I took attempted possession and that was the end. I
15   did it just to get the hell out of Staten Island. And it
16   worked for a while.
17 Q. From 2012 to 2015, give us an average, as best you can, of
18   how much heroin you were buying and when.
19 A. Sometimes it was five bundles every two days, and then at
20   the worst it would be 15 every three days. It was up and down
21   because I kept going back and forth to pain management.
22 Q. Between 2012 and 2015, how were you paying for this heroin?
23 A. Cash.
24 Q. Were you in that time period having to sell heroin to get
25   money to buy heroin?

1 A. No.
2 Q. So I think we started this before the break. When did you
3   start to buy heroin from Dino Kosic?
4 A. Dino Kosic myself, maybe a week in June.
5 Q. Of what year?
6 A. 2017.
7 Q. From June 2017, let's say, until October, November 2017,
8   you continued to buy from Kosic, correct?
9 A. On and off, yes.
10 Q. During that time period, were you buying from other drug
11   dealers, other heroin dealers?
12 A. Yes.
13 Q. Who?
14 A. It was mostly Drama.
15 Q. Did you buy from any other dealers?
16 A. Drama, we had G Unit, and a guy named Supreme. And a
17   couple of times from Derek Yung.
18 Q. Derek Yung?
19 A. Yes.
20 Q. How much would you buy from Derek Yung?
21 A. He had grams so it would last a while. I was afraid
22   because I couldn't measure it.
23 Q. Do you know an individual named Cesar?
24 A. Cesar is how I would get to Drama.
25 Q. I think I asked you earlier, also, some of the

1   circumstances surrounding your relationship with Kosic in terms
2   of buying heroin. Did you ever warn him about law enforcement?
3 A. No.
4 Q. Did he ever warn you about law enforcement?
5 A. No.
6 Q. There was a tape played, I believe yesterday, where there
7   is a conversation between you and Kosic about Belfield being
8   arrested. Do you recall that tape?
9 A. Yes.
10 Q. Why did you call him?
11 A. I was on the phone with him, it was just a regular
12   conversation. I just brought it up because I thought of it. I
13   thought she was the hot one for some reason.
14 Q. You heard the way Kosic responded. Did Kosic ever, either
15   in that conversation or later, chew you out or get angry with
16   you about somebody getting arrested that you were dealing with?
17 A. No.
18 Q. Did he seem to care?
19 A. Not at all.
20 Q. Once you started buying from Kosic, you mentioned Derek
21   Yung. Who else were your regular customers during that time
22   period?
23 A. From Kosic, when I'd come back later on in August --
24 Q. Let me withdraw and rephrase it.
25     I am talking about the time period when you do start

1   buying from Kosic until the end, all together, from whatever
2   sources, who were your customers?
3 A. I had Derek Yung, Mike Ogno, Cesar, on occasion, Mike G,
4   another kid Mike Marcus, I called him MM, Wok, Danny Nolan.
5   That's all I could think of.
6 Q. Hussein?
7 A. Hussein, yes. Hussein.
8 Q. Graziano?
9 A. Graziano back and forth.
10 Q. Mike G?
11     MR. FINKEL: Objection.
12 A. Mike G I said.
13     THE COURT: Overruled.
14 Q. Did Kosic ever direct you to sell to particular people or
15   not sell to particular people?
16 A. No.
17 Q. Other than Yung, did you ever buy heroin from any of these
18   people that were also your customers?
19 A. A couple of times Mike G, Wok.
20 Q. Now, when you were selling heroin -- again, this is all
21   post Kosic, post May 2017 -- would people help you sell heroin?
22 A. In the beginning, it was me and Francesca at the hotel.
23   She was another addict. She got thrown out of her house
24   because she got into a car accident. So she was homeless.
25     MR. FINKEL: Objection.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                          **May 14, 2019**

1        THE COURT: Overruled.
2   Q. So she helped you?
3   A. Yes.
4   Q. To the best of your understanding, did she have any
5     relationship with Kosic?
6   A. Not that I know of.
7   Q. You have spoken and Doreen Spinelli has come up a lot in
8     this case. What did you do with her?
9   A. She was another addict, a lifelong friend, 35 years, easy.
10   Q. You have known her for 35 years?
11   A. 35 years. She had no place to go. She started staying at
12     the hotel.
13        MR. FINKEL: Objection. There is not even a question
14     pending.
15        THE COURT: Objection is sustained.
16   Q. Did she help you sell heroin?
17   A. Yes.
18   Q. You have heard many conversations involving her. Are they
19     accurate in terms of what she would do?
20        MR. FINKEL: Objection.
21   A. Accurate in what way?
22   Q. When you were selling heroin.
23   A. It was actually her selling, and I came back into the
24     picture.
25   Q. I meant when you were delivering heroin to sell, what were

1     the circumstances, would you walk, would you drive, how would
2     it work?
3   A. Most of the time drive.
4   Q. Who would actually drive?
5   A. It would be me.
6   Q. Was anyone with you during most of these times?
7   A. Doreen.
8   Q. What would she do?
9   A. She would answer the phone; she would talk to everybody.
10   Q. During the same time period, once you started buying from
11     Kosic, were you hanging around or around anybody who wasn't an
12     addict?
13   A. No.
14   Q. Why?
15   A. I don't want people talking again.
16   Q. What?
17   A. It's embarrassing and it goes through my whole family.
18   Q. What is embarrassing?
19   A. Being an addict.
20   Q. Did Kosic ever discuss his business with you?
21   A. No.
22   Q. Were you aware of some of Kosic's business handlings, and
23     if so, how?
24   A. If I knew --
25        THE COURT: Excuse me. His business what?

1        MR. QUIJANO: Handlings, how he ran his business.
2        THE COURT: Objection is sustained. Rephrase the
3     question. I don't understand it.
4   Q. Did you ever learn from any people Kosic's situation with
5     giving credit, and if you did, from who?
6   A. Shaun Sullivan.
7   Q. What did he tell you?
8   A. He said that I was an asshole because he gets credit.
9   Q. Who is "he"?
10   A. Sullivan gets credit. And that Kosic didn't give me
11     credit.
12   Q. Did you come to know of anyone else around Kosic who got
13     credit?
14   A. I come to learn later on, but nothing that mattered back in
15     the time.
16   Q. Were you aware of any other aspects of Kosic's business and
17     how he handled it?
18   A. I learned of Gordo.
19   Q. Who is Gordo?
20        First of all, how did you learn about Gordo?
21   A. Gordo I learned from Shaun or Diane, it was in a
22     conversation.
23   Q. And what did you learn about Gordo? Who was Gordo?
24   A. That they go to see Gordo, that's where Kosic would get it
25     from, Gordo.

1   Q. That was Kosic's supplier?
2   A. Yes.
3   Q. Did you become aware of what Gordo's house looked like?
4   A. Yes. Because I met Kosic out in Brooklyn many times.
5   Q. But did you actually go into the house?
6   A. No.
7   Q. Was it ever described to you?
8   A. Yes.
9   Q. By who?
10   A. Shaun.
11   Q. Why would Shaun know some of these things about Kosic's
12     business?
13        MR. FINKEL: Objection.
14        THE COURT: Sustained.
15   Q. You talked with Shaun about Kosic's business, correct?
16        MR. FINKEL: Objection.
17        THE COURT: Overruled.
18   Q. Did you talk to Shaun about Kosic's business?
19   A. Yes. Shaun mentioned things.
20   Q. Did it appear as if Shaun knew a lot about Kosic's
21     business?
22        MR. FINKEL: Objection.
23        THE COURT: Overruled.
24   Q. Did he know details about Kosic's business that he talked
25     to you about?

1 A. A couple of things.
2 Q. What is your understanding as to why or how he would know
3   these things?
4         MR. FINKEL: Objection.
5         THE COURT: Overruled.
6 Q. What is your understanding as to why Shaun Sullivan would
7   know details about Kosic's business?
8 A. They were kind of close to Kosic. Meanwhile, his wife was
9   sleeping with him. So they kind of had an inside with him.
10   That's how that was.
11 Q. He had Kosic's trust?
12 A. Yeah. I would say so.
13 Q. You think you did?
14 A. No.
15 Q. Were you aware, were you ever told about fentanyl being in
16   Kosic's heroin? Just a yes or no at this point.
17 A. Yes.
18 Q. From where, from who?
19 A. Shaun Sullivan.
20 Q. What did Sullivan tell you?
21 A. After one of his ODs, he said that Dino's shit has got a
22   touch of fentanyl in there.
23 Q. Did you believe him?
24 A. No.
25 Q. Why?

1 A. I don't believe anything Shaun says most of the time.
2 Q. You bought from Kosic dozens, if not hundreds, of times in
3   that period between May and your arrest, correct?
4 A. Yeah. Not hundreds, but something, yeah.
5 Q. It sounded like a hundred listening to the calls.
6         Who was your first customer after you bought?
7 A. Me and Doreen.
8 Q. And by that you mean what?
9 A. Me and Doreen got a fix ourself.
10 Q. Every time?
11 A. Every time.
12 Q. You and Doreen ever get sick?
13 A. Sick?
14 Q. From using Kosic's heroin?
15 A. No.
16 Q. You and Doreen ever OD from using Kosic's heroin?
17 A. No.
18 Q. Did you ever go out to lunch with Dino, with Kosic?
19 A. No.
20 Q. Hang out with him in any way?
21 A. No.
22 Q. Socialize with him in any way?
23 A. No.
24 Q. Who is Ted Banasky?
25 A. He is a friend that Doreen knew that came to light after

1   Kosic closed down, Kosic gave up.
2 Q. When he stopped selling, Kosic?
3 A. He was sick, so somebody gave him my number to call me to
4   see if I could refer him to somebody.
5 Q. Did you and Teddy discuss a possible business venture?
6 A. He kept complaining about where I was going. I liked
7   Drama, but we had to throw Cesar --
8 Q. "He" is who?
9 A. Teddy Banasky.
10 Q. He was complaining about what?
11 A. Giving up something to Cesar because Cesar would take me to
12   Drama. So we would take care of Cesar.
13 Q. These are two other heroin dealers that you used?
14 A. Yes.
15 Q. Continue.
16 A. So he was complaining about it and he was saying --
17         MR. FINKEL: Objection as to the hearsay.
18         MR. QUIJANO: It's from the conspiracy.
19 A. Theodore Banasky --
20         MR. FINKEL: Same objection.
21         THE COURT: Overruled.
22 Q. Continue.
23 A. Theodore Banasky said that he had a way to get in touch
24   with Dino's guy, that he knows him, and that the minimum buy is
25   100 bundles and it will be $3,000.

1 Q. Dino's guy being Gordo?
2 A. Yeah.
3 Q. Continue.
4 A. He said that Dino's lying, that Gordo didn't close down. I
5   didn't know what that meant, but he needed $3,000 to see him.
6   So Teddy was going to borrow that money off somebody.
7 Q. Did anything ever come of this discussion?
8 A. No.
9 Q. To your knowledge, did Doreen Spinelli ever overdose in her
10   life?
11 A. Yeah. She told me about a story once.
12 Q. Briefly, what was that? Or at least the time frame, when
13   was it?
14 A. It had to be early May of '17.
15 Q. Describe what she told you.
16         MR. FINKEL: Objection.
17         THE COURT: Overruled.
18 A. She was at her friend Eric's house. She was in a program.
19   She was working. She came back to the Island, like we all do,
20   and she did a bag of heroin at Eric's. She overdosed on one
21   bag, from sniffing it. They threw her in the shower and she
22   came to with cold water.
23 Q. Did she indicate where she got that heroin from?
24 A. Yes.
25 Q. Where?

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1  A. A friend of ours named Tru.
2  Q. Now, you met with the government and spoke with them after
3  your arrest, right?
4  A. Yes.
5  Q. You were arrested when?
6  A. January 17, 2017.
7  Q. When did you meet with the government?
8  A. February 13.
9  Q. Less than a month?
10  A. Three weeks, yeah.
11       THE COURT: You were arrested in 2017 or 2018?
12       THE WITNESS: 2018. Sorry.
13  Q. Why did you want to meet with the government?
14       MR. FINKEL: Objection.
15       THE COURT: Sustained.
16  Q. You had an understanding of what the reason would be to
17  have such a meeting, right?
18       MR. FINKEL: Objection.
19       THE COURT: Overruled.
20  Q. You had an understanding as to the reason to have such a
21  meeting, correct?
22  A. A little bit.
23  Q. What did you understand?
24       MR. FINKEL: Objection.
25       THE COURT: Overruled.

1  Q. Did you tell them who you got heroin from when you started
2  to sell it?
3  A. Yes.
4  Q. Did you tell them all about Kosic and all the events that
5  took place after you started buying heroin from Kosic in 2017?
6       MR. FINKEL: Objection.
7  A. Yes.
8       THE COURT: Sustained.
9       MR. FINKEL: Move to strike.
10       THE COURT: Strike it out.
11  Q. Were you truthful, completely truthful in all you told the
12  government?
13  A. Except one thing.
14  Q. What was that?
15  A. The Michael Ogno.
16  Q. What did you tell them?
17  A. I told them the last time I sold him was around September
18  2017.
19  Q. Was that true?
20  A. No.
21  Q. When was the last time you sold Michael Ogno any heroin?
22  A. November 29, 2017.
23  Q. Two days before he died?
24  A. Yes.
25  Q. How much did you sell Michael Ogno on Wednesday the 29th?

1  A. I understood that if I could talk and, you know, plead my
2  case, that I would get some understanding.
3  Q. What do you mean understanding?
4  A. The situation, the charges were crazy, and speak.
5  Q. What would be the possible outcome?
6       MR. FINKEL: Objection, your Honor.
7       THE COURT: Sustained.
8  Q. Well, were you able to cooperate with them?
9  A. No.
10  Q. Why, as you understand it?
11       MR. FINKEL: Objection.
12       THE COURT: Overruled.
13  A. I would have to plead out to the top count.
14  Q. The charge in this case?
15  A. Yes.
16  Q. The Kosic conspiracy?
17  A. Yes.
18  Q. Could you do that?
19  A. No.
20  Q. Why?
21  A. I'm not guilty of that.
22  Q. Did you tell them that you sold heroin?
23  A. Yes.
24  Q. Did you tell them when you sold heroin?
25  A. Yes.

