# 19-706-cr(L), 19-3521-cr(CON)

# United States Court of Appeals

*for the*

## Second Circuit

———◆———

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

MEDIN KOSIC, AKA Dino, JASMIN CEJOVIC, AKA Min,
MIRSAD BOGDANOVIC, AKA Mike, SHAUN SULLIVAN, THEODORE
BANASKY, AKA Freddy, AKA Eduardo, ANTHONY FRANCESE,
ALEXANDER BUCCI, JOSEPH CUCCINIELLO, AKA Cuch, KENNETH
CHARLTON, JENNIFER BOGDANOVIC,

*Defendants,*

MICHAEL NUNEZ, AKA Gordo, PAUL VAN MANEN,

*Defendants-Appellants.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## DEFENDANT-APPELLANT PAUL VAN MANEN

DONALD J. YANNELLA III
DONALD YANNELLA PC
*Attorney for Defendant-Appellant
Paul Van Manen*
233 Broadway, Suite 2370
New York, New York 10279
(212) 226-2883

## Contents

TABLE OF AUTHORITIES ....................................................................... ii

JURISDICTION STATEMENT ..............................................................1

ISSUES PRESENTED..............................................................................1

SUMMARY OF THE CASE......................................................................2

SUMMARY OF THE ARGUMENT ........................................................2

STATEMENT OF THE CASE..................................................................2

ARGUMENT ..........................................................................................5

    POINT I:  THE TRIAL COURT ERRED IN PRECLUDING DEFENDANT'S PROPOSED EXPERT TESTIMONY ...............................................5

    POINT II:  THE DISTRICT COURT ERRED IN ADMITTING A STATEMENT AS AN EXCITED UTTERANCE. .............................................13

    POINT III:  THE DISTRICT COURT ERRED BY PRECLUDING CROSS EXAMINATION ABOUT FAILURE TO FOLLOW UP ON A LEAD AS TO ANOTHER SOURCE OF NARCOTICS ...........................................19

CONCLUSION ......................................................................................24

CERTIFICATE OF COMPLIANCE ......................................................25

# TABLE OF AUTHORITIES

**Cases**

*Brown v. Keane*, 355 F.3d 82 (2d Cir. 2004) ...........................................................15

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ....................................................12

*Davis v. Alaska*, 415 U.S. 308 (1974)....................................................................22

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ......................................................23

*Henry v. Speckard*, 22 F.3d 1209 (2d Cir. 1994).....................................................22

*United States v. Gonzalez*, 764 F.3d 159 (2d Cir. 2014) .........................................14

*United States v. McCallum*, 584 F.3d 471 (2d Cir. 2009) .......................................12

*United States v. Ulbricht*, 858 F. 3d 71 (2d Cir. 2017).............................................10

*Washington v. Texas*, 388 U.S. 14 (1967) ...............................................................12

**Statutes and Rules**

21 U.S.C. § 846...........................................................................................................1

Fed. R. Evid. 16 ....................................................................................................6, 10

Fed. R. Evid. 403 .....................................................................................................15

Fed. R. Evid. 602 .....................................................................................................15

Fed. R. Evid. 702 .......................................................................................................5

Fed. R. Evid. 803(2).................................................................................................13

# JURISDICTION STATEMENT

Paul Van Manen submits this brief in support of his appeal from a Judgment of the United States District Court, Southern District of New York, adjudging him guilty upon jury verdict of conspiring to distribute and possess with the intent to distribute heroin and fentanyl resulting in serious bodily injury and death, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A), and 841(b)(1)(C). Mr. Van Manen was sentenced principally to a term of 276 months' imprisonment by Judgment entered October 16, 2019, and a timely notice of appeal was filed on October 24, 2019. (SPA1, A772). The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and Van Manen appeals as of right pursuant to 28 U.S.C. § 1291.

# ISSUES PRESENTED

1. Did the trial court err in precluding appellant's proposed expert testimony?

2. Did the trial court err in admitting a statement as an excited utterance?

3. Did the trial court err by precluding cross examination about failure to follow up on a lead as to another source of narcotics?

Defendant submits that the answers to each of these questions is "yes."