1  A. Two and a half bundles.
2  Q. For how much?
3  A. 200.
4  Q. We will return to that.
5       Why did you lie about that?
6  A. I knew I had -- he had nothing to do with me, because the
7  last time I seen him, I didn't have anything to give him and I
8  knew somebody else did. And I assumed it was Derek Yung at
9  that point.
10  Q. Why did you lie?
11  A. Why did I lie? I didn't want to put myself anywhere near
12  it. I didn't understand it. Just normal, I guess, I don't
13  know.
14  Q. But it was a lie?
15  A. It was a lie, yes.
16  Q. Did you ever help Kosic package?
17  A. No.
18  Q. Did you ever manage or act as a stash house?
19  A. No.
20  Q. Did you share any profits with Kosic?
21  A. Profits? I never had a profit. How would I share
22  anything?
23  Q. What do you mean you never had a profit?
24  A. We couldn't even cover our heads me and Doreen.
25  Q. Just used the money to buy more heroin?

1 A. We try, yeah, we try.

2 Q. Did you ever feel comfortable even asking Kosic for credit?

3 A. No, not at all. Because he would look at me like a junkie

4 and wouldn't even touch the situation. There was one time, I

5 was on my way to him, I needed 15 bundles.

6      MR. FINKEL: Objection, your Honor. It's not

7 responsive.

8      THE COURT: Sustained. It's not responsive.

9 Q. Did an incident happen between you and Kosic that confirmed

10 your belief that you could never have credit from him?

11 A. Yes.

12 Q. Tell me about that.

13 A. It was a time I was going to him, I needed 15.

14 Q. 15 what?

15 A. Bundles, for $600. I was coming from Jersey. Doreen was

16 still in her room sick because we didn't have anything.

17 Q. How much money did you have on you?

18 A. $600.

19 Q. Go ahead.

20 A. So 15 bundles was 600. I asked him to cut it to 14 and a

21 half.

22 Q. Why?

23 A. Because I had to take 20 to go back over the bridge to make

24 sure Doreen was all right.

25 Q. The toll for the bridge?

1 A. Yes.

2 Q. 20 bucks?

3 A. Yes.

4 Q. What did Kosic say?

5 A. Tough. It sucks for you, that's what he said.

6 Q. What happened if you didn't have enough money to buy heroin

7 from Kosic, what would happen?

8 A. What would happen? I would cut the order. That's what

9 would happen.

10 Q. Could you tell him you were sick and you just needed it?

11 A. No.

12 Q. Why?

13 A. Never.

14 Q. Why?

15 A. It's junkie first. That's what it is.

16 Q. Did Kosic use heroin?

17 A. No, not at all.

18 Q. Cejovic, his cousin, did he use heroin?

19 A. No, not at all.

20 Q. In general, then, if you and Doreen didn't have money for

21 heroin, what would you do?

22 A. Doreen would go shoplifting.

23 Q. Literally just go steal?

24 A. She was good at it.

25 Q. That happened a lot?

1 A. Quite a few times. She actually got caught once.

2 Q. The government last week played a series of calls when

3 Cejovic was on the stand, including one that dealt with Mr.

4 Cejovic sending someone to you to pick up something. Do you

5 recall that?

6 A. Yes.

7 Q. What happened, as far as you know?

8      Well, what happened, what led up to this?

9 A. The day before we picked up 15 bundles. He gave it to us

10 in a bag.

11 Q. Again, you have got to use names. The day before you what?

12 A. Me and Doreen picked up 15 bundles. He gave it to Doreen.

13 She put it away. She put it in a bag. When we got back to the

14 room, it was extra in there.

15 Q. What do you mean extra?

16 A. There was 20 bundles extra in there.

17 Q. So you paid for 15?

18 A. Paid for 15 and got 35.

19 Q. By mistake?

20 A. Yeah.

21 Q. You're sure it wasn't Kosic being generous?

22 A. Generous? 20 bucks.

23 Q. Continue. So what happened?

24      This is the day before those calls that were played.

25 A. The day before he came. He caught it, and he said hold it

1 for me. So we held it for him. The next day he was sending

2 somebody. I didn't know who the hell it was. He told me twice

3 about it during the day, and I still forgot when he called the

4 last time. Then I seen somebody, I don't know who they were,

5 gave him the 12.

6 Q. Gave him 12?

7 A. 12 bundles.

8 Q. Who is "he"?

9 A. Kosic.

10 Q. So you were directed to give 12 of the 20 that he had

11 mistakenly left with you?

12 A. Yes. Correct.

13 Q. You kept eight?

14 A. I kept eight.

15 Q. Was that payment for doing this?

16 A. No.

17 Q. What do you mean?

18 A. I had to pay him when I seen him next.

19 Q. Which was when?

20 A. The next day, probably the 29th.

21 Q. Wednesday?

22 A. Yes.

23 Q. Just to be clear, it all starts on Monday the 27th, and

24 this is the week Ogno dies, so it all starts on Monday the

25 27th.

UNITED STATES OF AMERICA,  v.
PAUL VAN MANEN ET AL.,                                                  **May 14, 2019**

1          MR. FINKEL: Objection to defense counsel testifying
2    on behalf of the witness.
3          THE COURT: Please don't make remarks.  Just ask
4    questions.
5    Q.  Kosic mistakenly leaves 20 extra bundles with you on what
6    day?
7    A.  Monday, the 27th of November 2017.
8    Q.  On what day does Kosic or Cejovic send somebody to pick up
9    12 bundles?
10   A.  The next day, the 28th of November 2017, after 10:00 at
11   night.
12   Q.  When do you next see Kosic that week?
13   A.  The last time I seen Kosic is the next day, would be the
14   29th of November, sometime that night.
15   Q.  Three days before Ogno dies?
16   A.  It's two days.  30 days in November.
17   Q.  I will return to that.
18          Did you ever discuss with Kosic whether his heroin had
19   fentanyl in it?
20   A.  No, never.
21   Q.  Did he ever offer you fentanyl laced heroin to sell?
22   A.  Never.
23   Q.  Were you friends with Shaun Sullivan?
24   A.  Not really.  I tolerated him for his wife and his kid.  His
25   wife was like a sister to me, the kid was like another niece,

1    so I tolerated him.
2    Q.  What did she call you?
3    A.  Uncle Pauley.
4    Q.  Have you ever done fentanyl?
5    A.  No.  One time I think I did something that I thought was
6    fentanyl.
7    Q.  Tell me about it and give me a time frame, if you can.
8          MR. FINKEL: Objection.
9    A.  June 2015.
10          THE COURT: Overruled.
11   A.  And I had gotten it from Shaun Sullivan.
12   Q.  You what?
13   A.  I purchased it from Shaun Sullivan.
14   Q.  Purchased what?
15   A.  A brick of heroin from Shaun Sullivan.  And I believe that
16   had fentanyl because I don't like the way I react to.  I always
17   had a certain reaction with fentanyl.
18   Q.  What's that?
19   A.  I can't breathe.
20   Q.  Do you have any knowledge of where Sullivan got that
21   heroin?
22   A.  He was dealing with two guys, which he pretty much did.
23          MR. FINKEL: Objection.
24          THE COURT: Sustained.  Strike the answer.
25   Q.  Did Sullivan tell you where he got that heroin?

1          MR. FINKEL: Objection.
2    A.  Yes.
3          THE COURT: Overruled.
4    A.  That one was Lou Carbello.
5    Q.  Have you ever overdosed?
6    A.  Once I got something from Tru, and if that's any sign of
7    it, it was, like, I think so, I don't know.  I was, like, stuck
8    and I came out of it.
9    Q.  You weren't treated?
10   A.  No.
11   Q.  When was that?
12   A.  That was '17, a little bit after Doreen.
13   Q.  Do you know how many times Sullivan has overdosed?
14          MR. FINKEL: Objection.
15          THE COURT: If he knows.
16   Q.  Do you know?
17   A.  Yeah.  Four.
18   Q.  Including the October 5th one?
19   A.  Yeah, this one too.
20   Q.  Did you have an understanding from Sullivan as to whether
21   he used a particular type of heroin for himself as opposed to
22   what he sold?
23   A.  He always liked to get a better one for himself.
24   Q.  What do you mean?
25   A.  Something better, like from Will or Carbello, but Carbello

1    was gone.  He had somebody in Rosebank.
2    Q.  That he would use?
3    A.  He would use for himself.
4    Q.  Do you have understanding of what Sullivan would do with
5    Kosic's heroin?
6    A.  Sell that.  That's a money-maker, that's profit.
7    Q.  Do you have an understanding whether he ever used Kosic's
8    heroin?
9    A.  I'm sure, here and there.
10   Q.  How did you view Kosic's heroin compared to other dealers?
11   A.  Him or me?
12   Q.  Well, let's start with Sullivan.
13          MR. FINKEL: Objection.
14          THE COURT: Overruled.
15   A.  Weak.  He always complained how weak it was.
16   Q.  What about from your customers?
17   A.  Did my customers complain?
18   Q.  Yes.
19   A.  Every one of them.
20   Q.  I'm sorry?
21   A.  Every one of them, especially Derek Yung.
22   Q.  In regard to?
23   A.  Strength.
24   Q.  You saw that -- I think it was a series of texts yesterday
25   with Yung talking about fire?

UNITED STATES OF AMERICA,  v.
PAUL VAN MANEN ET AL.,
May 14, 2019

1  A. Yes.
2  Q. What was your understanding of that entire conversation?
3  A. I didn't learn because he did sell me a couple of grams.
4  Q. It was stronger?
5  A. It was stronger, but I didn't like it because I couldn't
6    measure it. It was dangerous to me.
7  Q. Would you consider Yung or Ogno among your top or more
8    frequent customers?
9  A. They were sporadic, here and there, maybe five days in a
10   row and then two weeks would disappear, come back another five
11   days. It was never constant.
12  Q. There was another call played last week of a conversation
13   between you and an individual who wasn't identified about the
14   strength of a particular batch as opposed to the previous batch
15   and a comparison of those. Do you recall that call?
16  A. Oh, yes.
17  Q. First of all, who were you talking to?
18  A. Cesar Mercado.
19  Q. Who is Cesar Mercado again in relationship to you?
20  A. Over 20 year friend.
21  Q. But in terms of heroin.
22  A. Another addict. He is a supplier at times. He is my
23   gateway to Drama.
24  Q. Would you ever sell to him?
25  A. If I didn't go to Drama, yeah, I would sell to him, but I

1    would never get paid.
2  Q. So as best as you could tell, what was that call about?
3  A. He was telling me how --
4  Q. You have to give names.
5  A. Cesar Mercado was telling me how --
6  Q. I am not asking you that. Do you remember the call?
7  A. Yes.
8  Q. Between Cesar and you?
9  A. Yes.
10  Q. So we are talking about what is going on in that
11   conversation, please.
12  A. He is telling me how the stuff I had earlier, that I had
13   gotten from somewhere else, was much stronger, he felt it, it
14   had a kick to it.
15  Q. When you say from somewhere else, you mean not from Kosic?
16  A. Not from Kosic.
17  Q. He seemed to be comparing that to a different batch?
18  A. Yeah. The batch that I had gotten from Kosic now. The
19   next batch he got from me was from Kosic.
20  Q. So continue.
21  A. And he said how weak it was, and that he's going to be in
22   trouble because --
23  Q. The new batch?
24  A. The new batch is weaker. It wasn't as strong as the one
25   before. That's what he said. And we went into -- I had said

1    to him -- do I need to go into the rest of it?
2  Q. Sure.
3  A. We went into the conversation. I said, well, Shaun
4    Sullivan had told me that Dino's heroin had fentanyl in it. He
5    said something that it comes back like champagne. He said,
6    what do you mean? I said, when you cook it up, it comes back
7    like champagne. He goes, that's Dino's regular. The weak one
8    that he is complaining about is Dino's regular, it's coming
9    back like champagne.
10  Q. When you stayed with Diane Scadutto for a few weeks, or
11   sometime in May of 2017, Shaun wasn't there, right?
12  A. No.
13  Q. Where was he?
14  A. He was in jail.
15  Q. Did there seem to be a pattern with Sullivan, in terms of
16   him being in jail and what would happen when he got out?
17        MR. FINKEL: Objection.
18        THE COURT: Sustained.
19  Q. You mentioned earlier that Sullivan OD'd at least three
20   other times before the October 5th?
21  A. Yes.
22  Q. Did any of those ODs have anything in common?
23        MR. FINKEL: Objection.
24        THE COURT: Overruled.
25  A. Anything in common?

1  Q. Yes.
2  A. Typical. This time he came home --
3        THE COURT: The question is did they have anything in
4    common?
5  A. In common, yes.
6  Q. What?
7  A. He was clean, he was clean for two years prior; he was in
8    jail for two years.
9  Q. So each OD followed a stint when Sullivan was in jail?
10  A. Yes.
11        MR. FINKEL: Objection.
12        THE COURT: Overruled.
13  Q. Is that correct?
14  A. Yes.
15  Q. To your knowledge, was Sullivan in jail prior to the
16   October 5th OD?
17  A. He just had gotten home September 13th, right before that,
18   2017. OD was October 5, 2017.
19  Q. Based on your own personal experience, if you're clean for
20   a period of time, a month even, does that affect how
21   susceptible you might be if you use heroin again?
22  A. Absolutely.
23  Q. How?
24  A. Your resistance is down. I call it resistance. So if you
25   go a month where you might do a bundle at one shot because

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                          May 14, 2019

1   that's known -- Shaun was known as Bundle Shot Sully -- you can
2   only do a half bag or a bag. You have to start slow. You have
3   got to build it back up.
4   Q. The times that Sullivan OD'd, from talking to Sullivan,
5   from your understanding, did he always need medical attention?
6   A. One time he got medical attention from a fire truck that
7   his wife stopped on Richmond Road in Staten Island. As soon as
8   the guy hit him with the Narcan, he told her, take off, and hid
9   the car behind the house.
10       MR. FINKEL: Objection. Move to strike. Lack of
11   foundation.
12       THE COURT: Sustained.
13   Q. Do you know anything about whether Sullivan got medical
14   attention after his other ODs?
15   A. He didn't, no.
16   Q. Do you know?
17   A. I know he didn't.
18   Q. How do you know?
19   A. Because me and his wife and him talked about it.
20   Q. To you?
21   A. Yes.
22       MR. QUIJANO: May the answer stand now or should I ask
23   again?
24       THE COURT: Ask again.
25   Q. What did you learn in terms of medical attention that

1   Sullivan received after the three prior ODs?
2   A. The one time was the fire truck. The other two times --
3   Q. Tell me about the fire truck again.
4   A. The fire truck, she got him in the car, her and his kid
5   Danny. She made two corners, maybe two minutes from the house,
6   sees the fire truck, and she stops the fire truck. They hit
7   him with the Narcan. He wakes right up. He tells her take
8   off. He wants to go back to the house.
9       MR. FINKEL: The government objects and moves to
10   strike. It's all based on hearsay.
11       THE COURT: Overruled.
12   Q. The other times?
13   A. The other times, she got him into the car, her and Danny,
14   and they got one time almost near the hospital and he came to
15   and started screaming, go back, go to the house. Then the last
16   time of that sequel, he didn't make it to the corner, he woke
17   up. She cursed him out. It's been the joke for years. That
18   was three days in a row 2015, May of 2015.
19   Q. Sullivan OD'd three days in a row?
20   A. Three days in a row.
21   Q. Why don't we talk about October 5th?
22   A. OK.
23   Q. Actually, let's start the night before.
24   A. OK.
25   Q. The government also played a call last week about the night

1   before. Do you recall that call?
2   A. Yes.
3   Q. So what were you going to do, even before Sullivan gets
4   involved, what were you going to do the night of October 4?
5   A. I was going to pick up heroin, me and Doreen.
6   Q. Did there come a point in time where you were asked to do
7   something?
8   A. Yeah. Pick up Shaun.
9   Q. What was your understanding of what Shaun was going to do?
10   A. Shaun was going to pick up heroin for himself.
11   Q. Were you going to buy heroin together with Shaun?
12   A. No.
13   Q. Were you going to pull money together?
14   A. No.
15   Q. Other than taking Shaun to his dealer, were you doing
16   anything else?
17   A. No.
18   Q. In that call, once you, Doreen and Shaun get to a certain
19   location, there is an instruction from Kosic, right?
20   A. Yes.
21   Q. What was that?
22   A. He said to give all the money to Shaun and send him to the
23   car to do the actual buy.
24   Q. Had that ever happened to you before where Kosic wanted to
25   speak to Shaun privately?