## SUMMARY OF THE CASE

This is an appeal from a Judgment of the United States District Court (Hon. Paul A. Crotty) entered October 16, 2019, adjudging him guilty upon jury verdict of conspiring to distribute and possess with the intent to distribute heroin and fentanyl resulting in serious bodily injury and death, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A), and 841(b)(1)(C). Mr. Van Manen was sentenced principally to a term of 276 months' imprisonment by Judgment entered October 16, 2019, and a timely notice of appeal was filed on October 24, 2019. (SPA1, A772).

## SUMMARY OF THE ARGUMENT

The District Court erred by precluding appellant's proposed expert testimony. The District Court erred in admitting a statement as an excited utterance. The District Court erred by precluding cross examination about failure to follow up on a lead as to another source of narcotics.

## STATEMENT OF THE CASE

This case involved two separate but overlapping investigations into narcotics distribution in Staten Island, Brooklyn, and New Jersey. The first investigation was conducted in large part by Det. Arthur Truscelli, who worked for

Staten Island Narcotics and an Overdose Task Force (A278). Between 2013 and 2017, together with other law enforcement officers, Det. Truscelli executed search warrants, arranged controlled and undercover buys, and repeatedly arrested Van Manen. Det. Truscelli conducted surveillance of Van Manen more than 100 times but denied Van Manen's allegation that he used homophobic slurs against Van Manen or had a vendetta against him. (A298). In 2017, Det. Truscelli and the Richmond County District Attorney's Office obtained authorization to wiretap Van Manen's phones. (A288).[1]

The second and overlapping investigation was opened in January 2017 by the Drug Enforcement Agency (DEA") and Homeland Security Investigations ("HIS"). Det. Truscelli testified that he reluctantly handed his file over to federal investigators, and he referred to the federal investigation as a "Strike Force" that had "gone up the ladder in terms of what kind of dealers they were dealing with." The Strike Force had targets that overlapped the state investigation as well as ones that Det. Truscelli did not know about. Det. Truscelli denied having any part in the federal investigation of Michael Ogno's death on December 1, 2018, but he

---

1. "Dkt" refers to an entry in the District Court's docket; "A." refers to the Appendix; "SPA" refers to the special appendix; "Tr." refers to the trial transcript.

testified that, as a courtesy, the Strike Force allowed him to assist in Van Manen's arrest in January 2018. (A295).

On January 16, 2018, a federal indictment charged Van Manen and ten others with conspiracy, between 2015 and 2018, to distribute and possess with intent to distribute one kilogram and more of heroin and fentanyl. The defendants included what Det. Truscelli referred to as "up the ladder" targets, including the lead defendant, Medin Kosic, also known as Dino.

During plea negotiations, Van Manen's attorney gave federal prosecutors a report from a forensic pathologist, Dr. Mark Taff. (A74-83) Defense counsel would later explain that Dr. Taff's report was "not meant to be Rule 16 Notice" of potential expert testimony at trial. Instead, it was used in an unsuccessful attempt to "persuade the Government not to supersede with a "death result" enhancement." (A99).

On November 6, 2018, a fourth superseding indictment was filed, again charging a conspiracy to distribute and possess with intent to distribute heroin and fentanyl. It differed from the original indictment in at least two significant ways. First, it expanded the time frame back to 2013, instead of 2015. Second, it increased the statutory minimum term of imprisonment to twenty years because it alleged that the conspiracy and distribution "resulted in the serious bodily injury of

Shaun Sullivan" on October 5, 2017 and "the death and serious bodily injury of Michael Ogno" on December 1, 2017. (A24-7).

After a nine-day trial, Van Manen was convicted by jury of the single-count indictment. The jury specifically found that Van Manen conspired to distribute one kilogram and more of heroin, under §§ 846, 841(b)(1)(A), and a detectable amount of fentanyl, under 841(b)(1)(C). The jury also found that the substance or substances that Van Manen conspired to distribute "resulted in the death of Michael Ogno" and "serious bodily injury of Shaun Sullivan." (A627-28).