1   A. Any time Shaun was with me.
2   Q. You gave Sullivan money?
3   A. Yes.
4   Q. When Sullivan comes back, what happens?
5   A. He hands us 15 bundles -- he hands Doreen. She puts it
6   away. And he puts his in his pants. We drive back to Staten
7   Island.
8   Q. Where did you drive him?
9   A. I dropped him off by his brother's.
10   Q. You saw, and it's been identified, the bed and breakfast
11   where Shaun Sullivan OD'd, correct?
12   A. Yes.
13   Q. Were you familiar with that from before?
14   A. I used to look out my window for almost a year at that
15   place.
16   Q. Where was that location in relationship to Shaun's
17   brother's house?
18   A. His brother's house is right behind it, 200 feet, tops.
19   Q. After you got the 15 bundles, you and Doreen got the 15
20   bundles from Kosic on October 4th, did you use any of that?
21   A. Right away, yeah.
22   Q. In the car?
23   A. In the car.
24   Q. Before you took off to take Sullivan home?
25   A. Yes.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                    May 14, 2019

1  Q. Between using the heroin before you take Sullivan home to
2  about 9:00 the next morning, did you use again from that batch?
3  A. Yes.
4  Q. How many times?
5  A. At least three or four.
6  Q. After Sullivan got into the car and until you dropped him
7  off, were you aware or did you see him using heroin in any way?
8  A. No.
9  Q. Again, based on your understanding, knowledge of Sullivan,
10  observations of Sullivan, would Sullivan do Kosic heroin?
11  A. If he had nothing else, he would.
12  Q. There was testimony about a lady who was with Sullivan when
13  the fire department showed up. Do you remember that?
14  A. Yes.
15  Q. Her name was mentioned as Corrine. Do you know that
16  person?
17  A. I have heard a lot about her.
18  Q. Do you have an understanding of any relationship between
19  her and Sullivan?
20         MR. FINKEL: Objection.
21  A. Yes.
22         THE COURT: Overruled.
23  Q. What's that?
24  A. Whenever his wife is in jail, that's his little gumar or
25  whatever.

1  Q. Do you know whether she uses heroin?
2  A. Yes.
3  Q. Do you know how much heroin she uses?
4         MR. FINKEL: Objection. The witness testified he
5  doesn't know this person.
6  A. I have no idea what she uses, but she is a continuous,
7  never been in jail. I'm assuming it's a lot. Assuming.
8         MR. FINKEL: Move to strike.
9         THE COURT: Strike it out.
10         You can't talk about assuming.
11         THE WITNESS: Sorry.
12  Q. On October 4 and October 5, based on your observations and
13  knowledge about Sullivan, how often would Sullivan inject?
14  A. Every four hours, every four hours he needs to inject.
15  Q. Did Sullivan or Kosic give you anything of value for
16  driving him to buy his heroin from Kosic that night?
17  A. Not at all.
18  Q. I don't think I asked you this. At any point on October
19  4th or October 5th did you give Sullivan any heroin from any
20  source?
21  A. No.
22  Q. Do you have any knowledge, or reason to believe even, if
23  the heroin you bought from Kosic that night had any fentanyl in
24  it?
25  A. No.

1  Q. Did you ever buy crack cocaine?
2  A. Yes.
3  Q. Did you sell it?
4  A. No.
5  Q. Did you use crack cocaine?
6  A. Yes.
7  Q. Why would you use crack cocaine?
8  A. If I did too much heroin, I would balance myself off. It
9  was mainly Doreen. She turned me on to it.
10  Q. Let's turn to Michael Ogno.
11  A. OK.
12  Q. How did you meet him?
13  A. Through Derek Yung.
14  Q. You have mentioned Anthony Perez. Did he have a
15  relationship with Michael Ogno?
16  A. No.
17  Q. Did he have a relationship with Derek Yung?
18  A. Yes.
19  Q. Briefly describe that and when it started.
20  A. That goes back, '15 I think.
21  Q. 2015?
22  A. Yes. They would play a video game online. They would come
23  by the house, hang out with Anthony in the room, play video
24  games, get high, do what they do.
25  Q. Was your relationship with Ogno and Yung purely that of a

1  customer of yours?
2  A. I more tended to sway towards Ogno once I met him.
3  Q. Why?
4  A. I didn't like Yung.
5  Q. What about Ogno?
6  A. Ogno's a sweet kid.
7  Q. What do you mean?
8  A. He knew -- sometimes we didn't have enough reup and we'd
9  tell him the situation, Doreen's got to go boosting or
10  whatever.
11  Q. You didn't have enough money to buy reup?
12  A. A few times he lent us a few hundred dollars, a few times.
13  So we'd try to do the same back.
14  Q. What did you know about Derek Yung's drug use?
15  A. I don't know. He points to everybody else, but he's like
16  the biggest junk box, if there was one, as he would say. I
17  hate that term.
18  Q. What would he take?
19  A. Anything. Xanax, shrooms, all kinds of shit with Anthony.
20  Q. How did you meet Ogno?
21  A. Through Derek Yung.
22  Q. When?
23  A. April or May of '17, when I was staying at Diane's.
24  Q. What did you know and come to understand about Ogno's level
25  of addiction?

**UNITED STATES OF AMERICA, v.**
**PAUL VAN MANEN ET AL.,**
**May 14, 2019**

1  A. Like the rest of us, he needs it; he needs it every couple
2  of hours. He's going to get sick. I have seen him sick many
3  times.
4       (Continued on next page)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  Q. Under what circumstances did you meet Michael Ogno?
2  A. It was supposed to be a one-time favor to Derek.
3  Q. Tell me about that. Tell us what happened in that.
4  A. It was me and Francesca. We went to meet Ogno on Malone.
5  Q. Let me stop you there. I think -- how was Ogno -- did you
6  come to you understand how Ogno was even trying to get in
7  contact with you?
8  A. Yeah. Derek asked me could he give him my number, and I
9  said yes.
10  Q. The way Yung testified yesterday?
11  A. Yes, pretty much.
12  Q. So what happens at this first meeting?
13  A. When I first met him, we had a bundle for him because Diane
14  didn't want to give as much. So I gave him the bundle, and he
15  handed me $120. I called him back to the car and I gave him
16  $40 back. And he was like -- I said, It's only 80. He said,
17  What? A couple minutes later Derek calls me up cursing me out.
18  Q. A couple minutes later Yung calls you?
19  A. Yung calls me, cursing me out. He says, Why can't you just
20  take the F'ing money. Why do you gotta be Mr. Honest? Why do
21  you gotta fuck up my game? I said, Your game? I was like,
22  That's how I pay for my heroin. You do what you do. I do what
23  I do. He goes, That kid's got plenty of money, blah, blah,
24  blah. He robs his mother, etc. He was going on and on. It
25  got really nasty. I didn't appreciate it. Why can't I just

1  take the F'ing money. He charges the kid $120 a bundle. And I
2  told him he was F'ed up for that. That is supposed to be your
3  friend from high school, because that's what you told me.
4  Q. Why did you go back to hand him the money back?
5  A. Because it was wrong. There was $120 there. I thought the
6  kid thought I had one and a half bundles or something. It was
7  only one bundle.
8  Q. Explain what you mean by that.
9  A. He was paying me $120, so that would have been a bundle and
10  a half to me. I'm not going to charge him $120 for a bundle.
11  It's $80, which is high, according to Derek.
12  Q. Did you come to know whether Yung had other sources for
13  heroin?
14  A. Yes. He was always trying to give us samples. Whenever he
15  came to the room, he could come talk to us about going through
16  him.
17  Q. Let me stop you there. You heard -- not heard. I believe
18  it was a series of texts about fire. Remember that?
19  A. Yes.
20  Q. And cutting it, turning two and a half bunnies to --
21  A. Into five, yeah.
22  Q. What's he talking about there?
23  A. He is talking about the strength of the grams that he gets
24  from this kid called CK.
25  Q. And CK was what?

1  A. CK is this guy that works by the bridge. He only works
2  from 9 to 5. Derek couldn't always reach him because he was
3  gone.
4  Q. He is a dealer.
5  A. He is a what?
6  Q. He is a dealer.
7  A. He is a dealer, yeah. Bulk. He give you bundles and
8  grams.
9  Q. And what Yung is referring to in those texts is heroin from
10  this CK.
11  A. CK.
12  Q. Which is fire, much stronger?
13  A. Yes. It's real strong.
14  Q. Are you familiar with what he was describing about cutting
15  it to increase the weight?
16  A. I know about it from listening, but I've never done nothing
17  like that.
18  Q. And, again, who would do that? Just a user or somebody who
19  is selling?
20  A. I don't know. Somebody that's selling it would be, yeah,
21  trying to make more money.
22  Q. Did he come -- did you become aware of any other suppliers
23  or dealers that Michael Ogno had?
24  A. Yes.
25       MR. FINKEL: Objection.

1    THE COURT: Overruled.
2  A. He had Angel from the gym.
3  Q. Stop right there.
4  A. Yeah.
5  Q. Did he refer to one particular gym or whether that was a
6    name or what was it?
7  A. Yeah, it was Retro.
8  Q. The Retro gym?
9  A. Yes.
10  Q. And he referred to him as Angel Gym?
11  A. Angel he referred to him as.
12  Q. Okay.
13    MR. FINKEL: Objection, your Honor. It is all
14    hearsay.
15  Q. How do you know this?
16  A. I know this from talking to him. Because if I wasn't
17    around, he had to find somewhere else to go.
18    MR. FINKEL: Objection, your Honor. This is all
19    hearsay. Lacks foundation.
20    THE COURT: Overruled.
21  BY MR. QUIJANO:
22  Q. What other suppliers, what other dealers did Ogno have?
23  A. It was mainly Derek and Angel and me, and he had others.
24    But that's the only ones I know of.
25  Q. Did he tell you his mother used heroin?

1  A. No, he didn't tell me that.
2  Q. Did he ever do heroin with Derek?
3  A. Yes.
4  Q. Did he tie you up?
5  A. I don't know how.
6  Q. No, he would tie you up?
7  A. Who?
8  Q. Derek.
9  A. Oh, me?
10  Q. Yeah.
11  A. Anthony, Derek, yeah.
12  Q. Did you ever do heroin with Michael Ogno?
13  A. Never.
14  Q. Did you ever see Michael Ogno when he was sick from not
15    having heroin?
16  A. Many times.
17  Q. You heard his young girlfriend, Jessica Fyfe, testify,
18    correct?
19  A. Yes.
20  Q. She described driving him to your motel. Do you recall
21    that?
22  A. Yes.
23  Q. She described showing you on FaceTime what he looked like
24    when he was --
25  A. Yes.

1  Q. You see him when he was sick other times?
2  A. Many, many times.
3  Q. When Ogno was buying heroin from you, was there a pattern
4    in terms of how he would contact you?
5  A. He would call us, or he texted us, Are you around? to see
6    what's up, touch base hours before. When he was about to run
7    out of something, he would touch base.
8  Q. Were there times when the contacts, when he would reach out
9    to you, would happen six, seven times in five minutes?
10  A. When he is sick.
11    MR. FINKEL: Objection, leading.
12    THE COURT: Overruled.
13  A. When he was sick. We all do that. I do it, too. I have
14    called Dino sometimes 20 times in a row.
15  Q. Do you have?
16  A. Fat bastard laying there. Went to his windows, banging on
17    his windows. When you are sick, you are sick.
18  Q. Based upon what you know about Michael Ogno's addiction,
19    how often would he need to use heroin?
20  A. Every four hours, just like us.
21  Q. How long would two and a half bundles last for Michael
22    Ogno?
23    MR. FINKEL: Objection.
24    THE COURT: Overruled.
25  A. Typical day.

1  Q. 24 hours?
2  A. Yes.
3  Q. Would you let Ogno buy on credit?
4  A. When I could, yes.
5  Q. Why?
6  A. 'Cause many times, like I said earlier, he would help us
7    out if we were stuck, so he was given credit.
8  Q. Was he good for it?
9  A. Yes.
10  Q. How would he pay you?
11  A. He would pay cash or Western Union, Moneygram, the typical.
12  Q. When you said "us," who is "us"?
13  A. Me and Doreen.
14  Q. Was there a typical pattern in terms of when you are
15    selling to Ogno in terms of whether there was an outstanding
16    debt, were you getting cash? Was there a common pattern?
17    MR. FINKEL: Objection.
18    THE COURT: Sustained.
19  Q. When you said "he was good to us," what do you mean?
20  A. He was good to me and Doreen.
21  Q. How so?
22  A. If we were in trouble for money, he would help us with
23    money when he could.
24  Q. Ogno died on December 1, 2017, a Friday. When was the last
25    time you sold him heroin?