## ARGUMENT

### POINT I: THE TRIAL COURT ERRED IN PRECLUDING DEFENDANT'S PROPOSED EXPERT TESTIMONY

Pursuant to Rule 702 of the Federal Rules of Evidence, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods;

and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 16(b)(1)(G) of the Federal Rules of Evidence provides that the defendant must, at the Government's request, give to the Government a written summary of any testimony that the defendant intends to use under Rule 702 of the Federal Rules of Evidence. But that notice requirement applies *only if*: "(i) the defendant requests disclosure under subdivision (a)(1)(G) and the government complies; or (ii) the defendant has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition." Because Van Manen neither requested disclosure of expert testimony from the Government nor sought to present expert testimony related to his mental condition, he was not required to provide a written summary of expert testimony.

On April 5, 2019, the Government filed a motion in limine to "preclude the proffered testimony of Van Manen's purported expert, Dr. Mark Taff" on the grounds that Dr. Taff's opinions "are not helpful to the jury, concern irrelevant issues, or are otherwise precluded under the Federal Rules of Evidence." (A30).

On April 15, 2019, Van Manen filed a letter in opposition, explaining that Dr. Taff's ten-page letter, dated August 6, 2018, was submitted as part of plea negotiations, not as Rule 16 notice. Van Manen also explained that, if called as an

expert pursuant to Rule 702 of the Federal Rules of Evidence, Dr. Taff would testify regarding "the proper and appropriate manner to conduct an autopsy and the proper and appropriate process by which autopsy reports are prepared…" Furthermore, Dr. Taff "would respond to the specifics of Dr. Cederroth's testimony to the extent it goes beyond what is set forth in the government's notice or not supported by the autopsy report." In addition, the opposition papers said that Van Manen "may call Robert H. Powers, Ph.D., whose Curriculum Vitae accompanies this submission as Exhibit A. Dr. Powers is a Toxicologist and would be called as an expert in the field of Forensic Toxicology." (A99-100).

On April 17, 2019, the Government submitted a reply memorandum, arguing that the Government was "left in the dark" because Van Manen's "notice" as to Dr. Taff and Dr. Powers was "insufficient and failed to comply with "Rule 16(b)(1)(c)" of the Federal Rules of Criminal Procedure. (A111-115). In yet another filing on April 21, 2019, the Government, continuing to misread Rule 16(b)(1)(C), sought preclusion of expert testimony on the grounds that "insufficient" notice put the Government in a position where it was "left to guess" and could not "adequately prepare for trial." (A127-28)

At a conference on April 23, 2019, defense counsel reiterated: "As we noted in our disclosure, first of all, at this point, we do not have any intention or belief

we will be calling them as witnesses. The only manner that it would come up in would be if we thought, after the government's case, in response to testimony by Dr. Kadehjian and Dr. Cederroth, there was necessity to call them in terms of their testimony." Defense counsel stated: "To be more specific than that, Powers' and Taff's testimony would be going only to issues in the autopsy and issues in Kadehjian's report in terms of the scientific conclusions. Their own testimony would be to address their views in terms of the scientific conclusions, if in fact there was testimony that essentially was at odds with what has been given to us in terms of their disclosures." (A207-09 – note that Dr. Kadehjian's name was misspelled in court transcripts but is corrected in this brief).

The Court inquired, "So if the government's experts testify consistently with their report, you're not going to put on –" Defense Counsel answered that he would not call Robert H. Powers under those circumstances. He stated, "It would be only to rebut something that came up that was at odds with either the autopsy findings by Cederroth or Kadehjian's findings in his report, the scientific conclusions or the medical conclusions within those reports. And they would only…" When pressed further, defense counsel stated, "Nor do I expect to challenge the ME or the toxicologist's conclusions from scientific and toxicological and medical conclusions within those two reports. I expect them to just testify

according to the reports, I expect them to answer questions in terms of the medical and toxicological findings according to the reports and the autopsy. And if that's the case, there's absolutely no need for us to call those witnesses, and I don't anticipate calling Powers or Taff." (A207-09).

Based on defense counsel's answer, the prosecutor stated, "Your Honor, my understanding is that the defendants' experts opinion is the same opinion as our experts. If that is true, then I don't have an objection, certainly, to that." (A209).