1 A. 11/29, two days before.

2 Q. How much did you sell him on November 29?

3 A. Two and a half bundles.

4 Q. Let me lead up to November 29.

5     MR. QUIJANO: Is this a convenient time to break while

6 I figure out how to use this.

7     THE COURT: Yes. We will take our afternoon recess

8 now. We will resume in 15 minutes.

9     (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Jury not present)

2 THE COURT: See you in 15.

3 (Recess)

4 THE COURT: Please bring in the jury.

5 (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Jury present)

2 THE COURT: Please be seated.

3 Mr. Quijano.

4     MR. QUIJANO: Thank you, your Honor.

5 Your Honor, Defense Exhibit PV2 is a blank November

6 2017 calendar where we have also printed in on the last square

7 12/01/2017 for that Friday.

8     THE COURT: Yes.

9     MR. QUIJANO: We offer it as an aid to his testimony,

10 and we would ask the court to take judicial notice that the day

11 after November 30 on 2017 is December 1.

12     THE COURT: Friday, December 1. Yes, I will

13 judicially notice that.

14     MR. QUIJANO: Thank you.

15 And PV8 is an excerpt from the government's 701A

16 exhibit. It will consist of pages 22 to 25. It is

17 highlighted. We offer this in evidence as PV8.

18     MR. FINKEL: No objection.

19     THE COURT: PV8 is in evidence.

20     (Defendant's Exhibit PV8 received in evidence)

21     MR. QUIJANO: Please publish PV2, the calendar.

22 BY MR. QUIJANO:

23 Q. Mr. Van Manen, this is a blank calendar of November and the

24 first day of December. From this portion on during your

25 testimony, I will put it before you as an aid to your

1 testimony.

2 A. Okay.

3 Q. Okay?

4 And I also am showing you extractions from Michael

5 Ogno's telephone, the Samsung. All right?

6 A. Okay.

7 Q. By the way, how many phones did you have during this time

8 period of 2017?

9 A. Three, maybe four.

10 Q. Did Kosic ever give you a phone?

11 A. Never.

12 Q. Did you have three at one time?

13 A. No, two. I had one that was a prepaid thing, but the

14 Internet never worked so I just got rid of it.

15 Q. Did you change phones or use the phones in any way out of

16 fear from law enforcement?

17 A. No.

18     MR. FINKEL: Objection.

19     THE COURT: Overruled.

20 A. No, not at all.

21 Q. Now, to the best of your knowledge, how many phones did

22 Michael Ogno have?

23 A. Two.

24 Q. Did you get calls from -- withdrawn.

25 This extraction is from one particular phone. Did you

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1 ever get calls from his other phone, the iPhone?
2 A. That's the 0111 one?
3 Q. I believe so.
4 A. Most of the time.
5 Q. So let's start with Monday, the 27th of November, okay?
6 A. Okay.
7 Q. Did you have any contact with Michael Ogno?
8 A. Yes.
9 Q. I am putting before you PV8. Do you see the highlighted
10 area that has 11/27?
11 A. Yes.
12 Q. These appear to be a series of phone calls between you and
13 Ogno started at 11:49, continuing to 2:00 in the afternoon of
14 Monday, the 27th. What was going on?
15 A. He was seeing if I was going to be around. And we had a
16 conversation of over two minutes, just talking, and I came down
17 later on, yes.
18 Q. Did he tell you why he wanted to see if you were going to
19 be around?
20 A. Yeah. He needed.
21 Q. Did he tell you how much he wanted, if you recall?
22 A. He was seeing how his funds were, but he was looking at
23 two, two and a half.
24 Q. And what are we talking about?
25 A. Two and a half bundles.

1 Q. Of heroin.
2 A. Yes.
3 Q. Now you see another -- the next attribution at line 26 is a
4 call from Angel Gym at 4:35?
5 A. Yes.
6 Q. From your involvement, your conversations with Ogno, what's
7 your understanding of what that is -- who that is?
8 MR. FINKEL: Objection.
9 THE COURT: Sustained.
10 BY MR. QUIJANO:
11 Q. Now, I will put the calendar back. What else happened with
12 you on Monday, November 27?
13 A. What happened?
14 Q. Well, in relation -- did you have any contact with Kosic
15 that day?
16 A. Yeah, that night.
17 Q. Tell us what happened then.
18 A. That night I met with Kosic and we picked up 15 bundles.
19 Q. Is this referring to what you described earlier where he
20 mistakenly gives you 20 extra?
21 A. Yes.
22 Q. So that's the night that that happens, Monday, the 27th,
23 that's the night. And at that point you had 15, correct?
24 A. Yeah, plus --
25 Q. Plus whatever he gave you.

1 A. Yeah.
2 Q. Going on to Tuesday, the 28th, let's say by late afternoon,
3 early evening, do you recall how much heroin you still had at
4 that point?
5 A. Of the 15?
6 Q. Well, it is 15 plus eight, correct?
7 A. That's not really mine. I already knew. Four, five.
8 Q. By Tuesday.
9 A. Yes.
10 THE COURT: That's four or five in addition to the 15,
11 correct?
12 THE WITNESS: In addition to the 20.
13 THE COURT: To the 20.
14 THE WITNESS: Yeah.
15 BY MR. QUIJANO:
16 Q. So let me just go back to the 27th. All right? You
17 said -- withdrawn.
18 Did you eventually meet up with Michael Ogno?
19 A. On the 27th? Yes.
20 Q. Monday, the 27th.
21 A. Yes.
22 Q. How much did he buy from you?
23 A. Two and a half.
24 Q. At that point, on Monday, the 27th, when you are selling
25 him the two and a half bundles, did he owe you any money from

1 previous sales?
2 A. No. He was clear that week.
3 Q. What were the terms of the sale on Monday, the 27th, for
4 the two and a half bundles?
5 A. After I seen him, he was going to Western me 200.
6 Q. So the -- did he give you any cash at that point?
7 A. No, he didn't have no cash.
8 Q. So it was all on credit?
9 A. It was going -- yeah, he was going to pay me with a Westy.
10 I don't know if he did it or he was going to do it.
11 Q. So as of Monday, the 27th, he owed you $200, right?
12 A. Yes.
13 Q. Let me turn to Tuesday. Oh. I'm sorry. Back on Monday.
14 By the end of Monday, had he wired you any money?
15 A. Yeah, he wired it early in the morning.
16 Q. How much did he wire you?
17 A. I think I got $80 that day. I don't think he could do 80.
18 Q. So by Tuesday, the debt is now $120?
19 A. Yeah, but we didn't pick that money up until late at night
20 that night. That's why we called him at 9:30, to get the
21 confirmation number again.
22 Q. The 9:30 call is --
23 A. It's from us going to him.
24 Q. And that's reflected at line 28?
25 A. Yeah, 28.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1  Q.  That was just to confirm that you had picked up $80 of the
2      $200 debt that he had?
3  A.  Yeah.
4  Q.  Which carried over a debt of $120 --
5  A.  Yes.
6  Q.  -- correct?
7          Correct?
8  A.  Correct.
9  Q.  Now, on November 28, which now is Tuesday, there is a call
10     to you from Michael at 2:14 in the afternoon.  Do you recall
11     what that was about?
12 A.  It's actually number 35?
13 Q.  Yes, I believe.
14 A.  He is calling me.  He is calling Doreen.
15 Q.  Oh, I'm sorry.
16 A.  At 12:14.
17 Q.  Okay.  And what happens?
18 A.  We told him to come outside the house.  We were right
19     there.
20 Q.  Okay.  And what happened?
21 A.  Gave him another two and a half.
22 Q.  Another two and a half bundles?
23 A.  Yeah.
24 Q.  And did he give you any money, any cash?
25 A.  He was sending another Westy.

1  Q.  Okay.  And did he eventually do that?
2  A.  Yes.
3  Q.  For how much?
4  A.  I think that one was 200.
5  Q.  So you had the carryover debt of $120?
6  A.  Yes.
7  Q.  Correct?
8  A.  Correct.
9  Q.  And then you sold for 200?
10 A.  Yes.
11 Q.  Which would bring you to 320?
12 A.  Um-hmm.
13 Q.  And you picked up -- you called it a Westy.  What's a
14     Westy?
15 A.  Western Union.
16 Q.  A Western Union for how much?
17 A.  200.
18 Q.  So as of Tuesday night, his debt is $120, correct?
19 A.  Yes, yeah.
20 Q.  Now, again, going to our parallel on the 28th, that's the
21     day that Cejovic sends the person to pick up the 12 and you pay
22     for your extra eight?
23 A.  Yes.
24 Q.  So by Wednesday morning, 29th, do you recall how much
25     heroin you and Doreen had?

1  A.  29th?  Four, five.  And Cejovic got whatever they sent, got
2      12, so I had eight, probably eight.
3  Q.  Let's go to the 29th.  And, again, to be clear, the 29th
4      now would be the Wednesday before Michael Ogno dies, correct?
5  A.  Yes.
6  Q.  So there is, again, a series of calls starting at 12:21 in
7      the afternoon and ending at 3:17 in the afternoon of the 29th.
8      At that point at least when the calls start, he has an
9      outstanding debt of $120.  What happens during these calls and
10     eventually on the 29th?
11 A.  He is asking me where I am.  I am at the DMV, so he had to
12     wait a while.
13 Q.  And?
14 A.  He called me back at 3:07 and I was already on the way to
15     him.  I said, I'm almost there.
16 Q.  Did you know how much he wanted?
17 A.  Two and a half again.
18 Q.  Did you eventually meet with him?
19 A.  Yes, I did.
20 Q.  Did the transaction happen?
21 A.  Yes, I gave --
22 Q.  Another two and a half bundles?
23 A.  Um-hmm.
24 Q.  How did he pay?
25 A.  He was sending me another Westy.

1  Q.  A Western Union?
2  A.  Yes.
3  Q.  For how much?
4  A.  200 it was supposed to be.
5  Q.  So at that point we added 200 to the outstanding debt of
6      120.  We are back to 320.  And he is supposed to send you a
7      Western Union for --
8  A.  200, but it didn't go through.  It never came through.
9  Q.  Let me show you what is in evidence as Government Exhibit
10     1102, the Moneygram records.  Do you see in that exhibit an
11     indication about the Wednesday Moneygram not coming through?
12 A.  Yes.
13         (Counsel confer)
14 Q.  Did he send you a Western Union or a Moneygram?
15 A.  This day it was Western Union.
16         (Counsel confer)
17 Q.  I'm sorry.  I think I misspoke.  So what he told you was
18     there was going to be a what?
19 A.  Western Union for 200.
20 Q.  Do you see the indication on Government Exhibit 1102 where
21     it shows that that transaction did not go through?
22 A.  Yeah, it starts with, oh, wow -- like after the 200 mark
23     there is zeros, there is three in a row, 00.
24 Q.  Here?
25 A.  Yeah, go up.  It goes up to -- yeah, that one.  That

1  starts. He tried. He didn't get through. He tried again. He
2  didn't get through. He tried again.
3  Q. Had that happened before?
4  A. Yes.
5  Q. And the transaction happened approximately when?
6  A. The transaction --
7  Q. What time?
8  A. Oh, when I seen him?
9  Q. Yeah, when you gave him --
10  A. 3 in the afternoon, 3:17.
11  Q. On the 29th?
12  A. Yes.
13  Q. What happened later on the 29th between you and Kosic?
14  A. I met Kosic, and I had to give him the money for the eight
15  that got left in the bag, and --
16  Q. And were you expecting to buy some?
17  A. Yeah.
18  Q. How much were you expecting to buy?
19  A. I was expecting to buy 15, but I could only buy 10. It was
20  all he had.
21  Q. That's all Kosic had?
22  A. Yeah, I believe that was the situation.
23  Q. So he sells you 10?
24  A. And he tells me it was over.
25  Q. Stop there. He sells you 10, and this is about what time

1  on the 29th?
2  A. 9, maybe 8:30, 9, 10.
3  Q. So at that point, including the 10 that he gave you, how
4  much total heroin do you and Doreen have?
5  A. The 10.
6  Q. You were wiped out from before then, right?
7  A. Yes.
8  Q. After Kosic gives you the 10, what does he tell you about
9  business?
10  A. He said that I will have to go somewhere else, and he knows
11  how I like that, you know, he was always quick to complain that
12  I go to other people. So he said -- I says, What's going on?
13  He says, I'll know more Monday, that his guy was relocating, he
14  was moving. Somebody was following the guy around the house or
15  something, around the building, and he was done.
16  Q. He was done?
17  A. He was done. He never did nothing again.
18  Q. But he tells you on Wednesday he is definitely, what,
19  through until Monday at least?
20  A. He said he will know more Monday. He wasn't expecting to
21  be operating again. He was done. And that was it.
22  Q. Did that come as a surprise to you?
23  A. No, no.
24  Q. That he would not have heroin for the next few days?
25  A. Oh, at that moment, yeah, it kind of put me in a bad spot.

1  Q. What do you mean?
2  A. Well I had just traded the car in and I was at the motor
3  vehicle's registering this car, and it was worse than the last
4  car.
5  Q. I mean in terms of the heroin that you had.
6  A. We were going to be in trouble. We were going to be short
7  money.
8  Q. You were going to be what?
9  A. Short money.
10  Q. Money?
11  A. Money, yeah.
12  Q. What do you mean short money?
13  A. We were going to be short money because now we have to go
14  to the other guy, Drama. Preferred Drama, but Drama you have
15  to buy 20 at a time. Dino says that, but -- he bitches, but I
16  can still get 10.
17  Q. So you needed more money --
18  A. I needed more money and then the kid's Westy stopped. That
19  didn't come. I got scared.
20  Q. But what, in terms of the heroin that you had, at that
21  point you have ten bundles left, right?
22  A. Yeah.
23  Q. Just for your own use and Doreen's use, how long would ten
24  bundles last you?
25  A. We were going to use three or four.