On May 10, 2019, the fifth day of trial, the Government informed defense counsel that they would not call their toxicologist, despite having previously given notice that their toxicologist was expected to testify that the cause of death was fentanyl toxicity. On Sunday, May 12, 2019, the Government filed a letter "to renew its motion that Defendant Paul Van Manen's purported toxicology expert be precluded from testifying." (A446-48). The prosecutor argued that another one of their experts, Dr. Cederroth, testified consistent with her autopsy report and that the cause of death was the combined effects of Alprazolam, heroin, and fentanyl. The prosecutor argued that the defense "failure to provide notice at this stage" was "sufficient cause for preclusion." (A446).

During oral argument on May 13, 2019, the defense countered that it had been sandbagged because the Government did not disclose that they would not call

their toxicologist until after the defense had cross examined the medical examiner. Furthermore, the defense argued that the prosecution had failed to provide notice that the medical examiner would be testifying regarding toxicology results. The defense argued that it had been relying on the opportunity to cross examine Dr. Kadehjian. Defense counsel intended to elicit from Dr. Kadehjian that the amount of heroin found in Ogno's body was not sufficient, by itself, to kill him. Instead, the amount of fentanyl present in his body was extremely high and would have been fatal by itself. This would have supported Van Manen's theory that the fentanyl, provided to Ogno by a source outside the charged conspiracy, caused Ogno's death. The District Court precluded the defense from calling Dr. Powers "for the reasons stated" by the Government. (A450).

It was error to preclude the testimony of Robert H. Powers. First, as argued above, the defense was not required under Rule 16 of the Federal Rules of Criminal Procedure to provide notice. Trial counsel was ineffective for not arguing that. It was first raised during a Rule 33 motion after trial by substitute counsel. (A670-75).

Even if the defense had violated Rule 16(b)(1)(C), it still would have been an abuse of discretion to preclude the proposed expert testimony. In considering whether there was an abuse of discretion in fashioning a remedy, this Court looks

to the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances. *United States v. Ulbricht*, 858 F. 3d 71, 114 (2d Cir. 2017). In the instant case, the defense did not announce its intention to call expert witnesses earlier because, when the trial began, it expected the Government's experts, a toxicologist and a doctor from the O.C.M.E., to testify in accordance with their reports. The defense only decided to call Robert H. Powers when the Government announced, a week into the trial, that it was no longer calling its expert in toxicology.

There was no prejudice to the Government. As set forth above, defense counsel said that both proposed defense experts were anticipated to testify in accordance with the Government's expert witnesses. The Government acknowledged as much at oral argument on April 23, 2019, and said: "Your Honor, my understanding is that the defendants' expert opinion is the same opinion as our experts. If that is true, then I don't have an objection, certainly to that." (A209).

The error was not harmless. There was no clear evidence of what drug caused the death of Michael Ogno. The needle next to his bed, attached as Exhibit G to Van Manen's Rule 33 (A659), was four to five times larger than a standard

needle used to inject heroin, according to a cooperating witness, Derek Yung. Mr. Yung testified that he and Ogno used fake prescriptions, that Ogno was "heavy into injecting steroids," and that they used a small needle, nowhere near as big as the needle shown in GX 17, to inject heroin. Yung also testified that Ogno had several suppliers. (A469).

Furthermore, the needle was vouchered by Police Officer Bryan Dunn, along with the ten glassines that were sent for testing. But Brittany Christie, a criminalist in the NYPD's controlled substance analysis section, said the needle was missing when she received the packet. (A423). The needle was not tested, and there is no way of knowing drugs were inside the needle next to Ogno's bed.

It is entirely possible that Ogno, in withdrawal, used a heroin patch, steroids, or some other source of narcotics such as Xanax laced with fentanyl on the day that he died. By precluding Van Manen from calling his toxicology expert, the District Court undercut Van Manen's ability to argue that narcotics from the charged conspiracy did not result in Ogno's death. Limiting Van Manen's presentation of his case implicated the fundamental right of "an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses

12

in his favor." The Supreme Court has held that this right to compulsory process includes "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967). According to the Court, "[t]his right is a fundamental element of due process of law." *Id*. Preclusion of the proposed testimony violated the defendant's Due Process rights under the Fifth Amendment.