1  Q. I'm sorry?
2  A. We're going to use three or four of those bundles within
3  the next day.
4  Q. What period of time?
5  A. Next 24 hours, so we were in bad shape.
6  Q. So this is starting Wednesday?
7  A. Wednesday.
8  Q. You need at least three or four to get you through the next
9  24 hours?
10  A. Yes.
11  Q. Which means by Friday unless you get more?
12  A. We weren't looking that far. We were looking at Thursday.
13  Friday we were going to be -- forget it. I didn't know what
14  the situation was going to be.
15  Q. So as of Wednesday night, you don't know where you are
16  going to get the money to buy more?
17  A. Yeah. I'm going to be short.
18  Q. And you are down to ten bundles, and you don't know when
19  you are getting more even for yourself?
20  A. Take us out, we are down to six. After we take me and
21  Doreen, we put something aside for us, we only got six bundles
22  to sell, whatever.
23  Q. And, again, I'm -- I think you have used "Westy" a few
24  times. What does that refer to?
25  A. Western Union.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,
May 14, 2019

1   Q.  So let's go to Thursday, the 30th.
2       Do you have any contact with Michael on Thursday, the
3   30th?
4   A.  I think I called him that night to say something about the
5   money again.
6   Q.  What do you mean, the money?  What were you concerned
7   about?
8   A.  The last Westy on the day before, on the 29th, didn't go
9   through, plus he owed 120.  So now he was in to us for 320.
10  Q.  At that point how much money did you and Doreen have
11  towards being able to purchase additional heroin?
12  A.  If we could control ourselves, we are hoping we would have
13  400.
14  Q.  On Thursday?
15  A.  Yes.
16  Q.  And how much do you need in order to be able to buy from
17  Drama?
18  A.  800.
19  Q.  What did Ogno say about the debt?
20  A.  He said he was going to have it, don't worry.  I never let
21  you down.  He never did.
22  Q.  At that point, does he ask you anything or does he discuss
23  with you a future purchase of heroin by him?
24  A.  He said he was starting to hurt, so as soon as he can do
25  it, he would do it.

1   Q.  By --
2   A.  And we would be, too.  He was going to do it first thing in
3   the morning, the next morning.
4   Q.  To buy from you?
5   A.  Yes.  He was going to get us the money so we can buy so he
6   can get.
7   Q.  And by "hurting," what did you understand to mean?
8   A.  Get sick, start withdrawing.
9   Q.  He was concerned about being sick by Friday morning?
10  A.  Yeah, Thursday night.  He was borderline.
11  Q.  Was there any discussion about -- with him about the need
12  you had for the money and why?
13  A.  Yeah, yeah, he did.  But I didn't stress him because he
14  said by the 1st.  When it didn't work the first time he would
15  get it by the 1st.
16  Q.  Was it a discussion in terms of what heroin you had
17  available at least as of Thursday night?
18  A.  No.  He knew we had nothing.  We had barely us.  We had
19  nothing.
20  Q.  And this conversation was late in the evening of Thursday?
21  A.  Thursday, and then he called me back Friday morning about
22  9:30.
23  Q.  Well, before, let me show you again, this is from the
24  extraction.  It is now page 24.
25      So first, starting at line 92, at 6:07 in the morning

1   to line 95, at 6:12 in the morning, those are a series of eight
2   calls from Angel Gym, correct?
3   A.  Correct.
4   Q.  He then calls you at 9:31.
5   A.  Yes, yeah.
6   Q.  You mentioned that on Friday when he is speaking to you he
7   is already saying that he sounds sick, right?
8   A.  He is sick the night before.  He is not sick at 9:30.
9   Q.  How does he sound when he calls you at 9:21?
10  A.  He is fine.  He just said, I gotcha.  I told you I would
11  come through.
12  Q.  He says that to you?
13  A.  Yeah.  So I got up and I got showered and I came down.
14  Q.  And what did you understand he was referring to "I got
15  you"?
16  A.  The money.
17  Q.  Did he sound sick still?
18  A.  No.
19  Q.  Finally let me put page 25, the extraction, 701A.  So it
20  appears that at 10:27, I think there is a text to you and then
21  I believe a call, line 104 and 105.  Do you recall what those
22  are about?
23  A.  Just updating that he sent $180 or whatever he sent, it was
24  180 to -- he couldn't get the Westy to work, so he did it
25  through the other one, Moneygram.

1   Q.  He said he sent how much on the Moneygram?
2   A.  He said he sent -- I think it was 180 he sent me.  Whatever
3   it was, he gave me 320 between the two of them, between the
4   cash and that.
5   Q.  And that would have been the full balance that he owed you,
6   correct?
7   A.  Yes.
8   Q.  Reading on, there is a series of texts then starting at
9   10:48 to at least for now 11:03 "LMK," let me know?
10  A.  Let me know when you get it, you know, call him, wake him
11  up, whatever.
12  Q.  And then the response is "will do"?
13  A.  "Will do."
14  Q.  You mentioned -- by the way, on that day, you are driving
15  to him?
16  A.  We are driving to the money, the place to get the money
17  because we are in bad shape.
18  Q.  So who are you with?
19  A.  Me and Doreen.
20  Q.  And who is actually doing the texting on the phone?
21  A.  Doreen has always done it.
22  Q.  Continuing on, there is another call to you at about 11:04.
23  It seems like just a minute later.  Do you remember what that
24  was about after that last text?
25  A.  Yeah.  Even though he was all right, he still wanted to get

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1  something to fall back on, you know, would I still extend the
2  credit after, of course.
3  Q.  Had there been a discussion -- sorry.  I should have asked
4  you this earlier.  Had there been any discussion with him at
5  least up to this point about purchasing additional heroin on
6  Friday?
7  A.  From somebody else?
8  Q.  No, no.
9  A.  From me, yes.
10  Q.  Had he discussed could he buy heroin on Friday?
11  A.  Later on could he advance more credit, could he start
12  credit again, yes.
13  Q.  Well, did you have any heroin at that point?
14  A.  I didn't have any.  When I got it, he wanted to get a
15  bundle for the next day.  He just wanted to have it for
16  fallback.
17  Q.  Had you explained to him the money situation in terms of
18  your ability --
19  A.  He already knew that.  He already knew that.  It was all
20  discussed the night before --
21  Q.  Did you discuss --
22  A.  -- and in the morning.
23  Q.  -- with him at that point any terms of a sale if it took
24  place now or the next day?
25  A.  No.  He said he wasn't in a rush.  He wanted to go to

1  sleep.  He was up all night, and he only wants a bundle now.
2  He was going to get two and a half, but I couldn't get it, I
3  didn't have it, so he had to make an investment somewhere else.
4  Q.  Okay.  But he wanted a bundle now?
5  A.  For later on, when we get hours.
6  Q.  You informed him you had none, right?
7  A.  Yes.  He was informed the night before I had none.
8  Q.  Did he ask for a way of doing it if you did have some, how
9  he wanted to buy it?
10  A.  On credit when I get it.  When I get -- when I obtain
11  heroin, he wants to know could he get a bundle on credit.  I
12  said, yeah, sure, when we get it.
13  Q.  And when is that conversation?
14  A.  That conversation was the second phone call in the morning
15  when I was talking to him or the last one here, the 33-second
16  one.
17  Q.  So you have learned that he has wired all the money that he
18  owes you?
19  A.  Some of it, yeah.
20  Q.  Or at least some of it.  And you are going to be picking up
21  something from him?
22  A.  Yes.
23  Q.  The balance?
24  A.  Yes.
25  Q.  In cash?

1  A.  Um-hmm.
2  Q.  And the two of you have discussed that when you have heroin
3  he can buy it on credit?
4  A.  I can throw him one, yeah.
5  Q.  Continue on, let's go to line 113.  It is a series of texts
6  back and forth.  "I'm getting your Moneygram and then I'm
7  coming to dinner" and then I guess Doreen replies "Okay.  We
8  are having turkey."
9  A.  No, that's outgoing from him.
10  Q.  Oh.
11  A.  I don't know what she was talking about.
12  Q.  I'm sorry, the one -- "We are getting your Moneygram and
13  then we are coming to dinner," that's from Doreen?
14  A.  Yeah, it's supposed to be "then we are coming by," but I
15  don't know where she got dinner, but . . .
16  Q.  Okay.  He replies "okay, we are having turkey," and then at
17  line 115, at 11:26, "on my way now, about ten minutes"?
18  A.  Yes.
19  Q.  And that's from you folks telling him about the time you
20  were arriving?
21  A.  Yup.
22  Q.  And that's arriving to him or to the Moneygram place?
23  A.  To him.  It is en route to the Moneygram place.  He is
24  after it.
25  Q.  By the way, do you have any idea what the turkey reference

1  was in the earlier text?
2  A.  No idea.
3  Q.  Thanksgiving had been the week before, is that right?
4  A.  Yeah.  I think it would be him saying that.  I don't know
5  what the hell he was doing.
6  Q.  He replies "okay," at 11:27.
7  A.  Yes.
8  Q.  And then he texts you, "So you want to give me the bunny?
9  I will owe it to you on Sunday."  You or Doreen reply "that's
10  what we said we were doing," right?
11  A.  "That's what we said we were doing."  That's what I told
12  her to text him.
13  Q.  Again, to be clear, though, you don't have any heroin?
14  A.  No.
15  Q.  And then he replies "Yes, sir," and you reply --
16  A.  "Here."
17  Q.  "There" being at his house?
18  A.  Yes.
19  Q.  What happened there?
20  A.  He gave me money, 140, I believe.
21  Q.  To clear his balance.
22  A.  Yes.
23  Q.  Did you give him anything?
24  A.  Didn't have anything to give him.
25  Q.  How did he appear to you?

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                   **May 14, 2019**

1 A. He was fine.
2 Q. How were you and Doreen?
3 A. We were feeling it. I was worse than her.
4 Q. Did he eventually -- withdrawn.
5      At that point how much money did you have?
6 A. About 320 from him, 400. I had like 720.
7 Q. Were you eventually able to purchase heroin later that day?
8 A. Yes.
9 Q. Approximately what time was that?
10 A. Couple hours later, three or four hours.
11 Q. Who did you purchase it from?
12 A. Went to Cesar's and we went through Cesar to Drama.
13 Q. How much did you buy?
14 A. I believe we had to get the 20, otherwise he was going to
15   charge us more money. So Cesar put money in.
16 Q. How much -- how many bundles did you have at the end of
17   this transaction?
18 A. 20.
19 Q. How much money did you have left?
20 A. We were broke. That was it.
21 Q. Were those bundles going to be used for you or sold or
22   both?
23 A. Both.
24 Q. By the way, earlier you said that you and Doreen were
25   feeling it. What do you mean?

1 A. Starting to get sick, runny nose, the eyes were tearing, my
2   stomach was going, couldn't keep the coffee down, that kind of
3   thing.
4 Q. After you got the heroin from Drama --
5 A. Drama.
6 Q. -- did you use it?
7 A. Yes, immediately.
8 Q. After you got the heroin from Drama, did you sell any of
9   that heroin that day?
10 A. A little while later, yeah.
11 Q. What time and to who?
12 A. I don't know, whoever would be calling, Mike G., Nick G.
13 Q. Did you sell any heroin after you received or got the
14   heroin from Drama to Michael Ogno?
15 A. No.
16 Q. Did you hear from Michael Ogno?
17 A. Never.
18 Q. Were you supposed to, once you had it, return to Michael
19   Ogno?
20 A. The first agreement was me calling to wake him up or
21   whatever, because he wanted to go to sleep. I said, How about
22   you just call me? You going to sleep 12 hours? What are you
23   sleeping? That's what I said to him.
24 Q. Did you ever receive a call from him?
25 A. No.

1 Q. How did you find out Michael died?
2 A. I think it was a week later. Derek Yung came to the hotel
3   room, to me and Doreen.
4 Q. You heard him describe that yesterday, right?
5 A. Yeah. His version, yeah.
6 Q. How did you feel when you heard this?
7 A. Sick.
8 Q. What do you mean?
9 A. I was sick. I had another friend die early that year. It
10   was not cool, not cool.
11 Q. Did Michael Yung by heroin from you at the motel after the
12   funeral?
13 A. Yeah. He bought his normal bundle.
14 Q. I'm sorry, Derek Yung.
15 A. Yes.
16 Q. Did he use it?
17 A. Yeah, right in front of us.
18 Q. Did Derek Yung tell you anything in terms of the overdose?
19 A. He was wearing a suit. Whenever a kid is wearing a suit, I
20   always go, Hey, Wall Street, and he said a funeral. I said,
21   oh, sorry. He goes Mikey. I said Mikey? I know a lot of
22   Mikes, but this one kid, I never call him Mike. I call him
23   Malone.
24 Q. Malone?
25 A. Mikey, he was like, yeah, Mikey, Mikey, Mikey. Your

1 fucking favorite. I said my favorite? He goes, yeah, Mikey.
2 I said, Mikey, what are you talking about Mikey? My head is
3 spinning. Malone. That's how I killed it. Me and Doreen got
4 upset, because out of everybody we dealt with, he was the best
5 kid. You couldn't get a better kid. Never. He'd help you.
6 He'd help you. You can't say no to him. If you have three
7 bags, you want to give him two. That's the kind of kid he was.
8      And this kid goes, oh, what are you getting upset
9 about. He was a fucking junk box. That's what he says to me.
10 He is a fucking junk box. Coming from this kid that turned him
11 into the junk box. And I said, What do you mean? Oh, he was
12 taking everything, banging steroids, doing this, pills, this
13 and that, the whole fucking house is fucked up. They are all
14 fucked up. That's when I learned about the girlfriend in the
15 basement, all of that shit from him. It was real little cold.
16 I thought it was the coldest thing ever. You go to school with
17 somebody. Even an enemy. I can't wish this on an enemy to go
18 through something like this. I can't. The kid is cold. That
19 kid is cold. You are looking at me like I'm the cold one. I'm
20 not. That shit's killing me.
21      THE COURT: All right. That's enough.
22      THE WITNESS: I know. It's the same. It is what it
23 is.
24 BY MR. QUIJANO:
25 Q. Prior to your arrest, did you ever try to quit heroin?

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                                May 14, 2019

1  A.  Several times.
2  Q.  Where are you living now?
3  A.  MCC.
4  Q.  It's a federal jail, right?
5  A.  Yeah.
6  Q.  Right across the street, right?
7  A.  Yeah, this way, I believe.
8  Q.  How long have you been there?
9  A.  16 months.
10 Q.  Are you currently clean?
11 A.  Yes.
12 Q.  When is the last time you used heroin?
13 A.  January 16, 2018.
14 Q.  How did you get clean?
15 A.  Well, they did a methanol detox, six days.
16 Q.  Since you started using heroin, this is the longest you
17   have gone without using?
18 A.  No.  I have gone a lot longer, a little bit longer, 21
19   months before.
20 Q.  In the past, after you quit, why did you start using again?
21       MR. FINKEL: Objection.
22       THE COURT: Sustained.
23 BY MR. QUIJANO:
24 Q.  Do you think you can stay clean?
25 A.  Yes.