## POINT II: THE DISTRICT COURT ERRED IN ADMITTING A STATEMENT AS AN EXCITED UTTERANCE.

On April 5, 2019, the Government filed a motion seeking to admit an excited utterance from Ogno's girlfriend, Jessica Fyfe, who had become hysterical after finding Ogno's body. Specifically, the Government sought to elicit that Fyfe "screamed, he "OD'ed!" and "It was Paul!" over and over." In support of the motion to admit the excited utterance under Rule 803(2) of the Federal Rules of Evidence, the Government said that Fyfe was aware that Ogno used heroin, that "his heroin dealer" was named Paul, and that "on several occasions" she "drove

Ogno to a hotel in New Jersey where "Paul" was staying so that Ogno could buy his heroin." (A59-60).

On April 15, 2019, Van Manen filed a letter opposing admission of Fyfe's statement as an excited utterance. Van Manen argued that Fyfe had no personal knowledge of whether Ogno overdosed or whether "Paul" (meaning Van Manen) was responsible. Van Manen argued that Fyfe knew little about Ogno's source of narcotics or how many suppliers Ogno had. Moreover, she knew nothing about where Ogno got the narcotics that caused his death. (A106-07). Just because she knew that one of Ogno's suppliers was "Paul" did not mean that he had supplied drugs on December 1, 2017

On April 17, 2019, the Government supplemented its motion by arguing that, on at least one occasion, Fyfe had seen Ogno speaking via Facetime to his dealer, Paul, and she had seen a portion of the person's face. (A118-19). But the Government did not specify a time frame for that observation. The District Court ultimately admitted Fyfe's statement as an excited utterance. (A389).

After finding Ogno's body, Fyfe was hysterical while talking to her mother. Fyfe testified at trial, over objection, that she "ran over" to the police when they arrived and told them: "I know who did this, I'll tell you everything, I know where he lives, and his name is Paul. (A394-95).

The admission of Jessica Fyfe's statement that Ogno had overdosed and that she knew Van Manen was responsible warrants reversal. A basic requirement of the law of evidence that a witness's statement may be admitted only where grounds exist for "a finding that the witness has personal knowledge of the matter" to which the statement relates. See Fed. R. Evid. 602.

The "excited utterance" exception to the hearsay rule is derived from the belief that contemporaneous statements about observed events leaves less time to forget or fabricate and, therefore, tend to be reliable." *United States v. Gonzalez*, 764 F.3d 159, 169 (2d Cir. 2014). But the excited utterance exception does not obviate the requirement that the declarant have personal knowledge of the subject of her report. See Fed. R. Evid. 803 advisory committee's note ¶ 3 (noting that hearsay exceptions identified in rule are subject to Fed. R. Evid. 602 requirement of firsthand knowledge). "An assertion of fact based on conjecture and surmise, to which the declarant would not be allowed to testify if called to the witness box, does not become admissible under an exception to the hearsay rule merely because it was uttered out of court in a state of excitement." *Brown v. Keane*, 355 F.3d 82, 90 (2d Cir. 2004) "Mere excitement… not coupled with knowledge of the event described, adds nothing to reliability. When a declarant, alarmed by the sound of

gunshots, speculates in a state of excitement as to the identity of a shooter she does not see, that speculation is not reliable." *Id*.

As Van Manen consistently argued, the testimony was inadmissible because Fyfe had no personal knowledge, as required by Rule 602 of the Federal Rules of Evidence. (Tr. 554). Her statement, though excited, was speculation and conjecture. Even if it qualified as an excited utterance under Rule 803(2), it was inadmissible under Rule 403 of the Federal Rules of Evidence because its probative value was substantially outweighed by a danger of unfair prejudice and confusing the issues. When Fyfe screamed that words to the effect that "Paul" did it, she was basing her statement on her long-term observations, not what drug caused his death on that particular day or night. She had no knowledge of when, where, or how Ogno obtained the drugs resulted in his death.