1        MR. FINKEL: Objection.
2        THE COURT: Sustained.  Strike the answer.
3        MR. QUIJANO: May I have a moment?
4        (Counsel confer)
5        MR. QUIJANO: Thank you, your Honor.
6        THE COURT: Mr. Finkel.
7        MR. QUIJANO: Oh, I'm sorry.  Oh, I do have something
8   further, if I may.
9  BY MR. QUIJANO:
10 Q.  You were arrested on what date?
11 A.  The 16th of January 2018, in Jersey.
12 Q.  Were you high when you were arrested?
13 A.  Yeah.
14 Q.  Were pictures taken?
15 A.  Yes.
16       MR. QUIJANO: May I show this to the witness, please?
17       THE COURT: Yes.
18 BY MR. QUIJANO:
19 Q.  What is this?
20 A.  That's the condition I came in in.
21       MR. QUIJANO: We offer it.
22       MR. FINKEL: Objection.
23       THE COURT: Sustained.
24 BY MR. QUIJANO:
25 Q.  You have talked about when you owned these properties and

1   the deli and the various other establishments.
2  A.  Yes.
3  Q.  Let me show you what's marked for identification as P4.  Is
4   that a representation of what you looked like at that time?
5  A.  Yes.
6        MR. QUIJANO: We offer it.
7        MR. FINKEL: Objection.
8        THE COURT: Sustained.
9        MR. QUIJANO: Thank you, your Honor.  I have nothing
10  further.
11       THE COURT: Mr. Finkel.
12 CROSS-EXAMINATION
13   BY MR. FINKEL:
14 Q.  Good afternoon.
15 A.  Good afternoon.
16 Q.  So you are a drug dealer, right?
17 A.  No, I wouldn't consider myself that.
18 Q.  Okay.
19       You sold heroin, right?
20 A.  Yeah.
21 Q.  More than once.
22 A.  Yeah, a little bit, yeah.
23 Q.  Multiple times a week.
24 A.  Yes.
25 Q.  You sold heroin multiple times a week for months, right?

1  A.  A few months.
2  Q.  You sold heroin multiple times a week for years, right?
3  A.  No.
4  Q.  You sold heroin in 2013, right?
5  A.  Just amongst me and my friends.
6  Q.  It's a yes-or-no question, sir.
7  A.  Yes.
8  Q.  Did you sell heroin in 2013.
9  A.  Yes.
10 Q.  You said that on direct, right?
11 A.  Yes.
12 Q.  And sold heroin in 2014, right?
13 A.  No.
14 Q.  2015 you sold heroin, right?
15 A.  No.
16 Q.  2016 you sold heroin, right?
17 A.  No.
18 Q.  2017 you sold heroin?
19 A.  Yes.
20 Q.  You sold to multiple customers, right?
21 A.  Eight or ten.
22 Q.  Many people.
23 A.  That's not many.
24 Q.  Numerous times, right?
25 A.  Yes.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                            May 14, 2019

1  Q. And when you sold heroin, you bought it from someone,
2  right?
3  A. Yes.
4  Q. And then you resold it, right?
5  A. Some of it.
6  Q. At a profit, right?
7  A. Yes.
8  Q. That's how you made money, right?
9  A. No. It's how I covered my habit.
10 Q. Sir, did you make a profit on the heroin you sold?
11 A. After my use, no, no profit.
12 Q. You bought bundles of heroin from Dino, right?
13 A. Sometimes.
14 Q. $40 a bundle, right?
15 A. Yes.
16 Q. And you sold it for 80, right?
17 A. Sometimes.
18 Q. So you made $40 profit, right?
19 A. Sometimes.
20 Q. Right. That's how drug dealers make money. They sell
21 drugs, right?
22 A. .No it's a big difference.
23 Q. Just to be clear, Dino provided you 15 to 20 bundles of
24 heroin every other day, right?
25 A. There was a short period he did.

1  Q. That's 60 to 80 bundles a week, right?
2  A. For that short period, yeah.
3  Q. 60 to 80 bundles a week, right? Yes?
4  A. That would be, yeah, for two weeks maybe.
5  Q. It's a yes-or-no question, sir.
6  A. Yes, yes.
7  Q. And you sold that heroin, right?
8  A. Half of it.
9  Q. That's how you made money.
10 A. That's how I covered our habits. That's how we covered our
11 habits.
12 Q. It's a yes-or-no question.
13 A. Yes.
14 Q. That's how you made money?
15 A. Yes.
16 Q. That's how you paid for your hotel, right?
17 A. Yeah.
18 Q. That's how you paid for your cars, right?
19 A. My cars, no.
20 Q. You had multiple cars didn't you?
21 A. Yeah, hoopties. I would trade them in there. Buy a
22 hooptie --
23 Q. Sir, the is a yes-or-no question.
24 A. Didn't come from drugs.
25 Q. Sir, you had multiple cars, right?

1  A. Yeah.
2  Q. And you paid for them with money, right?
3  A. I traded each car in for money, yes, nothing to do with
4  drug money.
5  Q. Purchased clothes, right?
6  A. No.
7  Q. You didn't buy clothes?
8  A. No.
9  Q. You didn't buy food either?
10 A. No. I had food stamps for that.
11 Q. Okay.
12      And sometimes when Dino gave you heroin, he let you
13 buy it on credit, right?
14 A. Never.
15 Q. You didn't always have all the money you needed to pay
16 Dino, right?
17 A. I always did.
18 Q. You always did.
19 A. Yes.
20 Q. Every single time.
21 A. Yes.
22      MR. FINKEL: Mr. Coleman, if we could dial up what's
23 in evidence as Government Exhibit 301V.
24      (Audio played)
25      MR. FINKEL: Pause right there.

1  BY MR. FINKEL:
2  Q. That's your voice, right, using the 8865 number saying
3  "hold on, let me count"?
4  A. Yes.
5  Q. And the other voice on the phone, that's Dino, right?
6  A. Yes.
7  Q. You know his voice, don't you?
8  A. Yes.
9  Q. You have spoken to him a lot.
10 A. A few times.
11 Q. More than a few, right?
12 A. Yeah, maybe --
13 Q. Hundreds.
14 A. Not hundreds.
15 Q. Not hundreds?
16 A. I wouldn't think hundreds.
17 Q. A hundred, right?
18 A. I wouldn't think a hundred.
19 Q. You wouldn't think a hundred?
20 A. No.
21 Q. Okay.
22      MR. FINKEL: Keep playing.
23      (Audio played)
24      MR. FINKEL: Pause right there.
25 BY MR. FINKEL:

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                        May 14, 2019

1 Q. Do you hear that clicking?
2 A. Yeah.
3 Q. That's you counting money, right?
4 A. Is it? Yeah.
5 Q. I'm asking you, sir.
6 A. Yeah.
7 Q. That's you counting money, right?
8 A. I guess so.
9 Q. You guess so or yes?
10 A. Yeah, yes, um-hmm.
11         MR. FINKEL: Continue.
12         (Audio played)
13         MR. FINKEL: Stop right there.
14 BY MR. FINKEL:
15 Q. You heard Dino say, "yeah, I know you told me you were
16   going to pay me back the next day, whatever." You heard him
17   say that, right?
18 A. Yeah.
19 Q. Okay.
20 A. Not for drugs.
21 Q. You heard him say that, right?
22 A. Not for drugs.
23 Q. Did you hear him say those words?
24 A. Yeah, I heard him say that.
25 Q. And you were talking about bundles right? That's what this

1   conversation is about, isn't it?
2 A. Yes.
3 Q. And the money you are counting out, that's to buy heroin,
4   right?
5 A. Yes.
6         MR. FINKEL: Okay. Keep playing, please.
7         (Audio played)
8         MR. FINKEL: Let's pause right there.
9 BY MR. FINKEL:
10 Q. So that's your voice saying, "So I will be there in ten
11   minutes," right?
12 A. Yes.
13 Q. And you mean to Dino, right?
14 A. Yes.
15 Q. To get heroin, right?
16 A. Yes.
17 Q. And then you go on to say, "You get 100 today, then I owe
18   you 270 at this point," right?
19 A. Yes.
20 Q. That's for drugs, right?
21 A. No.
22 Q. It's because you didn't have enough money to pay him for
23   the heroin, right?
24 A. No.
25         MR. FINKEL: Can you roll back like ten seconds and

1   play it?
2         (Audio played)
3         MR. FINKEL: Pause it.
4 BY MR. FINKEL:
5 Q. Mr. Van Manen, that's you saying, I'm going to pay you off,
6   right?
7 A. Yes.
8 Q. Your voice.
9 A. Yes.
10 Q. Because you didn't have all the money to pay for the
11   heroin, right?
12 A. Nothing to do with heroin.
13 Q. Then you go on to say, "Because I don't want to hear this,
14   so please just breathe," right?
15 A. Yeah.
16 Q. That's what you said to Dino, "just breathe."
17 A. Yes.
18 Q. Because he was letting you buy on credit, right?
19 A. He never let me buy on credit.
20         MR. FINKEL: Okay. Keep playing, please.
21         (Audio played)
22 BY MR. FINKEL:
23 Q. At the end of the call you say, "I'll take care of it,
24   please," right?
25 A. Yes.

1 Q. That's what you said to Dino?
2 A. Yes.
3 Q. That was about paying him back, right?
4 A. Yes.
5 Q. Paying him back for the heroin, right?
6 A. For something else. Nothing to do with heroin.
7 Q. And to be clear, the heroin you bought from Dino on credit,
8   you sold that to people on Staten Island, right?
9 A. Yes.
10 Q. Right. That's where -- that's where you did your business,
11   in Staten Island.
12 A. Yes.
13 Q. And in order to sell in Staten Island, you traveled from
14   New Jersey, right?
15 A. Yes.
16 Q. Because you stayed in New Jersey, right?
17 A. Yes.
18 Q. You went over the bridge and you sold heroin in Staten
19   Island.
20 A. Yes.
21 Q. And when you didn't have enough heroin, you would go to
22   Brooklyn, right?
23 A. Yes.
24 Q. And that's where you would pick up your heroin?
25 A. Yes.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                          **May 14, 2019**

1 Q. Took the Verrazzano Bridge, right?
2 A. Yes.
3 Q. That's where you got your heroin, brought it back to Staten
4    Island, and sold it to your customers, right?
5 A. Yes.
6 Q. Did that a lot, right?
7 A. Somewhat.
8 Q. You are a drug dealer, right?
9 A. No, drug addict.
10 Q. I'm sorry?
11 A. Drug addict, recovering.
12 Q. Huh?
13 A. Recovering drug addict.
14 Q. Now, you would agree with me that the more customers you
15    had, the more money you can make, right?
16 A. I wasn't interested in that.
17 Q. Well, you would agree with me that the more heroin you
18    could sell, the more money you can make, right?
19 A. If you were looking at it that way, yeah, but not me. It
20    wasn't about that.
21 Q. Sir, it's a yes-or-no question.
22 A. No.
23 Q. So just to be clear, your testimony is you do not agree
24    that if you had more customers to sell heroin to you could make
25    more money.

1 A. No.
2 Q. You don't agree with that.
3 A. Nope.
4 Q. Okay.
5      You don't agree that if you sold more heroin you could
6    earn more profit, right?
7 A. There is never been a profit.
8 Q. Sir, it's a yes-or-no question. You either agree or you
9    don't.
10 A. No.
11 Q. So you don't agree with that.
12 A. Nope.
13 Q. Now, when you sold your heroin in Staten Island, you didn't
14    do that alone, right?
15 A. No.
16 Q. You worked with other people.
17 A. Yes.
18 Q. Several other people?
19 A. One.
20 Q. Well, on direct you said two, right?
21 A. It's only one other person with me whenever I'm doing it.
22 Q. But on direct testimony, when Mr. Quijano was asking you
23    questions, you said there were two people you worked with to
24    sell heroin, right?
25 A. Yes, correct.

1 Q. So at least two, right?
2 A. Two.
3 Q. You have heard a lot about a lot more during this trial,
4    though, right?
5      MR. QUIJANO: Objection.
6      THE COURT: Overruled.
7 A. A lot more in this trial? Different times? Different
8    places? What?
9 Q. It's a yes-or-no question, Mr. Van Manen.
10 A. Yes, yes.
11 Q. One of the people you talked about about your heroin
12    business was Shaun Sullivan, right?
13 A. Shaun Sullivan? He was doing the talking. There is
14    nothing I would brag about, nothing I would be proud of --
15 Q. Okay.
16 A. -- to brag about or talk about it.
17 Q. So this is a yes-or-no question, Mr. Van Manen. And the
18    question is --
19 A. If the conversation came up --
20 Q. Sir, sir, please let me finish the question.
21 A. Go ahead.
22 Q. Thank you.
23      So you would discuss with Shaun Sullivan heroin sales,
24    right?
25 A. Yeah.