Fyfe's trial testimony demonstrated this. Fyfe testified that she had learned Ogno used Xanax and oxycodone shortly after they started dating, more than a year earlier. When Ogno was in "detox" in 2016, Fyfe saw text messages from a supplier named Angel demanding money, and she paid Angel to help Ogno "move on." In the beginning of 2017, Fyfe learned that Ogno was using heroin, that he bought first from a supplier named Anthony Francese, and then from "Paul." She begged Ogno to stop using narcotics, but he continued. Fyfe testified that Ogno

16

was like a "zombie" by November 2017.  (A391-93).  Fyfe was aware that Ogno had met Angel at a gym called Retro Fitness Center.  Fyfe did not know when Angel had last supplied Ogno with narcotics. (A396).

Fyfe did not see Ogno on November 30 or December 1, 2017.  She worked long hours on November 30th, then went shopping with her mother on December 1, 2017.  Alarmed that she had not heard from Ogno, she went to his house, found his mother passed out drunk on the floor, and broke into Ogno's room where she found him dead. (A393-94).

Fyfe also testified that Michael Ogno lived with his brother, Anthony Ogno, whose girlfriend Anastasia had died on the way to the hospital due to a prescription pill overdose.  Anthony Ogno was also arrested on December 1, 2017, even though he was not present when Fyfe arrived at the house. (A400).  The cousin of Michael and Anthony Ogno, Andrew Lassen, was a detective in the New York City Police Department, and he was present in the house to "help the family" that night. (A402).  All these circumstances make clear that there were numerous ways for Ogno to obtain a variety of drugs, which could have been laced with fentanyl and resulted in death.  Fyfe's excited utterance undercut Van Manen's ability to argue that he was not a member of the conspiracy charged in the indictment, led by Medin Kosic.

Van Manen testified that, although Ogno sent him money via Money Gram, it was for a prior debt. Van Manen testified that he never got heroin from Medin Kosic after November 29, 2017. (A547). Van Manen denied giving any heroin whatsoever to Ogno on November 30 or December 1, 2017. Van Manen testified that, as verified by phone extractions admitted in evidence, Ogno got a series of eight calls from "Angel Gym," who sold a variety of drugs laced with fentanyl, on December 1, 2017. At 9:30 AM , Ogno called Van Manen and no longer sounded sick, meaning he had gotten narcotics, potentially laced with fentanyl, from another source. (A 548). Van Manen further testified that he was hopelessly addicted to her heroin himself and that, unlike Medin Kosic, he did not sell narcotics for profit. Van Manen's invoked the buyer-seller defense, arguing that fellow addicts, such as himself and Ogno, pooled their money together to prevent themselves from getting sick every four hours. Van Manen denied being a member of Kosic's heroin conspiracy.

Fyfe's excited utterance distracted the jury from the facts, as presented by Van Manen. It was inadmissible under Rules 602, 403, and 803(b) of the Federal Rules of evidence. The statement went directly to the heart of the case with respect to causing the death of Ogno, and its admission requires reversal.

## POINT III:  THE DISTRICT COURT ERRED BY PRECLUDING CROSS EXAMINATION ABOUT FAILURE TO FOLLOW UP ON A LEAD AS TO ANOTHER SOURCE OF NARCOTICS

On May 2, 2019, the Government to preclude the defense from eliciting through Jessica Fyfe that Michael Ogno, on the morning of his death, had repeatedly asked his brother Anthony Ogno for "contact information for another heroin dealer."  Fyfe told the Government that Anthony had recounted this conversation to her when Anthony was released from jail following his December 1st arrest. (A144).  The circumstances were that Fyfe told Anthony that she thought it was Paul who supplied that fatal drugs, and Anthony responded that it could be Paul but it could also be a cousin of Anthony's ex-wife, who was either a heroin dealer or knew a heroin dealer. (A154-55).  When Fyfe later questioned Anthony about this conversation with Michael Ogno, Anthony "denied having such a conversation nor making such a statement to" Fyfe. (A144).  The Government argued that the statement was inadmissible due to the multiple levels of hearsay. *United States v. Cruz*, 894 F.2d 41, 44 (2d Cir. 1990).  Van Manen argued that the statement was admissible as an exited utterance (A154-55), but the District Court, in an Opinion and Order dated May 3, 2019, ruled that it was inadmissible hearsay. (A158-59).