1 Q. You would discuss with him how to make more profit, right?
2 A. He would talk about that.
3      (Continued on next page)

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                                    May 14, 2019

1  Q.  Sir, it's a yes or no question.  Would you discuss with Mr.
2     Sullivan --
3  A.  We had a conversation, yes.
4  Q.  Sir, please let me finish the question.  You will have an
5     opportunity to answer.  OK?
6  A.  OK.
7  Q.  Would you discuss with Shaun Sullivan selling heroin?
8  A.  Yes.
9  Q.  How to be a better drug dealer, right, you discussed that
10    with Mr. Sullivan?
11  A.  No.
12  Q.  How to get more inventory, right?
13  A.  Not in that way, that order.
14  Q.  How to get more customers, right?
15  A.  No.
16  Q.  Because you guys were in this together, right?
17  A.  No.
18        MR. FINKEL: Mr. Coleman, if we could play for the
19     witness what is in evidence as 301A-I.
20        (Audio played)
21        MR. FINKEL: Pause it right there.
22  Q.  That's your voice, right, that said --
23  A.  Yes.
24  Q.  Let me finish the question, sir.
25        That's your voice that said, "Has he said if he's

1  Q.  To Mr. Sullivan, right?
2  A.  Yes.
3  Q.  When you were talking about Dino providing heroin, right?
4  A.  Yes.
5  Q.  Then Sullivan said, "This is crazy, man," right?
6  A.  Yes.
7  Q.  And then you said, your words, "I can't take -- I don't
8     have enough money to take like too much of this stuff," right?
9  A.  Yes.
10  Q.  Because it was bad for business, right?
11  A.  I don't have enough money to buy extra.  I can only buy a
12    little bit.
13  Q.  Right.  Because you made your money selling drugs, right?
14  A.  No, that's how I made my fix, my habit.
15  Q.  Well, you're talking about losing customers with Mr.
16    Sullivan, right?
17  A.  Yes.
18  Q.  Your commiserating about it, in fact, right?
19  A.  Yes.
20  Q.  You're trying to figure out, how can we fix this problem
21    together, right?
22  A.  Go elsewhere, yeah.
23  Q.  Is that a yes?
24  A.  Not together.  That's not a yes.  It's not together.
25  Q.  OK.  Let's take a step back.  You just heard the call,

1     going to grab you or not," right?
2  A.  Yes.
3  Q.  Talking about Dino, right?
4  A.  Yes.
5  Q.  Your supplier?
6  A.  One of them.
7  Q.  Your major supplier?
8  A.  No.
9        (Audio played)
10        MR. FINKEL: Stop right there.
11  Q.  That's Mr. Sullivan telling you that he is going to lose
12    customers, right?
13  A.  Yes.
14  Q.  Because he couldn't get in touch with Dino on that
15    occasion?
16  A.  Yes.
17  Q.  You were empathetic with that, right?
18  A.  Yes.
19  Q.  Because you were afraid you were going to lose customers
20    too, right?
21  A.  No, not really.
22  Q.  You said, "I lost, I lost a bunch of mine, to be straight
23    up honest, at least ten peeps or another."  You said that,
24    right?
25  A.  Did I?  I guess so.

1     right?
2  A.  Yes.
3  Q.  It was a conversation with you, yes?
4  A.  Yes.
5  Q.  And a conversation with Shaun Sullivan, right?
6  A.  Yes.
7  Q.  And you were talking about losing heroin customers, right?
8  A.  Yes.
9  Q.  And Mr. Sullivan was describing that he didn't want to lose
10    customers, right?
11  A.  Yes.
12  Q.  It was bad for business, right?
13  A.  Yes.
14  Q.  And you agreed, right?
15  A.  Yes.
16  Q.  Because that's something the two of you would discuss from
17    time to time, right?
18  A.  On occasion, yes.
19  Q.  Because you didn't want to lose customers?
20  A.  I didn't want to lose my reup and be sick, no.
21  Q.  You didn't want to lose your heroin customers, right?
22  A.  The sale that would make me well, no.
23  Q.  Sir, it's a yes or no question.
24  A.  Yes.
25  Q.  Did you want to lose customers to whom you sold heroin?

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                    **May 14, 2019**

1  A. No.
2  Q. Because that's how you made your money, right?
3  A. Yes.
4  Q. Because you're a drug dealer, right?
5  A. No, I wouldn't say that.
6        MR. FINKEL: Can you roll it back like five seconds
7  and keep playing.
8        (Audio played)
9        MR. FINKEL: Pause it right there.
10 Q. That was your voice that said "everybody else is just
11  crappy," right?
12 A. Yeah. That day.
13 Q. That meant that, whoever else you got heroin from, it
14  wasn't as good as Dino, right?
15 A. No. Sometimes it was worse.
16 Q. Well, you said everyone else is just crappy, your words,
17  right?
18 A. Crappy, the price.
19 Q. Sir, those are your words?
20 A. Yes.
21 Q. Everyone else is just crappy, right?
22 A. Uh-hum..
23 Q. Meaning the product wasn't good, right?
24 A. No.
25 Q. Dino was the better product, right?

1  referring to is heroin, right?
2  A. Yes.
3  Q. We are not talking about rabbits, right?
4  A. Talking about bundles of heroin.
5  Q. Bundles of heroin. And that's your inventory?
6  A. Instead of 10, I want 20.
7  Q. So you have more to sell to your customers?
8  A. So I don't run out.
9  Q. So you can sell to your customers?
10 A. So I'm not sick for eight hours.
11 Q. So you can sell to your customers?
12 A. No.
13        MR. QUIJANO: Objection.
14        THE COURT: Sustained.
15 Q. You would agree with me that drug dealers need an inventory
16  of drugs to sell to their customers, right?
17        MR. QUIJANO: Objection. Asked and answered.
18        THE COURT: Overruled.
19 A. Inventory of drugs? I never look at it that way. I never
20  thought somebody would look at it that way.
21 Q. So you do not agree that drug dealers need an inventory of
22  drugs to sell to their customers?
23 A. I guess they would, yeah.
24 Q. They do?
25 A. Yeah.

1  A. No.
2  Q. Then you go on to say, "What I'm gonna do is I'm gonna
3  fucking hold every dime I got, I'm going to double my inventory
4  so I always have backup." You said that, right?
5  A. Yes.
6  Q. Inventory meant your heroin inventory, right?
7  A. Yeah.
8  Q. Because you needed inventory of heroin to sell to your
9  customers, right?
10 A. I need to always have so I wouldn't be sick. So that's
11  inventory to me.
12 Q. Your testimony is you use the word inventory to refer to
13  your own personal supply?
14 A. It's been my word for 30-something years, inventory.
15 Q. OK. So your testimony is today that you use the word
16  inventory to refer to your personal supply?
17 A. Yes.
18 Q. You don't use the word inventory to refer to your
19  customer's supply?
20 A. Most of the time I'm thinking about myself first; it's
21  about me and her not being sick, that's what it's about.
22 Q. Sir, I am just talking about the words you used on this
23  call.
24        My question is, you said, I'm going to double my
25  inventory so I always have backup. And the inventory you're

1  Q. Just like you need an inventory to sell to your customers,
2  right?
3  A. I need an inventory so I am not sick for eight, ten hours.
4        MR. FINKEL: Let's keep playing.
5        (Audio played)
6        MR. FINKEL: Let's pause it right there.
7  Q. Just to be clear, you're discussing this with Mr. Sullivan
8  your desire to make profit, right?
9  A. If you could, yeah. But that's not really what I'm saying,
10  but I'm telling him that.
11 Q. Just answer my questions. OK?
12 A. Yes.
13 Q. Your testimony is the words you used on that call are
14  different than their intended meanings?
15 A. It's a pissing contest.
16 Q. I'm sorry. I didn't hear your answer.
17 A. No. I'm good.
18        MR. FINKEL: Can the court reporter read it back. I
19  didn't hear it.
20        (Record read)
21        MR. FINKEL: If we can put up what is in evidence as
22  Government Exhibit 251.
23 Q. That's you, right?
24 A. Yes.
25        MR. FINKEL: If you can put up what is in evidence as

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                    **May 14, 2019**

1    Government Exhibit 253.
2  Q.  That's you again, right?
3  A.  Yes.
4  Q.  You're about to get out of the car, right?
5  A.  Yes.
6        MR. FINKEL: Can you put up what is in evidence as
7    Government Exhibit 252.
8  Q.  That's you outside of the car, right?
9  A.  Yes.
10       MR. FINKEL: Can you put up what is in evidence as
11   Government Exhibit 254.
12  Q.  That's you in that other car, right?
13  A.  Yes.
14  Q.  By the way, when these pictures were being taken, you
15   didn't know you were being surveilled, did you?
16  A.  No.
17  Q.  Because you were doing a heroin sale here, right?
18  A.  Yes, it would be.
19  Q.  You knew that was illegal, right?
20  A.  Yes.
21  Q.  You knew that was a crime?
22  A.  You never think of it when you're doing it, but yes.
23  Q.  You didn't think that it was a crime to sell heroin?
24  A.  It's beyond that.  You don't think.  When you're addicted,
25   you don't think like that.

1  Q.  Did you think it was a crime to sell heroin when you sold
2   heroin in this picture?
3  A.  Now I do, but then I didn't.
4  Q.  You talked on direct with Mr. Quijano, right, about all the
5   times you were arrested for selling heroin, right?
6  A.  No, for possessing heroin in my home.
7  Q.  OK.  So you knew possessing heroin was a crime?
8  A.  Yes.
9  Q.  But you didn't know selling heroin was a crime?
10  A.  Yes.
11  Q.  I'm sorry.  Your testimony was you didn't know selling was
12   a crime?
13  A.  I knew selling was a crime, yes.
14       MR. FINKEL: If we can go to 257.
15  Q.  That's just after the drug sale of heroin, right?
16  A.  Yes.
17  Q.  By the way, you heard the calls when Detective Truscelli
18   was on the stand.  This woman called you on the phone to
19   arrange a sale, right?
20  A.  Yes.
21  Q.  The 8865 number, right?
22  A.  Yes.
23  Q.  You answered?
24  A.  Did I?  Yeah, probably.
25  Q.  Or Doreen answered, because you guys helped each other out,

1   right?
2  A.  Yes.
3  Q.  And she arranged for you to meet her at a particular
4   parking lot to buy heroin, right?
5  A.  Doreen owed her two bags at that time.
6  Q.  I'm sorry.  This was a heroin sale, right?
7  A.  No.  Doreen owed her two bags.  That's what I remember.
8       MR. FINKEL: Mr. Coleman, can you go back to 254.
9  Q.  That's you?
10  A.  Then it is.
11  Q.  In the car, right?
12  A.  A different time, yes.
13  Q.  Not Doreen, you, right?
14  A.  That's me.
15       THE COURT: Mr. Finkel, would this be a convenient
16   place to break?
17       MR. FINKEL: Yes, your Honor.
18       THE COURT: Ladies and gentlemen, we are going to
19   break now and we will resume tomorrow morning at 9:30.
20   Remember the instructions.  Keep an open mind, don't do any
21   research, and don't talk about the case.  See you tomorrow
22   morning at 9:30.  Safe home.
23       (Jury exits courtroom)
24       THE COURT: You can step down, Mr. Van Manen.
25   Please be seated.

1       Are you going to have a rebuttal case, the government
2   going to have a rebuttal case?
3       MR. FINKEL: We haven't decided yet.  If we do, it
4   will be just that one witness.
5       THE COURT: You want to take a break before we get
6   starting with the jury charge?
7       MR. FINKEL: That would be appreciated.
8       THE COURT: Ten minutes?
9       MR. FINKEL: Thank you, your Honor.  That's fine.
10   (Recess)
11       THE COURT: You want to do something simple?  Any
12   observations on the jury verdict form?
13       MR. FINKEL: The government is OK with the jury form.
14       MS. O'NEILL: We would just request that not guilty be
15   put before guilty because the burden of proof is on the
16   government and there is a presumption of innocence in this
17   case.
18       MR. FINKEL: No objection.
19       THE COURT: We will change the positions of guilty and
20   not guilty in question number 1 and question number 2.
21       MS. O'NEILL: Thank you.
22       THE COURT: Turning to the jury charge.
23       There shouldn't be any questions for the first several
24   pages.  What is the first page you have for objections or
25   comments?

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,                                    May 14, 2019

1      MR. QUIJANO: On page 16.
2      THE COURT: Anybody before page 16?
3   OK.
4      MR. QUIJANO: Starting with the first line, "The
5   cooperating witnesses are facing fairly long maximum
6   sentences." We would ask that you include as well as mandatory
7   minimum sentences.
8      THE COURT: Fairly long maximum sentences and
9   mandatory minimums?
10     MR. QUIJANO: Yes. Of ten years.
11     MR. FINKEL: Your Honor, the government would object
12   to that.
13     THE COURT: I am not going to specify the years. But
14   I will say "and mandatory minimums."
15     Next page that you have?
16     MR. QUIJANO: I actually jump up to page 47.
17     THE COURT: Does the government have anything between
18   16 and 47?
19     MR. FINKEL: Yes, your Honor. This is minor.
20     On page 20, that the transcripts are not in evidence.
21   There are two transcripts that were put into evidence via
22   stipulation, the Albanian-language transcripts, which are
23   306F-T, I believe, and 303F-T. Let me just check that.
24     THE COURT: So what language do you want, Mr. Finkel?
25     MR. FINKEL: I would just say, except for 306F-T and

1   306E-T.
2      THE COURT: Do you have that, Amy?
3      LAW CLERK: FT and ET?
4      MR. FINKEL: That's right.
5      THE COURT: Mr. Quijano, you're up at 46.
6      MR. QUIJANO: Yes.
7      THE COURT: Anything before 46 from the government?
8   Mr. Finkel.
9      MR. FINKEL: Your Honor, on page 25, right before the
10   B heading, narcotics conspiracy general instructions, right
11   before that, we would ask that the Court include "even if just
12   for a moment." If they conspired just for a moment, that would
13   be sufficient. There is no need for the jury to find that the
14   conspiracy lasted for the entirety of the charged indictment
15   period.
16     MS. O'NEILL: We would object to that.
17     THE COURT: I think I will leave this the way it is.
18   The conspiracy was formed and existed for some time within the
19   period set forth in the indictment. I think that takes care of
20   it.
21     Anything before 46 now?
22     MR. FINKEL: Page 31, the seventh line, the government
23   would request that it say "or any of their co-conspirators were
24   aware that heroin and/or fentanyl were the object of the
25   conspiracy."