During trial, Fyfe testified that after telling a detective that Paul "did this," she ran into that same detective, Daniel Slevein, at a bakery a few days later. Five days later, Det. Slevin, and his partner, Det. Truscelli, visited Fyfe at her home. During that meeting, Det. Slevin and Det. Truscelli asked her to speak to Anthony Ogno. Although the defense was permitted to elicit from Fyfe that the detectives had asked her to speak to Anthony Ogno, the defense could not elicit the reason. (A394-95). The jury never learned what Anthony Ogno told Fyfe about his brother seeking contact information for another source of heroin on the morning of his death. Nor did the jury learn that Anthony Ogno had told Fyfe that it could have been Paul, but it also could have been his ex-wife's cousin. (A398).

While cross examining Det. Truscelli, defense counsel sought to elicit the substance of Anthony Ogno's statement under a different theory. This time, defense counsel argued that it was not for its truth, but to impeach both Det. Slevin and Truscelli. (A-398). Defense counsel argued that the statement is "material and relevant as to whether the investigation that Truscelli and Slevin were conducting was not just flawed, but biased; that… once they had Paul Van Manen as the target, as the person who presumably sold the heroin, they did nothing with this information, they didn't follow up on it…." Van Manen pointed out that Det. Slevin had to have perjured himself since he denied meeting Fyfe in a baker and

due to irregularities in Det. Slevin's DD5. The District Court again denied Van Manen's application. (A398).

There was ample reason to suspect that the investigation was biased and to doubt Det. Truscelli's claim that he could not remember what Fyfe said during the interview in her home. Det. Truscelli testified that he had personally surveilled Van Manen approximately 100 times (A298), and he admitted he was "not happy" about turning over his file to the Strike Force (A295). Det. Slevin was aware of Det. Truscelli's interest in Van Manen, and he called Det. Truscelli from Ogno's house on December 1, 2017, to tell him that Van Manen was a suspect. (A301). Moreover, when it came time to arrest Van Manen, the Strike Force let Det. Truscelli participate as a courtesy. (A295). Given Det. Truscelli's high level of interest in Van Manen, it impossible to credit Det. Truscelli's claim that, although he accompanied Det. Slevin to interview Fyfe in her home, he had no recollection of what Fyfe said. Det. Truscelli tried to explain away the discrepancy by saying, "If [Det. Slevin] was conducting the interview and it was his case, I mean, I could possibly have not been paying attention." (A302). He characterized Det. Slevin as a "young officer" and said he did not want to "step on his toes." Det. Truscelli claimed to have "no independent recollection" about what Fyfe said about Ogno's death, and he did not recall doing any follow up investigation. (A302). Fyfe

contradicted Truscelli, describing him as "interested" during the interview, and she said he was the one who asked her to reach out to Anthony Ogno. She did so and texted the detectives back. (A403).

Det. Slevin was equally evasive. He testified that he recovered two cell phones from Ogno's bedroom, but examined only one of them because he accepted Fyfe's report that Ogno used only one. (A315-16, 322). Because Det. Truscelli had been the "lead investigator" on the Van Manen investigation, Det. Slevin called Det. Truscelli from Ogno's home and told him that Van Manen might be involved. Five days later, Det. Slevin and Det. Truscelli went to interview Fyfe in her home. (A318-19). Det. Slevin was not permitted to testify what Fyfe said during that interview in her home. But defense counsel was permitted to elicit that Det. Trevin filled out a DD5 that falsely said it was a telephone interview and omitted the fact that Det. Truscelli was present. (A319-20). Det. Slevin testified that he did not discuss the substance of his interview with Fyfe with anybody except Det. Truscelli, not even with other members of the police department. Det. Selvin never followed up on what Fyfe said and never interviewed Anthony Ogno, Angel, or Derek Yung. (A 321-22). Det. Slevin denied telling Fyfe to follow up on her conversation with Anthony Ogno, and he never spoke to Fyfe after that December 6th interview in her home. (A 321).