1      THE COURT: What line, Mr. Finkel?
2      MR. FINKEL: The seventh line.
3      THE COURT: Any of their co-conspirators were aware
4   that heroin or fentanyl were the object of the conspiracy?
5      MR. FINKEL: Yes. We would ask that it be changed
6   from "or" to "and/or."
7      THE COURT: OK.
8      Anything else in the 30s from the government?
9      MR. FINKEL: Your Honor, aside from what I suppose the
10   Court might want to deal with separately, the government
11   objects to the multiple conspiracies charge, which is before
12   the 40s.
13     On page 33, 34, the government requests that the Court
14   modify the language that says, "Basically, what you are
15   determining is whether the drugs in Mr. Van Manen and Mr.
16   Charlton's possession were for their personal use or for the
17   purpose of distribution." We ask that it be changed to,
18   Basically, what you are determining is whether at least some of
19   the drugs in Mr. Van Manen and Mr. Charlton's possession were
20   for personal use or for distribution.
21     THE COURT: OK. Anything else in the 30s?
22     MR. FINKEL: Page 36. I should say both of these
23   points were in our letter, to the extent it will be helpful for
24   the Court and its staff.
25     On page 36, we would request that the Court add after

1   the sentence, "It is not even necessary that Mr. Van Manen and
2   Mr. Charlton knew every other member of the conspiracy," the
3   government requests the Court then add "or indeed that they
4   knew each other."
5      THE COURT: All right. I will make that change.
6      Anything else in the 30s?
7      Hearing none, I will go to you, Mr. Quijano. You're
8   at 46?
9      MR. QUIJANO: Yes, your Honor. In the paragraph
10   before venue, we are aware circuits have ruled on the issue of
11   foreseeability in connection with death resulting, but the
12   Second Circuit hasn't. So we would request the additional
13   language be added requiring that serious injury and death were
14   foreseeable to the defendant, whether he was directly
15   participating in the transaction or not. To hold the defendant
16   responsible for death resulting without this requirement is
17   simply at odds with due process and fundamental fairness, your
18   Honor.
19     THE COURT: What language do you want, Mr. Quijano?
20     MR. QUIJANO: That serious injury and death were
21   foreseeable to the defendant, whether he was directly
22   participating in the transaction or not.
23     THE COURT: Where would that go?
24     MR. FINKEL: Your Honor, the government would just
25   note I think this language is already present in the Court's

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

1  proposed charge, in the last paragraph before venue on page 47.
2      It says, "First, if Mr. Van Manen personally and
3  directly participated in the transaction that resulted in the
4  victim's serious injury or death; or, second, the distribution
5  of the heroin and/or fentanyl that caused the victim's serious
6  bodily injury or death was either known to Mr. Van Manen or was
7  reasonably foreseeable to him, and was within the scope of the
8  criminal activity that he jointly undertook."
9      MS. SIDERIS: Your Honor, if I may, I believe the way
10 the charge reads now is that -- OK. In the second example,
11 what was reasonably -- the way I am reading it is that it's the
12 distribution that was reasonably foreseeable. What Mr. Quijano
13 was requesting is that the victim's serious bodily injury or
14 death -- I just want to make it clear, actually. Sorry.
15     I'm sorry, your Honor. That was reasonably
16 foreseeable. It's the first instance, that Mr. Van Manen
17 personally and directly participated in the transaction, and
18 that serious injury or death was reasonably foreseeable to him.
19     MS. GHOSH: We don't believe that's an accurate
20 description of the law. We believe that the law as currently
21 in page 47 is the correct law, which is that the distribution
22 had to be foreseeable, but that the death or serious bodily
23 injury did not have to be foreseeable to the defendant. We are
24 not aware of any law that says that. I am not sure the
25 defendants have provided any.

1      THE COURT: I am going to leave it the way it is.
2      After 46, any comments?
3      MS. O'NEILL: Your Honor, if I may. At some parts in
4  the charge it says either Mr. Van Manen or Mr. Charlton or both
5  participated or performed an activity. We would request that
6  that language be used throughout instead of saying Mr. Van
7  Manen and Mr. Charlton. We can provide the Court with a list
8  of where that citation is.
9      THE COURT: Well, I will read it again, but what I am
10 trying to do is make sure that they consider each defendant
11 separately.
12     MS. O'NEILL: That's what we are trying to do too.
13 Thank you.
14     THE COURT: I will read it again with that observation
15 in mind.
16     MS. O'NEILL: Thank you, your Honor.
17     MR. FINKEL: On page 45, it's the last full sentence
18 on page 45. The government would request that you add after
19 "resulted in the death of Michael Ogno," "or serious bodily
20 injury."
21     MR. QUIJANO: Where are you?
22     MR. FINKEL: Last sentence on page 45.
23     THE COURT: OK.
24     Anything after 45?
25     MR. FINKEL: The other comments the government has are

1  what we articulated in our letter to the Court about sort of
2  more broader topics. Specifically, the charge that your Honor
3  read to the jury in part on the second day of trial, that
4  economic necessity is not a defense; additional language
5  concerning the buyer-seller relationship; that the multiple
6  conspiracies charge is not appropriate here; and additional
7  language regarding death resulting in serious bodily injury to
8  reflect the Supreme Court's ruling on that. And then, finally,
9  just language about a non-prosecution agreement since Mr. Yung
10 is here pursuant to a non-pros rather than a cooperation
11 agreement.
12     THE COURT: Do we have any expert witnesses besides
13 the coroner?
14     MR. FINKEL: Yes. Mr. Santos was an expert witness on
15 cell phone extraction. And the lab techs, too.
16     THE COURT: Who is that?
17     MS. GHOSH: The lab techs were Brittany Christie and
18 Dimitri Devito. They were qualified as expert witnesses.
19     Just to clarify, Mr. Santos was not qualified as an
20 expert witness.
21     THE COURT: So the experts are the two lab technicians
22 from the NYPD lab and the coroner?
23     MS. GHOSH: That's correct, your Honor.
24     THE COURT: And the cooperating witnesses are who?
25     MS. GHOSH: Shaun Sullivan, Anthony Francese, Jasmin

1  Cejovic.
2      THE COURT: What is Mr. Yung?
3      MS. GHOSH: He received a non-prosecution agreement.
4      THE COURT: Did we talk about that?
5      MS. GHOSH: In our May 12 letter, there is a proposed
6  instruction regarding a non-prosecution agreement, on pages 6
7  and 7 of our letter.
8      THE COURT: Should we strike character witness?
9      MS. GHOSH: Yes, your Honor.
10     THE COURT: That's at page 23.
11     Mr. Quijano, do you have anything else?
12     MR. QUIJANO: No, your Honor. Just note our objection
13 on the foreseeability aspect.
14     THE COURT: OK.
15     Ms. O'Neill.
16     MS. O'NEILL: Mr. Santos submitted a letter of a
17 proposed addition -- Mr. Santiago -- if the case has multiple
18 defendants, as here, the jury may return a jury at any time
19 during its deliberations as to any defendant.
20     THE COURT: I may give that if the jury gives me
21 cause, but I think right now I am going to stick with the
22 charge as given. I am not going to introduce the element that
23 they can return separate verdicts. I prefer that they consider
24 a verdict of guilty or not guilty on both defendants. If it
25 turns out that they can't, I will certainly consider this

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

1  charge. But I am not going to give this charge the way it's
2  proposed.
3      MS. O'NEILL: Thank you, your Honor.
4      THE COURT: Economic necessity is not a defense.
5  Buyer-seller relationship, you want the language
6  that's at the bottom of the page 2, is that it?
7      MR. FINKEL: That's correct.
8      THE COURT: Multiple conspiracies, you want that
9  deleted?
10     MR. FINKEL: That's correct, your Honor.
11     MS. O'NEILL: We would object to the deletion of
12  multiple conspiracies.
13     THE COURT: Yes, I understand.
14     This language at page 4, Mr. Finkel, going over to
15  page 5.
16     MR. FINKEL: Yes, your Honor.
17     THE COURT: You really want that in?
18     MR. FINKEL: Your Honor, that would be in the event
19  the Court determines that the defendants have met their burden,
20  such that a multiple conspiracies charge is appropriate, the
21  government would ask that that language be used. The
22  government doesn't believe that the defendants have met that
23  burden. The evidence introduced at trial is about a single
24  conspiracy that served narcotics, specifically, heroin, to the
25  populous of Staten Island. That is the conspiracy here, that

1  is one conspiracy. There has not an evidentiary showing
2  sufficient to allow for a multiple conspiracy charge.
3     MR. QUIJANO: There have been multitude suggestions of
4  multiple conspiracies involving various people, including the
5  defendant with Belfield and Doreen.
6     THE COURT: I thought the testimony was they hadn't
7  participated in the conspiracy as charged.
8     MR. QUIJANO: In the charged conspiracy. There
9  clearly are other conspiracies taking place. They are just not
10  charged.
11     THE COURT: I will consider it.
12     The non-prosecution agreement. This would be
13  additional language, is that correct?
14     MR. FINKEL: That's correct, your Honor.
15     THE COURT: And the suggestions you make at page 7
16  have been taken care of?
17     MR. FINKEL: Yes.
18     THE COURT: All right.
19     How likely is it going to be that we are going to get
20  through summations and the charge tomorrow?
21     MR. FINKEL: I think it's likely, your Honor.
22     THE COURT: How much more do you have?
23     MR. FINKEL: Maybe about an hour, hopefully less. I
24  will try to slim it down tonight.
25     THE COURT: The summations are how long?

1     MS. GHOSH: I expect the closing will be approximately
2  an hour and a half.
3     MR. QUIJANO: I expect the same.
4     MS. O'NEILL: Mine will be shorter, probably about 45
5  minutes.
6     THE COURT: Hour and a half and an hour and a half is
7  three hours, three hours and 45 minutes. This charge will take
8  a little bit more than an hour to give.
9     MR. QUIJANO: The government's rebuttal.
10     THE COURT: I forgot the government's rebuttal.
11     MS. O'NEILL: We won't forget.
12     THE COURT: I don't know if I can get the charge in
13  tomorrow. We will do our best.
14     MR. FINKEL: Just with respect to the economic
15  necessity and the buyer-seller additional instruction the
16  government requested, has the Court ruled on that or is that
17  under consideration? I will be happy to be heard on any issues
18  with respect to that.
19     THE COURT: I think I have heard you on the your May
20  12 letter. I haven't made up my mind. I am going to go
21  downstairs and make up my mind.
22     MR. FINKEL: Thank you, your Honor.
23     THE COURT: I will have a charge for you tomorrow
24  morning so you will know what I am going to charge.
25     MS. GHOSH: Thank you, your Honor.

1     MR. QUIJANO: Your Honor, first, I don't know if I
2  have, but I would object to the proposed buyer-seller language
3  by the government.
4     I have another issue that I want to raise now even
5  though I can't fully complete it because I can't pull up the
6  portion in the transcript which apparently was taken earlier.
7  We did find this. There is a string of questions by the
8  government on cross-examination about whether Paul Van Manen
9  was able to purchase on credit, and a string of answers in the
10  negative. And then the government asked, "And to be clear, the
11  heroin you bought from Dino on credit which you sold to people
12  in Staten Island?" And the defendant answered yes. That was
13  misstating entirely the prior evidence that the witness had
14  responded to. He never was allowed to buy on credit. I
15  propose to show this to the Court once I have the transcript
16  and would move to exclude that from misstating the evidence.
17     THE COURT: Mr. Finkel.
18     MR. FINKEL: The government opposes that application
19  for two simple reasons. For one, the defense did not object to
20  that question. Number two, I think your Honor has seen a slew
21  of evidence that Mr. Van Manen did in fact buy heroin from
22  Mr. Kosic on credit. That he admitted to that on the stand is
23  consistent with that evidence.
24     MR. QUIJANO: The defendant consistently said, no, he
25  was not allowed to buy on credit.

UNITED STATES OF AMERICA, v.
PAUL VAN MANEN ET AL.,

May 14, 2019

Page 1355

1      THE COURT: Where are the record references to Mr. Van
2 Manen getting credit from Mr. Kosic?
3      MR. FINKEL: I played one of the calls today, which
4 was 301B. There has been testimony from Mr. Francese about how
5 Mr. Van Manen would come over and get heroin, didn't always
6 have the money to pay it. It was hundreds of dollars, I think
7 he said. We can certainly point your Honor in the direction of
8 other calls as well.
9      MR. QUIJANO: The call he is referring to and asked
10 questions about, the defendant consistently said it had nothing
11 to do with heroin.
12      THE COURT: Well, just because he consistently said it
13 doesn't mean that it's so. There is contradictory evidence in
14 the record. That's what we have juries for.
15      MR. QUIJANO: Francese was asked on cross-examination
16 about that, and he backed off on that.
17      As to this specific question, your Honor, it follows a
18 string of answers by the defendant that he was not allowed to
19 buy on credit. The government in their question changed the
20 question. They included, Again, and to be clear, the heroin
21 you bought from Dino on credit. He had never admitted that.
22 The defendant did answer yes. And that was misstating the
23 evidence in that question.
24      MR. FINKEL: I would just say defense counsel had an
25 opportunity to redirect. They didn't object to the question.

Page 1356

1 The defendant answered it. The jury will decide how to
2 interpret that answer and how to --
3      THE COURT: That's right. See you tomorrow morning.
4      MS. O'NEILL: We would just join Mr. Quijano in the
5 objection to that new buyer-seller language. Thank you.
6      THE COURT: All right.
7      (Adjourned to May 15, 2019, at 9:30 a.m.)

Page 1357

1               INDEX OF EXAMINATION
2 Examination of:                  Page
3   WILLIAM COLEMAN
4   Direct By Ms. Ghosh . . . . . . . . . . . .1115
5   KENNETH CHARLTON
6   Direct By Ms. O'Neill . . . . . . . . . . .1130
7   Cross By Ms. Ghosh . . . . . . . . . . . . .1161
8   Redirect By Ms. O'Neill . . . . . . . . . .1192
9   Recross By Ms. Ghosh . . . . . . . . . . . .1199
10   NICOLE FERRARA
11   Direct By Ms. O'Neill . . . . . . . . . . .1200
12   Cross By Mr. Finkel . . . . . . . . . . . .1202
13   PAUL VAN MANEN
14   Direct By Mr. Quijano . . . . . . . . . . .1204
15   Cross By Mr. Finkel . . . . . . . . . . . .1317
16              GOVERNMENT EXHIBITS
17   Exhibit No.             Received
18   301EA through EG . . . . . . . . . . . . . .1110
19   301L  . . . . . . . . . . . . . . . . . . .1112
20   2 and 2A  . . . . . . . . . . . . . . . . .1113
21   3 and 3A  . . . . . . . . . . . . . . . . .1113
22   5 and 5A  . . . . . . . . . . . . . . . . .1114
23   8 and 8A  . . . . . . . . . . . . . . . . .1115
24   505 and 620  . . . . . . . . . . . . . . .1116
25   1100  . . . . . . . . . . . . . . . . . . .1117

Page 1358

1   1101  . . . . . . . . . . . . . . . . . . .1119
2   1102  . . . . . . . . . . . . . . . . . . .1120
3   1103  . . . . . . . . . . . . . . . . . . .1121
4   1104  . . . . . . . . . . . . . . . . . . .1123
5   1105  . . . . . . . . . . . . . . . . . . .1124
6   1010  . . . . . . . . . . . . . . . . . . .1167
7   80  . . . . . . . . . . . . . . . . . . . .1178
8              DEFENDANT EXHIBITS
9   Exhibit No.             Received
10   PV6  . . . . . . . . . . . . . . . . . . .1208
11   PV5  . . . . . . . . . . . . . . . . . . .1210
12   PV8  . . . . . . . . . . . . . . . . . . .1289