The limitation on scope of cross examination violated Van Manen's rights under the Confrontation Clause. The Confrontation Clause guarantees a criminal defendant the right to cross-examine government witnesses at trial. See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . ."). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).

One way of discrediting a witness is "cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." Id. "The motivation of a witness in testifying, including her possible self-interest and any bias or prejudice against the defendant, is one of the principal subjects for cross-examination." *Henry v. Speckard*, 22 F.3d 1209, 1214 (2d Cir. 1994).

[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness. *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986).

## CONCLUSION

For the foregoing reasons, this Court should vacate Van Manen's

conviction.

Dated:   May 11, 2020

/s/Donald Yannella, Esq.

CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times Roman proportional font and contains 4,950 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated:  May 11, 2020

<u>/s/ Donald J. Yannella, Esq.</u>

# SPECIAL APPENDIX

**i**

## TABLE OF CONTENTS

**Page**

Judgment of the United States District Court,
  Southern District of New York, filed
  October 16, 2019, Appealed From.......................... SPA-1

AO 245B (Rev. 09/19)   Judgment in a Criminal Case          (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

## Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) |
| PAUL VAN MANEN | ) Case Number:  S4 18 CR 30 - 003 (PAC) |
| | ) USM Number:  79919- 054 |
| | ) Donald Yanella (212) 226- 2883 |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)          I
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute and Possess with the Intent to | 1/17/2018 | i |
| [ 21 U.S.C. § 841(b)(1) | distribute Heroin and Fentanyl Resulting in Death | | |
| (A)] | | | |

The defendant is sentenced as provided in pages 2 through _____7_____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s)  Underlined Indictments          ☐ is   ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

10/15/2019
Date of Imposition of Judgment

_Paul A. Crotty_
Signature of Judge

Paul A. Crotty, U.S.D.J.
Name and Title of Judge

10/16/2019
Date

SPA-2

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___2___ of ___7___

DEFENDANT:  PAUL VAN MANEN
CASE NUMBER:  S4 18 CR 30 - 003 (PAC)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
Two Hundred and Seventy Six (276) Months on Count I.

☑ The court makes the following recommendations to the Bureau of Prisons:
That the defendant be designated to a facility as close as possible to New York with RDAP. Also, the Court recommends that the defendant stay at the MCC pending appeal.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 3 — Supervised Release

Judgment—Page   3   of   7

DEFENDANT:   PAUL VAN MANEN
CASE NUMBER:   S4 18 CR 30 - 003 (PAC)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Five (5) Years.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    ☐ The above drug testing condition is suspended, based on the court's determination that you
       pose a low risk of future substance abuse. *(check if applicable)*
4.  ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | | | Judgment—Page | 4 | of | 7 |

DEFENDANT: PAUL VAN MANEN
CASE NUMBER: S4 18 CR 30 - 003 (PAC)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page ___5___ of ___7___

DEFENDANT:  PAUL VAN MANEN
CASE NUMBER:  S4 18 CR 30 - 003 (PAC)

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found. The search must be conducted at a reasonable time and in reasonable manner. Failure to submit to a search may be grounds for revocation. The defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

The defendant will participate in an outpatient program approved by the United States Probation Office, which program may include testing to determine whether the defendant has reverted to using drugs or alcohol. The defendant shall contribute to the costs of services rendered based on the defendant's ability to pay and the availability of third-party payments. The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the Probation Officer.

The defendant will participate in an outpatient gambling addiction program approved by the United States Probation Office. You must contribute to the cost of services rendered based on your ability to pay and the availability of third-party payments. The Court authorizes the release of available evaluations and reports, including the presentence investigation report, to the treatment provider.

The defendant be supervised by the district of residence.



AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 5 — Criminal Monetary Penalties

Judgment — Page   6   of   7

DEFENDANT: PAUL VAN MANEN
CASE NUMBER: S4 18 CR 30 - 003 (PAC)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

   If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ _____ 0.00 | $ _____ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement   $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

   ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 6 — Schedule of Payments

Judgment — Page __7__ of __7__

DEFENDANT: PAUL VAN MANEN
CASE NUMBER: S4 18 CR 30 - 003 (PAC)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☑ Lump sum payment of $ __100.00__ due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.